1                     UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
2
    ------------------------------------------------------------
3                                     )
     United States of America,        )   File No. 18CR90
4                                     )   (RWP/CFB)
              Plaintiff,              )
5                                     )
     vs.                              )   VOLUME I
6                                     )
     Robert Phillip Ivers,            )   JURY TRIAL
7                                     )
              Defendant.              )   September 11, 2018
8                                     )   St. Paul, Minnesota
                                      )   Devitt Courtroom
9                                     )
    ------------------------------------------------------------
10
            BEFORE THE HONORABLE ROBERT W. PRATT AND A JURY
11              UNITED STATES DISTRICT COURT JUDGE
                          **(JURY TRIAL)**
12
    <u>APPEARANCES</u>
13
     For the Plaintiff:        Assistant United States Attorney
14                             JULIE ALLYN, AUSA
                               TIMOTHY RANK, AUSA
15                             300 South Fourth Street
                               Suite 600
16                             Minneapolis, Minnesota 55415

17   For the Defendant:        Kelley Wolter & Scott, P.A.
                               DANIEL M. SCOTT, ESQ.
18                             BRETT D. KELLEY, ESQ.
                               Suite 2530
19                             431 South Seventh Street
                               Minneapolis, MN 55415
20
     Court Reporter:           MARIA V. WEINBECK, RMR-FCRR
21                             1005 U.S. Courthouse
                               300 South Fourth Street
22                             Minneapolis, Minnesota 55415

23

24
            Proceedings recorded by mechanical stenography;
25   transcript produced by computer.

```
 1                          (1:50 p.m.)

 2              (IN COURT WITH THE JURY PRESENT)

 3                PRELIMINARY JURY INSTRUCTIONS

 4         THE COURT:  Please be seated.  United States

 5    District Court, the District of Minnesota, United States of

 6    America versus Robert Phillip Ivers, Defendant.

 7              Preliminary jury instructions.  You'll note that

 8    the first page is a table of contents that you can go back

 9    to if you want.  These will be available for you in the jury

10    room.

11              Preliminary instruction number 1.  Preliminary

12    instructions.  Members of the jury, before the lawyers make

13    their opening statements, the Court gives you these

14    preliminary instructions to help you better understand what

15    will be presented to you and how you should conduct yourself

16    during the trial.  You are to consider these instructions

17    together with any oral instructions given to you during the

18    trial, and the written instructions given at the end of the

19    case and apply them as a whole to the facts of the case.  In

20    considering these instructions, you'll attach no importance

21    or significance, whatever to the order in which they are

22    given.

23              Preliminary instruction number 2, general, this is

24    a criminal case brought by the United States of America

25    against the defendant Robert Phillip Ivers.  The defendant
```

1     is charged with one count of Threatening to Murder a United

2     States Judge, and one count of Interstate Transmission of a

3     Threat to Injure The Person of Another.  The charges against

4     the defendant are set out in an indictment, which I will

5     summarize for you.

6            An indictment is simply an accusation.  It is not

7     evidence of anything.  The defendant has pleaded not guilty

8     to the crimes charged against him, and he is presumed

9     innocent unless or until proved guilty beyond a reasonable

10    doubt.

11           The superceding indictment charges in Count 1 that

12    on or about February 27, 2018, in the State and District of

13    Minnesota, the defendant, Robert Phillip Ivers, did threaten

14    to murder a known United States judge, with intent to

15    retaliate against such judge on account of the performance

16    of the judge's official duties, in violation of Title 18,

17    United States Code, Section 115(a)(1)(B).

18           The superceding indictment charges that Count 2,

19    that on or about February 27, 2018, in the State and

20    District of Minnesota, the defendant Robert Phillip Ivers

21    knowingly and willfully did transmit in interstate or

22    foreign commerce a communication, specifically a phone call

23    to attorney A, and the communication contained a threat to

24    injure the person of another, a federal judge, in violation

25    of Title 18, United States Code, Section 875(c).

1          It will be your duty to decide from the evidence

2     whether the defendant is guilty or not guilty of the crimes

3     charged against him.  It is your duty to find based on the

4     evidence what the facts are.  You are entitled to consider

5     that evidence in the light of your own observations and

6     experiences in the affairs of life.

7          You may use reason and common sense to draw

8     deductions or conclusions from facts that have been

9     established by the evidence.  You will then apply those

10    facts to the law that I give you in these and in my other

11    instructions and in that way, reach your verdicts.

12         You are the sole judges of the facts, but you must

13    follow the law as stated in my instructions whether you

14    agree with it or not.

15         Do not allow sympathy or prejudice to influence

16    you.  The law demands of you just verdicts, unaffected by

17    anything except the evidence, your common sense, and the law

18    as I give it to you.

19         You should not take anything I may say or do

20    during the trial as indicating what I think of the evidence

21    or what I think the verdicts should be.

22         Finally, please remember that only the named

23    defendant, not anyone else, is on trial here, and that this

24    defendant is on trial only for the crimes charged, not for

25    anything else.

1         Preliminary instruction number 3, outline of

2    trial.  The trial will proceed in the following manner.

3    After I conclude with these preliminary instructions, the

4    government will make an opening statement.  Next, the

5    defendant's attorneys may, but do not have to, make an

6    opening statement.  An opening statement is not evidence,

7    but is simply a summary of what each party expects the

8    evidence to be.

9         The government will then present evidence and the

10   attorneys for the defendant may, but have no obligation to

11   cross examine any witnesses.  Following the government's

12   case, the defendant may, but does not have to, present

13   evidence, testify or call other witnesses.  If the defendant

14   calls witnesses, the government may cross examine them.

15        After presentation of evidence is completed, I

16   will instruct you further on the law.  The attorneys will

17   then make their closing arguments to summarize and interpret

18   the evidence for you.

19        Like opening statements, closing arguments are not

20   evidence.  After that, I will provide you with some

21   instructions on deliberations, and you will then retire to

22   deliberate on your verdicts.

23        Preliminary instruction number 4, elements of the

24   offenses.  In order to help you follow the evidence, I will

25   now give you a brief summary of the elements of the crimes

1    charged, which the government must prove beyond a reasonable

2    doubt to make its case.

3         The crime of Threatening To Murder a United States

4    Judge, as charged in Count 1 of the indictment, has two

5    essential elements, which are:

6         One, the defendant made a threat to murder a

7    United States Judge.

8         Two, the defendant intended to retaliate against

9    such judge on account of the performance of the judge's

10   official duties.

11        A threat for the purposes of Count 1 is a

12   communication that a reasonable recipient who is familiar

13   with the context of the communication would interpret as a

14   threat of injury.  A statement may qualify as a threat even

15   if the defendant did not intend to carry out the threat, did

16   not have the ability to carry out the threat, did not

17   subjectively intend for the recipient to understand the

18   communication as a threat, and even if the defendant

19   communicated the threat to someone other than the intended

20   victim.

21        The crime of interstate transmission of a threat

22   to injure the person of another, as charged in Count 2 of

23   the indictment, has three elements, which are:

24        One, the defendant knowingly sent a communication

25   containing a threat to injure another person.

1          Two, the communication was sent in interstate

2     commerce; and three, the defendant sent the communication

3     for the purpose of issuing a threat or with the knowledge

4     that the communication would be viewed as a threat.

5          In determining whether the defendant's

6     communication was sent for the purpose of issuing a threat

7     or with knowledge that the communication would be viewed as

8     a threat, you may consider all the circumstances surrounding

9     the making of the communication.

10          For example, you may consider the language,

11     specificity and frequency of the threat, the context in

12     which the threat was made, the relationship between the

13     defendant and the threat recipient, the recipient's

14     response, any previous threats made by the defendant, and

15     whether you believe the person making the statement was

16     serious, as opposed to mere idle or careless talk,

17     exaggeration or something said in a joking manner.

18          You may draw inferences about the defendant's

19     subjective intent by considering how a reasonable person

20     would understand the defendant's communication.

21     Circumstantial evidence is sufficient to prove a defendant's

22     mental state, direct evidence is not required.

23          An expression of an intent to injure in the past

24     may be circumstantial evidence of an intent to injure in the

25     present or future.

1          "To send a communication in interstate commerce,"

2     end of quote, means to send it from a place in one state to

3     a place in another state.  The communication containing the

4     threat can be handwritten, typed, oral, telephonic, e-mail,

5     text message, or any other form of electronic communication.

6          You should understand, however, that what I have

7     just given you is only a preliminary outline of the elements

8     of these charges.  At the end of the trial, I will give you

9     a final instruction on these matters.  If there is any

10    difference between what I told you and what I tell you in

11    the instructions I give you at the end of the trial, the

12    instructions given at the end of the trial must govern you.

13         Preliminary instruction number 5, presumption of

14    innocence.  The defendant, Robert Phillip Ivers, is presumed

15    innocent and, therefore, not guilty.  This presumption of

16    innocence requires you to put aside all suspicion that might

17    arise from the arrests or charges or the fact that the

18    defendant is here in court.

19         The presumption of innocence remains with the

20    defendant throughout the trial and alone is sufficient to

21    find him not guilty.  The presumption of innocence may be

22    overcome as to the defendant only if the prosecution proves

23    beyond a reasonable doubt each element of the crimes charged

24    against him.

25         Preliminary instruction number 6, a reasonable

1    doubt.  A reasonable doubt is a doubt based upon reason and

2    common sense and not the mere possibility of innocence.  A

3    reasonable doubt is the kind of doubt that would make a

4    reasonable person hesitate to act.

5          Proof beyond a reasonable doubt, therefore, must

6    be proof of such a convincing character that a reasonable

7    person would not hesitate to rely and act upon it.

8          Each fact that is essential to complete a set of

9    circumstances necessary to establish the defendant's guilt

10   must be proved beyond a reasonable doubt.  In other words,

11   before an inference essential to establish guilt may be

12   found to have been proved beyond a reasonable doubt, each

13   fact or circumstance on which the inference necessarily

14   rests must be proved beyond a reasonable doubt.

15         The burden is always upon the government to prove

16   guilt beyond a reasonable doubt.  This burden never shifts

17   to the defendant for the law never imposes upon a defendant

18   in a criminal case the burden or duty of calling any

19   witnesses or producing any evidence.  The defendant is not

20   even obligated to produce any evidence by cross-examining

21   the witnesses who are called to testify by the government.

22         Unless the government proves beyond a reasonable

23   doubt that the defendant has committed each and every

24   element of the offenses charged against him in the

25   indictment, you must find the defendant not guilty of that

1    crime.  However, proof beyond a reasonable doubt does not

2    mean proof beyond all doubt.

3           Preliminary instruction number 7, equals in court.

4    The fact that this indictment is brought in the name of the

5    United States of America does not entitle the prosecution to

6    any greater consideration than any other litigant would get,

7    but by the same token, the United States is entitled to no

8    less consideration.

9           The issues in this case must be decided on the

10   evidence and on the law.  The parties, the government and

11   the defendant, stand alike as equals before you and this

12   court.  No party is entitled to sympathy or favor.

13          Preliminary instruction number 8, definition of

14   evidence.  I have mentioned the word "evidence" end of

15   quote.  Evidence includes the testimony of witnesses,

16   documents and other things received as exhibits, any facts

17   that have been stipulated, that is formally agreed to by the

18   parties, and any facts that have been judicially noticed

19   that is facts which I say you may, but are not required to

20   accept as true, even without evidence.

21          Certain things are not evidence.  I will list

22   those things for you now.  One, statements, arguments,

23   questions or comments by lawyers representing the parties in

24   the case are not evidence.

25          Two, objections are not evidence.  Lawyers have a

1    right to object when they believe something is improper.

2    You should not be influenced by the objection.  If I sustain

3    an objection to a question, you must ignore the question and

4    must not try to guess what the answer might have been.

5         Three, testimony that I strike from the record or

6    tell you to disregard is not evidence and must not be

7    considered.

8         Four, anything you see or hear about this case

9    outside the courtroom is not evidence, unless I specifically

10   tell you other otherwise during the trial.  Furthermore, a

11   particular item of evidence is sometimes received for a

12   limited purpose only.  That is it can be used by you only

13   for one particular purpose and not for any other purpose.  I

14   will tell you when that occurs, and instruct you on the

15   purposes for which the item can and cannot be used.

16        Finally, some of you may have heard the terms

17   "direct evidence" and "circumstantial evidence."  You are

18   instructed that you should not be concerned about these

19   terms.  The law makes no distinction between direct and

20   circumstantial evidence.  You should give all evidence the

21   weight and value you believe it is entitled to receive.

22        Preliminary instruction number 9, credibility of

23   witnesses.  In deciding what the facts are, you will have to

24   decide what testimony you believe and what testimony you do

25   not believe.  You may believe all of what a witness said,

1    only part of it or none of it.

2         In deciding what testimony to believe, consider

3    the witness's intelligence, their opportunity to have seen

4    or heard the things they testify about, their memories, any

5    motives they may have for testifying a certain way, their

6    manner while testifying, whether they said something

7    different at an earlier time, the general reasonableness of

8    their testimony, the extent to which their testimony is

9    consistent with other evidence that you believe, and

10   anything else that will help you decide what testimony to

11   believe.

12        Preliminary instruction number 10, bench

13   conferences.  During the trial, it may be necessary for me

14   to talk with the lawyers out of the hearing of the jury,

15   either by having a bench conference here while the jury is

16   present in the courtroom or by calling a recess.

17        Please understand that while you are waiting, we

18   are working.  The purpose of these conferences is to decide

19   how certain evidence is to be treated under the Rules of

20   Evidence and to avoid confusion and error.  We will, of

21   course, do what we can to keep the number and length of the

22   these conferences to a minimum.

23        Preliminary instruction number 11, note taking, at

24   the end of the trial, you must make your decisions based on

25   what you recall of the evidence.  You will not have a

1    written transcript to consult, and it may not be practical

2    for the court reporter to read back lengthy testimony.

3    Therefore, you must pay close attention to the testimony as

4    it is given.

5           If you wish, however, you may take notes to help

6    you remember what the witnesses said.  If you do take notes,

7    please keep them to yourself until you and your fellow

8    jurors go to the jury room to decide the case.  And do not

9    let note taking distract you so that you do not hear other

10   answers by the witnesses.  When you leave at night, your

11   notes will be secured and not read by anyone.

12          Preliminary instruction number 12, and this is an

13   instruction that I will frequently remind you of when we

14   recess for the moment or for the day.  I'll call it an

15   admonition.  It's entitled, "Conduct of the Jury."

16          You must decide this case solely on the evidence

17   and the law in these instructions and any additional written

18   or oral instructions that I may give.  You must also keep to

19   yourself any information that you learn in court until it is

20   time to discuss this case with your fellow jurors during

21   deliberations.  To ensure fairness, you as jurors must obey

22   the following rules:

23          First, do not talk amongst yourselves about this

24   case or about anyone involved in it, until the end of the

25   case when you go to the jury room to begin your

1    deliberations.

2         Second, do not talk with anyone else about this

3    case or about anyone involved with it until the trial has

4    ended, and you have been discharged.

5         Third, when you are outside the courtroom, do not

6    let anyone ask you or tell you anything about this case,

7    anyone involved with any news story, rumor or gossip about

8    it, until the trial has ended and your verdicts have been

9    accepted by me.  If someone should try to talk with you

10   about this case during the trial, please report it to me.

11   It doesn't have to be me.  You can tell my law clerk or the

12   courtroom deputy as well.

13        Fourth, during the trial, you should not talk to

14   or speak with any of the parties, lawyers, or witnesses

15   involved in this case, even to pass the time of day, so that

16   there is no reason to be suspicious about your fairness.  It

17   is important not only that you do justice in this case, but

18   that you also give the appearance of doing justice.  If any

19   lawyer, party, or witness does not speak with you when you

20   pass in the hall, it is because they are not supposed to

21   speak with you.

22        Fifth, it may be necessary for you to tell your

23   family, friends, teachers, co-workers, or employer about

24   your participation in this trial, so that you can tell them

25   when you must be in court and warn them not to ask you or

1    talk to you about this case.

2          However, do not provide any information to anyone

3    by any means about this case until I have accepted your

4    verdicts.  That means do not talk face to face or use any

5    electronic device or media such as the telephone, a cell or

6    smart phone, a computer, the Internet, any internet service,

7    any text or instant messaging service, any internet chat

8    room, any blog or any website such as Facebook, My Space,

9    Snapchat, You Tube, Twitter or Instagram to communicate to

10   anyone any information about this case until I accepted your

11   verdicts.

12          Sixth, do not do any research on the Internet, in

13   libraries, in newspapers, in dictionaries or other reference

14   books or in any other way or to make any investigation about

15   this case, the law, or the people involved on your own.

16          Seventh, do not visit or view any place discussed

17   in this case, and do not use internet maps or Google Earth

18   or any other program or device to search for or to view any

19   place discussed in the testimony.

20          Eighth, do not read any news stories or articles

21   in print, on the internet or in any blog about this case or

22   about anyone involved with it, or listen to any radio or

23   television reports about the case or anyone involved with it

24   or let anyone tell you anything about any such news reports.

25   I assure you that when you have heard all of the evidence,

1    you will know more about this case than anyone will learn

2    through the news media, and it will be more accurate.

3           Ninth, do not make up your mind during the trial

4    about what the verdicts should be.  Keep an open mind until

5    after you have gone to the jury room to discuss the evidence

6    with your fellow jurors during deliberations.

7           Tenth, do not decide this case based on "implicit

8    bias."  As we discussed during jury selection, everyone

9    including me has feelings, assumptions, perceptions, fears

10   and stereotypes, that is implicit biases that we may not be

11   aware of.  These hidden thoughts can impact on what we see

12   and hear, how we remember what we see and hear, and how we

13   make important decisions.

14          Because you are making very important decisions in

15   this case, I strongly encourage you to evaluate the evidence

16   carefully and to resist jumping to conclusions based on

17   personal likes or dislikes, generalizations, gut feelings,

18   prejudices, sympathies, stereotypes, or biases.

19          The law demands of you to return a just verdict

20   based solely on the evidence in the instructions I have

21   given you.  Our system of justice is counting on you to

22   render a fair decision based on the evidence not on biases.

23          If at any time during the trial you have a problem

24   that you would like to bring to my attention or if you feel

25   ill or need to go to the rest room, please send a note to

1    the Court security officer who will give it to the courtroom

2    deputy or my law clerk, and he or she will give it to me.  I

3    want you to be comfortable, so please do not hesitate to

4    tell us about any problem.

5           So you've been sitting about 27 minutes.  Do you

6    want to stand and stretch?  And then we'll ask the

7    government if they want to make an opening statement.

8           Ladies and gentlemen of the jury, after we hear

9    from the lawyers on opening, then you will have notebooks.

10   As the instructions have told you, the opening statements

11   and the closings are not evidence, so I sometimes have

12   forgotten to do that, so the courtroom deputies are very

13   helpful.

14          Mr. Rank, would you like to make an opening on

15   behalf of the United States?

16          MR. RANK:  I would, Your Honor.

17          THE COURT:  You may.

18          MR. RANK:  May I proceed, Your Honor.

19          THE COURT:  You may.

20                **OPENING STATEMENTS BY MR. RANK**

21          MR. RANK:  Thank you.

22          Ladies and gentlemen, Robert Ivers knows the power

23   of words.  He knows words can scare you.  He uses his words

24   to scare people, and he likes that his words can scare

25   people.

1          Although, people have a right to say just about

2     anything, even things that we think are offensive or

3     horrific.  There is a line in the law, ladies and gentlemen,

4     a line that if it is crossed, where words are used as

5     weapons, where words are used to scare, to frighten.  If

6     that line is crossed, ladies and gentlemen, that's a crime.

7     You will learn in this case, the defendant Robert Ivers

8     crossed that line on February 27th, of 2018.

9          Now, what happened?  As you heard from Judge Pratt

10    in this case, Robert Ivers has been charged by a Grand Jury

11    by way of an indictment.  And what he's been charged with

12    contained in the indictment is one count of Threatening To

13    Murder a Federal Judge, and one count of Making An

14    Interstate Transmission of a Threat to Injure Person.

15         Both of these counts are based on a threat he made

16    on February 27 of 2018, in which Robert Ivers told two

17    people in the middle of a screaming and swearing and angry

18    rant on a telephone call you don't know the 50 different

19    ways he planned to kill U.S. District Court Judge Wilhelmina

20    Wright.

21         Now, ladies and gentlemen, you will learn in this

22    case that this isn't a case about a single statement taken

23    in isolation or about the words themselves but rather about

24    the totality of what was said by Robert Ivers and what led

25    up to it.  And so in order to understand the threat made by

1    Robert Ivers, you have to understand the background and the

2    context of what he said on February 27 of 2018.

3           To understand the full nature of the threat and

4    how Robert Ivers' anger built and festered over several

5    months because as the Court will instruct, and you've

6    already had some of the preliminary instructions you've seen

7    a bit of this, for you to determine whether Robert Ivers

8    with his words constituted a criminal threat, whether he

9    intended his words to be a threat or whether he knew that a

10   person listening to his words would consider them to be a

11   threat.  You have to know the context what led up to it, his

12   actions, his demeanor, and what he himself, after making

13   that threat, said about the threat.

14          So what was it that made Robert Ivers so angry he

15   talked about killing the Judge?  Well, at this point, I'm

16   going to give you an overview of what the evidence will show

17   in this case and then I'm going to talk a little bit more

18   about the specific areas that I've got up here, but it's

19   helpful I think to have a general understanding of what it

20   was that led up to his statements in the phone call on

21   February 27th.

22          So you will learn in this case that Robert Ivers

23   had a lawsuit.  He filed a lawsuit in front of Judge Wright

24   to enforce a $100,000 life insurance policy.  You will also

25   learn that on June 29, 2017, Judge Wright ruled against

1    Robert Ivers, meaning he wanted to get $100,000.  She ruled
2    against him.

3            In August of 2017, Robert Ivers is extremely
4    upset.  He is extremely upset immediately after getting this
5    order, but his communications about the order start
6    building.  He's very upset.  He starts sending angry letters
7    and accusing Judge Wright of cheating him.  He calls a
8    District Court staff member and tells her he is crazy mad,
9    crazy mad at Judge Wright, and he describes himself during
10   that call as a walking bomb.

11           Now, after that happened, deputy U.S. marshals go
12   out and talk to Robert Ivers.  They tell him that he's
13   scaring people, and they tell him to stop using threatening
14   language about Judge Wright.  That's in September of 2017.
15   You'll learn, ladies and gentlemen, that he doesn't stop.
16   And by February 27, 2018, it's almost nine months after that
17   decision where Judge Wright ruled against him, he is still
18   seething.  He is still angry.  And during the phone call
19   with the lawyers on February 27th, he refers to the 50
20   different ways he planned to kill Judge Wright.

21           You'll also learn, ladies and gentlemen, that
22   after the deputy U.S. marshals of the Marshals Service heard
23   this threat, they went out to talk to Robert Ivers to
24   confront him about what he said, to see if he presented a
25   danger.  And what they found was Robert Ivers after that

1    phone call and again more than nine months now after he had

2    lost his case with Judge Wright, he is still intensely

3    angry.  He is yelling, swearing, pacing and punching the

4    wall during the time that the marshals are talking to him

5    about what he had said on that phone call on February 27th.

6    And he says that he's happy that Judge Wright is scared

7    because "that's the fucking judge that stole my money."  And

8    he says, "if she doesn't sleep very good, too bad."  So

9    that's the overview.

10          Let's talk a little bit more detail about what it

11   was that led up to Ivers' threat on February 27, 2018.  So

12   you're going to learn in this case talking about the lawsuit

13   that he filed on the life insurance policy, you're going to

14   learn that Robert Ivers in about 2011 began living with a

15   person by the name of George Tallman.  Tallman provided

16   Robert Ivers with a room in his apartment, and in exchange,

17   Robert Ivers acted as Tallman's care giver.  Tallman had

18   been designated as a vulnerable adult by Adult Protective

19   Services, and Robert Ivers assisted him with day-to-day

20   needs.

21          In late 2013, a life insurance policy application

22   was submitted to the CMFG Life Insurance Company on behalf

23   of George Tallman.  The policy named Robert Ivers as the

24   beneficiary of that life insurance policy.  The policy was

25   issued in September of 2013.  Application for a second life

 1    insurance policy on Mr. Tallman was applied for and issued

 2    in February of 2014.  And George Tallman dies on April 20 of

 3    2014, ten months from that first life insurance policy and

 4    within a couple of months of the second life insurance

 5    policy.

 6            The total payout on this life insurance policy,

 7    ladies and gentlemen, was $100,000, meaning that if George

 8    Tallman died, Robert Ivers could submit a claim.  Well, he

 9    didn't.  After George Tallman died, Robert Ivers submitted a

10    claim for $100,000, and the insurance company, for some

11    reason as you'll learn a little bit more about this case,

12    denies the claim.  The lawsuit ended up in United States

13    District Court, because Ivers sued on the claim, and the

14    insurance company in this case filed a counter suit,

15    counterclaim alleging that the application for the life

16    insurance policies contained false information about George

17    Tallman's health.

18            So you learn that this lawsuit that was filed by

19    Robert Ivers against the life insurance company and the

20    insurance company counterclaimed ended up in United States

21    District Court in Minnesota before United States District

22    Court Judge Wilhelmina Wright.

23            Now, Judge Wright, as you'll learn in this case,

24    sits in a courtroom on the third floor of this courthouse.

25    And as part of her official duties, the Judge described one

1    of the elements of the offense of threatening to murder a

2    judge in retaliation for the performance of her official

3    duties, as part of her official duties, she presides over

4    civil and criminal cases, including the case against the

5    insurance company that was brought by Robert Ivers.

6              You'll learn, ladies and gentlemen, that the case

7    went to trial in January of 2017.  You'll also hear that

8    although Robert Ivers was originally represented by two

9    attorneys in his case, they withdrew from representing him

10   before the case went to trial.  And so by the time of trial

11   in this case, Robert Ivers was representing himself.

12             You'll learn a term, for those of you who don't

13   know it, he represented himself in what's called a pro se

14   capacity.  That just means a person representing themself.

15             You'll also learn that the trial is what's called a

16   bench trial, and what that means is that there was no jury.

17   The Judge was the one that was making the decision in the

18   case.  And so in this case, this was going to be a decision

19   made by Judge Wright without a jury.

20             So as I said, ladies and gentlemen, the trial took

21   place in January of 2017.  It started on January 9th of

22   2017.  But there were some preliminary proceedings in the

23   case after it was filed, and the case didn't move as fast as

24   Robert Ivers wanted.  And so when he was trying to get the

25   case moving forward, he was trying to get the case scheduled

1    for trial, he sent letters within intimidating threatening

2    language to try to get the Court to schedule his trial.

3    Because what you'll learn in this trial, ladies and

4    gentlemen, is that when Robert Ivers wants something, when

5    he is not getting what he wants, he uses words to try to

6    frighten people into doing what he wants.

7         So, for example, while he was trying to get his

8    case scheduled for trial, he sent letters to the Court.  In

9    those letters, one of those letters, a portion of one of

10   those letters in which Robert Ivers was demanding his

11   hundred thousand dollars and demanding a trial.  And as part

12   of those letters, ladies and gentlemen, to emphasize his

13   demands, he included a warning.  In that same letter, he

14   told the Court that he was "in dire fucking straits."  And

15   said, "I am becoming a very dangerous person."

16        Now, ladies and gentlemen, you will learn that

17   there are law enforcement officers who part of their job is

18   to provide protection and security to federal judges.  We

19   have deputies from the United States Marshal Service like

20   Deputy Farris Wooton, who Judge Pratt introduced him

21   earlier, he is sitting with us at counsel table.  And one of

22   the things that the Marshal Service does is followup on

23   threats that are directed at judges to try to determine

24   whether threats are real and whether the people making those

25   threats present a danger.

1           And you'll learn, ladies and gentlemen, that in

2    response to these letters, one of the deputy's colleagues, a

3    person by the name of Deputy U.S. Marshal Jeff Hattervig,

4    who you will hear from at trial, met with Robert Ivers to

5    talk about some of the threatening language he was using in

6    his letters.

7           The conversation between Deputy Hattervig and

8    Robert Ivers, it was fully recorded.  You're going to hear

9    the entirety of that recording at trial.  And one of the

10   things that Deputy Hattervig tried to do was to try to get

11   Robert Ivers to stop using threatening language that he was

12   using, to tell him that his words were scaring people.

13          This, ladies and gentlemen, is an excerpt of one

14   of the things that Deputy Hattervig told Robert Ivers.  He

15   said, okay, this guy's raising a red flag saying he's

16   dangerous.  Does that mean he's going to try and kill the

17   Judge or something?  We've got to take that stuff seriously,

18   you know.  This is what Deputy Hattervig is telling Robert

19   Ivers on January 24th of 2017.

20          Now, after he was warned by Deputy Hattervig,

21   "stop it, you're scaring people with your words."  Robert

22   Ivers actually said, "I'll stop."  Mr. Hattervig, once they

23   make a decision, one this trial is done, there's going to be

24   no more letters.  It's over with.  This is it.  Nothing

25   more.  January 4, 2017.

1           The trial, ladies and gentlemen, started five days

2    after this, January 9th of 2017.  It lasted two days.  It

3    was, as I mentioned before, a bench trial, meaning no jury.

4    It was a case that was tried directly to Judge Wright.  In

5    the two days of trial, Robert Ivers representing himself and

6    the lawyers representing the insurance company presented

7    testimony from witnesses and other exhibits.  There was

8    examination, cross-examination and argument by both parties

9    including Mr. Ivers.  And the trial finished on

10   January 10th.

11          And a few months after that trial, Judge Wright

12   issued her order deciding the case.  She issued a 29-page

13   written order with her decision in that case, and her

14   decision in that case was that Robert Ivers' claim for

15   breach of contract was denied.  She concluded that Robert

16   Ivers lost the case.

17          She also concluded that the life insurance company

18   who had had a counterclaim alleging that there was false

19   information in the application, that their counterclaim for

20   rescission of those contracts, that was granted.  And she

21   granted that the life insurance company's counterclaim based

22   on a conclusion, and that conclusion was that there was

23   willfully false and/or intentionally misleading information

24   that was contained in the language or its application,

25   information about George Tallman.

1          Now, ladies and gentlemen, you will learn that

2     this order issued on June 29th of 2017 made Robert Ivers

3     angry.  It made him extremely angry.  And you will learn

4     that his anger grew and festered over time.  And the object

5     of his anger, you will learn, was Judge Wright.  The person

6     he was directing his anger at was the person he was angry

7     with.  And so you'll know this because you will see letters

8     that Robert Ivers wrote to Judge Wright and to others after

9     this order was issued that show that Robert Ivers' anger is

10    building.

11         One of those letters that he sent which he

12    referred to Judge Wright as corrupt, went to the Chief Judge

13    in the United States District Court here in Minnesota, Chief

14    Judge Tunheim.  And in that, Robert Ivers referred to Judge

15    Wright as a corrupt judge.

16         He sent a very similar letter directly to Judge

17    Wright referring to her as corrupt Judge Wright and writing

18    on the outside of the envelope "pay attention."

19         He sent letters, it wasn't just the envelopes, he

20    sent letters and envelopes that accused Judge Wright of

21    cheating him, remanding redress.  This went directly to

22    Judge Wright, and he sent similar letters with that same

23    demand to the Chief Judge of the District Court and another

24    judge in the District of Minnesota.  It wasn't just the

25    envelopes.  The letters themselves contained other

1    allegations against Judge Wright.  Robert Ivers claimed that

2    the Court cheated him, that she was a biased judge, that

3    Judge Wright treated him unfairly, that Judge Wright

4    discriminated against him, that she was stacking the deck

5    against him, and that he claimed that Judge Wright disliked

6    him, had a bench trial to assure his loss.  He felt set up

7    or claimed that he was set up by Judge Wright.

8           These letters, ladies and gentlemen, show what he

9    was angry about and, more importantly, with who he was angry

10   at.  Most of these letters were sent in August of 2017, and

11   it wasn't just letters.  It was also phones call because

12   you'll hear from a witness that the deputy clerk for Chief

13   Judge Tunheim who got a call from Robert Ivers on August 23

14   of 2017.

15          And in that phone call, Robert Ivers was very

16   upset with Judge Wright.  He was communicating to the court

17   employee to convey to the Chief Judge how upset he was with

18   Judge Wright, and he said he was crazy mad.  He described

19   himself in that call as "a walking bomb."

20          And you'll learn, ladies and gentlemen, after the

21   series of letters that was sent to Judge Wright and to

22   others and after he called the court employee describing

23   himself as crazy mad and a walking bomb, that the deputy

24   marshals of the Marshal Service once again went out to talk

25   to Robert Ivers.

1          They went out to see him again, as he presents a

2    danger, and this time Deputy Wooton along with Deputy

3    Hattervig went out to speak to Robert Ivers.  And when they

4    talked to him, they did a few things.  First of all, they

5    told him that he was scaring people.  That his words were

6    scaring people.  Again, this is reminding him of what he had

7    been told back in that January conversation with Hattervig.

8          You'll hear a recording of this conversation, but

9    here are a couple of excerpts.  One of the things that he

10   said was when you call yourself this, what I talked to you

11   about before, when you call people in the courts, they get

12   frightened like when you said, "hey, I'm a ticking time

13   bomb."  And Robert Ivers said, "I am."  And Hattervig says,

14   "but, see, they sometimes take that as threatening."  And

15   Robert Ivers said, "yeah."

16         Deputy Hattervig again tells him that he is

17   scaring people with his words, "When you say I'm a ticking

18   time bomb, people are going to think that you're going to

19   hurt them."

20         You'll also hear, ladies and gentlemen, that in

21   these calls Robert Ivers again describes himself as crazy

22   angry with Judge Wright.  He said he understood that his

23   words were scaring people.  And when the deputy talked to

24   him, they said, stop, and told him to stop because they

25   didn't want him to get locked up, that what you're doing is

1    threatening.

2           Now, that call, ladies and gentlemen, this

3    interview, ladies and gentlemen, was on September 1st of

4    2017.  It's a couple months after the order in which Judge

5    Wright issued where she decided that Robert Ivers had lost

6    the case.  And a few months go by after this, and in

7    November of 2017, Robert Ivers decides he's got another way

8    of trying to get the money from the insurance policy.  What

9    he does is he files a new lawsuit in Federal District Court,

10   a new lawsuit but basically the same facts of the first

11   lawsuit that he lost in front of Judge Wright trying to make

12   a claim on the late insurance policy.

13          The lawsuit was assigned in Federal District Court

14   in Minnesota in front of a different judge.  This time not

15   Judge Wright, but you'll learn that when the lawsuit came

16   in, a Magistrate Judge, it's sort of an assistant judge who

17   helps out with the processing of cases in federal court,

18   rejected the new lawsuit because it did not state a claim,

19   and that Magistrate Judge did one other thing.  The

20   Magistrate Judge referred Mr. Ivers to the Pro Se Project.

21          Now, you're going to learn in this case that the

22   Pro Se Project is an organization that pairs up pro se

23   parties, people that are representing themselves, with

24   volunteer lawyers in the City of Minneapolis and St. Paul.

25   And it's intended to provide them with some assistance in

1    moving the case along or deciding what to do in this case.

2    In this case, Mr. Ivers was in the beginning right after he

3    filed the lawsuit, that was then rejected by the Magistrate

4    Judge.

5           As a result of being referred to the Pro Se

6    Project, Robert Ivers was connected up with two lawyers from

7    the Fredrikson & Byron law firm.  Two people by the name of

8    Lora Friedemann and Ann Rondoni Taverneier.  The lawyers

9    agreed to speak with Mr. Ivers to do what's called a phone

10   consultation, to talk with him about the new case that he

11   filed, and they set up a time to call each other on February

12   27 of 2018.

13          You'll learn, ladies and gentlemen, in February 27

14   of 2018, Robert Ivers was living with his sister in West

15   Fargo, North Dakota.  The two lawyers he was talking to were

16   in a law firm in Minneapolis.  They called Mr. Ivers from a

17   speaker phone in their office.  Mr. Ivers was at his

18   sister's residence at North Dakota.

19          The call lasted a total of about 30 minutes.  And

20   about 20 minutes into the call, after they had finished

21   talking about the new case, the new lawsuit that Robert

22   Ivers had filed, Robert Ivers began talking about Judge

23   Wright.  Robert Ivers began talking about this case before

24   Judge Wright.  And Lora Friedemann, who will testify in this

25   trial, will tell you it was as if a flip was switched.  That

1    Robert Ivers became intensely angry.  He was screaming on

2    the phone.  He was swearing, and his anger was entirely

3    focused on Judge Wright, not the insurance company, not the

4    loss of the case, but that judge who stole my future.

5         He said in the call, "she stole my life from me.

6    She stacked the deck to make sure that I lost."  He also

7    told the lawyers that after he got the decision from Judge

8    Wright, he tried to schedule a new court hearing to try to

9    get a new trial, and that Judge Wright cancelled the

10   hearing, and he said she was lucky she cancelled the hearing

11   during that phone call.  I'm speaking calmly.  I'm saying

12   this calmly, but he's saying at the time on the phone call

13   he is screaming, and he said during that call that she was

14   lucky that she cancelled the hearing because he was going to

15   start throwing chairs.

16        You will learn that his angry rant continued and

17   escalated.  The lawyers didn't really say anything.  They

18   were stunned.  And at a certain point, Robert Ivers said

19   something that really concerned them.  He said about Judge

20   Wright, "You don't know the 50 different ways I plan to kill

21   her."  The lawyers heard those words, they locked eyes.

22   They were shocked.  They were concerned.

23        Robert Ivers went on for a while, the call wrapped

24   up.  And after the call, Ms. Friedemann and Ms. Rondoni

25   Tavernier talked about it.  Ms. Friedemann has been a

1    lawyer for a long time.  She's been a lawyer for 23 years.

2    She's talked to a lot of people, a lot of people over the

3    course of her career, even people who are not happy with a

4    case or are not happy with a judge and she had never heard

5    anything like this before.  She had never heard anyone talk

6    about plans to kill a judge.

7         She was worried about the safety of Judge Wright,

8    given Robert Ivers' threatening language and the intensity

9    of his anger many months after Judge Wright had ruled on his

10   case.  She was worried that he was going to take some

11   action.  Both Ms. Friedman and Ms. Rondoni Taverneier were

12   shaking, and Ms. Friedemann decided to report the threats,

13   and she did.

14        She reported the threats to the head of the Pro Se

15   Project, to a Judge, Chief Judge here in the District Court

16   of Minnesota, and ultimately to Deputy Farris Wooton.  And

17   when Deputy Wooton heard the threats that had been made to

18   Judge Wright, he took immediate action.  He tracked down

19   Robert Ivers.  He didn't know where he was at first, because

20   he was not living where he had been living when he had the

21   case, and so eventually he tracked down Mr. Ivers at his

22   sister's house in North Dakota.

23        And you will learn that another deputy from North

24   Dakota went out to Iver's sister's residence to speak with

25   Robert Ivers.  At the outset, they wanted to figure out

1    again does he present a threat because why do you care about

2    threats?  You care about threats because of the potential

3    for action.  And at the outset of the interview again, this

4    interview between Deputy Seyfried and Robert Ivers, it was

5    recorded.  You'll hear the recording at trial.  And at the

6    outset of the interview, the conversation with Robert Ivers,

7    you'll learn what Deputy Seyfried told him about why he and

8    another deputy were there.

9           When you hear the recording in this case, ladies

10   and gentlemen, what you will here is a man who is crazy

11   angry, screaming, swearing, pacing and punching the wall.

12   And, again, even though it's nine months after Judge Wright

13   has issued her order denying Robert Ivers' claim on life

14   insurance policy, he is still fixated on the outcome and

15   intensely angry at Judge Wright because his anger has

16   increased even from the last time that the deputies talked

17   to him.

18          You're going to be able to listen to the recording

19   from September of 2017 and listen to a recording from March

20   of 2018 and hear that his anger has actually escalated.  And

21   what you will hear in that recording, ladies and gentlemen,

22   there will also be no doubt that Robert Ivers knew the

23   effect of what he had said.  He knew that his words were

24   viewed as a threat and that was exactly what he wanted.

25   Because as I said at the beginning, Robert Ivers knows the

1    power of words.  He knows his words can scare people.  He

2    uses his words to scare people, and he likes that his words

3    can scare people.

4         So after the deputies went up to him, they asked

5    him about it, what Robert Ivers told them about what he was

6    feeling when he made that phone call, here are some excerpts

7    from that call.  He identified exactly who he was angry

8    with.  He let the deputies know darn well that he knew the

9    effects of his words.  And he said what it was about what

10   had happened that was making him mad.

11        And so after the interview with Deputy Seyfried in

12   West Fargo, Mr. Ivers was charged in this case.  Because,

13   ladies and gentlemen, it is okay to be upset if you lose a

14   civil trial.  It's not unusual.  Nobody likes to lose.  But

15   when the person who loses decides to express his anger by

16   making threats that he knows will scare people, that's not

17   okay, and that's a crime, and that is a crime that Robert

18   Ivers is charged with.

19        Now, ladies and gentlemen, you've already received

20   some instructions from Judge Pratt, the preliminary

21   instructions, and you heard some of the elements of the

22   crimes at issue and some of the things that you can take

23   into consideration.  And you will also be instructed at the

24   end of the trial by Judge Pratt.  You will learn that guilty

25   of the crimes charged, Robert Ivers need not have made a

1    threat directly to Judge Wright.

2         You'll learn that threats can include both verbal

3    and nonverbal communication, that you take into

4    consideration all parts of the threat, including demeanor

5    and other things.  And when determining whether something is

6    a threat and whether the person intended it to be a threat

7    or knew that it would be viewed as a threat, you consider

8    the context in which that threat was made.  And you will

9    learn and be able to assess whether Robert Ivers' statement

10   that he had planned 50 different ways to kill Judge Wright

11   in taking into consideration with everything else he said

12   was a threat.

13        So in the context of this case.  What is the

14   context?  You have extensive evidence showing a man who is

15   angry, intensely angry at one person, at Judge Wilhelmina

16   Wright.  He's fixated on that judge and his case for months,

17   and even though he was repeatedly warned by the Marshal

18   Service, the deputy marshals, that his words were scaring

19   people, that his words were threatening, after he was told

20   repeatedly to stop, stop or you're going to get yourself

21   locked up, even after he was warned, he continued to use

22   words to threaten.

23        It will be nine months after he lost the case

24   still crazy angry on the call with the lawyers screaming,

25   yelling and talking about 50 ways he planned to kill the

1    Judge.  The lawyers were concerned enough to report that to

2    the marshals.

3            The marshals tracked him down to see how seriously

4    they should take that threat to see if he had calmed down,

5    and when they found him, as you will hear in the recording,

6    ladies and gentlemen, they learned that he had not calmed

7    down at all.  They got no comfort that Robert Ivers would

8    not act on his plans, would not act on his words, that he

9    was still raging mad, and that his anger was still focused

10   on one person.  The person he said he planned to kill, and

11   he gave no indication whatsoever that he had abandoned those

12   plans.  Quite the opposite, based on the way he reacted.

13           And so, ladies and gentlemen, the evidence in this

14   case will show that Robert Ivers by his words and by his

15   actions made a threat to murder Judge Wilhelmina Wright,

16   that he knew his words would be understood as a threat, and

17   that his threat was made in retaliation for Judge Wright in

18   the performance of her official duties.

19           And so at the end of this case, ladies and

20   gentlemen, the evidence will have proven beyond a reasonable

21   doubt that the defendant, Robert Ivers, is guilty of

22   Threatening To Murder a Federal Judge, guilty of Interstate

23   Transmission of A Threat to Injure Another.  And at the end

24   of this trial, we will come back and ask you to say so with

25   your verdict.  We'll ask you to find the defendant Robert

1    Ivers guilty.  Thank you.

2              THE COURT:  Mr. Scott?

3                   **OPENING STATEMENTS BY MR. SCOTT**

4              MR. SCOTT:  If I touch anything electric it

5    breaks.  Brett is going to do the work on this.  The old

6    guy's here to do the opening statements and then the younger

7    lawyers get to do the rest of the case.

8              Brett, who just set everything up, his name is

9    Brett Kelley.  I guess you heard it before.  He and I are

10   members of the same law firm.  We've been appointed to

11   represent Robert.  We've been representing him since he was

12   arrested in February, excuse me, on August 20th -- I keep

13   saying that -- April 20th of this year.  He's been in jail

14   now for almost five months, and what he's wanted most is to

15   have his trial so a jury can decide this case.

16             For you it's an important case.  For Bob it's the

17   most important case because he's the person that you are

18   here for.  You're not here for the judge or the prosecutor

19   or anyone else.  You're here because a fellow citizen has

20   been charged with a crime and only a federal citizen, all of

21   them can decide whether or not he's guilty.

22             As the Judge told you at the beginning, this is

23   pretty much unique.  There are basically two places in the

24   world when it's true or two types of places in the world

25   it's true.  It's England and former English colonies.  It's

1       about the only place that you get a jury trial.  Continental

2       law, which is European law, judges decide the case.  The

3       burden of proof is on the defendant to prove he's innocent,

4       not on the government to prove he's guilty.  You can have an

5       idea of what the conviction rate is in those countries.

6               But in the United States, the one thing that they

7       made sure when they put together the United States

8       Constitution was that the right of the citizens to only be

9       judged by their fellow citizens was preserved.

10              We remember back to our history classes, the right

11      of a jury trial in a criminal case was not in the

12      Constitution, and a number of state's legislatures said

13      unless you give it to us so that we can vote it as the Bill

14      of Rights, we are not going to approve this Constitution.

15      So the people who originally wrote it, who are very heavy on

16      the right of contract, and, you know, that slaves will come

17      to the streets of a citizen.  They didn't have everything

18      much thought of as the Bill of Rights.  Those were the

19      plantation landowners and the lawyers.  And it was the

20      citizenry that brought in the Bill of Rights, brought this

21      and kept it going to this day.

22              And it's our privilege to represent Bob.  He

23      swears a lot.  He's crude.  He can be cruel.  I know people

24      like him outside as well.  He falls in maybe on the edge of

25      the mainstream, but he falls into the mainstream.

1          We're going to be cross-examining the witnesses.

2     Bob is going to testify in this case, as is his right.  He

3     will be cross examined and made to look a fool by the

4     prosecution.  He did foolish things.  He should be made to

5     look a fool, but he's not guilty.  He's not guilty because

6     the crime didn't take place.

7          If you think for a while through the government's

8     opening statement, three quarters of the opening statement,

9     probably four-fifths of this trial, they're going to be

10    talking about things, statements that Bob made and things

11    that they call threatening that you are never going to be

12    called to vote on.  They're not charged.

13         The things that they threw up on the wall, the

14    covers to the letters, the quotes, the walking bomb, all of

15    that, none of that is charged in this indictment.  Not a

16    word of it.

17         The indictments give us the charges.  On one day,

18    February 27, 2018, and one phone call, the government says

19    that a threat was made to murder a federal judge and because

20    the phone call was from North Dakota to Minnesota, it was

21    transmitted in interstate commerce.  We have one phone call.

22    We have one statement, 12 words, and we have three witnesses

23    to that statement.  No deputies, no marshals, no nothing;

24    three witnesses to that statement.  He's not charged with

25    anything else.  And you heard the Judge in his preliminary

1    instructions tell you you are only to consider when your

2    verdict comes through what the charges are in the

3    indictment.

4         He's charged with making a threat.  A threat

5    generally is a statement.  It's a communication.  It's a

6    statement.  We usually can tell what it was because it's in

7    writing or it was recorded.  It's a statement made with the

8    intent to injure.  That is the statement itself is an intent

9    to injure.  In this case, murder or injure someone else.

10        I, as a lawyer, theoretically tell you that if I

11   threaten to kill myself, that that might be a crime.  If I

12   transmitted it, but I have some trouble with that.  It's a

13   statement as what I am going to do.  It's not a statement of

14   what I did.  A statement of what I did is a confession.

15        I'm going to punch you is a threat.  Punching you

16   is an assault.  I wanted to punch you is a confession of

17   intent.  It's not a threat because it's the past.  It's to

18   intimidate you as to what I'm going to do to you in the

19   future.  There's a problem with this case.  Major problem

20   with this case.

21        We don't know what was said.  Not only do we don't

22   know what was said, but we, meaning the prosecution in this

23   case, went and investigated this case and charged this case

24   and brought this case almost to the day of trial under a

25   completely different theory of what was said, and that

1    theory was given to them by one of the witnesses, and they

2    went running off ad hoc.

3            Here's what we do know.  We do know because Lora

4    Friedemann testified on June 18th of 2018 under oath in this

5    particular courtroom in a pretrial proceeding as to what she

6    remembered what was said.  And we'll flip it up in a minute,

7    not yet.  And she described an attorney-client privilege

8    conversation that she and another attorney in her office at

9    Fredrikson were having with Bob Ivers.

10           Now, this is important to know these things, to

11   know the context of the statement.  There's no question at

12   all that this was an attorney-client conversation.  That is

13   they were dealing with Bob Ivers through the Pro Se Project

14   as a person who was seeking legal advice and getting legal

15   advice from them.  That's an attorney-client relationship.

16   You don't, unlike the Griffith novel, you don't have to put

17   a dollar out on the table to have an attorney-client

18   privilege conversation.  Attorneys deal with clients all the

19   time that never hire them, but they talk about their case,

20   and they offer them advice about their case.

21           They were referred his case from the District

22   Court.  And if you weren't listening closely, you wouldn't

23   see the tie together.  Bob filed a case in District Court

24   that was assigned to Judge Schultz, who is a -- there's a

25   Magistrate named Judge Schultz, and the Magistrate referred

1    the case to the Pro Se Project that you heard.

2         The case was based upon the same set of facts that

3    have already caused Bob to lose in front of Judge Wright.

4    She had already decided the facts against them.  She was now

5    getting legal advice from these lawyers and part of the

6    legal advice, of course, is to research whether or not those

7    facts were going to preclude him from ever winning the

8    second case, which is what they were there to talk to him

9    about his chance of winning the second case.

10        So this was not something that came out of the

11   blue that he was nursing.  This was a conversation from them

12   as to whether Judge Wright's decision not only did him in on

13   the first case, but does him in on the second case, and he

14   reacted to that with anger.

15        But he reacted to that with anger.  But he reacted

16   to that with anger to people he was talking about in private

17   with his attorneys about his case, where the average person

18   talking to their lawyer would never think that their lawyer

19   can go blasting that statement throughout the world.  It

20   wasn't a communication that was meant to be passed on.

21   That's what the evidence shows.  It was him griping about

22   the person who had cost him his future.  And as the

23   government spent some time showing you, a person who was

24   griping in graphic language.

25        If he had meant it as a threat to be passed on, he

1    never said it.  If they were worried about it as a threat to

2    be passed on, they didn't take the steps to see if he was

3    serious.  They just ended it because he was being really

4    impolite, really impolite.

5           Now, these are not street lawyers.  These are

6    lawyers at Fredrikson.  Lora Friedman is going to come in

7    and tell you that she is one of the -- she won't say she's

8    the top, but she is one of the top intellectual property

9    copyright lawyers around.  She handles trademarks.  She

10   handles reporting licenses.  She handles none of the stuff

11   where you would expect to hear that kind of language.  She

12   handles the Prince estate.  And Ms. Rondoni Taverneier works

13   for her.  She's the young lawyer.  She did all the work, of

14   course.  That's the job of the young lawyers to do all the

15   work.  We get all the glory.

16          The statement is not recorded anywhere.  There is

17   no followup with Bob.  So we have to rely only on memory and

18   that's the memory of those three people.  Can you shift to

19   the second slide?  That's the third.

20          Okay.  On June 18th, she came into this courtroom

21   under oath being questioned by one of the prosecutors, and

22   she said, as you can see up there:

23          "He said, and I'll use his words, 'that f'g judge

24   stole my life from me.  And he said he imagined 50 ways to

25   kill her.'"

1                  "Did he say anything about a plan to kill her?"

2                  "Answer:  No."

3                  Now, I suspect as you will hear from the time line

4      here later, that came as quite a surprise from the

5      prosecutor because they worked from what she told them

6      earlier.  That's just simply not a threat.  I was imagining

7      ways.  I was thinking about ways.  This is simply not

8      threat.  A threat is now or in the future.  It's a lament.

9      It's how mad he had been at her.

10                  At this point, on June 18th, the only statement we

11     have under oath by anyone is the person who reported the

12     supposed threat, and he, she, didn't say he threatened

13     anyone.

14                  Shift to the next one.  The same here, a couple of

15     pages later.  Oh, that actually is, I think, on the same

16     page:

17                  "Did you write down the statements?"

18                  She said, "Yes, I wrote it down

19     contemporaneously."  So she said, "I took the notes, and I

20     wrote it down contemporaneously."  And a little later she

21     said, "I wrote the series of threats verbatim."  Word for

22     word.

23                  Now, you don't know, but you'll find out as you

24     work your way through the case, the one thing that the

25     prosecutor didn't have nor did we, one thing that we didn't

1    have were those notes.  And we'll get to those in a second.

2    Go to the next one.

3          Now, and this gets complicated for us as we're

4    working our way through.  I want to tell you something here.

5    Even though we represent Bob Ivers and even though

6    Fredrikson represented Bob Ivers, and each of us have that

7    same attorney-client privilege so that we can talk to each

8    other within the attorney-client privilege, they have

9    absolutely refused to talk to us at all about what happened

10   with Bob.  Absolutely refused any interviews.

11         Now, on the other hand, even though they have no

12   attorney-client -- they have attorney-client privilege that

13   Bob has never waived with the government, they've been happy

14   to talk to the government on numerous occasions.  So

15   sometimes what I'm anticipating what the evidence is going

16   to be, I'm guessing a little, and here I'm guessing a

17   little.  I'm guessing a little as to whether she wrote it or

18   told it to somebody else.  But, Ms. Rondoni Taverneier said,

19   and I'm quoting here, it's her words, when asked what he

20   said to her:

21         "Something like you don't know the 50 different

22   ways I thought of killing her."  Again, no threat.

23   Statement of past thinking in his head.  And the one thing

24   we still can't in the United States, that's not true in most

25   countries in the world as well, you can't be prosecuted for

1    what you think.  China, thinking bad things about the

2    chairman can put you in jail even if they can prove it with

3    circumstantial evidence.  Not here.

4         I want you to see what happens when they're both

5    writing without talking themselves to the government, when

6    they're not being helped by the government to get in the

7    direction the government wants it to go.  They're

8    consistently talking about him doing things in the past,

9    that is talking about doing things in the past, not then,

10   not a threat that day, but in the past.  So when their

11   memory is free from suggestion, and it's free wheeling,

12   they're remembering past.  That's what they're remembering.

13   Past.

14        The words are a little different.  I imagined.  I

15   thought.  And I will get to the third one, which is when we

16   finally get the notes, which we don't get until a month ago.

17   We don't get the notes because of the attorney-client

18   privilege.  Finally, the Judge ordered it.  They turned over

19   the notes.

20        On the notes, which is slide 5, that's the actual

21   notes.  No, that's me typing them down because we're not

22   pieces of evidence in front of you until they're admitted,

23   but this is what the notes are going to say.  With the

24   quotes:

25        "This f'g judge stole my life from me."  Written

1    down contemporaneously and verbatim.  "I had overwhelming

2    evidence."  Start to notice the tense here?  "Stole my

3    life."  "I had overwhelming testified."  "The Judge stacked

4    the deck," notice the quotes around?  Those are the quotes

5    of Ms. Friedemann.  "To make sure I lost the case."

6           Takes the blame himself, didn't read the fine

7    print, and missed the 30 days to seek a new trial.  And,

8    "she is lucky," in quotes.  "I was going to throw some

9    chairs."  Didn't say he was going to throw them at her.  He

10   was going to have a temper tantrum in the courtroom.  And

11   then when she wrote it down, she wrote down:  "You don't

12   know the 50 different ways I planned," again, past tense --

13   "to kill her."

14          None of that was on the wrong side of the law that

15   makes it a federal crime to threaten to murder a federal

16   judge.  This is not a threat.

17          Well, what happened?  What happened the last

18   month?  And I have double slides.  The same here.  This

19   gives you a hint where the government had been going.  This

20   is in June.  "And did you tell a U.S. Marshal that one of

21   those threats was, 'you don't know the 50 different ways I

22   plan to kill her?'"  The answer, "yes."  So here's what

23   happened.

24          Bob uses a loud voice.  He talks to lawyers who

25   aren't used to dealing with people who aren't of the upper

1    crust.  They, excited about his tone of language, go to the

2    government and say he's planning on killing a federal judge.

3    Well, that's a horse of a different color.  That's what the

4    government works from.

5              So the government's point of view after that is

6    why react when we can overreact?  A little fun here, a

7    little side fun, cynical fun here from a lawyer.  They

8    talked about the work that they did to figure out where he

9    was staying.  They could have looked at the court file,

10   which has the address in North Dakota right there.  They

11   didn't look through the court file.  It's right there where

12   he's living.

13             You know, I don't think it's necessary to offer it

14   as an exhibit.  His address in Fargo.  But it took them a

15   week or so to figure out he's living in Fargo, and so they

16   went up to see him.  And what you will hear when you go back

17   to September, you will hear these other things, is Bob has

18   an issue with authority.  He has an issue with people

19   telling him what to do what he can't do.  He doesn't listen

20   to people.  And you may have seen a little bit of that with

21   my hand going up from time to time, and it will go up from

22   time to time and have the same effect it generally does

23   during this trial.

24             Bob's opening when he sees the police, Bob's

25   opening was always, "Do you have a warrant?"  "No."  "Well,

1    then get out of here.  I don't have to talk to you."

2            Well, on the 14th of March when the deputies came

3    to see him, one, they weren't deputies he knew; but two was

4    he said, "do you have a warrant?"  And they said, "no."

5    And he said, "get out of here."  And they said, "no." They

6    were a little more polite, but they said, "no," four times.

7    He said, "you don't have a warrant, get out of here.  Get

8    off of my property."  Four times, and four times they said,

9    "no."  And the focus is on the Judge in the opening

10   statement.  There, the focus is on the police.

11           "Why are you still here?  I told you to leave.

12   You don't have a warrant.  Get off my property."  He never

13   came outside.  He talked to them from inside.  And he was

14   mad at them.  And he was mad at them.

15           Now, was he still mad at the judge?  Sure, he was

16   mad at the judge.  After all she did.  She did destroy his

17   life.  It's in the nature of being a judge.  I don't want to

18   say anything to you, but that's what they do.  People come

19   to court because they're fighting over very important

20   things, oftentimes money and one wins and one loses.  And

21   they fight federal court, they fight over the biggest things

22   in America.  They fight over the constitution.  They fight

23   over everything.  It's high stakes.  And the other side, one

24   side wins and one side loses.

25           So that's why when you go to court in State Court

1    and Federal, they try to put you through mediation to see if

2    you can work it out so you don't end up with nothing.  It's

3    all or nothing when you have a trial, and people lose, and

4    they're going to resent it, and it's part of being a Federal

5    Judge.  If they can't take the heat, they shouldn't be in

6    the kitchen.  They've got a lifetime job.  A few swear words

7    are not the end of the world.

8            So the government, when I say "overreact," you

9    haven't heard all of the stuff that's happening.  You'll

10   hear more of it.  So not only are they doing that, they're

11   running to court, and they're getting what I call a 21st

12   century wiretap.  They're tapping Bob's phone.  Not for the

13   words he's saying, but for every time he is using it and

14   everywhere he goes.  They know everywhere he goes, as long

15   as he's got the phone in his pocket.  They know his every

16   movement for a month.

17           And you're going to hear Deputy Wooton, I think,

18   testify that, oh, my God, he left North Dakota and headed to

19   Minnesota where he spent most of his life.  The address is

20   they know he resided.  And, oh, my God, we've got to get an

21   arrest warrant.  And he went running to get an arrest

22   warrant.  And, of course, he turned around and went back

23   because he came down to do some business and came back.

24           In fact, he's going to testify that he came down

25   on a Greyhound bus, came down to Hopkins, which is where he

1    is from, and did some banking because he's going to buy a

2    car and turned around and took the bus back up, got snowed

3    in in Alexandria and then went up and rode his bicycle

4    through the snow in Fargo and actually was able to buy a

5    car.  And a week and a half later, a little over a week and

6    a half later, a whole bunch of guys in black armor,

7    automatic weapons, come rushing into his house and arrest

8    him.  He's been there ever since.

9         He's got no felony convictions.  Lifelong citizen.

10   That gives you an idea of how important, and based on what

11   one sentence isn't all that important.  It's really

12   important.  It's important enough that he spent five months

13   in jail just awaiting his trial for an offense that never

14   took place.

15        So what do we know from some of this?  We

16   literally know that the people who are going to testify

17   don't know exactly what was said because their memory is

18   different from what they wrote down.  It's different than

19   what they told the government.  Other than coming in here,

20   the government has it in their head that it's planned, that

21   he's planning on killing a federal judge because that's what

22   they're reacting to.  And their reactions, at least in their

23   mind, are reasonable at that point because we had a guy who

24   has actually plotted against a federal judge.  And so that's

25   what they're all moving this from.

1            Every time they talk to Friedemann or Taverneier,

2     that's what they're talking about.  They're talking about a

3     plan.  And he said plan, and worst of all is they're being

4     agreeable.  Until the notes actually come out and the

5     government is looking and says, wait a minute, this is

6     vastly different.  Well, Taverneier said, "I'm not sure what

7     was said anymore."  Friedemann, who has testified to two

8     different versions, probably not sure either anymore.  We

9     won't know until we hear from her which one she's adopted

10    for today.

11            Well, what about the other 80 percent of the

12    evidence that we've heard about in the opening statement, we

13    heard about at the trial, but it's not charged.  Let's start

14    with that.  It's not charged.  And what it means when it's

15    not charged is the other problem conveniently then because

16    it's not charged, the government doesn't have to prove it.

17    You're never going to vote on it.  It's just mud being

18    thrown up a whole wall.  Bob would use a different word than

19    "mud" to see whether it would stick.

20            And the government can be sanctimonious about it,

21    as they will be about the use of the language because, well,

22    we're just putting it in to show we warned him.  No, they're

23    not.  That's not why they went through all of that.  They're

24    putting it in to make you think that those are threats even

25    though they're not, even though they're not charged as

1    threats, to leave you open so that you, who are not lawyers,

2    and you are going to hear the instructions once in your

3    life, are going to swing their way for something that is not

4    against the law.

5             But I'll tell you something, within all those

6    facts, within all those facts we're going to see maybe a

7    real touch of truth too.  Yeah, Bob likes to swear at

8    judges.  He likes to tell them they're corrupt, but that bad

9    language is just language.

10            And if you look closer at the evidence, it shows

11   Bob is a blowhard.  He's talk.  He's just talk.  And when

12   you hear more about the trial of this case, and you will

13   hear more about the trial in this case from both the

14   government and to some extent from Bob, familiar of the

15   facts from Bob, is he really doesn't understand how to try a

16   case.

17            You'll see his filings that he makes in court

18   because those things that the government has shown you,

19   they're part of a 40, 50-page filing, and he files the same

20   stuff over and over again with two extra pages each time.

21   So some of the filings are really long, but it's all in

22   there.  And it shows he really has no understanding at all

23   of the Rules of Evidence, how to put evidence in, what are

24   facts in such a way that the Judge can consider what's

25   facts.  He has no idea what they are.

1          But he's convinced to the righteousness of his

2     cause and that's what's in there, and he wants everyone else

3     to be convinced of it.  And he gets really frustrated when

4     he can't get his point across, so then he starts saying

5     things like when am I ever going to get my trial?  I'm

6     liable to have to sleep on the street tonight.  I've got no

7     place to live.  When am I getting my trial?  And because of

8     that, he can be taken advantage of, and he was in this case,

9     you know.

10          Let's get a little into the weeds here, but Bob

11     was the beneficiary of two life insurance policies.  He's

12     going to tell you they didn't do, you know, it's a classic

13     mail order kind of insurance company.  Send the stuff to us,

14     check off the things on there.  We don't check it unless we

15     got to pay and then we check.

16          Well, you know, Bob's opinion is that, you know,

17     that his answers that I was feeling pretty good that his

18     friend's answers were pretty accurate.  Well, the guy died

19     two months later after the second one.  They probably

20     weren't very accurate, and he lost his case, but they didn't

21     start checking, of course, until after he made a claim, and

22     then they said, no.  So he sued them.

23          He brought a lawsuit in State Court on the

24     contract.  Where?  Remember those planters.  The right of

25     contract is guaranteed by the Constitution.  And the right

1    of a jury trial on common law claims is guaranteed by the

2    Constitution, and in Minnesota that means something.  And so

3    he was entitled to a jury trial.  And then they removed the

4    case to Federal Court.  The insurance company did, maybe

5    because they thought they would get a better shake.  I don't

6    know.  We're not going to ask them.  They'll never tell us

7    anyway.

8            They removed it to Federal Court, and the Federal

9    Court said you've got a constitutional right, but you've got

10   to claim it.  They wrote the rules.  You have to make a

11   special claim to get a jury trial even though it is your

12   constitutional right.  It's Rule 38.  They're both Rule 38,

13   State and Federal.  And Bob had filed his case in State

14   Court where he didn't have to make that request.  The case

15   got removed to Federal Court where he did.

16           And in November, two months before the trial, the

17   Court issued a text order, they didn't sign it.  It was a

18   text order, and send it to him and said you seem to think

19   you're going to get a jury trial.  You're seriously wrong

20   because you to, you had to make a formal request under the

21   rule, and you had this time slot to make it, and you didn't

22   see the rule.

23           Now, when you read it, and it will get into

24   evidence because it's one of the documents, the government

25   has got it in one of their documents, and we have in one of

1    ours.  When you read it, you realize that the order said you

2    needed to make a request for a jury trial while this case

3    was still in State Court where you lost it, where you don't

4    have to make the request.  Too bad, so sad.  You don't get a

5    jury trial.

6           Now, I find it very interesting to see the Court

7    cite all of those rules and then not mention, oh, by the

8    way, there's an out clause in the next rule that you could

9    make a motion to ask me to give you a jury trial, even if

10   you get booted under the rules.  We find that nowhere, that

11   hint of that pro se person that you can make a motion to get

12   your funds back, not there.

13          And he sends back, which is the government's

14   exhibit by the way, docket 89, he sends back what's going on

15   here?  Nobody explained to me what's going on here.  And

16   that basically is what prompted the marshals to see him on

17   January 4th was him suddenly realizing that he had been

18   cheated out of his jury trial.  And so he says what you saw,

19   how can she deny me my jury trial and then give me a fair

20   trial?  Another reasonable thing to think about not for a

21   lawyer but for a layman, that's a reasonable thing.  You

22   just treated me out of a jury trial, and now you're going to

23   decide the case.

24          And there may be some other evidence that comes in

25   by other people.  We don't know.  The prosecutor didn't talk

1     about it in their opening statement.  I'm not going to talk

2     about it, because the government has told me that they're

3     not going to use it, is he's written stuff to other judges.

4     Well, and he's called the answering services of other judges

5     and said bad things, and he's not charged with that either

6     here.  And he's never been convicted of anything.  I take

7     that back.  He's never been convicted by a trial judge or a

8     state judge.

9          So people keep saying we're giving him notice.

10    The answer is is they're giving him notice, and they don't

11    like what he says when it's on the correct side of the line,

12    and what they're really saying is we're waiting for you.

13    We're waiting for you.  Step over the edge of that line, and

14    we're going to nail you.  That's what they're saying.  There

15    isn't even subtlety about it.  Well, he didn't this time

16    either.  He didn't step over that line.

17          He's been at this for 65 years of life.  This is

18    not the time, and these are not the facts to change where he

19    has been.  He's a citizen.  He's never been convicted of a

20    felony in his life.  He doesn't need to end his final years

21    any different than when he got there, not based upon a

22    conversation where we don't know what he was said, we know

23    wasn't recorded, and proof beyond a reasonable doubt.

24          When we come back at the end of the case, we're

25    going to ask you for a not guilty verdict on these two

1    counts for this one call on this one day in February of

2    2018.  Thank you.

3             THE COURT:  Ladies and gentlemen, we'll be in

4    recess until 3:45.

5                       (Recess at 3:30 p.m.)

6                       (3:45 p.m.)

7             IN OPEN COURT WITH JURY PRESENT

8             THE COURT:  Okay, please be seated.  Okay, we're

9    now at the part of the proceedings where the government will

10   present evidence.  So counsel for the United States, you may

11   proceed.

12            MR. RANK:  Thank you, Your Honor.  The United

13   States calls Terianne Bender.

14            THE COURT:  Ms. Bender, would you place yourself

15   in the jury box and after you do so, if you stand and face

16   the ladies and gentlemen of the jury, raise your right hand,

17   please.

18            (WITNESS TERIANNE BENDER SWORN UPON HER OATH AS

19   FOLLOWS:)

20            THE WITNESS:  I do.

21            THE COURT:  Please be seated.

22                       **DIRECT EXAMINATION**

23   BY MR. RANK:

24   Q.  Good afternoon, Ms. Bender.

25   A.  Good afternoon.

1    Q.   Ma'am, you have been in the courtroom many times but

2    never testified before?

3    A.   That's correct.

4    Q.   Okay.  What do you do for a living?

5    A.   I am the courtroom deputy for Judge Wilhelmina Wright, a

6    U.S. District Court Judge.

7    Q.   What does a courtroom deputy do?

8    A.   A courtroom deputy takes care of the Judge's courtroom

9    calendar.  They act as the liaison between the Judge and the

10   attorneys and/or litigants, answer the phone.  I docket

11   everything on our electronic docket for the Judge.  That

12   would be notices, different orders, things like that.

13   Q.   Is one of the things that you deal with are pro se

14   filings as well?

15   A.   Correct.

16   Q.   And you mentioned briefly both civil and criminal cases.

17   Can you describe briefly for the jury the difference between

18   those two kinds of cases?

19   A.   A civil case is when one party or company is suing

20   another party or company, and a criminal case is when the

21   government brings charges against a defendant for breaking

22   the law.

23   Q.   And so focusing on the civil kinds of case, how does a

24   civil case begin and how does it end, typically?  Let's talk

25   about how does it begin?

1    A.  They file a Complaint against the other party saying

2    they did something wrong usually.

3    Q.  If there's a lawsuit, it's going to be somebody who is a

4    plaintiff against the defendant?

5    A.  Correct.

6    Q.  And then again, typically, how does a civil case end?

7    A.  A civil case could end through settlement.  It could end

8    through, for instance, they could bring what's called a

9    dispositive motion, which might end the case if the Judge

10   rules in their favor, so it might be dismissed.  Or it

11   would, if those things don't happen, it would go to trial,

12   and it could be a jury trial or a bench trial or it would

13   reach a verdict or the Judge would make a decision.

14   Q.  Generally, a civil case starts with a Complaint, and it

15   ends with either settlement, dismissal or a trial?

16   A.  Correct.

17   Q.  Are there also some proceedings that take place in the

18   middle of that?

19   A.  There are.  The attorneys often file motions.  There's a

20   couple different types.  There's non dispositive motions,

21   which are kind of -- well, they don't take care of the case.

22   They're in between the case, and those are heard by the

23   Magistrate Judges that we have, and then there are

24   dispositive motions, which would take care of the case if

25   it's decided a certain way, so like a motion to dismiss.  If

1    that's granted, then the case goes away.  So the dispositive

2    motions would be heard by the district judge.

3    Q.  And so you made a distinction between a District Court

4    Judge and a Magistrate Judge, are Magistrate Judges kind of

5    like assistants to judges?

6    A.  I guess you could say that.  They're not appointed by

7    the President like District Judges.

8    Q.  They're there to assist the District Court Judges

9    though.

10   A.  Right.

11   Q.  And they handle some in between proceedings?

12   A.  Yes.

13   Q.  Is it occasionally are some you mentioned the word

14   "dispositive motions."  Dispositive motion is a motion or

15   something that can either get rid of or deal with some

16   portion of the case?

17   A.  Correct.

18   Q.  So either it could end in dismissal or it can end up in

19   some parts of the case being dismissed?

20   A.  Correct.

21   Q.  Is it from time to time, are some dispositive motions

22   referred to the Magistrate Judges?

23   A.  Yes, sir.

24   Q.  And then they rule on those as well?

25   A.  The Magistrate Judge would not rule on a dispositive

1    motion.  What they would do is they would examine it, and

2    they would make a recommendation to the District Judge to

3    say, you know, looking at all the evidence, this is why we

4    believe you should rule this way.  And the District Judge

5    looks at it and is free to agree with it or not agree with

6    it or.

7    Q.  So it's what's called a Report and Recommendation?

8    A.  It is.

9    Q.  And going back to the types of cases that you talked

10   about, the civil and criminal cases, is a District Court

11   Judge like Judge Wright who you work for handle all of those

12   cases or those kinds of cases, both civil and --

13   A.  Both civil and criminal.

14   Q.  And forgive me if I asked this, because it's one of the

15   elements of the case, is that her official duty is when

16   she's handling those kinds of cases?

17   A.  Yes.

18          COURT REPORTER:  Could you please turn your

19   microphone on?  Thank you.

20   A.  I project really well at being a courtroom deputy

21   though, don't I?  Can you hear me now?

22   Q.  It's better with the microphone.

23   A.  Yes, it is.

24   Q.  Ma'am, I'm going to show you --

25          MR. RANK:  First of all, Your Honor, may I

1    approach the witness?

2              THE COURT:  You may.

3    BY MR. RANK:

4    Q.  Ms. Bender, I'm going to put a number of folders up on

5    the witness stand.

6    A.  Okay.

7    Q.  And I may ask you about several of these, but I'm going

8    to ask you, first of all, about -- of course, the one I was

9    going to ask you about does not appear to be in here.  It's

10   27.  Take a look at what's been marked for identification as

11   Government's Exhibit 27.  Do you recognize that?

12   A.  Yes, it's a photo of my Judge.

13             MR. RANK:  I offer 27.

14             MR. KELLEY:  No objection.

15             THE COURT:  Received.

16   BY MR. RANK:

17   Q.  This is Judge Wilhelmina Wright, is that correct?

18   A.  Correct.

19   Q.  How long have you worked for Judge Wright?

20   A.  Two and a half years.

21   Q.  And as part of your job working as a courtroom deputy

22   for Judge Wright, you deal with the attorneys.  You also

23   deal with other litigants, is that correct?

24   A.  Correct.

25   Q.  And as part of your job in this case, do you

1   recognize -- part of your job, do you recognize the

2   defendant in this case?

3   A.  Yes.

4   Q.  And how is it that you recognize the defendant in this

5   case?

6   A.  Mr. Ivers appeared before Judge Wright for a civil case.

7   Q.  And he filed a lawsuit; is that correct?

8   A.  Yes, he did.

9   Q.  And that lawsuit was assigned to Judge Wright?

10  A.  Correct.

11  Q.  If you take a look in front of you, Ms. Bender, there's

12  a folder entitled Exhibit 20 on it.  Do you recognize that?

13  A.  Yes.

14  Q.  And generally speaking what is that?

15  A.  It is a certified copy of a printout of our electronic

16  docketing system.

17  Q.  And is that what's also referred to as like a docket

18  sheet?

19  A.  Yes.

20  Q.  And an ECF docket sheet?

21  A.  Yes.

22  Q.  What does ECF stand for?

23  A.  Electronic Case Filing.  It's the system that we use to

24  docket everything that happens on the case, the

25  communications, if you will, between the attorneys and the

1    Judge, so if she issues an Order, it will appear on the

2    docket.  If we schedule a hearing, it will appear on the

3    docket.

4    Q.  If the parties file something, will it appear on the

5    docket?

6    A.  Yes, it will appear on the docket, yes.

7    Q.  And what docket sheet is that case for?

8    A.  This is for 15CV1577, and that would be Ivers v. CMFG

9    Life Insurance Company.

10   Q.  So this was the case that Robert Ivers filed that was

11   then assigned to Judge Wright?

12   A.  Correct.

13   Q.  And you talked about --

14        MR. RANK:  Well, first of all, I would offer

15   Exhibit 20 at this time.

16        MR. KELLEY:  No objection.

17        THE COURT:  Received.

18   BY MR. RANK:

19   Q.  So the docket sheet lists pretty much everything that

20   happens in the course of a case?

21   A.  Right.

22   Q.  And it lists everything that's filed in the case; is

23   that correct?

24   A.  Correct.

25   Q.  And what are the ways in which something can get entered

 1    onto the docket sheet?

 2    A.  Court staff could do it like, for instance, myself.  Or

 3    the attorneys can do that.  Sometimes pro se or

 4    self-represented litigants can do it if they fill out a form

 5    and get permission to file it electronically, they can do it

 6    then.

 7    Q.  Okay.  So attorneys who practice in federal court can

 8    file things electronically, and it ended up on the docket

 9    sheet?

10    A.  Correct.

11    Q.  Court staff can file things on the docket sheet?

12    A.  Yes.

13    Q.  And you said that sometimes pro se parties can also file

14    things that end up on the docket sheet.  Are there two

15    different ways that can happen?

16    A.  Yes.  They can, as I said, get permission to do it and

17    file it electronically themselves.  Or if they don't have

18    that permission or don't request it for some reason, they

19    can mail in what they want to be on the docket and then our

20    clerk's office usually sends it to the chambers and then the

21    chambers will say, okay, go ahead and put this on the

22    docket.

23    Q.  Okay.  So let me break that second way down.  Who is the

24    person in a judge's chambers that deals with pro se filings

25    if they come to the chambers such that they get on to the

1      docket sheet?

2      A.  The courtroom deputy, myself.

3      Q.  Can you, looking at Exhibit 20, I'm going to pull

4      Exhibit 20 up, so the jury can see what we're talking about.

5      This is the first page of Exhibit 20; is that correct?

6      A.  Correct.

7      Q.  And it's a little fuzzy, so I'm just going to blow up a

8      portion at the top that we talked about a little bit.  It's

9      a little bit better when we blow it up, do you see that?

10     A.  Yes.

11     Q.  And that reflects that it's Ivers v. CMFG Life Insurance

12     Company and that it's assigned to Judge Wilhelmina M.

13     Wright, is that correct?

14     A.  Correct.

15     Q.  And also in the portion I blew up it references Robert

16     Ivers, do you see that?

17     A.  Yes.

18     Q.  And, generally speaking, what was the nature of this

19     lawsuit, Ms. Bender?

20     A.  Mr. Ivers had been living with a gentleman who had taken

21     out or that there was a life insurance policy issued, and

22     then Mr. Ivers was the beneficiary on those policies, and

23     the gentleman passed away, and the life insurance company

24     refused to pay it out, and Mr. Ivers was suing him.

25     Q.  Okay.  And does that also reflect that the insurance

1    company countersued Mr. Ivers?

2    A.  Yes, on the next page.

3    Q.  Do you recall what the basis was?

4    A.  For fraudulently applying for the life insurance.

5    Q.  Okay.  So does it appear based on Exhibit 20, the docket

6    sheet, that at least initially Mr. Ivers was represented by

7    counsel?

8    A.  Yes, it does.

9    Q.  And that's listed on the "represented by" portion under

10   Mr. Ivers' name, correct?

11   A.  Correct, the Demetri Lametti.

12   Q.  Was this case originally assigned to Judge Wright?

13   A.  No, it was not.

14   Q.  Can you tell the jury what date the case was originally

15   brought into Federal Court?

16   A.  That I can.  It was filed on March 23, 2015.

17   Q.  Was it originally filed in State Court, do you know?

18   A.  I can tell you in a minute.  Yes.  In Hennepin County.

19   Q.  And so was there something that's called "removal of the

20   case?"

21   A.  Yes.

22   Q.  What does that mean?

23   A.  First docket entry shows that it was removed from the

24   Fourth Judicial District.  It means that it was

25   originally -- Mr. Ivers originally filed it in State Court,

1    and then the insurance company asked that it be heard in
2    Federal Court.
3    Q.   Okay.   And what's the docket entry for that?
4    A.   Docket number 1.
5    Q.   So if we go to -- we have to go to page 3, I think.   I
6    pull that very first entry up.   It shows that the case was
7    removed into Federal Court on March 23rd of 2015.   Is that
8    correct?
9    A.   Correct.
10   Q.   And you said it was not originally assigned to Judge
11   Wright, is that correct?
12   A.   That is correct.
13   Q.   Do you know what judge it was originally assigned to?
14   A.   Yes, docket number 32 down, it says it was initially
15   assigned to Judge Michael J. Davis.
16   Q.   I'm blowing that up on the docket sheet; is that
17   correct?
18   A.   Yes.
19   Q.   Was there another judge in between Judge Davis and Judge
20   Wright?
21   A.   Yes, there was.   Docket number 35 on page 5 and 6.   It
22   says, "Order of recusal," which means Judge Davis felt he
23   had some sort of conflict with the case, and so he recused,
24   and it was reassigned randomly to Judge Susan Richard
25   Nelson.

1    Q.  And then if you go I think it's docket number entry

2    number 41 on the next page?

3    A.  Yes, and so then Judge Wright was appointed, and this is

4    one of the cases that they then reassigned to her as a new

5    judge.

6    Q.  And that will let us know when it was that this case was

7    then assigned to Judge Wright?

8    A.  Yes, February 18, 2016.

9    Q.  Shortly after the case was reassigned, did Mr. Ivers

10   start representing himself?

11   A.  Yes.

12   Q.  Can you tell that by looking at I think it's on the same

13   page on the docket entry number 46?

14   A.  Yes.

15   Q.  What does that show?

16   A.  It shows that his -- it's a motion to withdraw as

17   attorney for plaintiff by Mr. Lametti.

18   Q.  What's the date?

19   A.  March 21, 2016.

20   Q.  Okay.  And then was that motion granted?

21   A.  It was granted, docket 51, on April 5th.

22   Q.  And does that mean that from April 5, 2016, forward that

23   Robert Ivers was representing himself?

24   A.  Correct.

25   Q.  That's what's referred to as pro se?

1    A.   Pro se, yes.

2    Q.   There is, moving down on the same page, Ms. Bender, I'm

3    going to ask you about docket number 55.  It says on page 7

4    of Exhibit 20, blowing it up, could you tell the jury what

5    that means?

6    A.   That would mean that, as we discussed before, Judge

7    Wright chose to refer all motions to the Magistrate Judge,

8    not just the non-dispositive motions that the Magistrate

9    Judge would normally hear, but anything that might be filed

10   like a motion to dismiss would also be heard by the

11   Magistrate Judge and then a Report and Recommendation would

12   be issued to Judge Wright to make the final decision.

13   Q.   And so can you tell by looking at the docket sheet

14   whether there were any dispositive motions that were made?

15   A.   Yes.

16   Q.   I'm going to show you I think it is docket entry number

17   79, and can you tell the jury what that shows?

18   A.   Yes.  That is what the Magistrate Judge's chambers

19   docketed saying that there was a Report and Recommendation

20   and then it actually lists out the recommendation for the

21   different motions, which is the summary judgment motion,

22   which is it's not really like a motion to desist, but they

23   say we win the case.  There doesn't need to be a trial.

24   There's so much evidence, it's done.  So they have filed

25   that, and the Magistrate Judge had a hearing, and this is

1    their Report and Recommendation.

2    Q.  It looks like some parts of the motion were granted and

3    some were denied; is that correct?

4    A.  Yes.

5    Q.  What does that mean?

6    A.  It means that some parts were not going to go forward to

7    trial, but other parts were going to.  The case was not

8    settled.  The case was still going to move forward to trial.

9    Q.  Okay.  So after this, it meant that some portion of the

10   case was at least continuing to move forward?

11   A.  Correct.

12   Q.  And is that reflected, I'm highlighting, I'm going to

13   try to highlight the last full sentence in there saying the

14   only claim that would remain is Ivers' claim for breach of

15   contract.  Do you see that?

16   A.  Yes.

17   Q.  Is that the portion of the Report and Recommendation

18   that recommends that that part of the case move on to trial?

19   A.  Yes.

20   Q.  Okay.  Now, if we look at the bottom of that entry,

21   there's a CC that's on the bottom.  Do you see that?

22   A.  Yes.

23   Q.  What does that reflect?

24   A.  That would reflect what happens when the electronic

25   docket when I file something, for instance, and both parties

1     are represented by attorneys, the system automatically

2     generates a message to those attorneys and says this is

3     filed.  If a person, a litigant does not have that

4     electronic access, then what they do is they photocopy or

5     not photocopy but print out that entry, and they actually

6     physically mail it by U.S. mail to the person.

7     Q.  So if you're an attorney that has access to ECF, if

8     something gets on the docket sheet, you get an immediate

9     notice like through an e-mail, typically?

10    A.  Correct.

11    Q.  And if someone does not have access to ECF, a pro se

12    litigant may get it in a paper copy?

13    A.  Right, the clerk's office would do that.

14    Q.  And is that what that reflects is a paper copy of this

15    Report and Recommendation would have been provided to Mr.

16    Ivers?

17    A.  Yes.

18    Q.  Okay.  So I want to ask you next, take the highlighting

19    off here and hopefully this works quickly, Ms. Bender, about

20    docket number 84.  Do you want to take a look at that?  That

21    happens to be on the next page.  This is page 10 of Exhibit

22    20.  And can you tell us what is shown in docket number 84?

23    A.  Yes.  It's a notice by the Magistrate Judge chambers

24    that she has set a settlement conference.  It gives the date

25    and the time and the location, which is the Judge's chambers

1    before Magistrate Becky Thorson.

2    Q.  What is a settlement conference?

3    A.  Usually in a civil case, what the Magistrate Judges do,

4    they always bring in both sides and they talk to them about

5    their case and whether or not what their chances are and see

6    if they can come to some sort of element, so that it doesn't

7    go to trial.

8    Q.  Kind of like a mediation?

9    A.  Yes, very similar to a mediation.

10   Q.  Okay.  And you mentioned that, and I think the docket

11   entry says that the settlement conference was set for

12   January 20th of 2017?

13   A.  Correct.

14   Q.  At 9:00 a.m., and it also gives a location, is that

15   correct?

16   A.  Correct.

17   Q.  And what location was the settlement conference supposed

18   to take place in?

19   A.  In Judge Thorson's chambers.

20   Q.  So would that mean for a settlement conference that the

21   Judge would be present in chambers along with all the

22   parties?

23   A.  Yes.

24   Q.  So Mr. Ivers and anyone from the insurance company?

25   A.  Correct.

1    Q.  Together in a room?

2    A.  Yes.

3    Q.  And not like a courtroom like this but like an office

4    room?

5    A.  Correct.

6    Q.  So does this docket entry show that a notice of

7    settlement conference was sent out to the parties?

8    A.  Yes.  The insurance attorneys, again, would get it just

9    electronically and then it says, "CC Ivers," and then the

10   initials of the clerk's office person who would have mailed

11   it out.

12   Q.  And have I highlighted that correctly what you were just

13   talking about?

14   A.  Yes.

15   Q.  So how was it that Mr. Ivers would have gotten notice of

16   the settlement conference?

17   A.  I'm sorry, can you repeat the question?

18   Q.  So this reflects that it says, "CC Ivers," which means

19   that something was sent to him; is that correct?

20   A.  Correct.

21   Q.  By mail?

22   A.  Yes.

23   Q.  And so would there have been this order for a settlement

24   conference sent out to him?

25   A.  Yes.

1    Q.  Can I ask you to take a look, Ms. Bender, at what's been

2    marked for identification as Government's Exhibit 1.  It

3    should be the folder that's on top of the folders.  Do you

4    recognize that exhibit?

5    A.  I do.

6    Q.  How is it that you recognize that exhibit?

7    A.  I received it in the mail.

8    Q.  And so it was something that was sent to chambers; is

9    that correct?

10   A.  Yes.

11   Q.  Exhibit 1 is an envelope and then some papers inside

12   that envelope?

13   A.  Yes.

14   Q.  And you received that in the mail?

15   A.  I did.

16          MR. RANK:  I would offer Exhibit 1.

17          MR. KELLEY:  No objection.

18          THE COURT:  Received.

19   BY MR. RANK:

20   Q.  I take you to the first page of Government Exhibit 1 and

21   take this in parts.  First of all, does it look like its

22   postmarked October 31, 2016?

23   A.  Yes.

24   Q.  And who is it from?

25   A.  From Mr. Ivers.

1    Q.  And who is it to?

2    A.  It is to Judge Wilhelmina Wright, and it has the

3    chambers of Judge Thorson, but it still came to us.

4    Q.  Can you take the papers out of the envelope, Ms. Bender.

5    First of all, is it a multi-page document?

6    A.  It is, yes.

7    Q.  And does it contain some printed out papers as well as

8    some handwriting?

9    A.  Yes.

10   Q.  I'm going to take you to page 6 of Exhibit 1.  Are we on

11   the same page there?  Let's blow it up on the screen.

12   Sometimes it's easier for us to make sure we're on the same

13   page if you look at the screen in front of you as opposed to

14   the paper.

15   A.  Yep.

16   Q.  Do you see that?

17   A.  Yep.

18   Q.  And what is shown on page 6 of Government's Exhibit 1?

19   A.  This would be the Order from Judge Thorson setting a

20   settlement conference in the Ivers v. CMFG case.

21   Q.  So this would have been the Order that Mr. Ivers would

22   have received by mail?

23   A.  Correct.

24   Q.  That's what the "CC" that we looked at a moment ago

25   reflected?

1     A.  Yes.

2     Q.  And it looks like, again, just like the docket entry had

3     shown that there was a settlement conference scheduled on

4     January 20th to be held in the chambers of Magistrate Judge

5     Thorson; is that correct?

6     A.  Correct.

7     Q.  Okay.  On the next page of that document in there, does

8     it appear that Mr. Ivers has written on that document?

9     A.  Yes, he did.

10    Q.  And I'm going to take you, this is for the record,

11    page 7 of Government's Exhibit 1, and I'm going to blow up

12    the bottom portion of it so you can see it a little bit

13    better.  Do you see that?

14    A.  Yes.

15    Q.  So was this something that came in the mail to you that

16    you opened up as part of your job working for Judge Wright?

17    A.  Correct, yes.

18    Q.  And we see some highlighting that's on there and some

19    red underlining.  Was that there when you got the document?

20    A.  Yes, it was.

21    Q.  So this is how it came to you?

22    A.  Yes.

23    Q.  And this is written on the second page of the notice for

24    settlement conference, correct?

25    A.  Correct, yes.

1    Q.  And so it's written underneath the Order.  There are six

2    points, and it's dated October 14, 2016, correct?

3    A.  Yes.

4    Q.  "This is my frank settlement discussion.  I have mailed

5    the same to the defendants.  I am sick and tired of this f'g

6    BS.  I want my f'g money, and I want the entire hundred

7    thousand dollars.  I will not negotiate.  Have I made myself

8    clear?  I demand my f'g trial now."  Is that correct?

9    A.  Correct.

10   Q.  Do you remember receiving that?

11   A.  Yes.

12   Q.  I want to take you back to the docket sheet.  This is

13   dated October 14, 2016; is that right?

14   A.  Yes, it is.

15   Q.  If we go back to the docket sheet, and we go to page 10,

16   does it appear to you that the settlement conference was

17   cancelled?

18   A.  Yes, it was.

19   Q.  And so was it cancelled after the date of this letter?

20   A.  Yes, it was.

21   Q.  Is there a docket entry for that?

22   A.  October 31, 2016.

23   Q.  Can you tell me, if I blow that up, is that docket entry

24   number 85?

25   A.  Yes, it is.

1    Q.  So that would have been after the handwritten letter

2    that Mr. Ivers had sent?

3    A.  Right.

4    Q.  Now, this document actually came to you was postmarked

5    the 31st October, correct?

6    A.  Yes.

7    Q.  Were there some other pages in there that you saw?

8    A.  Yes.

9    Q.  Let me ask you this, when you got this envelope and went

10   through it, was it concerning to you?

11   A.  It was concerning to me, yes.

12   Q.  And why was that?

13   A.  He was obviously very agitated, and between the language

14   and some of another page he said some things that I

15   considered to be a threat.

16        MR. KELLEY:  Objection, Your Honor.  Legal

17   conclusion.

18        THE COURT:  Sustained.  Ladies and gentlemen,

19   generally, except for people that are qualified by education

20   and training, we do not allow people to give opinions.

21   There's an exception when a nonexpert perceives something,

22   there's a small exception that we let people opine as to

23   their feelings or perceptions at the time.  This is not one

24   of those.  So the legal conclusion that a witness may make

25   that's something constitutes a threat is for you to decide

1    and after being properly instructed.  The objection is

2    sustained.

3             MR. RANK:  Your Honor, I'll ask the question in a

4    latter --

5             THE COURT:  Yes, sir.

6    BY MR. RANK:

7    Q.  How did you find this letter to be?

8    A.  I found it to be concerning.  I took it to Judge Wright.

9    She also -- well, she at that point then asked me to contact

10   the marshals.

11   Q.  Did you yourself perceive it to be threatening?

12   A.  Yes.

13   Q.  And so was one of the reasons you perceived it to be

14   threatening based on I believe it is page 3 of Exhibit 1,

15   was this also contained in the packet of information you

16   received?

17   A.  Yes.

18   Q.  And this one appears to be addressed directly to Judge

19   Wright; is that correct?

20   A.  Yes.

21   Q.  And can you go through and read what you saw when you

22   opened the envelope from Mr. Ivers?

23   A.  Well, the first page he says, "I demand an immediate

24   trial.  The enclosed documents will show the defendants have

25   no case.  Defendants have stalled for three years.  They are

1    holding my money.  And in the meantime, I am suffering.

2    Both sides are ready for trial.  I'm 63 years old."

3    Q.  And if we go on a couple more pages, this also was in

4    the packet that was mailed and you received it?

5    A.  Correct.

6    Q.  And can you go through and read what was on the bottom

7    of that order?

8    A.  "I am f'g broke.  I am in between places to live.  I

9    have no automobile.  It's f'g wintertime.  The whole idea

10    behind life insurance is to protect people.  I have stage

11    one bladder cancer.  I am trying to care for my mentally

12    handicapped brother.  I am in dire f'g straits.  And I am

13    becoming a very dangerous person."

14    Q.  In connection with your perception that this was

15    threatening, were those last two points 8 and 9 part of that

16    conclusion?

17    A.  Yes.

18    Q.  And so after receiving this, you had mentioned that you

19    brought it to the Judge; is that correct?

20    A.  Correct.

21    Q.  And what did you do with it after you spoke with the

22    Judge?

23    A.  She asked me to contact the marshals so that is what I

24    did, and I gave them the packet.

25    Q.  Why would you contact the marshals?

1    A.  The marshals are the security protection detail for the

2    Judges.

3    Q.  Okay.  That's the role they play?

4    A.  That is the role.

5    Q.  And who did you end up talking to somebody about this

6    communication?

7    A.  Yes, the marshal Jeff Hattervig.

8    Q.  And is he a Deputy United States Marshal?

9    A.  Yes, he is.

10   Q.  Is it normal for you to give correspondence in your

11   cases to the Marshal Service?

12   A.  No.

13   Q.  Have you ever had to do it before that?

14   A.  No.

15   Q.  You mentioned, Ms. Bender, that one of the things you do

16   as part your job is to answer the telephone; is that

17   correct?

18   A.  Yes, that's correct.

19   Q.  And did you ever speak with Mr. Ivers in connection with

20   this case?

21   A.  Yes, two or three times.

22   Q.  Was it before or after you received the letter that's

23   shown in Exhibit 1?

24   A.  Honestly, I can't remember.

25   Q.  Do you recall him -- what was the subject matter of his

1    calls?

2    A.  Usually he wanted to know what the delay was, when we

3    would be having trial, those types of questions.

4    Q.  What do you remember about his demeanor during those

5    calls?

6    A.  During the calls, he didn't use language like he wrote.

7    He tried hard, I felt, to be courteous, I guess, in the

8    actual phone calls.  You could tell that when he wasn't, if

9    he didn't think that I was giving him a straight answer,

10   that he would start to get agitated and then he would say,

11   "well, you're just against me," but he wouldn't use language

12   like this.  He was polite.

13   Q.  I don't think I closed the loop on this.  After you

14   received the letter that's shown in Exhibit 1, did you in

15   fact provide it to Deputy Hattervig?

16   A.  Yes.

17   Q.  Do you know if he did anything in response to that

18   letter?

19   A.  I believe that he spoke to Mr. Ivers, and then I know he

20   came back and he spoke to the Judge about what he did to

21   followup.  I was not privy to that specific meeting.

22   Q.  Okay.  Did Robert Ivers' case get scheduled for trial?

23   A.  Yes, it did.

24   Q.  And is that something that's shown in the docket sheet?

25   A.  Yes, it is.

1    Q.  Is it shown on page 10 of the docket sheet?

2    A.  Yes.  The 86 was the trial order and the final pretrial

3    order, so there would be a document attached to that that

4    you don't see all the details in the little text entry, and

5    he would be mailed the actual document that was attached.

6    Q.  And this is giving him notice of when his trial would be

7    scheduled?

8    A.  Correct.

9    Q.  And so this text only entry indicates a few different

10   things; is that correct?

11   A.  Yes.

12   Q.  It shows the date that the trial was scheduled for?

13   A.  Uh-huh (affirmative.)

14   Q.  And what date was that?

15   A.  The actual trial was scheduled for January, January 9th.

16   Q.  Does it also indicate what kind of a trial it's going to

17   be?

18   A.  It does.  It explains that it's going to be a bench

19   trial.

20   Q.  And there's a portion here that I'll highlight and see

21   if this works.  This indicates that there was something that

22   was received by the Court and that it says, "which outlines

23   his expectation," his being Robert Ivers, "expectation that

24   the matter would be tried to a jury."  Do you see that?

25   A.  Correct, yes.

1    Q.   And did it get set on for a jury trial?

2    A.   No, it did not.

3    Q.   What did it get set on to be?

4    A.   It got set to be a bench trial, which is a trial to the

5    Judge.  And the reason is as it explains in here is that

6    litigants have a certain window when they can request a jury

7    trial, has to be so many days after they file their papers.

8    Mr. Ivers did not request a jury trial in the time limit

9    allowed.

10   Q.   Now, Ms. Bender, you talked about three different ways

11   in which information can get onto the docket sheet.

12   A.   Correct.

13   Q.   What is this an example of?

14   A.   This would be an example of something that I put on a

15   text only notice.

16   Q.   And is there a way that we can tell you entered too?

17   A.   Yes, that's my initials right there.

18   Q.   TJB?

19   A.   Yes.

20   Q.   And it references text only notice, is that something

21   that only the Court can do?

22   A.   As far as I know, yes, the one above it was the example

23   of where something is attached, where I attach something,

24   and this text only means there's nothing attached to it.  It

25   is what it is.

1    Q.  So everything that's related to what's going in here is

2    shown?

3    A.  On the face.

4    Q.  On the face, okay.  And so here this is something that

5    you entered into the ECF system, correct?

6    A.  Correct.

7    Q.  And then there's some other information at the bottom

8    that I want to ask you about.  I'm highlighting a portion

9    that says, "CC NEF Ivers," what does that mean?

10   A.  That it was sent to Mr. Ivers by EKL.

11   Q.  Okay.  And it would have been sent to him in some way

12   other than using the ECF system?

13   A.  Correct, yes.

14   Q.  So he would have gotten notice, as it's shown in this

15   entry, that his case was going to be set on for trial, but

16   it was going to be a bench trial, correct?

17   A.  Correct.

18   Q.  Was that an issue?

19   A.  Yes, he was upset about that.

20   Q.  And how do you know he was upset with that?

21   A.  We continued to get filings and phone calls that said

22   Judge Thorson said it should be a jury trial; and,

23   therefore, he believes it should be a jury trial.

24   Q.  Okay.  So if I ask you to take a look at what's in front

25   of you, I think you have Exhibit 2 in front of you in one of

```
 1    the folders.  Am I right?

 2    A.  You are correct, yes.

 3    Q.  And can you describe generally speaking what Exhibit 2

 4    is?

 5    A.  It is the printout of that text only notice that was

 6    sent to Mr. Ivers, and it's a certified copy.  And then he

 7    wrote comments again on the bottom.

 8    Q.  Does it appear if you look at the last page of what's

 9    been marked as Exhibit 2, that it was part of a mailing?

10    A.  Yes.

11    Q.  And is that last page a copy of the envelope?

12    A.  Yes, it is.

13              MR. RANK:  I would offer Exhibit 2.

14              MR. SCOTT:  Is that docket 89?

15              MR. RANK:  I don't believe -- is it docket 89?

16              THE WITNESS:  It says "docket 89" at the top.

17              MR. SCOTT:  No objection.

18              THE COURT:  Received.

19    BY MR. RANK:

20    Q.  So I'm going to start at the end of Exhibit 2, page 5,

21    so we can get a context for it.  Is that a photo copy of the

22    envelope that it came in too?

23    A.  Yes, it is.

24    Q.  And, again, would this have been something that came to

25    you?
```

1     A.  Yes.

2     Q.  Because you handle the pro se filings and cases assigned

3     to Judge Wright?

4     A.  Correct.

5     Q.  And I'm going to take you to the page 1 of Exhibit 2.  I

6     think you mentioned this before.  First of all, at the top

7     of this page, is this a printout of that text only entry

8     that you were just mentioning a moment ago?

9     A.  Yes, it is.

10    Q.  So this would have been the way in which Mr. Ivers

11    received it in paper form, printed out, and sent to him?

12    A.  Correct.

13    Q.  So what I've shown at the top text only notice saying

14    when his trial is scheduled and that it will be a bench

15    trial?

16    A.  Yes.

17    Q.  And then if we go to the bottom of that document, here

18    is some response by Mr. Ivers including him saying, "the

19    above document does not pass the smell test;" is that

20    correct?

21    A.  Yes, it is.

22    Q.  And he continues on to page 3 of that document in which

23    he writes, "I smell a rat."

24    A.  Uh-huh (affirmative.)

25    Q.  And if I take you to page 4 of that document, he says,

1    "has this case become corrupted?  I demand a jury trial or

2    my f'g money.  The Court and defendants know my position and

3    my conditions.  Why the stalling?"  Is that right?

4    A.  Correct.

5    Q.  What date was this document sent?  Can you tell by

6    looking at the post mark?

7    A.  The post mark was November 29th.

8    Q.  Of 2016?

9    A.  2016.

10    Q.  Okay.  Did the case get set on for trial?

11    A.  Yes.

12    Q.  And did the trial take place?

13    A.  Yes.

14    Q.  Is that reflected in the docket sheet, the date of the

15    trial?

16    A.  Yes.

17    Q.  I take you to page 11 of the docket sheet.  I'm ahead of

18    you because I have notes telling me what actually took

19    place, so I'm making you fumble through documents.  I direct

20    you to I think it's page 11 and docket entry is number 96

21    and 97?

22    A.  Yes.

23    Q.  What does that show?

24    A.  Those are what we call minute entries.  Again, there

25    would be something attached to it, but it just lets me know

1    that on 96, I entered minutes for the Court proceedings that

2    the bench trial began on 1-9-2017, and then the next date

3    was only an two-day trial, so then the entry for proceedings

4    held before the Judge and a bench trial was completed on

5    1-10.

6    Q.  Okay.  Lasted two days?

7    A.  Lasted two days, yes.

8    Q.  And it was a bench trial?

9    A.  Yes.

10   Q.  Did the defendant represent himself in that case?

11   A.  Yes, he did.

12   Q.  And was the trial in front of Judge Wright?

13   A.  Yes.

14   Q.  Again, was that part of her official duties?

15   A.  Yes, it was.

16   Q.  Was there anything unusual about the proceedings of that

17   trial?

18   A.  Yes, there was.  Judge, usually on a civil trial --

19          MR. KELLEY:  Objection, Your Honor, is there a

20   question before the --

21          THE COURT:  Was there anything unusual about the

22   proceedings of that trial?  She answered yes, there was, and

23   then she began a narrative.

24          MR. SCOTT:  She answered the question.

25          THE COURT:  She did answer the question.

1    BY MR. RANK:

2    Q.  What was unusual about the trial?

3    A.  Rarely in a civil trial, it's just the jury, if there is

4    one, and the litigants and the attorneys, et cetera, versus

5    a criminal trial where there is the defendant and the

6    security.  So in this particular case, the judge asked me to

7    get courtroom security for this particular civil trial, and

8    so I contacted the marshals, and we had two marshals and one

9    to two CSO's, Court Security Officers, in the courtroom

10   during that trial.

11   Q.  Okay.  And, again, is that common in a civil case?

12   A.  No.

13   Q.  Have you ever had that happen in any other civil case?

14   A.  No.

15           THE COURT:  Mr. Rank, you might have them tell the

16   jurors what a CSO is.  I'm not sure that they know.

17           MR. RANK:  Thank you, Your Honor.

18   BY MR. RANK:

19   Q.  What is a CSO?

20   A.  It stands for Court Security Officers, and we have one

21   in our courtroom right now.

22   Q.  They identify by wearing blue blazers.

23   A.  The one with the blue blazers, yes.

24   Q.  Gray pants?

25   A.  Yes.  And you saw them when you came through the

1   security to get into the building this morning.  That's one

2   of the things they do.

3   Q.  So in addition to the extra security in a courtroom,

4   well, let me ask you, were there witnesses that were called

5   by both sides in that case?

6   A.  There were witnesses that were called by the defendants.

7   Q.  Did Mr. Ivers call himself as a witness?

8   A.  Yes, he did.

9   Q.  Generally speaking, how did he behave at trial?

10  A.  Generally speaking, he did pretty well.  He had good

11  questions and made objections.  You could tell when he would

12  get a bit agitated if an objection by either side was ruled

13  against him.

14  Q.  But he was able to ask appropriate questions?

15  A.  He was able to ask appropriate questions, yes.

16  Q.  And so some of the rulings, did they go in favor of him?

17  A.  I think some of the rulings might have.  Without a

18  transcript, I can't remember.  Occasionally, there were a

19  couple of witnesses where he did ask inappropriate

20  questions, and the judge had to kind of pull him back, but

21  --

22  Q.  Okay.  And you said that sometimes when things -- when

23  the Judge would rule against him, how would you he react?

24  A.  He became frustrated like if the defense attorneys

25  objected, and it was sustained, he would get frustrated.  If

1    he objected, and it was overruled, he would get frustrated.

2    And he did at one point kind of throw up his hands and be

3    like, "You're against me.  I don't know why I bother."

4    Q.  Okay.  But otherwise able to comport himself in the

5    courtroom?

6    A.  Yes, otherwise, he was able to comport himself.

7    Q.  And so, Ms. Bender, it was a two-day trial.  It started

8    on January 9th and finished on January 10th?

9    A.  Yes.

10   Q.  And we've already established it was a bench trial.

11   A.  Correct.

12   Q.  In a bench trial, how does the ruling take place?

13   A.  Well, for instance here, the jury is the finder of the

14   facts, and the Judge is the law.  In a bench trial, the

15   Judge does both roles, they find the facts and the rule on

16   the law.  And so what happens after the trial instead of

17   getting an instant verdict from a jury, both sides in this

18   case were allowed to propose Findings of Fact and

19   Conclusions of Law.  They were given a certain amount of

20   time, and then the Judge issued an order or a findings of

21   facts and judgment when she made her decision.

22   Q.  That's an Order that kind of explains every aspect of

23   the Court decision?

24   A.  Correct, yes.

25   Q.  It's got a legal basis, the factual findings?

1    A.  Right.

2    Q.  And then the conclusion?

3    A.  The conclusion, yes, the judgment.

4    Q.  Did Judge Wright issue written Findings, Conclusions and

5    a Judgment in Mr. Ivers's case against the insurance

6    company?

7    A.  No, against the insurance company?

8    Q.  No.  I guess I asked that question very poorly so let me

9    try again.  Mr. Ivers had a case against the insurance

10   company?

11   A.  Correct.

12   Q.  And the insurance company had a counterclaim against Mr.

13   Ivers?

14   A.  Yes.

15   Q.  Did the Judge issue an order in connection with that

16   case?

17   A.  Yes.

18   Q.  All right.  Is that shown in docket number 104?

19   A.  Yes.

20   Q.  What page is that on?  Can you tell me?

21   A.  11.

22   Q.  So that is 104?

23   A.  104, yes.

24   Q.  We're going to try this again.  And that shows what date

25   was the Findings of Fact, Conclusions of Law and Order for

1      Judgment issued?

2      A.  On June 29, 2017.

3      Q.  You have in front of you, Ms. Bender, Exhibit 21, or

4      what's been marked for identification as Government's

5      Exhibit 21.

6      A.  Yes.

7      Q.  And is that the Findings of Fact, Conclusions of Law in

8      Mr. Ivers case?

9      A.  Yes.

10             MR. RANK:  I would offer Exhibit 21.

11             MR. KELLEY:  No objection, Your Honor.

12             THE COURT:  Received.

13     BY MR. RANK:

14     Q.  Is this the first page of Exhibit 21?

15     A.  Yes, it is.

16     Q.  And I blow it up, it's kind of helpful because up at the

17     top does it tell me how many total pages there are?

18     A.  Yes.

19     Q.  How many?

20     A.  29.

21     Q.  And so does it contain a number of factual findings and

22     a number of legal conclusions?

23     A.  Yes, it does.

24     Q.  I'm going to take you to page 28 of this document, try

25     to.  Does the document show who won the trial and who lost

1     the trial?

2     A.  Yes, it does.

3     Q.  And if I go to the bottom of page 28, who won the trial?

4     A.  The life insurance company.

5     Q.  And who lost the trial?

6     A.  Mr. Ivers.

7     Q.  And so that reflected in paragraph 2 under the Order,

8     and in Exhibit 21, it shows that Robert Ivers' claim for

9     breach of contract was denied; is that correct?

10    A.  Correct.

11    Q.  And in paragraph 1, it shows that the defendant life

12    insurance company's claim, counterclaim to rescind the

13    policies was granted, and the policies were rescinded?

14    A.  Correct.

15    Q.  If you go to page 1, again, of docket or of Exhibit 21,

16    can you tell what the actual counterclaims by the insurance

17    company were?

18    A.  Yes.  The suit basically invalid or to rescind the two

19    life insurance policies because they alleged that the

20    applications were fraudulently filed.

21    Q.  Okay.  And if we go, Ms. Bender, to the last page of

22    Exhibit 21, page 29, Exhibit 21, who wrote this Order?

23    A.  Judge Wright did.

24    Q.  It's part of Judge Wright's official duties?

25    A.  Yes, it is.

1    Q.  You mentioned that Judge Wright made a number of factual

2    findings that were reflected in this Order; is that correct?

3    A.  Yes.

4    Q.  Including that there was information in the application

5    of the policy that was willfully false or intentionally

6    misleading?

7    A.  Correct.

8    Q.  I'm going to take you to page 26 of Exhibit 21, and blow

9    up a portion of this.  Is this one of Judge Wright's factual

10   findings based on the evidence that came in at trial?

11   A.  Yes.

12   Q.  And just kind of ask you to look at the top part, this

13   is paragraph 15 of the document.  And what does that say?

14   A.  It says, "the overwhelming evidence demonstrates that

15   the answer of no in response to question number 8 in

16   application one was willfully false or intentionally

17   misleading."

18   Q.  And then if I take it to the next page, I believe this

19   is page 27 of Exhibit 21, and I'm going to blow up

20   paragraph 19.  Again, there's a second insurance policy, is

21   that correct?

22   A.  Correct.

23   Q.  Did Judge Wright make some findings about whether there

24   was false information that was contained in that second

25   insurance policy application as well?

1     A.  Yes, she did.

2     Q.  What does the first sentence of that paragraph say?

3     A.  "The overwhelming evidence demonstrates that the answer

4     no in response to question number 1 in application 2 was

5     willfully false or intentionally misleading."

6     Q.  And that Judge Wright's finding on this basis was one of

7     the reasons that she ruled to invalidate those insurance

8     policies?

9     A.  Correct.

10    Q.  Did Judge Wright also make some determinations about

11    Robert Ivers' credibility?

12    A.  She did.

13    Q.  Okay.  I'm going to take you to page 19 in Exhibit 21,

14    and I believe it's paragraph 55.  Mr. Ivers testified at the

15    trial, is that right?

16    A.  That's correct.

17    Q.  And so one of the things that a fact finder has to do is

18    to assess the credibility of the witnesses.

19    A.  Yes.

20    Q.  And did Judge Wright find that Mr. Ivers' testimony at

21    the trial lacked credibility?

22    A.  At least some of them because she says all other

23    statements by Ivers about Tallman's condition lacked

24    credibility.

25    Q.  And it looks like she was saying that the Court relies

1      on Ivers' statement that preceded this litigation and are

2      corroborated by other evidence?

3      A.  Correct.

4      Q.  The other statements by him about Tallman's condition

5      lacked credibility?

6      A.  Yes.

7      Q.  Ms. Bender, did you do anything in anticipation of this

8      Order being issued?

9      A.  Yes, I called Marshal Hattervig to let him know that we

10     were getting ready to issue this ruling and that Mr. Ivers

11     might not be happy with the results.

12     Q.  Why did you notify Deputy Hattervig of that?

13     A.  Because of correspondence that we had received earlier

14     from Mr. Ivers, it concerned us how he would react.

15     Q.  And did you do that on your own or did you do that at

16     someone's request?

17     A.  At Judge Wright's request.

18     Q.  So to notify the marshals before it was issued, it gets

19     issued or at least signed by the Judge on the 29th of June?

20     A.  Correct.

21     Q.  2017?

22     A.  Uh-huh (affirmative.)

23     Q.  How was it that Mr. Ivers, did he get notice of this

24     Order?

25     A.  He would have gotten a copy of it by U.S. mail.

1    Q.  Okay.  Let me take you to docket entry number 109, and I

2    think it's also on page 11, but we'll find out.  It's going

3    to be on page 12, I apologize.  So if I take you to 109?

4    A.  Yes.

5    Q.  Does this show in the docket sheet how it was that Mr.

6    Ivers was given notice of the ruling?

7    A.  Well, of the actual ruling it doesn't say how he was

8    given notice of the actual in this docket entry.  It would

9    have been back on the one where it shows that we issued it.

10   Q.  And what docket entry was that?

11   A.  104.

12   Q.  Okay.  So let's do this a little bit better.

13   A.  Okay, so after like there's my initials TJB, and then it

14   says "CC Ivers."

15   Q.  I see.  So this reflects that it would have been mailed

16   to Mr. Ivers?

17   A.  Right, on the 30th because it's modified on 6-30.  I

18   would have printed it out the day after we did it.

19   Q.  Okay.  And let me go back to the thing I was just asking

20   you about.

21   A.  Yes.

22   Q.  And can you tell the jury what is reflected in 109?

23   A.  Yes.  So after Mr. Ivers received the Findings of Fact

24   and the Judgment, then he contacted us, and he wanted to

25   secure a hearing date for a motion for a new trial that he

1    was going to bring.

2    Q.  Okay.  And how was it that he contacted chambers?  Did

3    he contact you?

4    A.  Yes.

5    Q.  And what happened after that?

6    A.  And so the Judge set the hearing date for that and then

7    this gives him directions of help that he needs to file his

8    motion papers consistent with the Local Rule 7.1.

9    Q.  Okay.  So this was something that was communicated to

10   Mr. Ivers?

11   A.  Correct.

12   Q.  There was a hearing date that was placed on the

13   calendar, and also he was given direction on what he needed

14   to do in order to get that hearing?

15   A.  Correct, and he had actually given me a fax number to

16   send him the information.  He left that I believe on a voice

17   mail saying he wanted a hearing date and that we could reach

18   him or communicate with him by the facsimile number.  So

19   that's how we notified him.

20   Q.  Highlighting that portion that says, "Ivers," the Court

21   informed Ivers via facsimile, is that right?

22   A.  Yes (coughing).

23   Q.  Do you need anything?

24   A.  I think I have a cough drop.

25   Q.  Okay, you good?

1    A.  Yes.

2    Q.  So you were the one that actually printed it out and

3    faxed it to Mr. Ivers?

4    A.  Yes.

5    Q.  Okay.

6    A.  Then he would have also received this text only notice

7    because I docketed it.  They would have printed it out in

8    the clerk's office and mailed it to him as well.

9    Q.  Okay.  Does this text only notice also indicate anything

10   about what happened with that hearing date?

11   A.  Yes.  He did not file his motion papers as we had

12   directed him to do, and as the local rules had required, and

13   so we cancelled the hearing.

14   Q.  Okay.  And was that communicated to Mr. Ivers?

15   A.  Yes.

16   Q.  And do you have, first of all, did you hear back from

17   Mr. Ivers after his hearing was cancelled?

18   A.  Yes.

19   Q.  How did you hear back from him?

20   A.  I believe he wrote some more letters.

21   Q.  Let me ask you, we're going to take a look at page or,

22   excuse me, Exhibit 3, what's been marked for identification

23   as Exhibit 3 that's I believe sitting in front of you.

24              THE COURT:  Ladies and gentlemen, you've been

25   sitting for an hour, do you want to take a minute to stretch

1    before counsel continues?  You may do so.

2            Okay, Mr. Rank, I apologize for interrupting.  I

3    think you were questioning the witness about Exhibit 3 that

4    was in front of the witness when I interrupted you.

5    BY MR. RANK:

6    Q.  Do you recognize what's been marked as Exhibit 3,

7    Ms. Bender?

8    A.  Yes.

9    Q.  What is it?

10   A.  It was another mailing received from Mr. Ivers.

11           MR. RANK:  Offer Exhibit 3.

12           MR. KELLEY:  No objection.

13           THE COURT:  Received.

14   BY MR. RANK:

15   Q.  I'm going to take you to the last page of Exhibit 3,

16   which I believe is page 39.  There we go.  And what is shown

17   on page 39?

18   A.  That is the envelope that it came in.

19   Q.  And that is from Mr. Ivers?  It is to the Clerk of

20   Courts, and it looks like it is postmarked?

21   A.  August, well, we received it August 14.  It was

22   postmarked August 10th.

23   Q.  What happened after it went to the Clerk of Court?

24   A.  Then it comes up to chambers.

25   Q.  Is that normal routing if it's a filing in connection

1     with a case assigned to Judge Wright even if it's mailed to

2     the clerk's office?

3     A.  Yes, it is.

4     Q.  Okay.  And did this what's in Exhibit 3 come to

5     chambers?

6     A.  Yes, it did.

7     Q.  So I'm going to take you to now I think this is page 1

8     of Exhibit 3.  Am I showing page 1 up on the screen?

9     A.  Yes.

10    Q.  All right.  And, first of all, it is addressed to a

11    couple of people.  Do you see that?

12    A.  Yes, I do.

13    Q.  Who is the top person that's listed on there?

14    A.  Our Chief Judge John Tunheim and Magistrate Judge Becky

15    Thorson.

16    Q.  And they also work in the District of Minnesota; is that

17    correct?

18    A.  Yes, they do.

19    Q.  And this letter is a letter that has some underlining on

20    it.  Is this how you received the letter?

21    A.  Yes.

22    Q.  I'm going to ask you to take a look at some portions of

23    this and tell us a little bit about it.  This was the first,

24    this is the first page of what's in Exhibit 3, correct?

25    A.  Correct.

1    Q.  And what in general is the thrust of this letter?

2    A.  Two things.  One is he first wants the Chief Judge to

3    overrule Judge Wright in the first one or to have her

4    reverse her own decision.  That's number 4.  And he

5    expresses the number 6 that Judge Wright treated him

6    unfairly from the beginning, and has stonewalled his

7    requests, and that number 8, Judges have unlimited

8    discretion especially with pro se.

9    Q.  I'm going to take you then to page 2 of that exhibit.

10   Is there some more writing on page 2?

11   A.  Yes.

12   Q.  And what's the non handwritten portion of page 2

13   showing?

14   A.  The non handwritten portion, it's our docket entry, a

15   text only notice saying that we entered judgment in favor of

16   the defendant, which is the insurance company.  And this is

17   the same one that says that we informed him by a fax that

18   his request to have a hearing has been cancelled because he

19   didn't file his papers consistent with the local rule.

20   Q.  Okay, and then I'm going to take you to page 6 of this

21   Exhibit 3.  It's a multi-page document; is that right?

22   A.  Yes.

23   Q.  And is this one of the pages that was in that document?

24   A.  Yes.

25   Q.  I'm showing you on the screen.  I'm going to take it

1    down to what it looks like paragraph 0, do you see that?

2    A.  Yes, I do.

3    Q.  And this is part of the 39 pages that was sent in this

4    packet of documents, correct?

5    A.  Yes.

6    Q.  It says, "Judge Wright ignored Mr. Ivers' protest

7    because she was already stacking the deck.  This motion, and

8    it's supporting evidence will prove Judge Wright disliked

9    Mr. Ivers, and a bench trial by her would assure his loss."

10   Did I read that correctly?

11   A.  You did.

12   Q.  And then I'm going to take you to the next page, which

13   is page 7 of Exhibit 6, and there was some other portions of

14   that letter.  Paragraph T, how does paragraph T refer to

15   Judge Wright?

16   A.  It basically said she made her decision not based on the

17   evidence that was presented at trial and that she

18   potentially is biased and that it shouldn't be a soldier

19   determining any case.

20   Q.  What about paragraph U?

21   A.  He felt he was discriminated against by Judge Wright.

22   Q.  And then the portion that I underlined in paragraph Y?

23   A.  And it says, "The Court has clearly cheated me."  He

24   feels Judge Wright cheated him.

25   Q.  There are a number of other pages in Exhibit 3; is that

1    correct?

2    A.  Yes.

3    Q.  Are they mostly printouts of some of the rulings in the

4    case highlighted or underlined?

5    A.  Yes.

6    Q.  Did you receive some more correspondence from Mr. Ivers

7    after this document?

8    A.  Yes.

9    Q.  Do you want to take a look at what's been marked for

10   identification as Government's Exhibit 7.  Do you recognize

11   that document?

12   A.  Yes.

13   Q.  Do you want to look at the last page, does that appear

14   to be the photocopy of the envelope that it came in?

15   A.  Yes.

16          MR. RANK:  I would offer Exhibit 7.

17          MR. KELLEY:  No objection.

18          THE COURT:  Received.

19   BY MR. RANK:

20   Q.  Exhibit 7, I'm going to start at the back, and this is

21   on the copy of the envelope.  Do you recall getting an

22   envelope that looked like this?

23   A.  Yes, I do.

24   Q.  I'll take you to the postmark on it.  What date is it

25   postmarked?

1    A.   August 22, 2017.

2    Q.   Okay.  It's from Robert Phillip Ivers, is that correct?

3    A.   Yes, it is.

4    Q.   And who is it directed to?

5    A.   It's directed to Judge Wilhelmina M. Wright.

6    Q.   It's actually, there's no, it's directed to W.M. Wright,

7    isn't it?

8    A.   W.M. Wright, yes.

9    Q.   Had the other correspondence to Judge Wright actually

10   been directed to Judge Wright?

11   A.   Yes.

12   Q.   There's also a portion at the bottom, do you see that?

13   A.   Yes, I do.

14   Q.   What does it say?

15   A.   It says, "you cheated me, and I will not stop smearing

16   your name until I get redress.  Case re-opened."

17   Q.   And then I'll take you to page 1 of Exhibit 7, and I

18   won't have you go through this, but is this the same letter

19   that we looked at a moment ago?

20   A.   Yes, it is.

21   Q.   Reflecting that this letter was sent to a number of

22   different people?

23   A.   Yes.

24   Q.   And, again, if you kind of page through it, does it also

25   have some photocopies of other case-related documents with

1    underlining and handwriting?

2    A.  Yes.

3    Q.  Ms. Bender, did you learn that on the same day that this

4    was sent to Judge Wright, it was also sent to the Chief

5    Judge and Magistrate Judge Thorson?

6    A.  Yes.

7    Q.  And to the Clerk of Court?

8    A.  Yes.

9    Q.  If you would look at Government's Exhibit 4, 5, and 6.

10   A.  I don't think I have them.

11   Q.  It would make it easier by actually having them in front

12   of you.  Do you want to just quickly by looking at the

13   envelope, tell me if you recognize that those are letters

14   that were sent on the same day to Judge Tunheim, Magistrate

15   Judge Thorson and the Clerk of Court?

16   A.  Yes.

17   Q.  And, Ms. Bender, I asked you to look at those documents

18   a few days ago to make sure and look through those, is that

19   correct?

20   A.  Correct.

21   Q.  You're not doing it necessarily from memory?

22   A.  No.

23            MR. RANK:  Okay.  I would offer 4, 5 and 6 at this

24   time.

25            MR. KELLEY:  No objection, Your Honor.

1           THE COURT:  Received.

2   BY MR. RANK:

3   Q.  Again, the things that were in those envelopes, were

4   they the same things that were in Exhibit 7 that we already

5   looked at?

6   A.  Yes.

7   Q.  I'm just going to take you very relatively quickly

8   through the front page.  And this is Exhibit 4; is that

9   correct?

10  A.  Yes.

11  Q.  Also, postmarked August 22nd, that same date?

12  A.  Correct.

13  Q.  And with a similar thing on the bottom.  This is one to

14  Chief Judge Tunheim.  What does it say?

15  A.  It says, "I was cheated by one of your federal judges

16  and I demand redress."

17  Q.  And if we go to Exhibit 5, that is a similar envelope.

18  It looks basically the same but a different address?

19  A.  Yes.

20  Q.  Also, postmarked August --

21  A.  August 22nd, yes.

22  Q.  And with the same thing written on the bottom of this as

23  the envelope to Judge Tunheim?

24  A.  Correct.

25  Q.  And then, lastly, this is Government Exhibit 6, and this

1   is the same envelope with the same writing but this time

2   addressed to Magistrate Judge Becky Thorson; is that

3   correct?

4   A.  Correct.

5   Q.  And those were all sent out on the same day?

6   A.  Yes, they were.

7   Q.  Did you get some more correspondence after the letters

8   that were sent on the 22nd of August, 2017?

9   A.  I believe we did, yes.

10  Q.  Take a look at what's been marked as Exhibit 10.  Maybe

11  I can take some of those off, so you have an easier time to

12  work with --

13           MR. RANK:  Your Honor, I apologize, I did not ask

14  to approach.

15           THE COURT:  That's fine.

16           MR. RANK:  Do you have 10?

17           THE WITNESS:  I do.

18  BY MR. RANK:

19  Q.  Do you recognize Exhibit 10?

20  A.  Yes.

21  Q.  And what is Exhibit 10, generally speaking?

22  A.  It's a photocopy of a letter to Chief Judge Tunheim and

23  Magistrate Judge Thorson with a lot of underlining nine

24  bullet points.  It's a similar one.  We got a lot of

25  duplicate photocopies of things.

1    Q.  Can you look at the last page of that?  Does it show the

2    envelope that it was sent in?

3    A.  Yes.

4    Q.  Okay.  And on the envelope, can you tell what the

5    postmark was?

6    A.  That is August 25, 2015.

7              MR. RANK:  Offer Exhibit 10.

8              MR. KELLEY:  No objection.

9              THE COURT:  Received.

10   BY MR. RANK:

11   Q.  Ms. Bender, I'm going to put up on the screen the last

12   page reflecting the envelope.  And this is white, but do you

13   recall what the color of the envelope when it actually came

14   in to you?

15   A.  I believe it was like a manila envelope and then I would

16   imagine that "pay attention," was in red is what I think.

17   Q.  So this is just a photocopy so you can't really tell

18   what the color of the envelope was or the color of any ink?

19   A.  No.

20   Q.  And so how is this envelope addressed?

21   A.  "Corrupt Judge Wright."

22   Q.  And there is a portion that you thought said might have

23   been in red, and what did that say?

24   A.  "Pay attention."

25   Q.  And by way of postmark you mentioned this, but it was

1    postmarked August 25 of 2017; is that correct?

2    A.  That's correct.

3    Q.  Did you also learn that this same letter was sent that

4    same day to the Chief Judge?

5    A.  Yes.

6    Q.  I'm going to show you what's been marked for

7    identification as Government's Exhibit 8 and Government's

8    Exhibit 9.  First of all, take a look at Government's

9    Exhibit 8, and tell me if you recognize it.

10   A.  Yes.

11   Q.  And is that a copy of that similar letter or same letter

12   but sent in an envelope to Judge Tunheim?

13   A.  8 is to Judge Becky Thorson.

14   Q.  Okay.  And how about 9?  I'm sorry.

15   A.  8 is and envelope.  9 is the same letter that we just

16   talked about to Judge Tunheim.

17   Q.  To Judge Tunheim, okay.  And that's number?

18   A.  Exhibit 9.

19   Q.  Do you have 11 in front of you?

20   A.  Yes.

21   Q.  I'll start with that one.  Is that a letter to Judge

22   Tunheim?

23   A.  Yes, it is.

24   Q.  And what's the postmark date of that?

25   A.  August 25, 2017.

1    Q.  So the same date as the letter that was sent to Judge

2    Wright?

3    A.  Yes.

4         MR. RANK:  I offer Exhibit 11 at this time.

5         MR. KELLEY:  No objection.

6         THE COURT:  Received.  Mr. Rank, when you get to a

7    place that you think is a good ending point for this

8    evening, tell me because I think the jurors are expecting to

9    conclude their work for today.

10        MR. RANK:  I will put this exhibit up, and we can

11   end, Your Honor, if that's acceptable.

12        THE COURT:  Yes, sir.

13   BY MR. RANK:

14   Q.  This is Government's Exhibit 11, is that correct?

15   A.  Correct.

16   Q.  And I won't ask you to talk about the contents of it

17   because are the contents I guess I will ask you, are they

18   the same as what was in the letter to Judge Wright?

19   A.  Yes.

20   Q.  And the envelope itself is addressed to Judge Tunheim on

21   the front side?

22   A.  Correct.

23   Q.  Reflects that where I think you had said you thought

24   that on the one to Judge Wright, the "pay attention" was in

25   red.  This was also in red, correct?

 1    A.  Correct.

 2    Q.  And if we look at page 2 of Government's Exhibit 11, is

 3    there something on the back of the envelope?

 4    A.  There is.

 5    Q.  And have I shown that accurately?

 6    A.  You have.

 7              MR. RANK:  Okay.  We can stop right here, Your

 8    Honor.

 9              THE COURT:  All right.  Thank you very much.

10    Ladies and gentlemen, remember the last instruction of

11    conduct of the jury.  Just remember how important it is to

12    decide the case just based on what is given to you here and

13    not on anything else.  So you've worked very hard today, and

14    we will see you tomorrow.

15              The courtroom deputy and my law clerk tell me that

16    there is consensus that we can start at 8:30 without

17    creating any problems for members of the jury, so I

18    certainly appreciate you doing that.  So we'll be in recess

19    with the jury.  The lawyers should stay.

20                    (Jury out at 5:02 p.m.)

21                         IN OPEN COURT

22              THE COURT:  Please be seated.  Counsel, maybe you

23    can help me, the only time I get in trouble with the jury is

24    if I'm misleading them about how long we think the case will

25    be, so are we making what you would consider adequate

1     progress?

2               MR. RANK:  We are, Your Honor.  And the first

3     witness is especially when we're putting paper in usually

4     take a little longer, and we're getting in many of the

5     exhibits through Ms. Bender, but I believe we're on pace.

6               THE COURT:  Because if we're going to go longer or

7     things change, just let me know and we can work with that.

8               MR. RANK:  I don't believe that we're off schedule

9     at all, Your Honor.

10              THE COURT:  We'll begin tomorrow at 8:30.

11              MS. ALLYN:  Your Honor, if I might put one thing

12    on the record.

13              THE COURT:  Yes, you may.

14              MS. ALLYN:  Thank you, Your Honor.  Tomorrow one

15    of the witnesses will be Deputy Jeff Hattervig.

16              THE COURT:  All right.

17              MS. ALLYN:  And he will be putting in, well,

18    actually I should say in general tomorrow or the next day,

19    there will be at least two deputies testifying.  We'll be

20    putting into evidence three different audio recordings of

21    conversations with the defendant.

22              THE COURT:  All right.

23              MS. ALLYN:  I have spoken to Brett Kelley about

24    how I believe all three of the audio recordings have some

25    type of reference to Mr. Ivers having had trouble in

1    Hennepin County or been arrested because of Hennepin County,

2    just brief references like that.  I did confirm though today

3    with and yesterday with defense counsel that those

4    recordings do not need to be further redacted.

5         I think some of that is given the 404(b) ruling

6    and just some is that it seems as if it's anticipated to

7    come into this trial regardless.  But I did want the record

8    to reflect nevertheless the government gave the defense an

9    opportunity to decide to redact that despite the Court's

10   ruling, and we are not doing that in agreement.

11        THE COURT:  All right.  Thank you very much.

12        Mr. Kelley, do you need to make any record?

13        MR. KELLEY:  No, Your Honor, that is our agreement

14   with the record.

15        MR. SCOTT:  You ruled against us on the reference

16   so, yeah.  They're entitled to it.

17        THE COURT:  I didn't understand.

18        MR. SCOTT:  You ruled to allow the 404(b) evidence

19   in, Your Honor.

20        THE COURT:  Yeah.

21        MR. SCOTT:  And the reference is back as a result

22   of the 404(b) evidence.

23        THE COURT:  I learned by reading your briefs, Mr.

24   Scott, that 404(b) does apply in civil cases.

25        MR. SCOTT:  It certainly does, Your Honor.

1        THE COURT:  We'll be in recess.

2             (Court adjourned at 5:05 p.m.)

3

4                  *      *      *

5                REPORTER'S CERTIFICATE

6

7        I, Maria V. Weinbeck, certify that the foregoing is

8    a correct transcript from the record of proceedings in the

9    above-entitled matter.

10

11            Certified by:  *s/ Maria V. Weinbeck*

12                           Maria V. Weinbeck, RMR-FCRR

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**INDEX**</u>

| | <u>**Page**</u> |
|---|---|
| **Preliminary Jury Instructions** | **2** |
| **Opening Statements By Mr. Rank** | **17** |
| **Opening Statements by Mr. Scott** | **38** |

| <u>**GOVERNMENT WITNESSES:**</u> | <u>**Page**</u> |
|---|---|
| **TERIANNE BENDER** | |
| **Direct Examination by Mr. Rank** | **59** |

| <u>**GOVERNMENT'S EXHIBITS**</u> | <u>**Received**</u> |
|---|---|
| **1** | **77** |
| **2** | **89** |
| **3** | **105** |
| **4** | **112** |
| **5** | **112** |
| **6** | **112** |
| **7** | **109** |
| **10** | **114** |
| **11** | **116** |
| **20** | **66** |
| **21** | **97** |
| **27** | **64** |

*        *        *        *        *