1
                        UNITED STATES DISTRICT COURT
                            DISTRICT OF MINNESOTA
2

3    ------------------------------------------------------------
                                        )
     United States of America,          )   File No. 18-CR-90
4                                       )            (RWP/CFB)
              Plaintiff,                )
5                                       )
     v.                                 )   St. Paul, Minnesota
6                                       )   September 12, 2018
     Robert Phillip Ivers,             )   8:30 a.m.
7                                       )
              Defendant.                )
8    ------------------------------------------------------------

9               BEFORE THE HONORABLE ROBERT W. PRATT
                 UNITED STATES DISTRICT COURT JUDGE
10                    **(JURY TRIAL - VOLUME II)**

     **APPEARANCES**
11    **For the Plaintiff:**         **U.S. ATTORNEY'S OFFICE**
                                      **TIMOTHY RANK, AUSA**
12                                    **JULIE ALLYN, AUSA**
                                      300 S. 4th St., #600
13                                    Minneapolis, Minnesota 55415

14    **For the Defendant:**         **KELLEY, WOLTER & SCOTT, P.A.**
                                      **DANIEL SCOTT, ESQ.**
15                                    **BRETT KELLEY, ESQ.**
                                      431 S. 7th St., #2530
16                                    Minneapolis, Minnesota 55415

17    Court Reporter:               DEBRA K. BEAUVAIS, RPR-CRR
                                      300 S. 4th St., #1005
18                                    Minneapolis, Minnesota 55415

19

20

21

22        Proceedings recorded by mechanical stenography;
     transcript produced by computer.
23

24

25

1                         I N D E X

2                                                    PAGE

3   TERIANNE BENDER
        Cont. Direct Examination by Mr. Rank        124
4       Cross-Examination by Mr. Kelley             128
    JEFFREY HATTERVIG
5       Direct Examination by Ms. Allyn             142
        Cross-Examination by Mr. Kelley             232
6       Redirect Examination by Ms. Allyn           271
    HEATHER ARENT-ZACHARY
7       Direct Examination by Ms. Allyn             281
        Cross-Examination by Mr. Kelley             306
8       Redirect Examination by Ms. Allyn           312
        Recross-Examination by Mr. Kelley           314
9   TIFFANY SANDERS
        Direct Examination by Mr. Rank              315
10      Cross-Examination by Mr. Kelley             354
        Redirect Examination by Mr. Rank            368
11  LORA FRIEDMANN
        Direct Examination by Mr. Rank              370
12      Cross-Examination by Mr. Kelley             393

13

14  **GOVERNMENT EXHIBITS**
    8-9                                             125
15  12                                              155
    13                                              194
    15                                              382
16  24                                              297
    25                                              318
17  26                                              323
    28                                              335
18  29                                              342

19

20

21

22

23

24

25

BENDER - DIRECT (CONT'D)                                    124

```
1              P R O C E E D I N G S

2                 IN OPEN COURT

3         THE COURT:  Please be seated.  Good morning,

4    ladies and gentlemen of the jury.  Good morning, Counsel,

5    Mr. Ivers.

6         When we left yesterday, Mr. Rank was examining

7    Ms. Bender on behalf of the United States.  So, Counsel, do

8    you want to proceed.

9         MR. RANK:  Thank you, Your Honor.

10

11           CONTINUED DIRECT EXAMINATION

12   BY MR. RANK:

13   Q.  Good morning, Ms. Bender.

14   A.  Good morning.

15   Q.  Ms. Bender, when we left off, I think I had a couple of

16   exhibits that were sitting in front of you that I had

17   started to ask you about and then I moved on to a different

18   exhibit.  Do you have Exhibits 8 and 9 in front of you?

19   A.  Yes.

20   Q.  And those have been marked for identification as 8 and

21   9.  They've not yet been admitted.  Do you recognize both of

22   them?

23   A.  Yes.

24   Q.  And what is shown in Exhibit 8?

25   A.  That is an envelope addressed to Magistrate Judge Becky
```

1   Thorson with some pages inside.

2   Q.  And then how about what's in Exhibit 9?

3   A.  Papers that are identical to the papers that are in the

4   envelope.

5   Q.  And the last page, what's been marked for identification

6   as Exhibit 9, is there also a copy of the front and back of

7   the envelope?

8   A.  Yes.

9            MR. RANK:  I'd offer Exhibit 8 and 9.

10           MR. KELLEY:  No objection, Your Honor.

11           THE COURT:  Received.

12  BY MR. RANK:

13  Q.  I'll put up on the screen -- first of all, Ms. Bender,

14  I'm showing the first page of Exhibit 8 on the screen?

15  A.  Yes.

16  Q.  We had looked at some exhibits yesterday that came into

17  your chambers.  One of them was a similar envelope dated

18  also -- postmarked August 25th; is that correct?

19  A.  Correct.

20  Q.  And this one, you said it's similar to the other

21  letters; is that correct?

22  A.  Yes.

23  Q.  And this one is to Magistrate Judge Becky Thorson?

24  A.  Correct.

25  Q.  I'm going to show you then the next page.  Is there

1    something on the back of that envelope, Ms. Bender?

2    A.  Yes, there is.

3    Q.  And am I showing to you the back of the envelope?

4    A.  You are.

5    Q.  And then going on to Exhibit 9.  Exhibit 9, this is a

6    photocopy of an envelope and then the papers that were

7    inside that envelope; is that correct?

8    A.  Yes.

9    Q.  And if we look then at Exhibit 9, can you tell me what

10   the last page of Exhibit 9 is, Ma'am?

11   A.  It is the back of an envelope.

12   Q.  And is there a page number on the bottom of it?

13   A.  Page 2.

14   Q.  I need to take you to Exhibit 9, don't I.  I apologize.

15   There we go.

16           That is the back of the envelope?

17   A.  Yes, it is.

18   Q.  And am I then showing the front of that envelope?

19   A.  Yes.

20   Q.  So, Ms. Bender, I think we've looked at four different

21   letters that were sent containing the same material on the

22   same date, August 25th; one to Judge Wright's chambers, one

23   to the Chief Judge, one to the Clerk of Court, and one to

24   Judge Thorson?

25   A.  Yes.  Correct.

1    Q.  And this is August 25th, 2017, correct?

2    A.  Yes.

3    Q.  We had looked at some other series of other letters

4    yesterday, and I just want to briefly touch on them.  They

5    come in over a period of time starting on the 9th of August,

6    and then going on to the 22nd of August, and then another

7    batch on the 25th of August; is that right?

8    A.  Yes.

9    Q.  And the ones -- going back to the first of those letters

10   that came in August of 2017 from Mr. Ivers -- showing

11   Exhibit 3, and I'm on page 1 of Exhibit 3 -- that's where we

12   saw the language that we see in a number of the letters that

13   says, "Judge Wright has treated me unfairly from the

14   beginning of my case"?

15   A.  Yes.

16   Q.  That's the first of a series of letters, correct?

17   A.  Correct.

18   Q.  And then going on to the next in the series of letters

19   that were sent on the 22nd of August, we're looking at --

20   I'm going to show you one of those.  This is the letter.

21   The first letter said "treated unfairly".  The second letter

22   that I am showing right now refers to Judge Wright cheating

23   Mr. Ivers; is that right?

24   A.  Correct.

25   Q.  And then the last of that series of letters where

1    they're coming in pretty quick succession, is that -- sorry,

2    Exhibit 11.  There we go.  This is Exhibit 11, and this is

3    the last of the series that comes in on August 25th?

4    A.  Yes.

5    Q.  And this one refers to Judge Wright as a "corrupt"

6    judge?

7    A.  Yes.

8    Q.  And is that true with respect to each one of those

9    letters that came into the court, to Judge Wright's

10   chambers, to Judge Thorson, to the Clerk of Court, and to

11   the Chief Judge?

12   A.  Yes.

13           MR. RANK:  Thank you very much, Ms. Bender.  I

14   have no further questions.

15           THE COURT:  Mr. Kelley, would you like to

16   cross-examine?

17           MR. KELLEY:  Yes, Your Honor.

18           THE COURT:  You may.

19           MR. KELLEY:  I just need a second here to plug in,

20   Your Honor.

21

22                        **CROSS-EXAMINATION**

23   **BY MR. KELLEY:**

24   Q.  Good morning, Ms. Bender.

25   A.  Good morning.

1    Q.  So I want to go over a few things that you discussed

2    with Mr. Rank about the civil jury trial.

3    A.  All right.  Yes.

4    Q.  So I'm going to go back to the docket first.  You don't

5    have any of these in front of you?

6    A.  I don't anymore.

7    Q.  Any exhibits up there?

8              THE LAW CLERK:  No.

9    BY MR. KELLEY:

10   Q.  So docket number 1, entry number 1, says that the case

11   was removed from state court to federal court on March 23rd,

12   2015, correct?

13   A.  I believe that was it.  Yes.

14   Q.  Is that your memory?

15   A.  Yes.

16   Q.  And then do you remember docket number 87, the text-only

17   order that denied the jury trial?

18   A.  I don't remember it, if it was 87.

19   Q.  I will put 87 up here for you to look at while I think

20   the exhibits are coming out.

21   A.  Thank you.

22   Q.  So you see 87 up here, the text-only order?

23   A.  Yes.

24   Q.  And that is dated 11-14-2016?  Is that when you entered

25   it?

1    A.  That's not when I entered it.  That would've been --

2    when you see it says "CC," corrected entry -- no, I take

3    that back.  I'm sorry.  Yes, that's when I would have

4    entered it.

5    Q.  It was you that entered that?

6    A.  I entered the text-only notice, yes.

7    Q.  But the Judge gave you the language to put in this text

8    only order, correct?

9    A.  Correct.

10   Q.  So those are her words?

11   A.  Correct.

12   Q.  You just entered it?

13   A.  Correct.

14   Q.  Okay.  Let's talk about Rule 38 and Rule 39.  Are you

15   familiar with those rules?

16   A.  No.

17   Q.  Rule 38(b), "Demand.  On any issue triable of a right by

18   a jury" --

19          MR. RANK:  Objection, reading something into the

20   record --

21          THE COURT:  Sustained.

22   BY MR. KELLEY:

23   Q.  Okay.  I'll move on here.

24          So you sat through the insurance trial?

25   A.  I would have been in and out.  If I was at my desk, I

1    would have been watching it on the screen to see if the

2    Judge needed anything.  I was in for -- sometimes I was in

3    the courtroom, yes.

4    Q.  But you generally watched pretty much the entire trial?

5    A.  Yes.

6    Q.  And you were also there for the pretrial hearing on

7    January 4th, 2017, correct?

8    A.  Yes.

9    Q.  So you got to observe Mr. Ivers' behavior?

10   A.  Yes.

11   Q.  Okay.  Can you tell us what contempt of court means?

12   Are you familiar with that term?

13   A.  I'm familiar with the term, but I wouldn't know if

14   somebody could be charged with it or not.  I mean, I don't

15   know what the standards are or --

16   Q.  Well, so if somebody comes into court and disobeys a

17   rule, procedure, or law, the judge can hold them in contempt

18   of court?  Does that sound familiar to you?

19   A.  I don't know.  It's vaguely familiar.  I'm not trained

20   legally, so I leave the statutes and the rules to the Judge

21   and the law clerks, and I file what they tell me to file.

22   That's it.

23   Q.  You testified that Mr. Ivers asked good questions.  He

24   didn't know what he was doing, though, did he?

25   A.  He asked some very good questions at times and other

1    times he would go off track.

2    Q.  But he's not an attorney, is he?

3    A.  No.  No.

4    Q.  He doesn't really understand the rules of procedure very

5    well?  Was that your understanding from the trial?

6    A.  I would think that's probably true of most lay people,

7    that they don't.

8    Q.  He probably didn't understand the rules of evidence very

9    well either?

10   A.  Unless he looked them up, I don't know.  He wasn't

11   trained in it.

12   Q.  So during the trial he didn't do anything inappropriate

13   enough to be yelled at by the Judge, did he?

14   A.  Well, she doesn't yell.  She did have to say "Mr. Ivers"

15   a few times to -- in a strong voice to get him to stop the

16   questioning or -- usually stop the questioning or arguing

17   with her.

18   Q.  But he wasn't swearing in open court a lot?

19   A.  No.  No, he wasn't.

20   Q.  And he wasn't yelling at the Judge?

21   A.  No, I would not say he was yelling at the Judge.

22   Q.  So he was behaving appropriately?

23   A.  For the most part, yes.

24   Q.  Okay.  He didn't do anything illegal in court, did he?

25   A.  No.

1  Q.  He wasn't charged with any crimes for anything he did

2  during the pretrial hearing --

3  A.  No.

4  Q.  -- or during the actual jury trial, was he?

5  A.  No, he wasn't.

6  Q.  So he acted appropriately during both of those?

7  A.  Yes.

8  Q.  Now I want to go through some of the filings that you

9  went through with Mr. Rank.  First I'm going to turn to the

10  Findings of Fact, Conclusions of Law Order.  So this is the

11  order dismissing the entire case, right?

12  A.  Correct.

13  Q.  And that was filed on June 29th, 2017?

14  A.  Yes.

15  Q.  So you and Mr. Rank went over paragraph 15, which I'm

16  putting up here, which essentially says that Mr. Tallman had

17  falsified a claim on his insurance application and,

18  therefore, she was going to deny him?  Is that what

19  paragraph 15 says essentially?

20  A.  That there was a falsification on the application, yes.

21  Q.  Okay.

22  A.  And/or misleading.

23  Q.  Okay.  Paragraph 60, Judge Wright did not find that

24  Mr. Ivers made that falsified statement, did she?

25  A.  She does not know who filled out the application.

BENDER - CROSS

1    Q.  That was a yes or no question.  So she did not find that

2    Mr. Ivers falsified any statements on that application, did

3    she?

4    A.  She did not find anyone filled out the application.

5    Q.  So she does not know and did not make any findings that

6    Mr. Ivers made any false statements on the application?

7    A.  Correct.  Correct.

8    Q.  Next we're going to go through the series of mailings

9    that came to the Court.

10   A.  Yes.

11   Q.  Some to Judge Wright?

12   A.  Yes.

13   Q.  And then to some of the other judges that you were just

14   aware of?

15   A.  Right.

16   Q.  So some of them are to Judge Wright, a couple of them?

17   A.  Yeah, two or three.  Usually --

18   Q.  So two or three mailings to Judge Wright?

19   A.  If it goes to the Clerk of Court, it also in effect

20   comes to Judge Wright.

21   Q.  Okay.  And then several others to Judge Thorson or Judge

22   Tunheim, but not directly to Judge Wright, correct?

23   A.  Correct.

24   Q.  Do you remember this one?  It's Government's Exhibit 1.

25   So this is Exhibit 1.  Do you remember this one?  It is

1      postdated October 31st, 2016.  It is a letter to the Court,

2      Judge Wright.  I'll flip the page here.  Nothing on the back

3      page.  This is him demanding his jury trial?

4      A.  Right.

5      Q.  Do you remember this?

6      A.  Yes.

7      Q.  Okay.  So Judge Wright received this in 2016.  Is

8      Mr. Ivers charged with anything that was said in this

9      letter?

10     A.  No.

11     Q.  Today he is only charged with what he said on February

12     27th, 2018, correct?

13             MR. RANK:  Objection, foundation.

14             THE COURT:  Overruled.

15     BY MR. KELLEY:

16     Q.  You understand Mr. Ivers is on trial for only what he

17     said on February 27, 2018, correct?

18     A.  No, I have no idea what the charges against him are.

19     Q.  But he is not charged with anything he said in this

20     letter to Judge Wright on October 31st, 2017, right?

21             MR. RANK:  Objection.

22             THE COURT:  Sustained.  Sustained.

23     BY MR. KELLEY:

24     Q.  You said "no" earlier?

25     A.  Well, I didn't understand the question.  I thought that

1    you meant right at that time, when we got it, was he charged

2    with anything.

3    Q.  I will ask another question here.

4             So we're going to go to Exhibit 3.  I believe this

5    is chronological.  So that was October 31st, 2016.  Now

6    we've moved forward to August 14th, 2017.  Do you remember

7    Exhibit 3 here?

8    A.  Yes.

9    Q.  Okay.  So this is a letter to Judge Tunheim, who's the

10   Chief Judge, and Magistrate Thorson.  And it's dated --

11   well, it was received by the court August 14th, 2017?

12   A.  Yes.

13   Q.  So it was not sent directly to Judge Wright, correct?

14   A.  I do believe we received a copy of it.

15   Q.  But it was not sent directly to her?

16   A.  Yes, I do believe he sent us directly a copy of it.

17   Q.  Might be one of these other ones, correct?

18   A.  But it wasn't addressed Dear Judge Wright.

19   Q.  But, again, Mr. Ivers is not charged with anything

20   that's contained in this, correct?

21   A.  I have no idea.

22             MR. RANK:  Objection, foundation.

23             THE COURT:  Sustained.

24   BY MR. KELLEY:

25   Q.  I'll skip forward here a couple months to August 2017.

137

1    Okay.  So they're a series of letters, Exhibit 4, to Chief

2    Judge Tunheim that is dated August -- 22nd, 2017 is postmark

3    on it.  Do you remember looking at this with Mr. Rank?

4    A.  Yes.

5    Q.  This was the one where Mr. Ivers goes through,

6    highlights, underlines various things asking for a new

7    trial, correct?  Asking for a decision to be --

8    A.  I assume.  It's hard for me to see that.  Sorry.  Thank

9    you.

10   Q.  Is that a little better?

11   A.  Yes.

12   Q.  Sorry.  So he is asking for the decision to be reversed?

13   A.  Right.

14   Q.  Okay.  So that's August 22nd, 2017, right?

15          Again, this August 5th -- or August 22nd, 2017,

16   very similar letter, just a copy of the previous one you

17   think?

18   A.  Yes.

19   Q.  Sent to the Clerk of Court?

20   A.  Right, and then routed to us.

21   Q.  Basically the same letter?  Basically the same letter?

22   A.  Yes.  Yes.

23   Q.  Exhibit 6, Magistrate Thorson.  This is just another

24   copy of that same letter, right?

25   A.  Yes.  Correct.

1    Q.  It's postdated August 22nd, 2017.  Same letter, correct?

2    A.  Yes.

3    Q.  So those letters are all postdated August 22nd, 2017,

4    and the Judge would've received them a few days after that,

5    right?

6    A.  Correct.

7    Q.  After that, Mr. Ivers did not send any correspondence

8    directly to Judge Wright, did he?

9    A.  I do believe he did, but I'm not positive.  I'd have to

10   refresh my memory.  We received quite a few mailings from

11   him, so --

12   Q.  Right.  So after August 2017, after that he files a new

13   lawsuit a few months later.  Are you aware of that?

14   A.  I am not.

15   Q.  I'll show you one more August -- or this is Exhibit 11.

16   A.  Okay.

17   Q.  Okay.  This is postdated August 25th, 2017, Chief Judge

18   Tunheim.

19   A.  Uh-huh.

20   Q.  This is the one where he says Judge Wright is "corrupt"?

21   A.  Right.

22   Q.  Do you remember this one?

23   A.  Yes.

24   Q.  And then I'll show you Exhibit 8.  This is just a copy

25   that you just testified about, right?

1    A.  Right.

2    Q.  This is Magistrate Thorson, basically the same thing,

3    right?

4    A.  Right.

5    Q.  Okay.  You just went over all those letters with the

6    government.  There isn't one after August 25th, 2017 that

7    you just went over, is there?

8    A.  No.

9    Q.  Did Mr. Ivers call Judge Wright after that point?

10   A.  I don't --

11   Q.  Yes or no.

12   A.  I'd actually have to look at the docket sheet to see if

13   we did a response to something.

14   Q.  Okay.  Let's look at that.

15   A.  There was a call asking for a new trial.  I can't

16   remember the date on it and when we put all of that out, was

17   that -- I don't know if that was before --

18            THE COURT REPORTER:  Could you pull the microphone

19   closer to you.  Thank you.

20   BY MR. KELLEY:

21   Q.  So that was August 25th.  Do you have the docket in

22   front of you?

23   A.  I don't.  I think it's one of the first things we looked

24   at.

25   Q.  Here is the docket.

```
 1    A.  Thank you.  Okay.  I do believe that was the last one,

 2    the August 25th.  Thank you.

 3    Q.  So Mr. Ivers' last correspondence directly to Judge

 4    Wright was at the end of August 2017?

 5    A.  Yes.

 6    Q.  No phone calls after that?

 7    A.  Correct.

 8    Q.  So after these August 22nd phone calls -- or mailings,

 9    rather -- excuse me.

10           I'm going to move back to kind of your background

11    here.  Okay.  So you work in the building up two floors, on

12    the third floor?

13    A.  Yes.

14    Q.  And that's where Judge Wright's chambers is?

15    A.  Correct.

16    Q.  And that's where her courtroom is?

17    A.  Yes.

18    Q.  And that's where the insurance trial from 2017 was, too?

19    A.  Correct.

20    Q.  A couple floors up?

21    A.  Yes.

22    Q.  Okay.  And you answer the mail for Judge Wright,

23    correct?

24    A.  I open and look at the mail, yes.

25    Q.  And if somebody walks into her chambers, you're one of
```

```
 1    the first people they see when they come in, right?

 2    A.  Correct.

 3    Q.  So somebody walks in that doesn't work there, they're

 4    going to see you first, generally?

 5    A.  Yes.

 6    Q.  Judge Wright was subpoenaed for this trial, wasn't she?

 7              MR. RANK:  Objection, relevance.

 8              THE COURT:  Overruled -- or sustained.  I'm sorry.

 9    Ladies and gentlemen, I didn't get a chance to sustain that

10    before, so you should ignore the response that came in and

11    the question.  You'll remember from the instructions

12    questions by the lawyers are not evidence.

13              MR. KELLEY:  One second, Your Honor.

14              (A brief discussion was held off the record.)

15              MR. KELLEY:  No further questions, Your Honor.

16              THE COURT:  All right.  Mr. Rank, any follow-up?

17              MR. RANK:  No, Your Honor.

18              THE COURT:  You may be excused.  Thank you.

19              THE WITNESS:  Thank you.

20              THE COURT:  Ms. Labriola is training me with the

21    lights, so you've got to give me a little patience here.

22              Mr. Rank, I would assume Ms. Allyn is retrieving

23    the witness?

24              MR. RANK:  That's a fair assumption, Your Honor.

25              MS. ALLYN:  Apologize, Your Honor.  The witness is
```

 1    on his way in the elevator.

 2              THE COURT:  All right.

 3              MR. RANK:  I believe the government will be

 4    calling Deputy U.S. Marshal Jeffrey Hattervig, Your Honor.

 5              THE COURT:  All right.

 6              MS. ALLYN:  I apologize, Your Honor.  He is

 7    coming.  Some miscommunication.  I apologize to the jury for

 8    your time.  It will be Deputy U.S. Marshal Hattervig,

 9    Jeffrey Hattervig.

10              THE COURT:  Marshal, would you step into the

11    witness box, please, and then while standing if you would

12    look at the ladies and gentlemen and raise your right hand

13    to be sworn.

14              (Witness administered oath by the Court.)

15              THE COURT:  Please be seated.

16              Counsel, you may proceed.

17              MS. ALLYN:  Thank you, Your Honor.

18

19    **JEFFREY HATTERVIG**

20                        **DIRECT EXAMINATION**

21    **BY MS. ALLYN:**

22    Q.  Good morning.

23    A.  Good morning.

24    Q.  Sorry, there was some miscommunication about where to be

25    when this morning; isn't that true?

1    A.  Yes.

2    Q.  So I apologize.  Thank you for getting here as quickly

3    as possible.

4    A.  Sure.

5    Q.  Can you let the jury know your name and where you work.

6    A.  Jeff Hattervig.  I work for the U.S. Marshal Service.

7    Q.  And what is your job title there?

8    A.  I'm a supervisory Deputy U.S. Marshal.

9    Q.  How long have you worked for the Marshal Service?

10   A.  A little over 20 years.

11   Q.  And what is your current job assignment there?

12   A.  I supervise the Fugitive Task Force.

13   Q.  How long have you had that assignment?

14   A.  A little over a year now.

15   Q.  What was your previous assignment before supervising the

16   Task Force?

17   A.  I did one year as a protective intelligence

18   investigator.

19   Q.  Is that also commonly referred to as a PII position?

20   A.  Yes.

21   Q.  That stands for?

22   A.  Protective intelligence investigator, PII.

23   Q.  And what does that mean?

24   A.  Well, it's a job that -- it's an investigator who looks

25   into any sort of threat or inappropriate communication to

1      any Marshal Service protectee.

2      Q.  And what are some examples of a Marshal Service

3      protectee?

4      A.  Anybody involved in the court system:  the judge, the

5      court staff, the jurors, the witnesses, the lawyers.

6      Q.  What was your time span of being PII?

7      A.  I started sometime around the fall of 2016 and then

8      ended one year later, fall of 2017.

9      Q.  Is that so you could move on and be with the Task Force?

10     A.  Yes.

11     Q.  Do you know a person by the name of Robert Ivers?

12     A.  Yes.

13     Q.  Generally how is it that you know him?

14     A.  That was one of the cases I worked during the year I was

15     protective intelligence investigator.  He had done some

16     mailings and some communications to various court employees.

17     Q.  You said it's a case you had worked.  Do you open up a

18     file, like a case on people?

19     A.  Yes.  You know, I'll open a case under his name, and all

20     of the communications that are causing the problems will be

21     saved under that case.

22     Q.  What can cause you to open up a case?

23     A.  Usually I'm contacted by a court employee saying that

24     they were uncomfortable with some sort of communication they

25     felt might've been a threat, and then I would open a case

1    and investigate.

2    Q.  Did you ever meet Mr. Ivers?

3    A.  Yes.

4    Q.  Do you see him here in the courtroom today?

5    A.  Seated at defense table on the left, my left.

6    Q.  So your left wearing a blazer?

7    A.  Yes.

8           MS. ALLYN:  If the record could reflect the

9    witness has identified the defendant, Mr. Ivers.

10           THE COURT:  It may.

11           MS. ALLYN:  Thank you, Your Honor.

12   BY MS. ALLYN:

13   Q.  So how did you first come to know of Mr. Ivers?

14   A.  I was contacted by Terianne Bender, who works in Judge

15   Wilhelmina Wright's office.  She had received a letter that

16   had some handwritten notes on it, and she had forwarded it

17   to me because it was concerning to her.

18   Q.  So you received that letter?

19   A.  Yes.

20   Q.  I'm going to show you what has been entered into

21   evidence as Exhibit 1.  Do you see that on your screen

22   there?

23   A.  Yes.

24   Q.  It's multiple pages.  I'll page through it.  Back of the

25   envelope, page 3.  Let me get a bigger screen picture of

 1   that.

 2              Are you recognizing this Exhibit 3?

 3   A.  Yes.

 4   Q.  And how is it that you recognize it?

 5   A.  That would've been -- well, there were several letters

 6   over the course of the case.  I think this was probably the

 7   first one that came in that was sent to me by Judge Wright's

 8   chambers.

 9   Q.  I'll go back to page 1 and show you the postmark.  Can

10   you see that now, the postmark?

11   A.  Yes.

12   Q.  And what's the date on that?

13   A.  October 31st, 2016.

14   Q.  So is this the first letter that you received with

15   respect to Mr. Ivers?

16   A.  I believe so.  Yes.

17   Q.  And what did you do when you received this letter?

18   A.  I made digital copies of it and uploaded it into our

19   computer system, and I opened a case and began working the

20   case.

21   Q.  You said you uploaded it into your system.  I'm going to

22   move to page 3.  Is there a notation in the upper,

23   right-hand corner of this letter?

24   A.  Yes.

25   Q.  And I'm blowing that up for you, what does it say?

1    A.   "Entered in JDIS."  That's our computer system.

2    Q.   What's the significance?  What does that mean that

3    that's stamped like that?

4    A.   Well, that's my own stamp.  It's just a reminder to me

5    that I've scanned it and put it into the computer system so

6    I know that I don't need to do it again.

7    Q.   Okay.  So let's break up piece by piece what you did.

8    You scan it into your system.  What do you do next?

9    A.   Then I begin looking into the person who sent it, their

10   background, criminal history, sort of looking into the facts

11   of what they were complaining about or what their case is

12   about, and just trying to figure out what the problem is.

13   Q.   So looking at Exhibit 1, if we were to go to page 5 --

14   and I'll blow up what's numbered 8 and 9 -- do you remember

15   reading that in this letter, 8 and 9?  If you could read

16   that into the record.

17   A.   Read 8, 9?

18   Q.   Yes, please.

19   A.   "I am in dire fucking straits.  I am becoming a very

20   dangerous person.  Bob Ivers."

21   Q.   And was this meaningful to you, this communication?

22   A.   Yes.

23   Q.   How so?

24   A.   Well, it's -- I would call it a veiled threat.  Seems to

25   be meant to cause some sort of intimidation to the reader.

1    Q.  And so does that mean you need to do anything?

2    A.  Yes.

3    Q.  And why is that?

4    A.  Well, we have to mitigate any potential threat.  You

5    know, it can go all the way up from doing protection detail

6    on the person who is threatened or an interview of the

7    person who sent it or any other sort of security measures

8    here in the courthouse to mitigate any potential threat.

9    Q.  And you said something about the person who received the

10   threat.  Who got this letter?

11   A.  Judge Wilhelmina Wright.

12   Q.  And is she one of your protectees?

13   A.  Yes.

14   Q.  Is she a United States federal judge?

15   A.  Yes.

16   Q.  For this district, the District of Minnesota?

17   A.  Yes.

18   Q.  So did you ever interview the person -- and if we look

19   on this envelope, it looks like it was sent by Robert Ivers?

20   A.  Yes.

21   Q.  Did you ever interview him?

22   A.  Yes.

23   Q.  Before interviewing him, did you try to learn anything

24   about him or how to approach this interview?

25   A.  Yeah, I did a general background, public record

 1     searches, and talking to various law-enforcement agencies

 2     that may have had contact with him in the past.  You know,

 3     he had had some law-enforcement contact in open cases in

 4     other jurisdictions.  I talked to those investigators and

 5     prosecutors.

 6     Q.  Did you ever work with other investigators in another

 7     district with respect to this letter that is Exhibit 1?

 8     A.  Another federal district?

 9     Q.  No.  Another local district or local law enforcement?

10     A.  Yes.

11     Q.  Can you explain that, please.

12     A.  Well, when I looked into his background, I found out

13     that he had an open criminal case for similar conduct in

14     Hennepin County, which had been removed.  The venue had been

15     moved to Anoka County.  So I had spoken to investigators in

16     both those counties.

17     Q.  You said for "similar conduct."  What do you mean by

18     that?

19     A.  It was a case of harassment or threatening letters.

20     Q.  To a judge?

21     A.  Or calls.  Yeah.  Yes.

22     Q.  And with respect to Exhibit 1 -- did you do anything

23     with respect to that local case in Exhibit 1?

24     A.  I gathered all of the case documents that those agencies

25     could provide me and uploaded those into our system --

1    reviewed them and uploaded them.

2    Q.  And did you send this October 31st letter that is

3    Exhibit 1 to the local investigators for Hennepin County or

4    Anoka County?

5    A.  I believe I shared these with the Anoka County

6    prosecutor who was doing the prosecution for the other case.

7    Q.  You thought this letter was relevant to the Anoka County

8    prosecutor --

9              MR. KELLEY:  Objection, Your Honor, leading.

10             THE COURT:  Sustained.

11   BY MS. ALLYN:

12   Q.  Why would you send this letter?

13   A.  Because it's an identical -- almost an identical type of

14   case, and I thought that the investigators and prosecutor in

15   that case should know that the same thing is going on here.

16   Q.  Do you recall having seen another letter from Mr. Ivers

17   maybe a little after this first letter that we've been

18   talking about?

19   A.  Yes.

20   Q.  I'm going to show you what's entered into evidence as

21   Exhibit 2.  Do you see that on your screen?

22   A.  I do.

23   Q.  Do you recognize this, what looks like a letter, as

24   Exhibit 2?

25   A.  Yes.

```
1    Q.  How is it that you recognize it?

2    A.  That would have been one of the letters received by one

3    of the court chambers.  I don't recall if this one went to

4    Judge Wright or one of the magistrate chambers.  I do

5    recognize the letter, that it was turned over to me.

6    Q.  Let me just sort of page down.  There's some handwriting

7    on this.  We're at page 2 now; is that right?

8    A.  Yes.

9    Q.  Page 3.  I think I'm going to highlight 5 -- number 5

10   and 6.  What does that writing say on that?

11   A.  "I smell a rat.  Somebody needs to explain to me what

12   the fuck is going on."

13   Q.  And who signed this letter?

14   A.  Bob Ivers.

15   Q.  And, again, who did this letter go to?

16   A.  Judge Wilhelmina Wright.  Oh, and also Magistrate

17   Thorson.

18   Q.  And do you recall who gave you this letter to review?

19   A.  If it went to Judge Wilhelmina Wright, it probably came

20   from Terianne Bender.  She was the one forwarding me the

21   correspondence to Judge Wright's chambers.

22   Q.  So I think you started talking about another step you

23   take is to interview the person who sends these type of

24   letters; is that right?

25   A.  Yes.
```

```
 1    Q.  And did you do that in this case?

 2    A.  Yes.

 3    Q.  Who did you interview?

 4    A.  Bob Ivers.  Robert Ivers.

 5    Q.  And when was that?

 6    A.  I believe it was January 4th of 2017 when he came to a

 7    court hearing here.

 8    Q.  If we were looking at some letters from end of October,

 9    early November, why wait until January 4th, 2017 to

10    interview him?

11    A.  It was efficient that way.  I knew where he would be and

12    at what time, so I didn't have to go out and look for him.

13    And, you know, I think some of his letters he even

14    mentioned, you know -- so I didn't quite know where to find

15    him, but it was easy to know where he would be at that time.

16    And also here, at the courthouse, is the safest place to do

17    it because everybody has to go through metal detection and

18    screening to get in.

19    Q.  So was it this courthouse here, in St. Paul?

20    A.  Yes.

21    Q.  You said something about the screening.  Where within

22    this building did you talk with Mr. Ivers?

23    A.  On the date and time of his court, I waited on the

24    secure side of the screening for him to pass through the

25    screening, and then I talked to him as soon as he was
```

1    cleared by screening.

2    Q.  And why were you talking to him that day?

3    A.  I wanted to assess him and what his intentions were, and

4    to also kind of warn him that he was -- he was scaring and

5    intimidating people and that he needed to back off from

6    that.

7    Q.  What other reasons would you have to talk with Mr. Ivers

8    that day?

9    A.  There was a request by Judge Wright's chambers that we

10   have increased security, and that Mr. Ivers have marshals

11   present while he was in the building because they were --

12   they had security concerns.

13   Q.  So does it have anything to do with threat assessment or

14   what of that nature is involved?

15   A.  Yeah.  Right, you know, in talking to him, trying to

16   judge what his intentions are and just have a conversation

17   with him.

18   Q.  With respect to chambers having reached out to you, was

19   there any role you were supposed to be playing with respect

20   to security and Mr. Ivers on January 4th, 2017?

21   A.  Well, the Court didn't assign the roles.  I sort of

22   assign the roles, I guess.  I had security people in the

23   courtroom.  I personally escorted Mr. Ivers while he was in

24   the courthouse.

25   Q.  When you first met up with Mr. Ivers, what did you tell

```
 1    him with respect to what you're wanting to do, what you're
 2    wanting to talk about?
 3    A.  You know, I always try to keep it friendly.  I said I'm
 4    sorry for the hassle, but you wrote these letters that were
 5    very concerning, so I need to have additional security here
 6    because of the letters, and he said that he understood.
 7    Q.  Did you record this conversation with Mr. Ivers on
 8    January 4th, 2017?
 9    A.  Yes.
10    Q.  And how is it that you recorded it?
11    A.  Just carrying a digital recorder in my pocket, my shirt
12    pocket.
13    Q.  And was that digital recorder able to capture most of
14    your conversation with Mr. Ivers on that day?
15    A.  Yes.
16    Q.  Now, you and I have met before to talk about your
17    testimony, right?
18    A.  Yes.
19    Q.  And I showed you a disk that you reviewed to see that it
20    contained the audio of your conversation with Mr. Ivers that
21    we'll be talking about here today; is that right?
22    A.  Yes.
23              MS. ALLYN:  Your Honor, may I approach?
24              THE COURT:  You may.
25              MS. ALLYN:  Thank you.
```

```
 1      BY MS. ALLYN:

 2      Q.  Can you look at Exhibit 12 there I've just handed you.

 3      Do you recognize that exhibit?

 4      A.  I do.

 5      Q.  How so?

 6      A.  I believe I initialed this yesterday in your office

 7      after listening to it.

 8      Q.  Does Exhibit 12 contain the majority of a conversation

 9      involving Mr. Ivers and your investigation with Mr. Ivers?

10      A.  As I recall, there were two disks.

11      Q.  Right.  There will be another exhibit.

12      A.  Yeah.  So this is, I guess, half of it.

13      Q.  That's one of the --

14      A.  That's one interview.

15      Q.  For the January 4th?

16      A.  Yes.  Yes.

17      Q.  Thank you.

18              MS. ALLYN:  Your Honor, at this time the

19      government offers Exhibit 12.

20              MR. KELLEY:  No objection.

21              THE COURT:  Received.

22              MS. ALLYN:  Thank you, Your Honor.  At this time I

23      would like to publish for the jury Exhibit 12.

24              THE COURT:  You may do so.

25              MS. ALLYN:  Thank you.
```

```
 1       BY MS. ALLYN:

 2       Q.  Deputy, one of the things we did when you were meeting

 3       is there was a transcript that sort of follows along with

 4       your recording of your interview with Mr. Ivers; is that

 5       true?

 6       A.  True.

 7       Q.  And you've listened to this transcript and 99.9 percent

 8       seems accurate to what you said and what you heard Mr. Ivers

 9       say; is that right?

10       A.  Yes.  I reviewed it and I noticed a couple of small

11       errors, and I think we fixed those.

12       Q.  Okay.  I'm going to play this for the jury in a moment.

13       I will find the play button.  There we go.

14                   (Audio recording played as follows:)

15                   "Mr. Ivers, Hi.  Jeff Hattervig with the U.S.

16       Marshal.  How are you doing?  I'm going to get you to your

17       courtroom.  Okay?  You're here for the 9:00 a.m. hearing

18       with Judge Wright, right?"

19                   "Yeah."

20                   (Audio recording paused.)

21                   MS. ALLYN:  I'm just pausing to see if the volume

22       is okay.  All right.  If everyone will indulge me, I might

23       put the volume up or down depending if things get harder to

24       hear.

25       BY MS. ALLYN:
```

1    Q.  Whose voice are we hearing on this recording?

2    A.  That's my voice and Mr. Ivers' voice.

3    Q.  I will continue playing it now.

4              (Audio recording resumed.)

5              "Okay.  Well, step over to the side over here.

6    Normally there's not a marshal assigned to escort you to a

7    courtroom in most cases, but because of the letters that you

8    wrote and saying you're a very dangerous person --"

9              "Oh, yeah."

10             "Okay."

11             (Audio recording paused.)

12   BY MS. ALLYN:

13   Q.  Okay.  That statement that you just said, can you

14   explain.  It's normally somebody doesn't escort you, what is

15   that about?

16   A.  This is a civil case.  The marshals don't do security

17   for civil cases generally, lawsuits.  We just do security if

18   there's an in-custody prisoner or some other security issue.

19   So this was unusual.

20   Q.  So when you're telling this to Mr. Ivers, that's

21   truthful, right?

22   A.  Yes.

23             (Audio recording resumed.)

24             "I understand it was just rhetoric."

25             "Yeah."

1          "But -- but because of that, they wanted some

2     extra security, so I'm going to be taking up to the

3     courtroom.  Okay?"

4          "Excellent.  Thank you."

5          "Okay.  Appreciate that."

6          " -- being arrested and taken to jail."

7          "Well, that's not going to happen.  The courtroom

8     doesn't actually unlock until ten minutes before, but

9     there's a waiting room up here.  Okay?"

10          "Okay."

11          "We're just going to wait outside.  Oh, thanks.

12          So you found a place to park your truck?"

13          "Yeah, parking ramp."

14          "What do they charge over there?"

15          "I'm gonna find out."

16          "What floor is this?  Oh, I'm sorry, I hit 4.  I

17     meant to hit 6.  Wrong floor."

18          "Are you undercover?"

19          "No.  Marshals don't wear uniforms."

20          "Oh.  Oh, yeah.  Marshal, sheriffs."

21          "There's a waiting room over here.  We've got --

22     it's 8:27, so we've got 20 minutes."

23          "That's fine."

24          (Audio recording paused.)

25     BY MS. ALLYN:

1    Q.  All right.  So, Deputy, at this point having reviewed

2    the transcript, the audio, is there, I don't know, like

3    seven minutes of just sort of talking about driving downtown

4    and street signs and chit-chat like that?

5    A.  Yes.

6    Q.  At some point, I would say after about seven minutes,

7    you try to talk to Mr. Ivers about these letters he sent?

8    A.  Correct.

9    Q.  So just to save everyone some time, I'm going to jump

10   ahead to about eight minutes if I can get this right.  Close

11   enough.

12            (Audio recording resumed.)

13            "Well, yeah, I saw you're on the docket for today

14   and you're on the docket for next week."

15            "For the 9th."

16            "For the 9th and -- well, it says 9th and then

17   however long it takes, I guess."

18            "Trial."

19            "So how long do you think it will take?"

20            "I -- you know, and technically it could end today

21   --"

22            "Oh, okay."

23            "-- I mean, in theory."

24            "Well, if you don't mind me asking, because I'm a

25   security guy, what do you mean when you -- like, when you

```
 1    wrote the letter to the judge saying, 'I'm becoming a very

 2    dangerous person,' what do you mean by that?"

 3              "I've got it with me.  I'd have to relook at it."

 4              "Okay."

 5              "Oh, when I sent that letter --"

 6              "Uh-huh."

 7              " -- I was broke and living in my car."

 8              "Uh-huh."

 9              "And they kept moving the hearing dates and legal

10    dates back.  And it was just an expression to get them to

11    hurry up --"

12              "I gotcha."

13              "-- and set the trial date."

14              "Because when the marshal --"

15              "I was broke and down on my luck and, you know --"

16              "I can understand that.  Yeah, it's -- people get

17    frustrated."

18              "It was just to get them to jump."

19              "Yeah.  Because when the marshals read that, they

20    think, okay, this guy's raising a red flag saying he's

21    dangerous, so does that mean he's going to try and kill the

22    judge or something, you know?  So we've got to take the

23    stuff seriously, you know?"

24              "Yeah, that's fine."

25              "So -- but you didn't mean anything like that?"
```

```
 1              "No."

 2              (Audio recording paused.)

 3    BY MS. ALLYN:

 4    Q.  Deputy, why are you doing this?  Why are you talking to

 5    Mr. Ivers specifically about how you are interpreting his

 6    letters?

 7    A.  I'm trying to keep him talking.  I want him to explain

 8    himself and get a rapport going with him and keep it as

 9    friendly as possible.  You know, if I just come out and sort

10    of chastise him and say you were wrong for doing this or

11    whatever, he's probably not going to talk to me, so keeping

12    our conversation going.

13    Q.  You continue to bring this up during the conversation a

14    few more times?

15    A.  Yes.

16              (Audio recording resumed.)

17              "I remember when I was writing that.  Let me

18    think.  It was just would somebody please fucking do

19    something."

20              "Yeah."

21              "These guys string me out -- my friend died three

22    years ago.  These guys strung me out for three years on the

23    insurance deal."

24              "Uh-huh."

25              "And they kept stringing me out, stringing me out,
```

1    stringing me out.  They wouldn't pay me and wouldn't pay me

2    and wouldn't pay me.  And they -- this trial was supposed to

3    be way back in August and then September, then October, and

4    then in January.  And I'm living in my car.  Yeah, it was

5    --"

6             "Things better now?"

7             "It was just -- no.  I -- no, I -- it's not

8    better.  It's bad."

9             "Hmm."

10            "They owe me some insurance money and we're in

11   court to get it."

12            "Well, it's five below zero.  You can't live in

13   your car now."

14            "Well, yeah.  No.  The engine in my car blew up.

15   I was in an abandoned truck -- or a borrowed truck."

16            "Hmm.  Well, you at least got a roof over your

17   head now?"

18            "Yeah, barely."

19            "Okay.  Well, I hope it works out for you.  I

20   don't know anything about your case, but -- you know --"

21            "Yeah.  It's just -- it's an insurance case.  You

22   know, insurance company, they want to take the money in and

23   they don't want to pay the money out.  I have that letter if

24   you want to see it."

25            "Oh, no, I've --"

1              "Well, just for your own sake."

2              "Yeah, the court gave me a copy when it came in

3       because they were afraid it was a threatening --"

4              "You might've got it out of context, the letter

5       out of context.  No.  Why would I be insulted or anything

6       that you were with me?  And, furthermore, I don't think I

7       have much to say about it."

8              "Yeah."

9              "I don't feel like it's -- I know, you know --"

10             "No, I appreciate the way you're handling it,

11      because some people get kind of abusive with me from time to

12      time."

13             "No, I wouldn't.  I -- my cousin was a sheriff out

14      in Minneapolis for 35 years.  He was a sheriff.  He was --

15      he's 70 years old now, but he was 19 years old and he was

16      playing basketball over in Northeast Minneapolis where he's

17      from, my cousin.  He'd be my mom's sister's boy.  And they

18      said, hey, the Sheriff's Department is hiring.  He went in

19      and filled out an application, but, boom, there was no --

20      nothing.  I mean, no --"

21             "Yeah."

22             "I don't even think he needed a high-school

23      diploma."

24             "Is he still a sheriff?"

25             "No.  He's 70 years old."

1          "Oh, he's retired."

2          "I'll show you something that'll really amuse you.

3     It's just paper."

4          "You've got kind of a way with words that sort of

5     scares people, though, a little bit."

6          (Audio recording paused.)

7     BY MS. ALLYN:

8     Q.  Deputy, why do you keep bringing this up?

9     A.  I want to circle back to, I guess, the behavior and let

10    him know that it's not okay, and to get him talking about it

11    to sort of find out what his motives are for sending those

12    communications.

13    Q.  Are you trying to warn him or trap him into being able

14    to arrest him or what are some of those motives?

15    A.  Well, yeah, at this point we're nowhere near even

16    thinking about arresting him.  It's more to warn him and

17    just say knock it off, please.

18    Q.  Do you ever want to give people chances to not be

19    arrested?

20    A.  Of course.  Yeah.

21    Q.  You say "of course," but why?  Why is that?

22    A.  Um, I guess, that, you know -- there's no reason to go

23    through all of this if they will just correct their behavior

24    in the early stages and realize that, you know, they're

25    scaring people and then back away from that and saying --

1    sort of contrition and say I won't do it anymore kind of

2    thing.

3    Q.  So if people are contrite or heed your warnings, is

4    there a different result?

5    A.  Yes.

6    Q.  How so?

7    A.  Well, this is -- I've had several cases during that

8    year.  This is the only one that ever went to charges.

9    Q.  Only one where somebody wasn't contrite and listened to

10   warnings?

11   A.  Right.  The other cases we talked to them and they

12   realized that they had crossed a line and, you know, usually

13   just said I'm sorry about that, I won't do it anymore.

14   Q.  Okay.  And I think you've pointed out this is just the

15   first time you're talking to Mr. Ivers; isn't that right?

16   A.  Yes.

17   Q.  And later in your testimony we'll talk about -- you

18   talked to him again, didn't you?

19   A.  Yes.

20   Q.  All right.  I interrupted this.  I will go back to the

21   recording.

22              (Audio recording resumed.)

23              "Here it is right here.  I do pretty good with --

24   this is exactly how she would've received it, I think color

25   and everything, that's --"

1              "Uh-huh."

2              "Read it from the very top, number one --"

3              "Right.  Uh-huh.  No, I've read it.  'Will show

4       the defendants have no case....'"

5              (Audio recording paused.)

6       BY MS. ALLYN:

7       Q.  It's great we have a recording, but there's things that

8       you're seeing that's obviously not recorded, so what's

9       happening?

10      A.  Mr. Ivers had, I think, a bag full of his legal papers

11      and he handed me some of the papers and asked me to read a

12      portion of it.

13      Q.  You did read a portion of those papers, right?

14      A.  Yes.

15      Q.  Was he actually showing you that letter that we were

16      looking at that's Exhibit 1?

17      A.  Well, I know it was one of the letters that had

18      profanity because that's what stood out to me.

19      Q.  If we go back where you see it's paused, there's quotes

20      "will show the defendants have no case"; is that right?

21      A.  Yes.

22      Q.  Is that because you are reading from the letter?

23      A.  Yes, that was me reading from the letter.

24      Q.  I think I can go back and forth in these exhibits.  I'm

25      pulling up Exhibit 1, page 3.  I'm going to highlight part

```
1        2.  Can you read that part?

2        A.  "The enclosed documents will show the defendants have no

3        case."

4        Q.  This is what you are reading, this letter, right?

5        A.  Yes.

6        Q.  So the defendant wanted to show you one of the exact

7        letters that you wanted to interview him about; is that so?

8        A.  Yeah.  All the letters that we had received he had his

9        own copies with him.

10       Q.  All right.  Let me just get us back to the recording.

11                So he knew what you were talking about, right?

12       A.  Yes.

13       Q.  I'm just going to get us back to where we paused, which

14       was at about 14 minutes.  All right.  And we're just going

15       to listen to this last little sentence again.

16                (Audio recording resumed.)

17                "Read it from the very top, number one --"

18                "Right.  Uh-huh.  No, I've read it.  'Will show

19       the defendants have no case.'  I think the -- in my opinion,

20       the profanity kind of scares the court a little bit too."

21                "You want to know what?  I -- I wasn't going to

22       walk around and internalize this stuff."

23                "Yeah."

24                "Okay?"

25                "I get ya."
```

1            "I'm not -- I wasn't going to do that to myself,

2      not after what these guys did.  These guys dragged me

3      through the coals.  And I'm not going to walk around like

4      this.  Then I'd be a walking bomb.  You can forget that."

5            (Audio recording paused.)

6      BY MS. ALLYN:

7      Q.  Tell me what's happening when you hear Mr. Ivers say,

8      "I'd be a walking bomb" to you as an investigator.

9      A.  It's just another, you know, red flag that is telling me

10     that he's got these very strong feelings that I may have to

11     worry about.

12     Q.  So you are continuing to talk with him?

13     A.  Yes.

14            (Audio recording resumed.)

15            "There it is.  There's --"

16            "Yeah."

17            "Well, you can -- that's the whole context.  No,

18     there's no -- the only reason why I'm sane and not in a

19     mental institution is because I vented."

20            "Yeah."

21            "You know, I'm not going to walk around with that

22     inside me.  I refuse to do it.  And if I'm going to hurt

23     that badly, I'm going to make sure everybody around me knows

24     about it that has to do with the case."

25            "I hear ya."

 1                "They -- these guys stalled me for three years,

 2      but now I'm in court.  This is it.  It's all going to be

 3      over with."

 4                "Uh-huh."

 5                "I'm getting my day in."

 6                "What's going to happen if you don't win?"

 7                "Then I don't win.  I don't think there's anything

 8      else."

 9                (Audio recording paused.)

10      BY MS. ALLYN:

11      Q.  Deputy, why would you ask Mr. Ivers that question?

12      A.  Because his anger was about his case.  And, you know, my

13      assumption is that if there was a positive outcome for him,

14      that probably there wouldn't be the anger problems as much.

15      But if he lost his case, which could happen, I was concerned

16      about what would happen then.

17      Q.  And why is that?

18      A.  Because I didn't want him to do anything to any of the

19      Marshal Service protectees.

20      Q.  Keep your case open in case he lost, things like that?

21      A.  Yes.

22                (Audio recording resumed.)

23                "Yeah.  I think it was -- there was a different

24      letter too."

25                "That's the only one that says I'm becoming an

```
1    angry person."

2               "Where did it say that?"

3               "At the very bottom."

4               "Maybe it was the other -- oh, I missed a page.

5    Oh, yeah, there you go."

6               "See that?"

7               "Yeah."

8               "I am fucking broke.  I'm just -- I'm not going to

9    carry that hurt around inside."

10              "I hear ya."

11              "Let's see.  I run five minutes fast.  Okay.  All

12   right.  That's all."

13              "It's understand --"

14              "It's all registered.  I say other things.  Now

15   --"

16              "In case you need it, there's my -- it's got my

17   cell phone number on there.  I don't know why you would, but

18   --"

19              "Yeah."

20              (Audio recording paused.)

21   BY MS. ALLYN:

22   Q.  What's happening there?  What are you referring to?

23   A.  I'm handing him a business card with my name, cell phone

24   number, and email address on it.

25   Q.  And why would you do that?
```

1   A.  To get him to contact me if there's sort of -- if he's

2   having any troubles that he wants to, I guess, maybe lash

3   out about that he could contact me and I could talk to him

4   about it, rather than going off on court employees.

5           THE COURT:  Ladies and gentlemen, you've been

6   sitting over an hour.  Do you want to take a minute to

7   stretch and then we'll resume.

8           (Stretch break.)

9           THE COURT:  All right.  Ms. Allyn, sorry for

10  interrupting you.  The last response was in response to your

11  question:  Why would you do that, and then I interrupted

12  you.

13  BY MS. ALLYN:

14  Q.  So I think you're explaining is this an investigative

15  technique, to give your card, ask Mr. Ivers to call you?

16  Can you explain what you're doing there?

17  A.  Um, yeah, I would -- it's sort of an investigative

18  technique.  It diverts -- trying to divert any sort of

19  negative communications to the Marshal Service.  And, you

20  know, if somebody wanted to, say, vent and use profanity and

21  speak in, you know, terms that might be offensive or

22  threatening, it's better for them to call me because I don't

23  mind listening to that.  It's part of my job.

24  Q.  Are you trying to kind of be friendly or rapport

25  building, that type of thing as well?

1   A.  Yes.

2   Q.  And I notice when you're talking to Mr. Ivers and he's

3   admitting that he wrote a letter that I'm becoming a

4   dangerous person -- right, he had admitted that?

5   A.  Yes.

6   Q.  Are you concerned about that?

7   A.  Yes.

8   Q.  It doesn't seem as if you are expressing it that

9   strongly to Mr. Ivers at the time.  Why are you acting like

10  that?

11  A.  Well, I'm trying to keep him talking.  You can see there

12  for a minute he sort of opened up and was explaining, you

13  know, I don't want to keep this inside and this is the

14  reason I'm writing.  So he's getting there.  He's explaining

15  it to me.  I just want to keep the conversation going and

16  let him tell me what his troubles are.

17  Q.  So would you downplay your real concerns about the

18  communications for an investigative reason?

19  A.  Yes.

20  Q.  And that's sort of what you're explaining then?

21  A.  Yes.

22  Q.  To keep him talking?

23  A.  Yes.

24  Q.  All right.  So let's go back to playing.

25              (Audio recording resumed.)

```
1              "I was going to show you this -- the part that I
2      said was this -- this isn't -- this is just stuff that I
3      have to talk to the judge about.  We're having a hearing
4      today.  This is my entire case right here."
5              "Uh-huh."
6              "It's actually just one of these.  Oh --"
7              (Audio recording paused.)
8      BY MS. ALLYN:
9      Q.  Are you guys looking at something right now?
10     A.  He had a bag of documents he was going through and
11     showing me, I guess, parts of his case, his civil case.
12             (Audio recording resumed.)
13             "Oh, it's a copy.  This is my entire case right
14     there.  That's -- right here.  That's it.  This is just --"
15             "Pretty simple."
16             "I got it with that to refer to.  And this is just
17     -- this is a copy of this.  Here's -- here's what I'm going
18     to have -- if we have a jury trial, this is what I'll have
19     on my desk in front of me.  This is my case.  This is what
20     these guys have sent me."
21             "Oh.  Have you read it all?"
22             "This -- this is what they did."
23             "I wouldn't be able to read that all, but have
24     you?"
25             "Well, a person can't -- you can't read all that.
```

1    Oh, yeah, I know the case like the back of my hand.  Look at

2    all of this is from them.  And here's mine."

3              "Uh-huh.  Well, they should be able to --"

4              "I don't know why I would need to call you."

5              "Well, the only reason I offer it is because if

6    some of the -- you know, like you say, where you have -- you

7    don't want to internalize it and you need to get it out and

8    -- it's better if you call me rather than --"

9              "Yeah, this case is over with.  Today it's done."

10             "Because when the judges get letters --"

11             "Once they make a decision, there's going to be no

12   more letters.  It's over with.  This is it."

13             "Okay."

14             "Party over."

15             "All right."

16             "This is what I've waited for for a long time."

17             "All right.  Well --"

18             "This is it.  It's all done."

19             "That's --"

20             "We're going to have the hearing today and then

21   there will be a trial.  And how the trial ends, it's over

22   with."

23             "Okay.  Well, you're welcome to call me if you

24   need to get something off your chest.  I'm just putting that

25   out there."

```
 1              "There isn't anything more to be said.  I said
 2      everything."
 3              "Because, you know, obviously law enforcement, we
 4      all talk to each other.  So, you know, you -- they actually
 5      arrested you in Hennepin County, right?"
 6              "A couple of times."
 7              "Yeah.  And the up side --"
 8              "I went to trial for it."
 9              "-- the up side of venting to me is it doesn't
10      bother me if you yell at me because --"
11              "No, I'm not going to.  I didn't yell.  I yelled
12      at the judge that that case is in court with, but not these
13      judges."
14              "Yeah.  Few more minutes."
15              "So yeah, a few little sheets of paper compared to
16      all of their papers."
17              "Hard to compete against --"
18              "No, it's not.  It's very easy."
19              "Is it?"
20              "All good.  I'm a smart guy.  Actually, their
21      investigation is basically what ruined them.  Their own
22      evidence is the part that's going to -- is why they are
23      going to lose."
24              "This is the 9:00 for Judge Wright."
25              (Audio recording paused.)
```

1    BY MS. ALLYN:

2    Q.  Okay.  Deputy, we've ended the recording here, but you

3    did keep talking to Mr. Ivers for a while after this part of

4    the exhibit; is that true?

5    A.  Yes.

6    Q.  Was the conversation sort of like talking about drinking

7    diet soda, losing weight?

8    A.  Yes.  We didn't talk any more about the substance of the

9    communication.

10   Q.  Okay.  No more about the substance of these letters and

11   how he's treating the Court?

12   A.  No.

13   Q.  But did you continue to escort him that day?

14   A.  Yes.

15   Q.  How so?

16   A.  Right after this was over, I walked him to the

17   courtroom, got him set up at his counsel table -- he was

18   representing himself, so he had his own table -- and gave

19   him instructions on, you know, where he could and couldn't

20   walk around in the courtroom, and kind of gave him the

21   security guidelines.  And then I stayed in the courtroom,

22   along with other security people, for most of the court

23   hearing.

24   Q.  So either the part that we didn't listen to of the

25   recording or the time that you were with Mr. Ivers, did he

```
 1   ever apologize for making those inappropriate communications
 2   in those letters?
 3              MR. KELLEY:  Objection, Your Honor, leading.
 4              THE COURT:  Sustained.
 5   BY MS. ALLYN:
 6   Q.  Did Mr. Ivers ever apologize for making --
 7              MR. KELLEY:  Objection, Your Honor.
 8              THE COURT:  Sustained.
 9   BY MS. ALLYN:
10   Q.  Tell me if there's anything in the recording or not in
11   the recording that Mr. Ivers said with respect to the
12   letters that we haven't captured, that we haven't talked
13   about.
14   A.  Well, he didn't back away from anything.  He sort of --
15   he didn't hide anything.  I mean, he just said yeah, that
16   was me, that's what I said, and that's what I meant sort of.
17   You know, he didn't backpedal at all, I'll give him that.
18   Q.  So he admitted to it?
19   A.  Yes.
20   Q.  Make any excuses for it?
21   A.  No -- well, other than he talked about his internal
22   anger and he wanted to vent and let it out.
23   Q.  Did he make my responses heeding your warning?
24   A.  I think at some point -- this would be later on, at the
25   trial -- I think he told me that once the trial was over, it
```

1    would be done and we wouldn't hear from him again.

2    Q.  I guess we'll talk some more too about the trial, but to

3    that point, we heard on the recording Mr. Ivers say when

4    trial is done you'll never hear from me again, right?

5    A.  Yes.

6    Q.  This will stop, right?

7    A.  Yes.

8    Q.  Was that true?

9    A.  No.

10   Q.  Did you continue to have to investigate Mr. Ivers?

11   A.  Yes.

12   Q.  But before we get to that, I want to go back a little

13   bit more to this pretrial hearing.

14          So you attended the pretrial hearing in the

15   courtroom, right?

16   A.  Yes.

17   Q.  And you couldn't record that part; is that true?

18   A.  No.  I shut off the recorder before we went to the

19   courtroom.

20   Q.  And what's your purpose then at that time to be in the

21   pretrial hearing?

22   A.  To observe him and just as an extra security body.

23   Q.  I think we heard during the recording you explain to

24   Mr. Ivers that you would need to be in the courtroom.  Is

25   that true?

```
 1    A.  Yes.
 2    Q.  When you went to the courtroom, did you explain to him
 3    who else was there for security purposes?
 4    A.  I don't know if I broke it down; I mean, it was obvious.
 5    The court-security officers have uniforms on and the
 6    marshals -- I think it was obvious who the marshals were.
 7    There were a couple of marshals in the courtroom.
 8    Q.  Did you explain to him that they were there because of
 9    him?
10    A.  Yes.
11    Q.  Did you explain to him that was unusual?
12    A.  Yes.
13    Q.  What did you observe of Mr. Ivers during the pretrial
14    hearing before Judge Wright?
15    A.  Can you repeat that.
16    Q.  What did you observe of Mr. Ivers', I guess, demeanor
17    during this pretrial hearing before Judge Wright?
18    A.  Throughout the entire hearing?
19    Q.  Yeah.
20    A.  Um, he was -- I don't know, he was being himself.  You
21    know, his courtroom decorum wasn't quite what you see from
22    lawyers, I guess.  But, you know, I thought he was trying to
23    do a good job for himself and trying to be somewhat
24    respectful toward the Court.
25    Q.  Any profanity?
```

1    A.  I don't recall him using any profanity.

2    Q.  Any expressions of agitation?

3    A.  Yeah.  You could tell that certain things that the Judge

4    wouldn't let him do or ruled on made him angry, but he

5    didn't lash out angry.  You could just visibly tell that --

6    he may shake his head and kind of throw his arms up or

7    something, but --

8    Q.  Do you recall if his agitation was in response to

9    anything specific with the Judge?

10   A.  I think the biggest factor that day was Mr. Ivers wanted

11   his civil case to be heard in front of a jury.  And I don't

12   know all the legal reasons behind it, but for whatever

13   reason, the Judge said that it would be a court trial in

14   front of the Judge, rather than a jury, and Mr. Ivers was

15   angry, I guess didn't agree with that, and made it clear

16   that he didn't agree with that.

17   Q.  At the end of the pretrial hearing, did you observe

18   anything of Mr. Ivers' conduct as he's leaving the courtroom

19   relevant to your testimony today?

20   A.  He made a comment about having -- some time during the

21   hearing abiding distrust for judges, and he pointed at the

22   marshals and the court-security officers and said something

23   about, you know, this is one of the reasons why I don't like

24   judges, something to that effect.

25   Q.  I'm sorry, I didn't quite hear that first thing you

1    said, abiding what for judges?

2    A.   Distrust.  I would have to look back at my report, but I

3    think that was the words he used.

4    Q.   Something like that?

5    A.   Yes.

6    Q.   And you said he was also referencing to the security

7    personnel?

8    A.   Yeah, he -- you know, he was -- he was polite to all the

9    security personnel, and he didn't seem agitated by it.  But

10   he did point at all the security personnel and say this is

11   why I don't like judges, which I took to mean that the

12   judges were bringing in security and he didn't like that.

13   Q.   You mentioned something about Mr. Ivers not seeming

14   contrite.  Did that matter to you?

15   A.   Yes, because, you know, in my experience when we

16   interview people and they are contrite, it sort of makes us

17   feel better about that they're not going to take it further

18   and actually act on their impulses or their words.  Some

19   people just get angry and say things they shouldn't say and

20   then when it's brought to their attention, they realize it

21   and they back off on it and say I'm sorry, I didn't mean it

22   that way.

23   Q.   So if Mr. Ivers didn't do that, what did you decide you

24   needed to do as an investigator?

25   A.   I kept the case open and monitored the progress of it,

1   which was just that there would be another couple of days of

2   court for his trial.  We would do security for that.  And I

3   made a security bulletin sort of print-out with his photo on

4   it and a brief synopsis of the reason we wanted the court

5   security to be aware of him.  I disseminated it to the

6   Marshal Service and to the court-security officers and to

7   the front screening station to be aware of his -- you know,

8   when he comes in that they need to let me know and keep an

9   eye on him.

10  Q.  And some of this is -- is this in reference to there's

11  going to be another appearance of Mr. Ivers a few days after

12  this January 4th pretrial?  Is that right?

13  A.  Yeah.  The January 4th hearing was to prepare for his

14  civil trial.  And then the trial was scheduled for, I

15  believe it was, maybe a week later.

16  Q.  Does January 9th sound about right?

17  A.  Yes.

18  Q.  So what steps are you doing to prepare for the January

19  9th hearing with respect to Mr. Ivers?

20  A.  Just making sure we have personnel working that day that

21  can cover the security for the courtroom.  And I made sure

22  that I was there to meet Mr. Ivers at the front door again.

23  And I believe I told him I would do that after the end of

24  the pretrial hearing.  I said I would be there for his trial

25  and we'd go through the same routine of me escorting him.

1   Q.  And is that what happened?

2   A.  Yes.

3   Q.  So were you with Mr. Ivers on January 9th and his trial

4   January 10th, 2017?

5   A.  Yes.

6   Q.  Was that recorded, those conversations with Mr. Ivers?

7   A.  Um, I don't believe there were any recordings because we

8   just went straight to the courtroom.

9   Q.  Did you still have opportunities to talk with Mr. Ivers

10  on January 9th and January 10th, 2017 about his

11  inappropriate communications?

12  A.  Um, we talked a little bit about everything.  There were

13  short breaks, you know, lunch breaks and bathroom breaks and

14  things.  It was mostly small talk, as I recall.

15  Q.  Any more words of warning, admonishment, discussions

16  like that?

17          MR. KELLEY:  Objection, Your Honor, leading.

18          THE COURT:  Sustained.

19  BY MS. ALLYN:

20  Q.  Did you talk to Mr. Ivers any more with respect to his

21  communications?

22  A.  In all of my interactions with Mr. Ivers I brought it up

23  and reiterated why I was going through all of this effort.

24  So he was made well-aware.

25  Q.  So you sat through both days of trial, right?

1    A.  I didn't sit through the entire trial.  I took breaks.

2    But maybe 75 percent.

3    Q.  And who was the presiding judge of that trial?

4    A.  Judge Wilhelmina Wright.

5    Q.  Did you get to observe Mr. Ivers then in the courtroom

6    and his performance during the trial?

7    A.  Yes.

8    Q.  Okay.  How would you describe that performance?

9    A.  The same as the pretrial.  I mean, his demeanor was odd

10   at times, you know, doing things like taking his shoes off

11   or kind of, you know, making gestures and noises.  But he

12   also -- you know, he tried his case and, you know, for the

13   most part he stuck to trying his case.  He's just not in the

14   lawyer mold, I guess.  He was different, I guess.  I don't

15   know.

16   Q.  But did he appear to you to be able to ask good

17   questions of witnesses?

18   A.  Yes.  Yeah, he did a good job I thought.

19   Q.  I guess that's what I'm getting at.  His performance as

20   a person other than a lawyer, how would you describe it or

21   rate it?

22   A.  A lot better than I expected.  I thought he did a good

23   job.

24   Q.  There's nothing threatening about shoes off or

25   gesturing, right?

HAYTERVIG - DIRECT

185

1   A.  No, it's just odd.

2   Q.  But you didn't have concerns from a security perspective

3   with respect to his performance in putting on his case,

4   right?

5   A.  No.  I don't think he was a security threat during --

6   well, I mean, had we not been there, I don't know, but, you

7   know, we were right next to him.

8   Q.  Tell me how many marshals were in that courtroom during

9   his trial.

10  A.  It varied as people rotated in and out, but probably

11  maybe three deputy marshals and one or two court-security

12  officers.

13  Q.  So there is a distinction, right?  You're a deputy

14  marshal; is that right?

15  A.  Yes.

16  Q.  And then is there separate court-security officers?

17  A.  Blue coat in the back there.

18  Q.  For the record, you have pointed to the back of the

19  courtroom where other court security are that always wear a

20  blue blazer; is that right?

21  A.  Yes.

22  Q.  So people can refer to them as blue coats?

23  A.  Yes.

24  Q.  Is that a common way to refer to them?  Right?

25  A.  They are the, I guess, security, the uniformed security

1   for the building.

2   Q.  So you had both marshals and what we call blue coats in

3   that courtroom?  Is that what you're saying?

4   A.  Yes.

5   Q.  And had you said anything about their presence there to

6   Mr. Ivers so that he understood why you were there?

7   A.  Um, yeah.  I mean, I explained it pretty clearly the

8   first time.  And I told him that it would be the same

9   throughout his trial.  So it was explained to him why the

10  marshals and the court-security people were in the

11  courtroom.

12  Q.  Did Mr. Ivers talk to you about his civil case at all

13  during that trial?

14  A.  Yes.

15  Q.  Like what kind of things would he say to you about it?

16  A.  That's mostly what he wanted to talk about.  You know,

17  he would always kind of steer the conversation back to his

18  case.  And he wanted to explain to me why he was right and

19  the defendant was wrong.  And I listened to him.

20  Q.  Any conversations about jury trial, bench trial, things

21  like that?

22  A.  Yeah.  He had made comments that he was disadvantaged

23  because he didn't get a jury because he says that he has

24  experience in front of juries and he does well and he can

25  usually convince a jury to take his side.

1   Q.  How would you characterize his feelings about not having

2   a jury trial?

3   A.  He was very unhappy that he didn't get that.  It was

4   definitely a sore subject for him.

5   Q.  Did you discuss with him, I don't know, your thoughts,

6   his thoughts about the outcome of trial?

7   A.  Um, on a few occasions I asked him, you know, if this

8   doesn't go your way and if this doesn't work out and they

9   find -- the Judge rules against you, what's going to happen

10   next?  How are you going to handle it?  And his general

11   answer was just that it would be over, just that's it.

12   Q.  Well, and did you say anything on your part to him about

13   what his behavior would have to be when the trial was over?

14   A.  Yeah.  I told him you can't send letters or make phone

15   calls that have profanity and threats and the kind of

16   language that's clearly meant to intimidate.  I said just

17   don't do that.

18   Q.  Did you warn him about walking a line, crossing a line,

19   anything like that?

20             MR. KELLEY:  Objection, Your Honor, leading.

21             THE COURT:  Overruled.

22             THE WITNESS:  Yes, I did.

23   BY MS. ALLYN:

24   Q.  How so?  Can you explain that.

25   A.  Well, he would -- he had asked me -- just about every

1    time I encountered him, he asked if we were going to arrest
2    him.  I explained, no, that's not what this is about.  But
3    these things could be, you know, criminal if you take it to
4    a certain level and you really need to back off from it.
5    Q.  Did you ever either, I don't know, before or after the
6    pretrial, trial, are you having conversations with Judge
7    Wright or chambers about your conversations with Mr. Ivers?
8    A.  Judge Wright asked me to meet with her prior to the
9    hearings just so that I could explain to her what security
10   measures I had put in place to sort of make her feel that
11   the courtroom would be safe.
12            And I also stayed in touch with Terianne Bender
13   from Judge Wright's office and gave her updates with
14   anything relevant that may have happened.
15   Q.  Deputy, I want to move you forward in time now towards
16   the end of June 2017.  Okay?
17   A.  Yes.
18   Q.  Did you have any further action that you took in
19   Mr. Ivers' case near the end of June 2017?
20   A.  The end of June.  Um, that probably would have been the
21   time that the ruling was sent out to Mr. Ivers.  And I had
22   stayed in contact with Terianne Bender and told her please
23   let me know when the ruling is going to be sent to Mr. Ivers
24   so that I can let the court security know one way or the
25   other, because I expected that if he lost his case, we'd

1    probably hear from him again because he was fixated.

2    Q.  And so Terianne Bender did contact you end of June and

3    say, hey, order is coming out?

4    A.  She said we mailed a letter to Mr. Ivers letting him

5    know that he had lost his civil suit.

6    Q.  And so what did you do in response to learning that?

7    A.  I updated our security bulletin, disseminated it to all

8    the Marshal Service people saying, basically, that Mr. Ivers

9    had lost his civil suit and he was likely to be angry about

10   it and that they should beware if he comes around the

11   courthouse again.

12   Q.  Did you then sometime that summer receive any reports of

13   inappropriate communications from Mr. Ivers?

14   A.  I think that was around the time that I was

15   transitioning to the new warrant supervisor job and there

16   was another investigator transitioning in.  So I believe

17   there was another letter received during that time.

18   Q.  Is the transition period about August 2017?

19   A.  Yes.

20   Q.  And who is taking over your spot at that time?

21   A.  Farris Wooton, Deputy Marshal.

22   Q.  And did Deputy Marshal Wooton -- did you have to do --

23   become involved or learn anything of Mr. Ivers in that

24   August 2017 time period?

25   A.  Yes.  Because I was versed in the case and I had started

1    with it, so I sort of worked it in conjunction with Farris

2    to continue.

3              There were some letters sent out to -- it started

4    out with Judge Wright, but then the letters that summer went

5    to several different judges, some magistrates and I think

6    maybe the Chief Judge.  And they were all duplicates sent

7    out to various judges.  And I think there was some more

8    troubling language in those.

9    Q.  If I show you, Deputy, what's in evidence as Exhibit 11,

10   do you see that on your screen?

11   A.  Yes.

12   Q.  Do you recognize that?

13   A.  Yes.

14   Q.  How so?

15   A.  That would have been one of the letters received late

16   summer.  I think that one must have been forwarded from the

17   court chambers to the marshals.

18   Q.  You remember seeing like a whole stack of letters?

19   A.  Yes.

20   Q.  Did you put that in as part of your investigation of

21   Mr. Ivers in August 2017?

22   A.  Yes, because we were transitioning, it would have been

23   either me or Deputy Wooton would have been documenting this

24   stuff in our computer system.

25   Q.  At some point did Deputy Wooton ask you to participate

1    in trying to talk or locate -- talk to or locate Mr. Ivers?

2    A.  Yes.

3    Q.  And why was Deputy Wooton asking you to help locate

4    Mr. Ivers?

5    A.  There were more concerning communications, and --

6    Q.  How so?  Like what?

7    A.  There was something about a ticking bomb, I think, or a

8    walking bomb, and so the court had reached out to the

9    marshals again, and then Deputy Wooton talked to me about it

10   and we decided, well, we need to go talk to Mr. Ivers again.

11   Q.  And did you know where Mr. Ivers was at this time that

12   you decided you needed to talk to him again?

13   A.  We didn't.  His addresses were -- well, he just wasn't

14   that easy to find.  The addresses that he had in public

15   records and that he had provided were not accurate.  So it

16   took a little digging to figure out where he was.

17   Q.  Took some effort?

18   A.  Yes.

19   Q.  Okay.  Sort of referring to time frame, is this about

20   end of August 2017?  Does that sound right?

21   A.  Yes.

22   Q.  So you did find him; is that right?

23   A.  Yes.

24   Q.  And did you go interview Mr. Ivers?

25   A.  Yes.

```
 1    Q.  All right.  When was that?

 2    A.  It would be the first week of September of 2017.

 3    Q.  Does September 1st, 2017 sound right?

 4    A.  Yes.

 5    Q.  And where did the interview of Mr. Ivers take place?

 6    A.  It was at a residence in Minnetonka that we'd located

 7    him at.

 8    Q.  And did anybody go with you to interview Mr. Ivers in

 9    September?

10    A.  Deputy Farris Wooton was with me.

11    Q.  And why were you going to talk to Mr. Ivers on September

12    1st?

13    A.  The additional letters that he had sent to court

14    employees, and it was still that same sort of frightening

15    rhetoric with the, you know, pay attention and I'm a ticking

16    bomb or something.  I don't recall the exact words right

17    now.  It was disturbing to the court employees, and they

18    felt like they were being threatened in some way.

19    Q.  But what would be your goals or motives to talk to him

20    on September 1st?

21    A.  Same as before.  Try to get him to explain what he's

22    thinking and what's going on in his head, and what his

23    motives are, and whether he has any plans to act on his

24    anger, you know, physically.  And, you know, hopefully get

25    him to show some contrition and say, okay, I realize that I
```

1    crossed the line and I won't do it anymore.

2            My hope was that he would just stop doing it and

3    he would go about his life and we wouldn't have to take any

4    further action.

5    Q.  So are you trying to assess if you have to take further

6    action or not?

7    A.  Yes.

8    Q.  When you talked to Mr. Ivers September 1st, did you

9    record that interview?

10   A.  Yes.

11   Q.  And how did you record it?

12   A.  A digital recorder in my pocket.

13   Q.  And sort of similar to Exhibit 12, did you meet in my

14   office and review a disk to ensure that the disk had the

15   majority of the September 1st recordings between you and

16   Mr. Ivers on the disk?

17   A.  Yes.

18            MS. ALLYN:  Your Honor, may I approach?

19            THE COURT:  You may.

20            MS. ALLYN:  Thank you.

21   BY MS. ALLYN:

22   Q.  All right, Deputy.  I've handed you Exhibit 13.  Do you

23   see this?

24   A.  Yes.

25   Q.  And you recognize it?

```
 1    A.  Yes.

 2    Q.  How so?

 3    A.  Those are my initials on it.

 4    Q.  Is this the September 1st, 2017 audio recording of your

 5    interview with Mr. Ivers?

 6    A.  Yes.

 7              MS. ALLYN:  Your Honor, the government would offer

 8    into evidence Exhibit 13.

 9              MR. KELLEY:  No objection, Your Honor.

10              THE COURT:  Received.

11              MS. ALLYN:  Thank you, Judge.  If I could publish

12    Exhibit 13 then for the jury?

13              THE COURT:  You may.

14              MS. ALLYN:  Thank you, Judge.

15    BY MS. ALLYN:

16    Q.  Okay, Deputy.  Sort of looking at the same thing.  We

17    have a transcript that's going to follow along with the

18    audio; is that true?

19    A.  Correct.

20    Q.  And you listened to this transcript as well -- I'm

21    sorry, you read the transcript while listening to the audio

22    as well?

23    A.  Yes.

24              THE COURT:  Ms. Allyn, at some point I'm going to

25    give the jury their morning recess, so as to not interrupt
```

 1    your presentation, do you want to do it after this exhibit

 2    or now?

 3              MS. ALLYN:  Your Honor, it might be better before

 4    this exhibit, before we get into the recording.

 5              THE COURT:  Okay.  We'll be in recess until 10:30.

 6    Remember the preliminary instruction about conduct of the

 7    jury.  We'll be in recess until 10:30.

 8              THE COURTROOM DEPUTY:  All rise.

 9              (A brief recess was taken.)

10                        **IN OPEN COURT**

11                      **(JURY NOT PRESENT)**

12              THE COURT:  The record should indicate we're

13    proceeding outside the presence of the jury.  Mr. Rank

14    wanted some discussion.

15              MR. RANK:  Yes, Your Honor, briefly.

16              A couple of things came up during the

17    cross-examination of Ms. Bender that I objected to and

18    didn't want to deal with at sidebar.  I would rather do it

19    outside the presence.

20              THE COURT:  Okay.

21              MR. RANK:  The first issue was Mr. Kelley asked

22    Ms. Bender whether Judge Wright had been subpoenaed.

23              THE COURT:  Right.

24              MR. RANK:  I objected to that on relevance

25    grounds, but I think that is an issue that the Court should

1   rule on, whether they get to ask that question at all,

2   anything about the subpoena, since it's been quashed by the

3   Court.

4              THE COURT:  Right.

5              MR. RANK:  We're going to ask for, I think before

6   closing argument, an order that the defense can't comment on

7   the failure of the government to call Judge Wright, because

8   I think that that's an appropriate order in this case.

9              THE COURT:  Okay.

10             MR. RANK:  But I think any inquiry regarding

11  whether she was subpoenaed, what happened as a result of

12  that subpoena should be not something that is in the realm

13  of appropriate questioning.

14             THE COURT:  All right.

15             MR. SCOTT:  Your Honor, generally you cannot argue

16  about the failure of the government to call a witness or the

17  failure of a witness to appear because the witness is

18  equally available to both sides, and that's just not true

19  here.  The witness here has made a decision that she is not

20  available to the defense.  So the witness is declining to be

21  here I think is a subject that a comment to the jury -- the

22  government never loses it's burden of proof.  So we don't

23  have to blame it on the government, just say you're not

24  hearing from the witness and it's not our fault.

25             THE COURT:  So I take it you're going to argue

1        that's a lack of evidence?

2              MR. SCOTT:  We're going to argue it's a lack of

3        evidence, yes, Your Honor.

4              THE COURT:  All right.  I have no idea what the

5        right ruling is.  I'm going to have to look at it.  But I

6        thought the question was not relevant given the fact that

7        I'd quashed the subpoena.  And I thought the answer was in.

8        That's why I moved to strike.  If the answer was not in,

9        that's why I told the jury to ignore the question.  Let me

10       look at it because I just don't know.  If you have some

11       authority that's helpful to me, either of you, because I

12       think -- I don't know of very many rulings either using the

13       three rationales for quashing the subpoena that I read

14       about, so I just don't know the right answer.

15             You, Mr. Scott, make a very relevant point that

16       it's not true in this case because apparently the witness

17       being represented by the prosecution, i.e. a United States

18       attorney, albeit in another district, is controlling or

19       representing her in resisting the compelling subpoena.  So I

20       want to look at it.

21             Mr. Rank, if you have some authority to help me

22       or, Mr. Scott, I would appreciate it.

23             MR. RANK:  I would just say, Your Honor, the

24       prosecution is not in a position where we have any -- my

25       understanding is that Judge Wright would have opposed a

```
 1    subpoena from either side.

 2              THE COURT:  Okay.

 3              MR. RANK:  So the government chose not to subpoena

 4    her, chose not to call her.

 5              THE COURT:  All right.

 6              MR. RANK:  But the prosecution wasn't the arm of

 7    the government that was representing Judge Wright.  And what

 8    I don't want to have to get into is explaining to the jury

 9    that there was a subpoena, there was a motion to quash and

10    Your Honor granted that motion to quash for all the reasons

11    --

12              THE COURT:  Right.  Right.

13              MR. SCOTT:  I don't think we can do that because

14    it's not of record.  It might've ended up of record, but you

15    objected and therefore it's not of record.  I don't think we

16    can argue something that's not of record.

17              But the fact she was a witness, she was deciding

18    things, she was talking to people who are testifying about

19    what she was saying and what she was ordering makes her a

20    relevant witness to the case.  Because of special rules and

21    if you've read 28 USC 604, the underlying statute is

22    interesting to see where the heck the rules ever came from

23    because there's no support for the regulations at all.  But

24    setting that aside, it's given her the power to say even

25    though I am a witness, I have decided I'm not important
```

 1    enough to appear and my decision is final.

 2           Now, the jury is not going to hear that, but the

 3    jury certainly can hear that an important witness is not

 4    here and testifying.  And normally, you know, you can't say

 5    that because the defense has the power to call the witness.

 6    I mean, that's the reason.

 7           The burden has never shifted.  The government has

 8    the burden of their not presenting -- or we're not hearing

 9    from that witness.  We will be careful in our argument as to

10    how we say it, but, you know -- in a case like this when a

11    witness who's clearly in the center of the case chooses not

12    to appear not through our fault, we're not going to let the

13    jury say how come the defense didn't call them.

14           THE COURT:  I appreciate you bringing it up in

15    anticipation of later controversy of it.

16           You want to bring the jury in?

17           MR. RANK:  Judge, I wanted to ask one other point.

18           A couple of times on cross-examination there was a

19    question of the witness about something that wasn't charged

20    in the indictment.  The judge sustained the objection again

21    on foundation grounds, but Mr. Scott argued this and

22    Mr. Kelley then asked Ms. Bender about what was in the

23    indictment.  As a factual matter what they asked was not

24    true.  The letters are charged in the indictment.  They are

25    in the indictment.  They're incorporated by reference into

1      the count language.  And so I don't want to have to keep

2      objecting on any grounds, but that's factually not true.

3      Those things are charged in the indictment.

4              MR. SCOTT:  Your Honor, maybe I'm completely off

5      into the wilderness here, but the indictment charges events

6      that took place on February 27th, 2018.  And it appears to

7      me that right now that the government is arguing to the

8      Court that that's not true, the indictment doesn't say that.

9      But all of this stuff that took place in 2017 as part of the

10     indictment and all of the stuff that took part in 2016 as

11     part of this indictment and it's all charged here, I don't

12     think that that is the least bit true, Your Honor.  It may

13     be lots of stuff that they want to talk about, but it's not

14     what's charged in the indictment.

15             What's charged in the indictment is on February

16     27th, 2018 that he made a statement and transmitted it in

17     interstate commerce.  He made a statement threatening the

18     Judge, Count One, and he transmitted it in interstate

19     commerce, Count Two.  None of these things that we're

20     talking about here took place on February 27th.

21             And I think it's fair to ask the witness.  Now,

22     the Court -- for whatever the reason the Court sustained the

23     objection, I suspect because the witness didn't know what

24     was charged, and so it was a foundation objection that was

25     sustained from because the witness did not know, couldn't

1    answer the question.  But we're spending most of the time in

2    this trial talking about things that aren't charged in the

3    indictment.

4              THE COURT:  But here's my understanding, all this

5    that's coming in for the three-year period, from March of

6    2015 through February of 2018, is that we're relying on the

7    committee's jury instruction about context and background.

8    So I think in the preliminary instructions we -- I'm sorry,

9    the Court told the jury that they've got two charges, so, I

10   mean, that's to me what the jury needs to know.  And why

11   they didn't charge these other things doesn't have anything

12   to do with our lawsuit --

13             MR. SCOTT:  Yes.

14             THE COURT:  -- except background and context for

15   the two counts in the indictment.

16             MR. SCOTT:  But the one thing I think the jury

17   needs to keep clear throughout is when they put up a

18   statement that's made here, the judge is corrupt, it's not

19   the charge in the indictment.  The charge in the indictment

20   is a conversation that took place on February 27th.  And I

21   think it's clearly -- the jury could clearly get confused

22   through this trial as to what was being charged by the way

23   the government is presenting the case, which is they're

24   presenting the case with all of this background materials.

25   They're highlighting the inappropriate language, and it's

1    the inappropriate language that keeps getting pounded in as

2    if it's charged and it is not.

3             THE COURT:  Right.  And you're going to argue that

4    in closing.  And, I mean, I can tell and re-emphasize to the

5    jury that the two counts that we're talking about were told

6    you in the preliminaries.  The rest of this is context and

7    background.  And it is for you to decide whether it's

8    important, relevant, proves up the case, whatever.  Right?

9             MR. SCOTT:  Yeah.

10            THE COURT:  Yeah.  And so, Mr. Rank, I don't know

11   exactly -- you were asking that I restrict the defendant's

12   cross-examination to the extent of saying why wasn't that

13   charged in the indictment?

14            MR. SCOTT:  I will never ask that word, why.

15            MR. RANK:  Whether it was charged in the

16   indictment two things:  The witnesses are not going to know

17   whether it was charged in the indictment for one thing.

18   And, two, it is charged in the indictment.  The background

19   and context --

20            THE COURT:  The surplusage, right, is in the

21   indictment.  But a lay witness, particularly Ms. Bender, or

22   -- that's the context it came up in, as I recall.

23            MR. RANK:  Right.  She shouldn't be asked about

24   that in the first place.  I don't want to have to keep

25   objecting on foundation grounds.

```
 1                    THE COURT:  Right.  Right.  And you don't have to.
 2        If they want to make an offer, they can.  Okay?
 3                    MR. RANK:  Thank you, Your Honor.
 4                    THE COURT:  You want to get the jury.
 5                    THE COURTROOM DEPUTY:  All rise for the jury.
 6                              IN OPEN COURT
 7                             (JURY PRESENT)
 8                    THE COURT:  Please be seated.  Ladies and
 9        gentlemen, I apologize.  We had a short -- remember the jury
10        instruction about bench conferences to discuss how to handle
11        matters?  We had a short bench conference.  We weren't
12        wasting our time.  I hope that it will lead to more
13        efficient presentation by both sides.  That's the reason
14        we're late.  You are entitled to know that.
15                    Ms. Allyn was presenting on behalf of the United
16        States with this witness.  So you may proceed, Counsel.
17                    MS. ALLYN:  Thank you, Your Honor.
18        BY MS. ALLYN:
19        Q.  Deputy, just to re-orientate everybody, we're about to
20        play the audio of your September 1st, 2017 interview with
21        Mr. Ivers; is that right?
22        A.  Yes.
23        Q.  And I didn't realize on the break I can jump this ahead
24        43 seconds and get us back on these minutes.  Okay.
25                    (Audio recording resumed.)
```

1              "Ivers.  Bob Ivers."

2              "There's a couple guys in there.  The only one I

3       know is the owner."

4       BY MS. ALLYN:

5       Q.  Can you just set the scene for us.  Is this a multiple

6       room, an apartment building?  Set the scene.

7       A.  It's a single house, but it's kind of rural.  It's on a

8       probably couple of acres.  There were some people in an

9       outbuilding that seemed to be working on a car or something.

10      I was asking them if they -- because this is the address

11      that I thought that I would be able to locate Mr. Ivers at,

12      so I was asking them if he was there.

13      Q.  You weren't even sure that Mr. Ivers was at this

14      address?

15      A.  No.

16      Q.  Can you explain again a little bit -- you said there was

17      some effort to find Mr. Ivers.  I don't understand that.

18      A.  Well, you know, all of the public records -- driver's

19      license, address, things like that -- were pointing to

20      different addresses, one being his brother's house in

21      Hopkins.  And, you know, we did some checking into that and

22      found out that he wasn't living there.

23              So we had to, I guess, do our sort of -- kind of

24      like we would do if we were trying to locate a fugitive,

25      trying to figure out where they're laying their head at even

1     though the public records aren't showing where they're at.

2     Q.  Did you take anything about how it was hard to find

3     Mr. Ivers?

4     A.  Did I --

5     Q.  Like why?

6     A.  Well, generally it's pretty easy to find anybody that's

7     not trying to stay off the radar because, you know, your

8     address is basically public record everywhere.  So if

9     somebody is not using where they're actually staying as

10    their address, I guess sometimes there's reasons for that.

11    Q.  Trying to avoid you or what?

12    A.  I don't know if they would be trying to avoid me, but

13    just not wanting people to know where they're at.

14    Q.  All right.  Let's go back to playing the recording.

15              (Audio recording resumed.)

16              "Do you guys live here?"

17              "-- I'm buying -- we're buying these trucks from

18    him.

19              "Oh, I gotcha.  Okay.  We'll just knock on the

20    door then."

21              "Yeah, there's a couple of them in there.  I'm not

22    sure whose -- yeah, I don't know."

23              "Are they home right now?"

24              "Richard is I know.  Richard --"

25              "I don't know the names."

```
 1                 "Okay."

 2                 (Audio recording paused.)

 3      BY MS. ALLYN:

 4      Q.   There is probably, what, about a minute of you walking.

 5      A.   Probably is.

 6      Q.   Here in the recording switching in your pocket; is that

 7      it?

 8      A.   Yes.

 9      Q.   I'm going to jump ahead to almost three minutes then.

10                 (Audio recording resumed.)

11                 "Hey there.  Bob around?  I'm with the U.S.

12      marshals."

13                 "No."

14                 "Yeah, I just heard his voice, so I know he's

15      here.  Can you step outside for a second?"

16                 (Unintelligible.)

17                 "Are you Richard?  Are you Richard?"

18                 (Knocking.)

19                 "That wasn't Richard.

20                 "Huh."

21                 "That -- that wasn't Richard."  (Unintelligible.)

22                 (Audio recording paused.)

23      BY MS. ALLYN:

24      Q.   So what had happened here?  What's going on?

25      A.   It was a nice day and the windows to the house were open
```

1    and so as we walked up to the front door, I could hear

2    Mr. Ivers talking to somebody inside.  He's got a pretty

3    distinctive voice, and I had heard it plenty of times in

4    court.  So I know Mr. Ivers was in the house.  I could hear

5    him.

6           We knocked on the door.  I think the "Richard" I'm

7    referring to is -- public records show that he was the owner

8    of the house, so that's why I was asking if it was Richard.

9    I don't know who the guy was who answered the door, but he

10   basically slammed the door on us and said "No" and shut the

11   door.

12   Q.  And said "No" to what?

13   A.  I said is -- something about is Mr. Ivers here or I'm

14   here to talk to Bob Ivers and he just said "No" and shut the

15   door.

16   Q.  But you had already heard Mr. Ivers by then?

17   A.  Yes.

18   Q.  Give me a second to get back to my "play" mode.  Here we

19   go.

20           (Audio recording resumed.)

21           "Hey, Bob, come outside for a little bit.  Talk to

22   us for a second."

23           (Dialing.)

24           (Knocking.)

25           "Here I am.  Okay.  I know you."

 1              "Hey, yeah, I know.  Bob --"

 2              "How you doing?  Hi.  How are ya?  What's up?"

 3              "I'm sorry to bother you at home."

 4              "You guys got a warrant for my arrest?"

 5              "No.  No.  We're not arresting you."

 6              " -- screwed me out of 100 ground and I need to

 7      process it."

 8              "I got ya."

 9              (Audio recording paused.)

10      BY MS. ALLYN:

11      Q.  Now, Deputy, because there was some unintelligibles

12      there, had you told Mr. Ivers what you were even there for

13      yet at the time he starts talking about the Judge?

14      A.  I don't think I had been able to get a word out at that

15      point.  He started talking.

16      Q.  So did he start talking about the Judge before you even

17      told him why you were there?

18      A.  Yes.

19              (Audio recording resumed.)

20              "Here's the deal.  I got a letter for the Attorney

21      General.  I'm sending this out to her now.  I'm going to the

22      post office now and to see if she can help me untangle this

23      thing.

24              "And we've talked about this before, how you don't

25      like to internalize, keep it in inside, so you need to vent

1    --"

2                (Audio recording paused.)

3    BY MS. ALLYN:

4    Q.  When you say "we've talked about this before," what are

5    you referring to?

6    A.  The conversation we had January 4th, 20 -- that would've

7    been 2017 before his pretrial hearing when he explained to

8    me that the language that he uses -- the profanity and the,

9    you know, what I would call veiled threats -- are his way of

10   not internalizing and letting it out.  So I'm telling him I

11   know that we've talked about this before.

12   Q.  And if you're talking to him now, September 1st, 2017,

13   this is after he has already sent all those August 2017

14   letters; is that right?

15   A.  Yes.

16                (Audio recording resumed.)

17                "I can't do any time in jail.  I can't do anything

18   there.  So I'm done."

19                "No, we're --"

20                "Whoever I yelled at and whatever, it's over

21   with."

22                "Let's talk right now.  Okay?  That's it.  Just do

23   me a favor and let's sit down and talk for just a few

24   minutes."

25                "You don't have a warrant for my arrest?"

1          "No.  We're not going to arrest you.  I promise

2     you."

3          (Audio recording paused.)

4     BY MS. ALLYN:

5     Q.  Okay.  You're asking to sit down to talk.  Can you set

6     the scene for the jury.  Where have you been standing?

7     Where is Mr. Ivers?

8     A.  Front door of the house had sort of like the concrete --

9     standard sort of concrete steps.  Deputy Wooton was standing

10    at the bottom of the steps.  I was standing on the top step

11    or the first step down.  And Mr. Ivers was standing on the

12    top landing step.

13    Q.  Would he let you inside the house?

14    A.  I didn't ask to go inside the house and he didn't offer.

15    Q.  You said, "let's sit down and talk for a few minutes."

16    Did Mr. Ivers sit down?

17    A.  He didn't want to sit down.  He stood the whole time.  I

18    sat down.

19    Q.  You did?

20    A.  Yes.

21    Q.  And where did you sit?

22    A.  On the top step.

23          (Audio recording resumed.)

24          "I'm not going to say anything to incriminate

25    myself."

HAYTERVIG - DIRECT

```
 1                    "No, and I'm not asking you to.  Listen, what it
 2        is is the same thing I talked to you about before, is the --
 3        the Clerk of Court and the people -- the employees, they get
 4        a little frightened when they get -- like, you had called in
 5        and said:  Hey, I'm a ticking time bomb."
 6                    "I am."
 7                    "Yeah, I know.  But, see, they -- they sometimes
 8        take that as threatening.  Okay?"
 9                    "Yeah."
10                    "And I know you don't mean it that way because --"
11                    "Yeah."
12                    (Audio recording paused.)
13        BY MS. ALLYN:
14        Q.  Explain what your thinking is.  You say, "I know you
15        don't mean it that way."
16        A.  I'm trying to get him to, basically, agree with me and
17        back off from this and give him the chance to -- give him an
18        out for him to say, okay, you're right, I don't mean it that
19        way and I don't want anybody to be afraid and I'm sorry.
20        That's generally the way these interviews go, is people back
21        away from what they had said or did.
22        Q.  This whole conversation, does he ever back away?
23        A.  No.
24                    (Audio recording resumed.)
25                    "And you and I have had a lot of conversations,
```

1    and I know that you're just venting.  I understand it, but

2    --"

3           "I'm out of my fucking mind, and I want you to

4    tell them down there that I'm fucking hurt.  I'm sleeping

5    under a fucking bridge.  100 -- my friend died.  He left me

6    a hundred thousand dollars, and this fucking judge snatched

7    it right out from under fucking -- under me.  You saw it in

8    court.  She denied me a jury trial.  She had the deck

9    stacked.  And I'm fucking crazy, fucking angry.  And tell

10   them downtown -- tell the federal judges this guy's out of

11   his fucking mind crazy.  This Judge cheated him.  I sent

12   them a letter and they know it."

13          "Okay."

14          (Audio recording paused.)

15   BY MS. ALLYN:

16   Q.  Compare his demeanor to the last time you talked to him

17   January 4th, 2017.

18   A.  I guess the last time I talked to him would be January

19   9th to 10th, and also January 4th.  He was clearly angry

20   from the beginning on this one.  He started out angry and

21   just stayed angry.  He wasn't that angry, you know, prior to

22   his trial.

23   Q.  Are you worried at this point in the conversation?

24   A.  Um, not for myself, but I'm worried that he may do

25   something.  Yes.

1    Q.   "Do something"?  What do you mean?

2    A.   Well, he's focusing on the Judge mostly, Judge Wright.

3    So I'm worried that he's going to try and take it out on her

4    somehow.

5              (Audio recording resumed.)

6              "I have to process it.  I have to process it."

7              "I get it.  I get it."

8              "That $100,000 -- I've got a mentally-handicapped

9    brother who needs to be taken care of.  I'm fucking broke.

10   I'm staying here.  This is just -- by the way, good job --"

11             "Yeah."

12             " -- finding the place."

13             "I'm good at my job."

14             "Use the cell phone?"

15             "No."

16             "Tracked it on my cell phone?"

17             "No.  I'm good at my job.  Don't worry."

18             "It's secluded."

19             "Yeah."

20             (Audio recording paused.)

21   BY MS. ALLYN:

22   Q.   What's Mr. Ivers talking about here?

23   A.   He was surprised that we were able to find him in a

24   secluded location.

25   Q.   Okay.  Sort of like what we talked about already?

```
 1        A.  Yes.

 2                  (Audio recording resumed.)

 3                  "And this Judge cheated me, and I'm fucking angry.

 4        And I'm not going to -- I haven't slept.  And I'm pissed

 5        off.  I'm just crazy -- a hundred thousand dollars, a tenth

 6        of a million fucking dollars.  And you want to know what,

 7        I've got 80 fucking dollars in my wallet.  I don't own a

 8        fucking car.  My life is in turmoil.  That money would have

 9        changed -- my whole world would've blossomed.  It would've

10        just blossomed.  I could've given each one of my kids 10

11        grand apiece, gotten back with them; bought a brand-new

12        $20,000 car and still had $65,000 left over.  And that

13        fucking Judge, she was biased from day one when I went in

14        that courtroom, biased from -- and I wrote the Chief Judge a

15        letter, which helped me vent --"

16                  "Yeah."

17                  "-- by telling the Judge.  I'm hurt."

18                  "Yeah."

19                  "And I'm glad the clerk called you, because I'm

20        glad they took it seriously.  I am damaged.  I'm hurt bad.

21        You don't how bad it hurts.  It's a hundred fucking thousand

22        dollars.  My friend died and left me a hundred thousand

23        dollars on his insurance policy.  And this Judge says fuck

24        you.  My dead friend left me that money and this Judge says

25        fuck you, and she took it away from me."
```

```
 1                "That's aggravating."

 2                (Audio recording paused.)

 3    BY MS. ALLYN:

 4    Q.  What is his physical demeanor while he's talking to you

 5    during all of this?

 6    A.  Clearly his body language is just angry.  You know, you

 7    can tell in his face, his expressions, sort of the way that

 8    he is using his hands that he is just very animatedly angry.

 9    Q.  And if you can try to put words to it.  When you say "in

10    his face," what is it you are seeing?

11    A.  I don't really know how to describe it.  You can tell by

12    looking at somebody if they are angry just by the

13    expression.  And he was clearly mad.

14    Q.  And we just heard him say something like I'm glad the

15    clerk called, glad they took it seriously.  What is that in

16    reference to?

17    A.  This most recent communication that the clerks had been

18    afraid about, that they had reported it to the marshals.  I

19    took it as he was saying I'm glad that they took it

20    seriously.

21    Q.  That bomb comment?

22    A.  Yes.

23                (Audio recording resumed.)

24                "Aggravating?  I've got 70 bucks in my pocket.

25    I've spent that hundred grand a thousand times, and she just
```

1    pulled it away.  It would have altered my entire life for

2    the rest of my life.  I could have done investments, bought

3    things, got a stock portfolio, all of this shit.  She was

4    gunning for me the first day.  She had nine fucking marshals

5    sitting in there.  And, well, by the way, that judge, I

6    never threatened that other judge.  I just screamed at him

7    and I was found not guilty.  I got vindicated on that case

8    in case you guys checked up on it."

9            "Well, no, you're on court probation for two years

10   in the Hennepin County case."

11           "Not two anymore.  February it will be one."

12           "Okay.  Well, anyway, sending the letters to the

13   judges and the clerks and stuff, that's fine.  I mean,

14   that's -- as far as I'm concerned, I think it's your legal

15   right to do that."

16           "Uh-huh."

17           "It's -- the only part --"

18           (Audio recording paused.)

19   BY MS. ALLYN:

20   Q.  Do you mean that?  Do you think it's fine?

21   A.  Well, I think it's fine for him to send legal

22   correspondence.  I don't think it's fine -- and I think I'm

23   about to say that -- I just don't think it's fine for him to

24   put in the profanity, and the threats, and the other stuff

25   that he adds on to his legal correspondence.

1    Q.  Okay.  So you're trying to explain to him the

2    distinction?

3    A.  Yes.

4              (Audio recording resumed.)

5              "That's when you scare people.  Okay?  When you

6    say I'm a ticking time bomb --"

7              (Audio recording paused.)

8              MS. ALLYN:  I'm going to just go back a little

9    because I think I stepped on it.

10             (Audio recording resumed.)

11             " -- all of this shit.  She was gunning for me the

12   first day.  She had nine fucking marshals sitting in there.

13   And, by the way, that judge, I never threatened that other

14   judge.  I just screamed at him and I was found not guilty.

15   I got vindicated on that case in case you guys checked up on

16   it."

17             "Well, no, you're on court probation for two years

18   in that Hennepin County case."

19             "Not two anymore.  February it will be one."

20             "Okay.  Well, anyway, sending the letters to the

21   judges and the clerks and stuff, that's fine.  I mean,

22   that's -- as far as I'm concerned, I think it's your legal

23   right to do that."

24             "Uh-huh."

25             "It's -- the only problem is when you scare

1    people.  Okay?  When you say, I'm a ticking time bomb,

2    because that makes them think, shit, this guy's going to

3    hurt me."

4              "I didn't say I'm a ticking time bomb.  I mean, at

5    you I just said I'm a ticking time bomb."

6              "But you know how people are going to take that."

7              "Hey, I watch a lot of fucking dudes, and I'm a

8    really smart guy.  It's still not against the law to tell

9    people how angry you are."

10             "You are a really smart guy --"

11             "It's not against the law to say I'm so fucking

12   mad I could kill someone.  They can't arrest you for that."

13             "No, but like you just told me, you want me to go

14   tell the judge that you're --"

15             "That this guy's fucking damaged.  He's damaged.

16   I want you to tell the judge this guy is fucking damaged.

17   And, you know, I have to figure out how to process it."

18             "Yeah, I understand.  But you don't want me to

19   tell the judge that this guy is dangerous?"

20             "Yeah, I'm not -- you want to know what?  I told

21   you I'm not going to say anything to get me thrown into jail

22   here this morning."

23             "I know, but I'm -- what I'm --"

24             "All I'm saying is that I'm fucking hurt -- "

25             "I understand that."

```
 1              " -- real bad, really bad."
 2              "And I'm trying to mitigate it.  I'm trying to say
 3      you're not a dangerous guy, and I'm trying to get you to
 4      agree with that, so you're --"
 5              (Audio recording paused.)
 6      BY MS. ALLYN:
 7      Q.  Did he ever tell you he's not a dangerous guy?
 8      A.  No.
 9      Q.  Did he ever back away from that statement that he's
10      dangerous?
11      A.  No.
12      Q.  Did he ever back away from the statement he could be a
13      walking bomb?
14      A.  No.
15              (Audio recording resumed.)
16              "Is it against the law to be a dangerous guy?"
17              "Well, it depends how far you take that."
18              "Okay.  Well, I didn't threaten anybody."
19              "I know, but you're -- and, I mean -- "
20              "Go back to them and say, you want to know what,
21      this guy's fucking -- you saw me here today.  I've been very
22      honest with you.  I'm so fucking damaged.  You have no
23      fucking idea.  When I stayed at that fucking Renegade Hotel,
24      you gave me a ride there.  I had to pay a girl 50 bucks to
25      drive me downtown when I had 200 bucks to my name in the
```

1    middle of the winter.  I walk in there, that Judge says,

2    Hey, you're not getting a jury trial.  When I have a jury, I

3    always win the case.  That Judge was hell-bent on failure

4    from the very beginning.  Who the hell sides with an

5    insurance company?  You always side with the defendant.  You

6    always say, well, you know, we know you guys don't ever want

7    to pay off and we're going to give the benefit of the doubt

8    to the plaintiff --"

9              "Uh-huh."

10             " -- Robert Ivers.  I'm going to -- he's going to

11   get his money, you know.  You guys -- but in this fucking

12   case -- now, if I would've had a six-person jury, you would

13   -- there would be -- you wouldn't never -- you wouldn't hear

14   me.  You would never see me again.  There would be a

15   beautiful new car in the driveway.  I'd have about 75 grand

16   left over for investments.  But that fucking Judge -- you

17   know, if she's scared and she's fearful, it's not my

18   problem.  She made her bed.  She's scared.  She's fearful.

19   She made her decision.  I didn't threaten anybody.  I didn't

20   saying anything.  You go downtown, you can tell them this

21   guy is just fucking hot."

22             "And it's fine to be hot, but you can't -- you

23   can't hurt anybody."

24             "I never said I was going to hurt anybody."

25             "Do you want to?"

1           "I never -- I'm not going to hurt anybody."

2           "So you don't have, like, the urge to like, fuck,

3    if I saw this judge at Target, I'd punch her in the fucking

4    face?"

5           "Do you think I'm trying to spend the weekend in

6    jail?"

7           "I know you don't want to, but I'm just asking."

8           "Another $10,000 bail."

9           "Yep."

10          "You want to know what, I like you guys.  Thank

11   you for not having an arrest warrant in your pocket.  I'm

12   the damaged party here."

13          (Audio recording paused.)

14   BY MS. ALLYN:

15   Q.  Why would Ivers think you would have an arrest warrant?

16   A.  My impression is that he knew he was on the line where

17   he could --

18          MR. KELLEY:  Objection, Your Honor, calls for

19   speculation.

20          THE COURT:  Sustained.

21          (Audio recording resumed.)

22          "That's why we just wanted to talk."

23          "I'm the damaged party here."

24          "We want to know what's on your mind, you know."

25          "No.  You want me to say something to get me

1    arrested."

2              "No."

3              "We're not trying to get you to say anything."

4              (Audio recording paused.)

5    BY MS. ALLYN:

6    Q.  Were you trying to get him arrested?

7    A.  No.

8    Q.  No.  What are you trying to do really?

9    A.  I'm hoping he'll back away from it.  And, you know, the

10   overall goal is to mitigate the whole situation and make

11   sure there's no security concern.  And, you know, criminal

12   prosecution is not something that we really -- you know,

13   that's not a goal of ours.

14   Q.  Really what's the ultimate goal?

15   A.  Safety.

16   Q.  And determining if somebody is safe or not?

17   A.  Yes.

18   Q.  Or not going to cause a security problem?

19   A.  Yes.

20             (Audio recording resumed.)

21             "Tell them downtown this guy is mother fucking

22   hot, and it's not against the law."

23             "Let me ask you one more thing, because I did a

24   little Google research on you just before I came out here.

25   You were a famous, like, musician in the '80s or something

1   like that?"

2              "I started the punk rock movement nationwide."

3              "Really."

4              (Audio recording paused.)

5   BY MS. ALLYN:

6   Q.  Are you doing that investigative technique here a little

7   bit?

8   A.  Um, yeah, rapport building and also I'm -- he seems to

9   be so despondent, and I'm trying to point out that he has

10  other avenues of income and things like that, that he could

11  look forward instead of back.

12  Q.  Like a refocusing or reshifting conversation?  Can you

13  explain what you're trying to do.

14  A.  Well, you know, just in my open source research I saw

15  that he did have a music career at one time and so I was,

16  you know -- he seems to, you know, at this point think his

17  life has ended because he didn't win this $100,000 suit.

18  I'm trying to point out, you know, this isn't the end of

19  your life.  You have other things going on.

20              (Audio recording resumed.)

21              "Okay.  Huh.  Are your records available

22  anywhere?"

23              "Yeah, CDbaby.com under the name Beatlestone."

24              "Do you get any stuff from that, any money type

25  --"

```
 1                    "Yeah, it's pretty rough."

 2                    "Pretty rough?"

 3                    "There's a billion Facebooks out there.  It's hard

 4       to compete with anything these days.  You know, the

 5       Facebook, it -- yeah, I ripped off the Beatles and Rolling

 6       Stones.  Here, I'll give you one toke.  Now I guess there's

 7       about 25 other bands called Beatlestone."

 8                    "So punk rock, huh."

 9                    "And now Facebook is the new Yellow Pages.  I do

10       not have a Facebook.  I don't have (inaudible) because

11       that's not fair.  Okay?  But it's -- it's, you know, pretty

12       tough to compete.  I --"

13                    "Are you still a competent musician?  You still

14       --"

15                    "Yeah.  I still -- but I don't --"

16                    "Well, what about giving lessons?"

17                    "Nope.  Lesson, I don't -- that was a long time

18       ago."

19                    "What all did you play?"

20                    "I'm kinda burnt out on it."

21                    "Guitar?  Drums?"

22                    "Guitar primarily.  Yeah.  So I sent the Chief

23       Judge and the other gal that was involved in my case a nice

24       letter."

25                    (Audio recording paused.)
```

1    BY MS. ALLYN:

2    Q.  Okay.  What is Ivers shifting back to talk about here?

3    A.  Back to his case, his legal case in federal court.

4    Q.  All right.  So he wouldn't continue to talk about his

5    music career then?

6    A.  No.  He -- I -- clearly he just wanted to talk about

7    something else at this point.

8    Q.  Mr. Ivers is the one that shifted the conversation back

9    to the letter, right, not you?

10   A.  Yes.

11          (Audio recording resumed.)

12          "It's sitting there.  And -- you know, by law you

13   have to send Judge Wright the letter and the attorneys and

14   stuff.  And I'm not interested in making anybody feel

15   comfortable tonight.  They've stole my life.  They've stole

16   the chance that I had to get back with my children.  You

17   know what it would be like if I woke up and had a hundred

18   fucking thousand fucking dollars in the bank?  My friend

19   died and left me that money.  He died and left me that

20   money, two beautiful insurance policies with windows on

21   them, Robert Ivers, you know, the real thing.  It looks like

22   money, one for 90 grand and one for 100 grand.  He left me

23   that money.  And she decided that I wasn't going to be able

24   to tell it to a jury.  She was going to decide whether I got

25   my dead friend's money.  And I'm not interested in anybody

1    sleeping soundly tonight.  I'm angry, and it's not against

2    the law.  I watch a lot of TV.  You still can't get arrested

3    for being fucking pissed off.  Yeah.  And I possibly could

4    be a walking bomb.  Okay?  See you guys."

5           "Hey, you didn't want it before, but my phone

6    number is on there.  If you -- just take it."

7           "I'm not --"

8           (Audio recording paused.)

9    BY MS. ALLYN:

10   Q.  All right.  What's happening?  He says, "Okay?  See you

11   guys."  Any physical movement from that?

12   A.  Yeah.  He started to move back inside the house, open

13   the door to go back inside.

14   Q.  And then what are you doing in response to that?

15   A.  I'm trying to give him my business card with my name and

16   cell phone and email address.

17   Q.  Why are you doing that?

18   A.  Same as before.  I mean, each time I met with him, I

19   tried to give him my card so that he would -- you know, if

20   he felt like he was having some anger problems or he needed

21   to let this out rather than directing it at the employees of

22   the court that he could call me, talk to me about it.

23   Q.  Are you still trying to keep talking to him to assess

24   his risk or not or --

25   A.  Yes.

```
 1                 (Audio recording resumed.)
 2                 "I'm not going to threaten anybody.  I'm sending a
 3      letter to the Attorney General.  Calling up and yelling at
 4      you isn't going to do any good for me."
 5                 "But you know what, you can yell at me because I
 6      speak that language and I don't care."
 7                 "But I'm not going to yell at you.  You just tell
 8      them that the guy's crazy fucking angry, got cheated by the
 9      Judge, period, walk away.  That's all you have to do.
10      Okay?"
11                 "All right.  Well, thanks for talking."
12                 "Yeah, I mean --"
13                 "I like you.  And don't do anything that will get
14      you locked up.  Okay?  That's only going to make it worse."
15                 "You don't want to go sit in jail.  All right?
16      It's not even worth it."
17                 "I don't want to get locked up.  I did that once
18      with a judge.  I'm not going to get locked up."
19                 "Follow the process."
20                 "What about -- I'm not interested in Judge Wright
21      sleeping comfortably."
22                 "What about appeals?"
23                 "You want to know what, it was federal court.  I
24      thought the -- my attorney told me -- I have an attorney
25      that helps me.  I thought the appeal was in 60 days.  It
```

1    ended in 30.  I lost out on the appeal.  I lost out on a new

2    trial."

3              (Audio recording paused.)

4    BY MS. ALLYN:

5    Q.  It seems like Mr. Ivers is trying to end the

6    conversation, but you're still trying to talk to him.  Is

7    that true?  Is that what's happening physically?

8    A.  Yes.

9    Q.  So why do you want to continue to talk to him?

10   A.  The more time I talk to him, the more he'll -- I'm

11   hoping that maybe he'll change his demeanor.  And, you know,

12   I have to report back to the court whether or not this guy

13   is a potential safety risk to the court.  You know, I'd love

14   to tell them, no, he's fine, he's not going to be a problem.

15   Q.  And with what's been happening in this conversation, do

16   you feel you can do that?

17   A.  No.

18   Q.  You said you want to "change his demeanor."  What's his

19   demeanor right now?

20   A.  Very angry.

21   Q.  And what does that mean to you as a threat investigator?

22   A.  Well, it's specifically a problem in this one because

23   all his anger is directed at Judge Wright, which gives him

24   one person he's sort of focused on, which is concerning to

25   me.

1    Q.  You keep trying to talk to him to do what, calm down?

2    Assess more?

3    A.  Yeah, calm him down.  But I also want to know what he's

4    thinking, whether he has any plans, what his recourse is in

5    his own mind, what he thinks he can do about it, and remind

6    him that, you know, there's lines that can't be crossed and

7    he's right up on those lines and he just has to stop with

8    the threatening-type behavior.

9                (Audio recording resumed.)

10               "And did you try anyway?  Sometimes they'll look

11   at it and do waivers, things like that."

12               "I'm so razzled and burnt out, I can't -- I've

13   been jump -- I have to jump buses.  I have to do all of this

14   shit to get things done.  And so it's -- it's -- to go

15   through the whole appeal process on a case I should've never

16   lost.  My friend is dead for three years.  I lived in my car

17   for the last two summers.  I had to find a place to winter.

18   And every day I lived in my car, 270 fucking days.  And I

19   told the Judge.  The Judge knows.  Judge Wright knows my

20   story.  The summer before the trial, I said, I'm in my

21   fucking car.  Winter's coming on.  When's this trial?  I'm

22   hurting.  I'm hurting.  When's the trial?  I want my money

23   --"

24               "Yeah."

25               " -- you know?  They know.  Two summers I spent in

1    my car waiting for this trial, waiting for my dead friend's

2    money that he left me.  Yeah.  You tell them how hurt I am.

3    You make sure they know.  If they're scared and worried, you

4    tell them how hurt I am and how broke I am and how I had

5    visions of that money.  That -- I was left that money."

6              "All right.  Well, you can throw this away if you

7    want.  I'm going to leave it.  If you're in crisis, call

8    me."

9              "I'm not in --"

10             (Audio recording paused.)

11   BY MS. ALLYN:

12   Q.  Is this your card again?  You're trying again?

13   A.  Yes.

14   Q.  So what you're referring to is you trying to give him

15   your card; is that right?

16   A.  Yes.

17   Q.  Did he ever call you?

18   A.  No.  I don't think he took my card ever.  I know I tried

19   to -- on this day I tried to just leave it behind and leave

20   it on the doorstep for him.  I can't remember if I left it

21   or not.  But he wouldn't take it.

22   Q.  He never called you to vent, did he?

23   A.  No.

24             (Audio recording resumed.)

25             "I know.  But I'm going to leave it.  And you can

MATTERVIC - DIRECT

```
 1    throw it away."

 2              "No, because --"

 3              "You can throw it away."

 4              "No, because I like you and I don't want to throw

 5    it away out of respect.  But if they're living in fear, too

 6    fucking bad.  It's what they deserve.  I've got to go."

 7              (Audio recording ended.)

 8    BY MS. ALLYN:

 9    Q.  This is pretty much the conclusion of the interview with

10    Mr. Ivers then?

11    A.  Yes.

12    Q.  So what's your conclusion at the end of this?  Is the

13    case against Mr. Ivers, the investigation, kept open?

14    A.  Yes.

15    Q.  And why is that?

16    A.  Because he didn't give me any reason to believe that he

17    was less of a potential threat to the safety and security of

18    the court employees.

19    Q.  But at this time the investigation is turned over to

20    Deputy Wooton; is that right?

21    A.  Yes.

22    Q.  So did this interview pretty much end your involvement

23    with Mr. Ivers?

24    A.  Yes.  I got busy with my new job, so I didn't probably

25    follow up with this case very much.
```

HATTERVIG - CROSS

```
 1    Q.  But it stayed open, the case?

 2    A.  Yes.  This case has never been closed.  It's still open.

 3              MS. ALLYN:  One moment, Deputy.

 4              Deputy Hattervig, I have no further questions for

 5    you, but defense counsel might.

 6              MR. KELLEY:  Your Honor, it's going to take a

 7    couple of minutes to plug in.

 8              THE COURT:  That's fine.  Should I put the lights

 9    up or do you have exhibits you're going to use here?

10              MR. KELLEY:  You can put up the lights, Your

11    Honor.  I'll just be using the transcript.  Okay.  We're

12    ready to go, Your Honor.

13

14                        CROSS-EXAMINATION

15    BY MR. KELLEY:

16    Q.  Good morning, Deputy Hattervig.

17    A.  Good morning.

18    Q.  It's nice to finally put a face to the name.

19              I want to go back to a series of letters, about

20    three letters that the government showed you.  The first

21    letter -- this is Exhibit 1, Government's Exhibit 1.  Do you

22    recognize this one?

23    A.  Yes.

24    Q.  Okay.  And it is postmarked -- I don't have as fancy of

25    equipment as the government, but it is postmarked October
```

1    31st, 2016, correct?  Do you see that?  In the middle more.

2    You got it?

3    A.  Yep.  It's pretty small, but I see it.

4    Q.  October 31st, 2016.  That is not February 27, 2018, is

5    it?

6    A.  No.

7    Q.  Okay.  The next one.  This is Government's Exhibit 11.

8    This is another letter.  This one is written to Chief Judge

9    Tunheim, not Judge Wright, correct?

10   A.  Correct.

11   Q.  Okay.  Postmark on this one -- I'll zoom in really far

12   again -- August 25th, 2017?

13   A.  Correct.

14   Q.  Okay.  That is not February 27, 2018, is it?

15   A.  No, it's not.

16   Q.  Last one.  This is Government's Exhibit -- I'll zoom out

17   a little bit -- Government's Exhibit 3.  Do you recognize

18   this?

19   A.  Yes.

20   Q.  Okay.  That says it was received by mail on August 14,

21   2017, correct?

22   A.  Correct.

23   Q.  Okay.  To the courts.  The courts received this then?

24   A.  Yes.

25   Q.  That is not February 27th, 2018, is it?

```
 1    A.  No, it's not.

 2    Q.  Thank you.

 3         And just to be clear, none of these documents were

 4    sent to the Fredrikson & Byron Law Firm, as far as you could

 5    tell, correct?

 6    A.  No.  I hadn't even heard of that law firm prior to you

 7    mentioning it.

 8    Q.  Okay.  All right.  Now I'm going to turn to the January

 9    4th, 2017 pretrial hearing.  We're going to play some of the

10    audio, not the entire thing, just a few snippets.  I don't

11    want to bore the jury with that.

12         Mr. Ivers showed up 40 minutes early for his

13    hearing, didn't he, about?

14    A.  Yeah, that's my recollection.  Yes.

15    Q.  So you spent 40 minutes with him?

16    A.  Yeah.  I think so.

17    Q.  Okay.  And he talked to you for the majority of those 40

18    minutes, right?

19    A.  Yeah.  Yes.

20    Q.  And then you sat through the hearing after that?

21    A.  Most of the hearing, yes.

22    Q.  Okay.  Mr. Ivers' behavior that day was abnormal, but he

23    was appropriate?  He acted appropriately, correct?

24    A.  Um, yeah.  You know, my concern is security, so in the

25    security realm I think he was appropriate.  He didn't cause
```

1    any security issues.

2    Q.  You wrote a report about this, didn't you?

3    A.  Yes.

4    Q.  In that report did you write that he was polite and

5    cooperative?

6    A.  Yes.

7    Q.  Okay.  So that report was for yourself, for the file,

8    for other marshals to look at, correct?

9    A.  Yes.

10   Q.  So there would be no reason for you to downplay anything

11   that Mr. Ivers did on January 4th in your own report, would

12   there?

13   A.  No.

14   Q.  Okay.  And you wrote in there "Ivers was polite and

15   cooperative"?

16   A.  Yes.  I would have to -- I don't know if I meant -- or

17   if that was referring to polite and cooperative with me.  I

18   think he was pretty polite and cooperative with everybody in

19   the system.

20   Q.  Okay.  And you wrote in your report that Ivers told you

21   "the letters were not meant to be threatening."

22              MS. ALLYN:  Objection.  This is improper

23   impeachment.

24              THE COURT:  Overruled.

25              THE WITNESS:  I'm sorry, could you repeat that.

```
 1                THE COURT:  I'm sorry.  The question is:  "Okay.
 2       And you wrote in your report that Ivers told you 'the
 3       letters were not meant to be threatening.'"
 4                THE WITNESS:  Yes.
 5       BY MR. KELLEY:
 6       Q.  Okay.  Your conclusion after January 4th was that he did
 7       not pose a threat, correct?
 8       A.  No.  That's not correct.
 9       Q.  Did you write that in your report maybe?
10       A.  That he did not pose a threat?
11       Q.  Yes.
12       A.  I don't think so.
13       Q.  Would it refresh your recollection to take a look at
14       your report?
15       A.  Sure.  Yes.
16                MS. ALLYN:  Counsel, could you let me know which
17       date.
18       BY MR. KELLEY:
19       Q.  I'm handing you a report here.  Do you recognize that
20       document?
21       A.  Yes.
22       Q.  Okay.  It's a report written by you, correct?
23       A.  Yes.
24       Q.  It's dated January 4th, 2017?
25       A.  Yes.
```

1    Q.  That is the date of the pretrial hearing, correct?

2    A.  Yes.

3    Q.  Okay.  So, again, do you remember including in there

4    that he did not pose a threat?

5    A.  You know, I don't remember that.  Is that somewhere?

6    Could you point to a line?

7    Q.  First paragraph.

8            MS. ALLYN:  Objection.

9    BY MR. KELLEY:

10   Q.  First paragraph, last line.

11   A.  Yes.  I'm saying that Ivers told me that the letters

12   were not meant to be threatening and that he doesn't pose a

13   threat.

14   Q.  Okay.  Thank you.

15   A.  Those weren't my words.  I mean, those were -- okay.

16   Q.  Thank you.

17           Okay.  Now let's go to the audio.  Okay.  So the

18   beginning of the recording you said you met him at security.

19   He came through and that's where it started?

20   A.  Correct.

21   Q.  Right at the beginning do you remember telling him that

22   you understood it was just rhetoric?

23   A.  Yes.

24   Q.  And that's referring to the letters he sent the court?

25   A.  Yes.

1    Q.  Okay.  You said it was just rhetoric?

2    A.  Yes.  I said that, yes.

3    Q.  Now I'm going to skip ahead to about eight minutes into

4    your interaction with Mr. Ivers.  Okay.  At this point, you

5    were asking him about his comment that he wrote down on one

6    of the letters to the Court that I'm becoming a dangerous

7    person?

8    A.  Okay.

9            (Audio recording played.)

10           "I mean, I'm very --"

11           "Well, if you don't mind me asking, because I'm a

12   security guy, what do you mean when you wrote the letter to

13   the judge saying 'I'm becoming a very dangerous person,'

14   what do you mean by that?"

15           "I've got it with me.  I would have to re-look at

16   it."

17           "Okay."

18           "Oh, when I sent that letter, I was broke and

19   living in my car."

20           "Uh-huh."

21           "And --"

22           (Audio recording paused.)

23   BY MR. KELLEY:

24   Q.  Okay.  So in that letter to the Court, he said, and you

25   testified to this earlier, "I'm in dire fucking straits."

1    Do you remember that?

2    A.  Yes.

3    Q.  Okay.  So could the fact that he is broke and living in

4    his car, could that be what he meant?

5    A.  Possibly.

6    Q.  Okay.  Somebody is in dire straits, that means they're

7    hurting probably financially?

8    A.  Yes.

9    Q.  Okay.  Broke and living in your car would be dire

10   straits?

11   A.  Yes.

12            (Audio recording resumed.)

13            "They kept moving the hearing dates and legal

14   dates back.  And it was just an expression to get them to

15   hurry up, set the trial.  I'm broke and down on my luck

16   and -- "

17            "I can understand that.  That's -- people get

18   frustrated."

19            "It was just to get them to jump."

20            "Yeah.  Because when marshals read that, they

21   think, okay, this guy is raising a red flag saying he's

22   dangerous, does that mean he is going to try to kill the

23   judge or something, you know.  So we have to take that stuff

24   seriously, you know."

25            (Audio recording paused.)

```
 1    BY MR. KELLEY:

 2    Q.  That's the $64,000 question.  That's your purpose for

 3    interacting with him, is to see if he's serious about all

 4    the communications he's had with the court, correct?

 5    A.  Yeah, two-fold:  To find out if he's serious and also

 6    just to be there for security while he's in the building.

 7    Q.  Okay.

 8              (Audio recording resumed.)

 9              "But you didn't mean anything like that?"

10              "No."

11              "Okay."

12    BY MR. KELLEY:

13    Q.  You just asked him if he was serious about his

14    statements to the court and he just told you "No"?

15    A.  Correct.  Yes.

16    Q.  He did not know you were recording?

17    A.  No, he didn't.

18    Q.  Did he have any reason to believe that?

19    A.  No.

20              (Audio recording resumed.)

21              "I remember what I was writing down.  Let me

22    think.  Yeah, it was just would somebody please fucking do

23    something."

24              "Yeah."

25              "These guys string me out.  My friend died three
```

1    years ago.  These guys strung me out three years on the

2    insurance deal."

3              (Audio recording paused.)

4    BY MR. KELLEY:

5    Q.  So you testified you didn't know a whole lot about the

6    case, the civil insurance case, correct, at this point?

7    A.  Well, I familiarized myself with the general outline of

8    the case, but none of the details.

9    Q.  So when Mr. Ivers is saying he's been strung out for

10   three years, wasn't it true that the case had been going on

11   for three years?

12   A.  I only knew that from him telling me, but it doesn't

13   surprise me.

14   Q.  Okay.  I think we're going to skip ahead.  Okay.  So I'm

15   now skipping ahead to a point where you are reading through

16   some of the court documents that Mr. Ivers had and handed to

17   you.  Do you remember that point in the conversation?

18   A.  Yes, sir.

19              (Audio recording resumed.)

20              "Read it from the very top."

21              "No, I've read it.  Make sure the defendants have

22   no case.  I think the -- my opinion, the profanity kind of

23   scares the court a little bit."

24              (Audio recording paused.)

25   BY MR. KELLEY:

1    Q.  You just said in your opinion, "the profanity kind of

2    scares the court a little bit"?

3    A.  Yes.

4    Q.  So we're here in federal court now.  It's a pretty prim

5    and proper place compared to state court, isn't it?

6    A.  I can't really make that judgment.  I haven't spent a

7    lot of -- I've always worked in federal court.  I haven't

8    spent much time in state court.

9    Q.  Would you agree that they do not tolerate profanity in

10   federal court?

11   A.  Um, discouraged I would say, yes.

12   Q.  You don't see it very often in federal court, do you?

13   A.  No.

14   Q.  You certainly don't see it in civil cases, right?

15   A.  No.

16   Q.  So in a civil case they're not used to profanity?

17   A.  Again, I don't have any experience in civil cases.  This

18   is one of the first I've dealt with.  It's always been

19   criminal.  But I do agree that I don't think that would be

20   appropriate in any of those court settings.

21   Q.  Profanity is inappropriate but not illegal?

22   A.  Right.

23              (Audio recording resumed.)

24              "I -- I wasn't going to walk around and

25   internalize this stuff.  Okay?"

```
 1                    (Audio recording paused.)

 2      BY MR. KELLEY:

 3      Q.  Sorry, I could have got that in there.  "I wasn't going

 4      to walk around and internalize this stuff."  Mr. Ivers is

 5      talking about his emotions, right?

 6      A.  Yes.

 7      Q.  All right.  He's talking about his friend having died

 8      three years prior, correct?

 9      A.  Yes.

10      Q.  He's talking about a court case that had been going on,

11      to the best of your knowledge, for three years?

12      A.  Yes.

13      Q.  All right.  And he felt like he was entitled to the

14      $100,000 insurance?

15      A.  Right.

16      Q.  So he was hurting inside?

17      A.  Yes.

18      Q.  So when he's talking about not being able to walk around

19      and internalize this stuff or he wasn't going to do that, he

20      is talking about processing his emotions?

21      A.  Yes.

22                    (Audio recording resumed.)

23                    "I get why."

24                    "I wasn't going to do that to myself, not after

25      what these guys did.  These guys dragged me through the
```

```
 1    coals.  I'm not going to walk around like that.  Then I
 2    would be a walking bomb."
 3              (Audio recording paused.)
 4    BY MR. KELLEY:
 5    Q.  "Walking bomb," we've heard that a couple of times here?
 6    A.  Yes, sir.
 7    Q.  This is not the only time he says that, right?  Yes or
 8    no?  You have heard him saying it more than once?
 9    A.  I think he said it, and I think it was in writing at one
10    point also.
11    Q.  Okay.  He says this?  This is an expression he uses?
12    A.  It's an expression, yes.
13    Q.  Okay.
14              (Audio recording resumed.)
15              "There it is.  That's the whole context.  You
16    know, there's no -- the only reason why I'm sane and not in
17    a mental institution is because I vented."
18              "Yeah."
19              (Audio recording paused.)
20    BY MR. KELLEY:
21    Q.  So right now you had been discussing these three letters
22    that he just reviewed that he sent to the court, correct?
23    A.  Discussing one of the letters for sure.
24    Q.  Okay.  So one of the letters that he had sent to the
25    Court for sure.  That's what you had been discussing up to
```

1    this point?

2    A.  Yes.  Correct.

3    Q.  And he was describing how he's processing his emotions,

4    too, correct?

5    A.  Yes.

6    Q.  Writing these letters was cathartic for him, correct?

7            MS. ALLYN:  Objection, foundation, calls for

8    speculation.

9            THE COURT:  Sustained.  Sustained.

10   BY MR. KELLEY:

11   Q.  He just told you he was venting, didn't he?

12   A.  Yes.

13   Q.  And he had just told you that he vents to maintain his

14   sanity, right?

15   A.  Yes.

16   Q.  Because he was hurting?

17   A.  Yes.

18   Q.  Skip ahead one more time a little later in the

19   conversation.

20           MS. ALLYN:  Is it possible to tell me the

21   timestamp?

22           MR. KELLEY:  Going to 17:50.

23           MS. ALLYN:  Thank you.

24           MR. KELLEY:  It is page 9.

25           (Audio recording resumed.)

1            "Look it, all of this is from them."

2            (Audio recording paused.)

3    BY MR. KELLEY:

4    Q.  Okay.  At this point, you guys are discussing your

5    business card that you were trying to hand to Mr. Ivers.

6            (Audio recording resumed.)

7            "Here's mine."

8            "Uh-huh.  You should be able to --"

9            "I don't know why I would need to call you."

10            "Well, the only reason I offer it is because if

11    some of the -- you know, you say where you have -- you don't

12    want to internalize it, you need to get it out, it's better

13    if you call me, rather than --"

14            "This case is over with."

15            (Audio recording paused.)

16    BY MR. KELLEY:

17    Q.  So you were handing him your business card in case he

18    needed to vent, correct?

19    A.  Yeah.

20    Q.  You would rather have him -- sorry.  You would rather

21    have him call you to vent than vent to the court?

22    A.  And also so that I could stay in contact and sort of

23    assess his situation and whether, you know, he's becoming a

24    safety risk.

25    Q.  Sure.  But you understood his venting process --

1    A.  Yes.

2    Q.  -- right?  Okay.

3              Just to be clear, this is January 4th, 2017.  This

4    is not February 27, 2018?

5    A.  Correct.

6    Q.  And you did not arrest him for anything he said or did

7    on January 4th, 2017, did you?

8    A.  No, I didn't.

9    Q.  Okay.  So there was a lot of down time after these

10   discussions before the hearing actually started, right?

11   A.  Um, there were a few minutes of I think we were just

12   sitting there, yeah.

13   Q.  So the total interaction before court started was about

14   40 minutes, correct?

15   A.  Yes.

16   Q.  I think we were just at 18 minutes into the audio

17   recording.  Did you have about 20, 25 minutes left?

18   A.  That makes sense, yeah.

19   Q.  So you sat there and talked with Mr. Ivers for about 20

20   minutes?

21   A.  We talked -- pretty much the whole time we talked.  It

22   wasn't always about official stuff.  We talked about diet

23   Mountain Dew for awhile.

24   Q.  Right.  You talked about losing weight, right?

25   A.  Yes.

```
1    Q.  You had lost some weight?

2    A.  Yes.

3    Q.  How did you lose your weight?

4    A.  Diet Mountain Dew.

5    Q.  Switching from regular Mountain Dew to diet Mountain

6    Dew?

7    A.  Correct.

8    Q.  Did you suggest a similar thing to Mr. Ivers?

9    A.  Only because he said he wanted to lose weight.

10   Q.  Do you remember how much he said he wanted to weigh?

11   A.  I don't recall.

12   Q.  Does it look like he has lost a considerable amount of

13   weight?

14            MS. ALLYN:  Objection, relevancy.

15            THE COURT:  Sustained.

16   BY MR. KELLEY:

17   Q.  Okay.  So after you have this discussion about Mountain

18   Dew and losing weight, you had the hearing?

19   A.  Yes.

20   Q.  Okay.  This is the pretrial hearing on January 4th.  And

21   you sat in the courtroom for that entire hearing?

22   A.  Not the entire hearing, but --

23   Q.  Most of it?

24   A.  -- most of it, yes.

25   Q.  Okay.  Mr. Ivers maintained his composure during that
```

```
1    hearing?

2    A.  Yeah, he did pretty well.  Again, he was odd, so it was

3    -- it was a little off-putting, some of the behavior.  But I

4    don't think he was -- he didn't cause problems.

5    Q.  Okay.  He didn't cause problems and didn't use

6    profanity, right?

7    A.  I think if he had used profanity, I probably would have

8    put it in my report, so I don't think so.

9    Q.  Okay.  So, to the best recollection, he didn't use

10   profanity?

11   A.  Correct.

12   Q.  Okay.  Now let's turn to the trial, January 9th and

13   10th.

14   A.  Yes.

15   Q.  It was a two-day bench trial in front of Judge Wright?

16   A.  Correct.

17   Q.  You said you were in the courtroom, you said, for 75

18   percent of that?

19   A.  Estimate.

20   Q.  The other 25 percent pop out, check emails, stuff like

21   that?

22   A.  Correct.

23   Q.  You were there the overwhelming majority?

24   A.  I just made sure there was always somebody from the

25   Marshal Service in there.
```

1    Q.  So Mr. Ivers was somewhat erratic and mildly

2    inappropriate, but he was fairly well-behaved during the

3    trial, right?

4    A.  Um, yeah.  You know, it was just decorum things.  It

5    wasn't -- again, I'm a security person so that's the lens

6    I'm looking through.  It was not a security problem for me.

7    Q.  Courtroom decorum.  Like if I started swearing, I might

8    get yelled at in here?

9    A.  Or took your shoes or whatever, it would be odd.

10   Q.  Okay.  And he maintained a friendly rapport with you

11   throughout the entire trial?

12   A.  Yes.

13   Q.  All right.  You guys actually got along really well,

14   didn't you?

15   A.  Um, yeah.  I would say so.

16   Q.  And he constantly talked to you about his civil case?

17   A.  Yes.

18   Q.  He's talking to you about the merits about whether or

19   not he thought he was going to win?

20   A.  Yes.

21   Q.  And he liked talking to you so much he even asked if you

22   wanted to hang out outside of court, right?

23   A.  At some point, yeah.

24   Q.  Socially?

25   A.  I assume so, yeah.

1    Q.  You politely declined?

2    A.  Yes.

3    Q.  And didn't he tell you during the trial that he wrote

4    the letters to the court with the vulgar language in them

5    because he was just venting?

6            MS. ALLYN:  Objection, calls for hearsay.

7            THE COURT:  Overruled.

8            THE WITNESS:  I'm sorry, could you repeat it.

9    BY MR. KELLEY:

10   Q.  Didn't Mr. Ivers tell you that he wrote the letters to

11   the Court back in August 20 -- sorry, I guess it would be

12   October 2016, he wrote those letters to the court because he

13   was just venting?

14   A.  Yeah, I think that was the conversation we had in the

15   waiting room before his first case.  He told me that he was

16   just venting and didn't want to internalize it.

17   Q.  Okay.  And he just wanted the court to act a little

18   faster because he had been waiting for three years for his

19   trial, right?

20   A.  Yes, I do recall that.

21   Q.  As you were escorting him around the building during the

22   jury trial, he told you that he was upset that Judge Wright

23   denied him a jury trial, right?

24   A.  Um, yes, at some point he mentioned it to me.  He argued

25   it openly in court, as well.

252

1    Q.  And he thought he should be entitled to a jury trial,

2    right?

3    A.  Yes.

4    Q.  At the end of the trial, you kind of walk out of this

5    building, you walk out with Mr. Ivers, say goodbye to him,

6    right?

7    A.  Yes.

8    Q.  Part ways.  And when you did, he said he probably

9    wouldn't be back to the St. Paul Courthouse after that?

10   A.  Correct.

11   Q.  All right.  In fact, he did not come back to the

12   St. Paul Courthouse until more recently?

13   A.  Yeah, I don't know of him ever coming back.

14   Q.  So between your conversation with him, the trial in

15   January 2017, right, and let's say February 27th, 2018, he

16   never came back down to this courthouse, did he?

17   A.  To my knowledge, he never did.

18   Q.  Okay.  And this is where Judge Wright works, correct?

19   A.  Yes.

20   Q.  And he never came back here in that entire time span?

21   A.  Not to my knowledge.

22   Q.  And you knew that Mr. Ivers lived in the west metro?

23   A.  Yes.

24   Q.  Okay.  He grew up in that area?

25   A.  Um, I don't know if I knew that, but I knew that's where

 1    his ties were.

 2    Q.  He lived in Hopkins at some point?

 3    A.  Yes.

 4    Q.  Lived in Minnetonka?

 5    A.  Yes.

 6    Q.  He had family out in that area?

 7    A.  Yes.

 8    Q.  And you also knew that he didn't have a working vehicle,

 9    right?

10    A.  He had mentioned it.  I think he had mentioned various

11    vehicles that were either broken down or that he had to take

12    the bus to get from place to place.  So I knew that he had

13    transportation problems.

14    Q.  Because for a while he was living out of his truck,

15    right?

16    A.  According to, I think, one of his letters he said that.

17    I didn't verify that.

18    Q.  Okay.  So he had serious vehicle problems, possibly no

19    vehicle?

20    A.  I never verified that, but I don't have any reason to

21    not believe it.

22    Q.  But he did tell you that it was very hard for him to

23    find transportation down to St. Paul, right?

24    A.  He did say that.

25    Q.  He had to jump buses or ask for rides?

1    A.  Yes.

2    Q.  It was difficult for him to get to this courthouse?

3    A.  Yes.

4    Q.  On top of that, he didn't return to the courthouse

5    between January 2017 and February 2018?

6    A.  Not to my knowledge.

7    Q.  Okay.  So at the end of the trial, your impression of

8    Mr. Ivers was that he was polite and cooperative throughout

9    the trial, right?

10   A.  Polite and cooperative with me for sure, yes.

11   Q.  All right.  Now we're going to start talking about the

12   September 1st interview.  The thing that spurred this

13   interview was the letters in August 2017, right?

14   A.  Okay.  Yes.

15   Q.  You would agree with that?

16   A.  Yes.

17   Q.  So these letters from August 22nd through maybe August

18   25th, 2017 -- I showed you those earlier?

19   A.  Yes.

20   Q.  Exhibit 1?

21   A.  Yes.

22   Q.  Postmarked August 22nd?  That one?

23   A.  Yes.

24   Q.  August 22nd, 2017?

25   A.  Yeah.  I can't see it, but you did show it to me before.

1        MR. KELLEY:  Thank you, Your Honor.

2   BY MR. KELLEY:

3   Q.  This one is Exhibit 3, August 14, 2017?

4   A.  Yes.

5   Q.  This one is Exhibit 11 and that is August 25th, 2017.

6   Okay.  Terrible focus.

7   A.  You showed them to me before.  Yeah.  So yes.

8   Q.  Right.  So you remember these?  These are August 2017?

9   A.  Yes.

10  Q.  Mr. Ivers did not send any correspondence to Judge

11  Wright after that time, did he?

12  A.  No.  It was to other judges after that.

13  Q.  Okay.  Nothing to Judge Wright or her chambers after

14  August 25th, 2017?

15  A.  Not to my knowledge.

16  Q.  No phone calls to her chambers or to Judge Wright after

17  that time?

18  A.  Not to my knowledge.

19  Q.  So he didn't come to the courthouse between the jury

20  trial and February 27, 2018, right?  Correct?

21  A.  He didn't come to the courthouse?

22  Q.  This courthouse.

23  A.  Not to my knowledge.

24  Q.  And he didn't send any mail, letters, correspondence,

25  anything like that to Judge Wright or her chambers during

HATTERVIG - CROSS

1    that same time period, right?

2    A.  Not to my knowledge.

3    Q.  He did not make any phone calls to Judge Wright or her

4    chambers during that entire period?

5    A.  Not to my knowledge.

6    Q.  So no contact between Mr. Ivers, Judge Wright, or her

7    chambers between January 2017 and February 27, 2018?

8    Nothing?

9    A.  Not to my knowledge.

10   Q.  Okay.  So we're at September 1st, 2017.  It took you a

11   minute to find him, right, where he was living?

12   A.  You mean it took me a minute or --

13   Q.  Yeah.  Did you have any trouble finding him?

14   A.  Well, yeah.  I had to knock on some doors and ask some

15   people, try to figure out where he was laying his head at.

16   Q.  Part of the reason that it's, you know, a little

17   difficult to find him sometimes is because he had housing

18   issues.  He doesn't have a secure housing situation, right?

19   A.  It could be.  Yes.

20   Q.  He does some couch surfing?

21   A.  It's possible.  I never verified that.

22   Q.  But the contacts you've had with him, he's been living

23   with friends, right?

24   A.  I only had one contact outside of the courthouse, and

25   that was in -- I don't know what his relationship was with

1    the person, the homeowner there.  I just found out that he

2    was staying there.

3    Q.  But it wasn't Mr. Ivers' home, was it?

4    A.  No.

5    Q.  Okay.  So he's in Minnetonka?

6    A.  Yes.

7    Q.  And at some point you testified -- sorry.  At some point

8    Mr. Ivers told you he was in a secluded area?

9    A.  Yes.

10   Q.  But it is in Minnetonka, right?

11   A.  Yeah.  It's sort of an acreage in Minnetonka.

12   Q.  It's not way out in the sticks in the mountains, right?

13   A.  Correct.

14          (A brief discussion was held off the record.)

15   BY MR. KELLEY:

16   Q.  Okay.  So the recording begins with you and Deputy

17   Wooton kind of walking around knocking on doors, trying to

18   figure out which residence is actually where Bob is, right?

19   A.  Well, we knew the residence because it was just by

20   itself, but we didn't know if he was home.

21   Q.  Okay.  So when you get to the door, he pops out, right,

22   pretty quick?

23   A.  Bob?  No.  There was a little trouble getting him to

24   come out initially.  He did come out willingly after some

25   cajoling.

 1    Q.  That's where we're going to start.

 2    A.  Okay.

 3              (Audio recording played.)

 4              "Here I am.  Okay.  I know you.  How are you

 5    doing?  Hi.  How are ya?  What's up?"

 6              "I'm sorry to bother you at home."

 7              "You guys got a warrant for my arrest?"

 8              "No."

 9              "I don't want to discuss the deal."

10              "I know --"

11              "The judge screwed me out of 100 grand and I need

12    to process it."

13              (Audio recording paused.)

14    BY MR. KELLEY:

15    Q.  Okay.  There he goes talking about processing.

16    A.  Yes.

17    Q.  Did you understand that to mean venting, like he had

18    described in January to you?

19    A.  I wasn't sure because he just started talking.  I hadn't

20    asked him any questions.  So I assumed that he was talking

21    about the same sort of thing.

22    Q.  It's entirely possible he was venting about losing the

23    court case?

24    A.  I think that's what he was talking about there, yeah.

25    He was venting about that.

```
 1                  (Audio recording resumed.)

 2                  "I got ya."

 3                  "And she screwed me out of 100 fucking thousand

 4         dollars.  Here's the deal.  I got a letter for the Attorney

 5         General.  I'm sending this out to her now.  I'm going to the

 6         post office now to see if she can help me untangle this

 7         thing."

 8                  (Audio recording paused.)

 9         BY MR. KELLEY:

10         Q.  Did you know what he was talking about right there?

11         A.  With the Attorney General's Office I didn't know what he

12         was talking about.  It was some sort of legal process that

13         he was --

14         Q.  He is talking about sending some sort of legal letter to

15         the Attorney General?

16         A.  Yeah.

17         Q.  Lori Swanson at that time, I believe?

18         A.  Uh-huh.  Yes.

19                  (Audio recording resumed.)

20                  "We talked before about how you don't like to

21         internalize, keep it inside.  You need to vent."

22                  (Audio recording paused.)

23         BY MR. KELLEY:

24         Q.  You're acknowledging again him bottling things up and

25         needing to vent?
```

```
 1    A.  Yes.

 2              (Audio recording resumed.)

 3              "Go ahead."

 4              "I can't do any time in jail.  I can't do anything

 5    there.  So I'm not -- whenever I yelled at, whatever, it's

 6    over with."

 7              "Just do me a favor and let's sit down and talk

 8    for just a few minutes.  You know -- "

 9              (Audio recording paused.)

10    BY MR. KELLEY:

11    Q.  He asked if you guys had an arrest warrant?

12    A.  Yes.

13    Q.  You did not?

14    A.  No.

15    Q.  You were just there to talk to him?

16    A.  Yes.

17    Q.  He didn't have to talk to you?

18    A.  No, he didn't.

19    Q.  But he voluntarily talked to you?

20    A.  Yes.

21    Q.  For awhile?

22    A.  For awhile.

23    Q.  Part of that is because he liked you?

24    A.  He said he did.

25              (Audio recording resumed.)
```

```
 1              " -- warrant for my arrest?"

 2              "I promise you -- all right."

 3              "I'm not going to say anything to incriminate

 4       myself."

 5              "No.  I'm not asking you to.  Listen, what it is,

 6       the same thing I talked to you about before, is the -- the

 7       -- the Clerk of Court and the people, the employees, they

 8       get a little frightened when they get -- like you had called

 9       in and said, Hey, I'm a ticking time bomb."

10              (Audio recording paused.)

11       BY MR. KELLEY:

12       Q.  Here's the "bomb" again.  He had said "walking bomb"

13       before?

14       A.  Yes.

15       Q.  So in January 2017, he said some comment about being a

16       "walking bomb" --

17       A.  Yes.

18       Q.  -- to you?  He said that comment to you in January 2017,

19       like at the pretrial hearing?

20       A.  Yeah.  I think -- yes.  Yes, he did.  He did say that.

21       Yep.

22       Q.  Okay.  And that was in a context of discussing him being

23       able to process the civil court case, the insurance trial

24       dragging on for three years --

25       A.  Yes.
```

1    Q.  -- right?  So he was trying to process his emotions.

2    And when he said "walking bomb" in January of 2017, he was

3    talking about himself, his sanity, and needing to vent,

4    right?

5              MS. ALLYN:  Objection, calls for speculation.

6              THE COURT:  Sustained.

7    BY MR. KELLEY:

8    Q.  You did not arrest him in January 2017 after he said

9    "walking bomb" to you, did you?

10   A.  No, I didn't.

11             (Audio recording resumed.)

12             "I am."

13             "Yeah, I know, but, see, they sometimes take that

14   as threatening.  Okay?  And I know you don't mean it that

15   way."

16             (Audio recording paused.)

17   BY MR. KELLEY:

18   Q.  So when you said, "I know you don't mean it that way,"

19   you're alluding to his venting process, right?

20   A.  Yes.

21   Q.  You knew he was coping by venting?

22   A.  Yes.

23             (Audio recording resumed.)

24             "Yeah."

25             "Because you and I have had a lot of conversations

1     and I know that you're just venting.  I understand it,

2     but --"

3                "I'm out of my fucking mind and I want you to tell

4     them down there that I'm fucking hurt.  I'm sleeping under a

5     fucking bridge.  100 -- my friend died.  He left me $100,000

6     and this fucking judge snatched it right out from under

7     fucking -- under me.  You saw her in court.  She denied me a

8     jury trial.  She had the deck stacked."

9                (Audio recording paused.)

10    BY MR. KELLEY:

11    Q.  So when Mr. Ivers said, "She had the deck stacked"

12    against him, he's referring to Judge Wright's rulings during

13    the court case, right?

14                MS. ALLYN:  Objection, calls for speculation.

15                THE COURT:  Sustained.

16    BY MR. KELLEY:

17    Q.  Judge Wright did, in fact, deny him the jury trial?

18    A.  Yes.

19    Q.  And you knew that later she also denied him a hearing on

20    a motion for a new trial, right?

21    A.  I don't know about that.  I think I was out of the case

22    by then.

23                (Audio recording resumed.)

24                "I'm fucking crazy fucking angry.  Tell them down

25    downtown, tell the federal judges this guy is out of his

 1    fucking mind crazy.  This judge cheated him.  I sent them a

 2    letter and they know it.  I have to process it.  I have to

 3    process it."

 4              (Audio recording paused.)

 5    BY MR. KELLEY:

 6    Q.  Again, talking about processing his emotions?

 7    A.  Correct.

 8              MR. KELLEY:  Ms. Allyn, I'm going to 11:26, page

 9    13.

10              MS. ALLYN:  Thank you.

11    BY MR. KELLEY:

12    Q.  I'm going to skip ahead.  This is towards the end of the

13    September 1st interview, if you could call it that.  And

14    Mr. Ivers has just described to you that he's hot, you know,

15    he's upset.

16              (Audio recording resumed.)

17              "And it's fine to be hot, but you can't -- you

18    can't hurt anybody."

19              "I never said I was going to hurt anybody."

20              (Audio recording paused.)

21    BY MR. KELLEY:

22    Q.  That was the $64,000 question, was he going to hurt

23    anybody, right?

24    A.  Yes.

25    Q.  And he just told you again I'm not going to hurt

1    anybody?

2    A.  He did say that.

3    Q.  Shortly after what we just heard, you and Deputy Wooton

4    left Minnetonka, went back to the station, right?

5    A.  Yes.

6    Q.  And that September 1st interview/discussion, whatever

7    you want to call it, that was the last time you spoke to

8    Mr. Ivers before -- oh, probably ever, right?  That was the

9    last time you spoke to him?

10   A.  That was the last time I spoke to him, yes.

11   Q.  So as part of this investigation, you were the PII.

12   What does that mean again?

13   A.  Protective intelligence investigator.

14   Q.  So you were in charge of the investigation into

15   Mr. Ivers?

16   A.  Yes, for one year or for --

17   Q.  For one year until Deputy Wooton took over?

18   A.  Yes.

19   Q.  So between August -- or, no, sorry, October 2016 when he

20   sent some of the first letters into the court, you were

21   there?

22   A.  Yes.

23   Q.  Okay.  January 2017 when you had the pretrial hearing

24   and the trial, you were there?

25   A.  Yes.

1    Q.  Okay.  You had interactions with Bob?

2    A.  Yes.

3    Q.  More extensive than any other marshal, right?

4    A.  Yes.

5    Q.  Okay.  And then you continued monitoring the situation

6    until September 2017?

7    A.  Yes.

8    Q.  And then you had that interview that lasted, I don't

9    know, 20 minutes, something like that, on September 1st?

10   A.  Correct.

11   Q.  Would you say that you had more interactions with

12   Mr. Ivers than anybody else in the investigation?

13   A.  Um --

14   Q.  Anybody in law enforcement?

15   A.  Yeah, that I know of.  Yeah.  You know, I know there was

16   some contact afterwards.  I didn't read those reports and I

17   don't know too much about it.  But up until that point, I

18   think I had more contact with him than anybody.

19   Q.  So in all of your interactions with Mr. Ivers, you knew

20   that he said inappropriate things, right?

21   A.  Yes.

22   Q.  He was fairly well-behaved in court?

23   A.  Yes.

24   Q.  You know he's not an attorney?

25   A.  Correct.

1    Q.  I think everybody knows that.

2            He doesn't fully grasp how the court system works?

3    A.  I --

4    Q.  He did a decent job in January as a layperson, right?

5    A.  Yes.

6    Q.  But he doesn't have an attorney's understanding of the

7    rules of evidence?

8    A.  I can't answer that.  I don't know what his knowledge of

9    the rules of evidence are.

10   Q.  Okay.  Just suffice it to say he's not an attorney?

11   A.  Yes.

12   Q.  You know that Mr. Ivers vents when he's upset?

13   A.  Yes.

14   Q.  It's his way of processing his emotions?

15   A.  Yeah.  He lets it out.

16   Q.  Okay.  And he's told you over the course of, I don't

17   know, roughly a year that you interacted with Bob, he has

18   told you how hurt he was about his friend dying, right?

19   A.  He mentioned that, yeah.  It wasn't continual, but he

20   mentioned it.

21   Q.  Okay.  And then that he felt like he did not get a fair

22   trial?

23   A.  Um, yeah.  The September 1st interview he -- that's kind

24   of what he was saying.

25   Q.  Okay.  And he was processing those things?

```
1    A.  Yes.

2    Q.  He felt hurt by them, and his way of processing it was

3    venting?

4              MS. ALLYN:  Objection, calls for speculation.

5              THE COURT:  Sustained.

6    BY MR. KELLEY:

7    Q.  You routinely described Mr. Ivers as friendly and

8    cooperative.

9    A.  With me, yes.

10   Q.  So in the entire time you knew him, he was friendly and

11   cooperative with you?

12   A.  Always with me, yes.

13   Q.  And he was well-behaved or behaved well enough in court

14   not to get in trouble, right?

15   A.  Yes.

16   Q.  So you stepped off the case and Deputy Wooton took over

17   sometime around September 2017?

18   A.  Sometime around there, yes.

19   Q.  So after that.

20            At that point, you had not arrested him for

21   anything, had you?

22   A.  No.

23   Q.  I think I heard you testify to the government in

24   September of 2017 you considered him just a potential

25   threat?
```

```
1    A.  Could you repeat that.

2    Q.  You considered -- so you testified to the government

3    your conclusion after September 1st was he was just a

4    potential threat?

5    A.  Yes.

6    Q.  Not an actual threat?

7    A.  Well, there's no way to know that unless somebody --

8    Q.  You did say potential threat?

9    A.  Yes, potential.

10   Q.  Okay.  You kept the investigation open?

11   A.  Yes.

12   Q.  Just to be clear, after September 1st, Mr. Ivers had no

13   correspondence whatsoever with Judge Wright or her chambers

14   that you know of?

15   A.  Right.  Not that I know of.  Correct.

16   Q.  You're aware of this phone call that happened on

17   February 27th, 2018 between Mr. Ivers and his two attorneys?

18   A.  I have heard about it from Deputy Wooton.

19   Q.  So you were not on that phone call?

20   A.  No.

21   Q.  Okay.  You have no knowledge about what was said on that

22   phone call?

23   A.  I don't.

24   Q.  Okay.

25   A.  I mean, I -- it's been relayed to me.
```

1    Q.  You were not there personally, so you have no personal

2    knowledge of what was said on that phone call?

3    A.  Correct.

4              MR. KELLEY:  One second, Your Honor.

5              (A brief discussion was held off the record.)

6    BY MR. KELLEY:

7    Q.  You're aware that the marshals went to visit Mr. Ivers

8    in North Dakota on March 14th, 2018, correct?

9    A.  I'm aware of it, but I was doing a completely different

10   job then so I paid no attention to any -- what was going on

11   so --

12   Q.  Did Deputy Wooton ask if you would go out there and meet

13   Bob Ivers in North Dakota?

14   A.  Asked if I would go to North Dakota?

15   Q.  Did he?

16   A.  I don't recall that.

17   Q.  Did you talk to -- so I think it was Deputy Seyfried and

18   Deputy Wickenheiser went to interview Mr. Ivers on March

19   14th.  Did you talk to either of them before they

20   interviewed Mr. Ivers?

21             MS. ALLYN:  Objection, foundation.

22             THE COURT:  Overruled.  You can lay foundation.

23   BY MR. KELLEY:

24   Q.  So you're aware that Deputy Seyfried and Deputy

25   Wickenheiser went to interview Bob Ivers on March 14th,

1    2018?

2    A.  Yeah, with the caveat that it was getting fuzzy for me

3    because I was not involved in the investigation then.  So

4    anything I knew about that was maybe passing somebody in the

5    hallway and saying, hey, we're going to North Dakota for

6    this or that.  I wasn't briefed on it.  I didn't read

7    reports.

8    Q.  Okay.

9            MR. KELLEY:  No further questions, Your Honor.

10           THE COURT:  All right.  Ms. Allyn, do you have

11    some redirect that would be brief so we can get the jurors

12    to lunch or is it longer than that that you think we should

13    --

14           MS. ALLYN:  Your Honor, I'll try to be brief.  My

15    only hesitation is when lawyers say that and then they're

16    not brief, that's held against them.  I'll do my best.

17           THE COURT:  The jury knows you're the only thing

18    between us and lunch.

19           MS. ALLYN:  Thank you for reminding us all, Judge.

20    I will be brief.

21

22                    **REDIRECT EXAMINATION**

23    **BY MS. ALLYN:**

24    Q.  Deputy Hattervig, I have to take you back a little bit

25    to the beginning of the cross-examination.  There are a

1   series of questions in showing you letters, like Exhibit 1,

2   Exhibit 11.  You looked at all those letters; is that right?

3   A.  Yes.

4   Q.  All those letters, that all makes up the case file that

5   you have against Mr. Ivers that brings you here today to

6   testify, doesn't it?

7   A.  Yes.

8   Q.  And there were some questions about Mr. Ivers being

9   polite and cooperative in the courtroom for his pretrial and

10  his trial.  Do you remember those questions?

11  A.  Yes.

12  Q.  Were there multiple armed guards in that courtroom on

13  all those occasions that Mr. Ivers was polite?

14  A.  Yes.

15  Q.  And did Mr. Ivers know that there were multiple armed

16  guards in the courtroom during that time?

17  A.  Yes.

18  Q.  Now, I just want to be clear because there's some

19  questions in a police report -- I'm sorry, in your report

20  following the pretrial where defense counsel was asking you

21  about you concluded that Mr. Ivers didn't pose a threat.

22  You didn't conclude that on January 4th, did you?

23  A.  No.

24  Q.  Any questions the defense counsel was asking you had to

25  do with you were quoting what Mr. Ivers said, right?

1    A.  Right.  I was paraphrasing what Mr. Ivers told me.

2    Q.  Was it your assessment that Mr. Ivers was not a threat

3    at the January 4th, 2017 pretrial?

4    A.  No.

5    Q.  In fact, did you continue to believe that Mr. Ivers

6    could pose a threat?

7    A.  Yeah.  There was still a concern definitely.

8    Q.  There's been a lot of talk in some of the venting stuff,

9    right?

10   A.  Yes.

11   Q.  And the processing stuff, right?

12   A.  Yes.

13   Q.  This I need to process idea, that came from Mr. Ivers,

14   right?

15   A.  Yes.

16   Q.  It's not your words saying this is just him processing,

17   is it?

18   A.  Well, I'm agreeing with him to some point and saying

19   that I understand what he's saying, so yeah.

20   Q.  Are you doing that to build rapport or just because you

21   don't care, you think this guy is just processing?

22   A.  To build rapport, to keep him talking, and also I'm

23   hoping that he will agree with me on certain other things

24   about, you know, you didn't mean this as a threat and, you

25   know, you don't want the people to be afraid of you.  I was

1    trying to get him to agree with me on those things, on those

2    points.

3    Q.  You don't think it's -- he is just processing at any of

4    the stage that you talked to him, do you?

5    A.  It would be my hope that that would be all it would be,

6    but I have no way of knowing that he is not going to

7    actually do something.  I would be worried about it.

8    Q.  So whether he calls it venting or processing, you have

9    to keep it open as an investigation?

10   A.  You can vent and process and also commit an act of

11   violence, so it was concerning.

12   Q.  Okay.  So just because somebody says they are venting

13   doesn't mean they're not a threat?

14   A.  Correct.

15   Q.  And just because they say they are processing doesn't

16   mean they don't have other ways of acting out on their

17   anger, does it?

18   A.  Yes.

19   Q.  Venting and processing can be just one way to act on

20   anger, isn't it?

21   A.  Yes.

22   Q.  If somebody is that angry, they still pose a threat

23   whether --

24            MR. KELLEY:  Objection, Your Honor, leading.

25            THE COURT:  Sustained.

1    BY MS. ALLYN:

2    Q.  Can somebody pose a threat still even if they are

3    venting?

4    A.  I think it's an indicator that they might pose a threat.

5    Q.  There were some questions about the defendant being in

6    dire straits, not having a car, and all that conversation.

7    Do you recall that?

8    A.  Yes.

9    Q.  When Mr. Ivers talks about being desperate, doesn't that

10   mean his desperation could make him more of a threat?

11   A.  It's the same.  It's concerning.

12   Q.  Concerning how?

13   A.  Well, if a person feels that their life is over, they

14   have nothing left, you know, that could lead them to do

15   things that normal people wouldn't do.

16   Q.  You know, in this January 2017 conversation where

17   there's some talk about venting, did the defendant admit to

18   you it's more than just venting, he's also doing it to get

19   people to jump?

20   A.  Yeah, he said he was doing it to get the court process

21   to move along faster and to get what he wanted.

22   Q.  So it's not just his own processing, right?  He is

23   wanting to get people to do what he wants, right?

24   A.  Yes.

25   Q.  There's some questions about the profanity or not, how

1   profanity is not illegal, right?

2   A.  Correct.

3   Q.  I guess that's sort of obvious.  But you did say the

4   profanity is concerning, right?

5   A.  Yes.

6   Q.  Does the profanity in this system sort of show a level

7   of disrespect to the judges?

8   A.  Um, yes.

9   Q.  And does that level of disrespect indicate a security

10  risk?

11  A.  I think it's an indicator that he is willing to cross

12  lines that other people aren't willing to cross.

13  Q.  If you are willing to act out and use profane language,

14  you might be willing to act out in other ways?

15  A.  It would be concerning.

16  Q.  With respect to this sort of idea of Mr. Ivers' proper

17  decorum in trial, it wasn't just the armed guards; you also

18  escorted him around the building, didn't you?

19  A.  Yes.

20  Q.  And there's a good level of security in this building,

21  wouldn't you say?

22  A.  Yes.

23  Q.  There's the metal detector, things like that?

24  A.  Correct.

25  Q.  So when defense counsel asks you a bunch of questions

1    about how Ivers never came back to this building after his

2    trial, there's a lot of security in this building, isn't

3    there?

4    A.  Yes.

5    Q.  There were some questions -- oh, I'm sorry -- the

6    September 1st interview, if you could turn to that.  There

7    was a question about how Mr. Ivers said, well, I'm not going

8    to hurt anybody, right?

9    A.  Yes.

10   Q.  He tried to tell you that.  But did you take a different

11   conclusion from that based on Mr. Ivers' tone or demeanor?

12   A.  Which conversation was that again?

13   Q.  September 1st when he claimed, well, I'm not going to

14   hurt anybody.

15   A.  I recall him saying that.

16   Q.  And how did you feel about that, when he said that?

17              MR. KELLEY:  Objection, Your Honor.

18              THE COURT:  Overruled.

19              THE WITNESS:  Well, I was glad that he said it.  I

20   mean, I was trying to get him to agree with me more on those

21   kind of things.  It was -- it was -- it was good that he

22   said that, but he also said a lot of other things that were

23   troubling.

24   BY MS. ALLYN:

25   Q.  And how about any continued demeanor or tone that added

1   to what you thought was troubling?

2   A.  He was angry the whole time, and he was saying that he

3   was glad that the court employees were afraid, and he was --

4   he said they made their bed or something like that, so he's

5   glad.

6   Q.  So you are still concerned with him even though he might

7   have said other things like I won't hurt anybody?  You were

8   still concerned?

9   A.  Yeah.  He didn't back off much at all.

10  Q.  Just because he says that doesn't mean he's not going to

11  do it?

12  A.  Well, you know -- and, again, I'm just trying to predict

13  the future and what he's going to do and there's no way to

14  do that.  There were a lot of red flags, put it that way.

15  Q.  What were some of those red flags?

16  A.  That he was glad that people were afraid of him; that he

17  had, you know, these feelings that made him feel like a

18  walking bomb or a ticking bomb; and his despondence about,

19  you know, the fact that he didn't get this $100,000 was like

20  the end of everything.  It made me worry that he would take

21  some sort of action.

22  Q.  Now, there are some questions about how the letters

23  seemed to stop end of August 2017.  Do you remember those

24  letters -- or those questions?

25  A.  Yes.

1    Q.  Every time that Mr. Ivers was sending letters to the

2    court, he got a visit from you, didn't he?

3    A.  Not on every letter.  But, you know, not too far after

4    the letters he did get a visit.

5    Q.  So he sent some letters fall of 2017 (sic) and you --

6    fall of 2016 and you visit with him in January of 2017,

7    right?

8    A.  Yes.

9    Q.  And he sends letters end of August 2017, and you visit

10   him September 1st, 2017, right?

11   A.  Correct.

12   Q.  So if he wants to scare Judge Wright, he better find

13   another plan, right?

14          MR. KELLEY:  Objection, Your Honor.

15          THE COURT:  Sustained.

16   BY MS. ALLYN:

17   Q.  Now, I think defense counsel asked you some questions

18   about a September 1st potential threat versus actual threat.

19   Do you recall that?

20   A.  September 1st potential threat versus actual threat?

21   Q.  I'll phrase it a little better.  He was talking to you

22   about the September 1st interview, and then after that you

23   had decided it was just a potential threat; is that right?

24   A.  I wouldn't say "just."  I mean, potential threat is a

25   potential threat.

1   Q.  And you didn't get to finish your answer about being an

2   actual threat or not.  What were you trying to answer?

3   A.  Um, well, I mean, an actual threat I would define as

4   somebody that we know is going to do something, and we just

5   don't have a way of knowing that.  So there is always a

6   potential.

7   Q.  Or if they were to actually issue a threat like saying

8   they plan to kill a judge?

9   A.  If they said I'm coming to kill somebody, then I guess

10  that would be an actual impending emergency.

11  Q.  Is your protection of judges limited to the courthouse?

12  A.  No.

13  Q.  What about where they live?

14  A.  Yes.

15  Q.  What about less secure places than this building?

16  A.  Yes.

17  Q.  So if somebody did want to hurt a federal judge, can

18  they find them in places less secure --

19          MR. KELLEY:  Objection, Your Honor.  We are

20  outside the scope of cross.

21          THE COURT:  Overruled.

22  BY MS. ALLYN:

23  Q.  Can they find those judges in places less secure than

24  this building?

25  A.  Yes.

1    Q.  So to come somewhere after August 2017 that's less

2    secure to find a judge, that's possible for Mr. Ivers?

3    A.  Yes.

4              MS. ALLYN:  Thank you.  No further questions.

5              THE COURT:  Okay.  Mr. Kelley, any recross?

6              MR. KELLEY:  No, Your Honor.

7              THE COURT:  All right.  Ladies and gentlemen,

8    we'll be in recess until 1:30.  Remember the previous

9    admonition of the Court.

10              THE COURTROOM DEPUTY:  All rise.

11              (A lunch recess was taken.)

12              THE COURTROOM DEPUTY:  All rise for the jury.

13              THE COURT:  Please be seated.

14              Ms. Allyn.

15              MS. ALLYN:  Thank you, Your Honor.  At this time,

16    the government calls Heather Arent-Zachary to the stand.

17              THE COURT:  Ms. Arent-Zachary, if you would place

18    yourself in the witness box, please.  And then raise your

19    right hand and look at the ladies and gentlemen of the jury.

20              (Witness administered oath by the Court.)

21              THE COURT:  Please be seated.

22              MS. ALLYN:  Thank you, Your Honor.

23

24    **HEATHER ARENT-ZACHARY**

25                        **DIRECT EXAMINATION**

1    **BY MS. ALLYN:**

2    Q.  Good afternoon.

3    A.  Good afternoon.

4    Q.  So you're sort of familiar with courtrooms, aren't you?

5    A.  I am.

6    Q.  Can you tell the jury where do you work?

7    A.  I work at the federal court in Minneapolis.

8    Q.  And who do you work for?

9    A.  I work for Chief Judge John Tunheim.

10   Q.  And is he a United States federal judge with the

11   District of Minnesota?

12   A.  He is.

13   Q.  What is your job title for Judge Tunheim?

14   A.  Courtroom Deputy.

15   Q.  Do you know a Terianne Bender?

16   A.  I do.

17   Q.  Is that the same job title that she has?

18   A.  Terianne has a combined position, so it's slightly

19   different from mine, but we do much of the same work.

20   Q.  And how are the positions different?

21   A.  She also functions as the judicial assistant for Judge

22   Nelson (sic), so there's more judge-specific administrative

23   work for her.

24   Q.  I think you said "Judge Nelson," but who does Terianne

25   Bender work for?

```
 1    A.  Oh, I'm sorry.  Judge Wright.  Excuse me.

 2    Q.  Judge Nelson is a different judge in this district?

 3    A.  Yes.  She works for Judge Wright.

 4    Q.  Let me back up.  Where did you work before working for

 5    Judge Tunheim?

 6    A.  I worked in the Clerk's Office.

 7    Q.  And how long did you work in the Clerk's Office?

 8    A.  In this district, for two years.

 9    Q.  When you say "Clerk's Office," what does that mean?

10    What is a Clerk's Office?

11    A.  The Clerk of Court is the administrative arm of the

12    court.  The clerk keeps the record.

13    Q.  And is that like the documents filed in a case?

14    A.  Yes, docket, documents.  They make sure that people or

15    parties who need access to the judges are able to get it.

16    Q.  File all the paperwork, things like that?

17    A.  Yes.

18    Q.  How long have you worked for Chief Judge Tunheim?

19    A.  Five years.

20    Q.  What are some of your official duties in working for a

21    federal judge like Chief Judge Tunheim?

22    A.  I supervise and coordinate all aspects of his caseload.

23    So that includes criminal and civil cases, scheduling

24    hearings, making sure that things move along.

25    Q.  You said "criminal and civil."  What are the differences
```

1    between those cases, just generally?

2    A.   Criminal cases are brought by the United States of

3    America.   Civil cases can be brought by anyone.

4    Q.   What about issuing orders?  Do you have any function for

5    your job with respect to Judge Tunheim issuing orders and

6    things of that nature?

7    A.   I may docket orders that he's issued, place them on the

8    record.

9    Q.   And what are some of your duties and responsibilities

10   then sort of day-to-day with Judge Tunheim?

11   A.   Every day I check in, see what was filed the day before,

12   and determine whether or not I need to follow up or take any

13   action on it.

14           I will make sure that hearings scheduled for that

15   day or that week or the next week, that everything is ready

16   either on the public kiosk, on the docket.  Make sure that

17   the Judge has all the materials he needs, and that everybody

18   is going to show up.

19   Q.   Do you help with jury or bench trials at all?

20   A.   Yes.

21   Q.   How so?

22   A.   I would schedule them.  I request the jury.  I make sure

23   that we have all the motions heard before we get to the

24   trial.  And, I mean, I basically -- when people ask me what

25   I do, I say the man behind the curtain.  I make sure that

1    whatever needs to be done before any kind of proceeding is

2    done.

3    Q.  Before the Judge were to take the bench, say?

4    A.  Yes.

5    Q.  And you've said things about documents being filed and

6    docketing.  Is there a specific, I guess, electronic system

7    that takes care of that?

8    A.  There is.

9    Q.  Can you explain that a little.

10   A.  So there used to be paper dockets and the courts

11   progressed, along with everyone else, to an electronic

12   docketing system where that is the record of all the

13   proceedings.

14          So it starts with, for a civil case, a complaint

15   and then goes from there.  There will be an answer or not or

16   whatever the case calls for.  But it's all kept

17   electronically.  We may get paper documents, but when we do,

18   those are scanned and made into a pdf and uploaded

19   electronically.

20   Q.  Sort of going back to your daily job

21   duties/responsibilities, what about phone calls or

22   correspondence?  What duties do you have with respect to

23   that kind of contact with chambers?

24   A.  Any phone calls or correspondence that are case related

25   come to me.  And I either respond to them myself or have the

1    Judge review it and respond in whatever manner he directs me

2    to.

3    Q.  What about with respect to letters?

4    A.  Same for letters.  I get all the letters.  I review

5    them.  Depending on what they are, I may be able to

6    determine what needs to happen without the Judge's input,

7    but very often I show them to him and then do whatever it is

8    he wants me to do with them.

9    Q.  You said something about getting calls, letters that are

10   case related, right?

11   A.  Yes.

12   Q.  Is that because although Judge Tunheim is a Chief Judge,

13   does he have his own caseload?

14   A.  Yes.

15   Q.  Do you sometimes get communications, though, to Judge

16   Tunheim just based on the fact that he's the Chief Judge?

17   A.  Yes.

18   Q.  Can you explain a little bit about that.

19   A.  Well, like any organization, if people don't know who to

20   contact or they have a complaint, generally it seems like

21   the idea is to go to the top, and he is currently the top.

22   So that does generate some of the contacts I get.

23   Q.  Are they trying to seek Judge Tunheim to do something

24   for them, things like that?

25   A.  Usually.

1    Q.  What's the volume of letters and phone calls you get in

2    your role working for the Chief Judge?

3    A.  It really depends.  I mean, summer can be quieter

4    because the lawyers are on vacation, they're not calling me.

5    But it really just depends on our caseload and what's going

6    on with it.  If we have things that are coming up to trial,

7    I'm usually busier than not.

8    Q.  Would you say at least several calls or letters a day?

9    A.  Oh, yes.

10   Q.  So a daily occurrence?

11   A.  Oh, yes.  Yes.

12   Q.  Are you familiar with the name Robert Ivers?

13   A.  I am.

14   Q.  And, generally, how are you familiar with Mr. Ivers?

15   A.  I had some contact with Mr. Ivers in my role as working

16   for the Chief Judge.

17   Q.  What were some of the -- so you had contact.  What were

18   some of the type of communications you had with Mr. Ivers?

19   A.  Phone calls and letters.

20   Q.  Does it sound like these communications would have been

21   from summer of 2017?

22   A.  Yes.

23   Q.  I guess starting with maybe the first phone call you

24   remember, what's the first phone call you remember receiving

25   from Mr. Ivers in the summer of 2017?

1    A.  He was calling to check on an order he was expecting

2    from Judge Wright.

3    Q.  And do you recall how you responded or anything more

4    about that conversation?

5    A.  I looked up the case so that I had some context for his

6    inquiry.  And I remember that there had been a trial, and he

7    was awaiting an order from the Judge after the conclusion of

8    that trial, and it had been a few months.  And I just

9    assured him that I'm sure the Judge is working on it and it

10   would be issued as soon as it was ready.

11   Q.  So you were able to, you say, look up the case.  What

12   does that mean?  How so?

13   A.  I looked it up on the electronic record.

14   Q.  And did you see who the judge was that was assigned to

15   Mr. Ivers' case?

16   A.  I did.

17   Q.  And who was that?

18   A.  Judge Wright.

19   Q.  Is she also a United States federal judge for the

20   District of Minnesota?

21   A.  She is.

22   Q.  Does she have similar official duties as Judge Tunheim,

23   excluding his chief duties?

24   A.  Yes.

25   Q.  So, I'm sorry, I think you said this, but if you can

1    remind me, what had you noticed about whether this order had

2    come out or not?

3    A.  It hadn't come out yet.

4    Q.  And that's what Mr. Ivers was calling about?

5    A.  Yes.

6    Q.  During this phone call with Mr. Ivers, how is his tone?

7    How is his demeanor with you?

8    A.  It was -- I recall it being fine.  I mean, he certainly

9    was hoping to get the order soon, but it was a perfectly

10   civil interaction.

11   Q.  Any swearing?

12   A.  No.  Nope.

13   Q.  So were you aware then that some point later that

14   summer, Judge Wright did issue a ruling on Mr. Ivers' case?

15   A.  Yes.

16   Q.  Was that a ruling favorable or unfavorable to Mr. Ivers?

17   A.  I believe it was unfavorable.

18   Q.  After that unfavorable ruling, did you ever hear from

19   Mr. Ivers after that?

20   A.  I did.

21   Q.  And can you explain to the jury what the next

22   communication was you had with Mr. Ivers after Judge

23   Wright's ruling.

24   A.  He was not happy with her decision, and he wanted Chief

25   Judge Tunheim to do something about it.

1    Q.  And how is it that he made that communication to you, by

2    phone call?

3    A.  Yes.

4    Q.  I guess we'll start -- you get a phone call from

5    Mr. Ivers?

6    A.  Yes.

7    Q.  And tell me how it goes.  What does he say?

8    A.  Well, he made it clear that he believed Judge Wright had

9    erred in her order, and he was upset and wanted Judge

10   Tunheim to do something about it.  That's not how it works.

11   Judge Tunheim doesn't review other judges' orders from the

12   same court, so he would have to file an appeal.  I don't

13   remember specifically what I said, but I'm sure I would have

14   told him that the way to address that would be to file an

15   appeal.

16   Q.  And how did Mr. Ivers continue in his conversation with

17   you then?

18   A.  He was not happy with that.  He did not want to go

19   through the process of an appeal.  He wanted something

20   faster.  But those are how things proceed, and all I can do

21   is provide information.

22   Q.  Did he ever say anything in the phone call that

23   concerned you?

24   A.  He did.

25   Q.  And what was that?

```
1    A.  He talked about how angry he was.  He was mad, and he

2    said he was a walking bomb at one point, and that sort of

3    language is very attention-getting.

4    Q.  You said he was "mad."  Did he characterize that, like

5    crazy mad, something like that?

6    A.  Yes.

7    Q.  Is that --

8    A.  Crazy mad, yeah.

9    Q.  And what was the bomb comment he said?

10   A.  He was crazy mad, and he didn't know what to do with it,

11   and he described himself as a walking bomb because he was so

12   frustrated.

13   Q.  And how did you feel when you heard that?

14   A.  It was alarming.

15   Q.  You get a lot of calls every week?

16   A.  I do.

17   Q.  How commonly do you feel alarmed by phone calls?

18              MR. KELLEY:  Objection, Your Honor, relevance.

19              THE COURT:  Overruled.

20   BY MS. ALLYN:

21   Q.  You may answer.

22   A.  Rarely.

23   Q.  Did Mr. Ivers say anything about Judge Wright during

24   this phone call?

25   A.  Yes, that she didn't know the law, that she didn't know
```

1    what she was doing, and he wanted Judge Tunheim to do

2    something about his case.

3    Q.  How would you characterize Mr. Ivers', I guess, focus or

4    not on Judge Wright?

5    A.  He was clearly unhappy with her specifically.

6    Q.  Not unhappy with anybody else?

7    A.  No.

8    Q.  Did he complain about the insurance company, for

9    example?

10   A.  I don't recall that.

11   Q.  What was Mr. Ivers' tone with you during the call?

12   A.  I mean, he was emotional.  He was upset.  I didn't feel

13   personally threatened.  He didn't swear at me.  I've had

14   other instances where people use colorful language, but he

15   did not, which I appreciated.  But he was clearly really

16   emotional and upset.

17   Q.  So you said you didn't feel personally threatened.  You

18   are distinguishing that between what?

19   A.  Well, you know, I'm an administrator.  Right?  I mean,

20   I'm sort of a cog.  I think he understood that I didn't

21   issue the order.  There wasn't anything I could personally

22   do.  I don't feel like he expected me personally to do

23   something.  But he was trying to find a way to get what he

24   wanted from the Court.

25   Q.  Were you concerned from that phone call, though?

1    A.  Oh, yes.

2    Q.  Why?

3    A.  It's unusual for someone to use language like "walking

4    bomb."

5    Q.  And who were you concerned for?

6    A.  The Judge.

7    Q.  What Judge?

8    A.  Pardon me, Judge Wright.

9    Q.  How was your perception of what this "bomb" language is?

10   A.  My perception of it?  Well, it's threatening.

11   Q.  How did you try to respond to Mr. Ivers?

12   A.  Again, it was a year ago, so I don't remember specifics,

13   but I'm sure that I gave him information regarding how he

14   needed to file an appeal and what the Chief Judge's role in

15   this would be.  But, I mean, any time I have a situation

16   like that, I just try to convey information so that the

17   people can take actions that are appropriate.

18   Q.  So you hang up from this phone call.  Right?  How do you

19   feel when you hang up?

20   A.  Concerned.

21   Q.  And what's the concern?

22   A.  It was -- it was disquieting.  It was that -- that kind

23   of conversation is not what I normally have with people when

24   they call me, and I felt like it needed some follow-up.

25   Q.  Was there anything about that terminology, "bomb"?

```
 1    A.  Absolutely.

 2    Q.  Why did that matter to you?

 3    A.  Well, I mean, bombs are inherently destructive.  It's

 4    not something that you joke about or particularly when it

 5    comes to judges.

 6    Q.  And you were sitting in a federal courthouse when you

 7    got this call, right?

 8    A.  Yes, I was.

 9    Q.  And Mr. Ivers called your court phone number, right?

10    A.  Yes, he did.

11    Q.  Did you have concerns with that connection of "bomb" and

12    federal courthouses?

13              MR. KELLEY:  Objection, Your Honor, leading.

14              THE COURT:  Sustained.

15    BY MS. ALLYN:

16    Q.  What did you do after you hung up?

17    A.  I emailed Judge Wright's assistant, Terianne, and the

18    marshals.

19    Q.  And why did you do that?

20    A.  Because whenever you have a contact like that that is

21    concerning to you, you're supposed to escalate it to the

22    marshals.  And I didn't know if Terianne had had any contact

23    with Mr. Ivers directly before.  I just wanted to warn her,

24    I guess let her know that maybe she was going to be getting

25    phone calls.
```

1    Q.  Why did you think Terianne needed to know, in addition

2    to the marshals?

3    A.  Well, it's good to know what might be coming your way.

4    If someone had spoken to a person that was unhappy with my

5    Judge, I would hope they would let me know because people

6    usually follow up.  They don't stop with just one call

7    necessarily.  They might go to other people if they are not

8    getting what they want.

9    Q.  Was this the issue of being focused on the Judge, not

10   just the decision?

11   A.  Yes.

12   Q.  So some worry more towards Judge Wright?  Is that what

13   you're saying?

14            MR. KELLEY:  Objection, Your Honor, leading.

15            THE COURT:  Sustained.

16   BY MS. ALLYN:

17   Q.  How soon after you got this call did you report it to

18   the marshals and Terianne?

19   A.  I believe it was immediately.

20   Q.  In the last five years of getting these phone calls, how

21   many times have you reported a call like this to the

22   marshals?

23            MR. KELLEY:  Objection, Your Honor, relevance.

24            THE COURT:  Overruled.

25            THE WITNESS:  I can't specifically remember any

```
 1    other instance.  There might've been one or two.  It's

 2    fairly unique.

 3    BY MS. ALLYN:

 4    Q.  Now, you mentioned you sent an email reporting this

 5    phone call with Mr. Ivers; is that right?

 6    A.  I did.

 7             MS. ALLYN:  Your Honor, may I approach?

 8             THE COURT:  You may.

 9    BY MS. ALLYN:

10    Q.  All right.  I've handed you a folder labeled Exhibit 24.

11    Can you look at that exhibit.

12    A.  Yes.

13    Q.  And do you recognize that exhibit?

14    A.  I do.

15    Q.  How is it that you recognize that exhibit?

16    A.  It's the email that I sent to Terianne and the marshals.

17             MS. ALLYN:  Your Honor, at this time the

18    government would offer into evidence Exhibit 24.

19             MR. KELLEY:  Objection, Your Honor, foundation.

20             MR. SCOTT:  Pretrial statement.  That's hearsay.

21             MS. ALLYN:  Your Honor, it's the email that this

22    witness is testifying she sent.  It's an action that she

23    took.

24             THE COURT:  But I think the objection is the

25    exhibit is hearsay.
```

ARENY-ZACHARY - DIRECT                          297

1          MS. ALLYN:  Thank you.  Your Honor, it's not

2    necessarily offered for the truth of the matter.  It is

3    offered for the steps that were taken, the times that they

4    were taken, and what people did upon receiving this email.

5          THE COURT:  Okay.  Received.

6          MS. ALLYN:  Thank you.  Your Honor, may I publish

7    it?

8          THE COURT:  You may.

9    BY MS. ALLYN:

10   Q.  Okay.  Do you see in the monitor before you Exhibit 24?

11   A.  I do.

12   Q.  It's kind of hard to see here, so I'm going to blow up

13   -- I'll get two different portions.  Okay?  Okay.  Do you

14   see the part I blew up in front of you?

15   A.  Yes.

16   Q.  So who is this from?

17   A.  Myself.

18   Q.  And it's to who?

19   A.  Terianne Bender and Tom Knutson.

20   Q.  Who is Tom Knutson?

21   A.  He is with the Marshal Service.

22   Q.  And what's the date on this email?

23   A.  August 23rd, 2017.

24   Q.  And the time?

25   A.  9:00 a.m.

1   Q.  So from what you can recall, how soon in time is this

2   email going out from when you received the phone call?

3   A.  Well, based on when I usually get to work, I think the

4   first thing I probably did was call Mr. Ivers back and then

5   send this email.  I think that's how I started my day.

6   Q.  So certainly sent that same day that you got the phone

7   call, right?

8   A.  Yes.

9   Q.  All right.  And can you read what you wrote.

10  A.  "Hi, I just returned a call to Bob Ivers and he

11  described himself as a 'walking bomb'.  He said he's crazy

12  angry and he doesn't know how to deal with it.

13          He's very upset with Judge Wright's rulings in his

14  case.  He didn't make any direct threats to anyone, but I

15  thought I would pass on my conversation with him.  He said

16  he put packages in the mail to Judge Tunheim, Judge Wright,

17  and Judge Thorson with a letter.  The number I reached him

18  at is 561-350-2566.  Thanks."

19  Q.  And did you receive a response to this email?

20  A.  I'm sure that I did, but I don't recall.

21  Q.  The marshals did reach out to you, right?

22  A.  Oh, certainly.  Oh, yeah.

23  Q.  By response -- I'm sorry, bad question.  Not necessarily

24  an email response, but did the marshals respond because of

25  this report?

ARENT - ZACHARY - DIRECT                                                  299

1      A.  They did.

2      Q.  How so?

3      A.  They said that they would go and talk with Mr. Ivers.

4      Q.  And I just want to clean up something on this exhibit

5      for the jury, the very top of the exhibit.  Look at what

6      I've just highlighted now, please.

7              Sort of who's sending what to who on the part that

8      I've highlighted?

9      A.  I am forwarding that to Farris Wooton.

10     Q.  And what's the date of that?

11     A.  September 4th, 2018.

12     Q.  And just explain to the jury why is there a different

13     date on this exhibit, why that date?

14     A.  The original didn't go to Farris, and I had been asked

15     to forward it to the marshals.

16     Q.  You understood Farris Wooton to be a case agent working

17     on Mr. Ivers' case?

18     A.  I did.  Yes.

19     Q.  Now, I'm not sure if I was fully understanding.  As part

20     of your phone call with Mr. Ivers, I think -- did you say

21     something like you told him write letters or something of

22     that nature?

23     A.  Oh, yes.  Yes.

24     Q.  Can you explain that a little bit.

25     A.  Well, anyone that calls if they want the court to take

1    any kind of specific action, I'll tell them to write a

2    letter because the court doesn't take action on phone calls.

3    We need a record.  So put it in writing and send it to us,

4    and that way we can do something about it.

5    Q.  So when you told Mr. Ivers that, how did he respond?

6    A.  Well, based on the email, he said he had already put

7    packages in the mail, so we were maybe getting something

8    soon.

9    Q.  Okay.  And so this phone call is August 23rd, 2017,

10   right?

11   A.  Yes.

12   Q.  And did you get some letters from Mr. Ivers following

13   that phone call?

14   A.  We did.

15   Q.  I'm going to show you what's in evidence as Exhibit 4.

16   I ask if you recognize Exhibit 4?

17   A.  I did.

18   Q.  And how is it that you recognize Exhibit 4?

19   A.  It's a letter he sent that we received.

20   Q.  So kind of blowing up Chief Judge John Tunheim, that's

21   your Judge?

22   A.  Yes.

23   Q.  You guys aren't in St. Paul, right?

24   A.  No.

25   Q.  But you get an email for the Chief Judge even if it's

ARENY-ZACHARY - DIRECT                301

1    sent to the St. Paul Courthouse?

2    A.  Yes.  There's interoffice mail.  They send it to us.

3    Q.  I'm showing you the postmark.  Can you read when it's

4    postmarked?

5    A.  August 22nd, 2017.

6    Q.  So that's the day before the phone call with Mr. Ivers?

7    A.  Yes.

8    Q.  And shortly after getting this letter, do you recall

9    getting any other letters from Mr. Ivers?

10   A.  I do.

11   Q.  What was that?

12   A.  I do.

13   Q.  I'm going to show you what's in evidence as Government

14   Exhibit 11.  Do you see that on your screen?

15   A.  Yes.

16   Q.  And do you recognize that letter?

17   A.  I do.

18   Q.  And how do you recognize that letter?

19   A.  It's another letter we received from Mr. Ivers.

20   Q.  All right.  I'm going to blow up that postmark part

21   again.  And what's the date on this letter?

22   A.  August 25th, 2017.

23   Q.  So about three days later does it sound like is when you

24   got it then?

25   A.  Yes.

1    Q.  Did you notice anything different between the two

2    letters when you received them?

3    A.  Well, the red writing and its large lettering.

4    Q.  Let's see if I can get this right.  I didn't.  Hold on.

5    I'm going to see if I can pull up each exhibit.  All right.

6    Do you see that?

7    A.  Yes.

8    Q.  Okay.  So if you were to look at the true Exhibit 4,

9    it's on your left?

10   A.  It is.

11   Q.  And Exhibit 11 on your right?

12   A.  Yes.

13   Q.  What did you notice as the difference between Exhibit 4

14   and Exhibit 11?

15   A.  Well, the "pay attention" in red is --

16   Q.  So Exhibit 11, the bottom, "pay attention" in different

17   color now, right?

18   A.  Yes.

19   Q.  I'm looking at Exhibit 4.  What does it say at the

20   bottom of Exhibit 4?

21   A.  "I WAS CHEATED BY ONE OF YOUR FEDERAL JUDGES AND I

22   DEMAND REDRESS."

23   Q.  All in caps?

24   A.  Right.

25   Q.  Let's see if I can do this right.  Exhibit 4, page --

1     see the back of the envelope of Exhibit 4?

2     A.  Yes.

3     Q.  And can you describe it.

4     A.  It is plain, no writing.

5     Q.  And Exhibit 11, I'm on page 2 now, the back of that

6     envelope, and how does that envelope compare?

7     A.  That one has additional writing.

8     Q.  And how so?  What does it says?

9     A.  It says, "Judge Wright is a corrupt judge."

10    Q.  Now I'm going down a page on Exhibit 4 and I'm going to

11    go down the page on Exhibit 11.  Do you see those side by

12    side, as well?

13    A.  I do.

14    Q.  Is it the same content of those two letters, between

15    Exhibit 4 and Exhibit 11 on page 3?

16    A.  It is.  The text is the same.

17    Q.  And how otherwise is it different?

18    A.  Exhibit 11 has more -- like the red ink and --

19    Q.  Number 4 especially has red under it?

20    A.  Yes.

21    Q.  Can you read the sentence that's been, I guess, added

22    attention to it on Exhibit 11.

23    A.  "The honorable action in this case is for Judge Wright

24    to reverse her decision."

25    Q.  I see another difference on Exhibit 11, and I'm going to

1    highlight that.  Can you read the part I've highlighted on

2    Exhibit 11.

3    A.  "Received August 29, 2017, Judge Tunheim chambers."

4    Q.  And who would have put that stamp there?

5    A.  I did.

6    Q.  Okay.  I don't see that stamp on Exhibit 4.  Why is it

7    on Exhibit 11?

8    A.  I think that after -- well, I know that after receiving

9    the phone call from Mr. Ivers that I wanted to make sure I

10   noted specifically when we received that letter.

11   Q.  Because why?  I mean, why did you want to pay attention

12   to it now?

13   A.  Well, it was the last in a line of several contacts.

14   And he was getting more and more sort of unhappy with each

15   contact, so I just felt like it would be a good idea to note

16   when we had received it.

17   Q.  Did you let the marshals know about these letters?

18   A.  I did.

19   Q.  I just want to finish paging down.  It's a little bit

20   more in the exhibit.  Exhibit 4 I have gone to the next

21   page.  I have done the same thing for Exhibit 11.  Are they

22   different, I guess, sort of attachments to these letters at

23   this point?

24   A.  Yes.

25   Q.  In general, on Exhibit 4, what is this page about?  Did

1    he just attach a document?

2    A.  Yeah.  It looks like it was a part of the Order or

3    something issued by Judge Wright.

4    Q.  This document number thing --

5    A.  Yes.

6    Q.  -- is that that ECF system, how you file things?

7    A.  It is.

8    Q.  Now, the letter sent a few days later, that has, what, a

9    note from Mr. Ivers?

10   A.  Yes.

11   Q.  Can you, please, read that to the jury.

12   A.  "Friday, August 25, 2017.  If the Tallman verdict is not

13   reversed now (one week), I will inform Lori Swanson,

14   Attorney General Minnesota, of the corrupt decision of Judge

15   Wright.  I will request her help in contacting officials of

16   the ADA to activate an investigation of Judge Wright's

17   decision based on the attached evidence and court file on

18   this case.  Federal violation, Bob Ivers."

19   Q.  And I think after this, if I can just page down each

20   exhibit now, it's just completely different from each other?

21   A.  Yes.

22   Q.  So we pointed out on these letters that it appears

23   Mr. Ivers is asking for Judge Tunheim to give him some

24   redress, right?

25   A.  Yes.

```
 1    Q.  And did Judge Tunheim give Mr. Ivers any relief after he
 2    received these letters?
 3    A.  No.
 4    Q.  The defendant did not get redress from Judge Tunheim?
 5    A.  No.
 6    Q.  Now, what did you do when you received these letters?
 7    A.  Well, I think the first one we forwarded on to Judge
 8    Wright.  We usually -- that's what we would do if we get
 9    communications assigned to a different judge.  Judge Tunheim
10    would review it and very often without comment just forward
11    it on to that other judge.  I think that's what happened the
12    first time.
13         Then by the second letter it had a few contacts
14    and the marshals were involved, and I believe I made a copy
15    of it and gave it to the marshals.
16    Q.  At that point, you just made sure the marshals were
17    involved?
18    A.  Uh-huh.
19         MS. ALLYN:  One moment.
20         (A brief discussion was held off the record.)
21         MS. ALLYN:  Thank you.  I have no further
22    questions, but defense counsel might.
23
24                        CROSS-EXAMINATION
25    BY MR. KELLEY:
```

```
 1    Q.  Good afternoon.

 2              The government showed you a series of letters just

 3    a few minutes ago.  Do you remember those?

 4    A.  I do.

 5    Q.  Two letters, in fact --

 6    A.  Yes.

 7    Q.  -- correct?  Just two?

 8    A.  Yes.

 9    Q.  And those letters were from Mr. Ivers?

10    A.  Yes.

11    Q.  Okay.  So you remember this is Government Exhibit 4?

12    You were shown this earlier?

13    A.  Yes.

14    Q.  Okay.  And this is postdated August 22nd, 2017, correct?

15    A.  It is.

16    Q.  And it's to Chief Judge Tunheim?

17    A.  Yes.

18    Q.  It is not dated February 27th, 2018, correct?

19    A.  No.

20    Q.  It was not received on February 27th, 2018, was it?

21    A.  No.

22    Q.  It was not addressed to Judge Wright, was it?

23    A.  No.

24    Q.  It was not addressed to Fredrikson & Byron?

25    A.  No.
```

1   Q.  The second letter, this is Government's Exhibit 11.  Do

2   you recognize this from a couple minutes ago?

3   A.  I do.

4   Q.  Okay.  This one is postdated August 25th, 2017, correct?

5   A.  It is.

6   Q.  And also addressed to Judge Tunheim?

7   A.  Yes.

8   Q.  Like the other one, this is not dated February 27, 2018,

9   is it?

10  A.  It is not.

11  Q.  And it was not received by the courts on February 27,

12  2018, was it?

13  A.  No.

14  Q.  And it was not sent to Fredrikson & Byron?

15  A.  No.

16  Q.  Just talking about these letters, both of them are very

17  similar, right?  The two letters, they contain copied

18  material that was in the first letter and is in the second

19  letter, right?

20  A.  Yes.

21  Q.  And what Mr. Ivers was asking the Chief to do was to

22  effectively overrule Judge Wright's decision?

23  A.  Yes.

24  Q.  That's not the proper procedure for asking for that

25  relief, right?

1    A.  No.

2    Q.  Mr. Ivers is not an attorney, very clearly?

3    A.  Yes.

4    Q.  And with his letters he attaches parts of court

5    documents that have highlighting and writing all over them,

6    correct?

7    A.  Yes.

8    Q.  So in some places there's yellow highlighting, correct?

9    A.  Yes.

10   Q.  Other places there's red highlighting under things?

11   A.  Yes.

12   Q.  Is it possible that Mr. Ivers thinks that these filings

13   are the correct way to ask for the relief he's asking for?

14           MS. ALLYN:  Objection, calls for speculation.

15           THE COURT:  Sustained.

16   BY MR. KELLEY:

17   Q.  An actual attorney would know that this is not the

18   proper way to ask for this relief, right?

19   A.  Yes.

20   Q.  Okay.  Let's turn to the August -- so that was an August

21   22nd letter, right?

22   A.  Yes.

23   Q.  And you received, was it, a voicemail from Mr. Ivers

24   that you returned or was it a phone call?

25   A.  I think that I had more than one contact from Mr. Ivers,

```
 1    so -- it was clear from the email that I was returning a
 2    call in that particular instance.  I think either likely
 3    happened, one way or the other.
 4    Q.  I mean, it was over a year ago now, right?
 5    A.  It was.
 6    Q.  You can't really remember if it was a voicemail you were
 7    returning or a direct call to you?
 8    A.  Well, based on the email, clearly I was returning a
 9    voicemail.  But as far as other contacts, I don't remember.
10    Q.  And after you got this phone call, you felt like you
11    should forward it on to Terianne Bender, correct?
12    A.  Yes.
13    Q.  Judge Wright's clerk?
14    A.  Yes.
15    Q.  Okay.  You told her that there were no direct threats
16    made by Mr. Ivers --
17    A.  I did.
18    Q.  -- right?
19              So even though he said the statement "walking
20    bomb" to you, and he said he was crazy angry, didn't know
21    how to deal with it, you still told Ms. Bender that there
22    were no direct threats?
23    A.  I did.
24    Q.  You said you had multiple phone calls with Mr. Ivers?
25    A.  Yes.
```

ARENT - ZACHARY - CROSS

1    Q.   And in those phone calls he's never threatened you?

2    A.   No, not personally.

3    Q.   And he hasn't been angry with you, has he?

4    A.   Not personally, no.

5    Q.   So we have these two letters that I just showed you.

6    One is dated August 22nd.  The other is dated August 25th.

7    After that, you didn't receive any communications from Bob,

8    did you?

9    A.   I don't recall anything after the second letter.

10   Q.   Okay.  So nothing after August 25th, 2017?

11   A.   Well, that's when it was mailed.

12   Q.   So you might've received it a few days later?

13   A.   I think we received it on the 29th or something.  After

14   the marshals got involved, I never heard from him again.

15   Q.   Okay.  So this letter arrived and you received it before

16   September 1st, 2017, correct?

17   A.   Yes.

18   Q.   So, like, August 29th, 2017, correct?

19   A.   That's when I stamped it.

20   Q.   The marshals said they were going to go visit Mr. Ivers?

21   A.   I know that they were going to.  I don't know when it

22   happened, but I knew it was going to.

23   Q.   And then you did not receive any correspondence from

24   Mr. Ivers again?

25   A.   I did not.

```
 1                 MR. KELLEY:  No further questions, Your Honor.

 2                 MS. ALLYN:  Thank you, Judge.  Just a few.

 3

 4                     REDIRECT EXAMINATION

 5    BY MS. ALLYN:

 6    Q.  Defense counsel asked you a question about how these

 7    letters that Judge Tunheim received from Mr. Ivers were

 8    asking Judge Tunheim for relief; isn't that right?  Do you

 9    remember those questions just a minute ago?

10    A.  Uh-huh.  I do.

11    Q.  But if I'm looking here at Exhibit 11, page 4, isn't

12    Mr. Ivers also asking or at least telling Judge Tunheim that

13    he's going to retaliate against Judge Wright by reporting

14    her --

15                 MR. KELLEY:  Objection, Your Honor, legal

16    conclusion.

17                 THE COURT:  Well, she hadn't finished.  If you

18    want to let her finish, I'll see if it's a legal conclusion.

19                 Go ahead, Counsel.

20    BY MS. ALLYN:

21    Q.  Is he threatening to report her to Lori Swanson, the

22    Attorney General, and the ADA?

23    A.  Yes.

24    Q.  He is not just asking for Judge Tunheim's help in these

25    letters, is he?
```

 1    A.  No.  There will be consequences if he doesn't comply.

 2    Q.  Defense counsel asked you a question about the emails

 3    saying there's no direct threats.  You testified that you

 4    found the language threatening.  Is that because you thought

 5    it was, what, indirect?

 6    A.  Um, well, there have been judges that have gotten bombs

 7    in the mail.  I mean, you don't joke around about judges and

 8    bombs.  I don't know.  It's attention-getting.

 9    Q.  You still found it threatening?

10    A.  Absolutely.  Yeah.

11    Q.  Even if it's a veiled threat?

12    A.  It was enough to have someone follow up on it.

13    Q.  Was he talking about a bomb but just not specific to a

14    person at that point?  Is that it?

15    A.  He just said, I'm a walking bomb, like he was clearly --

16    he was very upset and, you know, didn't know what to do with

17    it and was clearly just really unhappy with --

18    Q.  So using the word "bomb" in connection with a tone or

19    demeanor?

20    A.  Yes.  Yes.

21            MS. ALLYN:  Thank you.  No further questions.

22            MR. KELLEY:  Recross, Your Honor?

23            THE COURT:  I'm sorry.  Go ahead.

24            MR. KELLEY:  Thank you.

25

| | |
|---|---|
| 1 | **RECROSS-EXAMINATION** |
| 2 | **BY MR. KELLEY:** |
| 3 | Q.  So as a clerk, you're familiar with the policies about |
| 4 | the courts here, mailing policies specifically? |
| 5 | A.  I don't deal with -- I don't do the receipt of the mail |
| 6 | like from the post office, so -- |
| 7 | Q.  Let me ask it -- |
| 8 | A.  -- maybe in some way. |
| 9 | Q.  Let me ask you a question.  So you're aware that court |
| 10 | security goes through and scans all the mail, letters that |
| 11 | come to the judges? |
| 12 | A.  They do. |
| 13 | MS. ALLYN:  Objection, outside the scope of |
| 14 | redirect. |
| 15 | THE COURT:  Overruled. |
| 16 | THE WITNESS:  Yeah, they do scan it. |
| 17 | BY MR. KELLEY: |
| 18 | Q.  Okay.  So everything that we've seen today would have |
| 19 | been scanned by court security just as a matter of practice? |
| 20 | A.  Yes. |
| 21 | MR. KELLEY:  No further questions.  Thank you. |
| 22 | THE COURT:  Okay.  You may step down. |
| 23 | Call your next witness. |
| 24 | MR. RANK:  United States calls Tiffany Sanders. |
| 25 | THE COURT:  Ms. Sanders, please stand and face the |

```
 1    members of the jury.  Raise your right hand to be sworn.

 2              (Witness administered oath by the Court.)

 3              THE COURT:  Please be seated.

 4              MR. RANK:  May I proceed, Your Honor?

 5              THE COURT:  You may.

 6              MR. RANK:  Thank you.

 7

 8    TIFFANY SANDERS

 9                        DIRECT EXAMINATION

10    BY MR. RANK:

11    Q.  Good afternoon, Ms. Sanders.

12    A.  Good afternoon.

13    Q.  For the benefit of the court reporter, could you state

14    and spell your full name.

15    A.  Sure.  Tiffany, T-I-F-F-A-N-Y; Ann, A-N-N; Sanders,

16    S-A-N-D-E-R-S.

17    Q.  Thank you, Ma'am.

18              Ma'am, what do you do for a living?

19    A.  I'm the coordinator of the Pro Se Project.

20    Q.  And what is the Pro Se Project?

21    A.  It is a collaboration between this court, the federal

22    court here in the District of Minnesota, and the Minnesota

23    chapter of the Federal Bar Association to enhance access to

24    justice here in the courts for the civil pro se litigants

25    that the judges refer to the Project.
```

1  Q.  And who participates in the Pro Se Project at least on

2  the lawyer end?

3  A.  You know, it's volunteer lawyers that are admitted to

4  federal court in good standing that have malpractice

5  insurance is really about it.

6  Q.  So those are the basic criteria?

7  A.  Correct.

8  Q.  And on the other side, that's the lawyer side, who

9  participates in the Pro Se Project on the participant's

10  side, the party side?

11  A.  So when a litigant comes to this federal court on a

12  civil matter, the judges exercise discretion over whether

13  they'd like to issue a referral to that individual.  And I

14  don't believe there's any rhyme or reason to the discretion.

15  It's just if it would benefit the court or the litigant or

16  both, the judge can issue that referral.

17  Q.  So if there is a pro se party in federal court in

18  Minnesota and a judge decides it's a good idea to refer that

19  person to the Pro Se Project, that's how they might be

20  connected up to the Project?

21  A.  Correct.  And they refer plaintiffs and defendants.

22  Q.  Okay.  So, Ma'am, are you yourself a lawyer?

23  A.  Yes.

24  Q.  Are you currently practicing law?

25  A.  No.

1    Q.  In your role as director of the Pro Se Project, are you

2    practicing law?

3    A.  No.

4    Q.  Your role is administering that project?

5    A.  Correct.

6    Q.  At some point in time, did you receive a referral

7    related to the defendant in this case, Robert Ivers?

8    A.  Yes.

9    Q.  How did that come about?

10   A.  So how it's set up, when the court issues a referral, it

11   generates a notice of electronic filing, an NEF, and I get a

12   copy of that via email.  Back when Judge Davis was the Chief

13   Judge, he set up a system where I can get these electronic

14   filings and I can access the docket and look at filings

15   without a fee.

16          So Magistrate Judge Schultz issued a referral to

17   Robert Ivers referring him to the Project, and I received an

18   NEF, notice of electronic filing, of that referral letter.

19   Q.  Okay.  And as part of that, did you get also access to

20   Mr. Ivers' electronic file?

21   A.  Correct.

22   Q.  Meaning that you could look at all of the documents that

23   were on the docket sheet?

24   A.  Correct.

25              MR. RANK:  May I approach, Your Honor?

1          THE COURT:  You may.

2    BY MR. RANK:

3    Q.  Ms. Sanders, I'm going to put four exhibits in front of

4    you.  I can take these from you.  Thank you.  I'm going to

5    ask you about Exhibit 25 first, if you want to take a look

6    at that.  Do you recognize Exhibit 25?

7    A.  Yes.

8    Q.  Is that a document that was one of the documents in the

9    case that the Pro Se Project got a referral for for

10   Mr. Ivers?

11   A.  Yes.  It appears to be Docket No. 5.

12          MR. RANK:  I would offer Exhibit 25 at this time.

13          MR. KELLEY:  No objection.

14          THE COURT:  Received.

15   BY MR. RANK:

16   Q.  I will put 25 up on the screen.  You can look at either

17   the one in the folder or look on the screen.  It might help

18   to look at the screen because I'm going to blow portions of

19   it up.  First of all, I'll blow up the top portion.  And

20   this is called a case caption?

21   A.  Yes.

22   Q.  And the caption here shows that the case is Robert

23   Ivers, Plaintiff, versus CMG Life Insurance Company,

24   Defendant; is that correct?

25   A.  That's what I'm seeing, yes.

SANDERS - DIRECT

```
 1    Q.  And there is -- at least with respect to the time that
 2    you got the referral on this, what judge was this case in
 3    front of?
 4    A.  So it looks like the Article III judge is Patrick
 5    Schiltz and the magistrate judge is David Schultz.
 6    Q.  Okay.  And so that's referenced in what I am pointing to
 7    here?  That's the "PJS"?  That's Patrick J. Schiltz?
 8    A.  Correct.
 9    Q.  And then "DTS" is David T. Schultz?
10    A.  Correct.
11    Q.  And so the judge assigned to this case is Judge Schiltz
12    and Magistrate Judge Schultz?
13    A.  That's what I'm seeing, yes.
14    Q.  Were you aware as you were looking through the documents
15    that this was the second case that Mr. Ivers had filed
16    against this life insurance company?
17    A.  Not in looking at this document, no.
18    Q.  Did you come to learn that at a later time?
19    A.  Yes, sir.
20    Q.  Okay.  So I'm going to take you down, because I want to
21    sort of bring you to where you were at the time that you got
22    the referral.
23            So this, first of all, looks like it was filed on
24    what date?
25    A.  December 8th, 2017.
```

1    Q.  Okay.  And then I'm going to blow up this first

2    paragraph here.  Maybe you can tell the jury kind of what

3    this first paragraph is telling us.

4    A.  So just by my understanding of the court process, it may

5    help with enlightening the jury on this highlighted portion.

6    A lot of the pro se litigants the court refers to the Pro Se

7    Project are plaintiffs who have requested in forma pauperis

8    status.  And what that means is that they're asking the

9    court to deem them to be in a financial situation where they

10   aren't able to afford their filing fee and it's waived.  My

11   understanding is there's a federal statute that regulates

12   IFP status and judges not only look at the financial status

13   of the individual but also the sufficiency of their

14   complaint.

15            From what I recall and from reading this document

16   here, Mr. Ivers filed his complaint and requested IFP

17   status, and the Court -- and I believe this was from

18   Magistrate Judge Schultz -- issued an order saying it cannot

19   determine the IFP status at this time because the complaint

20   was deficient.

21   Q.  I will take you to the next page of this document, page

22   2 up on the screen and highlighting or blowing up the second

23   full paragraph on page 2, and I will -- does this explain a

24   little bit more about why the complaint filed by Mr. Ivers

25   was deemed to be deficient by Magistrate Judge Schultz?

1    A.  It appears so, yes.

2    Q.  What does it show?

3    A.  Well, it's saying -- or Judge Schultz is saying Ivers

4    pled an American with Disability Act claim, but he has not

5    pled a set of facts that could support that claim.

6    Q.  Does he also indicate anything about what is alleged in

7    the complaint about the basis for the denial of the claim?

8    A.  Looks like he does in that second highlighted sentence.

9    Judge Schultz is saying that the complaint alleges that the

10   life insurance was denied because Tallman lied on the

11   application.

12   Q.  Lastly, the last sentence up there, what is the upshot

13   of that information?

14   A.  "Ivers has therefore failed to state a plausible claim

15   for relief."

16   Q.  And if I take you to the next paragraph and ask you to

17   take a look at the top sentence, what does that say?

18   A.  "Because Ivers' complaint fails to state an actionable

19   claim for relief, he cannot be granted IFP status at this

20   time."

21   Q.  So is there also some language in this document that

22   refers to the Pro Se Project?

23   A.  I don't recall if Judge Schultz made the referral in

24   this order, which sometimes magistrates do.  I do recall

25   there being a separate letter.  If it's in here, I can look.

1    Q.  I'm going to show you the last paragraph --

2    A.  Okay.

3    Q.  -- on here.  Do you see that?

4    A.  Yes.

5    Q.  And does that show that at least he is contemplating

6    referring it to the Pro Se Project?

7    A.  Yes.

8    Q.  And so there's even a sentence at the bottom referring

9    to consulting with the FBA; is that correct?

10   A.  Yes.  Correct.

11   Q.  What does that say?

12   A.  "Ivers should make a concerted effort to consult with a

13   lawyer recommended by the FBA before attempting to file an

14   amended complaint."

15   Q.  Then taking you to the last page -- this is the last

16   page of Exhibit 25, for the record it's page 4 -- and does

17   the order from Judge Schultz indicate some timing with

18   respect to filing an amended complaint?

19   A.  Yes.  He had 30 days from December 7th, 2017 to do so.

20   Q.  Okay.  So that would have been meaning that it would

21   have been due somewhere around January 6th or 7th?

22   A.  Sure.  Yes.

23   Q.  I tried to do the math accurately.

24            I'm going to ask you now to take a look in front

25   of you at Exhibit 26 and see if you recognize that?  Does

SANDERS - DIRECT

1    that appear to be another order issued in the case by

2    Magistrate Judge Schultz?

3    A.  Yes.  It just threw me off when I was looking at the

4    markings at the top with some different judges, but yes.

5    Q.  It was an order that was issued after the order we just

6    looked at date-wise?

7    A.  December 7th was the other one.  This is December 20th.

8    So yes.

9              MR. RANK:  I would offer Exhibit 26.

10             MR. KELLEY:  No objection.

11             THE COURT:  Received.

12   BY MR. RANK:

13   Q.  So looking at Exhibit 26, this is the same case we were

14   just talking about.  I am going to take you to -- blow up

15   the middle section of it.

16             Does it appear from this order that Mr. Ivers

17   sought some additional time to be able to file an amended

18   complaint?

19   A.  It appears he requested an additional 60 days.

20   Q.  And does it also appear that Judge Schultz granted that

21   request for an additional 60 days?

22   A.  It does.

23   Q.  In fact, pointing to the "is granted" language; is that

24   correct?

25   A.  Yes.

1    Q.  If you look at Exhibit 26, does it also mention you?

2    A.  Yes.

3    Q.  So I'm going to blow up the bottom of page 1.  What does

4    that state?

5    A.  "The Court also recommends that plaintiff contact

6    Tiffany Sanders, the FBA Federal Pro Se Project Coordinator

7    at:"

8    Q.  And then on the next page is that your contact

9    information?

10   A.  Yes.

11   Q.  Is there also a letter attached to that order?

12   A.  Yes.

13   Q.  And what is that letter?

14   A.  It is a December 11, 2017 letter to Mr. Robert Ivers

15   from the chambers of David T. Schultz, U.S. Magistrate

16   Judge.

17   Q.  Have I blown up the top part of that letter on the

18   screen?  Have I?  I'm sorry.  And this is page 3 of Exhibit

19   26 for the record.

20   A.  Yes.

21   Q.  And would this be a referral letter that went out to

22   Mr. Ivers?

23   A.  Correct, what I was describing earlier where I get the

24   notice of electronic filing of this.

25   Q.  And so the date of this letter is December 11th, 2017?

SANDERS - DIRECT                                    325

1    A.  Correct.

2    Q.  And it kind of goes through and says a little bit about

3    what the Pro Se Project is; is that correct?

4    A.  Correct.

5    Q.  And it also mentions your name in the letter that was

6    sent to Mr. Ivers, correct?

7    A.  Yes.  Correct.

8    Q.  And then gives some contact information, I believe, on

9    the next page of the letter for how to get ahold of the Pro

10   Se Project?

11   A.  Yes.

12   Q.  Again, this letter was dated December 11th of 2017.  Do

13   you know, did you get contacted by Mr. Ivers around this

14   time period?

15   A.  I was contacted by Mr. Ivers.  I don't recall the exact

16   date, but it was around this time period, yes.

17   Q.  Okay.  Sometime after December 11th?

18   A.  Correct.

19   Q.  Do you know how long after December 11th it was?  And

20   perhaps you could think that you eventually connected him up

21   with some lawyers in the end of February; is that correct?

22   A.  Correct.

23   Q.  So how far before that do you think you began speaking

24   with Mr. Ivers?

25   A.  I honestly don't recall.

SANDERS - DIRECT

326

```
1    Q.  Sometime between December 11th and December 27th?

2    A.  That would be fair.

3    Q.  So he did contact you, correct?

4    A.  Yes.

5    Q.  And did you speak with him in person or by telephone?

6    A.  By telephone.

7    Q.  What did you discuss when you talked to him?

8    A.  When I spoke with Mr. Ivers, I recall us talking about,

9    as I do with all pro se litigants, that the court had

10   referred the case to the Project, and that I had an

11   opportunity to review his complaint and the docket.

12          I typically explain how the Pro Se Project works,

13   which I'm assuming I did so here, making clear that there's

14   no civil right to a -- or constitutional right to an

15   attorney in a civil case, but the Project helps to at least

16   find a volunteer lawyer to consult with the litigant.

17          I recall Mr. Ivers informing me that he had been

18   involved in numerous lawsuits and he knew what he was doing,

19   but what he wanted me to do was to find him a lawyer to

20   approve his amended complaint, and so that led me to ask

21   Mr. Ivers about the prior lawsuits.  He said they were for

22   various reasons.

23          So I remember as I'm talking to Mr. Ivers on the

24   phone, I -- when you're on the court's website, it's called

25   CM-ECF, you can do certain queries and look up cases or what
```

1    have you by name, and so I put in Mr. Ivers' name to do a

2    query and I found a prior lawsuit.  And just glancing over

3    it while I'm on the phone, I said, Oh, I see you have a

4    prior lawsuit against the same defendant, but it looks like

5    it's for breach of contract.  He said, That's totally

6    different.  That's what I recall from the conversation,

7    other than saying, as I usually do, if I find an attorney,

8    I'll let you know and you two can meet and go from there.

9    Q.  After you finished speaking with Mr. Ivers, did you do

10   some additional research into the prior case?

11   A.  I did.

12   Q.  And what, if anything, did you find out about it?

13   A.  So in looking at the prior case, I went to the docket

14   and saw there was a complaint.  I probably had that pulled

15   up when I was talking to Mr. Ivers.  But I noticed -- what

16   struck me as odd is that the complaint in the prior case was

17   essentially the same as the complaint in the case that Judge

18   Schultz had referred to the Project.

19           Comparing the two, without having them side by

20   side, but just in looking back and forth, it looked like the

21   prior complaint was repackaged into another complaint and

22   instead of breach of contract, it was an ADA claim.  So I

23   thought, well, that's interesting.

24           So in looking at the docket of the prior case, it

25   had gone to trial, and there was a bench trial in front of

1    Judge Wright.  So I just quickly went to that and saw there

2    was a Findings of Fact, Conclusions of Law, and Order and I

3    read through Judge Wright's Order.

4           It was concerning to me and so I thought, well, he

5    said he has also been in other cases, and I don't recall

6    seeing any other ones on the federal system, so I went to

7    the state court system and saw there were numerous state

8    court filings.

9           I don't know if you want me to continue or if that

10   answers your question with respect to me looking at the

11   prior case.  That's about what I did.

12   Q.  Okay.  Let's focus on what you looked at in terms of his

13   prior case in front of Judge Wright.

14   A.  I focused on the complaint, the Findings of Fact, and

15   Conclusions of Law, and Order.

16   Q.  And by reviewing the complaint, which I think you said

17   had essentially the same facts as the complaint of its

18   current lawsuit in front of Judge Schiltz?

19   A.  That's my recollection, yes.

20   Q.  And the fact that that complaint in front of Judge

21   Wright had ended in Findings of Fact, Conclusions of Law,

22   and Order against Mr. Ivers, did that give you some concern

23   about the viability of his new case?

24   A.  Yes.  I'd say that's fair.

25   Q.  Okay.  And so did you do anything in response to

SANDERS - DIRECT

1    figuring that out, comparing those two lawsuits?

2    A.  So what I did was I summarized what I just described in

3    an email to Katie Haagenson -- I may be getting her last

4    name wrong -- but she is Magistrate Schultz's Judicial

5    Assistant.  I essentially told Katie I just want to bring to

6    the Court's attention what I found and make sure Judge

7    Schultz still wants me to reach out to a volunteer lawyer on

8    his behalf.

9    Q.  Did you know whether Magistrate Schultz was already

10   aware of the prior case in front of --

11   A.  I did not know whether he was or wasn't.

12   Q.  You thought that was something you should bring to his

13   attention?

14   A.  Yes.

15   Q.  And why was it that you were bringing it to Magistrate

16   Judge Schultz's attention?

17   A.  Several things.  At the time, Magistrate Judge Schultz

18   was a newer magistrate judge, so I wanted to make sure he

19   was aware of the prior lawsuits and still wanted me to make

20   a referral.

21          But also I'm the only person that does the Pro Se

22   Project, if you will, and so I feel an obligation to protect

23   the integrity of the Project, and so I wanted to make sure

24   the Court wanted me to use volunteer resources for Mr. Ivers

25   since he had already litigated essentially the same thing.

1    Q.  And so did you hear back from Magistrate Judge Schultz

2    as to whether he wanted to continue the referral?

3    A.  I did through Katie, his Judicial Assistant.

4    Q.  And what did you hear back?

5    A.  Magistrate Judge Schultz said, Sure, as long as the

6    volunteer attorney is aware of Judge Wright's prior order

7    and will advise Mr. Ivers to its effect.

8    Q.  And so did you eventually find some volunteer lawyers to

9    work with Mr. Ivers as part of the Pro Se Project?

10   A.  I did.

11              THE COURT:  Ladies and gentlemen, we're going to

12   take a stretch break.  You've been sitting over an hour.

13              (Stretch break.)

14              THE COURT:  Mr. Rank, I apologize for

15   interrupting.  She said that she found lawyers to talk with

16   Mr. Ivers.

17              MR. RANK:  Thank you, Your Honor.

18   BY MR. RANK:

19   Q.  Ms. Sanders, you've indicated that you found some

20   lawyers who might volunteer to do a consultation with

21   Mr. Ivers; is that correct?

22   A.  Correct.

23   Q.  And who were they?

24   A.  Lora Friedemann and Anne -- and I may not get the name

25   right -- Rondoni Tavernier --

1    Q.  I think it's close enough for our purposes.

2    A.  -- from the Fredrikson & Byron Law Firm.  My apologies.

3    Q.  I believe it's Rondoni Tavernier.

4    A.  Thank you.

5    Q.  She'll let us know when she testifies.

6           So you located a couple of lawyers from the

7    Fredrikson & Byron firm; is that correct?

8    A.  Correct.

9    Q.  And are there steps involved in determining whether

10   someone is available or not to do a consultation?

11   A.  Yes.  What I typically do is think about who I will be

12   contacting on behalf of the pro se litigant.  Then I send an

13   email to the lawyer and provide an overview of the case, the

14   parties; ask the lawyer if he or she will run a conflict

15   check and if no conflicts, consider consulting with the

16   pro se litigant.  That's what I did in this case.

17   Q.  Let's take this in steps.

18          You said you had located Ms. Rondoni Tavernier and

19   Ms. Friedemann; is that correct?

20   A.  Correct.

21   Q.  Had you ever worked with Ms. Rondoni Tavernier before?

22   A.  No.

23   Q.  Had you worked with Ms. Friedemann before?

24   A.  Many times.

25   Q.  And what was your experience working with

1    Ms. Friedemann?

2    A.  So back when I was hired to be the coordinator of the

3    Project in 2010, Lora Friedemann worked with Judge Davis to

4    create the Project and hire me and so she's very familiar

5    with how the Project works.

6           Over the course of the years that I've been the

7    coordinator, Lora has taken many cases and she's done a

8    fabulous job of really being efficient, working the cases

9    and getting them resolved.  And Lora has also presented at

10   panels that I have put on for volunteer lawyers, CLEs, about

11   client-management skills and how to effectively help

12   litigants and the court through the Project.

13   Q.  So that's part of her work -- first of all, she

14   participated in the formation of the Pro Se Project?

15   A.  Correct.

16   Q.  And then has done several cases working with pro se

17   litigants?

18   A.  Correct.

19   Q.  Has taught at seminars on how to deal with pro se

20   litigants --

21   A.  Correct.

22   Q.  -- effectively?

23   A.  Correct.

24   Q.  So the next thing you said -- the other step I wanted to

25   ask you about, you said that you have to do conflicts

1     checks.  What does that mean?

2     A.  So I don't want to suggest I know for all purposes, but

3     typically what happens when a lawyer is reviewing a file to

4     take in a firm, they'll look to see if there's any conflicts

5     of interest, meaning have they represented the opposing

6     party before or the person.  They just look to see if the

7     firm has any contact with the litigants to see if there's a

8     conflict of interest in them taking the case.

9     Q.  Any firm relationship?

10    A.  Thank you.  That was the word I was trying to pull up.

11    Q.  And then the last thing you mentioned was they would

12    have to do that before deciding whether to do a consult or

13    to consult with the person; is that correct?

14    A.  Correct, because if there's a conflict, they are unable

15    to do it, and that happens.

16    Q.  What does that mean, to consult?

17    A.  So what we ask -- the goal of the Pro Se Project is that

18    the volunteer lawyer provide a meaningful consultation with

19    the pro se litigant.  Most often it's in person, but if

20    people have challenges, if they have disabilities where

21    that's not going to happen or if they're located outside of

22    the Twin Cities area, they can certainly consult by phone or

23    Skype or whatever they come up with.

24         The consultation, what we ask is that the lawyers

25    candidly evaluate the case, give the litigant their candid

1    advice, tell them what to expect in their lawsuit, tell them

2    what they're up against, answer questions, what have you.

3    Q.   Okay.  And you did that in this case with respect to

4    Ms. Friedemann and Ms. Rondoni Tavernier?

5    A.   Did what?

6    Q.   At least reached out to them initially to establish at

7    least the start of a relationship?

8    A.   Correct.

9    Q.   Can you look at Exhibit 28, which would be in the folder

10   in front of you.  In connection with this, did you send some

11   communication to Ms. Rondoni Tavernier?

12   A.   Yes.

13   Q.   And is that reflected in what's been marked for

14   identification as Government's Exhibit 28?

15   A.   Correct.

16   Q.   It is an email to Ms. Rondoni Tavernier; is that

17   correct?

18   A.   Yes.

19   Q.   From who?

20   A.   From me.

21   Q.   Dated?

22   A.   February 21st, 2018.

23   Q.   And are there some attachments to that email, as well?

24   A.   Yes.

25                MR. RANK:  I would offer 28.

 1                MR. KELLEY:  No objection, Your Honor.

 2                THE COURT:  Received.

 3       BY MR. RANK:

 4       Q.  I will put 28 up on the screen.  You can look at the

 5       paper or the screen, whichever is better for you.

 6                So I'm going to blow up the top and the first two

 7       paragraphs.  So it looks like the -- first of all, there are

 8       some attachments that are reflected up at the top of the

 9       email.  Do you see that?

10       A.  Yes.

11       Q.  And what, generally speaking, were you attaching to this

12       email?

13       A.  From looking at this, it looks like the first one may be

14       the complaint in the case against Magistrate Judge Schultz.

15       The amended complaint.  It looks like those numbers are

16       close enough that it's probably the amended complaint in the

17       same case.  It looks like another amended complaint.  I'm

18       having trouble tracking here.  Or maybe the first one isn't

19       a complaint.  It's hard to tell from this.

20       Q.  If I showed you a document with the actual print-outs,

21       might it refresh your recollection?

22       A.  Hopefully so.

23       Q.  I can clear those arrows, too.

24                Can I ask you, generally speaking, are the

25       attachments, are they documents related to both the current

1    case in front of Judge Schultz, as well as documents related

2    to the past case in front of Judge Wright?

3    A.  Yes.

4    Q.  And does it contain the complaint from the case in front

5    of Judge Wright, as well as the complaints for the case in

6    front of Judge Schultz?

7    A.  It should, but bear with me.  I'm getting there.

8    Q.  Make sure you have accurate information.

9    A.  I see the complaint from Judge Wright's case.  Yes.

10   Q.  So complaints from both cases?

11   A.  Yes.  I see the one in Judge Schultz's case, too.  I

12   keep saying "Judge Schultz" because he's the magistrate that

13   referred it; although, it's Judge Schiltz that is the

14   Article III judge.  I apologize if that's confusing.

15   Q.  If you are saying "Judge Schultz" with the "U" even

16   though it's the case that is also Judge Schiltz with an "I"?

17   A.  Correct.

18   Q.  So did you also attach to that the Findings of Fact,

19   Conclusions of Law, and Order for judgment from Judge

20   Wright's case?

21   A.  I did.

22   Q.  Okay.  I don't have any more questions at this time

23   about the attachments.

24          You indicate in this email that Magistrate Judge

25   Schultz has referred Mr. Ivers' case to the Pro Se Project,

1    and then you go on to say that the case is a bit unusual; is

2    that right?

3    A.  Correct.

4    Q.  And what was unusual about it?

5    A.  Essentially what I described earlier with it being

6    similar in nature to a case that had previously been

7    adjudicated.

8    Q.  In fact, I'll show this, this references the bottom, the

9    last section of the portion I've blown up.  What does that

10   say?

11   A.  "Mr. Ivers' current case came after he previously sued

12   CMFG for breach of K," which stands for contract.

13   Q.  So that's lawyer-speak for contract?

14   A.  At least mine, yes.

15   Q.  And then if I go down starting at the next paragraph,

16   next two, you then go on to reference that prior case; is

17   that correct?

18   A.  Correct.

19   Q.  And also indicate in your communication to Ms. Rondoni

20   Tavernier what?

21   A.  "In the prior case, the allegations were essentially the

22   same as those in the present case (instead of disability

23   discrimination, Mr. Ivers alleged breach of contract.)"

24   Q.  You also have some information for Ms. Rondoni Tavernier

25   about sort of results of that case?

1    A.  Correct.

2    Q.  And what are you saying in the next sentence?

3    A.  "Judge Wright presided over a bench trial, found

4    Mr. Ivers not credible, rescinded both life insurance

5    policies at issue, and entered judgment against Mr. Ivers."

6    Q.  What does that reference, the judge found Mr. Ivers "not

7    credible"?  What does that mean?

8    A.  Without going back through the Findings of Fact and

9    Conclusion of law, I don't recall specifically what Judge

10   Wright stated, but she found in her order that Mr. Ivers was

11   not a credible witness.

12   Q.  And then if we go on to the next paragraph, it is that

13   you learned about the prior case and you are sort of

14   advising Ms. Rondoni Tavernier about a subsequent

15   conversation or communication you had with Magistrate Judge

16   Schultz; is that correct?

17   A.  Correct.

18   Q.  What are you saying in that next paragraph?

19   A.  Essentially what I described earlier, that I checked in

20   with the referring judge to make sure he wanted me to reach

21   out to a volunteer attorney and Judge Schultz confirmed that

22   he would.

23            And then that is -- what you just highlighted,

24   provided the lawyer is apprised of WMW's -- that's Judge

25   Wright, Wilhelmina M. Wright -- order and that the lawyer

1    advised Mr. Ivers as to its effect.  I think I pasted from

2    what Katie sent me.

3    Q.  What does that mean, advised the lawyer as to the effect

4    of that order?

5    A.  What does it mean or what did I take it to mean?

6    Q.  What did you take it to mean?

7    A.  I took it to mean that a volunteer lawyer could consult

8    with Mr. Ivers and essentially help him understand the

9    significance of filing a lawsuit and having that finalized

10   and get the decision, and then filing another lawsuit that's

11   essentially the same with a slight tweak.

12           I haven't litigated in a while, but I'm recalling

13   it to be a res judicata-type thing that a lawyer could

14   explain, meaning you can't just keep bringing the same

15   lawsuit over and over.

16   Q.  I'm going to take you to the next portion here.  You

17   mentioned that you attached some documents.  That's the

18   documents that you talked about earlier, documents both from

19   the prior case in front of Judge Wright, as well as the case

20   in front of Judge Schiltz; is that correct?

21   A.  Correct.  That's what I mean by documents from both

22   files, yes.

23   Q.  Okay.  And you also have in here sort of some additional

24   information.  I'm going to highlight the second sentence.

25   Could you read that for the jury.

1    A.  "As you will notice, Mr. Ivers is adamant that he is

2    entitled to the benefits from his friend's life insurance

3    policies and does not seem to understand, or accept, the

4    Court's prior ruling."

5    Q.  And if I take you to, I think, the last portion here,

6    what are you saying there?

7    A.  So I'm asking Anne to conduct a conflict check, and if

8    there's no conflicts, to consider consulting with Mr. Ivers

9    regarding this case in front of Schiltz and Schultz.

10   Q.  You give the parties, which is Robert Ivers, and then

11   the insurance company to do the conflict check?

12   A.  Correct.  Correct.

13   Q.  And this is if conflict check comes back okay, then to

14   consult with Mr. Ivers; is that correct?

15   A.  Correct.

16   Q.  And if we go to the next page of this exhibit, page 2 of

17   Exhibit 28 for the record, which I can't see unless I blow

18   it up, are you talking a little bit about the scope of what

19   the agreement is in this email?

20   A.  The scope of what I'm asking her to do, yes.

21   Q.  Okay.  What is that?

22   A.  To consult with Mr. Ivers.  And because Anne -- I had

23   not worked with her before, I'm recalling she was a newer

24   lawyer at the time, just explain that she is not obligating

25   herself to represent him by agreeing to consult with him.

1    Q.  Okay.  Did you also after this get some information back

2    from Ms. Rondoni Tavernier and Ms. Friedemann?

3    A.  Yes.

4    Q.  What did you hear back?

5    A.  I heard back that Anne and Lora would take the case --

6    or would agree to consult with Mr. Ivers, I should say.

7    Q.  And, again, consultation doesn't mean representation?

8    A.  Correct.

9    Q.  Okay.  And so did you also let Mr. Ivers know that you

10   had found volunteer lawyers willing to consult with him?

11   A.  Yes.

12   Q.  And did you speak with Mr. Ivers?

13   A.  I did.

14   Q.  And what, if anything, did you tell him?

15   A.  That I found attorneys who had agreed to consult with

16   him and provided their names.  I don't recall if I gave all

17   the contact information, a phone number.  I don't remember

18   the extent of that.

19        I don't recall specifically having -- I don't

20   recall the exact words, but with every pro se litigant I

21   remind them that the lawyer has agreed to consult with them

22   and is not obligated to represent them.

23   Q.  Do you also put that in writing typically?

24   A.  Yes.

25   Q.  Do you have Exhibit 29 in front of you?

```
 1    A.  Yes.

 2    Q.  Is Exhibit 29 a letter that you sent to Mr. Ivers about

 3    securing some lawyers who were willing to speak with him?

 4    A.  Yes.

 5              MR. RANK:  I would offer Exhibit 29.

 6              MR. KELLEY:  No objection.

 7              THE COURT:  Received.

 8    BY MR. RANK:

 9    Q.  I won't spend a lot of time on this letter.  Does this

10    letter sort of summarize what you've already testified about

11    with respect to communications with Mr. Ivers?

12    A.  Yes.  This is the letter that followed the telephone

13    conversation.  Yes.

14    Q.  Okay.  And just so we can see it, this is dated February

15    23rd, 2018?

16    A.  Correct.

17    Q.  And it's from you?

18    A.  Yes.

19    Q.  To Mr. Ivers?

20    A.  Correct.

21    Q.  It appears to also be sent to him at a residence in West

22    Fargo, North Dakota; is that correct?

23    A.  Correct.

24    Q.  I don't know if it's a residence, but an address in West

25    Fargo, North Dakota?
```

SANDERS - DIRECT

 1    A.  Right.

 2    Q.  Then you also have some additional information in this

 3    letter.  Is this consistent with what you would have advised

 4    him on the telephone call with him?

 5    A.  Yes.

 6    Q.  What are you saying with regard to the scope of the

 7    consultation?

 8    A.  Essentially what I just stated, that the lawyers have

 9    agreed to consult with you, but they are not obligated to

10    represent you.

11    Q.  Okay.  Did you also provide Ms. Rondoni Tavernier and

12    Ms. Friedemann with a way to contact Mr. Ivers?

13    A.  Yes.

14    Q.  And did you give them a telephone number where to reach

15    him?

16    A.  Yes.

17    Q.  Do you remember how you did it?

18    A.  Yes.  And I remember in this case providing the

19    telephone number because Mr. Ivers did not have email.  And

20    I emailed Anne and Lora and provided his full contact

21    information that I had.

22    Q.  If I asked you, you couldn't tell me off the top of your

23    head what that telephone number was?

24    A.  I could not.

25    Q.  How about if I showed you a document?  Would that

1    refresh your recollection?

2    A.  Okay.

3    Q.  This is an email that you sent to Ms. Friedemann and

4    Ms. Rondoni Tavernier?

5    A.  Yes.

6    Q.  Does it contain a telephone number in it for Mr. Ivers?

7    A.  Yes.  And just bear with me.  Yes.  It's the same number

8    on the docket, the court docket.  Yes.

9    Q.  Can you actually for the record tell us what that phone

10   number was.

11   A.  952-529-8798.

12   Q.  Okay.  And so did you have some further communications

13   with Ms. Friedemann and Ms. Rondoni Tavernier before they

14   contacted Mr. Ivers?

15   A.  Other than this email you just showed me?

16   Q.  Yes.

17   A.  I'm not recalling any.

18   Q.  How about another email communication regarding --

19   well --

20           MR. RANK:  May I approach, Your Honor?

21           THE COURT:  You may.

22   BY MR. RANK:

23   Q.  If I showed you another email communication, might it

24   refresh your recollection as to other communications?

25   A.  My apologies.  I was thinking after the email you showed

1    me with the phone number.  Yes, this refreshes my

2    recollection.  Thank you.  The answer is yes.

3    Q.  And what additional communication did you have with

4    them?

5    A.  So after the February 21st, 2018 email asking Anne to do

6    the conflict check, Anne responds on February 23rd, 2018 and

7    says, Yes, Lora and I are happy to consult.  February 23rd,

8    same day, I say, "Thank you.  I will give Mr. Ivers a call

9    and let him know."  I attach additional filings that I

10   didn't previously provide.

11   Q.  Let me stop you because that's not --

12   A.  Oh, I'm sorry.

13   Q.  -- in evidence.  Actually, if you could take a look at

14   the second page of that email where it starts with "Lora."

15   Did you give Ms. Friedemann some -- actually, it may be in

16   the first email about Mr. Ivers being --

17   A.  Oh, it's in this email.  I'm sorry.  The jury doesn't

18   know the February 23rd one later.

19   Q.  Okay.  So I'm sorry for that series of confusing

20   questions.  I apologize.

21          If looking at that email refreshes your

22   recollection -- you don't have to read from it, but do you

23   remember giving Ms. Friedemann some additional information

24   about Mr. Ivers' case?

25   A.  I do.

1    Q.  And what was that?

2    A.  I in my email said, Lora, you probably recall when you

3    have presented a panel for the Pro Se Project, you helped

4    young or newer lawyers think about delivering potential bad

5    news to a client in stages.  You possibly may want to

6    consider doing that here.

7    Q.  Did you think that, based on your review of the case,

8    whatever information that Ms. Rondoni Tavernier and

9    Ms. Friedemann were going to give to Mr. Ivers it might be

10   potentially bad news?

11   A.  Could be.

12   Q.  All right.  So you connect up the lawyers with

13   Mr. Ivers.  Do you at some point in time hear back from

14   either one of the lawyers at a later time?

15   A.  I do.

16   Q.  How does that go?

17   A.  Lora Friedemann called me.

18   Q.  And do you recall approximately when that was?

19   A.  I want to say it was toward the end of February 2018.

20   Q.  Could it have been February 28th?

21   A.  Could've been.  Sure.

22   Q.  And what was the substance of that call?

23   A.  Lora indicated she had bad news.  She was concerned,

24   didn't really know what to do, but wanted to tell me so

25   hopefully I could help her.

SANDERS - DIRECT

```
 1    Q.  And what was the bad news?

 2    A.  She said she and Anne consulted with Mr. Ivers and that

 3    he made a threat against Judge Wright.

 4    Q.  Did she say anything else about why she was telling you?

 5    A.  Other than she didn't know what to do with this

 6    information and figured I would.  She just said something to

 7    the effect that if anything were to happen and she didn't

 8    tell someone, she'd feel horrible.

 9    Q.  Anything happen to whom?

10    A.  Judge Wright.

11    Q.  She said it was a threat and she was telling you because

12    she was worried something might happen?

13    A.  That was my understanding.

14    Q.  What did you do with that information?

15    A.  My mind spun, and I ended up calling District Judge

16    Michael Davis.

17    Q.  Why did you call District Judge Michael Davis?

18    A.  So he was the Chief Judge when the court and the FBA

19    created the Project.  And during the tenure of his being

20    Chief Judge, he's the one that I reported to essentially, if

21    you will.  So we worked together closely on the Project.

22              District Judge Tunheim is now the Chief Judge.  I

23    thought about calling him.  I thought about calling

24    Magistrate Judge Noel, who I work with, but I essentially

25    decided I was most comfortable with this awkward situation
```

```
 1   talking to Judge Davis whom I knew better.
 2   Q.  Okay.  And had you ever had to report a threat from
 3   anyone from the Pro Se Project before?
 4              MR. KELLEY:  Objection, Your Honor, relevance.
 5              THE COURT:  Overruled.
 6              THE WITNESS:  No.
 7   BY MR. RANK:
 8   Q.  Had you ever received a threat to a judge before?
 9   A.  No.
10   Q.  And so how long after you got the call from
11   Ms. Friedemann did you reach out to Judge Davis?
12   A.  Five minutes at the most, just to think through who am I
13   calling.  Probably less than that.
14   Q.  And were you able to reach him?
15   A.  No.  I spoke with Gerri Rishel, his Judicial Assistant.
16   I'm not recalling why Judge Davis wasn't immediately
17   available.  And she assured me she would have him call me as
18   soon as he could.
19   Q.  Have you had a lot of communications with Gerri Rishel?
20   A.  Oh, yes.
21   Q.  Did you convey to her in some way the immediacy of your
22   request to speak with Judge Davis?
23   A.  I recall telling Gerri, because I do know her and I've
24   worked with her, that I had received a threat against Judge
25   Wright and needed to speak with Judge Davis as soon as
```

1    possible.

2    Q.  Did you get a call back from Judge Davis relatively

3    quickly?

4    A.  Within minutes, yes.

5    Q.  All right.  What happened after that?

6    A.  So Judge Davis asked me the exact threat, and I informed

7    him that I did not ask Lora for that.  And so Judge Davis

8    had Gerri come into his chambers, Gerri Rishel, and we tried

9    to conference call Lora in, and Lora was not available.  So

10   Judge Davis instructed me to reach Lora, get the exact

11   threat, and call him back.

12   Q.  So in your initial call with Ms. Friedemann she just

13   said there's a threat to Judge Wright and god forbid if

14   anything happens to her?

15   A.  Correct.  And I recall me not specifically asking

16   because I had no idea if this was attorney-client privilege.

17   It really threw me off.

18   Q.  I mean, how were you reacting to that statement

19   emotionally?

20   A.  Judge Wright and I just traveled to Atlanta together for

21   an FBA national conference and I just --

22              MR. KELLEY:  Your Honor, objection, nonresponsive.

23              THE COURT:  Sustained.

24              MR. KELLEY:  Move to strike.

25              THE COURT:  Sustained.  You should ignore the

1    answer.  The question that's posed Ms. Sanders is:  "How

2    were you reacting to the statement emotionally?"

3                MR. KELLEY:  Your Honor, objection to that

4    question.

5                THE COURT:  Right.  I know.  I sustained it.  But

6    I didn't think it was responsive, is the reason I sustained

7    it.  I think the question is not objectionable.  I think not

8    being responsive is objectionable.  But am I missing

9    something here, Counsel?  Help me out.

10                MR. KELLEY:  No, Your Honor.

11                THE COURT:  Okay.

12                THE WITNESS:  I'm tracking.

13   BY MR. RANK:

14   Q.  So you can answer the question.

15   A.  Frazzled.  I'm not a very emotional person, but it threw

16   me for a loop.

17   Q.  Did you have some personal connection with Judge Wright?

18   A.  Yes.

19   Q.  Did that enhance your reaction?

20   A.  Yes.

21   Q.  Okay.  After you spoke to Judge Davis the first time,

22   you tried to conference in Ms. Friedemann, you were unable

23   to do so, he asked you to reach out to her; is that correct?

24   A.  Correct.

25   Q.  Were you able to get ahold of Ms. Friedemann?

```
 1    A.  Yes.

 2    Q.  And what did you do when you got ahold of her?

 3    A.  Asked her for the exact quote -- or threat.

 4    Q.  What did she tell you?

 5    A.  She said --

 6              MR. KELLEY:  Your Honor, objection, hearsay.

 7              THE COURT:  Sustained.

 8    BY MR. RANK:

 9    Q.  Ms. Sanders, did you take what she told you and pass it

10    along to Judge Davis?

11    A.  What Lora told me, yes.

12              MR. RANK:  So I'm asking, Your Honor, for what she

13    did with that information.

14              THE COURT:  You may.

15              MR. KELLEY:  Your Honor, objection, hearsay.

16              MR. SCOTT:  It's still hearsay.

17              THE COURT:  I don't think it's being offered for

18    the truth, is it?

19              MR. RANK:  No.

20              THE COURT:  You may answer.

21              THE WITNESS:  Thank you.

22              I told Judge Davis that Lora informed me Mr. Ivers

23    said, "You don't know the 50 different ways I've planned to

24    kill her."

25    BY MR. RANK:
```

```
 1    Q.  After that -- how did Judge Davis react to that?

 2    A.  Judge Davis told me -- I had indicated to him that this

 3    -- that Mr. Ivers had been referred to the Project in the

 4    case before Schultz and Schiltz.  So Judge Davis informed me

 5    that he would inform Schiltz and Schultz, he would inform

 6    the U.S. marshals, and he instructed me to inform Judge

 7    Wright.

 8    Q.  Did you have a reaction to him telling you to instruct

 9    Judge Wright?

10    A.  Yes.

11    Q.  What was that?

12    A.  I recall saying, "Your Honor, with all due respect, why

13    me?"

14    Q.  What did he say to that?

15    A.  Because I heard the threat directly from Lora.

16    Q.  Did you, in fact, contact Judge Wright?

17    A.  I did.  I called her chambers right away.

18    Q.  Did you reach her right away?

19    A.  No.  I spoke with Terianne Bender, her Judicial

20    Assistant.

21    Q.  And were you able to eventually reach Judge Wright?

22    A.  Yes.  Judge Wright wasn't available right when I called,

23    but she called me back relatively quickly, and we spoke by

24    phone.

25    Q.  Did you advise her of what you had been told by
```

SANDERS - DIRECT

1    Ms. Friedemann?

2    A.  Yes.

3    Q.  How did she react?

4    A.  She wasn't surprised, which surprised me.

5    Q.  Did she indicate why she wasn't surprised?

6               MR. KELLEY:  Your Honor, objection, relevance.

7               THE COURT:  Sustained.

8               MR. KELLEY:  Hearsay.

9    BY MR. RANK:

10   Q.  Did she appear to have knowledge of other threats to

11   other judges?

12              MR. KELLEY:  Your Honor, objection.

13              THE COURT:  Sustained.

14   BY MR. RANK:

15   Q.  Other than communicating the threats to Judge Wright,

16   did you do anything else with that information, Ms. Sanders?

17   A.  All I recall doing is informing Judge Davis that I had

18   communicated with Judge Wright.

19   Q.  Were you also eventually interviewed by someone from the

20   Marshal Service?

21   A.  Oh, yes.

22              MR. RANK:  I have no further questions at this

23   time, Ms. Sanders.  Thank you, Ma'am.

24              THE COURT:  Mr. Kelley, would now be a good time

25   to take our afternoon recess or not?

```
 1              MR. KELLEY:  Yes, Your Honor, it would.

 2              THE COURT:  We'll be in recess until 3:20.

 3              THE COURTROOM DEPUTY:  All rise.

 4              (A brief recess was taken.)

 5              THE COURTROOM DEPUTY:  All rise for the jury.

 6              THE COURT:  Please be seated.

 7              Mr. Kelley.

 8              MR. KELLEY:  Your Honor.

 9

10                      CROSS-EXAMINATION

11    BY MR. KELLEY:

12    Q.  Good afternoon.

13    A.  Good afternoon.

14    Q.  So we were just talking about February 28th.  A lot of

15    stuff had happened.

16    A.  Okay.

17    Q.  So February 28th you receive a call from Ms. Friedemann?

18    A.  Correct.

19    Q.  Do you remember what time of the day that was?

20    A.  It was before lunch because I recall when Judge Davis

21    and Gerri and I were trying to conference call Lora in, it

22    was over the lunch hour.

23    Q.  So before lunch?

24    A.  Correct.

25    Q.  And she says to you simply a threat was made against
```

SANDERS - CROSS                    355

```
 1    Judge Wright, something to the effect of --

 2    A.  Something to that effect, yes.  Correct.

 3    Q.  She does not use any precise words?

 4    A.  Other than the precision of saying what she said, yes.

 5    Q.  A threat was made?

 6    A.  Correct.

 7    Q.  So then the next thing you do is try to call Judge

 8    Davis' chambers?

 9    A.  I do call his chambers, yes.

10    Q.  And you speak to his Judicial Assistant, not Judge

11    Davis, correct?

12    A.  Gerri Rishel, correct.

13    Q.  After that, Judge Davis called you back?

14    A.  Correct.

15    Q.  You try to call Friedemann, no luck?

16    A.  Correct.  On that conference call, yes.

17    Q.  Then you call back Ms. Friedemann, talk to her, correct?

18    A.  Correct.

19    Q.  And she tells you some words that Mr. Ivers said,

20    correct?

21    A.  Yes.  Correct.

22    Q.  Then you report those words to Judge Davis?

23    A.  Correct.

24    Q.  All right.  Judge Davis then reports something to the

25    marshals, correct?
```

1    A.  That's my understanding, yes.

2    Q.  You understood that Judge Davis was going to talk to the

3    marshals, he was going to handle that?

4    A.  Yes.

5    Q.  Okay.  And he said, Ms. Sanders, you tell Judge Wright?

6    A.  Yes.

7    Q.  Judge Davis tells the marshals?  You tell Judge Wright?

8    A.  And he indicated he would tell --

9    Q.  That was a -- just those two?

10   A.  As long as you understand there's a third, yes.

11   Q.  Okay.  You have no idea what Judge Davis told the

12   marshals, do you?

13   A.  No.  Of course not.

14   Q.  Okay.  I want to go back to the Pro Se Project

15   generally.

16   A.  Okay.

17   Q.  That was created, what, 2011?  2012?

18   A.  Originally created May of 2009.

19   Q.  2009?

20   A.  Yes.

21   Q.  And the people who helped create it were Judge Davis and

22   Lora Friedemann, correct?

23   A.  And some others, yes.

24   Q.  Those were the two that kind of spearheaded it, right?

25   A.  I don't feel comfortable saying Lora spearheaded it, but

SANDERS - CROSS

```
 1    she worked with Judge Davis.
 2    Q.  They were both involved with it?
 3    A.  Yes.  Correct.
 4    Q.  And I'm not sure I caught when you started working for
 5    the Pro Se Project.
 6    A.  I didn't say.
 7    Q.  When did you start working for the Pro Se Project?
 8    A.  June of 2010.
 9    Q.  So, roughly, a year, six months after it started?
10    A.  Yes, a year.  May 2009 and then I come in the following
11    June.  Yes.
12    Q.  So Pro Se Project is created around 2009, 2010, and you
13    take that job.  And you have held that job ever since?
14    A.  Yes.  And it was created May of 2009.  Yes, and I've
15    been the coordinator since June of 2010.
16    Q.  Who hired you?
17    A.  The FBA had a hiring panel or committee.  Judge Davis
18    made the ultimate decision.
19    Q.  Lora Friedemann on that panel?
20    A.  She was not.
21    Q.  Now I want to discuss the civil lawsuit.  So you first
22    come to understand that there is this civil lawsuit that is
23    in front of Magistrate Schultz with a U, correct?  That's
24    how you come to come in contact with Mr. Ivers' case,
25    correct?
```

1    A.  Not from the case being in front of him, but from the

2    referral from Magistrate Judge Schultz, yes.

3    Q.  That is the first case you're dealing with with

4    Mr. Ivers, is the second civil lawsuit?

5    A.  Correct.

6    Q.  Then you do some internet research and figure out there

7    was a prior civil lawsuit?

8    A.  Correct.

9    Q.  And that was in front of Judge Wright?

10   A.  Yes.

11   Q.  And you've testified that these two cases were basically

12   the same, same set of facts and circumstances?

13   A.  Essentially, yes.

14   Q.  And you said a term, res judicata.  Do you remember

15   that?

16   A.  Yes, I did.

17   Q.  Okay.  So you said you're not currently licensed?

18   A.  Litigating.

19   Q.  Litigating.

20   A.  It's been awhile since I've thought about res judicata.

21   Q.  Okay.  So res judicata essentially means what?

22   A.  Precludes you from bringing the same lawsuit twice.

23   Q.  And you said that one of the things you require of

24   volunteers for the Pro Se Project is that they have a

25   meaningful discussion about whatever case you refer to them?

1    A.  That's what I ask them to do in the consult, yes.

2    Q.  So here you referred Mr. Ivers' case to Ms. Rondoni

3    Tavernier and Ms. Friedemann, correct?

4    A.  I didn't refer it to them.  I just want to make sure

5    we're clear.  I asked them if they would accept the referral

6    to consult with him.  So maybe we're saying the same thing.

7    Q.  Sure.  So the referral actually came from the

8    magistrate?

9    A.  Yes.

10   Q.  Goes through you?

11   A.  Yes.

12   Q.  Goes to Rondoni Tavernier and Friedemann?  And they

13   accept?

14   A.  Correct.

15   Q.  Okay.  So the way you understood Mr. Ivers' case was it

16   was going to be dismissed likely because it was the same as

17   the first case?

18   A.  No, I didn't make any assumptions on the disposition.  I

19   just found it odd that it was essentially the same case with

20   a different theory.

21   Q.  Okay.  So if Ms. Rondoni Tavernier and Ms. Friedemann

22   are going to have a meaningful conversation about the second

23   case, the second civil lawsuit --

24   A.  Correct.

25   Q.  -- if they're going to talk about res judicata, that

1    would necessarily include a discussion of the first civil

2    lawsuit, right, or most likely would?

3    A.  And so I guess I'm hung up.  I don't know if they're

4    talking about res judicata or not.

5    Q.  Okay.  But the cases are based on the same set of facts?

6    A.  From what I could tell, yes.

7    Q.  Okay.  And res judicata is essentially you can't bring

8    the second case -- or the same case twice, right, more than

9    once?

10   A.  Is my understanding, yes.

11   Q.  So likely that Ms. Rondoni Tavernier and Ms. Friedemann

12   were going to discuss that with Mr. Ivers?

13   A.  "That" meaning the prior case, yes.  Res judicata, I

14   have no idea.

15   Q.  Very likely they're going to discuss the first lawsuit?

16   A.  I would hope so.

17   Q.  Okay.  You would hope so.  Okay.

18            You said something interesting when you were

19   talking about the duties of Pro Se Project volunteers.

20   Earlier you testified that volunteers don't necessarily have

21   to represent the clients that are referred to them,

22   something to that effect?  Do you remember that?

23   A.  I guess I'm hung up on "clients."  The litigants,

24   correct.  They do not have to represent the litigants.

25   Q.  Are you familiar with the term prospective client?

1    A.  Yes.

2    Q.  Okay.  So if somebody has a consultation with an

3    attorney, that person is a prospective client, correct?

4    A.  Sure.  Sure.

5    Q.  So I just wanted to clarify this point so the jury

6    understood, is that Mr. Ivers would have been treated as a

7    prospective client during his consultation with Ms. Rondoni

8    Tavernier and Ms. Friedemann, correct?

9    A.  That's fair.  Yes.

10   Q.  And as a prospective client, he would be owed the exact

11   same duties of confidentiality let's say?

12   A.  I would hope so.

13   Q.  Right.  That a normal client, you know, somebody that is

14   a paying client --

15   A.  Sure.

16   Q.  -- comes?  So Ms. Rondoni Tavernier and Ms. Friedemann

17   owed Mr. Ivers the duty of confidentiality?

18   A.  I would hope so.  I mean, yes, from my perspective I

19   would agree with that.

20   Q.  So that means during the consultation, there's a

21   presumption that the attorneys will not reveal anything

22   that's said during that conversation, correct?

23   A.  I'd hope so.

24   Q.  That is the duty of confidentiality essentially, right?

25   A.  Yes.  Right.

1    Q.  Rule 1.6 of the Minnesota Rules of Professional Conduct?

2    A.  I will take your word for it.

3    Q.  Okay.  Would it refresh your --

4    A.  Sure.

5    Q.  Okay.  I'm showing you Rule 1.6, Minnesota Rules of

6    Professional Conduct.  Take a look at 1.6(a), subparagraph

7    a.

8    A.  Yes.  I have it here.

9    Q.  Okay.  And that says, in part, a lawyer shall not

10   knowingly reveal information relating to the representation

11   of a client, correct?

12   A.  That's what it says, yes.  Correct.

13   Q.  That is generally the duty of confidentiality?

14   A.  Sure.  Yes.

15   Q.  Just to be clear then, there was a presumption that

16   whatever Mr. Ivers told Ms. Rondoni Tavernier and Friedemann

17   on this phone call, the consultation, would be presumed

18   confidential?

19   A.  And I'm smiling because normally I would say yes, but in

20   this circumstance that didn't play out.

21   Q.  But it would have normally attached to any conversation

22   an attorney has with a client, correct?

23   A.  I don't think it attaches to any.

24   Q.  Would it attach to a confidential communication, so a

25   phone call where it's just an attorney and a client?

1    A.  I think we're getting hung up on the substance of that

2    communication.

3    Q.  It's a yes or no question.  If somebody calls their

4    attorney on the phone and it's just the two of them, is that

5    conversation confidential?

6    A.  I don't have a yes or no answer for that.  Would you

7    like me to answer?

8    Q.  No.  We'll leave it at that.

9              All right.  I also want to talk about timing here.

10   So you received this referral from Magistrate Schultz

11   mid-December?

12   A.  I believe that's the day of that letter we looked at,

13   yes.  December 11th, I believe.

14   Q.  That sounds right.  So December 11th you receive a

15   referral from Magistrate Schultz?

16   A.  Correct.

17   Q.  And on that it said that Mr. Ivers had 60 days to -- 30

18   --

19   A.  It was 30.

20   Q.  -- 30 days to file an amended complaint?

21   A.  So the referral letter did not say that, the order did.

22   I believe that was December 7th, if I'm recalling from the

23   papers we just looked at.  That one said 30 days from

24   December 7th.

25   Q.  Okay.  So he had 30 days to file an amended complaint?

1    A.  Correct.

2    Q.  Otherwise, the case would be dismissed?

3    A.  That's my understanding.

4    Q.  You didn't refer -- so you get this referral to the Pro

5    Se Project mid-December.  You don't send that to Ms. Rondoni

6    Tavernier and Ms. Friedemann until mid -- into February?

7    A.  I believe the emails indicate that.  I believe it was --

8    but if you look at the docket, Mr. Ivers had requested and

9    received --

10   Q.  Go ahead, finish.

11   A.  -- he asked for an extension of time to file his amended

12   complaint.  So we weren't operating under that 30 days from

13   December 7th deadline anymore.

14   Q.  And that was 60 days?

15   A.  I think so.  It put it out to March, I want to say, from

16   what we just looked at.

17   Q.  March 3rd?  Does that sound correct?

18   A.  And Mr. Ivers had filed his amended complaint.

19   Q.  Okay.  But you didn't actually refer -- or you didn't

20   actually send the pro se referral to Ms. Rondoni Tavernier

21   and Ms. Friedemann until end of February, right?

22   A.  If that's what the emails indicate, then yes.

23   Q.  So you testified when the government was talking that

24   you heard Ms. Friedemann say the word "planned," passive?

25   Or did you say "plan," present tense?

SANDERS - CROSS

```
 1    A.  I don't know which one I said to tell you the truth.  We
 2    can go back and look at the transcript.
 3    Q.  That's not what I'm asking.  You can't remember what you
 4    said ten minutes ago?
 5    A.  If I said it in present tense or past tense, I'm sorry,
 6    I don't.
 7    Q.  Okay.  So you don't remember what you said now.
 8            Do you remember sitting down for an interview with
 9    Deputy Wooton sometime middle of May?
10    A.  We did not sit down together, but I spoke with him.
11    Q.  So it was a phone call?
12    A.  Correct.
13    Q.  With Deputy Wooton?
14    A.  Yes.
15    Q.  Do you remember what you said to him?
16    A.  In general, yes.
17    Q.  Do you remember specifically the words that you said to
18    him regarding this phone call with Ms. Friedemann,
19    Ms. Rondoni Tavernier, and Mr. Ivers?
20    A.  If you're asking me for the threat that I told him, I
21    remember telling him that Ms. Friedemann or Lora
22    communicated to me that Mr. Ivers said, "You don't know the
23    50 ways I've planned to kill her."  Planned, plan, I'm sorry
24    if I'm not enunciating my words correctly.
25    Q.  Is it plan or planned?
```

SANDERS - CROSS

1    A.  I recall "planned."

2    Q.  With "ed"?

3    A.  That's what I recall.  Now, whether that's correct or

4    not, I'm sorry, I don't know.  Could've been plan.

5    Q.  So it could've been present tense?

6    A.  It could've been.

7    Q.  Okay.  So you can't remember what you told Deputy Wooton

8    exactly?  Could be plan?  Could be planned?

9    A.  Oh, with the verb tense you're correct, yes.

10   Q.  Okay.  And you can't remember what you said 25 minutes

11   ago because the verb tenses were not that fresh in your

12   memory or it's not that important to you?

13   A.  I wouldn't say it's not important.  I don't always

14   enunciate my words the way some people do.  So whether I

15   said planned or plan I don't recall.  The transcript will

16   tell us, if you'd like to see exactly what I said.

17   Q.  Thank you.

18   A.  Okay.

19   Q.  But what I'm hearing you say is you had this phone call

20   with Deputy Wooton May 15th; does that sound right?

21   A.  I don't recall the date.

22   Q.  You had this phone call with Deputy Wooton and now you

23   cannot remember whether you said the word plan, present

24   tense, or planned, past tense?

25   A.  I have already answered that.  Correct.

SANDERS - CROSS

```
1    Q.  The Judge will let you know if you don't have to answer
2    a question.  But that is correct?
3    A.  Yes.
4    Q.  Could be plan or it could be planned?
5              MR. RANK:  Objection, asked and answered.
6              THE WITNESS:  Yes.
7              THE COURT:  Sustained.  It's also argumentative.
8              MR. KELLEY:  One second, Your Honor.
9              (A brief discussion was held off the record.)
10   BY MR. KELLEY:
11   Q.  Last question here, I hope.
12             When you got this phone call from Ms. Friedemann,
13   you said it just made you feel frazzled, right?
14   A.  Yes.
15   Q.  So whatever Mr. Ivers said, it just frazzled you?
16   A.  What Lora told me that he said frazzled me, yes.
17   Q.  Okay.  But she didn't give you his words initially,
18   right?
19   A.  Correct.
20   Q.  She just said that a threat had been made against Judge
21   Wright?
22   A.  Correct.
23   Q.  And then you called her back, got those words?
24   A.  Correct.
25   Q.  Passed it on to Judge Davis?
```

1    A.  Yes.

2    Q.  But you have no idea what Judge Davis told the deputies?

3    A.  Correct.

4    Q.  And you don't remember what you said to Deputy Wooton in

5    May?

6            MR. RANK:  Argumentative, asked and answered.

7            THE COURT:  Sustained.

8            MR. KELLEY:  No further questions.

9            (Computer sound.)

10           THE WITNESS:  Did I do that?

11           MR. RANK:  I think it was the unplugging of this.

12           May I approach, Your Honor?

13           THE COURT:  You may.

14

15                    **REDIRECT EXAMINATION**

16   **BY MR. RANK:**

17   Q.  Ms. Sanders, Mr. Kelley asked you some questions about

18   Minnesota Rule of Professional Conduct 1.6.  Do you recall

19   those questions?

20   A.  Yes.

21   Q.  And he asked you about the duty of confidentiality,

22   dealing with people that attorneys are speaking to.  Do you

23   remember those?

24   A.  Yes.

25   Q.  There are exceptions to the duty of confidentiality,

1    correct?

2    A.  Hence why I couldn't give a yes or no answer.

3    Q.  You were trying to answer that.  Let me ask you about

4    one of the exceptions.  Can you look at 1.6, subparagraph 6.

5    A.  Are we talking 1.6(b)(6)?

6    Q.  (B)(6), I believe.  I had to look it up on my phone.

7    A.  Do we need to share?

8    Q.  Let me make sure we're talking about the same thing.  It

9    is this one right here.  Yeah.  1.6(b)(6).  This is an

10   exception to the rule of confidentiality; is that correct?

11   A.  Well, (b) says a lawyer may reveal information relating

12   to their representation of a client if, and we go down to 6,

13   the lawyer reasonably believes the disclosure is necessary

14   to prevent reasonably certain death or substantial bodily

15   harm.

16   Q.  Thank you, Ms. Sanders.

17           MR. RANK:  I have no further questions.

18           THE COURT:  Any brief cross, Mr. Kelley?

19           MR. KELLEY:  No, Your Honor.  Thank you.

20           THE COURT:  All right.  You may be excused.

21           THE WITNESS:  Thank you, Your Honor.

22           MR. RANK:  The government calls Lora Friedemann,

23   Your Honor.

24           THE COURT:  All right.  Ms. Friedemann, would you

25   please stand and look at the ladies and gentlemen of the

FRIEDEMANN - DIRECT

```
 1    jury and raise your right hand to be sworn, please.

 2              (Witness administered oath by the Court.)

 3              THE COURT:  Please be seated.

 4              MR. RANK:  May I proceed, Your Honor?

 5              THE COURT:  You may.

 6              MR. RANK:  Thank you.

 7

 8    LORA FRIEDEMANN

 9                    DIRECT EXAMINATION

10    BY MR. RANK:

11    Q.  Good afternoon, Ms. Friedemann.

12    A.  Good afternoon.

13    Q.  Ma'am, could you for the court reporter state your full

14    name, spelling your last name for the record.

15    A.  Yes.  My name is Lora Friedemann.  First name is

16    L-O-R-A.  Last name is F-R-I-E-D-E-M-A-N-N.

17    Q.  Ms. Friedemann, what do you do for a living?

18    A.  I'm an attorney.

19    Q.  And where do you work?

20    A.  I work at Fredrikson & Byron, which is a law firm

21    primarily based in Minneapolis here.

22    Q.  Do you have a specialty in the law?

23    A.  I do.  I'm a litigation attorney, so I represent

24    companies in lawsuits generally involving trademarks,

25    copyrights, and patents.
```

1    Q.  How long have you been a lawyer?

2    A.  Twenty-three years.

3    Q.  Do you have regular interactions with clients and

4    prospective clients in your legal practice?

5    A.  I do.

6    Q.  And is that true over that full 23-year period?

7    A.  It is.

8    Q.  Do you also do what's known as pro bono work?

9    A.  Yes.

10   Q.  What is pro bono work?

11   A.  Well, it's when we represent somebody free of charge or

12   nearly free of charge.

13   Q.  And over that 23-year period, approximately how many

14   hours of pro bono work have you done during that time?

15   A.  Well, my goal for myself is 50 hours a year.  Sometimes

16   I've exceeded it.  Sometimes I haven't made it.  But it's

17   over 1,000 hours for sure.

18            THE COURT:  Are you hearing the witness okay or

19   does she need to pull the microphone closer?  Okay.  Thank

20   you.  Excuse me, Counsel.  Okay.

21   BY MR. RANK:

22   Q.  So as part of your pro bono work, have you also

23   participated in the Federal Bar Association's pro bono

24   project?

25   A.  Yes, I have.

1    Q.  And the Court just a moment ago heard from Tiffany

2    Sanders.  Is she the coordinator of the pro bono project?

3    A.  She is.

4    Q.  Did you have some role in the formation of the Pro Se

5    Project?

6    A.  Yes, I did.  I had the privilege of serving as president

7    of our local chapter of the Federal Bar Association.  And

8    the project was an effort between the court and the local

9    Federal Bar Association.  So I was involved during the year

10   that I served as president.

11   Q.  So have you then also participated in a number of cases

12   as part of the Pro Se Project?

13   A.  I have.  Having been part of starting the project, I've

14   continued to volunteer.

15   Q.  Why might it be helpful to provide assistance to pro se

16   parties appearing in federal court?

17   A.  Well, there are a number of reasons.  The most obvious

18   one is it's pretty hard to represent yourself in federal

19   court if you're not an attorney.  So if you're in that

20   circumstance, having a lawyer willing to help you, it means

21   everything.

22          It's also very helpful to the Court because

23   parties need to follow the rules, and if you have someone

24   who doesn't know the rules, that's tough.

25          And it's actually also helpful to the other side

1    many times when someone can help explain things and help

2    facilitate a resolution.

3    Q.  And so was this project an idea to sort of increase

4    access to the justice system?

5    A.  Absolutely.

6    Q.  Can you talk, generally speaking, about, at least in

7    your experience, taking cases as part of the Pro Se Project

8    the steps involved in getting involved and working with

9    somebody as part of the project, if that question made

10   sense.

11   A.  I think so.  And tell me if I'm starting too soon.  The

12   first step would be a conflict check.  And then we can

13   either do a consultation or full representation.

14   Q.  Okay.  And so conflicts check is -- we've heard some

15   testimony about that.  That's making sure that the firm

16   doesn't have -- your law firm doesn't have any conflicts

17   with the parties involved in the case?

18   A.  Correct.

19   Q.  And then you said if you pass or get through the

20   conflicts check, then there's a consultation phase.  What is

21   the consultation phase?

22   A.  The consultation phase you have not actually appeared in

23   the action to represent the party in the case, but you're

24   meeting with that person and discussing the case with them,

25   and it may or may not lead to actual representation of that

1    person in the lawsuit.

2    Q.  So at least in terms of that consultation, there's no --

3    you haven't agreed to represent that person at the

4    consultation phase?

5    A.  Correct.

6    Q.  It may lead to that?

7    A.  It may.

8    Q.  And in your experience of working on cases with the Pro

9    Se Project, have your cases sometimes led to representation?

10   A.  Yes, all of them except for Mr. Ivers.

11   Q.  Okay.  You anticipated my next question, which is did

12   you have some communications with the defendant in this

13   case, Robert Ivers, as part of the Pro Se Project?

14   A.  I did.

15   Q.  How was it that that came about?

16   A.  It was a referral through the Pro Se Project that we

17   have been discussing.  Ms. Sanders contacted my colleague,

18   Ann Rondoni Tavernier, with the opportunity to consult with

19   Mr. Ivers.  We performed our conflicts check.  The conflicts

20   were clear, and Annie and I agreed to do the consult

21   together.

22   Q.  "Annie" is Ms. Rondoni Tavernier?

23   A.  Yes.

24   Q.  And you said it was referred to her.  Is that correct?

25   Maybe I'm using the wrong term.  Did the Pro Se Project

FRIEDEMANN - DIRECT

1    reach out to Ms. Rondoni Tavernier to see if she would

2    accept the consultation with Mr. Ivers?

3    A.  Yes.  That is exactly how it happened, and then she got

4    me involved.  Ms. Rondoni Tavernier is a fairly new lawyer,

5    and in those circumstances we often want to have a more

6    senior person involved.  Whenever you do something for the

7    first time, right, you want somebody more senior with you.

8    Q.  And you had done a number of other Pro Se Project cases,

9    so did you have some experience with Ms. Rondoni Tavernier

10   before that time?

11   A.  I did.  We worked together frequently.

12   Q.  Okay.  So you said the conflicts check was run.  You

13   agreed to communicate with Mr. Ivers.  What happened after

14   that?

15   A.  It was Ms. Rondoni Tavernier who set up a call with

16   Mr. Ivers.  It was scheduled for a certain day, I think at

17   11:00.  And at that appointed time, I went to her office and

18   we called Mr. Ivers.

19   Q.  Prior to the call, had you done any research regarding

20   Mr. Ivers' case?

21   A.  Yes, I did.  You know, I didn't go in blind to this

22   consultation.  Right?  So I looked at the Complaint in the

23   case that was pending in front of Judge Schiltz.  I also

24   looked at some of the pleadings and documents relating to

25   the case that had been in front of Judge Wright.

1    Q.  Did you also see a communication from Tiffany Sanders to

2    Ms. Rondoni Tavernier indicating that there was an Order in

3    Judge Wright's case that was going to be relevant to your

4    discussion with Mr. Ivers?

5    A.  Yes.

6    Q.  And what do you remember about that?

7    A.  Well, I remember that the ultimate conclusion of the

8    trial was unfavorable to Mr. Ivers.

9    Q.  And what was the relevance of that to his new case in

10   front of Judge Schiltz, if anything?

11   A.  It was certainly relevant to the substance of the advice

12   that we would give.

13   Q.  Okay.  So Ms. Rondoni Tavernier set up a telephone call

14   for February 27th of 2018, correct?

15   A.  Yes.

16   Q.  Had you ever met with or spoken to Robert Ivers before

17   that call?

18   A.  No.

19   Q.  Where were you when the call was made?

20   A.  We were in her office.

21   Q.  All right.  And this was a phone call with Mr. Ivers; is

22   that correct?

23   A.  Yes.

24   Q.  Do you know where he was at the time?

25   A.  I don't know.

1    Q.  Were you on a speaker phone?

2    A.  Yes.

3    Q.  And what was the purpose of the phone call?

4    A.  This was our consultation with him.  So the purpose of

5    the call was for us to give him our preliminary assessment

6    of the case, to listen to him, and then either conclude the

7    representation or move into the full-blown representation in

8    this case.

9    Q.  So at the end of it you were either going to decide to

10   represent him or not?

11   A.  Yes.

12   Q.  And when you say consult with him about the case, what

13   case was it that you were talking to him about?

14   A.  I'm sorry, Judge Schiltz's case.

15   Q.  Okay.  And so did you have a phone call with Mr. Ivers?

16   A.  Yes.

17   Q.  And does a portion of that call deal with the case in

18   front of Judge Schiltz?

19   A.  Yes, it does, the substance.  Yes.

20   Q.  I'm not going to ask you about the substance of that

21   portion of the call.

22          At some point in time in the phone call -- first

23   of all, how long was the phone call approximately?

24   A.  Approximately 30 minutes.

25   Q.  Okay.  And of the 30 minutes approximately how much of

FRIEDEMANN - DIRECT

1   the call was related to the case in front of Judge Schiltz?

2   A.  I would say most of it.

3   Q.  Okay.  And at some point in time -- was that the front

4   part of the conversation?

5   A.  Yes.

6   Q.  At some point in time, did Mr. Ivers start talking about

7   a different case?

8   A.  Yes.

9   Q.  What case did he start talking about?

10  A.  He started talking about the case in front of Judge

11  Wright.

12  Q.  And did his demeanor change when he began talking about

13  that case?

14  A.  It did.

15  Q.  And how would you describe his demeanor changing?

16  A.  It was like a switch flipped.

17  Q.  In what sense?

18  A.  He had been, you know, calm.  We had been having a

19  typical conversation, and then he became very angry and was

20  yelling.

21  Q.  Again, you said you've represented a number of pro se

22  defendants.  Did you ever experience anything like that

23  before?

24  A.  Not that kind of yelling, no.

25  Q.  And what did his change in demeanor indicate to you?

1    A.  Well, I was immediately concerned about the change in

2    demeanor and then what he was starting to say, and I started

3    -- my instinct was to start taking notes.

4    Q.  So did the volume of Mr. Ivers' voice change?

5    A.  Definitely.  Yes.

6    Q.  Did the speed of his voice change?

7    A.  It may have.  I think he sped up.  Usually sometimes

8    when people are upset or yelling, they speed up.

9    Q.  Did the words that he was using in the call also change?

10   A.  Yes.  There was cursing and -- yeah.

11   Q.  Okay.  What was it about his change in demeanor -- did

12   it give you an indication of his emotional state?

13   A.  I thought he was sort of irrational.  Yeah.

14   Q.  Did he appear to be angry?

15   A.  He was very angry.

16   Q.  Who was his anger directed at?

17   A.  It was directed at Judge Wright.

18   Q.  How do you know that?

19   A.  That was the context in which he -- that switch flipped

20   and he started yelling and getting angry, and he was talking

21   about the case and the trial in front of her.

22   Q.  Did the level of his anger stay the same or did it

23   appear to escalate during the call?

24   A.  It escalated.

25   Q.  What were some of the things that he said during the

FRIEDEMANN - DIRECT                                                    380

1    call that you can recall?

2    A.  He said, you know, "that fucking judge stole my life

3    from me."  He talked about the fact that he had been

4    intending to seek a new trial but missed the deadline for

5    doing so, and that that was a good thing because he had been

6    planning to come to court and "throw some chairs."  And then

7    the concluding comment he made was that he had imagined 50

8    different ways he planned to kill her.

9    Q.  So how were you reacting at that time?

10   A.  I'm in a state of shock, especially at the ultimate

11   threat that he made.  Ms. Rondoni Tavernier and I locked

12   eyes and our mouths went agape.  We didn't say anything at

13   that time.  He was still kind of on his rant.  But that was

14   very serious.

15   Q.  How would you describe his level of anger at that time?

16   A.  I would say it was barely controlled rage.

17   Q.  You said at some point in time you began to write down

18   some of the things that he said; is that correct?

19   A.  Yes.

20   Q.  Did you write down everything he said or just a portion?

21   A.  I did not write down everything he said.  But I started

22   writing things down when he said, "that fucking judge stole

23   my life from me."

24   Q.  All right.  I'm going to ask --

25           MR. RANK:  May I approach the witness, Your Honor?

 1          THE COURT:  You may.

 2    BY MR. RANK:

 3    Q.  Ms. Friedemann, I'm showing you what's been marked for

 4    identification as Government's Exhibit 15.  Do you recognize

 5    that?

 6    A.  Yes, I do.

 7    Q.  And what is shown in what's been marked for

 8    identification as Government's Exhibit 15?

 9    A.  These are my notes from the conversation.

10    Q.  Two pages of notes; is that correct?

11    A.  That's correct.

12    Q.  And is the first page of the notes -- the first pages of

13    notes what we call redacted?

14    A.  Yes, it is.

15    Q.  Meaning they are blanked out so you can't see what's in

16    them?

17    A.  Correct.  And on that page of notes I wrote some things

18    down about the substance of the advice that we gave to

19    Mr. Ivers.

20    Q.  Regarding the case in front of Judge Schiltz?

21    A.  Correct.

22    Q.  And then the second page of your notes, what is shown

23    there?

24    A.  Well, those -- and that is when I started writing.  And

25    I did not take down everything, but I wrote down the

1    statements Mr. Ivers made that were of most concern to me.

2    Q.  And when did you write these statements down?

3    A.  As the phone call was occurring.

4    Q.  So contemporaneous with when he was screaming on the

5    phone?

6    A.  Yes.

7              MR. RANK:  I would offer Exhibit 15 at this time.

8              MR. KELLEY:  No objection, Your Honor.

9              THE COURT:  Received.

10   BY MR. RANK:

11   Q.  I'm going to put up Exhibit 15 on the screen in front of

12   you, Ms. Friedemann, so we can look at page 1 which shows

13   the date of the call and then also shows in the upper,

14   left-hand corner the blanked-out portion it says "Redacted";

15   is that correct?

16   A.  Correct.

17   Q.  So it has Mr. Ivers' name at the top and then it says

18   "FBA Pro Se Project," correct?

19   A.  Yes.

20   Q.  Is that your handwriting?

21   A.  It is.

22   Q.  I'll take you to the next page, and we're going to do

23   this a little bit at a time because it's hard to see.  Can

24   you see that on the screen?

25   A.  I can.

1    Q.  And these are things that you wrote down as Mr. Ivers

2    was speaking, correct?

3    A.  Yes.

4    Q.  And what does the first thing say?

5    A.  It says, "this fucking judge stole my life from me."

6    Q.  Below there are quotes at the beginning of that.  Maybe

7    they're underneath the bottom of the "g."  Are there quotes

8    on the end as well?

9    A.  I believe so.  Yes.

10   Q.  And then what is the next statement?

11   A.  "I had overwhelming evidence."

12   Q.  First of all, who is he talking about during this time

13   period?

14   A.  He was talking about Judge Wright.

15   Q.  And when he says, "I had overwhelming evidence," did you

16   understand what he was referring to in that statement?

17   A.  Yes.  He was referring to the trial in front of her.

18   Q.  And then it said, "the judge 'stacked the deck' to make

19   sure I lost the case."  Is that also about Judge Wright?

20   A.  Yes.

21   Q.  You've got the -- 'stacked the deck' is in quotes.  Does

22   that reflect that that's a verbatim quote?

23   A.  It does.

24   Q.  If we go a little further down, there is another portion

25   in there.  Can you read what that says.

1    A.  That says, "didn't read the fine print and missed the 30

2    days to seek a new trial."  And "she is lucky" I was "going

3    to throw some chairs."

4    Q.  So, Ms. Friedemann, you are calm right now.  You're

5    reading that right now.  How was it that Mr. Ivers was

6    delivering this?

7    A.  He was yelling, very angry.

8    Q.  And this is part of what you said, that "barely

9    controlled rage" time period?

10   A.  Yes.

11   Q.  And what was he talking about or did you understand what

12   he was talking about in reference to the didn't read the

13   fine print and missed the 30 days to seek a new trial?  What

14   was that about?

15   A.  That was what I was referring to, where he had missed

16   the deadline for him to seek a new trial.  And he was

17   talking about what he would've done in the courtroom that

18   day had there been a hearing in front of her.

19   Q.  And that he was going to "throw some chairs"?

20   A.  Yes.

21   Q.  Then moving to the bottom, what does that say?

22   A.  It says, "you don't know the 50 different ways I planned

23   to kill her."

24   Q.  And who was that in reference to?

25   A.  It was in reference to Judge Wright.

FRIEDEMANN - DIRECT

1    Q.  Again, his tone of voice, his demeanor at the time that

2    he was saying this was what?

3    A.  It was very scary.  It was -- he was very clearly angry

4    and out of control.

5    Q.  At this point in time how are you reacting?

6    A.  Well, I -- I was um, frankly, kind of frightened, scared

7    for Judge Wright.

8    Q.  You talk to a lot of people in your job as a lawyer?

9    A.  Yes.

10   Q.  And perhaps even some people that are not happy with

11   their case?

12   A.  Yes, unfortunately.

13   Q.  And have you ever had any sort of reaction like this in

14   your career?

15   A.  No.

16   Q.  You described Mr. Ivers in this time period as

17   uncontrolled or "barely controlled rage"?

18   A.  Yes.  I think that's accurate.

19   Q.  Who was the focus of his anger at this time?

20   A.  It was Judge Wright.

21   Q.  During this time period -- how long of a period of time

22   was this ranting portion of the call?  Do you recall?

23   A.  You know, I'm not good at time, especially because this

24   was such a strange experience, so I couldn't tell you if it

25   was two minutes or six, but that sort of -- roughly.

1    Q.  Are you having an emotional reaction as you're listening

2    to this?

3    A.  Oh, yes.

4    Q.  Did you engage with Mr. Ivers while he was saying these

5    things?

6    A.  No.

7    Q.  You mentioned that you were looking at Ms. Rondoni

8    Tavernier at the time.  Could you tell from looking at her

9    what her reaction was?

10   A.  She was just as shocked as I was.

11   Q.  How did the call end?

12   A.  Eventually Mr. Ivers finished his rant, and we wanted to

13   conclude the call.  I indicated our consultation was over,

14   and that is the way that it ended.

15   Q.  After the call ended with Mr. Ivers, did you have any

16   conversation with Ms. Rondoni Tavernier?

17   A.  I did.  I think I said -- well, I think I said, "Holy

18   shit, did that just happen?"  And we agreed that we should

19   talk to ethics counsel about what to do.

20   Q.  Okay.  What does that mean?

21   A.  Well, there is a -- in any law firm, especially one of

22   our size, one of our colleagues serves as the lawyer to the

23   law firm, and we wanted to seek advice ourselves as to what

24   we should do in this circumstance.

25   Q.  And does that have anything to do with sort of rules

1    about confidentiality, of speaking with people?

2    A.  Yes.  Absolutely it does.  The starting point for any

3    representation with anyone is that the communications are

4    confidential and privileged and there's confidence there.

5    So this situation presented a circumstance that was one

6    where we needed to seek advice.

7    Q.  So that's sort of an internal process when the rules of

8    ethics come up?

9    A.  Yes.

10   Q.  You said there were some rules of confidentiality; is

11   that correct?

12   A.  Yes.

13   Q.  Generally speaking, you can't disclose information from

14   people that you're speaking to?

15   A.  Correct.

16   Q.  Clients or potential clients?

17   A.  Right.

18   Q.  Are there some exceptions to that rule?

19   A.  There are some exceptions.

20   Q.  And so did you at some point in time speak with the

21   firm's ethics counsel?

22   A.  I did.

23   Q.  That was sort of a requirement before talking about

24   anything that would otherwise be a client confidence?

25   A.  Yes, in my mind it was.

FRIEDEMANN - DIRECT

1    Q.  Were you able to make a decision about what to do with

2    that information immediately?

3    A.  No, I wasn't.  We -- I -- no decision had been made

4    until the following day.

5    Q.  And how did you -- how were you dealing with that in the

6    meantime?

7    A.  I found myself really not able to focus very well that

8    afternoon at work, and then I didn't sleep well that night.

9    Q.  Why is that?

10   A.  I just kept -- what Mr. Ivers said, the way he said it

11   just kept entering my thoughts.

12   Q.  What were you concerned about?

13   A.  Well, I was concerned about what he might do.  I

14   definitely viewed this as a scary thing, a threat.  I had,

15   you know, questions about my own obligations as a lawyer.

16   And, you know, obviously I want to always do the right thing

17   for my clients.  So it was stressful.

18   Q.  In your 23 years as a lawyer, had you ever had to report

19   a threat made by anyone that you had gotten confidential

20   information from?

21   A.  No.

22   Q.  Had you ever had to report a threat to a judge before?

23   A.  No.

24   Q.  What, if anything, did you do with regard to the threat?

25   A.  I made a report.  I ultimately -- we decided to report

1    at least the threats that were made -- not the rest of the

2    conversation, but the threats.  And not knowing who to call,

3    I called Tiffany Sanders who runs the program.

4    Q.  And did you report to Ms. Sanders that the threat had

5    been made to the Judge?

6    A.  Yes.

7    Q.  Did you at some point in time -- well, let me ask you,

8    in that first call did you tell her what the threat was?

9    A.  I don't believe I did.

10   Q.  Did she at some point in time contact you again to get

11   some more information?

12   A.  She did, and I conveyed to her that Mr. Ivers had said

13   he'd imagined 50 different ways he planned to kill Judge

14   Wright.

15   Q.  The statement "you don't know the 50 different ways I

16   planned to kill her"?

17   A.  Yes.

18           MR. SCOTT:  Your Honor, could I have that last

19   answer and the next question -- and the sum of that answer

20   read back.  I'm not sure they're the same and I'd like to

21   check.

22           THE COURT:  Do you want the last answer back?

23           MR. SCOTT:  Could I have the answer and then his

24   summary, which I think is --

25           THE COURT:  Yeah.  The last answer is:  She did

```
1    and I conveyed to her that Mr. Ivers had said he imagined 50
2    different ways to plan to kill Judge Wright.
3              Next question is the statement, the 50 ways I
4    planned to kill her?
5              MR. SCOTT:  Yeah, I'm going to ask that the
6    question be stricken as a misstatement of the testimony.
7              THE COURT:  Sustained.
8    BY MR. RANK:
9    Q.  Ms. Friedemann, on the screen above you, is that a
10   verbatim statement of what Mr. Ivers said to you?
11   A.  It is.  And I don't remember when I was talking to
12   Ms. Sanders if I had my notes in front of me or not.  I
13   probably did; and if I did, I would have read it verbatim.
14   Q.  Did you at some point in time, Ms. Friedemann, get a
15   call from a deputy U.S. marshal?
16   A.  I did.
17   Q.  Was it shortly after you contacted Ms. Sanders?
18   A.  Very quickly after.
19   Q.  And, in fact, was the person that you spoke to Deputy
20   Wooton who's at counsel table?
21   A.  Yes.
22   Q.  Did you talk to him about the phone call with Mr. Ivers?
23   A.  I did.
24   Q.  Did you talk to him about the entire call?
25   A.  No, I did not talk to him about the entire call.  It was
```

```
1    a pretty short conversation.  I did have my notes in front

2    of me, and I read to him the ultimate threat that Mr. Ivers

3    had made.

4    Q.  And that was -- were you on the telephone with him?

5    A.  Yes.

6    Q.  And that's the portion that's blown up on the screen

7    behind you?

8    A.  Yes, that "you don't know the 50 different ways I

9    planned to kill her."

10   Q.  And this would've been on the 28th of February; is that

11   correct?

12   A.  Yes.

13   Q.  At a later time, did you have a somewhat more detailed

14   conversation with Deputy Wooton and Ms. Allyn from the U.S.

15   Attorney's Office?

16   A.  Yes, we did.

17   Q.  And in that conversation did you provide some of the

18   other information that was in your notes?

19   A.  I did.  We shared then the contents of the notes that

20   are on page 2.

21   Q.  And, again, did you read from those notes when you spoke

22   to them?

23   A.  I did.

24   Q.  Now, Ms. Friedemann, yesterday during Mr. Scott's

25   opening, he mentioned some testimony that you gave on June
```

1    18th of 2018.  Do you remember testifying in a hearing on

2    June 18th of 2018?

3    A.  I do.

4    Q.  And during that testimony did you have your notes with

5    you?

6    A.  No, I didn't.

7    Q.  Was your memory at the time that you wrote these notes

8    down better than it was on June 18th of 2018?

9    A.  For sure.

10   Q.  I'm going to say something to you, Ms. Friedemann.  I

11   want you to tell me back what I say.  You don't know the 50

12   different ways I plan to kill her.  What did I just say?

13   A.  "You don't know the 50 different ways I plan to kill

14   her."

15   Q.  Do you know if I say plan or planned?

16   A.  No.

17   Q.  Ms. Friedemann, did Mr. Ivers' words, demeanor, tone of

18   voice, behavior indicate that he had a present anger towards

19   Judge Wright during that call?

20   A.  Yes.

21   Q.  And he had said you don't know the 50 different ways I

22   plan to kill her, correct?

23   A.  Correct.

24   Q.  Did Mr. Ivers' words, demeanor, tone of voice, behavior

25   give any indication that he had abandoned those plans?

```
 1    A.  No.

 2    Q.  Now, did Mr. Ivers ever call back -- call you back after

 3    the February 28th phone call and say that he was sorry about

 4    what he said?

 5    A.  No.

 6    Q.  Did he ever call you back after that February 28th phone

 7    call and say he really hadn't planned to kill Judge Wright?

 8    A.  No, he didn't.

 9    Q.  Other than the phone call on February 27th of 2018, have

10    you ever spoken with Mr. Ivers again?

11    A.  No.

12          MR. RANK:  Thank you very much, Ms. Friedemann.  I

13    have no further questions.

14

15                     CROSS-EXAMINATION

16    BY MR. KELLEY:

17    Q.  Good afternoon, Ms. Friedemann.

18    A.  Good afternoon.

19    Q.  So I'm going to jump right into February 27th phone

20    call.

21    A.  Okay.

22    Q.  So Ms. Rondoni Tavernier had scheduled this call with

23    Mr. Ivers for sometime in the morning of February 27th,

24    correct?

25    A.  Yes.
```

1    Q.  And you were sitting in on the call because Ms. Rondoni

2    Tavernier is a more junior attorney?

3    A.  Yes.

4    Q.  So you were supervising her in essence?

5    A.  In essence.

6    Q.  She was doing most of the questioning?

7    A.  Yes.  She handled the phone call.

8    Q.  Okay.  But it's just the three of you on the call?

9    A.  There were only the two of us on our end.

10   Q.  So you and Ms. Rondoni Tavernier on your end and

11   Mr. Ivers on his end?

12   A.  Yes.

13   Q.  Okay.  And you two placed -- that's you and Ms. Rondoni

14   Tavernier -- placed the call to Mr. Ivers?

15   A.  I believe she did place the phone call.

16   Q.  No one else on the phone call?

17   A.  Not to my knowledge.

18   Q.  And Mr. Rank has gone over kind of the details of the

19   second case and the first case, but the purpose of this call

20   was for Ms. Rondoni Tavernier to explain the viability of

21   Mr. Ivers' second civil lawsuit, correct?

22   A.  Yes.

23   Q.  To tell him, essentially, that it was a loser, he was

24   going to lose?

25   A.  Do you want me to go into the substance of the legal

1    advice we provided to Mr. Ivers?  I can answer the question,

2    but would you like me to?  I believe it's privileged.

3    Q.  You think that part is privileged?

4    A.  Yes.

5    Q.  Yes.  Did Ms. Rondoni Tavernier tell Mr. Ivers he was

6    going to lose his case?

7    A.  Yes.

8    Q.  Okay.  And before this phone call --

9              THE COURT:  Could we have a sidebar.

10             (Sidebar discussion.)

11             THE COURT:  Needless to say, I've never had this

12   before, so I've not thought about it before today.  When

13   anybody asks for this, I think it is privileged.  I don't

14   think she can say on the merits -- what she told him about

15   the merits, the viability of the lawsuit.

16             MR. RANK:  Except if she -- you can waive

17   privilege.  By asking a question you can waive privilege.

18             THE COURT:  But, I mean, shouldn't somebody tell

19   her or do we presume that she knows the appropriate rules or

20   --

21             MR. RANK:  I think what has taken place here -- if

22   Mr. Ivers wants to waive his privilege, that counsel

23   represents Mr. Ivers, if counsel is asking a question that

24   knowingly invades the attorney-client privilege and he

25   doesn't have authorization from the client, then that's --

1            THE COURT:  So this is an implicit waiver of the

2    privilege?  That's what you're saying?

3            MR. RANK:  Yes, sir.

4            MR. SCOTT:  Although, Your Honor, I would say

5    this, from our point of view, the Court has already sliced

6    out so much of the conversation that --

7            THE COURT:  No, no, no, I understand.

8            MR. SCOTT:  -- it's nonsensical without the rest

9    of it coming in.

10            MR. RANK:  It's a knowing, implicit waiver.

11            THE COURT:  Okay.  Just so it's an implicit

12    waiver.  Yeah.

13            MR. SCOTT:  But it's not independent of the fact

14    that you gave him the second page.  You have to talk about

15    the first page.

16            THE COURT:  Mr. Scott, you have the air bag.

17            MR. SCOTT:  I worry about those things.

18            MR. RANK:  Thanks, Judge.

19            THE COURT:  Thank you.

20                 (Sidebar discussion ended.)

21            THE COURT:  Mr. Kelley, I apologize for the

22    sidebar.  That was helpful to me.

23    BY MR. KELLEY:

24    Q.  So Ms. Rondoni Tavernier was going to tell Mr. Ivers he

25    was going to lose his second case.  Did she, in fact, tell

1   him that his second case was going to lose?

2   A.  Yes.

3   Q.  And before you had this phone call on February 27th,

4   Tiffany Sanders had told you guys -- the two of you,

5   Ms. Rondoni Tavernier and you -- that Mr. Ivers might become

6   upset when you tell him he was going to lose his second

7   case, right?  She told you about that?

8   A.  I believe you're referring to an email?

9   Q.  Correct.

10  A.  Not having it in front of me, I don't know if you've --

11  if your characterization is perfectly accurate, but I recall

12  her saying something about -- and it's something that I have

13  said in the past, that it's often better to give bad news in

14  smaller doses if you can.

15  Q.  Okay.  But Ms. Rondoni Tavernier intended to tell him he

16  was going to lose his second case?

17  A.  Ms. Rondoni Tavernier explained to him why his second

18  case was not viable.

19  Q.  Part of that included a discussion of his first case in

20  front of Judge Wright, correct?

21  A.  I'm not sure -- no.  Not really.

22  Q.  The two cases were based on the same set of facts and

23  circumstances, correct?

24  A.  Yes.

25  Q.  Okay.  So if you're talking about the second case, it's

1    necessarily going to include the exact same facts and
2    circumstances as the first case, right?
3    A.  I think I can answer that question, Mr. Kelley, but I
4    want to make sure that you're okay with me explaining the
5    why about that, because it involves the advice that we gave
6    to Mr. Ivers that I do believe is privileged.  So unless
7    you're waiving it on his behalf, I guess I'm not really
8    comfortable talking about it.
9    Q.  Please go ahead.
10   A.  Then, yes, we talked about the first case to the extent
11   that we needed to to explain to him that you get one chance
12   to make your claims based on one single set of facts and if
13   it doesn't go your way, you don't go to re-do it.
14   Q.  Okay.  So that was the advice you were going to giving
15   him?
16   A.  That is the advice that we gave him.
17   Q.  You did, in fact, give him that advice?
18   A.  Ms. Rondoni Tavernier did, yes.
19   Q.  And did you discuss why Judge Wright denied him a jury
20   trial?
21   A.  No.
22   Q.  Did you discuss why Judge Wright denied him a motion for
23   a new trial?
24   A.  No, other than Mr. Ivers' rant that possibly --
25   Q.  So no?

1    A.  But, no, we did not discuss that.

2    Q.  So toward the end of the phone call he becomes upset,

3    correct?

4    A.  Yes, angry.

5    Q.  Okay.  He's yelling, swearing a little bit?

6    A.  Yes.

7    Q.  Swearing a lot?

8    A.  It depends on what you think "a lot" is.  There was more

9    than one curse word in the call.

10   Q.  So you practice intellectual property law?

11   A.  Yes.

12   Q.  Safe to say that most of your clients don't swear during

13   consultations?

14   A.  I wouldn't say that.  I have had some colorful clients

15   in my career.

16   Q.  You've never had somebody, apparently, that swore as

17   much as Mr. Ivers?

18   A.  No, I wouldn't say that either.

19   Q.  Really?

20          But you're taking notes during the end of this

21   phone call?

22   A.  I took notes, yes.

23   Q.  And you wrote down verbatim and contemporaneously what

24   Mr. Ivers said?

25   A.  I did.

FRIEDEMANN - CROSS

```
 1    Q.  And on that phone call you wrote down "you don't know
 2    the 50 different ways I planned" past tense "to kill her"?
 3    A.  That's what I wrote, yes.
 4    Q.  Past tense, correct?
 5    A.  Yes.
 6    Q.  That was February 27th, 2018, correct?
 7    A.  It was.
 8    Q.  In the morning?
 9    A.  I believe it was at 11:00 our call was scheduled.
10    Q.  Okay.  You wait a full at least 24 hours before you call
11    anybody, correct, before you report this to anyone?
12    A.  Yes.
13    Q.  So you wait over 24 hours and you call Tiffany Sanders?
14    A.  Yes.  And in that period of time I --
15    Q.  Thank you.
16              So you call her the next day, February 28th.  And
17    you don't remember if you had your notes in front of you, do
18    you?
19    A.  I don't.
20    Q.  Okay.  And you don't really remember what you told
21    Ms. Sanders on that first phone call?
22    A.  Other than --
23    Q.  Yes or no.  Do you?
24    A.  Some, yes.  Can I repeat it for you word for word?  No.
25    Q.  Okay.  So you don't remember the exact words you told to
```

1    Ms. Sanders?

2    A.  No.

3    Q.  All right.  Is it possible you said "a threat against

4    Judge Wright" had been made?

5    A.  That's quite possible.

6    Q.  Is it possible you said "a threat against Judge Wright's

7    life" had been made?

8    A.  That's also possible.

9    Q.  Okay.

10   A.  I don't see much difference between the two.

11   Q.  But it's possible you said those instead of the words

12   that you wrote down in your notes?

13   A.  Yes.  In fact, I believe that is what I conveyed to her.

14   Q.  Okay.  So you conveyed something different than what you

15   had written down in your notes?

16   A.  I summarized the notes as a threat, a death threat

17   against Judge Wright.

18   Q.  So you call Tiffany Sanders a day later and you tell her

19   there is a death threat against Judge Wright?

20   A.  Yes.

21   Q.  Okay.  You don't use the words verbatim that you had

22   written down that Mr. Ivers had said during the phone call?

23   A.  I don't believe I did during that initial call to

24   Ms. Sanders.

25   Q.  I have a curious question:  If you thought a death

FRIEDEMANN - CROSS

402

```
 1    threat had been made against Judge Wright, why didn't you
 2    call the police right away?
 3              MR. RANK:  Objection, argumentative.
 4              THE COURT:  Overruled.
 5              THE WITNESS:  My steps of what I believed was the
 6    most prudent was first to speak with our firm counsel so I
 7    understood my own ethical obligations, and once having done
 8    that I made a report.
 9    BY MR. KELLEY:
10    Q.  Okay.  So you told Tiffany Sanders there was a death
11    threat and you waited over 24 hours to report it to someone,
12    correct?
13    A.  It took me that long to connect with my firm's counsel.
14    Q.  So you wait 24 hours and you call Tiffany Sanders.  She
15    is not law enforcement, is she?
16    A.  No, but I --
17    Q.  She is not law enforcement, is she?
18    A.  She is not law enforcement.
19    Q.  All right.  Later on February 28th -- so you've reported
20    death threat against Judge Wright to Tiffany Sanders.  You
21    get a call from Deputy Wooton later that day?
22    A.  Yes.
23    Q.  Okay.  Deputy Wooton and you have a conversation, short
24    conversation, right?
25    A.  Yes.
```

1    Q.  Okay.  And you told Deputy Wooton "you don't know the 50

2    different ways I plan," present tense, "to kill her."  Isn't

3    that what you told him?

4    A.  I read to the Deputy from my notes, and I don't believe

5    there is -- it's not very easy to distinguish between the

6    present and past tense orally.

7    Q.  Thank you.

8           You remember testifying at an evidentiary hearing

9    in this courtroom, in fact, on June 18th?

10   A.  I do.

11   Q.  Do you remember being asked what you told Deputy Wooton

12   on February 28th?

13   A.  Not specifically.

14   Q.  Would it refresh your recollection to look at the

15   evidentiary hearing transcript?

16   A.  You can show it to me.  I'm sure it would refresh my

17   recollection as to what I said.

18   Q.  Page 46.  Please turn to page 46, Ms. Friedemann.

19   A.  Okay.  I'm there.

20   Q.  Okay.  At the bottom, line 24, it's a question from

21   Ms. Allyn.

22   A.  Yes.  I see the question and my answer.

23   Q.  Okay.  So do you remember testifying that you told

24   Deputy Wooton you don't know the 50 different ways I plan,

25   present tense, to kill her?

1   A.  The transcript is written in the present tense.

2   Q.  Okay.  So the transcript says "plan to kill"?

3   A.  The transcript says "plan."

4   Q.  Present tense?

5   A.  Present tense.  And I answered, "Yes."  Of course, I did

6   not have the written transcript in front of me.

7   Q.  So today you're testifying that you told Deputy Wooton

8   planned, past tense?  Is that what you testified to about

9   five minutes ago?

10   A.  I read my notes, so I read "planned."

11   Q.  Past tense?

12   A.  That's how I read it, yes.  That's what I wrote.

13   Q.  And on June 18th you testified "plan," present tense?

14   That's what the transcript says, correct?

15   A.  The transcript is written in the present tense.

16   Q.  So it does say that?

17   A.  The question was posed to me by Ms. Allyn.  I, frankly,

18   don't know whether she was speaking in the present or the

19   past tense.

20   Q.  But your response was "plan," present tense, according

21   to the transcript, correct?  Yes or no?

22   A.  According to the transcript.

23   Q.  Okay.  Let's fast forward to March 16th.  March 16th you

24   get a phone call from Assistant U.S. Attorney Tim Rank and

25   Deputy Wooton.  So this is the second time you've talked to

FRIEDEMANN - CROSS                    405

1    Deputy Wooton.  Do you remember this phone call?

2    A.  I do.

3    Q.  Okay.  And at that point, the marshal told you what he

4    remembered you telling him, which is you don't know the 50

5    different ways I plan, present tense, to kill her?

6              MR. RANK:  Objection.  That misstates the

7    evidence.

8              THE COURT:  Overruled.

9    BY MR. KELLEY:

10   Q.  Do you remember agreeing that you said "you don't know

11   the 50 different ways I plan," present tense, "to kill her"

12   to the marshal?

13   A.  When I spoke to the marshal on both occasions, I had my

14   notes in front of me and I read them verbatim because I knew

15   it was important.

16   Q.  So if the marshal has something else written down, he

17   must be wrong?

18   A.  I think it's very difficult to --

19   Q.  That was a yes or no question.

20             THE COURT:  Well, there's a question posed.

21   Ms. Friedemann, I think the pending question -- I don't

22   think you'd completed your answer -- so if the marshal has

23   something else written down, he must be wrong?  Answer:  You

24   began, "I think it's very difficult to --"

25             THE WITNESS:  I think it's very difficult to

FRIEDEMANN - CROSS

 1    distinguish between the present and past tense in that

 2    phrase.  So I may have intended the past tense and he may

 3    have heard the present.

 4    BY MR. KELLEY:

 5    Q.  They confirmed during that phone call that you wrote

 6    down what Mr. Ivers said verbatim and contemporaneously,

 7    correct?

 8    A.  Yes.

 9    Q.  April 18th Mr. Ivers is indicted.  Are you aware of

10    that?

11    A.  No.

12    Q.  Are you aware that he is indicted generally?

13    A.  I am now.

14    Q.  He is in trial based on an indictment?

15    A.  Obviously, I understand that.

16    Q.  And do you understand that he was indicted for the

17    phrase "you don't know the 50 different ways I plan,"

18    present tense, "to kill her"?

19            MR. RANK:  Objection, relevance.

20            THE COURT:  What was the relevance?  Sustained.

21    BY MR. KELLEY:

22    Q.  Let's go to May 7th.  You sit down with the government

23    again.  So this time you sit down with Assistant U.S.

24    Attorney Julie Allyn and Deputy Wooton again.  They

25    interview you.  It's a phone call.  Do you remember this?

1    A.  I'm not sure.  I remember an in-person meeting.

2    Q.  Okay.  It might've been in-person.  Do you remember an

3    in-person meeting?

4    A.  I do.

5    Q.  Would it have been at the U.S. Attorney's Office in

6    Minneapolis?

7    A.  Yes.

8    Q.  So you went down to their office to talk to them?

9    A.  I did.

10   Q.  Okay.  Did Mr. Ivers give you permission to do that?

11   A.  No.

12   Q.  Okay.  And this time you tell Deputy Wooton and

13   Ms. Allyn that Mr. Ivers said, "you don't know the 50

14   different ways I plan," present tense, "to kill her."

15   That's what you told them?

16   A.  I believe I had my notes and read from them.  And,

17   again, I -- I can read it to you if you want, Mr. Kelley.

18   Q.  No, I do not.

19   A.  Okay.

20   Q.  But do you remember what you said to them?

21   A.  I believe I read from my notes.

22   Q.  Do you remember what you said to them?

23   A.  I believe I said that Mr. Ivers had said "you don't know

24   the 50 different ways I planned to kill her."

25   Q.  Okay.  Let's go to June 18th.  So I'm going to talk

1    about the hearing again.

2         At the hearing you testified to something

3    different, correct?

4    A.  I don't believe so.

5    Q.  At the hearing when asked by Ms. Allyn what Mr. Ivers

6    said during the phone call you said, "He said he had

7    imagined 50 different ways to kill her," "imagined," past

8    tense.  Do you remember saying that?

9    A.  If that's what the transcript says, it probably is what

10   I said.

11   Q.  Okay.  So you said then during that testimony on June

12   18th "imagined" in the past tense?

13   A.  Perhaps.  I didn't have my notes in front of me, nor was

14   I trying to give a direct quote.

15        MR. RANK:  Your Honor, may we approach?

16        THE COURT:  Yes.

17             (Sidebar discussion.)

18        MR. RANK:  We have another witness that has a

19   three-week old baby, Ms. Rondoni Tavernier.  Do you know how

20   much longer you have with Ms. Friedemann?

21        MR. KELLEY:  It will take us to 5:00 at least.

22        MR. RANK:  Can we take Ms. Rondoni Tavernier,

23   because in order to get to her -- she has been here all day.

24   She has a three-week old baby.

25        MR. KELLEY:  You want to stop with Friedemann?

```
1              MR. RANK:  You can resume your cross.  We can take
2    her out of order.  I'm worried she is coming out of order.
3              MR. SCOTT:  We didn't cause this problem, Your
4    Honor.
5              MR. RANK:  I'm not saying you caused the problem.
6              THE COURT:  Can you give me a reasonable estimate
7    of how long you're going to be?
8              MR. KELLEY:  Over 45 minutes.
9              THE COURT:  45 minutes from now?  Okay.  We'll
10   take a recess and take the witness out of order.  If you are
11   going to be 45 minutes, I assume you're going to go back
12   over what you covered so far?
13             MR. KELLEY:  Additional things.
14             THE COURT:  That's fine if we get her on.  I think
15   it's sound discretion of the trial court.  Seems to me she's
16   always going to be available.  If she has a three-week-old
17   baby and has been here all day, I mean -- my sense is we
18   ought to put her on.
19             MR. KELLEY:  I mean, I'm not going to be able to
20   get through cross on her by 5:00.  It's 4:30 now.
21             THE COURT:  We'll work past 5:00 if we have to.  I
22   mean, I don't know --
23             MR. SCOTT:  I can't imagine my cross --
24             THE COURT:  Wait a minute.  You've all forgotten
25   who my favorite judicial philosopher is, Rodney King.  Can't
```

1    we all just get along here.  This seems to be a reasonable

2    solution, to put the witness on.  But if you are going to be

3    that long, I guess it's not reasonable.  We'll have her come

4    back tomorrow.  So we'll continue with Ms. Friedemann.

5                  (Sidebar discussion ended.)

6              THE COURT:  Okay.  Mr. Kelley, when we left off

7    here -- I'm going back to the record you were making -- "Q.

8    Okay.  So you said then during the testimony on June 18th

9    'imagined' in the past tense?

10             A.  Perhaps.  I didn't have my notes in front of

11   me, nor was I trying to give a direct quote."

12             And then Mr. Rank asked to approach, if that helps

13   you.

14             MR. KELLEY:  Yes.  Thank you, Your Honor.

15             THE COURT:  All right.

16   BY MR. KELLEY:

17   Q.  So, June 18th hearing, we were just talking about what

18   you testified to as far as what Mr. Ivers said during the

19   February 27th phone call, and I asked you if you remembered

20   saying to Ms. Allyn in response to Ms. Allyn's question that

21   Mr. Ivers said, "He said he had imagined," past tense, "50

22   ways to kill her."

23             MR. RANK:  Objection, asked and answered, Your

24   Honor.

25             THE COURT:  Sustained.

1    BY MR. KELLEY:

2    Q.  Do you remember saying "imagined" in past tense during

3    that hearing?

4    A.  No.

5    Q.  Would it refresh your recollection to look at the

6    transcript?

7    A.  Sure.

8              THE COURT:  Ladies and gentlemen, while she's

9    looking at the transcript, you've been seated over an hour.

10   If you want to take a minute to stretch, you can do so.

11             (Stretch break)

12   BY MR. KELLEY:

13   Q.  Okay.  Ms. Friedemann, now that you have had a chance to

14   look at your testimony, do you remember saying the words "he

15   had imagined," past tense, "50 ways to kill her"?

16             MR. RANK:  Objection, asked and answered.

17             THE COURT:  Overruled.

18             THE WITNESS:  What I said was Mr. Ivers was very

19   angry.  He said -- and I'll use his words -- "that fucking

20   judge stole my life from me," and he said he'd imagined 50

21   ways to kill her.

22   BY MR. KELLEY:

23   Q.  So you did say "imagined"?  That is what you testified

24   to?

25   A.  Unless the transcript was incorrect, and I doubt it.

FRIEDEMANN - CROSS

412

1    Q.  So you doubt the transcript was incorrect?  You did say

2    "imagined"?

3    A.  It looks like I did.

4    Q.  While you're on that page, the next question Ms. Allyn

5    asked you was:  "Did Mr. Ivers say anything about a plan to

6    kill her?"  What did you say?

7    A.  I said, "No," and I had --

8    Q.  Okay.  Thank you.  You said, "No."

9    A.  I understood the question was asking --

10           MR. KELLEY:  There is no question before the

11   witness, Your Honor.  I would object to that.

12           THE COURT:  Well, you have to let her answer the

13   question that was pending, Counsel.

14           MR. KELLEY:  She answered "No," Your Honor.

15           THE COURT:  Well, let me see it.  Let me go back

16   here.  Well, actually, she didn't finish because the last

17   part of it was:  While you're on that page, the next

18   question Ms. Allyn asked you, did Mr. Ivers say anything

19   about planning to kill her, what did you say?

20           A.  "I said, 'No,' and I had --"  And then there

21   was an interruption.

22           Had you completed your answer?

23           THE WITNESS:  I had not, Your Honor.  I said, "No"

24   and I had understood that Ms. Allyn was asking about a

25   specific plan, like I'm going to use a gun or I'm going to

1    -- that sort of thing.

2    BY MR. KELLEY:

3    Q.  I'm going to stop you there.  That's not what she said,

4    is it?

5    A.  That's what I had understood.

6    Q.  Okay.  Ms. Allyn just said -- her words are:  "Did he

7    say" -- make sure I get it right -- "did he say anything

8    about a plan to kill her" --

9         MR. RANK:  Asked and answered, Your Honor, and

10   argumentative.

11        THE COURT:  Argumentative.  Sustained.

12   BY MR. KELLEY:

13   Q.  She didn't ask if he had a specific plan, did she?

14        MR. RANK:  Objection, argumentative.

15        THE COURT:  Sustained.

16   BY MR. KELLEY:

17   Q.  You told Ms. Allyn Mr. Ivers did not have a plan to kill

18   her?

19        MR. RANK:  Objection, asked and answered, and

20   argumentative.

21        THE WITNESS:  That is definitely not what I said.

22   BY MR. KELLEY:

23   Q.  Okay.  Let's talk about another subject here.  Talking

24   about this February 27th phone call, it is just you,

25   Ms. Rondoni Tavernier, and Mr. Ivers on the phone call.

1    Mr. Ivers never told you to communicate what was said during

2    that phone call to anyone else, did he?

3    A.  No.

4    Q.  Okay.  He didn't tell you to communicate anything that

5    was said during that phone call to Judge Wright?

6    A.  Correct.

7    Q.  He didn't tell you to communicate anything that was said

8    during that phone call to Judge Wright's staff?

9    A.  That's correct.

10   Q.  Didn't tell you to communicate it to the court?

11   A.  No.

12   Q.  Okay.  Not to Tiffany Sanders?

13   A.  That's correct.

14   Q.  Not to the marshals?

15   A.  Correct.

16   Q.  I believe Mr. Rank talked to you about the duty of

17   confidentiality.

18   A.  Yes.

19   Q.  And the general rule is that a lawyer shall not

20   knowingly reveal information relating to the representation

21   of a client?

22   A.  Yes.  That's a general rule.

23   Q.  That's a general rule.  There are some exceptions to it?

24   A.  Correct.

25   Q.  Mr. Ivers did not expect you to reveal anything that was

```
 1    said during the February 27th phone call, did he?

 2            MR. RANK:  Objection, foundation, calls for

 3    speculation.

 4            THE COURT:  You want to lay some foundation?

 5            MR. KELLEY:  Okay.

 6    BY MR. KELLEY:

 7    Q.  During the February 27th phone call, did you tell

 8    Mr. Ivers you were going to disclose what he said during

 9    that phone call to somebody else?

10    A.  No.

11    Q.  Okay.  And is it reasonable for a client to expect, any

12    client, that their attorney will keep their communications

13    confidential generally speaking?

14            MR. RANK:  Objection.  Mr. Ivers wasn't a client

15    and what he would expect --

16            THE COURT:  Counsel, what I think is foundation --

17    Mr. Rank and Mr. Kelley, what I think is foundation is what

18    normally goes into an engagement with a lawyer and a client.

19    That's the kind of foundation that I was looking for.

20            MR. KELLEY:  I'll lay a little bit more.

21            THE COURT:  All right.

22    BY MR. KELLEY:

23    Q.  So, generally speaking, when you're dealing with a

24    client, okay -- and it could be a prospective client, could

25    be a client that's paying and you've fully taken on to do an
```

1    entire case -- if you have a conversation that is

2    confidential, that means that it's just between the attorney

3    and the client, there's nobody else listening, it's just the

4    two of you generally speaking, correct?

5    A.  I'm not sure I understand the question.

6    Q.  So a confidential communication is something that is

7    just between an attorney and the client?

8    A.  It's generally what the word "confidential" means.

9    Q.  Okay.  And clients expect what is said to their attorney

10   will be kept confidential, generally speaking, right?

11   A.  I don't know that all clients expect that or that -- and

12   I certainly don't know what Mr. Ivers thought.

13   Q.  Okay.  So you're saying now that clients don't expect

14   that you will keep their information confidential when they

15   talk to you?

16   A.  I don't expect that -- there are some clients who are

17   lawyers themselves and have a keen understanding of

18   privilege and confidence; many are not, and I suspect that

19   they may not.

20   Q.  Okay.  I'm going to go over a hypothetical here from the

21   duty of confidentiality.  Okay?

22          If a client -- prospective client let's say --

23   somebody comes to you as an attorney, knows you're an

24   attorney and says, I killed my wife, I buried her in the

25   backyard, she's dead, that information is confidential,

1    isn't it?

2              MR. RANK:  Objection, relevance, Your Honor.

3              THE COURT:  Overruled.

4              THE WITNESS:  I don't believe so.

5    BY MR. KELLEY:

6    Q.  It relates to past conduct.

7              So your answer today is that you could -- that

8    information is not confidential?

9    A.  Mr. Kelley, you're asking me a hypothetical that is

10   incomplete, and I don't believe you had included in your

11   hypothetical the idea that this was a current client.

12   Perhaps I --

13   Q.  A prospective client and a current client, both are owed

14   the duty of confidentiality, correct?

15   A.  Yes.

16   Q.  Okay.  So then it doesn't matter.  If somebody comes --

17   a prospective client or a current client -- and tells you

18   that information, the duty of confidentiality applies to it,

19   correct?

20             MR. RANK:  Objection, compound question, the form

21   of the question.  I don't even understand the question.

22             THE COURT:  That's sustained.

23             Ladies and gentlemen, we're going to recess for

24   the day.  I don't want you to punish the government or the

25   defense because they've been a little contentious this

418

1    afternoon.  That's the nature of lawyering.  You're smiling,

2    but I mean that.  You've got to decide this case based only

3    on the evidence and on the instructions, not on what you

4    think the lawyers should or shouldn't have done or did.  So

5    it's my job to handle the objections.  So remember the

6    admonition of the Court.

7         The lawyers are going to stay.  We're going to

8    discuss some matters about how to proceed tomorrow.

9         So don't access any additional information beyond

10   what you're getting here in court.  So we'll be in recess

11   until 8:30 tomorrow with the jury.

12        THE COURTROOM DEPUTY:  All rise.

13        (Jury dismissed.)

14        THE COURT:  Okay.  Please be seated.  Okay.

15   Here's the way I'm going to handle this tomorrow.

16   Mr. Kelley, I rarely -- or, Mr. Rank, I rarely put time

17   limits on lawyers because I operate on the theory the

18   lawyers always know more about the case than I do.  And I

19   shouldn't be telling them how to handle their cases.  That

20   said, it seems to me a half hour tomorrow morning,

21   Mr. Kelley, is it.

22        MR. KELLEY:  On Ms. Friedemann, Your Honor?

23        THE COURT:  With Ms. Friedemann.  And then we can

24   schedule the other witnesses appropriately.  If you think

25   that my conclusion is unfair and you need more time, just

1    set out some specifics so I can fairly judge if -- the root

2    word is arbitrary.  I want to be arbitrary here.  And it may

3    be that I just don't understand the aim of the defense or,

4    for that matter, the government.  So I always look forward

5    to help.  So I'm going to do that tomorrow.

6           So we're going to start at 8:30.  We're going to

7    conclude with your cross at 9:00.  If Mr. Rank has any

8    follow-up on redirect, he can, of course, do that.  And

9    then, Mr. Rank, can you tell me at least now, I'm not

10   holding you to this, in the morning how you're going to

11   proceed tomorrow.

12          MR. RANK:  Yes.  We would anticipate calling

13   Ms. Rondoni Tavernier immediately after Ms. Friedemann.

14   After that we would anticipate putting on testimony of

15   Deputy Matt Seyfried or Farris Wooton, between the two of

16   them, so two deputy marshals at that point in time.

17          THE COURT:  So you're anticipating resting perhaps

18   by noon, maybe not?

19          MR. RANK:  I would hope to by noon.  It depends on

20   the cross-examination.

21          THE COURT:  Mr. Kelley and Mr. Scott, does that

22   work for you in terms of any record you want to make,

23   witnesses you want to put on?

24          MR. SCOTT:  With their case?  Yes.  I mean, they

25   are not putting on the 404(b).  They said they were on

1    Monday.  Yes.  We're ready to go forward tomorrow afternoon,

2    Your Honor.

3             THE COURT:  Right.  Well, I'm looking forward to

4    how we can -- you think we can get it submitted by Friday?

5             MR. SCOTT:  Yes, Your Honor.  We expect to have --

6    at this point we only expect to have two witnesses, unless

7    we have to call -- I don't think we're going to have to, but

8    if we have to do something to finish the impeachments.  I

9    think we'll do it during their case.  So I think we've got

10   two witnesses, my client's sister and him.  The sister will

11   not be real long.  Don't know how long cross will be because

12   they have interviewed him too.  Then the client is going to

13   take close to half a day between direct and cross.  It's

14   limited, of course, by -- they have almost an unlimited area

15   in cross as you've seen in the 404(b) notices.  So it will

16   depend on them as to how long he testifies.

17            THE COURT:  We'll be in recess.

18            THE COURTROOM DEPUTY:  All rise.

19            (Court adjourned at 5:00 p.m.)

20                      *      *      *

21        I, Debra Beauvais, certify that the foregoing is a

22   correct transcript from the record of proceedings in the

23   above-entitled matter.

24            Certified by:   *s/Debra Beauvais*
                             Debra Beauvais, RPR-CRR
25