1                  UNITED STATES DISTRICT COURT
                 DISTRICT OF MINNESOTA

2

3   ------------------------------------------------------------
                         )
   United States of America,   )  File No. 18-CR-90

4                            )         (RWP/CFB)
        Plaintiff,        )

5                            )
   v.                   )  St. Paul, Minnesota

6                            )  September 14, 2018
   Robert Phillip Ivers,      )  8:30 a.m.

7                            )
        Defendant.        )

8   ------------------------------------------------------------

9            BEFORE THE HONORABLE ROBERT W. PRATT
        UNITED STATES DISTRICT COURT JUDGE

10            **(JURY TRIAL - VOLUME IV)**

11  **APPEARANCES**
  **For the Plaintiff:**     **U.S. ATTORNEY'S OFFICE**

12                         **TIMOTHY RANK, AUSA**
                       **JULIE ALLYN, AUSA**

13                         300 S. 4th St., #600
                       Minneapolis, Minnesota 55415

14

  **For the Defendant:**    **KELLEY, WOLTER & SCOTT, P.A.**

15                         **DANIEL SCOTT, ESQ.**
                       **BRETT KELLEY, ESQ.**

16                         431 S. 7th St., #2530
                       Minneapolis, Minnesota 55415

17

  Court Reporter:        DEBRA K. BEAUVAIS, RPR-CRR

18                         300 S. 4th St., #1005
                       Minneapolis, Minnesota 55415

19

20

21

22

23      Proceedings recorded by mechanical stenography;
  transcript produced by computer.

24

25

1                          I N D E X

2                                                    PAGE

3    Charge Conference                               752

4    Final Instructions                              771

5    Closing statements by:
         Ms. Allyn                                   783
6        Mr. Kelley                                   797
         Ms. Allyn                                   833
7
     Verdict                                         843
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           **IN OPEN COURT**

2          **(JURY NOT PRESENT)**

3                THE COURTROOM DEPUTY:  All rise.

4                THE COURT:  Please be seated.

5                Good morning.  The record should show the Court

6      sent the final jury instructions to the parties last

7      evening.  I have two comments:  One for Mr. Rank regarding

8      Instruction No. 10, page 14, and a request regarding an

9      admonition to the jury that the punishment, if any, is for

10     the Court, not the jury.

11               So, Mr. Scott, do you have some suggestions,

12     objections, corrections for the Court?

13               MR. SCOTT:  Yes.

14               THE COURT:  All right.

15               MR. SCOTT:  Let me start first with the date, Your

16     Honor.  Given the nature of this case, which is that much of

17     the testimony in this case covered areas in 2016, 2015, even

18     some cross earlier than that, 2017, there's no -- we want

19     the Court -- and we think the jury instructions should make

20     clear that the date of this offense.  And your Instruction

21     8, which is the indictment; 9, Count 1; and 10, Count 2 do

22     not delineate a time frame.  We think that Instruction

23     No. 9, Instruction No. 10, the first element should have the

24     date, which is -- let's take Instruction No. 9.  It says,

25     "One, the defendant made a threat to murder a United States

1    judge."  It should say:  On or about February 27, 2018 the

2    defendant.  And the same thing for Instruction 10, which on

3    one it should say:  On or about February 27th, 2018.  Start

4    with, I think, the date that the crime is alleged to have

5    committed is --

6              THE COURT:  Just a minute.  So on 10 you want

7    after One:  The defendant knowingly sent a communication

8    containing a threat to injure another person on or about --

9    no.

10             MR. SCOTT:  Open with that:  On or about February

11   27th, 2018.

12             THE COURT:  Okay, open with that.  So in the

13   introductory phrase:  The crime of interstate

14   transportation, that's where you want it?

15             MR. SCOTT:  No, I want -- well, one -- let's take

16   Instruction 10.

17             THE COURT:  Okay.

18             MR. SCOTT:  The elements are 1 comma.  Right there

19   it should say:  On or about February 27, 2018.

20             THE COURT:  All right.  That's your request?

21             MR. SCOTT:  That's the initial request for both

22   Instruction 10 and Instruction 9.

23             THE COURT:  All right.  Thank you.

24             Anything else?

25             MR. SCOTT:  Oh, yes.

1              THE COURT:  Okay.

2              MR. SCOTT:  Although some of this is a reiteration

3      of what we had in the past.

4              THE COURT:  All right.

5              MR. SCOTT:  For Count 1, which is Instruction

6      No. 9, Your Honor, it -- first and foremost, again, I think

7      that the temporal part of the definition of a threat needs

8      to be in the indictment.  We had suggested that it be in the

9      count.  But we also had it in our, unfortunately unnumbered,

10     proposed instruction, but we had temporal at page 31 of

11     ours, which is that "a reasonable person would interpret as

12     a serious expression of an intention to murder a federal

13     judge now or in the future."  And we had it in our

14     explanation -- explanatory definitions, our unnumbered

15     instruction at page 33, which covered the First Amendment

16     rights.  That also talked about the same exact words:  "A

17     reasonable person would interpret as a serious expression of

18     an intention to murder a federal judge now or in the

19     future."  We believe that is the case law, Your Honor, to

20     start with.  That it's important -- the temporal part is

21     important in this case because it is our belief and, in

22     fact, the Court even addresses it in an odd way in its

23     instructions, that whether the statements of the defendant

24     are meant to be in the future even if they are said in the

25     past is something for the jury to look at, that it

1    acknowledges that that temporal issue is here before the

2    jury.  If his words are talking about past actions, then the

3    government is going to have to prove more to show that,

4    despite the words, it's an intent to do something in the

5    future.

6              At no place in either of those instructions --

7    either for Count 1 or Count 2 -- do you place presently now

8    or in the future or presently in the future to quote the

9    exact words the court uses in *Doe* and lots of other cases.

10   At no place do you put that in and tell the jury that that's

11   important, that it is part of what the threat is.  I think

12   in -- and so that applies to both Count 1 and Count 2,

13   Instruction 9, Instruction 10.

14             THE COURT:  Where do you want "now or in the

15   future"?  Let's start out with Instruction 9, page 12.

16             MR. SCOTT:  Okay.  Instruction 9, page 12 should

17   be in, again, element one:  The defendant made a threat to

18   murder a federal judge now or in the future.

19             THE COURT:  Okay.

20             MR. SCOTT:  Second, Your Honor, I think in Count 1

21   -- in Count 1 you do not address the subjective intent of

22   the defendant that's required under *Elonis* at all; I think

23   you do in Count 2, which is element number 3 in Count 2, but

24   you do not in Count 1.

25             In Count 1 the subjective intent of the defendant

1    as it relates to the threat is not addressed by the Court in

2    its instruction at all.

3              THE COURT:  So you want element 3 in 10 to be

4    element 3 in 9?

5              MR. SCOTT:  It should probably be element 2 in 9,

6    yes, Your Honor, so that we have the objective and the

7    subjective in both of the counts, because you've got an

8    intent related, but that's really purpose.  His purpose is

9    to retaliate.  That's independent of the threat.  It's just

10   the motivation behind the threat or what the threat is

11   intended to accomplish, which is to retaliate.  I'd say it's

12   more a motive than a purpose.  But that's entirely separate,

13   as to whether it's a threat.  That's just the motivation

14   behind the threat.  That doesn't go to whether a person

15   subjectively intends it as a threat.  And I think *Elonis*

16   requires that and it should be in Count 1, as well as Count

17   2.

18             Again, we made those same suggestions in our

19   instructions as to Count 1 and Count 2, which are in, again,

20   page 31 of our instructions and page 38 of the instructions.

21             THE COURT:  Do you think the jury instruction

22   committee got this wrong, because 9 and 10 come directly

23   from the instructions on the website?

24             MR. SCOTT:  Your Honor, if the instructions on the

25   website for 115 say that, then those instructions are

1    absolutely wrong.  I think the instructions go to 875.  And

2    in that you've got an expression that covers *Elonis*, which

3    was your third element for 10.  But for some reason, two

4    elements in -- basically the same crime but just a different

5    motivation.  I mean, the first crime the motive is relevant.

6    The second crime the transport is relevant.  But underneath

7    it the threat is the same.  It has the same components.  It

8    has an objective component to decide whether it's a threat

9    and a subjective to decide whether he meant it.

10             THE COURT:  My clerk has corrected me.  Nine is

11   not from the committee, 10 is.

12             Okay.  What else do you have?

13             MR. SCOTT:  I have one that may be more a

14   complaint about the Eighth Circuit pattern, its general

15   pattern instructions, but I think "knowingly" ought to be

16   in.  We submitted "knowingly," that it's not done by

17   absence, mistake, action, or other innocent reason.  And we

18   put "knowingly" and "willfully" in ours, but certainly

19   "knowingly" I think is required.  We put that in each of

20   ours.  I know that the Eighth Circuit pattern instructions

21   are not big fans of "knowingly."

22             THE COURT:  Okay.  So now you're discussing 11?

23             MR. SCOTT:  It might be.  I don't have 11 right

24   now, Your Honor.  I have to flip over.  Yes, Your Honor.

25   That's different than the knowledge instruction I submitted.

1     I submitted the more old-fashioned instruction, which is not

2     as an absence of mistake, accident or other reason.

3                THE COURT:  So you want in 11 -- as I get what

4     you're telling me, you want the word "knowingly"?

5                MR. SCOTT:  Yes.  And we submitted that in our

6     instructions, Your Honor, at page 34 of our instructions at

7     the bottom of the page.  That one relates to -- it's the

8     same instruction we give twice, but that relates to Count 1.

9     There is the identical language in our instruction relating

10    to Count 2, which is found on page 41 of the filed requested

11    instructions.

12                Your Honor, let me just go back to one looking at

13    my notes for just a second.  Instruction No. 9, your

14    instruction for Count 1, in the paragraph -- the longer

15    paragraph after the two elements that starts with "a

16    threat," the second sentence in that says a statement they

17    qualify "even if the defendant," and you have "did not

18    intend to carry out, did not have the ability."  I have no

19    problem with that.  "Did not subjectively intend for the

20    recipient to understand the communication as a threat," I

21    think that's the exact opposite of what *Elonis* requires.

22                So if you put the third element into Count 1 that

23    you have in Count 2, I think you have to take out the "did

24    not subjectively intend for the recipient to understand the

25    communication as a threat," because I think that is *Elonis*.

1          THE COURT:  Anything else?

2          MR. SCOTT:  No, Your Honor.

3          THE COURT:  All right.  Thank you.

4          Mr. Rank.

5          MR. RANK:  Thank you, Your Honor.  Let me try to

6     take this one thing at a time.

7          THE COURT:  Yes.

8          MR. RANK:  First of all, with respect to the date,

9     on or about February 27th, the government doesn't object to

10    that.  I think that's a fine suggestion.

11         THE COURT:  Okay.

12         MR. RANK:  I would ask, Your Honor, though, that

13    if we put in that it took place on or about February 27th,

14    2018 we get the model instruction for "on or about," so the

15    language instructing with the jury -- the phrase "on or

16    about" means to the jury.  I think if we add that --

17         THE COURT:  If the parties are --

18         MR. SCOTT:  I may have actually said it once, but,

19    yeah, the "on or about" language is -- that's the standard

20    language.  I don't mind.

21         THE COURT:  That's fine.  The government need not

22    -- the instruction says the government need not prove the

23    specific date.

24         MR. SCOTT:  Sure.  I don't have a problem with

25    that at all.

1          THE COURT:  Right.  Right.  I think it's entitled

2     "on or about," the instruction.

3          MR. RANK:  Thank you, Your Honor.

4          THE COURT:  Right.

5          MR. RANK:  With respect to the other points --

6     many of the other points, Mr. Scott is right, these are all

7     things that were considered by the Court before the issuance

8     of the pretrial instructions and, in particular, with

9     respect to the additional language that's not in the Eighth

10    Circuit model instructions.  The Court, I think, properly

11    adopted the Eighth Circuit model instructions with respect

12    to the definition of a threat.

13          In particular, Your Honor, Mr. Scott talks about

14    the intent to murder the federal judge and says that there

15    should be a subjective intent element in this.  We briefed

16    this issue before trial in reference to the *Wynn* case.  And

17    Your Honor actually specifically mentioned the *Wynn* case at

18    the pretrial conference in this case, which deals with --

19    it's a post-*Elonis* case in which it deals with what is

20    needed to be proved in order to make a 115 case.  So a

21    Section 115 case requires what is in the Court's

22    instruction.

23          So what the Court has already instructed, what are

24    in these instructions are consistent with what the Eighth

25    Circuit approved in the *Wynn* case.  And that *Wynn* case was

1    decided after *Elonis* and actually considered *Elonis* in

2    determining whether that was an appropriate instruction.  So

3    the instruction that's in the Court's instructions for

4    Section 115 is consistent with the instruction approved by

5    the Eighth Circuit in the *Wynn* case.  And the *Wynn* case

6    specifically considered the *Elonis* case when making that

7    decision.

8              THE COURT:  *Wynn* is Instruction No. 9, elements of

9    the offense, Count 1.

10             MR. RANK:  Yes, sir.

11             THE COURT:  *Elonis* is elements of the offense,

12   Count 2.

13             MR. RANK:  That's correct, Your Honor, because

14   *Elonis* dealt with a Section 875 case specifically, and

15   that's referenced in the Eighth Circuit model instructions,

16   which were also done after *Elonis* and specifically

17   considered *Elonis* in creating those model instructions.

18             So both the *Wynn* case and the Eighth Circuit model

19   instructions considering 875(c) specifically considered

20   *Elonis* in determining the appropriate elements for those

21   offenses.

22             So with respect to the two suggestions by

23   Mr. Scott:  one, that there be an additional element of

24   subjective intent in Count 1, that's not consistent --

25   that's inconsistent with the *Wynn* case.  And so there should

1    be no third element.  And also the portion where he wanted

2    to strike the language "did not subjectively intend for the

3    recipient to understand the communication as a threat," that

4    should not be struck because that language is consistent

5    with what the Eighth Circuit ruled in the *Wynn* case.

6              With regard to the request for a knowingly

7    instruction, Your Honor --

8              THE COURT:  Yes.

9              MR. RANK:  -- the government has no objection to

10   that.  So in the -- I guess it is Instruction No. 11 --

11             THE COURT:  Yes.

12             MR. RANK:  -- if the Court wishes to include both

13   an intent definition and a knowingly definition, we don't

14   have a problem with that.

15             THE COURT:  All right.  So you have two agreements

16   with Mr. Scott and two disagreements.

17             MR. RANK:  That's correct, Your Honor.  And I

18   think the two disagreements the Court has already ruled on.

19             THE COURT:  Okay.

20             MR. RANK:  And then with respect to the requests

21   by the government, I don't know if the Court wishes to be

22   heard on -- for us to speak as to those issues?

23             THE COURT:  I put your request in from last

24   evening.  That's already in, I think.

25             MR. RANK:  Okay.  Thank you, Your Honor.

1              THE COURT:  And the second request is a reference

2     to punishment.  Beyond duty to deliberate, that is the last

3     instruction.

4              MR. RANK:  That's correct.  My concern, Your

5     Honor, is that Mr. Ivers repeatedly and unsolicitedly and

6     emphatically yesterday yelled out "I'm facing 15 years, I'm

7     facing 15 years," suggesting a nullification issue to the

8     jury.  And I think it's important that in light of the

9     specificity and repetition of Mr. Ivers yelling that out in

10    an unsolicited way that the Court should specifically

11    address it.

12             THE COURT:  Right.  I don't know if the -- I don't

13    have any problem with saying it twice, because your request

14    was during his testimony the defendant stated he was facing

15    15 years in prison, you are instructed that if the defendant

16    is found guilty, the sentence to be imposed is my

17    responsibility.  And then we go on to tell them there's no

18    mandatory penalty.  I don't think we ought to tell them

19    anything about the penalty.

20             MR. RANK:  I would ask, though, Your Honor --

21    well, he has said something about the penalty and that's why

22    I think it's important.

23             THE COURT:  He did.

24             MR. RANK:  That is sitting out there, Your Honor,

25    that the jury has been told more than once that he's looking

1     at 15 years.

2             THE COURT:  Okay.

3             MR. RANK:  So at least -- and that's why I think

4     something to the extent that -- maybe not that that sentence

5     regarding mandatory penalty, but at least the portion that

6     says consequently if convicted the decision whether to

7     impose a sentence that includes a term of confinement is

8     solely up to the Court I think is an accurate statement of

9     the law.

10            THE COURT:  And you want that as a separate

11    instruction?

12            MR. RANK:  Please, Your Honor.  And I would like

13    it before the last thing sending them to the jury.  I think

14    the duty-of-the-jury instruction is a good idea.  I think it

15    should be given at the same time.  But I think in light of

16    what we closed with yesterday was Mr. Ivers repeatedly

17    yelling that he's looking at 15 years that it's appropriate

18    in this case to focus the jury's attention on that and make

19    clear to them that they should not take punishment into

20    consideration.

21            THE COURT:  All right.  Thank you.  Anything else?

22            MR. RANK:  No, Your Honor.

23            THE COURT:  Mr. Scott, I just need a response.

24    What's your response to counsel's point about 9?  Number 9

25    reflects *Wynn* and nothing more need be said than what's

1      already in 9.

2              MR. SCOTT:  Well, Your Honor, first is that *Wynn*

3      was a case in which the jury instructions that went to the

4      jury in that case were pre-*Elonis* instructions.

5              THE COURT:  Right.

6              MR. SCOTT:  And then the case came up to the

7      circuit, and the circuit upheld the conviction, and the

8      judge made a remark that he thought the instructions were

9      fine.  I think it was Judge Loken that made the remark that

10     he thought the instructions were fine.  I'm not so sure that

11     he worked his way through those instructions in *Elonis*.  He

12     discussed *Elonis* in terms of the sufficiency of the

13     evidence, and then he mentioned the instructions as part of

14     that.

15             You know, I don't think the Eighth Circuit has

16     ever specifically upheld these type of instructions without

17     *Elonis* when it's faced them head-on after an *Elonis* case.  I

18     think the government goes forward in their peril to say that

19     the Supreme Court decision, which clearly applied to the

20     definition of threat and what it was, suddenly doesn't apply

21     to 115.  I think they go forward at their peril.  I think

22     that the Court should save them from that because I think

23     it's wrong.

24             THE COURT:  Right, but I thought the 115

25     discussion -- there's very little discussion about the --

1      because the government conceded at argument.  I think Judge

2      Loken said the government conceded at argument.  They agreed

3      that *Elonis,* that happened after the trial and before the

4      appeal, applies.  But as to the other count, they did have a

5      discussion about why that was the appropriate instruction.

6              MR. SCOTT:  I've made, I think, my record, Your

7      Honor.  I think if 115 comes up to the circuit or beyond, if

8      it ever does, that that decision is going to be

9      distinguished.

10             THE COURT:  Yeah, the way I read *Elonis* is that

11     it's the B part of the statute, and the other two sections

12     require knowledge, this section doesn't.  And the Chief

13     Justice said you've got to give knowledge so you don't sweep

14     in "innocent people."  I think that was the thrust of what

15     he said.  Okay.  Well, I'll consider it and we'll make our

16     record in just a minute.

17             And what do you think of -- Mr. Scott, what do you

18     think of the request by the government regarding punishment?

19             MR. SCOTT:  Well, Your Honor, it is the law that

20     punishment is not for the jury and it's for the Court.

21     Language for that is in almost all standard jury

22     instructions.

23             THE COURT:  Okay.  Well, I'm going to say

24     something about it because of yesterday's record.

25             MR. SCOTT:  I've not got a problem with that, Your

1    Honor.

2              THE COURT:  All right.  We'll reconvene in, like,

3    15 minutes and then you can argue.  We'll be in recess.

4              THE COURTROOM DEPUTY:  All rise.

5              (A brief recess was taken.)

6              THE COURTROOM DEPUTY:  All rise.

7              THE COURT:  Please be seated.  The record should

8    show we're proceeding in open court without the jury.

9              With regard to the record made earlier by counsel

10   for the government and the defense, the Court has added to

11   Instruction 9 and Instruction 10 the "temporal" request by

12   Mr. Scott unobjected to by Mr. Rank.

13             With respect to the Instruction No. 9 elements of

14   the offense, Mr. Scott is correct that the discussion by the

15   Court of Appeals is very brief.  It's one paragraph

16   entitled, "Was the jury properly instructed" at page 785.

17   Nonetheless, the Court is going to stick with the

18   instruction as I made it initially.  So the objection that

19   it doesn't comply with the law is overruled.

20             With regard to what I have added as 12, it expands

21   the original instruction on proof of intent or knowledge to

22   now add "knowingly."  I believe that's agreed to between the

23   parties.  I adopted -- there was a little difference between

24   Mr. Rank and Mr. Scott's; I took Mr. Rank's language.

25             As to Mr. Rank's request regarding the record that

```
1    has a comment by the defendant, or perhaps two comments or
2    more than that, about the punishment, I've added 15, which
3    will be read.  The way I do this is I read 15, let the
4    lawyers argue, and then I read duty to deliberate.  I've
5    added role of the Court as No. 15.  I didn't know what else
6    to call it.  So that's the record on the instruction.
7           One other thing that I had overlooked, earlier
8    there was some discussion -- I don't think it came up this
9    morning -- the government was concerned that the defense was
10   going to talk about lack of evidence and refer to the
11   quashing of the subpoena or the failure to have Judge Wright
12   appear.  I think that the record demonstrates, at least I
13   find, that Judge Wright is equally unavailable to both
14   parties, therefore, there should be no comment about the
15   government's failure to call Judge Wright.
16          So other than finding my law clerks, I don't know
17   what else we have to wait for.  Is there anything else that
18   I've overlooked?
19          MR. RANK:  Your Honor, the only thing I would ask
20   is that -- thank you very much for the addition of
21   Instruction 15.  I would ask that you include the sentence
22   that is from Model Instruction 3.12 at the end of that,
23   which would be a sentence you are not to consider punishment
24   in any way in deciding whether the government has proved its
25   case beyond a reasonable doubt.  That's, again, the role of
```

1    the judge.  That's that sentence directly out of 3.12.  So

2    it's --

3              THE COURT:  So you want me to add what I have in

4    16 again back in 15?

5              MR. RANK:  Just that last sentence, Your Honor.

6    So everything about the Court's proposed Instruction 15 I

7    agree with.  I would just ask that the Court also include

8    that last sentence that's included in 3.12, which instructs

9    not only is it the role of the Court, but also tells them

10   that they can't consider it as part of determining whether

11   the government has proved its case beyond a reasonable

12   doubt.

13             MR. SCOTT:  Your Honor, if you felt you correctly

14   used those words in your Instruction 16 --

15             THE COURT:  Yeah, I'm just going to leave it just

16   the way it is.  I will leave the role of the Court 15, the

17   way I have it, and then I will read the way I have 16.

18             MR. RANK:  Thank you, Your Honor.

19             THE COURT:  Do you want to get the jury.

20             My understanding of your Rule 39 is that you both

21   have an hour.  Is that right?

22             MR. SCOTT:  Yes, Your Honor.

23             Your Honor, I'm sorry, before we bring the jury in

24   in a second, at the close of all of the evidence are you

25   going to rest in front of the -- did you rest in front of

1    the jury at the end of the day?

2         MR. RANK:  We rested in front of the jury in our

3    case-in-chief.  I'm happy to rest on the record.  I don't

4    feel the need to rest on the record and say no rebuttal.  We

5    can do that off the record or outside the presence of the

6    jury.

7         MR. SCOTT:  With the government resting in

8    rebuttal, all of the evidence is in, we would renew our Rule

9    29 motions.

10        THE COURT:  Okay.  Thank you.  And the record

11   should show the Court has considered those taking the

12   evidence in the light most favorable to the government, as I

13   must, and the motions are overruled under Rule 29.

14        THE COURTROOM DEPUTY:  All rise for the jury.

15                     **IN OPEN COURT**

16                     **(JURY PRESENT)**

17        THE COURT:  Please be seated.

18        Good morning.  Ladies and gentlemen, here's the

19   way we're going to proceed this morning:  I'm going to read

20   you 16 instructions.  I'm going to read the first 15

21   instructions.  You'll be able to follow along, and you'll

22   have them in your jury room.  After I finish with the 15 of

23   the 16 instructions, you'll then hear final arguments, first

24   from one of the lawyers for the defendant -- you'll hear

25   from one of the lawyers for -- you'll hear from one of the

1    lawyers for the government.  You'll then hear from one of

2    the lawyers from the defense.  And then because, as you

3    know, the government has the burden of proof, they have a

4    rebuttal argument as well.  And then the case will be yours.

5            No judge should ever instruct a jury as to length

6    of deliberation.  That's entirely for you to determine.  So

7    once you get the case, it's yours.  You can deliberate as

8    long as you want, and I'll be here.

9            In the United States District Court for the

10   District of Minnesota, Case No. 18-00090, United States of

11   America, Plaintiff, v. Robert Phillip Ivers, Defendant.

12   Final Jury Instructions.  Table of Contents.  The first page

13   has a table that you can go back to if you're discussing one

14   of the jury instructions.

15           Members of the jury, the Court now gives you the

16   following instructions:

17           **Instruction No. 1, Introduction**

18           Members of the jury, the instructions I gave you

19   at the beginning of the trial and during the trial remain in

20   effect.  I now give you some additional instructions.

21           You must, of course, continue to follow the

22   instructions I gave you earlier, as well as those I give you

23   now.  You must not single out some instructions and ignore

24   others, because all are important.  This is true even though

25   some of those I gave you at the beginning of and during the

1    trial are not repeated here.

2          The instructions I am about to give you now are in

3    writing and will be available to you in the jury room.  I

4    emphasize, however, that this does not mean they are more

5    important than my earlier instructions.  Again, all

6    instructions, whenever given and whether in writing or not,

7    must be followed.

8          **Instruction No. 2, Duty of the Jury**

9          It is your duty to find from the evidence what the

10   facts are.  You will then apply the law, as I give it to

11   you, to those facts.  You must follow my instructions on the

12   law, even if you thought the law was different or should be

13   different.

14         Do not allow sympathy or prejudice to influence

15   you.  The law demands of you a just verdict, unaffected by

16   anything except the evidence, your common sense, and the law

17   as I give it to you.

18         **Instruction No. 3, Evidence**

19         I have mentioned the word "evidence."  The

20   "evidence" in this case consists of the testimony of

21   witnesses, the documents and other things received as

22   exhibits, and the facts that have been stipulated -- that

23   is, formally agreed to by the parties.

24         You may use reason or common sense to draw

25   deductions or conclusions from facts which have been

1    established by the evidence in the case.

2            Certain things are not evidence.  I will list

3    those things again for you now:

4            1.  Statements, arguments, questions, and comments

5                by lawyers representing the parties in the

6                case are not evidence.

7            2.  Objections are not evidence.  Lawyers have a

8                right to object when they believe something is

9                improper.  You should not be influenced by the

10               objection.  If I sustained an objection to a

11               question, you must ignore the question and

12               must not try to guess what the answer might

13               have been.

14           3.  Testimony that I struck from the record, or

15               told you to disregard, is not evidence and

16               must not be considered.

17           4.  Anything you saw or heard about this case

18               outside the courtroom is not evidence.

19           Finally, if you were instructed that some evidence

20   was received for a limited purpose only, you must follow

21   that instruction.

22       **Instruction No. 4, Direct and Circumstantial Evidence**

23           There are two types of evidence from which a jury

24   may properly find a defendant guilty of an offense.  One is

25   direct evidence -- such as the testimony of an eyewitness.

1    The other is circumstantial evidence -- the proof of a chain

2    of circumstances pointing to the commission of the offense.

3          The law makes no distinction between direct and

4    circumstantial evidence.  You should give all evidence the

5    weight and value you believe it is entitled to receive.  The

6    law simply requires that, before convicting a defendant, the

7    jury must be satisfied of a defendant's guilt beyond a

8    reasonable doubt from all of the evidence in the case.

9         **Instruction No. 5, Jury's Recollection Controls**

10         If any reference by the Court or by counsel to

11   matters of testimony or exhibits does not coincide with your

12   own recollection of that evidence, it is your recollection

13   which should control during your deliberations and not the

14   statements of the Court or counsel.

15         You are the sole judges of the evidence received

16   in the case.

17        **Instruction No. 6, Credibility of Witnesses**

18         In deciding what the facts are, you may have to

19   decide what testimony you believe and what testimony you do

20   not believe.  You may believe all of what a witness said,

21   only part of it, or none of it.

22         In deciding what testimony to believe, consider

23   the witness's intelligence, the opportunity the witness had

24   to have seen or heard the things testified about, the

25   witness's memory, any motives that witness may have for

1    testifying a certain way, the manner of the witness while

2    testifying, whether that witness said something different at

3    an earlier time, the general reasonableness of the

4    testimony, and the extent to which the testimony is

5    consistent with any evidence that you believe.

6         In deciding whether or not to believe a witness,

7    keep in mind that people sometimes hear or see things

8    differently and sometimes forget things.  You need to

9    consider therefore whether a contradiction is an innocent

10   misrecollection or lapse of memory or an intentional

11   falsehood, and that may depend on whether it has to do with

12   an important fact or only a small detail.

13        After making your own judgment or assessment

14   concerning the believability of a witness, you can then

15   attach such importance or weight to that testimony that you

16   feel it deserves.

17        You should judge the testimony of the defendant in

18   the same manner as you judge the testimony of any other

19   witness.

20        **Instruction No. 7, Impeachment of a Witness**

21        The testimony of a witness may be discredited or,

22   as we sometimes say, impeached by showing that he or she

23   previously made statements which are different than or

24   inconsistent with his or her testimony here in court.  The

25   earlier inconsistent or contradictory statements are

1       admissible only to discredit or impeach the credibility of

2       the witness and not to establish the truth of these earlier

3       statements, made somewhere other than here during the trial.

4       It is the province of you, the jury, to determine the

5       credibility, if any, to be given the testimony of a witness

6       who has made prior inconsistent or contradictory statements.

7               If a person is shown to have knowingly testified

8       falsely concerning any important or material matter, you

9       obviously have a right to distrust the testimony of such an

10      individual concerning other matters.  You may reject all of

11      the testimony of that witness or give it such weight or

12      credibility as you may think it deserves.

13                     **Instruction No. 8, Indictment**

14              The indictment in this case charges the defendant

15      with two different crimes.

16              The defendant has pleaded not guilty to each of

17      these charges.

18              The indictment is simply the document that

19      formally charges the defendant with the crime for which he

20      is on trial.  The indictment is not evidence.  At the

21      beginning of the trial, I instructed you that you must

22      presume the defendant to be innocent.  Thus, the defendant

23      began the trial with a clean slate, with no evidence against

24      him.  The defendant is not on trial for any act or any

25      conduct not specifically charged by the indictment.

1          The presumption of innocence alone is sufficient

2     to find the defendant not guilty of each count.  This

3     presumption can be overcome as to each charge only if the

4     government proved during the trial, beyond a reasonable

5     doubt, each element of that charge.

6          Keep in mind that each count charges a separate

7     crime.  You must consider each count separately, and return

8     a separate verdict for each count.  The fact that you may

9     find the defendant guilty or not guilty as to one of the

10    offenses charged should not control your verdict as to the

11    other offense charged.

12         There is no burden upon a defendant to prove that

13    he is innocent.  Instead, the burden of proof remains on the

14    government throughout the trial.

15    **Instruction No. 9, Elements of the Offense - Count One**

16         The crime of threatening to murder a United States

17    judge, as charged in Count One of the indictment, has two

18    essential elements, which are:

19         *One*, on or about February 27, 2018, the defendant

20    made a threat to murder a United States judge;

21         *Two*, the defendant did so with the intent to

22    retaliate against such Judge on account of the performance

23    of the Judge's official duties.

24         A threat for the purpose of Count One is a

25    communication that a reasonable recipient, who is familiar

1    with the context of the communication, would interpret as a

2    threat of injury.  A statement may qualify as a threat even

3    if the defendant did not intend to carry out the threat, did

4    not have the ability to carry out the threat, did not

5    subjectively intend for the recipient to understand the

6    communication as a threat, and even if the defendant

7    communicated the threat to someone other than the intended

8    victim.

9         If all of the elements for threatening to murder a

10   United States judge, as charged in Count One, have been

11   proved beyond a reasonable doubt, then you must find the

12   defendant guilty of the crime charged in that count,

13   otherwise, you must find the defendant not guilty.

14   **Instruction No. 10, Elements of the Offense - Count Two**

15        The crime of Interstate Transmission of a Threat to

16   Injure the Person of Another, as charged in Count Two of the

17   indictment, has three elements, which are:

18        *One*, on or about February 27, 2018, the Defendant

19   knowingly sent a communication containing a threat to injure

20   another person,

21        *Two*, the communication was sent in interstate

22   commerce, and

23        *Three*, the defendant sent the communication for

24   the purpose of issuing a threat or with knowledge that the

25   communication would be viewed as a threat.

1          If all of these elements of Interstate

2     Transportation of a Threat to Injure a Person of Another, as

3     charged in Count Two, have been proved beyond a reasonable

4     doubt, then you must find the defendant guilty of the crime

5     charged in that count; otherwise, you must find the

6     defendant not guilty of the crime charged in that count.

7          In determining whether the defendant's

8     communication was sent for the purpose of issuing a threat

9     or with knowledge that the communication would be viewed as

10    a threat, you may consider all the circumstances surrounding

11    the making of the communication.  For example, you may

12    consider the language, specificity, and frequency of the

13    threat; the context in which the threat was made; the

14    relationship between the defendant and the threat recipient;

15    the recipient's response; any previous threats made by the

16    defendant; and whether you believe the person making the

17    threat was serious, as distinguished from mere idle or

18    careless talk, exaggeration, or something said in a joking

19    manner.

20         You may draw inferences from the defendant's

21    subjective intent by considering how a reasonable person

22    would understand the defendant's communication.  Inferences

23    are simply deductions or conclusions which reason and common

24    sense lead the jury to draw from the evidence received in

25    the case.  Circumstantial evidence is sufficient to prove

1    the defendant's mental state, direct evidence is not

2    required.  An expression of an intent to injure in the past

3    may be circumstantial evidence of an intent to injure in the

4    present or future.

5         A statement may qualify as a threat even if the

6    defendant did not intend to carry out the threat, or did not

7    have the ability to carry out the threat, and even if the

8    defendant communicated the threat to someone other than the

9    intended victim.

10        To send a communication in "interstate commerce"

11   means to send it from a place in one state to a place in

12   another state.  The communication containing the threat can

13   be handwritten, typed, oral, telephonic, email, text

14   message, or any other form of electronic communication.

15               **Instruction No. 11, On Or About**

16        The instruction charges that the offenses alleged

17   in each count were committed "on or about" a certain date.

18   Although it is necessary for the government to prove beyond

19   a reasonable doubt the offense was committed on a date

20   reasonably near the date alleged in each count of the

21   indictment, it is not necessary for the government to prove

22   that the offense was committed precisely on the date

23   charged.

24        **Instruction No. 12, Proof of Intent Or Knowledge;**

25                  **"Knowingly" Defined**

1          Intent or knowledge may be proved like anything

2     else.  You may consider any statements made and acts done by

3     a defendant, and all the facts and circumstances in evidence

4     which may aid in a determination of the defendant's

5     knowledge or intent.

6          You may, but are not required to, infer that a

7     person intends the natural and probable consequences of acts

8     knowingly done or knowingly omitted.

9          An act is done knowingly if the defendant is aware

10    of the act and does not act through ignorance, mistake, or

11    accident.  You may consider evidence of the defendant's

12    words, acts, or omissions, along with all the other

13    evidence, in deciding whether the defendant acted knowingly.

14    **Instruction No. 13, Prior Acts By the Defendant**

15         You have heard evidence that the defendant engaged

16    in communications related to judges other than the judge the

17    indictment references in this case.  You may consider this

18    evidence only if you unanimously find it is more likely true

19    than not true.  You decide that by considering all of the

20    evidence and deciding what evidence is more believable.

21    This is a lower standard than proof beyond a reasonable

22    doubt.

23         If you find this evidence has been proved, you may

24    then consider it to help you decide the defendant's intent,

25    knowledge, and absence of mistake.  You should give it the

1   weight and value you believe it is entitled to receive.  If

2   you find that this evidence has not been proved, you must

3   disregard it.

4         Remember, even if you find that the defendant may

5   have committed similar acts in the past, this is not

6   evidence that he committed such an act in this case.  You

7   may not convict a person because you believe he may have

8   committed similar acts in the past.  The defendant is on

9   trial only for the crimes charged, and you may consider the

10  evidence of prior acts only on the issue stated above.

11            **Instruction No. 14, Reasonable Doubt**

12        The prosecution must prove each and every essential

13  element of an offense "beyond a reasonable doubt" for you to

14  find the defendant guilty of that offense.  If the

15  prosecution fails to prove any essential element of an

16  offense against the defendant beyond a reasonable doubt,

17  then you must find the defendant not guilty of that offense.

18        A reasonable doubt may arise from the evidence

19  produced by either the prosecution or the defense, keeping

20  in mind that a defendant never has the burden or duty of

21  calling any witnesses or producing any evidence.  A

22  reasonable doubt is a doubt based upon reason and common

23  sense, and not doubt based on speculation.  A reasonable

24  doubt is the kind of doubt that would make a reasonable

25  person hesitate to act.  Proof beyond a reasonable doubt,

1    therefore, must be proof of such a convincing character that

2    a reasonable person would not hesitate to rely and act upon

3    that proof in life's most important decisions.  However,

4    proof beyond a reasonable doubt does not mean proof beyond

5    all possible doubt.

6                  **Instruction No. 15, Role of the Court**

7                  During his testimony, the defendant stated that he

8    was facing fifteen years in prison.  You are instructed that

9    if the defendant is found guilty, the sentence to be imposed

10   is my responsibility.  Consequently, if convicted, the

11   decision whether to impose a sentence that includes a term

12   of confinement is solely up to the Court.

13                  Ladies and gentlemen, we've been sitting about 15

14   or 20 minutes.  You want to stand and stretch and then we'll

15   hear from the government in their summation.

16                  (Stretch break.)

17                  MS. ALLYN:  Thank you, Your Honor.

18                  You don't know the 50 different ways I plan to

19   kill her.  Now think for a moment.  If you are Lora

20   Friedemann and Anne Rondoni Tavernier and you heard that

21   from this defendant, but even louder, it's part of an angry

22   rant about a specific judge, who is swearing in a barely

23   controlled rage.  On February 27th, 2018, when this

24   defendant raged, You don't know the 50 different ways I plan

25   to kill her, he had been seething in anger and hatred

1    towards Judge Wright for over a year.  You saw for

2    yourselves yesterday that this defendant still hates Judge

3    Wright.  And just like how --

4            THE COURTROOM DEPUTY:  Counsel, could you turn the

5    microphone towards you.

6            MS. ALLYN:  And just like how this anger erupted

7    in the courtroom yesterday, that is how that anger escalated

8    and erupted in the phone call on February 27th, 2018.  This

9    defendant knows he's making a threat and he doesn't care.

10   Remember how he testified yesterday?  He knows he's scaring

11   people.  And what did he say?  Fuck 'em.

12           Now, Judge Pratt just read to you some jury

13   instructions, and I'm going to walk through some of these

14   elements and jury instructions -- and these will be the same

15   jury instructions you'll have back in the room with you --

16   but just to walk through and see how all the evidence proves

17   beyond a reasonable doubt that this defendant is guilty of

18   both counts.

19           Starting with Count One, the elements.  The crime

20   of threatening to murder a United States judge, as Judge

21   Pratt has read, one, the defendant made a threat to murder a

22   United States judge.  You have all the evidence that Judge

23   Wright is a United States judge for the District of

24   Minnesota.

25           Two, the defendant did so with the intent to

1    retaliate against such Judge on account of the performance

2    of the Judge's official duties.

3          You know, this wasn't a very long trial.  It was

4    only two days.  And you heard over and over and over again

5    how this defendant was mad and retaliating for what Judge

6    Wright did in his civil lawsuit.  She denied him a jury

7    trial.  Exhibit 21 that you will have in the jury room with

8    you, Judge Wright's Order, Judge Wright's Order denying him

9    the payment on those insurance applications of 100,000, she

10   did this in her official duties.  And he clearly is

11   retaliating against her.  His anger and threats are about

12   this.  I won't replay for you over and over again how many

13   times he said this Judge screwed me out of my money, she

14   stole my life, but that is his motive and your proof for his

15   retaliation that what he is reacting to, what is he

16   responding to when he threatens Judge Wright.

17         Now, the issue to talk about, the evidence to

18   focus on that you have, is that this is a threat.  And for

19   Count One the instructions give you some things to

20   understand that a threat for the purpose of Count One is a

21   communication that a reasonable recipient who's familiar

22   with the context of the communication would interpret as a

23   threat.  I'm going to go back to that in just a minute, but

24   I also think it's important to point out what is not a

25   threat as these instructions tell you.

1           A statement may qualify as a threat even if the

2     defendant did not intend to carry it out or did not have the

3     ability to carry out that threat.  Seemed like maybe the

4     trial defense was trying to make a point that defendant

5     doesn't even have a car and couldn't even have gotten to

6     Minnesota.  Well, first off, that doesn't matter now you see

7     in these instructions.  And, second of all, he was doing

8     everything to get a car and was getting money and did get a

9     car.

10          What else?  The threat, even if the defendant

11    communicated the threat to someone other than the intended

12    victim.  So a couple things there.  First off, Lora

13    Friedemann and Anne Rondoni Tavernier, they are victims of

14    having heard this threat.  We're going to talk about that in

15    a minute.  But even if the victim's intended target is Judge

16    Wright, this is still a threat under the law when it's made

17    to those two lawyers, not just has to be made to Judge

18    Wright.

19          So let's go back, though, to how this is a threat,

20    it's communication that a reasonable recipient who's

21    familiar with the context would interpret it as a threat of

22    injury.  The reasonable recipient, Anne Rondoni Tavernier

23    and Lora Friedemann.  Let's look at the context of this

24    threat and their response as a reasonable recipient.

25          Context:  This defendant was simply to be

1      receiving a preliminary legal consultation on a federal

2      lawsuit.  This defendant is talking to two attorneys he has

3      never met before.  He does know that they're private law

4      firm attorneys who practice in federal court.  He

5      understands that federal court is a serious place where

6      judges are to be respected.  So this is not the defendant

7      talking to some friend in a bar.  No.  He is talking to two

8      people who are part of the justice system and he knows that.

9              The conversation starts calmly enough, but then

10     this defendant gets an answer that he does not like.  And

11     what does this defendant do when he gets an answer he does

12     not like?  He threatens.  And both attorneys, Lora

13     Friedemann and Anne Rondoni Tavernier, told you that once

14     they told him his civil lawsuit was not going to be viable,

15     he switched to talking about Judge Wright and the previous

16     lawsuit, and it's as if a switch flipped.  Now he is

17     yelling, he is swearing, he's talking about throwing chairs.

18     And Lora Friedemann told you she has never experienced this

19     kind of yelling before.  His voice changed.  He is getting

20     very angry, they said, saying the Judge stacked the deck

21     against him, the fucking Judge stole my life.  They describe

22     how the anger escalates.  The anger is focused, and it is

23     focused on Judge Wright.  He's getting louder.  He's talking

24     faster.  He's getting to barely controlled rage.  And then

25     Lora Friedemann says he's very clearly angry, he's out of

1    control when he says -- when he yells, You don't know the 50

2    different ways I plan to kill her.  And how do they respond

3    to hearing that threat, that level of anger, and that kind

4    of language?  They took it as a threat.

5           Lora Friedemann is an attorney for, you know, over

6    20 years.  She testified that she's heard a lot.  But when

7    she heard this, she and her young associate, they locked

8    eyes.  They had a "holy shit" moment that you could almost

9    just picture because they are stunned.  They are shocked.

10   They describe their feelings of hearing this threat very

11   scary, distressing.  Lora Friedemann testified that she was

12   frightened and scared for Judge Wright.  They had an

13   emotional reaction.  Their heart rate is speeding up.  They

14   needed to calm down afterwards.  They couldn't focus.  They

15   couldn't sleep.  They were concerned.  They were concerned

16   what if something happens to Judge Wright.  They were

17   concerned he would take action.

18          Anne Rondoni Tavernier testified about being

19   thankful that Lora Friedemann was there, thankful she could

20   take notes.  That was important.  She understood that even

21   then.  Thankful that she was not alone because she was

22   personally scared.  She testified about being glad it was

23   over the phone, being glad that this defendant was in a

24   different state, being glad even to have increased security

25   in her office building.  Anne Rondoni Tavernier testified

1    that she was concerned because he was clearly angry enough

2    and he was making threats.

3            Lora Friedemann even called this a "death threat."

4    They absolutely believed this was a present threat.  Anne

5    Rondoni Tavernier testified that defendant was still

6    believing that this Judge stole his life, still believing

7    the Judge stacked the deck against him.  Lora Friedemann

8    said because of his words, his tone, his demeanor that she

9    viewed it as a present threat.

10           You viewed both these women testifying in this

11   courtroom.  You saw how careful and measured their words

12   were.  You saw they had an emotional response even still in

13   testifying before you in this courtroom.  These are not

14   women that overreact.  They were careful in trying to

15   explain in detail what they witnessed, what they

16   experienced, and what they felt, because these were also

17   women that had to overcome a whole extra obstacle to even

18   report this threat.  And that's because if you understood,

19   as lawyers they have this ethical obligation of an

20   attorney-client confidentiality so that even if defendant is

21   getting a consultation, they had to check first, is it okay

22   for me to report this threat.  And Lora Friedemann told you

23   in her 23 years of experience she had never revealed a

24   confidence before, but that this time that's how serious it

25   was.

1           And Tiffany Sanders, remember her, she's from the

2      Pro Se panel -- or Project.  She was asked by Brett Kelley

3      about these exceptions, and she testified about Rule

4      1.6(b)(6) that a lawyer may reveal this information if the

5      lawyer reasonably believes the disclosure is necessary to

6      prevent reasonably certain death or substantial bodily harm.

7      That's an analysis these women had to make, and that is the

8      analysis they made and what they concluded, to report this

9      threat.

10          And look at everything that flowed from there once

11     it's reported.  Once Lora Friedemann gets the permission

12     from an ethics adviser to report it, she reports it right

13     away to Tiffany Sanders and they report it to another, Judge

14     Davis, who makes sure Judge Wright knows.  They report it to

15     the marshals.  The marshals begin investigating immediately.

16     They're interviewing Lora Friedemann.  They're trying to

17     find the defendant.  They finally find him in North Dakota.

18     They interview him to get comfort to see if maybe this is

19     nothing, and they are not confident.

20          You heard that March 14 recording when Deputy

21     Seyfried tried to talk to this defendant, that still present

22     rage and anger.  No recanting.  No contrition.  And so the

23     marshals have to continue to take it seriously to the point

24     that they are tracking his phone to make sure he's not

25     coming to Minnesota to hurt Judge Wright.  And, in fact,

1    there is a time that he is coming back into Minnesota they

2    have to mobilize, ready to charge and arrest him if they

3    need to.  He left before they needed to.  But that is how

4    seriously everybody took this threat.

5            So all of that, all that detail about the context

6    of the threat and how it was taken, demonstrates to you the

7    charges for Count One, but also for Count Two.  You are

8    going to be able to consider all that I just said with

9    respect to Count Two, but let's look at the elements and

10   some of the other elements for finding defendant guilty

11   beyond a reasonable doubt for Count Two.

12           I know the Judge just read this to you.  We're

13   going to talk about the threat and understanding the threat

14   part in a moment, but otherwise these elements containing a

15   threat to injure another person, again, think of everything

16   that we just talked about with respect to Lora Friedemann

17   and Anne Rondoni Tavernier's testimony.

18           But, okay, element two, the communication was sent

19   in interstate commerce.  It's pretty simple, right?  A phone

20   call.  These are a little bit like lawyer words to say what

21   interstate commerce is.  He is in North Dakota.  They are in

22   Minnesota.  He uses a phone to send that threat.  And you

23   have the stipulation, Government Exhibit 30.  It's as simple

24   as that.

25           Element three.  The defendant sent the

1    communication for the purpose of issuing a threat or with

2    knowledge that the communication would be viewed as a

3    threat.  I sort of broke this down to make it clear, it's

4    either/or or both.  For the purpose of issuing a threat or

5    with knowledge it would be viewed as a threat, now, these

6    jury instructions help you understand that, what that means,

7    what you can look at, and you will see that this is proved

8    beyond a reasonable doubt.

9            In determining whether the defendant's

10   communication was sent for the purpose of issuing a threat

11   or with knowledge that the communication would be viewed as

12   a threat, you may consider all the circumstances surrounding

13   the making of the communication; for example, the language,

14   specificity, and frequency of the threat; the context in

15   which the threat was made; the relationship between the

16   defendant and the threat recipient; the recipient's

17   responses.  This is everything that we just talked about.

18   The recipients are Lora Friedemann and Anne Rondoni

19   Tavernier.  You understand the context in which that threat

20   was made and all that demeanor and all that tone in which he

21   screamed and yelled in barely controlled rage when he made

22   that threat.  But also look at any previous threats made by

23   defendant.

24           Now, everything that happened on February 27th,

25   2018, that is enough to prove these charges beyond a

1    reasonable doubt, but you also do get to look at this bigger

2    picture, all the circumstances, including prior threats.

3              Defense counsel maybe made it sound like just look

4    at February 27th, just look at February 27th, but that's not

5    the case, what these instructions are saying you can do.

6    There were previous threats.  There is a previous history.

7              Let's look at some of those past threats.  For

8    example, defendant writing a letter:  I'm becoming a

9    dangerous man.  The defendant calling the clerk:  I'm a

10   walking bomb.  He made these prior threats.  And what's

11   interesting and important about that is what he does.  He

12   didn't like something he heard from Judge Wright.  She

13   denied the jury trial.  He sends a threat.  Denied his claim

14   for the insurance application, he calls and claims he's a

15   bomb, gives a threat.

16             But what's even more interesting and more

17   important for you to consider, what happens when he sends

18   these other threats?  He gets talked to by deputy marshals.

19   And why is that important?  This matters to you because he's

20   on notice now.  He has that knowledge.  He is told you say

21   these words, it's considered a threat.  And that's part of

22   what you're determining.  Did defendant know these

23   communications would be viewed as a threat?  If you are told

24   this many times by deputy U.S. marshals -- you have to have

25   extra marshals in a courtroom when you are having a trial

1   because of the words that you are saying; when he had that

2   January 2017 civil trial, you heard Deputy Hattervig

3   testify, extra marshals, gets talked to.  You clearly know

4   then the power of your words and that you are threatening.

5   So you certainly know by the time you use the word "kill" in

6   relation to a federal judge it's going to be viewed as a

7   threat.

8           Again, it wasn't a long trial.  Go back if you

9   want and listen to Exhibit 12, Exhibit 13, those prior

10  interviews that Deputy Hattervig had with this defendant

11  where he just tried every single way to warn the defendant,

12  to tell him you are crossing the line.

13          What is even better evidence that this defendant

14  knows that his words or what he said about Judge Wright was

15  a threat?  His own testimony, his own attitude, and his own

16  testimony from yesterday.  He does not care that he crosses

17  the line and that he crossed the line.  He admitted over and

18  over again you were warned, you were told your words are

19  threats and he said, I don't care.  He's glad that people

20  lose sleep.  He's glad that they are scared.  He admitted

21  that he was warned.  He was asked:  You wanted them to be

22  scared? And his response:  Fuck 'em.  So this defendant

23  knows that people are taking his words as threats.  You know

24  it to this extent and you still say a threat, like I plan to

25  kill a federal judge, you're intending it as a threat.

1          What does this attitude of defendant's testimony

2     also show you?  Last line here:  Whether you believe the

3     person making the statement was serious, as distinguished

4     from mere idle or careless talk, exaggeration, or something

5     said in a joking manner.  I mean, there has been nothing the

6     defendant has ever said for you to think that anything that

7     he is doing or that threat on February 27th, 2018 was idle,

8     careless.  You could feel it from his own testimony.  You

9     could feel that anger.  There's nothing joking about this.

10          Let's talk about his credibility in testifying.

11     This defendant testified before you yesterday and in direct

12     testimony he claimed to you that he never made even one of

13     the single threats or comments that the two lawyers

14     testified to you about.

15          Exhibit 15, you've seen it, the notes.  Defendant

16     complained why isn't this recorded?  How about you record

17     it?  Well, it is recorded.  It's recorded right there

18     verbatim in real-time.  You heard Lora Friedemann and Anne

19     Rondoni Tavernier testify.  You heard everything they had to

20     go through to report this threat, to come before you to

21     testify, how emotional they got on the stand.

22          So for you to believe that defendant did not say

23     the threat "You don't know the 50 different ways I planned

24     to kill her" as written down by Lora Friedemann, for you to

25     believe him means you have to think that those women lied,

1    that they lied on the stand, and that is not reasonable,

2    that Lora Friedemann would come in here, very careful

3    person, lie to you under oath, risk her career for this

4    defendant.

5             What is reasonable is that it's this defendant who

6    lied, claimed he didn't make that threat because he has a

7    motive to lie.  He knows this time he crossed the line.

8             Look even at how he testified when talking about

9    the March 14th interview with Deputy Seyfried after the

10   threat.  This defendant claimed he didn't make a threatening

11   statement, never made it.  But what was his reaction when

12   the deputy showed up at his door in North Dakota?

13   Immediate, complete anger.  He never even gave them a chance

14   to say why they were there, because he knew why they were

15   there.  He knew why they were there because he made that

16   threat.  And he knows now after everything he has been

17   warned that this threat -- he said the word "kill" -- this

18   threat crossed the line.

19            This defendant testified before you, sat there in

20   defiance thinking he can say anything he wants to and fuck

21   anyone who's scared by his words, but you cannot say

22   anything you want to.  Judge Pratt has instructed you

23   threats are crimes.  This was a threat.  And the fear it

24   caused is not okay.  These threats are not okay in a

25   civilized society.  You get to say horrible, disgusting

1      things even.  That's not against the law.  But a threat is

2      against the law.

3           When defendant said, You don't know the 50

4      different ways I plan to kill Judge Wright by screaming and

5      yelling with fury to those lawyers and all the fear that

6      that caused, the fear for Judge Wright, the fear for the

7      lawyers themselves, that crossed the line because under the

8      law we don't get to use words that cause people to fear

9      violence.  And all the disruption, all of the harm, all that

10      damage that that fear causes, you don't get to say fuck 'em

11      when you scare people with your words.

12           Defendant also testified in defiance:  Well, these

13      words are a threat?  Then arrest me.  Well, we did, and he's

14      charged here now before you.  And you have all the evidence

15      you need to find this defendant guilty beyond a reasonable

16      doubt of both counts.

17           Thank you.

18           THE COURT:  Mr. Kelley, you may proceed.

19           MR. KELLEY:  Thank you, Your Honor.  Good morning,

20      ladies and gentlemen.

21           The Judge gave you some instructions.  About 45

22      minutes ago he went through them.  I'm just going to

23      highlight a few of the major points, a few of some of the

24      constitutional guarantees this country affords criminal

25      defendants in this country.

1           The first one is a presumption of innocence.

2    Judge Pratt read to you what the presumption of innocence

3    is.  You must presume the defendant to be innocent.  The

4    defendant is not on trial for any act or any conduct that is

5    not specifically charged in the indictment.  When the Judge

6    read Counts One and Two to you, it said the defendant is

7    charged for whatever happened on or about February 27th,

8    2018.  He is not charged with anything that happened before

9    February 27th or after February 27th.  It is only what

10   happened on February 27th, 2018.  So that is what we are

11   dealing with here.

12           And the government must prove beyond a reasonable

13   doubt each and every element of Count One and Count Two.  So

14   when you are looking at Count One and you start picking

15   apart the words, it's kind of dense, if you think any of

16   those words in there has not been proved beyond a reasonable

17   doubt, then that element has not been proved up.  He is

18   innocent of that charge.  So I want you to carefully look at

19   each one of those counts and see were they proved beyond a

20   reasonable doubt.

21           Lastly, presumption of innocence guarantees that

22   the burden of proof remains on the government.  It is not on

23   Mr. Ivers.

24           Let's talk about a threat.  I think the word

25   "threat" was probably said 500 times during this trial.

1    Okay?  And the Judge instructed you that what these
2    witnesses testified to were not legal definitions of a
3    threat.  When they say "threat," that does not mean a crime
4    has been committed.  And you heard Deputy Seyfried, when I
5    was talking to him, say that they use "threat" as a term of
6    art.  It means that there has been an alleged threat and
7    they need to investigate it.  Deputy Seyfried said you have
8    to go out and check is it credible, does it have no bite.
9         So the fact all these witnesses were using
10   "threat" does not mean that a crime has been committed.  You
11   need to use your common sense and reason to determine
12   whether or not you think anything Mr. Ivers may have said
13   was a threat.  You are reasonable people.  The Judge said I
14   implore you to use your reason and common sense when you
15   deliberate.
16        So what is a threat?  What do reasonable people
17   think is a threat?  When you threaten somebody, it must be a
18   present or immediate intent to do something.  It must be I'm
19   going to punch you right now.  Okay?  Or it must be
20   something in the future.  Next week I'm going to punch my
21   boss in the face.  That is future intent.
22        What is not a threat?  Common sense, something
23   that happened in the past, past conduct, past statements,
24   completed acts.  Things that happen in the past do not
25   express the present intent to immediately do something or

1     future intent.  So, like I said, I punched him.  That is not

2     a threat.  It's a statement about something that happened in

3     the past.  I was going to punch him, again, talking about

4     something that happened in the past, not a threat.  I

5     thought about punching him, not a threat.  Thought about it,

6     that's in the past, does not express present or future

7     intent to do anything.  I had imagined punching him.  Again,

8     thoughts about something in the past, that is not a threat.

9     People say those things.  Common sense dictates that is not

10    a threat.

11         Reasonable doubt.  So the Judge read the

12    instruction and he asked you to apply reason and common

13    sense.  That's why I keep saying it.  Reasonable doubt is a

14    very dense subject, and what it really means is would a

15    reasonable person hesitate to act based on the evidence

16    before you.  And the government must produce proof of such

17    convincing character that a reasonable person would not

18    hesitate to rely and act upon that proof in life's most

19    important decisions, life's most important decisions.

20         So when you deliberate, I ask you to treat

21    Mr. Ivers' case like one of the most important decisions in

22    your life.  And if you would hesitate to act in that

23    decision, then you should find him not guilty.  That's what

24    the presumption of innocence is.  That's what the burden of

25    proof is.  That's what reasonable doubt is.

1          So we attorneys like to use hypotheticals,

2     analogies, things like that to explain dense subjects --

3     reasonable doubt, pretty dense.  I think we went over it.  I

4     think you all understand it.  But I tried to think of

5     something, some analogy that would apply to the facts here.

6     So I want you to imagine going to the doctor and getting an

7     X-ray of your head.  It shows a large brain tumor.

8     Radiologist takes a look at the X-ray, writes down "not

9     cancerous."  Tells the surgeon whatever the radiologist

10    says.  The surgeon hears "cancerous."  They sound kind of

11    similar.  Surgeon goes off of that, schedules surgery.

12    Brain surgery is very risky.  Everybody understands that.

13    It could be life-threatening.  You're going to be under the

14    knife for awhile.  X-ray is missing.  You must rely on the

15    radiologist's memory.

16          Radiologist now remembers that there was a very

17    large tumor, I remember seeing that on the X-ray, but I

18    can't really remember if it was cancerous or not cancerous.

19    I wrote down "not cancerous."  Would you rely on the

20    radiologist's memory in making an important decision about

21    whether to have brain surgery?  Do you hesitate to act?

22    Absolutely.  You get a second opinion.  You do not go under

23    the knife there.  You need to figure out what happened.

24          Here the government wants you to convict Mr. Ivers

25    based on the word of Ms. Friedemann and Ms. Rondoni

1   Tavernier.  Like the missing X-ray, we don't have a

2   recording.  It's unfortunate.  I'd love to play a recording

3   of that for you.  We don't have one.  So we have to rely on

4   their memory.  That's all we have, the memory of those two

5   witnesses and Mr. Ivers.  Their account of what was said on

6   February 27th is all we're dealing with here.

7           One phone call is what Mr. Scott told you at the

8   beginning of the case.  Three witnesses.  There is no

9   recording.  February 27th, 2018.  And really it boils down

10  to one sentence.  And what we've heard during this trial is

11  we don't know what was said.  Ms. Friedemann said it

12  could've been had imagined, he had imagined 50 different

13  ways to kill her.  Planned, we heard that a bunch of times.

14  Planned, heard her say that.  Imagined.  You heard

15  Ms. Rondoni Tavernier say thought of, planned again.  She

16  thinks maybe if Ms. Friedemann wrote down planned, it must

17  be planned; I'm not sure.  You heard Ms. Friedemann testify

18  again had imagined.  Ms. Rondoni Tavernier something like

19  thought of, that's what she said in August.  Planned.  Heard

20  them say plan occasionally.  I think I told Deputy Wooton

21  plan, can't remember.  It's difficult to discern the

22  difference between plan and planned.  Ms. Rondoni Tavernier

23  didn't take notes.  Look at how many different versions of

24  this important phrase that the government wants you to

25  convict Mr. Ivers on.  We don't know what was said.  But you

1        know what this shows?  Best guess of their memory, every

2        single one of these is past tense -- had imagined, he'd

3        imagined, planned.  Every single one of them is talking

4        about something that happened in the past.  None of them

5        expresses a present or future intent to do anything.  It's

6        not Mr. Ivers saying I'm planning to kill Judge Wright.  I

7        have a plan.  He's not saying that.  He's talking about the

8        Judge's decision from eight months prior in June of 2017.

9        He's talking about how that made him feel.  And to the best

10       of Ms. Rondoni Tavernier and Friedemann's recollection, this

11       is what they think he might have said.  We don't really

12       know.  Do you have doubts about what was said?  If you don't

13       doubt, they're all past tense.

14              Let's talk about the government's star witness,

15       Ms. Friedemann.  Two days ago and then yesterday in the

16       morning, you heard Mr. Rank examine Ms. Friedemann.  So this

17       is Mr. Rank questioning Ms. Friedemann.  Ms. Friedemann was

18       asked:  What were some of the things that Mr. Ivers said

19       during the call that you can recall?

20              Ms. Friedemann.  Highlighted.  And then the

21       concluding comment he made was that he had imagined 50

22       different ways he planned to kill her.  That's different

23       than a lot of the things you have heard her say -- had

24       imagined, planned, past tense.  But, again, it's not what

25       she wrote down in her notes exactly.  She doesn't really

1    remember.

2          Later she was asked and he said, You don't know

3    the 50 different ways I plan to kill her, present tense?

4    She said, Correct.  Conflicts with what she just testified

5    to.

6          Then, finally, she's asked, you know, did at some

7    point in time in that first call, did you tell her that the

8    threat -- so this is her talking about the threat again.

9    It's covered up.  What's important here is that Mr. Ivers --

10   she thinks Mr. Ivers said he'd imagined 50 different ways he

11   planned to kill Judge Wright.  Okay.  So, again, he'd

12   imagined, planned, past tense.  He's not expressing any

13   present plan to do anything.  He's not talking about a

14   future plan.  Please use your common sense when you are

15   looking at that.  This is what she testified to here.

16         Okay.  The next time -- or the previous time that

17   Ms. Friedemann was under oath was June 18, 2018, sitting

18   right here again.  What did she say then?  She was asked by

19   Ms. Allyn on direct examination -- again, this is not me

20   asking questions, this is the government -- what were the

21   threats?  He said he had imagined 50 ways to kill her, past

22   tense.  She doesn't say planned.  That's what she wrote down

23   in her notes.  She said, he had imagined.

24         Ms. Allyn asked did he say anything about a plan

25   to kill her?  That's present, future intent.  No.  No, he

1    didn't.

2              What did you tell the marshal?  I told the marshal

3    you don't know the 50 different ways I plan to kill her,

4    present tense.  Okay?  That's going to be important later

5    when we talk about how the investigation came together and

6    why Mr. Ivers was indicted in the first place.  She told the

7    marshals something else.

8              But what we have here is a bunch of conflicting

9    statements.  Almost all of them are past tense.  They're

10   statements about past thoughts, past conduct, stuff like

11   that.  The only time you hear one that is a present or

12   future intent is her mistaken comment to the marshals.

13             Then we have Ms. Friedemann's notes.  We've seen

14   those a bunch of times.  What did she write down?

15   "Planned."  She has testified under oath he had imagined,

16   had imagined, he had planned, a bunch of things.  This is

17   what she wrote down.  You heard her testify this is what I

18   wrote down verbatim, contemporaneously, "planned."  We'll

19   look at the notes again and talk about the context of all

20   the other statements all in past tense.  This is consistent

21   with those statements.  He's talking about how upset he was

22   months ago about rulings that happened in the past.  He is

23   not talking about a future plan or any present plan.

24             When you're deliberating and thinking about one of

25   life's most important decisions, would you rely on

1     Ms. Friedemann's memory and her testimony?  She just doesn't

2     know.  She has made some mistakes.  Most of the statements

3     she said are past tense.  She doesn't really know what she

4     said.  Would you hesitate to act?  Yes.

5          Okay.  Ms. Rondoni Tavernier.  During trial here,

6     she said Mr. Ivers said, You don't know the 50 different

7     ways I thought of killing her, again, past tense.  That's

8     what she remembers.  That's what she testified to, "thought

9     of."  That's not something he's presently thinking of doing.

10    That's not something he's planning on doing in the future.

11    The context of the conversation, "thought of" is something

12    he was angry about in the past, might still be angry, but

13    this statement, about the past.

14          Okay.  She also said it could've been planned.

15    She said, I trust Ms. Friedemann's notes.  If she said

16    planned, it must have been planned, past tense.  She also

17    said she didn't really recall.  She couldn't really

18    remember.

19          Earlier in August, she thought it was something

20    like thought of, again, past tense.  She also said she

21    couldn't really remember what he said.  It's five months

22    after the fact.  She didn't take notes.  What are we left

23    with?

24          July she sat down with Ms. Allyn and Deputy Trinh

25    and she told them it was plan.  Conflicting statement, it's

1    a long time after, and she doesn't really remember what was

2    said.  Would you rely on her memory?  Would you hesitate to

3    act based on her testimony?  Yes.

4          Okay.  Let's examine these notes.  So you have

5    seen them a bunch of times.  I went over the notes with the

6    witnesses, with Ms. Friedemann.  Kind of combative when

7    Ms. Friedemann and I were discussing this, but she agreed

8    that the verb tense on every single one of these is past

9    tense or is consistent, rather; so consistently past tense.

10          This fucking judge stole my life from me.  He's

11    talking about the Judge's decision which dismissed his

12    lawsuit.  That happened in the past.  I had overwhelming

13    evidence.  He's talking about the fact that he thought he

14    should have won the case.  He came to court, doesn't really

15    know what he's doing.  He thought he could win it.  Had

16    evidence, he is talking about something in the evidence.

17    The next comment:  The Judge stacked the deck to make sure I

18    lost the case.  He's talking about decisions Judge Wright

19    made and then he lost the case, again, in the past.  This is

20    providing context for everything that comes next.

21          Didn't read the fine print and missed the 30 days

22    to seek a new trial.  Common sense that's past tense.

23    Clearly happened in the past.  It's done.  Completed act.

24          Okay.  And she's lucky, I was going to throw some

25    chairs.  Do you remember me talking about this with one of

1    the witnesses?  He asked for a hearing on a motion for a new

2    trial.  He missed the deadline.  He screwed up.  He never

3    got that hearing.  So the fact that he might have thrown

4    some chairs at a hearing that never even happened, I'm not

5    even sure that's a statement about past conduct.  It's just

6    weird.  But it's about something that did not happen in the

7    past.

8            And then, finally, Ms. Friedemann writes down:

9    "You don't know the 50 different ways I planned to kill

10   her," "planned," past tense, consistent with everything else

11   he's talking about.  He is talking about things that

12   happened in the past.  He's not talking about what he is

13   planning to do now.  He's not talking about what's going to

14   happen in the future.  He's talking about stuff in the past,

15   and those are not threats.

16           There is no immediate intent in any of the

17   statements he made on February 27, 2018.  There's no future

18   intent.  There are no threats.

19           One of the other elements in Count One is that you

20   need to -- or the government, rather, needs to prove beyond

21   a reasonable doubt that Mr. Ivers intended whatever

22   statements he made to be retaliation against Judge Wright in

23   her official capacity.

24           So we know that attorneys and clients have

25   confidential conversations and the duty of confidentiality

1       applies to those.  I'll talk about the exception and other

2       things that the government just covered in a minute.  But

3       this duty of confidentiality is like the doctor-patient

4       privilege.  You go to see your doctor, you don't expect the

5       doctor to disclose what you tell them.  There might be some

6       exception that allows them to say, you know what, he was

7       suicidal, I've got to tell the authorities.  But you still

8       expect them to keep that information confidential.  That is

9       a reasonable thing for a client to expect.  Same thing with

10      priest-penitent.  You go to see your minister.  You say

11      something to them in confidence.  You'd expect them to keep

12      that confidential.

13              And you heard Tiffany Sanders and Ms. Rondoni

14      Tavernier testify that, yes, this would have applied to the

15      conversation with Mr. Ivers.  Okay?  So then he would have

16      reasonably expected, as a prospective client, like any other

17      person, that my attorney is not going to disclose anything I

18      say.

19              So that's the general rule:  Attorneys may not

20      reveal information.  Okay?  If an exception applied, which

21      is a whole different question, there's not room for

22      improvement here, but if an exception applied, Mr. Ivers

23      wouldn't know about that.  Lay people don't know there are

24      exceptions and what they are.  He goes under the general

25      rule that average people know:  Reasonable people expect

 1    that their attorneys will keep information you say to them

 2    confidential.  So why is that important?  So whatever was

 3    said to Ms. Friedemann and Ms. Rondoni Tavernier, Mr. Ivers

 4    would expect, like any of us, that they wouldn't disclose

 5    that.  The fact that Ms. Friedemann went to her attorney,

 6    they spent 24 hours talking about it and said, you know

 7    what, we may -- we are permitted to disclose this we think,

 8    we are not required to, we can, Mr. Ivers would have no idea

 9    about that.  He expected that they would keep that

10    information confidential.  That's important because what he

11    said to them should have stayed in that conversation.  He

12    never expected it to go outside.  He didn't expect it to

13    ever reach Judge Wright.  He didn't tell them to disclose

14    that information.  That was very clear.  I asked Ms. Rondoni

15    Tavernier and Friedemann did he say tell anybody else?  No.

16    He expected it to stay in that conversation.

17              There was no threat.  We went over that.  There

18    was also no intent to retaliate.  He never meant that

19    statement to leave that room metaphorically.  I suppose he

20    is in North Dakota.  They're in Minneapolis.  But he never

21    expected those statements to leave that phone call.

22              One of the elephants in the room is Mr. Ivers is

23    not a likeable guy.  I'm sure many of you don't like him.

24    Some probably have pretty strong feelings about him.  He

25    says awful things, offensive things, very vulgar things,

1     racist things.  It's hard to like him.  He yells.  He

2     screams.  He gets angry.  You heard the audio.  You heard

3     him in court yesterday.  None of that is illegal.  Those are

4     not crimes.  His character is not on trial.

5            What we're here to determine is whether or not one

6     sentence that he said on February 27th, 2018 carried a plan

7     to commit a crime immediately or something in the future.

8     It's not what was said.  He's not on trial.

9            So you may not like him.  You may want to take him

10    off the streets like the government wants you to, but that's

11    not why he's on trial.  That is not your job.  And you

12    cannot convict him just because you don't like him.

13           So the instructions also tell you you can consider

14    the context of what was said, what was happening.  All

15    right?  We were here for several days.  The government spent

16    most of the time talking about what didn't happen on

17    February 27th.

18           So I'm going to quickly breeze through the first

19    lawsuit because I know we've gone over that.  I feel like we

20    were going through a civil trial.  But it was filed March of

21    2015.  Gets removed to federal court.

22           October 14, 2016, Judge Wright issues this

23    text-only order you saw saying, Mr. Ivers, you missed the

24    deadline to demand a jury trial.  Even though I have the

25    power to grant you a jury trial, I'm denying it.

1           October 31st, 2016, Mr. Ivers sends a letter to

2     Judge Wright who received it a few days later.  He says, I

3     demand an immediate trial.  He wanted a jury trial.  I am in

4     dire fucking straits.  He was broke.  You heard it.  He was

5     living out of his truck, and that's true.  I am becoming a

6     dangerous person.  Based largely on that last statement,

7     Deputy Hattervig has to investigate.  That's reasonable.

8     That's his job.  He's doing his job.  So he goes to

9     investigate that.

10          So this is January 4th, 2017.  Deputy Hattervig

11    comes to this courthouse, meets Mr. Ivers at security, and

12    he spends about 40 minutes with him.  And his purpose for

13    being there was really to determine whether or not Mr. Ivers

14    was serious, whether or not the comment "I'm becoming a

15    dangerous person" meant he was actually a threat.  And he

16    asked him point blank, you know, when we get stuff like that

17    and we hear I'm becoming a dangerous person, I'm in dire

18    fucking straits, we need to investigate that.  That's fine.

19    But you didn't mean anything like that, did you?  Mr. Ivers

20    responds to Deputy Hattervig:  No.

21          And in his report, which there's no reason for

22    Deputy Hattervig to say anything that isn't the truth in his

23    report -- Mr. Ivers isn't going to see it, writes it for the

24    marshals -- writes Mr. Ivers was polite and cooperative.  He

25    testified to that.  So this is January 4th.

1    We also heard Deputy Hattervig go through the

2    testimony -- or, rather, not the testimony, the actual

3    hearing or recording from January 4th and they talked a lot

4    about Mr. Ivers processing his emotions.  These guys dragged

5    me through the coals.  He's talking about the case.  The

6    lawsuit has been dragged on for several years.  That's what

7    he's talking about.  Okay.

8    Then at the bottom you hear Mr. Ivers tell Deputy

9    Hattervig:  The only reason why I'm sane and not in a mental

10    institution is because I vented.  Deputy Hattervig:  Yes.

11    He understood he was just venting.  Okay.

12    So what happens after January 4th?  They keep the

13    investigation open.  No threats made there.  He's not

14    charged for anything that happened there.

15    Okay.  Deputy Hattervig tries to offer Mr. Ivers

16    his card.  Hey, here's my phone number.  Mr. Ivers:  I'm not

17    sure why I would need it.  Because Deputy Hattervig

18    understood kind of what was going on in Bob Ivers' head.  He

19    says, If you don't want to internalize stuff and you need to

20    get it out, it's better if you call me.  The upside of

21    venting to me is it doesn't bother me if you yell at me.

22    It's not a crime.  But Deputy Hattervig understood him.  He

23    vents when he's processing his emotions.

24    Okay.  January 9th and 10th, that's the trial.

25    Deputy Hattervig sits through the entire thing, describes

1    Mr. Ivers' behavior as mildly inappropriate, says that he

2    maintained friendly rapport, he was cooperative.  Mr. Ivers

3    reiterated that he was just venting.  He said those words to

4    Deputy Hattervig, and that's what you heard him testify to,

5    again, just venting.  He understood him.

6              So let's jump to the trial.  It happens in front

7    of Judge Wright.  It's a bench trial.  The Order comes out

8    six months later, dismisses Mr. Ivers' case.

9              A couple months later, that's when Mr. Ivers sends

10   some letters to the court, and we saw those.  Okay?  He asks

11   -- you saw them.  There is a lot of stuff going on in

12   there -- highlighting, red underlining, writing on the side.

13   He is annotating all these court documents.  He wants Judge

14   Tunheim, some of the other judges, Judge Thorson, he wants

15   them to overrule Judge Wright.  He thinks she was wrong.  He

16   writes "pay attention" in red marker on one of the

17   envelopes, and then he is underlining those things in the

18   document in red because he wants them to pay attention to

19   it.  He's not an attorney.  He doesn't operate a computer.

20   This is how he does things.  He writes:  Judge Wright is a

21   corrupt judge.  It's not illegal.  It's very disrespectful.

22   It's not illegal.  He says, I'm going to contact the

23   Attorney General.  I'm not sure if he did.  I don't think we

24   heard that testimony.  But nothing illegal about that.  He

25   is not charged for anything in those letters.

1              At the same time he calls Heather Arent-Zachary.

2    That is Judge Tunheim, the Chief Judge's Clerk.  She was one

3    of the first witnesses in the trial.  And this is when he

4    says, you know, he is talking about a motion for a new trial

5    in a hearing and overruling Judge Wright's Order.  He says,

6    I'm a walking bomb, something like that.  Right?  That could

7    be alarming.  What did Heather Arent-Zachary say?  The Clerk

8    said -- this is an email to Judge Wright's Clerk:  Just

9    returned a call to Bob Ivers and he described himself as a

10   walking bomb, said he's crazy angry and doesn't know how to

11   deal about it, processing his emotions, very upset with

12   Judge Wright's rulings in his case.  He didn't make any

13   direct threats to anyone, but I thought I would pass on my

14   conversation.  She didn't even consider them direct threats

15   when she passed on this email.  But she did tell the

16   marshals, and it is their job to investigate things like

17   that.  It's reasonable.  It's her job.

18             So based on that statement, this phone call to

19   Heather Arent-Zachary, Judge Tunheim's Clerk, Deputy

20   Hattervig and Deputy Wooton go to visit Bob Ivers in

21   Minnetonka.  We heard that testimony.  You heard the

22   recording from September 1st.  The purpose was to

23   investigate the "walking bomb" comment and determine whether

24   or not he was serious about that -- it's a reasonable thing

25   to do -- and to tell him, tell Bob Ivers, stop the

1    correspondence with the court, stop sending these letters to

2    the Court, stop calling people.  You heard Deputy Hattervig

3    testify that was one of their goals.

4            You also heard Deputy Hattervig again talking to

5    Bob Ivers about venting.  Mr. Ivers:  I have to process it.

6    I have to process it.  Again, he's talking about his

7    emotions, how he deals with things.  He's a complicated guy.

8    Mr. Ivers, toward the end of the recording, characterizing

9    the letters that he wrote to Judge Tunheim and Judge

10   Thorson:  I wrote the Chief Judge a letter, which helped me

11   vent --

12           Mr. Wooton:  Yeah.

13           -- by telling the Chief Judge I'm hurt.

14   Processing his emotions, not a crime, and he is not charged

15   with it.

16           Deputy Hattervig says to him:  It's fine to be

17   hot, but you can't hurt anybody.  That was one of their

18   goals in going out there.  Are you serious?  Are you going

19   to hurt somebody?  What did Mr. Ivers say back to them?  I

20   never -- I'm not going to hurt anybody.  He's not charged

21   with anything that happened on September 1st.  And we know

22   that he stopped all correspondence with the court after

23   September 1st.  The deputies achieved their goal.  You heard

24   that from Ms. Bender, Judge Wright's Clerk.  I asked her:

25   Did he send any more mail?  Did he send any emails?  Did he

1    make any calls to Judge Wright's chambers?  No, nothing

2    after September 1st.  You heard that from Judge Tunheim's

3    Clerk:  Nothing, correspondence stopped.  You heard that

4    from Deputy Hattervig; he confirmed it.  You heard that from

5    Deputy Wooton.  They all confirmed no correspondence after

6    the end of August, after they visited him on September 1st

7    and said stop it, he didn't.  You know what, he didn't

8    apologize.  He wasn't apologetic, and that bothered them a

9    lit bit.  Investigation continued.  Right?  He's not charged

10    with anything.

11           Okay.  So we skip to November 2017.  Mr. Ivers

12    files his second lawsuit assigned to Magistrate Schultz.

13    You heard that confusing thing.  Why they assign Judge

14    Schiltz with Magistrate Schultz, I don't know.

15           December 2017, Mr. Ivers moves in with his sister,

16    Janet, because he's broke.  He has nowhere to live.  It's in

17    West Fargo four hours from here, four and a half according

18    to Deputy Wooton.  And life is good for the first time in a

19    very long time.  He's got a roof over his head.  He has a

20    warm bed.  He has hot food.  Army guy, those things are

21    important.  He's got a daily routine.  He gets up in the

22    morning.  He sleeps in, we heard that, pretty late, I guess.

23    He sleeps in.  He reads the paper front to back, watches the

24    news a lot, a lot of cable news.  And then he works on his

25    Pepsi project.  Okay?  I mean, whatever you think of his

1       Pepsi project, this is consuming his time.  He's drawing up

2       posters.  He has this plan for a new can he wants to launch

3       with Pepsi.  He wants to talk to them about it.  He actually

4       bought stock in Pepsi.  You heard that from his sister.

5       They went out and bought it.  They were planning on going to

6       the shareholders' meeting and meeting with Pepsi so Bob

7       could tell them his thoughts, show them the posters, the

8       things he is spending his time on while he was with his

9       sister.

10              He's not talking about the insurance case.  There

11      might have been periods where Janet had to go to work, but

12      they are not talking about it.  They keep things private.

13      If this is so important, as the government claims it is

14      consuming his time and thoughts, don't you think he would

15      have talked about how angry he was at this case at some

16      point?  He doesn't.  And he doesn't talk about Judge Wright.

17      He's not sending any correspondence to the court.  He's not

18      calling.  He's living with his sister in West Fargo.  Things

19      are good.

20              February 2018, okay, this is when the case gets

21      assigned -- the second lawsuit gets assigned to the Pro Se

22      Project.  Tiffany Sanders emails Ms. Rondoni Tavernier:

23      Would you take Mr. Ivers' case?  Mr. Ivers didn't ask for

24      this, but it happens.  They agree to consult with him.

25              February 27th, 2018, the only day that really

1    matters for this case.  This is the only thing he is charged

2    with, is what was said on February 27th, 2018 during a short

3    phone call, 30 minutes.

4            Ms. Rondoni Tavernier, Ms. Friedemann call

5    Mr. Ivers and they deliver the bad news.  You heard it,

6    res judicata, very dense legal term we were talking about

7    yesterday.  Hard to understand.  Basically means if you

8    brought a lawsuit once, you cannot bring a second lawsuit

9    based on the exact same facts and circumstances.  That's

10   what he had done.  They told him you're going to lose.  Then

11   Ms. Rondoni Tavernier testified that the conversation

12   organically shifted to the first case with Judge Wright.

13           So Mr. Ivers had been living with his sister.

14   He's not thinking about the case.  He's not talking about

15   Judge Wright.  But it comes up in this conversation.  That

16   upsets him, re-opens an old wound.  You heard Ms. Rondoni

17   Tavernier say that he started discussing Mr. Tallman, his

18   friend that had died, that he believed he was entitled to

19   the life insurance policy for.  Explained that he was down

20   on his luck.  He wanted a jury trial; he didn't get that.

21   He missed a deadline to file a motion for a new trial.

22   Didn't understand how he could lose the case.  These are

23   things he is discussing with Ms. Rondoni Tavernier and

24   Ms. Friedemann, natural for him to do that.

25           He is upset.  He is yelling.  He is swearing.

1    Okay, that's startling, not a crime, not a threat to yell,

2    swear, do anything like that.  And that's how Mr. Ivers is.

3    You heard him yesterday.  He yells.  He swears.  He gets

4    upset.

5          Toward the end of the call, Ms. Friedemann writes

6    down this:  This fucking Judge stole my life.  I had

7    overwhelming evidence.  Judge stacked the deck.  Didn't read

8    the fine print.  Missed the 30 days.  I was going to throw

9    some chairs.  And, lastly, the sentence that matters:  "You

10   don't know the 50 different ways I planned," past tense, "to

11   kill her."  That's what she writes down.

12         Right after that Ms. Rondoni Tavernier gets a call

13   back from Mr. Ivers, clarifies the legal advice about the

14   second lawsuit.  It's a short call.  I think she said it was

15   under five minutes, unremarkable.  Consider the context of,

16   oh, my God, death threat happened, and then a phone call a

17   few minutes later, unremarkable.  She never hears from

18   Mr. Ivers again.  He doesn't contact her or Ms. Friedemann

19   ever again.  That was the last thing.  They gave him his

20   legal advice.  He went his separate way.  He's in West

21   Fargo, goes back to his daily routine.

22         It was important for the marshals -- I mean, it's

23   their job -- but important for them to figure out what

24   Mr. Ivers meant every time he sent something disrespectful,

25   alarming to the Court.  It was very important for them to

821

1    determine what he meant, whether or not he was serious,

2    whether or not he was venting.

3            Ms. Rondoni Tavernier and Ms. Friedemann didn't

4    ask him any questions.  They didn't ask what do you mean by

5    that?  Are you serious?  They don't tell him don't do that,

6    don't say any of those things.  They are alarmed.  They

7    don't know what to say.  They just let him go.  He just, you

8    know, rants for a bit and then he stops.  Okay?  And then

9    they conclude the call, tell him can't represent you

10   anymore, sorry about your case.

11           Ms. Friedemann does not report it to the

12   authorities.  Okay.  Instead, she goes to legal counsel.

13   They figure out, well, can we turn this over?  Are we

14   permitted to do this?  So they wait over 24 hours.  You

15   know, if they really thought there was a serious threat, is

16   it reasonable to wait 24 hours, to go to your ethics

17   attorney first instead of calling the authorities?

18           So she calls Tiffany Sanders.  She's not sure what

19   she told Tiffany Sanders.  We heard a bunch of different

20   things.  So this is what Ms. Friedemann testified about what

21   she said to Tiffany Sanders:  I don't remember if I reported

22   them verbatim to Ms. Sanders, but I said that a threat had

23   been made to Judge Wright.  That's different than the words

24   he used.  Had she said the actual words she wrote down,

25   maybe they would've reacted differently.  Then she also

1    testified -- this is Ms. Friedemann -- I summarized the

2    notes as a threat, a death threat against Judge Wright.

3    That is a stark leap from what he actually said on that

4    phone call.  So if we think you don't know the 50 different

5    ways I planned, past tense, to kill her, stark difference

6    from calling somebody and just saying a death threat has

7    been made against somebody's life.  Okay?  People react

8    differently to that.  That's what she said, "death threat."

9    Death threat against Judge Wright, that's what she thinks

10   she said.  She's not sure.

11          Okay.  So then we know that Ms. Sanders reports to

12   Judge Davis' chambers.  She calls them, gets a call back

13   from Judge Davis.  She passes along this "death threat."

14   That's alarming.

15          Judge Davis called Deputy Wooton.  He passes along

16   the message from Ms. Sanders, "death threat."  That's very,

17   very serious.

18          Deputy Wooton calls Ms. Friedemann.

19   Ms. Friedemann claims she told Deputy Wooton "planned," past

20   tense, because that's what she wrote in her notes.  You

21   heard Deputy Wooton testify.  You get to determine his

22   credibility and Ms. Friedemann's.  Maybe there was just --

23   you know, it's been a long time.  Maybe she just doesn't

24   remember.  But Deputy Wooton believes she said "plan to

25   kill."  That is a future intent statement, "plan to kill."

1        That is much more alarming than what he actually may have

2    said.  He may have said he had imagined, he'd imagined,

3    planned, thought of, all those statements.  If they would

4    have said those, that's different than "plan to kill."  So

5    he is going off the idea that Mr. Ivers has a "plan to

6    kill."  That's what he writes in his report.  So naturally

7    he needed to investigate it.

8            Just like every other time Bob Ivers said

9    something, they go investigate it, check it out, determine

10   is it credible, is it not.  But the investigation is based

11   solely on this misrepresentation "plan to kill."  They think

12   there is a plan to kill out there.  They think there's a

13   death threat.  That's the only statement they have at this

14   time, the only one, this one sentence.

15           So we jump to March 14, 2018.  Finally, a couple

16   weeks later, the marshals go out and visit him.  You heard

17   this recording.  Deputy Seyfried and Deputy Wickenheiser,

18   they go out to West Fargo.  Purpose?  To assess a threat.

19   That's their job.  And you heard from Deputy Seyfried:

20   That's not a legal term, that's something we use, it's an

21   alleged threat, not necessarily a crime.  You need to

22   determine whether it's credible or it has no bite.

23           They also said they were looking for an apology.

24   You're not going to get an apology for Bob Ivers.  He

25   doesn't apologize for the things he says.  He just doesn't

1   do that; doesn't have to.  It would be nice, doesn't do it.

2          They get there.  They wake him up.  You heard the

3   audio.  He is loud, screaming, says some awful things.

4   Deputy Seyfried's conclusion at the end of it -- is it

5   credible, no bite -- could go either way.  That's what he

6   testified to in court.  He wasn't sure.

7          So he reports back to Deputy Wooton; said, hey,

8   investigation continues.  He is not charged with anything he

9   said on March 14th.  They are just following up on the

10  investigation.  That's their job.  They think there is a

11  plan to kill out there because Ms. Friedemann told them

12  there was.

13         March 16th, Deputy Wooton and Mr. Rank interview

14  Ms. Friedemann.  They confirm that Ms. Friedemann said

15  "planned to kill."  Okay?  This is it.  Confirmed during the

16  phone call that what you wrote down was verbatim and

17  contemporaneously.  Yes.  When I spoke to the marshal on

18  both occasions, I had my notes in front of me and I read

19  them verbatim because I knew it was important.  They

20  confirmed she said "planned to kill."  She agrees with that.

21  Ms. Friedemann in court says she said "planned."  The

22  authorities are operating off of "plan to kill," future.

23         So then Deputy Wooton obtains a search warrant to

24  monitor or tap -- he described it differently, I don't know

25  all the legal terms -- but to monitor Mr. Ivers'

1    whereabouts.  Bob Ivers has no idea they are doing this, so

2    he has no idea to hide what he is doing.  He is also not

3    restricted from traveling anywhere.  There is no movement

4    between March 16 when they get the search warrant and April

5    3rd because Bob doesn't have a car.  He's just in this daily

6    routine in West Fargo with his sister, reading the paper,

7    working on his Pepsi project, watching the news, going to

8    movies, cooking.  That's what he's doing.  No correspondence

9    with Judge Wright or the court in this time frame.

10              Then we jump to April 3rd.  This is an important

11   date.  Mr. Ivers decides to take a bus trip.  He doesn't

12   have a car.  He grew up in the west metro here.  He comes

13   back here, travels down 94, goes to St. Louis Park/Hopkins

14   area because that's where he lived.  That's where his stuff

15   is.  He is going to get some of his Pepsi materials.  He

16   also needs money.  Natural for him to do that.  That's where

17   he lives.

18              Deputy Wooton gets a cell phone ping tracking

19   Mr. Ivers coming to the city.  Right?  He thinks that

20   Mr. Ivers is going to Judge Wright's house.  And as we heard

21   yesterday, nobody knows where Judge Wright lives.  She lives

22   somewhere out east, don't know if it's Woodbury, don't know

23   if it's 25 miles away.  I have no idea, neither does Bob

24   Ivers.  But when Deputy Wooton seems him traveling, he

25   overreacts.  He runs into -- well, I asked that question and

1     it turns out he called them, but he calls Mr. Rank

2     immediately on the phone.  They agree to get an arrest

3     warrant for Bob Ivers because they thought he was coming

4     down to visit Judge Wright.  That's when they determine it.

5     He's traveling down in a bus and they go that's it, that's

6     the straw that broke the camel's back.  Turns out that

7     wasn't true.

8          This is what he was doing:  He was getting stuff

9     from where he lived.  He went to his brother's house, jumped

10    on a bicycle, got some stuff, jumped back on the bus.  And

11    we know he returned.  There was a snowstorm.  He got stuck

12    in Alexandria overnight.  And his sister picked him up at

13    4:00 a.m. from wherever the bus dropped him off in West

14    Fargo.  That's what Deputy Wooton testified to.  That was

15    important.

16         Deputy Wooton made a mistake.  He was wrong.  And

17    that was what they based the decision to go arrest Bob Ivers

18    on.  They didn't have anything on March 14th that they

19    wanted to arrest him for, didn't have anything before that.

20    It was this, the mistaken belief that he went on a bus and

21    was heading down to see Judge Wright.

22         So April 17th is grand jury testimony.  Deputy

23    Wooton is the only witness that testifies there.  He doesn't

24    tell them about the bus trip, but he says, Ms. Friedemann

25    told me there is a "plan to kill," present tense.  That's

1    what he tells the grand jury.  He's got a plan.  And they

2    return an indictment.  Bad mistake.  He's operating off the

3    wrong words from Ms. Friedemann.

4              April 20th he's arrested in West Fargo.  Okay?

5              Go ahead a few weeks.  Deputy Wooton and Ms. Allyn

6    this time interview Ms. Friedemann.  This is the third

7    interview Ms. Friedemann had given to the government.  They

8    confirm again that Mr. Ivers said "plan to kill."  She

9    agrees, present tense, future intent.  This is what they are

10   operating off of.  So the way the government is acting is

11   actually kind of reasonable.  They think there's some future

12   plan out there.

13             Friedemann testified here in court, no, I told

14   them "planned," so they must be wrong.  Not only Deputy

15   Wooton, but Mr. Rank and Ms. Allyn, they must be wrong.

16             End of May 2018, we ask to talk to Ms. Friedemann.

17   We ask, hey, we'd like to know what happened during this

18   phone call.  We get a waiver from Mr. Ivers saying you can

19   talk to us and so can Ms. Rondoni Tavernier.  Please tell us

20   what happened.  You're not supposed to tell the government,

21   but please tell us.  She refuses.  We can't tell what was

22   said.  We don't get her notes.  If we had her notes, maybe

23   we could've convinced the government, hey, he said

24   "planned."  Let's talk about this.

25             June 18th, it's when she comes here and testifies

1    he had "imagined."  She also testifies that she told Deputy

2    Wooton "plan to kill," another conflicting statement.  She

3    is having trouble remembering.  That's reasonable.  She

4    can't remember what was said.

5              Okay.  Early July 2018, that's when we learned

6    from Ms. Rondoni Tavernier she is not going to interview

7    with us either.  She won't talk to us about what happened.

8              Okay.  This is from June 18th.  We've seen this

9    before, but this is what Ms. Friedemann testified:  To.

10   Mr. Ivers said he had imagined 50 different ways.  Did he

11   say anything about a plan to kill?  No.  And then what did

12   you tell the marshals?  I told them plan to kill.  Okay.

13             August 2018, this is the first time that anybody

14   sees Ms. Friedemann's notes.  She turns them over to the

15   government first.  It's five months too late.  Five months

16   too late.  The notes say "planned," past tense.  First time

17   the government has seen it.  They realize they made a

18   mistake.  It changes the game.

19             At the same time, Ms. Rondoni Tavernier changes

20   her story.  She interviews with the marshals and she tells

21   Deputy Trinh "plan to kill," that's what I remember, present

22   tense, future intent.

23             Now in court she claims he said something like

24   "thought of," not really sure what he said, turned to

25   Ms. Friedemann's notes.

 1              August 21st, because of this change in verbiage,

 2      now that they know it was a past statement about past

 3      conduct, the government runs back to the grand jury and

 4      tells them that.  And there was some confusing testimony

 5      about a pin communication.  We're not sure what convinced

 6      the grand jury.  You've heard the statement a grand jury can

 7      indict a ham sandwich.  But they go back, they felt it was

 8      important enough to tell them it was "planned," not "plan."

 9      That is a big deal.

10              So how did we get here?  Ms. Friedemann made a

11      mistake, made a few more.  The government believed there was

12      a plan to kill out there.  They did their job.  They

13      investigated it.  They continued investigating it.  And then

14      we have an overreaction that leads to the indictment on

15      April 3rd.  Thought he was going to see Judge Wright.  That

16      wasn't true.  Ms. Friedemann waited five months to own up to

17      her mistake.  That was a month ago.  Now we're here at

18      trial.

19              So the government's case:  They're not sure what

20      Mr. Ivers said and neither are we.  We've heard a lot of

21      statements.  They are going to tell you -- and they did

22      earlier, but I'm sure that Ms. Allyn is going to tell you --

23      it doesn't matter what he said.  Whatever he said was a

24      threat because Mr. Ivers is a bad guy.  You shouldn't like

25      him.  He says horrible things.  He says offensive things,

1      vulgar things, racist things.  He yells, he screams, he

2      rants.  He needs to be off the street.

3             So we don't know what he said, but whatever he

4      said, it's a threat, convict him.  Why?  Think about the

5      things he's not charged with.  Think about the letters he

6      sent.  Think about the phone calls, things that did not

7      happen on February 27th, 2018.  Think about those things.

8      We don't know what he said on February 27th.  Convict him.

9             So what are we left with?  We've got one phone

10     call.  No recording.  Nothing to listen to.  Two witnesses.

11     Changing stories.  Different words.  Conflicting statements.

12     Sometimes during the same examination you might hear

13     Ms. Friedemann say had imagined, he had imagined and planned

14     in the exact same testimony.  We don't know what he said;

15     neither do they.

16            Case boils down to one sentence:  You don't know

17     the 50 different ways I plan to blank.  Government says just

18     fill in the blank threat, send him away.  You don't know

19     what he said.  Do you have doubts about what was said?  Do

20     you have doubts about what he meant?  Would it have been

21     nice for them to ask what he meant, like the marshals did

22     every time he sent something allegedly threatening to the

23     court?  Yeah, it would've been nice.  He might've said, like

24     he always did, no, I'm just venting.  I'm pissed off about

25     the case.  The Judge stole my damned life.

1          Not sure what he said.  The best guess from the

2     two witnesses who talked Mr. Ivers -- Mr. Ivers can't

3     remember, says he doesn't remember -- but best guess from

4     Ms. Friedemann and Rondoni Tavernier, he said something in

5     the past tense.  They can't remember exactly what it was,

6     but it was past tense.  And you remember the notes.

7     Everything in there is talking about something that happened

8     months in the past, a past conduct.  That is not a threat.

9          When Bob Ivers moved to West Fargo, he wasn't

10     thinking about this case.  He wasn't talking about Judge

11     Wright.  He wasn't corresponding with the court.  He was

12     doing other things.  He had a stable situation with his

13     sister.  He had a good deal, first time in a long time.

14          The only time Judge Wright comes up is when

15     Ms. Friedemann and Ms. Rondoni Tavernier call him and

16     unknowingly re-open this old wound.  Like we've seen him do,

17     he goes off, he rants, he vents, he screams, he swears.

18     That's scary.  But what he was talking about were things

19     that happened in the past.  He's not talking about a future

20     plan he has against Judge Wright.  He's talking about how he

21     felt about how the case went down, and you heard him talk

22     extensively about that yesterday.

23          I said at the beginning that I'd like you to treat

24     this deliberation like you're making one of the most

25     important decisions in your life, and that's what the Judge

1    has instructed you to do.  I ask that you do that here.

2              Would you rely on Ms. Friedemann and Ms. Rondoni

3    Tavernier's memory of what was said during a 30-minute phone

4    call to convict a man?  Do we know what was said?  Best

5    guess?  Something, one of these words, or you can't really

6    remember?  Does that give you reasonable doubt about whether

7    or not a threat happened?  Would you hesitate to act in one

8    of your most important decisions of your life?  Yes.

9              When you receive the verdict form, we ask that you

10   return a verdict of not guilty on both counts.  There wasn't

11   a threat.  No threat was made here.  Not sure what was said,

12   but not enough to convict a man.

13             Ms. Allyn is going to have the last word.  She's

14   going to be up here in a minute.  You're not going to hear

15   from me again.  And I'm guessing that she saved some of her

16   best material for last.  She is going to have some punchy

17   things, leave some unanswered questions.  She knows I can't

18   respond.  If she does that, she asks one of those questions,

19   she says something and you're thinking whoa, I have a

20   question about that, think of how I would respond.  Think of

21   how Mr. Scott would respond to it.  There was no threat

22   here.

23             Thank you very much.

24             THE COURT:  Ladies and gentlemen, we're going to

25   take a morning recess.  We'll reconvene at 20 minutes to

1     12:00.

2                    THE COURTROOM DEPUTY:  All rise.

3                    (A brief recess was taken.)

4                    THE COURTROOM DEPUTY:  All rise for the jury.

5                    THE COURT:  Please be seated.  I'll hear from the

6     government in its rebuttal argument.

7                    MS. ALLYN:  Thank you, Your Honor.

8                    The defense attorney made a lot of comments about

9     how this threat is not recorded, but it is recorded.  You

10    have seen it over and over and over again (indicating).

11    It's Exhibit 15.  It's recorded exactly for the reason that

12    these women are being attacked now.

13                   They are careful attorneys.  They are trained as

14    attorneys, so they know when something important is

15    happening, write it down.  Write it down verbatim.  Write it

16    down immediately.  And that's what they did, because they

17    know exact words -- memory later can be harder, but not if

18    you have written it down real-time.  This is what they are

19    trained to do as lawyers, and this is who they are.  They

20    are careful lawyers.

21                   So what is in these notes is your best record of

22    what is said.  And what was said was:  "You don't know the

23    50 different ways I planned to kill her."  Really all the

24    evidence you have -- there's no reason to doubt this,

25    especially when you contrast it to what defendant claimed --

1    defendant claiming didn't even say anything at all.  But you

2    have these written notes.  These women would not go through

3    everything they went through, overcome those ethical

4    obstacles for any sort of lesser threat as defense wants you

5    to believe.  You watched and you heard them testify.  You

6    can believe they are credible.  Their fear was real because

7    it was a threat.

8         Now, it's understandable why they might want to

9    try to run away from this word "planned."  They might want

10   to try to think if only it was imagined, if only it was

11   thought, because when it's planned, it is a threat.  That's

12   why they are trying to refocus you on some of these other

13   words.  If you planned to kill and nothing shows you

14   abandoned that plan, it's a threat.  That's why they want

15   you to maybe think it's a different word, but it's not.  You

16   have the notes.

17        So then there's this other idea:  planned, past

18   tense, versus plan.  You heard the barrage of questions to

19   witnesses who actually heard the threat.  There was no

20   distinction to them.  They heard "planned."  They thought

21   "planned" was a threat because it was a threat.  Think about

22   it.  It's an inherent -- you know what a plan is, right?

23   You make the plan in the past so you can take a future

24   action.  I planned my vacation so I can go on vacation.  I

25   planned to kill her so I can do it.  The witnesses who heard

1     the threat in the context told you that's how they heard it

2     and that's how they took it, as a threat.

3           And there's clearly nothing in the past about

4     defendant's anger and loathing for Judge Wright.  There's

5     nothing in the past about his understanding that his words

6     are threats.  His motive came from the past.  That just

7     gives him the motive to say the threat that he did say, to

8     have that present future intent.  He planned to kill her.

9     Planned your vacation, you're going to go do it.  He never

10    backed off.  He was interviewed in March 2014 and he was

11    still angry.  He testified before you here yesterday, still

12    angry.

13          Now, defense had some other things they wanted you

14    to focus on.  Right, Mr. Ivers is not being charged with

15    taking a bus trip to Minneapolis.  He is being charged with

16    his words from February of 2018.  The evidence about the

17    marshals monitoring him is to show you how serious this

18    threat was taken, how important Deputy Wooton took this

19    threat to understand part of the circumstances in the

20    context of this receiving of the threat.

21          And this idea about venting, if you're venting and

22    you vent a threat, it's still a crime.  You don't get to

23    just call it, well, I was venting, I get a

24    get-out-of-jail-free card for it.  If you said a threat,

25    whatever your reason, it's still a threat and it's still a

1    crime.  But also this idea that that's all defendant is

2    doing is somehow venting, it's not reasonable with all the

3    other evidence you have.  If the defendant really wanted to

4    vent, he could've called Deputy Hattervig.  I mean, Deputy

5    Hattervig give him a hundred opportunities.  You want to

6    vent, call me.  You want to vent, he could've talked to his

7    sister.  Because he's not venting.  He is mad at specific

8    people when they tell him no, and he wants to use his words

9    as a weapon.  He wants them, those people, to hear his

10   words.  He wants them to hear the threat.  He uses his words

11   as weapons because he knows it scares people.  It's not just

12   venting.  And even if he wants to call it that, say a

13   threat, it's still a crime.

14          Defense attorney talked to you too about history

15   and don't pay attention, I guess, to all the other letters

16   you heard and all the other circumstances in the context you

17   have, but this is evidence of what he's retaliating about.

18   It's evidence of his motive and his anger.  And it helps to

19   prove how his anger lasts months after months after months,

20   that he is still seething in February 2018.  He's still

21   knowing that his words are used as weapons.

22          This idea that somehow now he's sitting out in

23   North Dakota and he's past this, that's not the time frame

24   at all.  If you're following the time frame, while he is in

25   North Dakota is when he is trying to file the second

837

1     lawsuit.  He has not stopped this obsession at all.  Whether

2     he tells his sister or not -- I mean, you heard his sister

3     testify, lovely lady.  She says he doesn't talk to her and

4     probably understandably so.  She doesn't want to hear what

5     it is this defendant would say.

6          So he has not abandoned anything while he is in

7     North Dakota.  He is still focused.  He is still obsessed

8     with Judge Wright.  He still knows his words can be used as

9     weapons and so that is what happens.  When he is told no by

10    the attorneys, Lora Friedemann and Anne Rondoni Tavernier,

11    he erupts in anger and he issues that threat.

12         Now, there was also some argument about

13    confidentiality and that defendant couldn't have somehow

14    done this threat because he believed there was some

15    confidentiality.  There's no evidence about that, that this

16    defendant thought he had that confidentiality.  He didn't

17    testify that way.  You do have evidence from Lora Friedemann

18    who said I'm not sure that everybody does really know that

19    because, in part, certainly there are exceptions to

20    confidentiality.  There are duties to report.  Even the

21    examples given, the medical examples, you still have to

22    report if somebody is saying I plan to kill somebody.  That

23    they're going to kill somebody, you need to report that.

24    And that's what a reasonable person understands.  And this

25    defendant certainly had that experience, that when he called

1    up the Clerk and said, I'm a walking bomb, he knows it gets

2    reported.

3          In any event, this idea of, oh, but they weren't

4    going to tell Judge Wright, remember the jury instruction

5    that if Judge Wright is what you're thinking is a victim of

6    that crime, the defendant -- even if the defendant

7    communicated a threat to someone other than the intended

8    victim, still a threat, because the harm is caused on those

9    people who have to hear it.  You saw that with Lora

10   Friedemann and Anne Rondoni Tavernier.  They had to feel

11   that disruptive, harmful power when they fear violence.  So

12   at that time that crime is complete.

13         But even this case this defendant still knew that

14   this was going to get to Judge Wright.  That's part of what

15   if you were here and listening to him talk about his prior

16   Hennepin County case.  If you were following those charges,

17   he was convicted for what a different person, an intended

18   victim, he was leaving a message for a judge heard by a

19   clerk.  So he understands that when he uses this threatening

20   language to whoever he says it to, it's then and there a

21   crime.

22         Now, Mr. Kelley said to you, I think twice, you

23   know, no one asked Mr. Ivers what he meant.  Wouldn't it

24   have been nice if somebody had just tried to ask Mr. Ivers

25   what he meant?  Well, they did try.  I mean, it's exactly

1    what they did when they went to interview him March 14th in

2    North Dakota.  It's exactly what they were trying to do.

3    And if that's supposed to be what they should do to get the

4    answer about his intent, if it was really a threat, well,

5    then they sure did get their answer, because he was so

6    angry.  He was so mad.  It's at this time he says fuck Judge

7    Wright, he doesn't care if she loses sleep, and he calls her

8    the N word.  That is a hate-filled word you heard the

9    testimony about.

10              So if that's part of the answer that you get to

11   know if that's a threat, then they have their answer.  It is

12   a threat.  His anger was present and real, nothing about

13   abandonment or apology, because there is nothing in the past

14   about his anger and hatred.

15              You're asked if you should rely on Lora Friedemann

16   and Anne Rondoni Tavernier.  Look who they are, how they

17   testified, what they did, what they had to do.  All the

18   behavior of the defendant before and after that underscores

19   the witness testimony, corroborates them.  And, yes, you can

20   believe those witnesses.  You can believe, as they did, that

21   this was a threat.

22              The United States is not asking you to convict

23   this defendant because he's a bad guy, because he should be

24   taken off the streets or acts odd.  The United States is

25   asking you to convict him because Mr. Ivers used his words

1    as a weapon to scare.  He knows that when he does that that

2    he is threatening, and he wanted it that way.  And that's

3    why we are asking you to return verdicts of guilty.

4          Thank you.

5          THE COURT:  **Instruction No. 16, Election of a**

6    **Foreperson/Duty to Deliberate**

7          In conducting your deliberations and returning

8    your verdict, there are certain rules you must follow.  I

9    will list those rules for you now.

10         First, when you go to the jury room, you must

11   select one of your members as your foreperson.  That person

12   will preside over your discussions and speak for you here in

13   court.

14         Second, it is your duty, as jurors, to discuss

15   this case with one another in the jury room.  You should try

16   to reach agreement if you can do so without violence to

17   individual judgment, because a verdict -- whether guilty or

18   not guilty -- must be unanimous.  Each of you must make your

19   own conscientious decision, but only after you have

20   considered all of the evidence, discussed it fully with your

21   fellow jurors, and listened to the views of your fellow

22   jurors.  Do not be afraid to change your opinion if the

23   discussion persuades you that you should.  But do not come

24   to a decision simply because other jurors think it is right,

25   or simply to reach a verdict.

1          Third, if the defendant is found guilty of one or

2     more counts, the sentence to be imposed is my

3     responsibility.  You may not consider punishment in any way

4     in deciding whether the government has proved its case

5     beyond a reasonable doubt.

6          Fourth, if you need to communicate with me during

7     your deliberations, you may send a note to me through the

8     marshal or court-security officer, signed by one or more

9     jurors.  I will respond as soon as possible either in

10    writing or orally here in open court.  Remember that you

11    should not tell anyone -- including me -- how your votes

12    stand numerically.

13         Fifth, your verdict must be based solely on the

14    evidence and on the law which I have given you in my

15    instructions.  The verdict, whether guilty or not guilty,

16    must be unanimous.  Nothing I have said or done is intended

17    to suggest what your verdict should be -- that is entirely

18    for you to decide.

19         Finally, the verdict form is simply the written

20    notice of the decision that you reach in this case.  You

21    will take this form to the jury room.  When each of you has

22    agreed on the verdicts, your foreperson will fill in the

23    form, sign and date it, and advise the marshal or

24    court-security officer that you are ready to return to the

25    courtroom.

1          Mr. Roe and Mr. O'Connor, you were selected as

2     alternates, so I thank you for your service.

3          The rest of the jurors may go with Ms. Labriola to

4     the jury room.  We will send the instructions and the

5     exhibits to the jury room.

6          THE COURTROOM DEPUTY:  All rise.

7                         **IN OPEN COURT**

8                       **(JURY NOT PRESENT)**

9          THE COURT:  We'll be in recess.

10          Raise your hand, marshal, to be sworn.

11          (Court-security officer administered oath by the

12     Court.)

13          MR. SCOTT:  We already put on the record we went

14     through the exhibits and they are ready to go to the jury.

15          THE COURT:  Thank you.

16          MR. SCOTT:  Location, Your Honor?  We're

17     Minneapolis lawyers.

18          THE COURT:  Okay.

19          MR. SCOTT:  And we want to know what your

20     preference is on attendant -- or being attendant to the

21     Court.

22          THE COURT:  Well, we'll contact you as soon as we

23     have any questions or I'll contact you, obviously, when

24     there is a verdict, give you all the time you need to get

25     here.  You don't have to stay in the courthouse.  I know

1    some judges insist on that; I don't.  I suspect you have

2    more than one client.

3              MR. SCOTT:  And the rest of them help subsidize

4    these cases, Your Honor.

5              THE COURT:  I bet that's true.  The same pertains

6    to Ms. Allyn and Mr. Rank.  If they have other work to do,

7    just so we can at a reasonable time get together.

8              MR. SCOTT:  Your clerk, I think, now has all of

9    our cell phone numbers.

10              THE COURT:  Good.  I want to put on the record how

11    much I enjoyed working with all of you and how well-prepared

12    you were.  And, you know, I feel privileged to be able to

13    work with such fine lawyers as you.

14              MR. RANK:  Thank you.

15              MS. ALLYN:  Thank you, Judge.

16                   (Court adjourned at 12:03 p.m.)

17                             * * *

18

19    **2:51 p.m.**

20              THE COURTROOM DEPUTY:  All rise.

21              THE COURT:  Ms. Labriola, do you want to bring the

22    jury in.

23              You can be seated, please.

24              THE COURTROOM DEPUTY:  All rise for the jury.

25

1              **IN OPEN COURT**

2              **(JURY PRESENT)**

3              THE COURT:  Please be seated.

4              Mr. Marcus, am I safe to assume that you have been

5    selected by your fellow jurors as the foreperson of the jury

6    and, therefore, authorized to speak for the jury here in

7    court?

8              THE FOREPERSON:  Yes, sir.

9              THE COURT:  All right.  I want you to listen very

10   carefully.  Has the jury unanimously agreed on verdicts with

11   respect to both counts of the grand jury's superseding

12   indictment?

13             THE FOREPERSON:  Yes, sir.

14             THE COURT:  All right.  Mr. Marcus, I want you to

15   hand the jury verdict to Ms. Labriola.  I'm going to inspect

16   your verdict to see that it complies with the law.  Once I

17   do that, I'm going to read it aloud.  It will be very

18   important that you listen carefully because the lawyers have

19   the right on behalf of their clients to ask for a polling of

20   the jury, in which case I will ask each of you individually

21   if what I read publicly is, in fact, your verdict.

22             In the United States District Court for the

23   District of Minnesota, United States of America, Plaintiff

24   v. Robert Phillip Ivers, Defendant, 18-90, Verdict Form.

25                       **VERDICT FORM**

1       **COUNT ONE**

2            With regard to the crime of threatening to murder a

3       federal judge, as charged in Count One of the indictment,

4       we, the jury, unanimously find the Defendant ROBERT PHILLIP

5       IVERS, the jury has checked the box "GUILTY."

6       **COUNT TWO**

7            With regard to the crime of interstate transmission

8       of a threat to injure the person of another, as charged in

9       Count Two of the Indictment, we, the jury, unanimously find

10      the Defendant ROBERT PHILLIP IVERS on the form "GUILTY" has

11      been marked.

12            The verdict form has been dated 9-14-18 and signed

13      by the jury foreperson.

14            Mr. Kelley or Mr. Scott, do you want the jury

15      polled?

16            MR. SCOTT:  Yes, Your Honor.

17            THE COURT:  Mr. Kaliszewski, I will start with

18      you.  Is the verdict that I read your verdict?

19            JUROR KALISZEWSKI:  Yes, it is, Your Honor.

20            THE COURT:  Mr. Marcus, is the verdict that I read

21      your verdict?

22            JUROR MARCUS:  Yes.

23            THE COURT:  Mr. Schmitz, is the verdict that I

24      read your verdict?

25            JUROR TERRANCE SCHMITZ:  Yes.

```
1              THE COURT:  Mr. Schmitz, is the verdict that I

2      read your verdict?

3              JUROR LUKE SCHMITZ:  Yes.

4              THE COURT:  Mr. Notermann, is the verdict that I

5      read your verdict?

6              JUROR NOTERMANN:  Yes, Your Honor.

7              THE COURT:  Ms. Schafer, is the verdict that I

8      read your verdict?

9              JUROR SCHAFER:  Yes, sir.

10              THE COURT:  Ms. Jorgenson, is the verdict that I

11     read your verdict?

12              JUROR JORGENSON:  Yes, sir.

13              THE COURT:  Ms. Johnson, is the verdict that I

14     read your verdict?

15              JUROR JOHNSON:  Yes, Your Honor.

16              THE COURT:  Ms. Leete, is the verdict that I read

17     your verdict?

18              JUROR LEETE:  Yes, Your Honor.

19              THE COURT:  Mr. Vazquez, is the verdict that I

20     read your verdict?

21              JUROR VAZQUEZ:  Yes, Your Honor.

22              THE COURT:  Ms. Johnson, is the verdict that I

23     read your verdict?

24              JUROR JOHNSON:  Yes, sir.

25              THE COURT:  Mr. Milton, is the verdict that I read
```

1    your verdict?

2              JUROR MILTON:  Yes, Your Honor.

3              THE COURT:  All right.  Ladies and gentlemen, I'll

4    file your verdict as your finding with the clerk of the

5    district court.  You have a note from me, along with the

6    evaluation form that I told you about during voir dire.  On

7    behalf of the judges of this District of Minnesota and the

8    citizens of the District of Minnesota, I thank you for your

9    service.  You may go with the Courtroom Deputy.  You're

10   excused.

11             THE COURTROOM DEPUTY:  All rise.

12             (Jury dismissed.)

13                         **IN OPEN COURT**

14                       **(JURY NOT PRESENT)**

15             THE COURT:  Please be seated.

16             The Court is going to order a presentence

17   investigation in this case.  I'll file a formal order.

18   Within 14 days of today, the U.S. Attorney's Office will

19   provide the probation a written statement of the defendant's

20   offense conduct, and then there's a series of dates here.

21   The Probation Office will complete the presentence report

22   within 60 days and submit it to the parties by November 28.

23   Objections will be by November 13th, 2018.  The parties will

24   have until November 27 -- I'm sorry, until December 4 to

25   object.  I'll set a sentencing date after that in

1    conformance with your local rule.

2            Mr. Kelley and Mr. Scott, here's what my Probation

3    Office tells me:  I'm going to have a probation officer from

4    Southern Iowa do the report since I think it's inappropriate

5    to have a Minnesota probation officer report.

6            There is a young woman here named Beth Sanchez.

7    She's a technical writer for Southern Iowa Probation.  She

8    cannot visit the jail, as I understand it, so here's what

9    she has asked me to do:  Mr. Ivers is detained by the

10   marshals at a local jail under a contract with the marshals.

11   So I think the best option is for one of you to accompany

12   the defendant to the Minneapolis Courthouse where Mr. Ivers

13   can be interviewed by Ms. Sanchez.  And I'm going to ask

14   your office and the Marshal Service to coordinate that with

15   Ms. Sanchez.

16           Are there any other matters the Court has to take

17   up?

18           MS. ALLYN:  Not from the government, Your Honor.

19           MR. SCOTT:  No, Your Honor.

20           THE COURT:  We'll be in recess.

21           THE LAW CLERK:  All rise.

22           (Court adjourned at 3:15 p.m.)

23                         *      *      *

24

25

1          I, Debra Beauvais, certify that the foregoing is a

2     correct transcript from the record of proceedings in the

3     above-entitled matter.

4               Certified by:   *s/Debra Beauvais*
                                Debra Beauvais, RPR-CRR
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25