1          UNITED STATES DISTRICT COURT
              DISTRICT OF MINNESOTA
2

3    ------------------------------------------------------------
                                )
4    United States of America,  ) File No. 18-cr-90
                                )          (RWP/CFB)
         Plaintiff,             )
5                               )
     v.                         )
6                               ) Devitt Courtroom
     Robert Phillip Ivers,      ) St. Paul, Minnesota
7                               ) Thursday, September 13, 2018
         Defendant.             ) 8:30 a.m.
8                               )
     ------------------------------------------------------------

9

10        BEFORE THE HONORABLE ROBERT W. PRATT
       UNITED STATES DISTRICT COURT SENIOR JUDGE
              AND A JURY
11

12            **(JURY TRIAL - VOLUME III)**

13   APPEARANCES
      For the Plaintiff:        UNITED STATES ATTORNEY'S OFFICE
                                BY:  TIMOTHY C. RANK, AUSA
14                                   JULIE E. ALLYN, AUSA
                                300 South Fourth Street, #600
15                              Minneapolis, Minnesota 55415

16

      For the Defendant:        KELLEY, WOLTER & SCOTT P.A.
17                              BY:  DANIEL M. SCOTT, ESQ.
                                     BRETT D. KELLEY, ESQ.
18                              431 South Seventh Street, #2530
                                Minneapolis, Minnesota 55415
19

20    Court Reporter:           RENEE A. ROGGE, RMR-CRR
                                300 South Fourth Street, #1005
21                              Minneapolis, Minnesota 55415

22

23        Proceedings recorded by mechanical stenography;
      transcript produced by computer.
24

25

1

### INDEX - VOLUME III

2
**WITNESSES**                                              **PAGE**

3
  **LORA FRIEDEMANN**
     Cross-Examination (Resumed) by Mr. Kelley         424
4    Redirect Examination by Mr. Rank                  436
  **ANNE RONDONI TAVERNIER**
5    Direct Examination by Mr. Rank                    442
     Cross-Examination by Mr. Kelley                   464
6  **MATTHEW SEYFRIED**
     Direct Examination by Ms. Allyn                   493
7    Cross-Examination by Mr. Kelley                   522
     Redirect Examination by Ms. Allyn                 536
8  **FARRIS WOOTON**
     Direct Examination by Mr. Rank                    538
9    Cross-Examination by Mr. Kelley                   562
     Redirect Examination by Mr. Rank                  588
10   Recross-Examination by Mr. Kelley                 593

11 **GOVERNMENT RESTS**                                597

12 **JANET PATTERSON**
     Direct Examination by Mr. Kelley                  598
13   Cross-Examination by Mr. Rank                     627
  **ROBERT IVERS**
14   Direct Examination by Mr. Scott                   640
     Cross-Examination by Ms. Allyn                    676
15
   **DEFENDANT RESTS**                                747
16

17 **GOVT EXHIBITS**          **MARKED**    **OFFERED**    **RECEIVED**

18  14                                      508            508
    30                                      559            559
19
   **DEFT EXHIBITS**          **MARKED**    **OFFERED**    **RECEIVED**
20
    1                                      645, 676        676
21  2                                      676             676
    3                                      658             658
22

23                          *   *   *

24

25

**P R O C E E D I N G S**

**IN OPEN COURT WITHOUT THE JURY PRESENT**

1

2

3

4        THE COURT:  We are waiting on one juror.

5        The record should show that Docket 58 involves a

6   confidential memo only part of which the court gave to the

7   government.  Mr. Rank emailed me last night regarding it and

8   copied counsel.  Mr. Scott wants his previous objection to

9   the court's ruling noted.  It's noted.

10        Mr. Rank, do you want to make a motion?

11        MR. RANK:  Yes, Your Honor.  The government would

12   make an oral motion to disclose the full in camera

13   memorandum, the active portions being removed, that was

14   previously disclosed as Docket No. 119-1.

15        MR. SCOTT:  Your Honor, what Mr. Rank told you in

16   the email last night is correct.  We want to maintain our

17   objection for opening up the conversations at all; but once

18   they were opened, it was our decision to finish opening

19   them, and so the government's entitled to that.

20        THE COURT:  Okay.  All right.  We will await the

21   juror and then begin.

22        **IN OPEN COURT WITH THE JURY PRESENT**

23        THE COURT:  Please be seated.  Good morning.

24        When we left off last evening, Mr. Kelley was

25   cross-examining Ms. Friedemann, so we will continue with

FRIEDEMANN - CROSS (Resumed)

1   that examination.

2           When a witness re-appears, we don't re-swear them,

3   so.

4                   LORA FRIEDEMANN,

5   called on behalf of the government, was previously sworn,

6   was further examined and testified as follows:

7                   CROSS-EXAMINATION (Resumed)

8   BY MR. KELLEY:

9   Q.  Good morning, Ms. Friedemann.

10  A.  Good morning.

11  Q.  It's kind of hard to tell exactly where we left off

12  yesterday in the afternoon, but I believe we were talking

13  about the May 7th interview with the government.  Do you

14  remember that?

15  A.  I don't remember where we left off either, Mr. Kelley,

16  but you can bring me back there.

17  Q.  All right.  We will start there.  So May 7th, 2018, you

18  were interviewed by AUSA Tim Rank and Deputy Wooton at the

19  U.S. Attorney's Office, correct?

20  A.  Yes.

21  Q.  And you told them that Mr. Ivers said during the

22  February 27th call, quote, you don't know the 50 different

23  ways I plan to kill her, present tense.  Do you remember

24  that?

25  A.  I believe I read from my notes, as I had for my prior

─── FRIEDEMANN - CROSS (Resumed) ───

1    conversation with Deputy Wooton.

2    Q.  So if they wrote down "plan," they must be wrong?

3    A.  I wouldn't say wrong.  I would say, again, it's very

4    difficult to tell which tense a person is speaking.

5    Q.  You did not provide the government with your notes at

6    that time, did you?

7    A.  I don't believe the government received my notes until a

8    later date.

9    Q.  Okay.  You did not provide them with your notes in May?

10   A.  No.

11   Q.  So that was May, three months after the February 27th

12   phone call.  I am going to jump to August 2018.  So just a

13   month ago.  That's when you finally disclosed your notes to

14   the government, right?

15   A.  I don't recall the timing, but when the government

16   requested my notes they were provided.

17   Q.  So the government requested your notes in August?

18   A.  I believe that's the case.

19   Q.  And your notes say planned, past tense?

20   A.  They do.

21   Q.  So this is five months after the February 27th phone

22   call.  That's the first time you disclose your notes to the

23   government?

24   A.  Yes.

25   Q.  And prior to disclosing your notes, you had spoken to

FRIEDEMANN - CROSS (Resumed)

1   the government at least three times?

2   A.  Yes.

3   Q.  February 28th with Deputy Wooton?

4   A.  Yes.

5   Q.  You did not provide him with your notes then?

6   A.  I didn't.  I read -- I read them to him.

7   Q.  March 16th you talked to Mr. Rank and Mr. Wooton or

8   Deputy Wooton.  You did not provide your notes to them then,

9   did you?

10          MR. RANK:  Your Honor, this is cumulative

11   testimony.  This has all been asked and answered.

12          THE COURT:  It's repetitive and cumulative.

13          Counsel, it has been asked and answered.

14          MR. KELLEY:  Okay.

15   BY MR. KELLEY:

16   Q.  So sometime early August you disclosed your notes.

17   August 14th Mr. Rank calls you.  Do you remember that?

18   A.  I'm not sure of any of the dates.  I remember a phone

19   conversation.

20   Q.  Do you remember a phone conversation with Mr. Rank

21   sometime mid August?  You can't remember exactly when?

22   A.  That's fair.

23   Q.  Okay.  The next day -- let's say it is August 15th, but

24   the next day after this phone call Mr. Rank emails you,

25   correct?

427

FRIEDEMANN - CROSS (Resumed)

1    A.  I don't recall.

2    Q.  You don't recall if he emailed you?

3    A.  I'm sure you have a copy that you can show me.

4    Q.  I do.  So just to get some context here, the email asks

5    you to confirm what you said during the August 14th phone

6    call.

7    A.  Okay.

8    Q.  Okay, you don't remember this?

9    A.  No.  I do remember that.

10   Q.  Okay.  And you respond to his email 30 minutes later and

11   you -- do you remember saying to Mr. Rank, "You summarized

12   the conversation accurately, Tim.  If there's anything else

13   you need, please don't hesitate to ask.  Lora"?  Do you

14   remember responding that way?

15   A.  That seems accurate.

16   Q.  So yes?

17   A.  I don't have the document in front of me, and I want to

18   be very careful here, but I am assuming you read it

19   correctly.

20   Q.  Okay.  And his email confirms your notes say, "You don't

21   know the 50 different ways I planned to kill her," planned,

22   past tense.

23   A.  Yes, that's what my notes say.

24   Q.  Okay.  But he's emailing to confirm that?

25   A.  I think he was -- well, I don't know what his thought

FRIEDEMANN - CROSS (Resumed)

1    process was.

2    Q.  And you also -- summarizing this, you have agreed that

3    this says that you told him it is difficult to discern the

4    difference between plan and planned, present and past tense.

5    A.  Well, when spoken, I believe that's true.

6    Q.  You told him you cannot say with certainty whether

7    Mr. Ivers said plan, present tense, or planned, past tense.

8    A.  Correct.

9    Q.  And you confirmed that you wrote down planned, past

10   tense.

11   A.  I did.

12   Q.  So now sitting in trial, you have talked to the

13   government at least four to five times about what Mr. Ivers

14   said.

15   A.  Yes.

16   Q.  We, Mr. Scott and myself, the defense attorneys, also

17   asked to talk to you, didn't we?

18   A.  Yes, you did.

19   Q.  That would have been around the end of May, May 22nd?

20   Does that sound about right?

21   A.  That's about right.

22   Q.  So in order to talk to you, we obtained a waiver from

23   Mr. Ivers that would have allowed you and Ms. Rondoni

24   Tavernier to tell us what was discussed during the

25   February 27th phone call.  Do you remember receiving this

FRIEDEMANN - CROSS (Resumed)

1    waiver?

2    A.  I remember you sending me a waiver.

3    Q.  Okay.  And that's what it would have allowed you to do,

4    to talk to us about what happened during that phone call,

5    correct?

6    A.  I didn't look at the wording closely to see if I agreed

7    that it would have permitted that conversation.  We -- I

8    chose not to speak to, as you know, to you.

9    Q.  Yes.  So let's talk about that.  So you initially agreed

10   by email to have an interview with Mr. Scott and myself and

11   our investigator, correct?

12   A.  Yes.  And then I changed my mind.

13   Q.  All right.  So we actually scheduled the interview.

14   A.  Yes.

15   Q.  And then you cancelled the day of.

16   A.  Yes.

17   Q.  And you've refused to let us interview you ever since.

18   A.  Correct.

19   Q.  And then -- so we already discussed that your notes were

20   disclosed to the government sometime in early August.  You

21   can't remember exactly when, though, right?

22   A.  Right.

23   Q.  Your notes were not disclosed to us until August 16th.

24   Does that sound about right?

25   A.  I don't know the process, Mr. Kelley, but if you are

430

FRIEDEMANN - CROSS (Resumed)

1   telling me that's when you got them, I believe that would be

2   true.

3   Q.  After the government had already received your notes.

4   A.  I don't know.

5   Q.  Okay.  Let's talk about your notes.  These are your

6   notes from the February 27th phone call, the second page.  I

7   will provide you with a copy, so you can look at them.

8   A.  Thank you.

9   Q.  So let's look at the first line here.  These are the

10  notes that you wrote down verbatim while Mr. Ivers was

11  speaking on February 27th.

12  A.  The things that are in quotations were verbatim.

13  Q.  So there are a few portions, say, you know, here, things

14  that are in quotes, things that are not in quotes.  Anything

15  that's in quotes is verbatim what Mr. Ivers said.

16  A.  Yes, anything in quotes is verbatim what Mr. Ivers said.

17  The portions that are not in quotes are not necessarily

18  verbatim.

19  Q.  Okay.  To the best of your memory, this is what he said?

20  A.  Yes.

21  Q.  Let's go over the first line.  It says, "This fucking

22  judge stole my life from me."

23  A.  Yes.

24  Q.  Stole is past tense.

25  A.  Yes.

FRIEDEMANN - CROSS (Resumed)

1    Q.  So literally it means he's referring to something that

2    happened in the past.

3                MR. RANK:  Objection.  Cumulative.

4                THE COURT:  Sustained.

5    BY MR. KELLEY:

6    Q.  You knew that his friend Mr. Tallman had died and left a

7    hundred thousand dollars to him.

8    A.  I understood that was what the first trial was about.

9    Q.  And you knew that that lawsuit meant a lot to Mr. Ivers,

10   didn't it?

11   A.  That was clear to me from our conversation.

12   Q.  And by dismissing the lawsuit, he believed the judge

13   took that away from him.

14   A.  Through the words he used were that "fucking judge stole

15   my life from me."

16   Q.  Okay.  About what the judge had done in the past?

17   A.  About Judge Wright's ruling in the trial.

18   Q.  In the past?

19   A.  Yes, it was the past at that point.

20   Q.  Let's go over the next line.  "I had overwhelming

21   evidence."  Again, past tense, correct?

22   A.  It's past tense.

23   Q.  Mr. Ivers believed he had a strong case against the

24   insurance company in that first trial with Judge Wright,

25   correct?

FRIEDEMANN - CROSS (Resumed)

1    A.  That's what he conveyed.

2    Q.  Let's go over this third line here.  "Didn't read the

3    fine print and missed the 30 days to seek a new trial."  So

4    again this refers to some past event.

5    A.  Yes.

6    Q.  Mr. Ivers admitted that he missed a 30-day deadline to

7    file a motion for a new trial in the past.

8    A.  Yes.

9    Q.  And then he says -- you have got it here, so "and" is

10   not in quotes, but "she is lucky" in quotes -- "She is

11   lucky.  I was going to throw some chairs."  That is also

12   past tense, correct?

13   A.  Yes.

14   Q.  So you knew that Judge Wright had denied him a motion

15   for a new trial.  Was that clear to you?

16   A.  I wasn't -- I guess I don't know if he brought one and

17   it was late or if he just missed the deadline.  I'm not

18   sure.

19   Q.  But it seemed like he did not get this motion hearing on

20   a new trial, right?

21   A.  Correct.

22   Q.  Okay.  So consequently there was never a hearing in the

23   first place.

24   A.  Yes.

25   Q.  Okay.  And what he is saying here is if there had been a

FRIEDEMANN - CROSS (Resumed)

1    hearing, that actually never occurred, he would have thrown

2    some chairs.

3    A.   And that was my understanding.

4    Q.   Okay.  But that hearing never occurred.

5    A.   Correct.

6    Q.   No chairs were thrown.

7    A.   Correct.

8    Q.   The last statement.  "You don't know the 50 different

9    ways I planned to kill her."  This is also past tense, isn't

10   it?

11   A.   I wrote it in past tense.  Given my -- how difficult it

12   is to discern whether someone is speaking in present or past

13   tense in that phrase, I can't say with confidence which

14   tense Mr. Ivers used.

15   Q.   You wrote down planned in past tense.  That is

16   consistent with the verbiage in every single other thing you

17   wrote down.  They are all past tense, aren't they?

18   A.   They are all past tense.

19   Q.   Referring to things that happened in the past.

20   A.   They are all written in past tense, yes.

21   Q.   Last question, a few questions here.  So you practice

22   intellectual property law.  You have been doing that for

23   23 years?

24   A.   Yes.

25   Q.   And you had -- you have had some big cases over the

FRIEDEMANN - CROSS (Resumed)

1    years.

2    A.  I have had big and small cases.

3    Q.  Currently, you have a really big case.  The Prince

4    estate case, right?

5    A.  Yes.

6    Q.  Okay.  And you have, in fact, you have one case that's

7    in state court in Carver County that Fredrikson & Byron is

8    representing the Prince estate in?

9    A.  In the probate matter for the Prince estate my firm

10   represents the personal representative.  I am not involved

11   in that aspect of the Prince estate, but where there is a

12   need to enforce the intellectual property rights,

13   trademarks, the Prince mark, the symbol, the love symbol, or

14   the copyrights and the music, that's what I do.

15   Q.  We're talking about the purple Prince symbol?

16   A.  Exactly.

17   Q.  It's a pretty cool case?

18   A.  It is a privilege to work on it.

19   Q.  So there are also two federal cases, correct?

20   A.  There are more than two.

21   Q.  More than two?  One of those federal lawsuits where

22   Fredrikson & Byron is representing the Prince estate happens

23   to be in front of Judge Wilhelmina Wright; isn't that

24   correct?

25   A.  Yes.

FRIEDEMANN - CROSS (Resumed)

1    Q.  And you are the lead attorney on that case?

2    A.  Yes.

3    Q.  There are a number of Fredrikson attorneys on that case?

4    A.  Correct.

5    Q.  Including Ms. Rondoni Tavernier?

6    A.  Yes.

7    Q.  Okay.  So this federal lawsuit in front of Judge Wright

8    that we are talking about was in federal court before Judge

9    Wright in 2017, correct?

10   A.  Yes.

11   Q.  On February 27th, 2018, the case in front of Judge

12   Wright had already been going on for a while, right?

13   A.  Yes, it had.

14   Q.  Okay.  So when you had the phone call with Mr. Ivers,

15   you had also had this big case in front of Judge Wright?

16   A.  Yes.

17   Q.  Last question.  Mr. Rank went into your background.  I

18   wanted to get into this earlier, but early in your career

19   you clerked for a federal judge?

20   A.  I did.

21   Q.  And that was now Chief Judge Tunheim?

22   A.  Correct.

23   Q.  And we heard from -- excuse me.  And that was, what,

24   1998?

25   A.  It was 1998.

FRIEDEMANN - REDIRECT

1    Q.   Okay.  How long did you clerk for him?

2    A.   Typically, clerkships are two years.  Mine was six

3    months.  I filled in for someone else for that period of

4    time.

5    Q.   You still friends with him now?

6    A.   With Chief Judge Tunheim?

7    Q.   Judge Tunheim.

8    A.   Yes.

9    Q.   So you guys have been friends for over 20 years?

10   A.   Well, friends.

11   Q.   Former boss?

12   A.   We get warm greetings when we see each other.  We don't

13   go to each other's homes.

14              MR. KELLEY:  One second, Your Honor.  No further

15   questions, Your Honor.

16              THE COURT:  All right.  Mr. Rank, did you have any

17   redirect?

18              MR. RANK:  I am going to say briefly, Your Honor,

19   and try to be brief.

20              THE COURT:  All right.

21                      REDIRECT EXAMINATION

22   BY MR. RANK:

23   Q.   Ms. Friedemann, yesterday Mr. Kelley asked you about the

24   time it took for you after the phone call to report the call

25   to Ms. Sanders.  How were you feeling during that time

FRIEDEMANN - REDIRECT

1    period?

2    A.   I was feeling -- well, my stomach was just in knots

3    during that period of time, worrying about the whole

4    situation and what to do.  And the reason for that one-day

5    delay was simply the amount of time it took for me to

6    consult with firm counsel.

7    Q.   And that's because those rules that we talked about

8    yesterday about confidentiality you take pretty seriously?

9    A.   Yes I, do.

10   Q.   It is a big deal to go outside of that?

11   A.   It's a very big deal.

12   Q.   Did you know, Ms. Friedemann -- you talked to Mr. Ivers

13   on the telephone on the 27th, correct?

14   A.   Yes.

15   Q.   And he was calling from a number in North Dakota; is

16   that correct?

17   A.   That's my understanding.

18   Q.   And so at least with respect to where he was physically

19   in North Dakota, did that give you some comfort in waiting

20   sometime?

21   A.   It did.

22   Q.   Now, Ms. Friedemann, Mr. Kelley asked you a question

23   about you declining to speak with Mr. Kelley and Mr. Scott.

24   Do you recall that?

25   A.   Yes.

FRIEDEMANN - REDIRECT

1   Q.  But Mr. Kelley actually had a pretty extensive

2   opportunity to speak with you before this trial, correct, on

3   June 18th of 2018?

4   A.  Indeed, yes.

5   Q.  In fact, not just to speak with you, but you were

6   testifying in a pretrial hearing?

7   A.  Yes.

8   Q.  He actually asked you a bunch of questions?

9   A.  Yes.

10  Q.  In fact, he could have asked you anything he wanted?

11  A.  True.

12          MR. KELLEY:  Objection, Your Honor.

13          THE COURT:  On the basis of what, counsel?  I need

14  a reason you are objecting.

15          MR. KELLEY:  It misstates the reason for the

16  June 18th hearing and the context of it.

17          THE COURT:  Well, the only thing that's in the

18  question is he asked her if she was testifying in a pretrial

19  hearing.  What is the --

20          MR. KELLEY:  I do not believe that was the

21  question, Your Honor.

22          THE COURT:  Well, that's the question I have.  He

23  follows up with, In fact, could he have asked you anything

24  he wanted?  Is that what your objection goes to?

25          MR. KELLEY:  Yes, Your Honor.

FRIEDEMANN - REDIRECT

```
 1              THE COURT:  Okay.
 2              MR. KELLEY:  So that misstates the context of the
 3    June 18th hearing.  We in fact could not ask whatever we
 4    wanted.
 5              THE COURT:  Okay.  That's sustained.
 6              Do you want to rephrase your question?
 7    BY MR. RANK:
 8    Q.  Ms. Friedemann, was Mr. Kelley limited in any of the
 9    questions that he asked you at that hearing?
10    A.  I answered --
11              MR. KELLEY:  Objection, Your Honor.  Same
12    objection.
13              THE COURT:  Overruled.
14              THE WITNESS:  I answered all the questions he
15    asked at that hearing.
16    BY MR. RANK:
17    Q.  And then, lastly, I'm going to ask you about the notes
18    that Mr. Kelley was asking you about.  This is Exhibit 15.
19    And Mr. Kelley was asking you about some of the -- a lot of
20    verb tense questions.
21    A.  Yes.
22    Q.  Do you recall those questions?
23    A.  I do.
24    Q.  Okay.  He asked you about the tense of the various
25    things that you wrote down.  And he asked you whether, the
```

———FRIEDEMANN - REDIRECT———

1  first one, whether this F'g "judge stole my life," was that

2  written in the past tense.  And you said yes, it was written

3  in the past tense, correct?

4  A.  Yes.

5  Q.  Did Mr. Ivers still appear to believe this statement

6  when he was screaming it on the phone call with you?

7  A.  Very much so.

8         MR. KELLEY:  Objection.  Calls for a conclusion as

9  to what Mr. Ivers was thinking.

10         THE COURT:  Overruled.

11         You may answer.

12         THE WITNESS:  This still appeared to be very real

13  and immediate for him.

14  BY MR. RANK:

15  Q.  Very present?

16  A.  Very present.

17  Q.  How about the next one?  Did he still appear to believe

18  that he had overwhelming evidence?

19  A.  Yes.

20  Q.  And that's why he was so angry?

21  A.  Correct.

22  Q.  Did he still appear to believe that the judge "stacked

23  the deck" against him?

24  A.  Yes.

25  Q.  And then lastly, Ms. Friedemann, you got asked a bunch

FRIEDEMANN - REDIRECT

1    of different times about this statement; is that correct?

2    A.  Yes, the ultimate threat.

3    Q.  And I just want to confirm you wrote this down verbatim

4    at the time.  And does this reflect your best memory of what

5    was said?

6    A.  It does.

7            MR. RANK:  No further questions.  Thank you.

8            THE COURT:  Okay.  Any recross, counsel?

9            MR. KELLEY:  No, Your Honor.  Thank you.

10           THE COURT:  You may be excused.

11           Do you want to call your next witness?

12           MR. RANK:  Thank you, Your Honor.  The United

13   States calls Anne Rondoni Tavernier.

14           THE COURT:  Ms. Rondoni Tavernier, would you

15   please face the ladies and gentlemen and raise your right

16   hand to be sworn, please?

17                    ANNE RONDONI TAVERNIER,

18   called on behalf of the government, was duly sworn, was

19   examined and testified as follows:

20           THE WITNESS:  I do.

21           THE COURT:  Please be seated.

22           MR. RANK:  May I proceed, Your Honor?

23           THE COURT:  Yes.

24           MR. RANK:  Thank you.

25

1          DIRECT EXAMINATION

2    BY MR. RANK:

3    Q.  Good morning, ma'am.

4    A.  Good morning.

5    Q.  Ms. Rondoni Tavernier, would you for the benefit of the

6    court reporter state your full name and then spell your last

7    name for the record?

8    A.  Yes.  It's a lot of name.  My name is Anne Rondoni

9    Tavernier.  First name is spelled A-N-N-E.  Last name is two

10   last names, not hyphenated, R-O-N-D-O-N-I, second last name

11   is Tavernier, T-A-V-E-R-N-I-E-R.

12   Q.  Thank you, ma'am.  Where do you work?

13   A.  I work at Fredrikson & Byron Law Firm in Minneapolis.

14   Q.  And what do you do at Fredrikson & Byron?

15   A.  I'm an intellectual property litigation attorney.

16   Q.  And intellectual property litigation attorney, does that

17   mean you litigate cases involving intellectual property?

18   A.  Yes.  Mostly I work on cases involving copyrights,

19   trademarks and patents and lawsuits that involve them.

20   Q.  And so that means cases that might ultimately go to

21   trial?

22   A.  Yes.

23   Q.  And how long have you been a lawyer?

24   A.  Two years.

25   Q.  Have you worked at Fredrikson & Byron the entire time

RONDONI TAVERNIER - DIRECT

1    that you have been a lawyer?

2    A.  Yes.

3    Q.  And as part of your practice, do you also do some pro

4    bono work?

5    A.  Yes.

6    Q.  And approximately how much of your practice is pro bono

7    work?

8    A.  I'm not sure percentage wise.  I would say I do at

9    least, you know, 30 to 50 hours a year so far.

10   Q.  As part of your pro bono practice, have you done some

11   work with the Pro Se Project?

12   A.  Yes, I have.

13   Q.  Did you have some communication with the defendant in

14   this case, Robert Ivers, as part of your work with the Pro

15   Se Project?

16   A.  Yes, I did.

17   Q.  And, in fact, did you have a telephone conversation with

18   Mr. Ivers on February 27th of this year?

19   A.  Yes.

20   Q.  Can you describe for the jury how it came about that you

21   had that conversation?  What led up to it?

22   A.  Sure.  Well, as part of the Pro Se Project, I received

23   an email from Tiffany Sanders indicating that she had a

24   referral for me to take a look at.  She included some kind

25   of basic background information about what the referral

RONDONI TAVERNIER - DIRECT

1    would involve, including some documentation that was, you

2    know, involved with what we would potentially be looking at

3    or consulting on.  So I ran a conflicts check based on the

4    information that she had given me about the identity of the

5    person that we would potentially be consulting with.  I

6    spoke with my colleague Lora Friedemann to see if she would

7    assist me with doing that consult and seeing where it would

8    go.  I indicated, after I had spoke with Lora Friedemann, I

9    indicated to Ms. Sanders that we would agree to consult with

10   Mr. Ivers.  And at that point we had been given contact

11   information of Mr. Ivers, and I reached out to him to

12   arrange a time that we could have a more lengthy phone call

13   to discuss the background of the issue that was being

14   referred to us, and at that point we set up a phone call,

15   and that was how that came about.

16   Q.  Okay.  Very thorough.  So in terms of the materials --

17   the jury has heard some testimony already about this phone

18   call and some of the things that led up to it.  But you said

19   you got some background materials, some documents from

20   Ms. Sanders; is that right?

21   A.  Yes.

22   Q.  Generally speaking, what were those?

23   A.  They were all publicly-filed documents relating to the

24   legal issues that we would be taking a look at, so there

25   were several complaints and a judicial order.

445

RONDONI TAVERNIER - DIRECT

1    Q.  Did they include documents from the case that you were

2    going to be talking about as well as a previous case?

3    A.  Yes.

4    Q.  And what was the previous case?

5    A.  The previous case.  Mr. Ivers had, I believe, sued an

6    insurance company to -- or, rather, involving some insurance

7    policies.  And so we had received the complaint and the

8    order that had followed a trial in that case.

9    Q.  Okay.  And what was the purpose of getting the materials

10   from the previous case?

11   A.  Ms. Sanders had indicated in her email to me that the

12   previous case would potentially have some effect on the

13   advice and consultation that we would be reviewing and

14   potentially giving to Mr. Ivers.

15   Q.  Okay.  So it was a previous case that was in front of

16   Judge Wright.  Was the current case that you would be

17   talking about a case that was in front of Judge Schiltz?

18   A.  Magistrate Judge Schultz?

19   Q.  Well, it's --

20   A.  Yes.

21   Q.  Was the Article III judge on it, was that Patrick

22   Schiltz and the Magistrate Judge David Schultz?

23   A.  Yes.

24   Q.  So if I ask that in a way that you can't understand what

25   I am talking about.  Was it that case that you were going to

RONDONI TAVERNIER - DIRECT

1    be talking to him about, the case in front of Judge Schiltz?

2    A.   Yes.

3    Q.   And so you mentioned that Ms. Sanders had indicated that

4    there was some impact on the present case based on the past

5    case with Judge Wright?

6    A.   That's what she indicated in her email.

7    Q.   Okay.  And did you review those materials?

8    A.   Yes.

9    Q.   Did you review those materials for purposes of having a

10   consultation with Mr. Ivers on the February 27th phone call?

11   A.   Yes.

12   Q.   And did you then reach some conclusions by looking at

13   those documents?  I won't ask you about the conclusions, but

14   did you reach those conclusions?

15   A.   Yes.  I looked at those documents, and I did some

16   independent research as well.

17   Q.   And that was in preparation for the phone call?

18   A.   Yes.

19   Q.   So on February 27th you set up a phone call.  You had

20   talked to Mr. Ivers the previous day; is that correct?

21   A.   Yes, I believe so.

22   Q.   And so would that have been February 26th?

23   A.   That sounds right.

24   Q.   Okay.  And did you talk at all about the case when you

25   talked to Mr. Ivers on the 26th or just was it a logistics

1    call?

2    A.  On the 26th it was just a logistics call, just to set up

3    when we would be speaking to each other to more fully

4    discuss the legal issues.

5    Q.  Okay.  And so does the phone call take place on the

6    27th?

7    A.  Yes.

8    Q.  And where are you when the phone call takes place?

9    A.  I was in my office.

10   Q.  Okay.  And was anybody in your office with you?

11   A.  Yes.  Lora Friedemann was with me.  We had the door

12   closed.

13   Q.  And how about -- and where was Mr. Ivers?

14   A.  He -- we had just called him.  He wasn't physically

15   present with us.  I believe he was in North or South Dakota

16   at the time.  I know that he wasn't in the state.

17   Q.  Okay.  He was -- he was out of state, and is that why

18   you were doing a phone consultation rather than an in-person

19   consultation?

20   A.  I presume so, yeah.

21   Q.  So what was the purpose of the phone call?

22   A.  The purpose of the phone call was to essentially provide

23   what the Pro Se Project is designed to do, which is give

24   Mr. Ivers our opinion, our initial, kind of, thoughts on his

25   case and to indicate whether there was a possibility that we

1    could potentially move forward with representing him with

2    regards to that case or if, you know, in our opinion we

3    wouldn't be moving forward.

4    Q.  Ms. Rondoni Tavernier, your phone number at your office

5    is what?

6    A.  612-492-7265.

7    Q.  And that's the number you called from?

8    A.  Yes.

9    Q.  Okay.  Did you on that phone call begin talking with

10   Mr. Ivers about the case that he had in front of Judge

11   Schiltz?

12   A.  Yes, his pending case at that time.

13   Q.  Did you have some discussion about that case?

14   A.  Yes.

15   Q.  Did you have some discussion about the effect of the

16   decision in Judge Wright's case on the viability of his case

17   in front of Judge Schiltz?

18   A.  I am not sure whether this goes into privileged

19   territory or whether we have waived that at this point.

20   Q.  There was -- we have not been able to ask you about this

21   before, correct?

22   A.  Okay.  I don't believe so.

23          MR. RANK:  And so, Your Honor, based on the

24   court's ruling yesterday and the waiver we heard about

25   yesterday, may Ms. Rondoni Tavernier be able to answer that

RONDONI TAVERNIER - DIRECT

1    question?

2                MR. KELLEY:  No objection, except for the

3    objection that we put on the record about the waiver.

4                THE COURT:  She may.

5                MR. RANK:  Thank you, Your Honor.

6    BY MR. RANK:

7    Q.  Does that give you comfort to answer the question?

8    A.  Yes.  Yes, we did -- we did discuss the effect of the

9    prior case on the pending case, yes.

10   Q.  And was your conclusion and was the advice that you

11   provided to Mr. Ivers that there was a negative impact based

12   on that prior ruling?

13   A.  Again, assuming that this is within the parameters of

14   what we have waived, yes, that we advised that there would

15   be a negative impact on his pending case based on what had

16   occurred previously in front of Judge Wright.

17   Q.  Okay.  Approximately, how much of the phone call was

18   focused on that issue?  And if we could, do you remember how

19   long the phone call was?

20   A.  In total, I would say it was probably around a half

21   hour.

22   Q.  Okay.  And of the portion that was talking about the

23   case in front of Judge Schiltz, approximately how much of

24   that was that portion?

25   A.  I would say it was probably the first third to half we

RONDONI TAVERNIER - DIRECT

1    were discussing that.  It was probably mostly me talking and

2    explaining some legal concepts and our thoughts and how we

3    had arrived at them.  So I would say it was probably the

4    first 10 to 15 minutes.

5    Q.  Okay.

6    A.  Maybe 10 to 12.

7    Q.  You indicated that you had done some analysis and some

8    research before the phone call?

9    A.  Yes.

10   Q.  And then you were explaining to him sort of the process

11   of your analysis?

12   A.  Yes.

13   Q.  Which I guess ultimately was the order in the prior case

14   in front of Judge Wright would have a negative impact on the

15   viability of his present case?  And I think that's covered

16   under --

17   A.  Yes.

18   Q.  -- the waiver.

19   A.  Yes.

20   Q.  And counsel will object if it isn't.

21   A.  Okay.

22   Q.  Yes.

23   A.  Yes, that was the conclusion we had come to.

24   Q.  Okay.  So at some point in time did Mr. Ivers start

25   talking about a different case, other than the one that was

RONDONI TAVERNIER - DIRECT

1    in front of Judge Schiltz?

2    A.  Yes.

3    Q.  And describe what happened.

4    A.  As we had kind of -- or, rather, as I had sort of

5    explained Ms. Friedemann and I's position with regard to his

6    pending case in front of Judge Schiltz, I would say that the

7    conversation kind of shifted a little bit.  As I was sort of

8    done explaining our piece, Mr. Ivers began to sort of

9    discuss a little bit about what had happened previously in

10   front of Judge Wright.  It was kind of an organic shift, I

11   guess, in the conversation.  And at that point he, as we

12   kind of merged on to that topic, he really began to sort of

13   focus and fixate on what had happened in front of Judge

14   Wright and began speaking at length about it.

15        At that point I had made the determination that I

16   would kind of let him speak, you know, wanting to make sure

17   that he had felt like his -- like he had been heard, that he

18   could have a chance to explain, you know, what he thought

19   had occurred, you know, despite what we had decided from a

20   legal standpoint, to kind of just have that conversation and

21   allow him to speak.  So I mostly let him speak unhindered.

22   I didn't interject.  And as he spoke, it escalated very

23   quickly and it kind of became essentially just a rant, an

24   angry rant based on -- or discussing what had happened in

25   the case in front of Judge Wright.

RONDONI TAVERNIER - DIRECT

1    Q.  Did Mr. Ivers' tone of voice change?

2    A.  Yes.  It -- he was calm at the beginning of the call;

3    and then as we kind of merged into this topic, he became

4    very clearly agitated and angry.  He was, you know, speaking

5    faster and raising his voice to the point where -- and at

6    one point he was essentially shouting through the phone.

7    Q.  And what was the focus of his anger at that point?

8    A.  It was primarily focused on Judge Wright on, you know,

9    the way that he felt he had been treated by her and, you

10   know, the way that the lawsuit in front of her had

11   proceeded.  It was focused on her.

12   Q.  You are speaking right now to me calmly.  How were you

13   feeling at the time that you were listening to this?

14   A.  I became increasingly upset as things went along.  You

15   know, at first, at first, you know, I was sort of telling

16   myself, you know, it's very natural for people to be upset

17   when they have had, you know, a negative experience with the

18   judicial system.  It is certainly not a surprise that, you

19   know, some people would feel, if they had had a negative

20   experience on something that was important to them, that

21   they would feel upset or, you know, even cheated, perhaps,

22   but this kind of went beyond what I would say I would

23   normally expect somebody who had just had a negative

24   interaction with the judicial system to be like.  It became

25   really distressing to listen to and it -- I, you know, I

RONDONI TAVERNIER - DIRECT

1    started to have a physical reaction.  My heart rate was

2    starting to go and I was sort of needing to remind myself to

3    just, you know, kind of keep breathing and, you know, let

4    things kind of unfold as they will.

5    Q.  Did you have any communication with Ms. Friedemann

6    during the time of the ranting portion of the call?

7    A.  Not really verbal communication.  You know, we were kind

8    of interacting just facially, I guess.  You know, she was

9    sitting across my desk from me, so we kind of made eye

10   contact at various times.  And, you know, as things

11   continued, I may have muted the phone at one point when we

12   had decided, okay, it's time to kind of wrap things up a

13   little bit, when Mr. Ivers had been speaking for a lengthy

14   amount of time.  So we were kind of just reacting together,

15   I guess I would say, but not really -- we weren't speaking

16   to each other.

17   Q.  Was Ms. Friedemann doing anything during this call?

18   A.  She was taking notes on -- based on what he had said.  I

19   had my notes in front of me for what I was going to say kind

20   of from that legal standpoint, but she was taking notes on

21   more of what had transpired during the call, which I wasn't

22   doing.

23   Q.  You had notes on what you were going to say to

24   Mr. Ivers?

25   A.  Yes.

RONDONI TAVERNIER - DIRECT

1    Q.  She was taking notes on what was being said during

2    the --

3    A.  Exactly.

4    Q.  Okay.  Do you recall some of the things that Mr. Ivers

5    said during that call?

6    A.  Yeah, a couple of things stand out.  I remember him

7    saying that -- that Judge Wright was lucky that he didn't

8    show up to court or that there wasn't another court

9    appearance for him, because he was going to go in there and

10   throw chairs.

11           I remember saying that -- him saying that she had

12   stacked the deck against him and, you know, insinuating that

13   she had, you know, kind of made sure that he lost.

14           I remember him saying that fucking judge stole my

15   life from me.

16           And I remember him saying you don't know the 50

17   different ways I planned or thought of killing her.

18   Q.  And so that last statement, was that one of the last

19   things that he said during the call or was that just the

20   last thing that you recall in the call?

21   A.  I can't say exactly when, you know, things transpired

22   chronologically.  I would say that was toward kind of the

23   peak of the rant for sure.

24   Q.  And did you notice whether Ms. Friedemann was taking

25   notes during this portion of the call?

455

RONDONI TAVERNIER - DIRECT

1   A.  Yes, she was definitely taking notes during that portion

2   of the call.

3   Q.  Did you think anything about that?

4   A.  I was really glad she was taking notes, particularly

5   when he said -- when he made the statement about 50

6   different ways to kill her.  I remember her and I looking at

7   each other very pointedly, you know, our eyebrows kind of

8   raising, and she immediately within two seconds went to

9   write it down.  And my reaction was good, you know, somebody

10  needs to be taking notes about what's going on here and I'm

11  clearly not, so.

12  Q.  And why was it that you were relieved that she was

13  taking notes?

14  A.  Because I was concerned about what was being said.  You

15  know, as each statement kind of became more pointed and more

16  upsetting and more, you know, threatening, I thought it was,

17  you know, my lawyer brain says let's have a record of what's

18  occurring here.

19  Q.  Did you have some concern that you weren't going to be

20  able to remember it at a later time?

21  A.  Yes.  Absolutely, especially considering how upset I was

22  feeling by that point.

23  Q.  Ms. Rondoni Tavernier, I'm going to show you up on the

24  screen what's been admitted into evidence as Government

25  Exhibit 15.  And I'll blow up the first third of that.  Can

1    you see that on the screen?

2    A.  Yes.

3    Q.  And do you recognize the handwriting?

4    A.  Yes.

5    Q.  And whose handwriting does that look like?

6    A.  That's Lora Friedemann's.

7    Q.  You work with Ms. Friedemann pretty routinely at

8    Fredrikson; is that right?

9    A.  Oh, yes.

10   Q.  And the first statement that's up there, "This" F'g

11   "judge stole my life," is that something you recall being

12   said?

13   A.  Yes.

14   Q.  And the next one, "I had overwhelming evidence," is that

15   something you remember being said?

16   A.  Yes.

17   Q.  And then last on the screen, the "Judge 'stacked the

18   deck' to make sure I lost this case."  Do you remember that?

19   A.  Yes.

20   Q.  And during the time that he was saying this, what was

21   his level of anger to you?

22   A.  It was kind of ever increasing.  It sort of became kind

23   of a positive feedback loop.  You know, every statement kind

24   of became more animated, I guess, than the next, you know,

25   louder, faster, just clearly, you know -- even thinking and

RONDONI TAVERNIER - DIRECT

1    talking about it was clearly upsetting him to the point

2    where it was just escalating.

3    Q.  Was he screaming during this portion of the call?

4    A.  I don't recall.  I just recall that -- yeah, you know,

5    now I do, yes, yeah, especially that first statement that

6    she stole his life from him.  I remember him yelling that.

7    Q.  Now, Ms. Rondoni Tavernier, did he appear to still

8    believe that she stole his life?

9    A.  Yes.

10   Q.  Did he appear to still believe that he had overwhelming

11   evidence?

12   A.  Yes.

13   Q.  And did he appear to still believe that the judge had

14   stacked the deck against him?

15   A.  Yes.

16   Q.  Based on how he was stating it?

17   A.  Yes.  Absolutely.

18   Q.  Then if we move to the next portion, there's another --

19   some notes on there.  Can you read what that says?

20   A.  "Didn't read the fine print and missed the 30 days to

21   seek a new trial and 'she is lucky'.  I was 'going to throw

22   some chairs'."

23   Q.  And is that something that you remember him talking

24   about?

25   A.  Yes.

RONDONI TAVERNIER - DIRECT

1    Q.  You testified about that a moment ago.  Did he appear to

2    still be angry at the time that he was saying this?

3    A.  Absolutely.

4    Q.  And then lastly --

5    A.  "You don't know the 50 different ways I planned to kill

6    her."

7    Q.  And, again, this is something that you saw Lora writing

8    down right at the time it was being said?

9    A.  Yes.  I specifically remember that statement being made,

10   and I specifically remember us making eye contact and her

11   immediately going to write it down.

12   Q.  Ma'am, again, how are you feeling at this point in time?

13            MR. KELLEY:  Objection, Your Honor.  Relevance.

14            THE COURT:  Sustained.

15   BY MR. RANK:

16   Q.  How did you react to this statement?

17   A.  I was stunned.  You know, up until that point I would

18   say it was, as I said, it was getting continually more

19   threatening and continually more distressing to listen to,

20   but hearing somebody state that they had at least, you know,

21   conceived of different ways to kill someone was difficult to

22   hear and so it -- it stunned me.

23   Q.  What do you consider this to be?

24   A.  A threat.

25   Q.  Against who?

RONDONI TAVERNIER - DIRECT

1   A.  Judge Wright.

2   Q.  And who or what throughout the ranting portion of the

3   call was the focus of Mr. Ivers' anger?

4   A.  Judge Wright.

5   Q.  Did you engage with Mr. Ivers after he had said he had

6   planned to kill Judge Wright?

7   A.  I didn't verbally react to his statement, no.

8   Q.  How about any of the statements that he was making?

9   A.  No.  I didn't think it was a good idea to try to

10  interject.

11  Q.  Approximately, how much of the conversation was this

12  angry, ranting part?

13  A.  I would say probably about ten minutes in total,

14  somewhere around there.  Maybe, you know, nine, eleven,

15  something like that.

16  Q.  Okay.  And how did the call end?

17  A.  We -- when Lora and I decided that it was -- when

18  Ms. Friedemann and I decided that it was time to kind of

19  wrap up the call, I tried to steer the conversation back

20  toward the, you know, legal purpose for the call, the advice

21  that we had given him, and ensuring that there were no loose

22  ends as far as that matter was concerned and wrapped up the

23  call at that point.

24  Q.  Did he call back shortly after that call ended?

25  A.  He did.  He called back possibly even just a couple

RONDONI TAVERNIER - DIRECT

1    minutes later, maybe five minutes, maybe less.

2    Q.  What was the content of that call?

3    A.  He asked a logistical or legal question about something

4    having to do with the case in front of Judge Schiltz, which

5    I answered, and then we hung up.  It was a very short call.

6    Q.  What did you do after that call ended?

7    A.  Well, that afternoon I know, I know Lora and I had a

8    discussion about the call.  We kind of debriefed what had

9    occurred.  And I also -- I think right after the call or

10   after Lora and I's discussion, one of the two, I sort of

11   closed my door and just took some time to try to gather

12   myself.

13   Q.  Why?

14   A.  It was really upsetting to hear, and, you know, I'm a

15   newer lawyer, and it was just -- it was just a difficult

16   conversation to have.

17   Q.  Did you discuss reporting the threat to anyone with

18   Ms. Friedemann?

19   A.  Yes.  We discussed whether or not we should disclose the

20   threat that had been made.  And we discussed that Lora

21   Friedemann would take it to -- would take the issue of

22   whether or not we should disclose it to our law firm's

23   internal counsel to discuss whether there would be any legal

24   or ethical issues that we needed to make sure were observed,

25   if we decided to disclose or whether we should even

RONDONI TAVERNIER - DIRECT

1    disclose.

2    Q.  Did you feel that that threat should be disclosed?

3    A.  I was concerned that -- that action would be taken based

4    on how I was feeling and the statements that had been made

5    at the time.  So, you know, I can't really say whether, you

6    know, legally -- I wasn't in the conversation with Lora

7    Friedemann and our internal counsel wherein they discussed

8    the legal and ethical issues, so I can't really say from

9    that perspective, but personally I felt good that Lora was

10   pursuing possibly disclosing it.

11   Q.  So setting aside the legal/ethical disclosure issues,

12   did you think it should be reported?

13   A.  Yes.

14   Q.  After you said you went back to your office to kind of

15   take a couple hours to regain your composure, what were you

16   thinking about?

17        MR. KELLEY:  Objection.  Your Honor, the relevant

18   -- irrelevance.

19        MR. RANK:  Your Honor, effect on the listener is

20   one of the factors that is in the jury instructions

21   regarding a threat case.

22        THE COURT:  Overruled.  You can answer.

23        THE WITNESS:  I'm sorry.  Could you repeat the

24   question?

25

RONDONI TAVERNIER - DIRECT

1   BY MR. RANK:

2   Q.  Sure.  What were you thinking about when you were in

3   your office with the door closed trying to regain your

4   composure?

5   A.  I was thinking about a lot of different things.  I was

6   thinking that I was glad that our office building had

7   recently increased their security measures.

8          MR. KELLEY:  Objection, Your Honor.  Relevance

9   again.  Move to strike her --

10          THE COURT:  Overruled.

11          THE WITNESS:  I was thinking I was glad that we --

12   I was glad that I had asked Lora Friedemann to be on the

13   call with me so that I didn't have that discussion alone.  I

14   was glad that the discussion was over the phone.  And I

15   remember being -- being -- thinking about the fact that he

16   was not in the state and, you know, wondering if he would

17   ever possibly return to Minnesota and to -- I also remember

18   thinking about -- I have a family member, who is also a

19   lawyer, who had discussed --

20          MR. KELLEY:  Objection.  Relevance, Your Honor.

21          THE COURT:  Sustained.

22   BY MR. RANK:

23   Q.  You had started, when I first asked you, you started

24   talking about being happy that your office had upgraded

25   security; is that right?

RONDONI TAVERNIER - DIRECT

1    A.  Yes.

2    Q.  Okay.  Did you have any concerns about your own safety?

3              MR. KELLEY:  Objection, Your Honor.  Relevance.

4              THE COURT:  Well, Mr. Kelley, if you can tell me,

5    I think the instruction talks about effect on the listener.

6    That's the basis for my ruling.  So unless you can give me

7    some reason why that's wrong -- or if you want to have a

8    side bar about it, we can do that.

9              MR. KELLEY:  I'll withdraw my objection, Your

10   Honor, for now.

11             THE WITNESS:  Sorry.  Could you --

12             THE COURT:  Okay.  Counsel -- I'm sorry.  Go

13   ahead.

14   BY MR. RANK:

15   Q.  Did you have any concerns for your own safety?

16   A.  Yes.

17   Q.  And what were those based on?

18   A.  It was based on the fact that I had just, you know, had

19   this consult with somebody who is clearly very angry,

20   clearly angry enough to make threats and that he, you know,

21   knew how to get in contact with me and knew where I was.

22   Q.  Ms. Rondoni Tavernier, did Mr. Ivers ever call you back

23   to say he was sorry about the call?

24   A.  No.

25   Q.  Did he ever call you back to tell you that he really

1    wasn't planning on killing a judge?

2    A.  No.

3    Q.  Other than the phone call on February 27th, 2018, did

4    you ever speak with Mr. Ivers again?

5    A.  No.

6    Q.  Thank you, ma'am.

7            MR. RANK:  No further questions.

8            THE COURT:  If you want to stretch before there is

9    any cross-examination, you may do so.

10                    (Short break taken.)

11           THE COURT:  Mr. Kelley, you can proceed.

12           MR. KELLEY:  Thank you, Your Honor.

13                    CROSS-EXAMINATION

14   BY MR. KELLEY:

15   Q.  Good morning.

16   A.  Good morning.

17   Q.  So I'm going to jump right into Mr. Ivers' second

18   lawsuit.  This is the one that the Pro Se Project referred

19   Mr. Ivers for representation about, right?

20   A.  Yes.

21   Q.  Okay.  And this is in front of Magistrate Schultz?

22   A.  Yes.

23   Q.  Okay.  So Mr. Rank didn't go through the facts.  It's

24   been a while.  So I'm going to go through them with you.

25   You tell me what you remember.  So the case involved a

RONDONI TAVERNIER - CROSS

1   friend of Mr. Ivers who took out a hundred thousand dollars

2   in life insurance policies with Mr. Ivers as a beneficiary,

3   correct?

4   A.  Yes.

5   Q.  And then that friend died leaving Mr. Ivers the hundred

6   thousand dollars, correct?  Is that your understanding of

7   the --

8   A.  My understanding was that he was the beneficiary.

9   Q.  And then the insurance company refused to pay out?

10   A.  That's my understanding.

11   Q.  Mr. Ivers sued in state court?

12   A.  I don't recall if it was state court, specifically, but

13   I know that he sued.

14   Q.  Okay.  But it wasn't originally in federal court, was

15   it?

16   A.  It may have been removed to federal court.  I don't

17   specifically recall that initial procedural --

18   Q.  But you did -- you reviewed the case before you talked

19   to Mr. Ivers, correct?

20   A.  Yes.  I -- yeah.  It's entirely possible that it was

21   removed.  I just don't recall specifically.

22   Q.  Okay.  So you don't recall that it was removed from

23   state court to federal court?

24   A.  That sounds like it could be right.

25   Q.  Okay.

RONDONI TAVERNIER - CROSS

1    A.  That wasn't really the basis for my evaluation.

2    Q.  Right.

3    A.  Whether it was removed was not something I was

4    particularly concerned with.

5    Q.  Part of the history of the case, though?

6    A.  Yeah, yeah.

7    Q.  And Mr. Ivers was pro se, as we call it, so he's

8    representing himself?

9    A.  In the previous case or in the current case?

10   Q.  Current case that you were helping him with.

11   A.  Yes.

12   Q.  Okay.  You also reviewed the first case --

13   A.  Yes.

14   Q.  -- in front of Judge Wright?

15   A.  Yes.

16   Q.  And in that case Mr. Ivers had asked for a jury trial.

17   A.  I don't recall specifically whether he asked for a jury

18   trial.

19   Q.  Do you recall whether or not Judge Wright denied him a

20   jury trial?

21   A.  I recall Mr. Ivers making statements about something

22   close to that, but I think that would be privileged, whether

23   or not I could --

24   Q.  I think the judge has already instructed you that you

25   can answer our questions.

RONDONI TAVERNIER - CROSS

1    A.   Okay.  I just want to make sure.

2    Q.   Yes.

3    A.   I recall Mr. Ivers saying that he felt that he had been

4    denied a jury trial.

5    Q.   Okay.  But you don't remember whether or not he asked

6    for a jury trial?

7    A.   No.

8    Q.   Or demanded one?

9    A.   The documentation that I received from Ms. Sanders

10   included the original complaint, the -- and Judge Wright's

11   findings of fact and conclusions of law and the docket, I

12   believe.

13   Q.   Okay.  So you --

14   A.   I did not review every single filing in the --

15   Q.   But you did have the docket?

16   A.   I did have the docket.

17   Q.   So the docket would list all the events that happened in

18   the case?

19   A.   Yes.

20   Q.   So if Mr. Ivers moved for a new trial, that would be in

21   the docket, correct?

22   A.   It would be in the docket, but, again, it wasn't

23   something that was germane to the legal analysis that I was

24   asked to do.

25   Q.   Okay.  You didn't review the docket that closely then?

RONDONI TAVERNIER - CROSS

1    A.  I did review the docket.  It's just that particular

2    piece, whether or not he had requested a jury trial,

3    wasn't -- didn't have a bearing on what I was going to be

4    looking at for the purposes of our consultation.

5    Q.  Mr. Ivers talked about during -- I'm jumping ahead to

6    the February 27th phone call.

7    A.  Okay.

8    Q.  But he talked about being denied a jury trial during

9    that phone call, right?

10   A.  He did.

11   Q.  So back to the first case, there's a bench trial on

12   January 2017 in front of Judge Wright.  Do you remember

13   that?

14   A.  Yes.  That sounds correct.

15   Q.  And then the judge issues an order almost six months

16   later in June dismissing the case.

17   A.  Yes.

18   Q.  Okay.

19   A.  I don't recall whether it was June specifically, but I

20   saw the order, I read it, dismissing the case.

21   Q.  Okay.  End of June?  That could be end of June?

22   A.  Yeah, that could be, correct.

23   Q.  After that, Mr. Ivers asked for a new trial.  Do you

24   remember that?

25   A.  Yes.  Well, again, I remember Mr. Ivers and I discussing

RONDONI TAVERNIER - CROSS

1    that he -- that there was an issue of a new trial, in terms

2    of whether he had asked for that within the time allotted I

3    think was the subject of discussion.

4    Q.  Okay.  So you talked about how he missed the deadline to

5    file a motion for a new trial?

6    A.  Yes.

7    Q.  And then Judge Wright denied him a hearing on a motion

8    for a new trial.  Do you remember that?

9    A.  That sounds correct.

10   Q.  Okay.  So that takes us to the fall of 2017.  He filed

11   the second lawsuit that is assigned to Magistrate Schultz in

12   November of 2017.

13   A.  Yes.

14   Q.  So you reviewed the first case with Judge Wright and the

15   second case with Magistrate Schultz?

16   A.  Yes.  And the second case included both that initial

17   complaint in the fall, and then I believe he also submitted

18   an amended one in January before we had had our discussion.

19   So there were two complaints that I had reviewed with regard

20   to the current pending case.

21   Q.  Okay.  So you are familiar with both cases then?

22   A.  Yes.

23   Q.  The second case in front of Magistrate Schultz was

24   virtually identical to the first case with Judge Wright,

25   correct?

RONDONI TAVERNIER - CROSS

```
1    A.  Identical in what way?

2    Q.  The facts, the circumstances.  It was basically the same

3    case again, correct?

4    A.  The underlying factual basis was the same.

5    Q.  But the claims were different.

6    A.  The claims were different.

7    Q.  Okay.  So the first time it was a breach of contract

8    claim?

9    A.  Yes.  That's correct.

10   Q.  The second time it was an ADA claim?

11   A.  A disability claim, yes.

12   Q.  Okay.  So Americans with Disabilities Act?

13   A.  Yes.

14   Q.  His friend George Tallman that died was disabled?

15   A.  I believe that was what he was claiming, yes.

16   Q.  So that's -- he files this lawsuit November 2017.  Then

17   you receive an email from Tiffany Sanders end of February?

18   A.  Yes, end of February.  Around February 20th, 22nd,

19   something like that.

20   Q.  Around that time frame.  And Tiffany Sanders is the one

21   who says here's Mr. Ivers' case, I want you to take a look

22   at it?

23   A.  Yeah.  She said we have a referral for you, please let

24   us know if this is something you can take on.

25   Q.  So you agreed to take on Mr. Ivers?
```

1    A.  I looked at it.  I looked at what she had sent us.  I

2    read her email.  I spoke with Lora Friedemann, and we agreed

3    to do an initial consultation with Mr. Ivers.

4    Q.  And during that initial consultation Mr. Ivers would

5    have been a prospective client?  Is that the term that would

6    apply to him?

7    A.  I believe so.

8    Q.  So you have to talk to Mr. Ivers and give him your legal

9    opinion about this new case in front of Magistrate Schultz.

10   That's your job at this point?

11   A.  That was what we agreed to do, was take a look at what

12   had been given to us and provide our initial thoughts and

13   advise him as to whether we would continue -- whether we

14   would represent him with the case or not.

15   Q.  And what you just testified to in the government's

16   questioning is that you were going to tell Mr. Ivers he was

17   going to lose that second case, right?

18   A.  We were going to tell Mr. Ivers that we did not believe

19   that we could go forward with representing him because we

20   didn't believe that there was a basis to do so for us as

21   attorneys.

22   Q.  The basis being that the case was --

23   A.  That there was a viable claim.

24   Q.  "Viable claim" means the case was a loser, in lay terms?

25   A.  In lay terms, it meant that we didn't think that he had

RONDONI TAVERNIER - CROSS

1    stated a claim that we could in good faith come in front of

2    a court and -- and bring.

3    Q.   Okay.  So you are scheduling a phone call to break that

4    bad news to Mr. Ivers?

5    A.   We were scheduling a phone call to give him our opinion.

6    Q.   Okay.  So you testified that you called Mr. Ivers on

7    February 26th, you believe, to set up --

8    A.   Yeah, it was around there, yeah, 26th.

9    Q.   And you knew at this time that he lived in North Dakota,

10   right?  You had been sent that information from Tiffany

11   Sanders.

12   A.   Yes, we had been sent his address and his phone number.

13   So, yeah, North Dakota sounds right.  I knew it was one of

14   the Dakotas.

15   Q.   Okay.  West Fargo, North Dakota?  That sounds about

16   right?

17   A.   Yes, that sounds correct.

18   Q.   Okay.  That's about four hours from the Twin Cities?

19   A.   Maybe.  I haven't looked how long that is.

20   Q.   Haven't been to Fargo in awhile?

21   A.   I haven't.  I've never been to Fargo.

22   Q.   Neither have I.  All right.  So you scheduled this phone

23   call for the morning of February 27th.

24   A.   Mm-hmm.  Yes.

25   Q.   And the plan was for you to call him.

1    A.  Yes, the plan is that I would call him.

2    Q.  Okay.  Let's jump to February 27th.

3    A.  Yes.

4    Q.  You're in your office.  Ms. Friedemann is there to

5    supervise.

6    A.  She was there to join me on the call.  I mean, she is my

7    superior, so she's always supervising me, you know, but she

8    was joining me in my opinion as well.

9    Q.  Okay.  But she is sitting back taking notes and --

10   A.  Yes.

11   Q.  -- you are doing the talking?

12   A.  I was primarily conducting the call.

13   Q.  So you call Mr. Ivers.  What time was that?

14   A.  I think it was around 11 in the morning, 10:30, mid

15   morning.

16   Q.  10:30, 11?

17   A.  Something like that.

18   Q.  Some time in the morning?

19   A.  Yes.

20   Q.  Now let's talk about what you guys discussed.  So you

21   reviewed the complaint that was in front of Judge Wright and

22   the complaint and amended complaint that were in front of

23   Magistrate Schultz.  You are reviewing both cases with

24   Mr. Ivers.

25   A.  We discussed both cases with Mr. Ivers, yes.

1    Q.  And then you also reviewed the June 29th, 2017, order

2    from Judge Wright dismissing his first lawsuit.

3    A.  Yes, I had reviewed it.  I don't know that we

4    necessarily walked through the order with him, you know,

5    point by point.

6    Q.  But you discussed it.

7    A.  We discussed it, yeah.

8    Q.  What does "res judicata" mean?

9    A.  Res judicata is a legal principle that says basically

10   you get one shot at a case.  So if it's a -- if you are

11   bringing a case and you have a final decision on the merits

12   of that case, and "on the merits" is kind of a legal jargon

13   meaning, you know, you arrived at the final conclusion of

14   the case based on the substance of the claims, that that was

15   your decision for those claims as related to these facts so

16   that you couldn't bring -- so that you're barred essentially

17   from bringing a subsequent claim based on the exact same

18   facts that you have already gotten a final decision on.

19   Q.  Okay.  And that's what had happened here with Mr. Ivers,

20   in your opinion?

21   A.  Again, yes, assuming that this is all waived --

22   Q.  It is.

23   A.  Yeah.  Yes, my opinion was that the effect of Judge

24   Wright's order was that the two had been -- his case in

25   front of Judge Wright and the case that he was bringing in

RONDONI TAVERNIER - CROSS

1    front of Magistrate Judge Schultz was based on the exact

2    same set of factual circumstances.  He had already litigated

3    through a bench trial with Judge Wright to a final decision

4    on the merits, based on those facts, so that his subsequent

5    case that was based on the same facts, even though it was a

6    different claim, that he would be barred from bringing it in

7    front of the court and that it would be dismissed.

8    Q.  And you explained this to Mr. Ivers.

9    A.  Yes.  I tried very hard to make it easily understandable

10   and not use the words "res judicata" too much, but to try to

11   explain that that's -- that that's what would very likely

12   occur.

13   Q.  It's a very dense term.  It would be hard for a

14   layperson, even a lawyer to understand, right?

15   A.  Yes.  It's one of those terms you learn first year of

16   law school and then sort of sticks in your head.

17   Q.  But if you are explaining res judicata in lay terms, you

18   are discussing the first case in front of Judge Wright a

19   fair amount, correct?

20   A.  Yeah.  I mean, I -- yes.  You know, when I was

21   discussing res judicata, I was discussing the fact that, you

22   know, the two cases were factually similar and that he had

23   gotten a final decision on that first case.

24   Q.  You testified that there was an organic shift and

25   Mr. Ivers started talking about the first lawsuit in front

RONDONI TAVERNIER - CROSS

1    of Judge Wright.

2    A.  Yeah.  I think, you know, the conversation kind of

3    turned there as we were sort of -- as it was becoming clear

4    that, you know, he kind of understood our position with

5    respect to, you know, the case, the conversation naturally

6    turned toward that previous case more and more.  And as I

7    testified to, I wanted to let him speak and sort of say his

8    peace.

9    Q.  Based on your discussion of res judicata and your legal

10   opinion, it was logical for him to be discussing the first

11   case with Judge Wright.

12   A.  Yes.

13   Q.  So you testified that he started or became agitated,

14   rather.

15   A.  Yes.

16   Q.  While he was talking about this first lawsuit and Judge

17   Wright.

18   A.  Yes.

19   Q.  He raised his voice.

20   A.  Yes.

21   Q.  Used some profanity.

22   A.  Yes.

23   Q.  A lot of profanity?

24   A.  Yes.

25   Q.  More than your regular clients?

RONDONI TAVERNIER - CROSS

1    A.  Far more than my regular intellectual property clients,

2    yes.

3    Q.  And then he talked about his relationship with George

4    Tallman.

5    A.  Yes, he did.

6    Q.  George Tallman is the man, his friend, who had died with

7    the insurance policy.

8    A.  Yes.

9    Q.  And did you understand that was an emotional subject for

10   him?

11   A.  Yes.

12   Q.  Okay.  He's angry, but he's emotional too about his

13   friend when he's talking about him.

14   A.  Yeah.  I -- you know, the discussion about his friend

15   was a very small -- I mean, I think it got mentioned, but we

16   weren't talking about it in depth.  So, yes, I mean, I could

17   tell he was upset about all of it, but in terms of, you

18   know, his particular emotion with regard to his friend, I

19   wouldn't say it was any different from anything else that

20   had been -- that he was upset about at that time.

21   Q.  He described to you how he was down on his luck?

22   A.  Yes.

23   Q.  And he was broke?

24   A.  Yes.

25   Q.  Broke, living in West Fargo?

RONDONI TAVERNIER - CROSS

1    A.  Yes.

2    Q.  And he moved in with his sister in West Fargo.

3    A.  I believe he said that, yes.

4    Q.  His older sister.

5    A.  Yes.  Sure.  His sister.

6    Q.  When he was talking about the first case, he talked

7    about his first attorney that was on the first case and part

8    way through the second case, right?

9    A.  Yes, I remember him mentioning his first attorney.

10   Q.  He had an attorney at some point --

11   A.  Yes.

12   Q.  -- in the insurance case?

13   A.  Yes.

14   Q.  And his attorney quit after the case was removed to

15   federal court.  Does that sound right?

16   A.  Possibly.  I know his attorney quit at some point.  I

17   can't say specifically when.

18   Q.  And Mr. Ivers told you he wasn't happy with his first

19   attorney.

20   A.  I do recall that, yes.

21   Q.  And he told you he wanted a jury trial?

22   A.  He told me that he had felt cheated out of a jury trial.

23   Q.  He was upset when the judge wouldn't give him a jury

24   trial.

25   A.  I guess so, yes, but my understanding of the case was

RONDONI TAVERNIER - CROSS

1    that I believe he had --

2    Q.  I don't think there was a question before you.  I'll

3    move on here in one second.  And we already talked about

4    that he tried to move for a new trial?

5    A.  I believe so, but I believe he had --

6    Q.  Okay.  So --

7    A.  -- left his time.

8    Q.  At this point he's talking about how he missed that

9    deadline.

10   A.  Yes.

11   Q.  And he was unhappy about it?

12   A.  Yes.

13   Q.  Might have -- if there was a hearing on it, he might

14   have thrown some chairs.

15   A.  He said that if that -- he said that Judge Wright was

16   lucky that there wasn't a hearing because he was going to go

17   in and throw some chairs.

18   Q.  But that hearing never actually happened, right?

19   A.  No, not to my knowledge.

20   Q.  So when he said that, he's talking about something that

21   couldn't possibly happen, right?

22   A.  Not at that time, but it was clear that he had thought

23   about it and --

24   Q.  Let me rephrase it.  Could he throw chairs at a hearing

25   in the past that never happened?

1          MR. RANK:  Objection.  Argumentative.

2          THE COURT:  Sustained.

3    BY MR. KELLEY:

4    Q.  He also told you that he couldn't understand how he lost

5    the first case.

6    A.  I don't recall him using those specific words.  I mean,

7    it was clear to me that he didn't believe that he should

8    have lost the first case.

9    Q.  And he's not an attorney.  He doesn't really understand

10   things like res judicata.

11   A.  No.  Yes.

12   Q.  So part of your job on this phone call was to explain

13   that to him.

14   A.  Yes.

15   Q.  I believe you testified that you were not taking notes

16   while Mr. Ivers was talking.

17   A.  I was not taking notes of what was occurring during the

18   call.  I had my notes about what I wanted to cover with him,

19   and so I was kind of making notes maybe about that, but I

20   was not like -- I was not taking notes about what was

21   occurring during the call, no.  Lora Friedemann was doing

22   that.

23   Q.  Thank you.  Then he said a few other things about how he

24   felt about the case towards the end of the call, right?

25   A.  Yes.

1    Q.  Okay.  So he's upset.  He's using profanity.

2    A.  Yes.

3    Q.  And you believe Mr. Ivers said, "You don't know the 50

4    different ways I thought about killing her."

5    A.  I know that he said, "You don't know the 50 different

6    ways I" either "thought of killing her" or "planned to kill

7    her."  I can't remember the exact specific word that he

8    used, because at that point I was trying to think of ways to

9    rein in the call and Lora was taking notes.

10   Q.  So it could be "thought of."  Is that what you just

11   said?

12   A.  I said I don't recall -- my memory, I don't recall

13   specifically what was said.  I think it was that he said,

14   "You don't know the 50 different ways I planned to kill

15   her," because that was what my coworker wrote down and I

16   watched her write it down, so I would trust her notes.

17   Q.  But you don't recall what he actually said.  You are

18   relying on her notes.

19   A.  I recall him saying, "You don't know the 50 different

20   ways" to kill her, that "I planned" or "I thought" or "I

21   conceived" or whatever verb he used.  I know that he said,

22   "You don't know the 50 different ways I thought of,

23   planned," whatever, "to kill her.

24   Q.  So you said --

25   A.  And that is crystal clear in my mind.

RONDONI TAVERNIER - CROSS

1    Q.  -- thought of, planned, conceived --

2    A.  I know he didn't say conceived.

3    Q.  Okay.  Well, you just said it, so you --

4             THE COURT:  Ms. Rondoni Tavernier, we have a

5    really good court reporter, but she can't take both of you

6    at once.  So here's the rule.

7             Mr. Kelley, you wait till she completes her

8    answer.

9             Ms. Tavernier, you wait till he completes his

10   question.

11            Okay?

12            MR. KELLEY:  Yes, Your Honor.

13            THE COURT:  You may proceed.

14   BY MR. KELLEY:

15   Q.  So not conceived of, but maybe planned, thought about,

16   thought of?

17   A.  It was either planned or thought of in my head, but,

18   again, I know that Lora wrote it down -- that Ms. Friedemann

19   wrote it down immediately after and I know that he had --

20   that the rest of that statement is crystal clear in my mind.

21   It's just the specific word I can't recall.

22   Q.  You can't remember the specific word.

23   A.  I can't remember that one specific verb.  I remember "50

24   different ways to kill her" crystal clear in my mind.

25   Q.  When the government was asking you questions about these

1    plans, he didn't describe any plans, did he?

2    A.  He didn't start describing his plans to kill her, no.

3    Q.  No prior plans?

4    A.  Well, but based on his statement it would sound like he

5    had made prior plans.

6    Q.  But they were prior.  That was your understanding.

7    A.  Prior.

8    Q.  You have no idea.  He didn't discuss any of these

9    things, did he?  He just made that statement.

10                   MR. RANK:  Objection.  Asked and answered.

11                   THE COURT:  Sustained.

12   BY MR. KELLEY:

13   Q.  Okay.  So then after this statement, you wrap up the

14   call and tell him that Fredrikson & Byron will not represent

15   him after the phone call, essentially?

16   A.  Yes.

17   Q.  So until that point you considered him a prospective

18   client.

19   A.  I guess so, yes.

20   Q.  And not a client after the phone call.

21   A.  Yes.

22   Q.  Okay.  So the phone call is over.  About five minutes

23   later Mr. Ivers calls back?

24   A.  Yes.  Approximately five minutes later.  Sometime in

25   there.

484

RONDONI TAVERNIER - CROSS

1   Q.  And he asked you a question about the second lawsuit

2   with Magistrate Schultz.

3   A.  I believe so, yes.

4   Q.  And you answered that question?

5   A.  Yes.

6   Q.  Give him legal advice about it?

7   A.  Yes.

8   Q.  Only lasted five minutes?

9   A.  Not even.

10  Q.  Not even.  It was a fairly unremarkable call, wasn't it?

11  A.  Yeah.  It was a technical question that had an easy

12  answer.  I think it was something to do with filings or kind

13  of what happened next.

14  Q.  So five minutes after this other call Mr. Ivers is calm.

15  A.  I don't know if I would say he was calm.  He was asking

16  a question about the lawsuit.

17  Q.  It was an unremarkable phone call.

18  A.  It was an unremarkable phone call.

19  Q.  And that was the last time you ever heard from

20  Mr. Ivers.

21  A.  Yes.

22  Q.  He never sent you any letters.

23  A.  No.

24  Q.  Any emails?

25  A.  No.

485

RONDONI TAVERNIER - CROSS

1    Q.  He never called you again?

2    A.  No, I don't think so.

3    Q.  He never came to your office?

4    A.  Not that I'm aware of.

5    Q.  Let's quickly talk about your office building.

6    Fredrikson & Byron right downtown Minneapolis has a lot of

7    security in that building.

8    A.  Especially in the last year with the Super Bowl and

9    various protests, they changed the security system

10   significantly.

11   Q.  Okay.  So you need a key card, check in at the desk with

12   security in order to get past?

13   A.   In order to get even to the elevators, you need to have

14   a key card to get through some turnstiles.  And if you don't

15   have a key card, you need to check in at the desk.  And

16   there needs to be a prior record of somebody expecting your

17   visit.

18   Q.  Right.  So if somebody showed up unannounced, you

19   wouldn't get in?

20   A.  They would probably give you a phone call, see if you

21   were expecting them.

22   Q.  What floor do you work on?

23   A.  The 33rd floor.

24   Q.  The 33rd floor.  Okay.  So this was all February 2018.

25   I'm going to move to July.  Around July 3rd-ish Mr. Scott

486

RONDONI TAVERNIER - CROSS

1   and I asked to interview you.  Do you remember that?

2   A.  Yes.

3   Q.  And you understood that Mr. Ivers had provided us with

4   the waiver that would have allowed you to talk to us about

5   the February 27th phone call.

6   A.  I recall the email that I received saying something

7   about a waiver.  I hadn't independently confirmed the

8   existence of any waiver or what the scope of it would be.

9   Q.  But you understood that you were allowed to talk to us?

10  A.  I'm not sure what you mean by "allowed."

11  Q.  For the interview.  You were allowed to interview with

12  us, if you wanted.

13  A.  I knew that I could speak with you, if I wanted to, I

14  guess, but I -- in terms of being allowed, I guess I didn't

15  know that, because I would have had to consult internally

16  and ensure that --

17  Q.  So you -- I'll stop you there.  You might not be allowed

18  to talk to us based on perhaps your in-house counsel at

19  Fredrikson, their advice?

20  A.  Again, I'm not sure what you mean by "allowed."  I mean,

21  I -- I wasn't sure whether it would have been advisable for

22  me to go forward.  Again, I'm a second-year attorney, so I

23  tend to be paranoid and check with everybody before I --

24  before I do things.

25  Q.  So you ultimately refused to talk to us.

RONDONI TAVERNIER - CROSS

1    A.  I believe I was advised that at that time it wasn't a

2    good idea to speak with you at that time.

3    Q.  So on the advice of your attorney you refused to talk to

4    Mr. Ivers' attorneys.

5    A.  I believe so.

6    Q.  I'm going to skip to the end of July, July 27th.  This

7    is five months after the phone call.  Yes?

8    A.  That sounds correct, yep.

9    Q.  You were interviewed by Ms. Julie Allyn and Deputy

10   Wooton -- or actually it was Deputy Marshal Trinh.  Does

11   that sound right?

12   A.  That sounds right, and the date range sounds about

13   correct.

14   Q.  So interview on February 27th, Julie Allyn and Deputy

15   Marshal Trinh.

16   A.  I'm sorry.  You said February 27th.  Did you mean July?

17   Q.  Oh, yes.  I'm sorry.

18   A.  Yes, the end of July.  That sounds correct.

19   Q.  And the purpose of this interview was to discuss the

20   February 27th phone call.

21   A.  Yes.

22   Q.  And one of them asked you if Mr. Ivers had said, "You

23   don't know the 50 different ways I plan to kill her."  Do

24   you remember that?

25   A.  I don't recall that they specifically asked me that

488

RONDONI TAVERNIER - CROSS

1    question.  I recall discussing the call.

2    Q.  Did you tell them Mr. Ivers said, "You don't know the 50

3    different ways I plan to kill her," in the present tense?

4    A.  I don't recall specifically what I said.  I believe I

5    conveyed that he made that statement, that Mr. Ivers made

6    the statement about having thought of or planned 50

7    different ways to kill Judge Wright.  I don't recall

8    specifically what I said on that date.

9    Q.  So you believe you told them on July 27th thought of or

10   planned, but you can't really remember.

11   A.  I can't specifically remember.  I know that I conveyed

12   that -- that he had made that statement.  I may have even

13   conveyed that I didn't recall the specific wording that he

14   used.  In fact, I would think that I did, conveyed that I

15   didn't recall the specific, that specific -- that one

16   specific word.

17   Q.  Okay.  So you think you told them you couldn't remember

18   exactly what he said.

19   A.  I -- I believe so, yeah.  Yeah.

20   Q.  So that's the end of July.  Moving into August, you

21   change your story a little bit.

22   A.  I don't think I've ever changed my story.  I think I

23   have always been clear that -- that Mr. Ivers made the

24   statement that "You don't know the 50 different ways I"

25   either planned of or thought of "to kill her."  I think I

1    have always been clear that I did not recall that one

2    specific word and I was forthcoming with that, but that the

3    rest of the statement was clear to me.

4    Q.  Okay.  Just to be clear, even in August you can't

5    remember what you said --

6    A.  I --

7    Q.  -- or what Mr. Ivers said.  Sorry.

8              MR. RANK:  Objection.  Asked and answered.

9              THE COURT:  Sustained.

10   BY MR. KELLEY:

11   Q.  During the February 27th phone call Mr. Ivers never

12   instructed you to disclose what was said during that phone

13   call, did he?

14   A.  On February 27th?

15   Q.  Correct.

16   A.  No.

17   Q.  He didn't tell you to disclose anything to Judge Wright?

18   A.  No.

19   Q.  He didn't tell you to disclose anything to Judge

20   Wright's chambers?

21   A.  No.

22   Q.  Not Tiffany Sanders?

23   A.  No.

24   Q.  Not the marshals?

25   A.  No.

RONDONI TAVERNIER - CROSS

1    Q.  Is it possible he thought the conversation would remain

2    confidential?

3                MR. RANK:  Objection.  Calls for speculation.

4                THE COURT:  Is it possible -- overruled.

5                You can answer.

6                THE WITNESS:  I don't know what he thought

7    specifically.  I mean, it's possible that he thought that

8    our conversation was confidential.  I can't speak to what

9    was in his mind.  He made no statements one way or the

10   other.

11   BY MR. KELLEY:

12   Q.  But it is possible that he thought it was a confidential

13   conversation?

14               MR. RANK:  Objection.

15               THE COURT:  This has been asked and answered.

16   Sustained.  Repetitive, cumulative.

17   BY MR. KELLEY:

18   Q.  On February 27th during the phone call did you ever ask

19   what Mr. Ivers meant by his statement, "You don't know the

20   50 different ways I" thought of, planned --

21   A.  No.  As I testified to, I didn't verbally react to his

22   -- to those statements that he made.

23   Q.  And Ms. Friedemann didn't ask him any questions.

24   A.  Not to my knowledge, no.

25   Q.  Is it possible he didn't mean that?

RONDONI TAVERNIER - CROSS

1        MR. RANK:  Objection.  Foundation.

2        THE COURT:  Sustained.

3    BY MR. KELLEY:

4    Q.  Did you ask if he was just venting?

5        MR. RANK:  Objection.  Asked and answered.

6        THE COURT:  Overruled.

7        THE WITNESS:  As I said, I didn't ask him -- I

8    didn't interject while he was -- during this portion of the

9    phone call.  I wanted to let him speak and say his peace,

10   and I didn't think that any of those statements -- that any

11   reaction from me would be necessary or helpful.

12   BY MR. KELLEY:

13   Q.  Don't you think it would have been important to know

14   what he meant by those statements?

15   A.  As I said, at the time I was trying to focus on bringing

16   the call to a good resolution, to bringing it back to the

17   topic.  I didn't think it was a good idea to interject or to

18   react to his statements.

19   Q.  You didn't think it was a good idea to ask your client

20   to clarify what he meant.

21       MR. RANK:  Objection.  Argumentative.

22       THE COURT:  Overruled.

23       THE WITNESS:  I didn't consider him a client at

24   that time.  And because these statements weren't

25   specifically relating to the advice that I was giving him,

———RONDONI TAVERNIER - CROSS———

1    the -- the questions and the follow-up that I did was

2    related to, during that call, was related to the substance

3    of the legal communication that I was giving him.  That was

4    what I wanted to make sure that he understood.  These

5    statements were outside of --

6    BY MR. KELLEY:

7    Q.  I'll stop you there.  That's a little far beyond the

8    answer I was asking for.  But under oath here today, you

9    can't really remember the exact words he said.

10              MR. RANK:  Objection.  Cumulative, asked and

11   answered several times.

12              THE COURT:  Sustained.  Sustained.

13              MR. KELLEY:  No further questions, Your Honor.

14   Thank you.

15              THE COURT:  Mr. Rank, do you have any redirect?

16              MR. RANK:  No, Your Honor.

17              THE COURT:  You may be excused.

18              Do you want to call your next witness, or is now a

19   time for the jury's morning recess?  You tell me what is

20   going to work for your planning.

21              MS. ALLYN:  Your Honor, I will leave it to the

22   court's discretion.

23              THE COURT:  Okay.  Well, call your witness.

24              If you want to stretch while the witness comes in,

25   you can do so.

SEYFRIED - DIRECT

1        (Short break taken.)

2        THE COURT:  Do you want to stand and look at the

3    ladies and gentlemen of the jury and raise your right hand

4    please to be sworn?

5                    MATTHEW SEYFRIED,

6    called on behalf of the government, was duly sworn, was

7    examined and testified as follows:

8        THE WITNESS:  I do.

9        THE COURT:  Please be seated.

10       You may proceed, counsel.

11       MS. ALLYN:  Thank you, Your Honor.

12                  DIRECT EXAMINATION

13   BY MS. ALLYN:

14   Q.  Good morning.

15   A.  Good morning.

16   Q.  Can you tell us your name?  I'm sorry.  I was getting my

17   glass of water.

18   A.  Sure.  My name is Matthew Seyfried.

19   Q.  And where do you work?

20   A.  I work for the U.S. Marshals Service in the District of

21   North Dakota, Fargo office.

22   Q.  And what is your job title there?

23   A.  I am a Deputy U.S. Marshal.

24   Q.  How long have you worked for the marshals service?

25   A.  I've worked for the marshals service for a total of

SEYFRIED - DIRECT

1    14 years now, 13 years of which I have been a deputy.

2    Q.  And you are at which field office?

3    A.  The Fargo office.

4    Q.  And how long have you worked at the Fargo, North Dakota,

5    office?

6    A.  The 13 years I have been a deputy.  It's been my first

7    station, and I have been there ever since.

8    Q.  Are you from there originally?

9    A.  I am not.

10   Q.  What is your current job assignment for the Fargo

11   office?

12   A.  My current job assignment is just Deputy U.S. Marshal.

13   The Fargo office is a small office, we only have four

14   deputies there, so we don't really have specific jobs.  We

15   all kind of do what needs to get done as it pops up.

16   Q.  So do larger marshal offices separate different

17   responsibilities between marshals differently than a smaller

18   office like North Dakota?

19   A.  That's correct.  In my experience sometimes we have to

20   travel to help other offices, bigger offices like

21   Minneapolis or Los Angeles.  What they will do is they will

22   section deputies off and say you are going to work warrants

23   for six months, you are going to work cell block, you are

24   going to work court, maybe subpoenas and serving processes.

25   You kind of rotate through those jobs.  In Fargo we just

SEYFRIED - DIRECT

1    don't have that luxury.  If there's warrants, we have to

2    work them.  If there's court, we have to do it.  And we just

3    share and get it all done.

4    Q.  So you kind of wear all those hats, do all those jobs in

5    North Dakota?

6    A.  That's correct.

7    Q.  So what about having a person assigned or

8    responsibilities with respect to -- we have heard some

9    testimony of a PII.  Do you want to refresh my memory of

10   what that stands for?

11   A.  Yeah.  I don't honestly -- we don't have PIIs in North

12   Dakota.  The function of a PII is to investigate threats for

13   the judicial branch, any type of judge or anyone who works

14   for the court.  If the threat happens, a PII would handle

15   that.  It's an elevated position, what we would call a

16   managerial position.  We call them 13s in slang for the

17   marshals service.  But, regardless, only big offices have

18   them.  In North Dakota we don't have them.  What we do

19   have -- should I go into that?

20   Q.  Yeah.  So how would threats to a judge be handled then

21   in North Dakota without a PII investigator?

22   A.  Sure.  So in North Dakota what we have and what all of

23   the offices have is what we call collateral duties.  One of

24   my collateral duties is a district threat investigator.  We

25   call them DTIs for short.  So anytime a threat happens with

496

SEYFRIED - DIRECT

1     the judicial branch, our judicial security inspector, or JSI

2     for short, would get the threat and would normally handle it

3     and then he will usually grab me as well and both of us will

4     tag team the threat and help interview it and discuss

5     whatever we need to figure out to do.

6     Q.  How many full-time marshals are in Fargo, North Dakota?

7     A.  Well, in Fargo we have four, what I want to call grunts,

8     just the main guys who do the main base-level work, of which

9     I am one, and then we have four managers.  We have two

10    supervisors, a JSI and then we have a chief.

11    Q.  Did you become involved in a case involving Robert Ivers

12    that brings you here today to testify?

13    A.  I did.

14    Q.  Did you ever meet Mr. Ivers personally?

15    A.  I did on the day of the interview, but prior to that I

16    had no knowledge of Mr. Ivers.

17    Q.  Do you see him here in the courtroom today?

18    A.  I do.

19    Q.  Can you identify where you see him or where he's

20    sitting, what he's wearing?

21    A.  Sure.  He is seated all the way on the left, a blue

22    shirt, maybe a black coat, dark blue coat, next to the

23    defense attorney.

24    Q.  How did you first then become involved in this case

25    involving Mr. Ivers?

SEYFRIED - DIRECT

1    A.  Sure.  So we first became involved in this case on

2    March 7th, 2018.

3            So just to help explain a little bit, the way the

4    marshals service works is we are a nationwide agency, but

5    any time something happens outside in another district or

6    another state it doesn't make sense for us to drive to that

7    other state to handle it, because it would just mess up all

8    the manpower issues.  So what we do is we ask the marshals

9    service in that area that's closest to handle the

10   investigation, the warrant, the serving of papers, whatever.

11           So in this case what happened is on March 7th

12   Farris Wooton, seated over there, sent what we call a

13   collateral lead to the marshals in Fargo, North Dakota.  It

14   would have went to Bill Klug, our JSI investigator.  And he

15   asked us -- he said Mr. Ivers made a threat to his attorney

16   over the phone and that he would like us to go interview

17   Ivers to find out if the threat is what we call credible or

18   not, for example, do we think he's going to actually move

19   forward with this threat or is this something that's maybe

20   just made verbally with no bite behind it, per se.

21   Q.  So did you act on this lead request from Deputy Wooton?

22   A.  I did.

23   Q.  Can you explain sort of what happened, what steps were

24   taken when you acted on this lead request?

25   A.  Yep.  So, as I mentioned earlier, the lead came in on

SEYFRIED - DIRECT

1    March 7th, 2018, and it would have went to Bill and then --

2    Q.  And I'm sorry.  Who is Bill again?

3    A.  I'm sorry.  Bill Klug is our judicial security inspector

4    in Fargo, North Dakota.  He's the one who gets all these

5    threats and handles a lot of them, and I usually help him

6    with most of them, so.

7    Q.  So continue.  It goes to Bill Klug.  And then what

8    happens?

9    A.  So it would have went to Bill Klug, and then at some

10   point he would have came and talked to me about the threat.

11          From what I remember about that time period, we

12   were extremely low on manpower.  I was actually an acting

13   supervisor at the time, so that took one man out of the

14   office.  So we only had two guys, maybe three at the time

15   doing the work, so -- and Bill was busy too.

16          So he got the lead on the 7th.  We put on our

17   calendar to get it taken care.  For whatever reason, I don't

18   know, Bill wasn't able to handle it that week, so it had to

19   wait till the next week to make sure we can do it.  Again,

20   Bill still wasn't able to handle it, so I had to grab Kevin

21   Wickenheiser.  He's a deputy down here in the District of

22   Minnesota.  That's how short-staffed we were.  We were

23   actually pulling people up from the Minneapolis/St. Paul

24   office just to help us.  So I had to grab Kevin Wickenheiser

25   instead of Bill, because he just wasn't able to help, and

1   then we went out on March 14th to interview Mr. Ivers.

2   Q.   And why did you need to grab a second person?

3   A.   Yep.  So the marshals service just has a stand-alone

4   policy.  We do everything in at least twos.  We don't do

5   anything by ourselves, but especially in threat

6   investigations where someone alleges a death threat or a

7   threat to harm somebody, we don't know what that person is

8   going to be like, we don't know if they are going to try to

9   harm us or if it was just something that was said, you know,

10  willy-nilly.  So it's always best to have two, sometimes

11  even more, just to protect ourselves and also to protect the

12  person.

13  Q.   Before you go to do an interview, what -- I don't

14  know -- background work are you doing before you do that

15  interview?

16  A.   Yep.  So a couple of basic steps that I will do is I

17  will look up the name in what we call NCIC.  It has those

18  criminal histories and history of past crimes.  So I will

19  look up the individual in there to see if maybe they had

20  past histories of murder or maybe nothing, but it just gives

21  us a general idea of who that person has been over time.

22  Other than that, the things what we will always do, at least

23  me personally, is whoever sends the lead I will call down

24  and talk to them about it.

25           So in this case I would have called Farris and got

1    a little background of the case, what happened before this

2    and what do you expect to come out of this, what are you

3    looking for, just so I have a general idea of what I am

4    walking into, because he would have more experience in this

5    case.  And actually in this case it seems that Farris knew a

6    bunch, but he didn't know as much, so he directed me to a

7    Jeff Hattervig, and Jeff Hattervig handled this case prior

8    to Farris, so then I also called a Jeff Hattervig and got a

9    little bit more background of what's been going on with

10   Mr. Ivers over these past -- I don't remember how long, a

11   couple years, maybe a year, two years, I don't know, but

12   there was a history where they would have been dealing with

13   him for sometime now.

14   Q.  And so at some point it sounds like you did interview

15   Mr. Ivers; is that right?

16   A.  It is.

17   Q.  And I'm sorry.  If you said the date, can you tell me

18   the date again when you interviewed Mr. Ivers?

19   A.  Yeah.  I believe it was March 14th, 2018.  It would have

20   been in the morning, late morning hours, if I remember

21   correctly.

22   Q.  And that was you and this Deputy Kevin Wickenheiser?

23   A.  Correct.

24   Q.  I guess start us with that day.  What do you do first

25   when you are heading out to interview somebody, specifically

SEYFRIED - DIRECT

1   Mr. Ivers?

2   A.   Yep.  So -- and besides talking to the deputies who

3   informed me about the case, I will then get in our car, we

4   will drive over there.  I always like to pass by the house a

5   few times to see what I'm looking at, get an idea of what

6   the layout is and any areas that what I would call threat

7   areas, see if someone is going to jump around the back, are

8   there 20 doors out of the place, just one.

9        So in this case we drove by the house.  I took a

10   look at it.  I came back around the block.  We sat a few

11   blocks away.  I just looked at it for a few minutes or two,

12   talked to Kevin, explained to him what we were going to be

13   doing, how I wanted to handle the --

14        COURT REPORTER:  Excuse me, sir.  Would you please

15   slow down?

16        THE WITNESS:  Sure.  Sorry.

17        So we drove by the house.  I took a few seconds to

18   talk to Kevin, and we discussed what we were going to do.  I

19   told him how I wanted to handle it.  And then we turned back

20   around, pulled into the driveway.  And then I would have

21   started my recorder and walked up to the door.

22   BY MS. ALLYN:

23   Q.   Okay.  You are talking about a house.  Do you know whose

24   house it was?

25   A.   We do.  Actually, the information I received from Farris

SEYFRIED - DIRECT

1    was that the house belonged to Robert Ivers' sister Janet

2    Patterson.

3    Q.  And you said something about starting your recorder.

4    Where -- what recorder were you using, and where were you

5    holding it?

6    A.  Yep.  So I had an audio recorder on me, just a cheap $10

7    audio recorder.  And I wear a bullet-resistant vest,

8    sometimes we call them bullet-proof, and I put it right in

9    between my chest, between the vest and my body, so it was

10   right there underneath my mouth, but it wasn't visible.

11   Q.  So I assume you go up to the door, knock, ring the

12   doorbell.  Anybody answer?

13   A.  Yes.  We -- I believe I knocked and rang the doorbell.

14   I don't remember for sure.  But I know Janet Patterson

15   eventually came to the door.  And I introduced myself to

16   Janet, and I told her the reason why I was there, that I

17   just wanted to speak with Robert Ivers.

18   Q.  And how did Janet Patterson respond?

19   A.  Janet seemed a little confused at first.  I had to

20   reiterate that I wanted to speak with Robert.  I don't know

21   if maybe she just didn't hear me the first time, but the

22   second time I spoke with her and told her that I wanted to

23   talk to Robert, she said okay and she closed the door and

24   then she went to get Robert.

25   Q.  Okay.  I guess, yeah, explain that.  She closed the

SEYFRIED - DIRECT

1    door.  Are you outside the house, inside the house, and

2    where is Deputy Wickenheiser standing?

3    A.  Okay.  So we were both outside the house.  I am on the

4    front steps of the house.  Kevin is about 8 to 10 feet

5    behind me.

6         So to set this up for you, when we walk up to the

7    house, there's a garage on my right.  The front door will be

8    in front of me.  So this is about an 8-foot wall maybe right

9    there where the garage is.  Kevin stood all the way back on

10   the corner by the garage.  We do that so he can help watch

11   my back.  If somewhere were to be -- if this was a more

12   violent situation and someone were to come out a back door

13   and try to come around us, we have somebody there watching

14   my back.  Me, I was at the front door, knocking on the door

15   and ringing the doorbell.

16   Q.  Did you ever end up going inside the house?

17   A.  No, not on that occasion.

18   Q.  So I think I left you off where Janet Patterson said

19   okay, I will go get Mr. Ivers.  Is that it?

20   A.  That is correct.

21   Q.  And did she do so?

22   A.  She did.

23   Q.  And how long did it take for Mr. Ivers to come to the

24   door?

25   A.  If I remember correctly, it was about four or five

SEYFRIED - DIRECT

1    minutes.  It took quite a while.  I know maybe about

2    30 seconds for her, from what I could hear, and go down --

3    it's a split level.  So if you were to look in the door,

4    from what I remember, the steps on the left go up six or

5    eight steps and the steps on the right go down six or eight

6    steps.  So she went downstairs, and then she came back

7    upstairs, and she said he will be just a minute.

8    Eventually, I want to say it was like another minute or two,

9    Mr. Ivers came up the steps.  He looked at us, walked right

10   past us.  I heard him argue with his sister for a little

11   bit.  And then he eventually came back down to the front

12   door and spoke with us.  I would guess a total of maybe four

13   to five minutes, I don't know, but it was -- it felt like

14   forever when you are standing outside with nothing to do,

15   so.

16   Q.  Okay.  So you are describing observing Mr. Ivers before

17   he came speak to you; is that right?

18   A.  Correct.

19   Q.  Okay.  There's, what, a front door window?  How are you

20   doing this?

21   A.  Yeah.  So there is a storm -- there's two doors.

22   There's a storm door, and there was another door.  And then

23   there were side, from what I remember, there were side

24   windows on the sides of the door.

25   Q.  So did Mr. Ivers finally come to the door?

SEYFRIED - DIRECT

1  A.  He did.

2  Q.  And what happened then?

3  A.  Mr. Ivers came to the door.  He opened it somewhat

4  quickly.  I tried to introduce myself.  He said he didn't

5  want to hear anything about it.  It was something like no,

6  no, no or what do you want.  I told him that I just wanted

7  to speak with him.  And he said if I don't have a warrant, I

8  don't want to talk to any -- slammed the door in our face,

9  so.

10  Q.  And then you said this was recorded, this conversation;

11  is that right?

12  A.  I did.

13  Q.  So to just set up that recording a little bit, you just

14  described -- is it fair to say in the recording there's --

15  Mr. Ivers comes to the door, leaves the door, comes to the

16  door, leaves the door?  Can you just describe that a little

17  bit so that the recording would make sense to the jury?

18  A.  Sure.  So the entire conversation I had with Mr. Ivers,

19  if you want to call it that, is he would come to the door,

20  he would say a few pieces, most of the times he would yell

21  at me, and then he would slam the door and walk away.

22  Towards -- this happened a few times.  Eventually, towards

23  the end, his sister got fed up.  She came to the door and

24  tried to speak with us.  And she actually stepped outside

25  eventually to talk to us, so we could talk face to face.

SEYFRIED - DIRECT

1    But even during those interactions, when we were talking

2    with Janet, he would still come to the door and he would

3    yell and he would slam the door again in our face.

4    Q.  Can you hear Mr. Ivers speaking even when he would go

5    back inside the house?

6    A.  Yes.  Yes, you could.  He was -- he was very angry.  I

7    would use the word irate, just constantly yelling.  There

8    was never a point of normal conversation.  There was just --

9         THE COURT:  Deputy, would you slow down again for

10   the reporter a little bit?

11        THE WITNESS:  Yes, sir.  I apologize.

12        THE COURT:  That's right.

13        THE WITNESS:  There was never a, from what I

14   remember, never just a normal low-level conversation.  Janet

15   was very nice to speak to.  I had a nice conversation with

16   her.  But Mr. Ivers was -- yelled at us the entire time.  He

17   would jab his finger at us.  His face was very red.  He was

18   kind of hunched forward.  I didn't feel like he was going to

19   attack me, but it's what I would characterize as a fighting

20   stance.  You know, you are kind of leaned in, like you want

21   to yell at somebody in their face.  That was just the entire

22   interaction we had with him.  He would yell, run away, yell,

23   run away.

24   BY MS. ALLYN:

25   Q.  And, deputy, this is your first time testifying in a

SEYFRIED - DIRECT

1   trial; is that true?

2   A.  That is true.

3   Q.  So it is hard for the court reporter to take everything

4   down if you talk too fast or if I talk over you.

5   A.  Yes.  I apologize.  I am also from New Jersey, so -- we

6   talk incredibly fast.  I haven't gotten that out of my

7   system yet.  I am trying, but --

8   Q.  Well, I think -- but I will also help try to slow you

9   down, if we need to.

10          Before we play the recording, I just -- I guess I

11  want to understand if the recording device is in your pocket

12  and Mr. Ivers is back inside the house, is any of that still

13  captured on the recording device?

14  A.  It is, surprisingly.  Just one correction.  It wasn't in

15  my pocket.  It was in my chest, so -- we have a

16  bullet-resistant vest that comes over my normal clothing.

17  So I would have had it stuck in between the vest and my

18  shirt, kind of right down on your sternum.  But, yes, it

19  captured almost all of the conversation, which I was

20  pleasantly surprised about.  I put it there hoping that I

21  would talk to Mr. Ivers face to face.  I have always had it

22  work really well, but in this situation it caught

23  everything.  Even when he was inside and I think either

24  upstairs or downstairs, you could still hear him, which is

25  just how loud he really was.

SEYFRIED - DIRECT

1          MS. ALLYN:  Your Honor, may I approach?

2          THE COURT:  You may.

3     BY MS. ALLYN:

4     Q.  Deputy, I have handed you what's marked as Exhibit 14.

5     Do you recognize that exhibit?

6     A.  I do.

7     Q.  And how is it you recognize that exhibit?

8     A.  It has my initials and the date of 9-12-18 on it.

9     Q.  So we've met before to discuss your testimony, right?

10    A.  We have.

11    Q.  And I asked you to review that disk to make sure it

12    contained an accurate recording to the extent you could

13    capture what you could call conversation between you and

14    Mr. Ivers, right?

15    A.  Correct.

16    Q.  And you initialed that recording because it appeared

17    accurate to what you witnessed the day you tried to talk to

18    Mr. Ivers, right?

19    A.  Yes, ma'am.

20         MS. ALLYN:  Your Honor, at this time the

21    government would offer into evidence Government's

22    Exhibit 14.

23         MR. KELLEY:  No objection.

24         THE COURT:  Received.

25         MS. ALLYN:  Thank you, Your Honor.

SEYFRIED - DIRECT

1          Your Honor, if I could publish to the jury

2     Exhibit 14.  Thank you, judge.

3     BY MS. ALLYN

4     Q.  Deputy, before I play this, is it true the volume does

5     range from loud to quiet, depending on where Mr. Ivers is

6     standing?

7     A.  That is correct.

8               (Audio recording is playing.)

9     Q.  Who are you talking to and what are you talking about

10    there, this Hattervig-Jeff sentence?

11    A.  Yep.  At that point I was talking to Kevin Wickenheiser,

12    the other deputy who was with me, and I was just kind of

13    mentally refreshing myself that when I spoke with both

14    Farris and Jeff over the phone regarding Mr. Ivers they told

15    me that Mr. Hattervig had a lot of success talking to Robert

16    Ivers.  He was -- just every time he was able to talk to him

17    he was able to calm him down and elicit information out of

18    him.  So I was under the impression and hope that if I --

19    when I spoke to Mr. Ivers and I said, hey, I spoke with Jeff

20    Hattervig, he is having me here come talk to you, that maybe

21    I would have more success in talking to Mr. Ivers.

22    Q.  Right before that there's something about a newspaper.

23    What is that about?

24    A.  Yeah.  When I got to the front door, there was a

25    rolled-up newspaper by the front door, like she had a

SEYFRIED - DIRECT

1   newspaper delivery.  So I was just offering to give it to

2   her, just be nice, I guess.

3   Q.  And right now while -- you were just talking to

4   Mr. Wickenheiser because why?  What are you -- what's

5   happening?

6   A.  Yeah.  I was just double -- just running my ideas past

7   him real quick saying, hey, it is Jeff Hattervig, right,

8   just because there's a lot of things running through my mind

9   at that front door, so I just want to make sure I got the

10  name correct and didn't spit out the wrong name, so.

11  Q.  I mean, like, is this one of these times you are waiting

12  to see if Mr. Ivers will come to the door?

13  A.  Correct.  Yeah.  Janet at this point walked away, closed

14  the door, and she was retrieving Mr. Ivers.

15                  (Audio recording is playing.)

16  Q.  Okay.  You are just talking to Mr. Wickenheiser at this

17  point?

18  A.  Again, yeah, just talking to Kevin.  We are just

19  waiting.  As deputies tend to do, when we are standing

20  waiting, we like to look around, see what's going on.  So at

21  this point I am just watching the front door, looking to the

22  left and to the right just to see what I could see in case

23  there is anything else I should know or -- so I am not

24  surprised with anything.

25  Q.  And there's, what, some green lights?  So St. Patrick's

SEYFRIED - DIRECT

1   Day must be around this March 14th date, I guess?

2   A.  Yeah.  I don't remember where the light was, if it was

3   on Janet's door or a door across the street, but I saw a

4   green light somewhere.  So just small talk, I guess.

5                     (Audio recording is playing.)

6   Q.  Is this about the time frame where maybe you are

7   waiting, I don't know, five minutes or so to see if

8   Mr. Ivers is coming to the door?

9   A.  It is.

10  Q.  And is this the time frame you are describing where you

11  sort of saw, what, Janet trying to talk to Mr. Ivers?  What

12  is it you are watching right now, while we are sitting here

13  waiting for more words on this video?

14  A.  Yeah.  And at this point there is nothing really going

15  on.  Janet went downstairs; and when she came back up, she

16  said he will just be a minute and she continued upstairs and

17  then there is just nothing.  Eventually, at some point, you

18  will see Mr. Ivers will come up from downstairs.  He will

19  look at us real quick, look at me, I should say, and then he

20  walks -- continues upstairs to talk to Janet, which is where

21  she was.

22  Q.  Okay.  So if I were to move ahead to about five minutes,

23  does that sound about right when maybe there's some more

24  action?

25  A.  Yeah.  Nothing really happens until Mr. Ivers --

512

SEYFRIED - DIRECT

1   Q.  That's my fault.

2   A.  Nothing really happens until Mr. Ivers comes back to the

3   door.

4                    (Audio recording is playing.)

5   Q.  And, deputy, is this one of these times -- can you

6   explain, kind of, where Mr. Ivers might be when we are

7   trying to listen to this part of the audio?

8   A.  Yeah.  From my recollection, Mr. Ivers went back

9   upstairs to talk to Janet or he could have went down, but I

10  think it was my understanding he went back upstairs to talk

11  to Janet.  So he was away from the front door for sure.

12  Q.  Okay.  So I'm just going to back this up a little bit,

13  so I can fix the volume so that half this conversation won't

14  be too loud and half of this won't be too quiet.

15                   (Audio recording is playing.)

16  Q.  Okay.  Just describe a little physically what is

17  happening here with Mr. Ivers.  Is this coming to the door,

18  back and front of the door -- just describe that a little

19  bit.

20  A.  Correct.  So during this time I think I counted two he

21  would come, he would talk to us, he would go away, talk to

22  his sister.  Then he would come back and yell at us a little

23  bit; then he would go away.  And then the same with this

24  third time.  You can kind of even hear the door close.  When

25  he would close the door, he really closed it hard.  You

SEYFRIED - DIRECT

1  could see the windows shake on the side of the house.  So he

2  didn't want to have anything to do with us that day, so.

3  (Audio recording is playing.)

4  Q.  When you say you are really not that worried, is that

5  true?

6  A.  No.  It's just me trying to get some more information.

7  I don't want her to think that I am here to arrest

8  Mr. Ivers, which we weren't, but I was just there to talk to

9  him and I just wanted to be able to at least get in front of

10  him and have a conversation with him.  We were worried

11  enough that I had to go talk to him, so.

12  Q.  And at that point the way Mr. Ivers was responding, was

13  that making your worry worse?

14  A.  It made me a little nervous.  I haven't been a threat

15  investigator for 13 years, but I have been doing it for

16  about maybe five or six, if I had to guess, and of all

17  interviews I have had with both fugitives and threateners

18  this is by far the angriest person I ever dealt with.  It is

19  Fargo, but he was very angry.  You can hear at one point in

20  the conversation where he hits the side of the door frame,

21  constant slamming of doors, yelling, and we didn't even

22  really have a chance to talk yet.  It just was anger from

23  the start.  There was no -- there was just no normal

24  conversation.

25  (Audio recording is playing.)

SEYFRIED - DIRECT

1    Q.  Deputy, who is Mr. Ivers saying that statement to, that

2    fucking judge, if she doesn't sleep very good, F her?  Who

3    did he say that to?

4    A.  He said that to me, but it was in reference to Judge, if

5    I remember correctly, Wright, the federal judge that he

6    threatened.  He made a threat to his attorney over the phone

7    call with.

8    Q.  I mean, there is some back and forth with him talking

9    and his sister talking to you.  At that point was he talking

10   to you?

11   A.  Yes.

12   Q.  He had come back to the door to talk to you?

13   A.  Yeah.  So at this point I was speaking with Janet.  The

14   entire conversation with Janet, some took part inside the

15   house, when she was standing inside and I was outside.  At a

16   certain point Janet stepped outside to speak with us.  I

17   don't know where we were at this point, but Mr. Ivers

18   would -- I don't remember where he went, because my focus

19   was on Janet at the time, but he would walk away, the door

20   would close, we would talk to Janet.  He would be close

21   enough that he could hear, because he would eventually come

22   running back and open the door and make a comment about what

23   we said and then close the door again and leave.

24              (Audio recording is playing.)

25   Q.  Sir, why are you reporting -- or repeating that N word?

1    A.   Yeah.   The reason why I repeated the N word was because

2    I didn't know what the recording was doing.   I didn't know

3    how well it was picking up the conversation.

4            Normally, when I have these threatener interviews,

5    we will sit down at a table or somewhere and I will take my

6    interviewer out and put it on the table.   In this case it

7    was stuck between my vest and my shirt.   He's inside; I'm

8    outside.   So I just wasn't for sure what was being picked up

9    on the recorder.

10           So when I heard that word, I wanted to make sure I

11   memorialized it into the recording so that when I wrote my

12   report later it would make a note of it, because it's

13   just -- it's a word that people don't say normally, at least

14   in my experience.   It's a hateful word.   So I just wanted to

15   capture it and make sure I had it written down.

16   Q.   So you didn't first say it.   You heard Mr. Ivers say it.

17   Is that it?

18   A.   That is correct.

19   Q.   And you repeated it just to make sure there was a

20   recording that he had said that?

21   A.   Yes, ma'am.

22   Q.   And you are saying it is a hateful word?

23   A.   Yes, ma'am.

24           MR. KELLEY:   Objection, Your Honor.   Relevance.

25           THE COURT:   Sustained.

SEYFRIED - DIRECT

1          Are you talking about the question?

2          MR. KELLEY:  Yes, Your Honor.

3          THE COURT:  Okay.  You've got an instruction

4     questions are not evidence.  You can't consider them.  Okay?

5          You may proceed, counsel.

6     BY MS. ALLYN:

7     Q.  Deputy, tell me the relevance of that word to you in

8     evaluating this threat investigation.

9     A.  Yes.  So in this investigation I knew that Judge Wright

10    was an African American woman.  So when I heard the N word,

11    it, to me, it seemed like a racial slur towards that judge.

12    Most Caucasian men, at least in my experience, don't call

13    other Caucasian people the N word; but when a Caucasian

14    calls an African American the N word, it's usually, in my

15    experience, again, because of some hate or animosity towards

16    that person.

17    Q.  Does that matter to you in your assessment whether or

18    not Mr. Ivers was a threat or had made that threat?

19    A.  It does.  It confirms to me that he is very angry with

20    the judge, and it's something I should at least make a note

21    of and we can maybe be worried about it more in the future.

22              (Audio recording is playing.)

23    Q.  Now, what was your mission that wasn't successful?

24    A.  Yeah.  So ultimately your mission in a threat

25    investigation is to speak with the actual person who made

SEYFRIED - DIRECT

1    the threat and get a feel for them and talk to them and just

2    try to feel out if this person is actually going to move

3    forward with the threat, or in most cases I have dealt with

4    usually it is something that somebody said in the heat of

5    the moment and now that they realize they said it they

6    usually apologize and the investigation will close itself.

7    Q.  Did that happen here?

8    A.  No.  As you can tell, I just never had a chance to talk

9    with Mr. Ivers.  He just didn't want to talk to us.

10   Q.  There some things we can't hear on there.  Did he ever

11   apologize?

12   A.  Not to me, no.

13   Q.  Take it back, say he was joking?

14   A.  No.

15   Q.  There was some more conversation for a while just

16   between you and Ms. Patterson; isn't that right?

17   A.  That is correct.

18   Q.  Just talking about her work and a few things like that

19   for a few more minutes?

20   A.  Yeah.  At the end of the interview, when we were done

21   with that, Mr. Ivers is gone, he doesn't come back at this

22   point, but my partner Kevin asked Janet a few questions,

23   like how long have you lived here, the car in the driveway,

24   is it your's, what's your phone number in case we need to

25   reach you, just follow-up questions so in case we do need to

SEYFRIED - DIRECT

1    come back we know more of what we are walking into.

2    Q.  But there was no more part of the interview that you

3    could hear Mr. Ivers?

4    A.  Correct.  At this point I think he went downstairs to

5    his room.  I don't remember.  Again, my attention was on

6    Janet.

7    Q.  So we can hear a lot on the recording, but can you

8    explain some of the things, you know, that we can't see,

9    like how does defendant look during this time that he's

10   talking to you?

11   A.  So as I believe I mentioned --

12             MR. KELLEY:  Objection, Your Honor.  Asked and

13   answered.

14             THE COURT:  Overruled.

15             THE WITNESS:  So as I mentioned earlier, Mr. Ivers

16   was -- the term I would use is irate, very angry, red-faced.

17   He would slam the door and open it quickly.  You would --

18   you could hear him yelling throughout the house, whether he

19   was in our face or whether he was away.  He would point his

20   finger at me and kind of jab it.  He never jabbed me or

21   touched me, because there was a door between us, but he

22   would point at us very aggressively, is how I would term it,

23   just very angry, just -- you could just tell he wanted

24   absolutely nothing to do with us, and he was irate is the

25   best way I can explain it.

519

SEYFRIED - DIRECT

1   BY MS. ALLYN:

2   Q.  You said he didn't touch you.  Did he ever hit anything

3   else?  Did he hit anything?

4   A.  He did.  At some point in the interview he -- I think

5   it's the stop disturbing the household or don't harass me.

6   At one point he kind of slams on the door frame.  He opens

7   up the door and he says one of those two statements, where

8   he just kind of hits the door frame.

9   Q.  How was he standing?

10  A.  Yeah.  So Mr. Ivers, when he would talk to us, at least

11  from my perspective, Mr. Ivers would lean forward to us,

12  kind of hunched forward.  I don't want to say it's a

13  fighting stance, but it's not a stance of comfort.  It's a

14  stance of aggressiveness.  He was very angry that we were

15  there, and he wanted to make his anger known.

16  Q.  Does the recording accurately do justice to the volume

17  of his voice?

18  A.  I think so.  It's not a professional recorder, by any

19  means.  I can't remember -- it's quite old.  It's a little

20  box, probably from Radio Shack.  I don't even think they

21  exist anymore, but it's in my vest and he's inside.  I

22  was -- I was shocked that it caught everything that it did,

23  to be honest.  That's why I memorialized that N word in

24  there, is because I just didn't know what it would catch.

25  Q.  As you're concluding this interview, what are you

SEYFRIED - DIRECT

1   feeling about what next steps you need to do?

2   A.  Yep.

3           MR. KELLEY:  Objection, Your Honor.

4           THE COURT:  Sustained.

5   BY MS. ALLYN:

6   Q.  What did you do at the conclusion of this interview?

7   A.  At the conclusion of this interview I would have got

8   back in the car, closed out the recording and then went back

9   to my office.  At that point I would have called Farris, who

10  sent us the lead, the information on paper, explain to him

11  everything that happened and my thoughts of it.  And then I

12  would have typed up a report, made a -- taken the recording

13  itself and emailed that to Farris.

14  Q.  What were your conclusions about whether or not

15  Mr. Ivers posed a threat?

16          MR. KELLEY:  Objection.

17          THE COURT:  Overruled.

18          THE WITNESS:  My conclusion was I couldn't say

19  either way.  I for sure didn't not think he was a threat,

20  but I wasn't sure that he was going to enact on the threat

21  either.  He was angry enough that I was a little bit

22  worried, and I told Farris that we needed to discuss this

23  case more and maybe might have to take further steps.  Since

24  it's a Minnesota case, he has to initiate those things, you

25  know, maybe like search warrants or court orders and things

SEYFRIED - DIRECT

1  like that, but at that point I said we will probably have to

2  see this guy again in the future.  I knew this was not it;

3  at some point we are going to have to make contact with

4  Mr. Ivers again.

5  BY MS. ALLYN:

6  Q.  You knew that this case would need further investigative

7  steps?

8  A.  Yes, ma'am.

9  Q.  And why is that?

10  A.  Again, he was just very angry.  And every other threat

11  investigation I have done so far that I can remember I at

12  some point have been able to make contact, establish why

13  somebody said something and figure out what to do with it

14  point forward.  Here, I couldn't get anything out of

15  Mr. Ivers, except that he was very angry at the judge and

16  then wanted nothing to do with me.

17  Q.  Now, one moment, deputy.  Thank you, deputy.  I have no

18  further questions, but defense counsel might.

19          THE COURT:  We will be in recess until 11 o'clock.

20          Remember the previous admonition of the court.

21          THE CLERK:  All rise.

22      (Recess taken from 10:41 a.m. till 11 a.m.)

23          THE COURT:  Okay.  Please be seated.

24          Mr. Kelley.

25          MR. KELLEY:  Thank you, Your Honor.

<u>CROSS-EXAMINATION</u>

1

2      <u>BY MR. KELLEY:</u>

3      Q.  Still morning.  Good morning, Deputy Seyfried.

4      A.  Good morning, sir.

5      Q.  When you and Ms. Allyn were talking, I don't know, maybe

6      20 minutes ago, you were defining some terms that you use,

7      terms of art professionally.  Do you remember that?

8      A.  I do.

9      Q.  Okay.  And when you were talking about threat

10     investigations, you used the word "threat" a number of

11     times.  Do you remember that?

12     A.  I do.

13     Q.  So threat is a term of art that you use as a marshal,

14     correct?

15     A.  In terms of these investigations, yes.

16     Q.  So it's a technical term that you guys use internally?

17     A.  Correct.

18     Q.  And that's in reference to some alleged threat that has

19     been brought to your attention, right?

20     A.  Yes, sir.

21     Q.  But when you used the word "threat" with Ms. Allyn, that

22     doesn't necessarily mean a crime has been committed?

23               MS. ALLYN:  Objection.  Calls for a legal

24     conclusion.

25               THE COURT:  Overruled.

SEYFRIED - CROSS

1          THE WITNESS:  I would -- I would guess maybe yes.

2    Normally, with legal stuff, if I think that a crime has been

3    committed, I usually would talk to an Assistant U.S.

4    Attorney and vet it with them, because I don't know all the

5    federal laws, but I would say yes, maybe in some cases you

6    would be correct.

7    BY MR. KELLEY:

8    Q.  But in other cases no, it might just be an allegation

9    and it might not be a crime?

10   A.  Correct.  It's a possibility.

11   Q.  You also said that when you are doing these

12   investigations and you are looking at an alleged threat your

13   job is to determine whether it is credible or whether it

14   has -- I think you said no bite?

15   A.  Correct.

16   Q.  So when you go out to see Mr. Ivers on March 14th, you

17   are trying to see whether or not it was credible or had no

18   bite?

19   A.  Yes, sir.

20   Q.  You also said that you talked to Deputy Hattervig and

21   Deputy Wooton before you went to see Mr. Ivers on

22   March 14th?

23   A.  That is correct.

24   Q.  Did they tell you that Mr. Ivers had had no

25   correspondence with Judge Wright since the fall of 2017?

524

SEYFRIED - CROSS

1    A.  They might have.  I honestly don't remember.  All I

2    remember was that they said that he's made similar

3    statements like this, but nothing that ever came to this

4    level, I guess.  I don't know.  I remember --

5    Q.  You can't really remember?

6    A.  I can't.  I am sorry.

7    Q.  That's all right.  And one of them, it could be Deputy

8    Wooton, it could be Bill Klug -- is that supervisor Bill

9    Klug?

10   A.  Yeah.  Judicial Security Inspector Bill Cluge is in

11   Fargo, though.

12   Q.  So one of those two told you that Mr. Ivers had said to

13   his attorney, "You don't know the 50 different ways I plan

14   to kill her," present tense?

15   A.  Correct.  I believe that's correct.  I can look at my

16   notes, if you want.

17   Q.  Go ahead.  I will -- refresh your memory.

18   A.  That's correct.  It's present tense.

19   Q.  Okay.  So that's what you were going out of here, is

20   that one statement, plan, present tense?

21   A.  Yes, sir.

22   Q.  Did you remember telling Janet Patterson, Mr. Ivers'

23   sister, that exact statement during the interview on

24   March 14th?

25   A.  I have to look at the transcript.  I know I would have

525

SEYFRIED - CROSS

1    got it close.  I don't know if I would have got it word for

2    word, because I was just going off my memory when I spoke

3    with her.

4    Q.  Turn to page 5 of the transcript, please.  Look at

5    line 16.

6    A.  Yes, sir.

7    Q.  Line 16.  This is you talking to Ms. Patterson.  It's

8    Bob Ivers' sister, right?

9    A.  Yes, sir.

10   Q.  And you say this phrase to her that I have just

11   highlighted on the screen.  Do you see that?

12   A.  Yes, sir.

13   Q.  Okay.  And that is -- underline it red here -- plan,

14   present tense?

15   A.  Yes.

16   Q.  Thank you.  So you are at the house under the impression

17   that Mr. Ivers said he had a plan to kill the judge.

18   A.  I guess my reason for being there was just for what he

19   said.  I just wanted to see if he did have a plan or not.  I

20   wasn't sure either way.  It was just the statement that

21   brought us there.

22   Q.  So you guys weren't sure?

23   A.  Correct.

24   Q.  You recall you went into detail about how you slid the

25   $10 recorder between your body armor and your shirt?

SEYFRIED - CROSS

1    A.  Yes, sir.

2    Q.  Did you tell Mr. Ivers or his sister that you were

3    recording them?

4    A.  I did not.

5    Q.  So they had no idea that they were being recorded while

6    they were talking?

7    A.  That is correct.

8    Q.  You also discussed Mr. Ivers' behavior from inside the

9    house at length with Ms. Allyn.

10   A.  Yes, sir.

11   Q.  You said he was pointing his finger, correct?

12   A.  That is correct.  It wasn't the entire time, but there

13   was -- I remember one point of which when he was talking to

14   us or yelling at us that he would point his finger at me.

15   Q.  But you also said Mr. Ivers never left the house.

16   A.  Correct.  He stayed behind the storm door the entire

17   time.

18   Q.  So there was a storm door between you and Mr. Ivers the

19   entire time?

20   A.  Yes, sir.

21   Q.  And he is inside his house?

22   A.  He is.

23   Q.  I'm going to play a little bit of the audio, but I'm not

24   going to make the jury listen to the entire thing again.

25   I'm going to start it at the beginning of the tape.

SEYFRIED - CROSS

1    A.  Yes, sir.

2    Q.  This would be helpful.  Try it again.

3                   (Audio recording is playing.)

4    Q.  I'm curious.  Which attorney said he was living there?

5    A.  I wasn't told by the attorney myself, but in the report

6    that I received from Farris asking me to interview him it

7    said that, from my recollection, that his attorney stated he

8    was living at this address, so it was on paper.  I would

9    assume it was Friedemann, but I do not know.

10   Q.  Okay.  It might have been Friedemann talking to the

11   deputies before March 14th?

12   A.  Correct.

13                  (Audio recording is playing.)

14   Q.  Okay.  I am going to skip ahead five minutes; and this

15   would be page 3 of your transcript, if you want to follow

16   along.  Do you still have that?

17   A.  I do.

18   Q.  Okay.  This is when Mr. Ivers finally comes up.  So when

19   you went to go visit Mr. Ivers and his sister on March 14th,

20   what time was it?

21   A.  I want to say it was mid afternoon.  I might have it in

22   my report or it might be on the recording.  I guess I don't

23   remember.  Can I look or --

24   Q.  Yes, you may.

25   A.  So the report I made of the interview says that it was

SEYFRIED - CROSS

1    approximately 10:27 in the morning.

2    Q.  10:27 in the morning.  It's possible Mr. Ivers was still

3    sleeping?

4    A.  Sure.

5    Q.  It's pretty late for most people, but he could have been

6    sleeping, right?

7    A.  Sure.  Yeah.

8    Q.  So you might have just woken him up when you came to the

9    door?

10   A.  That's possible, yes.

11   Q.  And he came up from downstairs.  Is that your

12   recollection; when you first saw him, he came from the

13   basement?

14   A.  Correct.

15   Q.  And did you know that's where his bedroom is?

16   A.  At that time, no, but at a later point we learned that

17   it was, yes.

18   Q.  It's possible he just woke up and came from downstairs

19   where his bed is to the door to you guys?

20   A.  Correct.

21   Q.  So starting from Mr. Ivers coming up the stairs.

22                    (Audio recording is playing.)

23   Q.  You were not there to arrest him, in fact.

24   A.  Correct.

25   Q.  You did not have an arrest warrant?

SEYFRIED - CROSS

1   A.  No, we did not.

2   Q.  And from his, you know, kind of initial statements here,

3   is it clear to you he does not want to talk to the two of

4   you?

5   A.  It is.

6   Q.  But you stay there?

7   A.  Correct.

8               (Audio recording is playing.)

9   Q.  How many times do you think Mr. Ivers told you he didn't

10  want to talk to you?

11  A.  If I had to guess, maybe three times that interview.

12  Usually --

13  Q.  How many times do you think he told you to leave?

14  A.  Two or three, maybe.

15  Q.  Okay.  So he told you multiple times he didn't want to

16  talk and he wanted you to leave?

17  A.  That's correct.

18  Q.  You didn't leave?

19  A.  Correct.

20  Q.  And you did not have an arrest warrant to be there to

21  arrest him, right?

22  A.  Correct.

23  Q.  Didn't have a search warrant to go into the house and

24  search it?

25  A.  No, we did not.

SEYFRIED - CROSS

1    Q.  So you were just there to have a voluntary encounter

2    with Mr. Ivers and Ms. Patterson?

3    A.  Yes, sir.

4    Q.  Like a normal situation if somebody says "get off my

5    property," normally you have to leave, right?

6    A.  I would -- I guess it depends on the context, but

7    normally we would after a certain period of time, yeah.  I

8    wouldn't harass them all day, but I would at least try.

9    Sometimes I have had experiences where people have told me

10   to go away, but after a few minutes I can calm the situation

11   down and we can at least progress to some type of interview.

12   Q.  Okay.  But here it was very clear he didn't want to talk

13   to you and he wanted you to leave.

14   A.  Yes.  That's correct.

15   Q.  So you actually end up talking to his sister a lot more

16   than him, right?

17   A.  Yes, sir, very much.

18   Q.  She is a very pleasant woman, isn't she?

19   A.  Very pleasant woman.

20   Q.  So at the end of the March 14th interview you spend five

21   minutes talking to Janet Patterson, his sister, five or so

22   minutes talking to her, and Mr. Ivers is nowhere to be seen?

23   A.  Correct.  Towards the very end of the interview, yes.

24   There was a little point where he interjected, but, yeah, at

25   the end it was just Janet.

SEYFRIED - CROSS

1    Q.  So you are talking to her about, you know, her

2    profession.

3    A.  Correct.

4    Q.  What she does.

5    A.  Yes.

6    Q.  Okay.  And then you notice there's a car in the

7    driveway, a new one.

8    A.  I don't remember if it was new, because it was my

9    partner Kevin who noticed it, but I know it was a

10   newer-looking car for sure.  I don't know what year.  I'm

11   terrible with cars.

12   Q.  And that was her car?

13   A.  Yes.  That's what she told us.

14   Q.  There wasn't another car.  Mr. Ivers does not have a

15   car, right?

16   A.  I didn't see another car that day, so no.  I guess I

17   never looked -- I never checked DMV databases for a car, but

18   there was only her car there that day, so that sounds like a

19   good --

20   Q.  Now you testified to Ms. Allyn that after this interview

21   your conclusion was you couldn't say either way.

22   A.  Yes, sir.

23   Q.  You didn't know if it was a credible threat or whether

24   it had no bite?

25   A.  Yes, sir.

SEYFRIED - CROSS

1   Q.  You did not arrest him at the end of the March 14th

2   interview.

3   A.  I did not.

4   Q.  Because you didn't know whether an actual threat had

5   been made?

6   A.  Yes, sir.

7   Q.  Okay.  So that's March 14th.  You don't have any more

8   interactions with Mr. Ivers after that, correct?

9   A.  Correct, sir.

10  Q.  In preparation for this trial, however, you met recently

11  with Ms. Patterson, his sister, out in West Fargo, right?

12  A.  I did, yes.

13  Q.  That was September 5th.  Does that sound about right?

14  A.  That sounds about right.

15  Q.  If you want to look at your notes, that would be fine.

16  A.  Yes, sir, September 5th, 2018.

17  Q.  Okay.  Wednesday of last week?

18  A.  I would have to check a calendar, but that sounds about

19  right.

20  Q.  Did you record that conversation?

21  A.  I did.

22  Q.  Another pleasant conversation with Ms. Patterson?

23  A.  Oh, yes.  I love Ms. Patterson.

24  Q.  And you asked her what she remembered about the

25  February 27th phone call, didn't you?

SEYFRIED - CROSS

1    A.  I did, yeah.

2    Q.  And in that report you again told her that Mr. Ivers had

3    said, "You don't know the 50 different ways I plan," present

4    tense, "to kill her."

5    A.  Yes, sir.

6    Q.  So you are still going off of this statement from

7    February 27th with the word plan, present tense.

8    A.  Sure.

9    Q.  And Ms. Patterson told you that she didn't think her

10   brother would hurt anybody.

11              MS. ALLYN:  Objection.  Calls for hearsay.

12              THE COURT:  Sustained.

13   BY MR. KELLEY:

14   Q.  Ms. Patterson's memory of February 27th was kind of

15   hazy?  Would you say that's a good characterization of it?

16   A.  That's how she characterized it to me, yes.

17   Q.  Okay.  But she remembered key facts about it.

18   A.  I guess, yes.  I guess it depends on what you define as

19   key facts, but --

20   Q.  Remembers taking -- Mr. Ivers taking --

21              MS. ALLYN:  Objection.  Calling for hearsay.

22              THE COURT:  Well, I don't know what you are

23   asking, counsel.  "She remembered key facts about it" is the

24   question.

25              MR. KELLEY:  I think there was one --

SEYFRIED - CROSS

1        THE COURT:  Remembers talking to -- overruled.  I

2   guess the question is do you remember talking -- yeah,

3   overruled.

4        THE WITNESS:  Can you repeat the question?  I'm

5   sorry.

6   BY MR. KELLEY:

7   Q.  Do you remember Ms. Patterson talking about Mr. Ivers --

8   this is on February 27th -- taking the phone call and going

9   downstairs?

10  A.  Do you mean on September 5th?

11  Q.  Yeah.  So you are there on September 5th talking to

12  Ms. Patterson.

13  A.  Okay.

14  Q.  And she's talking about what Mr. Ivers did on

15  February 27th.

16  A.  Yes.

17  Q.  And she remembered --

18       MS. ALLYN:  Objection.  Your Honor, defense

19  counsel is about to state hearsay for his question.

20       THE COURT:  Well, I don't know -- I'm sorry.  Go

21  ahead, counsel.  Go ahead.

22       MS. ALLYN:  His question is about to state

23  hearsay.  This answer will call for hearsay.  We object on

24  hearsay grounds.

25       THE COURT:  Sustained.

SEYFRIED - CROSS

1        You can make an offer at the break, counsel.

2            MR. KELLEY:  Thank you, Your Honor.

3    BY MR. KELLEY:

4    Q.  You asked if Mr. Ivers had any weapons.

5    A.  That's something I would ask.  I don't remember asking

6    it, but sure.  Yeah.

7    Q.  So you don't remember asking that?

8    A.  I don't.

9            THE COURT:  Was this September?

10           MR. KELLEY:  September 5th, Your Honor.

11           THE COURT:  Yes.  Okay.

12           THE WITNESS:  She might have volunteered it or I

13   think she, if I remember correctly, she volunteered that

14   they have no weapons.  I don't remember asking it, but I

15   think it was part of the conversation.  She said no, we

16   don't have any weapons, all I have is a butcher knife or

17   something like that she reflected towards.

18   BY MR. KELLEY:

19   Q.  So she said no weapons in the house?

20   A.  Yeah.

21   Q.  No further questions.  Thank you.

22   A.  Thank you, sir.

23           THE COURT:  Thank you.

24           Any redirect, counsel?

25           MS. ALLYN:  Yes, Your Honor.  Thank you.

SEYFRIED - REDIRECT

1          REDIRECT EXAMINATION

2     BY MS. ALLYN:

3     Q.  Hi, deputy.

4     A.  Hello.

5     Q.  Just a few questions.

6     A.  Yes, ma'am.

7     Q.  The questions about, sort of, the legal question of a

8     credible threat or not, remember some of those questions?

9     A.  Yes, ma'am.

10    Q.  Deciding if something is a credible threat or not,

11    that's a charging decision, right?

12    A.  Yes, ma'am.

13    Q.  That's not a decision you make, is it?

14    A.  Not normally, no.  And especially so much more in this

15    case, because it's a District of Minnesota case.  So all I'm

16    really doing is the interview for the Minnesota U.S.

17    Attorney's Office, marshals office, so I'm just going to

18    relay what I find, and it's up to them what they want to do

19    with it.  Unless the crime happens right in front of me, I

20    am not going to bother charging anybody.

21    Q.  Okay.  That's the other question I was going to ask you.

22    You are there for an interview in order to pass on

23    information to Deputy Wooton, right?

24    A.  Yes, ma'am.

25    Q.  At the end of the interview did you tell Farris Wooton

SEYFRIED - REDIRECT

1   there is nothing here to worry about?

2   A.  No.

3   Q.  No.  You told him what instead?

4   A.  From my recollection I told him that this will need

5   further follow-up, we weren't able to talk to him, very

6   angry.  We just will need to either go -- I asked him if you

7   want me to go back out again, let me know and we will try to

8   interview him again.  And from my memory I think Farris said

9   something along the lines that we will -- let me talk with

10  my people and then I will get back to you.

11  Q.  So then from there it was up to Deputy Wooton to

12  investigate it?

13  A.  Yes, ma'am.

14  Q.  Thank you.

15          MS. ALLYN:  No further questions.

16          THE COURT:  You may step down.

17          Do you want to call your next witness?

18          MR. RANK:  Thank you, Your Honor.  The United

19  States calls Deputy Farris Wooton.

20                  FARRIS WOOTON,

21  called on behalf of the government, was duly sworn, was

22  examined and testified as follows:

23          THE WITNESS:  I do.

24          THE COURT:  Please be seated.

25          MR. RANK:  May I proceed, Your Honor?

WOOTON - DIRECT

1          THE COURT:  You may.

2          MR. RANK:  Thank you.

3                    DIRECT EXAMINATION

4    BY MR. RANK:

5    Q.  Good morning, Deputy Wooton.

6    A.  Good morning.

7    Q.  Deputy Wooton, could you state your full name and spell

8    your last name for the benefit of the court reporter,

9    please?

10   A.  It's Farris Wooton.  F-A-R-R-I-S.  W-O-O-T-O-N.

11   Q.  Deputy Wooton, where do you work?

12   A.  United States Marshals Service here in the District of

13   Minnesota.

14   Q.  What's your job title?

15   A.  Deputy United States Marshal.

16   Q.  How long have you been a Deputy United States Marshal?

17   A.  Sixteen and a half years.

18   Q.  And what office do you work in?

19   A.  District of Minnesota.  We get bounced back and forth

20   between St. Paul and Minneapolis.

21   Q.  And have you been in the District of Minnesota your

22   whole time as a Deputy U.S. Marshal?

23   A.  I started in the Eastern District of Missouri in the

24   St. Louis office for my first three years and then

25   transferred here and been here ever since.

539

WOOTON - DIRECT

1    Q.   What year did you transfer to Minnesota?

2    A.   2006.

3    Q.   And do you have a specific job title within the office?

4    A.   As far as like a collateral duty?

5    Q.   Yes, sir.

6    A.   District threat investigator.

7    Q.   And have you had specialized training to be a district

8    threat investigator?

9    A.   Yes.  I went to a 40-hour course down at the Federal Law

10   Enforcement Training Center.

11   Q.   And how long have you been a district threat

12   investigator?

13   A.   Since 2008.

14   Q.   Do you have an even more specialized title that you have

15   gotten within the past couple of years?

16   A.   Yes, sir.  I have had the opportunity to do an acting

17   position as the protective intelligence investigator in our

18   district two separate times.

19   Q.   And are you currently the protective intelligence

20   investigator for the district?

21   A.   I am not.

22   Q.   But you have been in the past?

23   A.   Yes, sir.

24   Q.   That's something that we have heard referred to as PII?

25   A.   Yes.

WOOTON - DIRECT

1    Q.  Can you describe a little bit about how the Minnesota --

2    the District of Minnesota Marshals' Office is organized?

3    A.  Yes.  We, of course, have our management, the marshal,

4    chief, assistant chief and supervisors.  And then we have

5    also what's nonsupervisory senior inspector jobs, so same

6    pay grade as a supervisor, but you don't supervise anyone,

7    and those are the jobs as a protective intelligence

8    investigator, sex offender investigations coordinator, and

9    our judicial security inspector.

10   Q.  What kinds of things does the marshals service do in

11   Minnesota?

12   A.  I'm sorry?

13   Q.  What kind of things does the marshals service do in

14   Minnesota?

15   A.  Fugitive apprehension, protection of the courts and the

16   entire court family, transportation and production of

17   prisoners, serve civil process.

18   Q.  Have you had a lot of interactions with people over your

19   time as a Deputy U.S. Marshal?

20   A.  Yes, I have.

21   Q.  And, in fact, you do prisoner transport at some point in

22   time for people that are in jail and then brought to the

23   courthouse?

24   A.  Yes, sir.

25   Q.  Is that something you have done a lot of?

WOOTON - DIRECT

1   A.  Quite a bit.

2   Q.  The protective intelligence investigator position, how

3   was that position created?

4   A.  It was formed from -- I'm not sure if anyone remembers.

5   I think it was about early 2004.  There was a federal judge,

6   Judge Lefkow, in the Northern District of Illinois, Chicago,

7   her husband and mother-in-law or mother were murdered in her

8   house by a civil litigant that she had made a ruling on.  Of

9   course, that's one of our protectees.  And after that case,

10  the marshals service found a need for protective

11  intelligence to be a very specific job that got a lot more

12  attention in our agency.

13  Q.  That's a position that you have held from time to time

14  in the office?

15  A.  Yes, sir.

16  Q.  So you mentioned this, but in terms of providing

17  protection to the judges in the district, are they referred

18  to as your protectees?

19  A.  Yes, sir.

20  Q.  In your role as a protective intelligence investigator,

21  did you overlap with Deputy Hattervig who testified

22  yesterday?

23  A.  I did.

24  Q.  And did you, in fact, take that position over from him?

25  A.  He was doing it as -- it was his full-time job, and then

WOOTON - DIRECT

1    he lateraled over to a supervisor position.  So before they

2    could fill the job again, I did it in an acting capacity,

3    which is you get the pay increase and you can do it for up

4    to 120 days at one time.

5    Q.  What time periods was it that you were taking over that

6    position for Deputy Hattervig?

7    A.  When I took it over from him would have been -- I think

8    I started in November of 2017 and then ended four months

9    later.

10   Q.  And let's go back to September of 2017.  Do you remember

11   that time period?

12   A.  Yes, sir.

13   Q.  And the jury has heard an interview, recorded interview

14   with Mr. Ivers from September 1st of 2017.  Do you recall

15   that?

16   A.  Yes, sir.

17   Q.  In fact, were you present for that interview?

18   A.  I was.

19   Q.  I think Deputy Hattervig's voice is heard more often.

20   Was he doing most of the questioning during that interview?

21   A.  He was.  He had a good rapport with Robert Ivers.

22   Q.  We also heard through Deputy Hattervig an earlier

23   recording from I believe January of 2017?

24   A.  Yes.

25   Q.  And were you involved -- first of all, were you at that

WOOTON - DIRECT

1    point in time a PII?

2    A.  No, I was not.

3    Q.  Were you involved in the interview with Mr. Ivers from

4    January of 2017?

5    A.  I was not.

6    Q.  How was it that you came to be at the interview with

7    Mr. Ivers on September 1st of 2017?

8    A.  I'm a district threat investigator, as I said, so -- and

9    I have been doing it for the longest time in our district,

10   longer than anyone else, so a lot of times on threats

11   anybody going out that's working one to do an interview will

12   ask me to come along.  And I try to stay current on all the

13   threats we have in our district.  I don't work them all, but

14   I try to stay on top of them, and Robert Ivers was a pretty

15   big one for us.

16   Q.  Prior to going out to interview Mr. Ivers on

17   September 1st, did you review some letters that he had sent

18   to various judges and other parts of the court?

19   A.  I did.

20   Q.  And did you also learn about a phone call that he had

21   placed to the deputy courtroom clerk for Chief Judge

22   Tunheim?

23   A.  Yes.

24   Q.  Do you remember what the substance of that phone call

25   was?

1    A.  He had mentioned, you know, how angry he was, and a

2    statement was made that he was a walking bomb.

3    Q.  Did you learn at that point in time who he was talking

4    about and what he was talking about when he referred to

5    himself as a walking bomb?

6    A.  He was talking about Judge Wright and the rulings she

7    had made against him.

8    Q.  Prior to going out to talk to Mr. Ivers on

9    September 1st, did you review some of the letters that he

10   had sent to judges and to the court?

11   A.  Yes, sir.

12   Q.  And as a district threat investigator, did you have some

13   concerns based on review of those letters and the phone call

14   that he made to Chief Judge Tunheim's clerk?

15   A.  I did.  And my concerns were the aggressive nature of

16   the letters, the fixation on Judge Wright, the repeated

17   mailings to multiple people, calling her corrupt, and the

18   increased agitation against Judge Wright, coupled with the

19   phrase "walking bomb" was very concerning to me.

20   Q.  And that was -- you knew that before going out to speak

21   with him on September 1st?

22   A.  Yes, sir.

23   Q.  After you spoke with Mr. Ivers on September 1st, did the

24   marshals service stop paying attention to him?

25   A.  No, sir.  We kept our threat case opened and continued

WOOTON - DIRECT

1    to monitor.

2    Q.  And at some point in time after that conversation with

3    Mr. Ivers did you become the PII?  I think you mentioned

4    November of --

5    A.  Yes.  November of 2017 is when I officially became paid

6    for it, so that's when they consider it starting.

7    Q.  So that means that your primary or one of your primary

8    roles was to be investigating specific threats?

9    A.  It would be my only role as a PII.

10    Q.  Okay.  Starting in November of 2017?

11    A.  Yes, sir.

12    Q.  After you became the protective intelligence

13    investigator, did you hear something about Robert Ivers

14    again?

15    A.  Yes, sir.

16    Q.  And how did that come about?

17    A.  I received a phone call from Kristine Wegner, who is the

18    calendar clerk for District Judge Michael Davis.

19    Q.  Okay.  And what did you learn from her?

20    A.  In the phone call she stated that Judge Davis wanted her

21    to contact me about a threat that had been made against

22    Judge Wright.

23    Q.  And is Judge Wright at that point in time one of your

24    protectees?

25    A.  Yes, sir.

WOOTON - DIRECT

1    Q.  And, in fact, is her courtroom in this courthouse?

2    A.  It is.

3    Q.  After you got the call from Judge Davis' clerk about the

4    threat to Judge Wright, what did you do?

5    A.  I contacted Judge Wright and wanted to inform her, make

6    sure she knew and then kind of ask what she knew.

7    Q.  When you got the report from Judge Davis' clerk, do you

8    recall what it was that she told you the threat was?

9    A.  From the clerk?

10   Q.  Yes, sir.

11   A.  I don't know if the clerk told me what the threat was.

12   Q.  Okay.

13   A.  Just that there was a threat.

14   Q.  And when you contacted Judge Wright, did you know what

15   the substance of the threat was, when you were communicating

16   to her, or just that there had been a threat?

17   A.  Just that there had been a threat.

18   Q.  Okay.  After you contacted Judge Wright, did you do

19   anything else?

20   A.  I did.  Judge Wright informed me what she knew, which

21   was who the threat was made to, and I contacted that person.

22   Q.  Okay.  Who the threat had been communicated to?

23   A.  Yes.

24   Q.  And so did she appear to already know that that threat

25   had been made by the time you spoke with her?

WOOTON - DIRECT

1    A.  She did.

2    Q.  And so who was it that she said the threat had been made

3    to?

4    A.  Lora Friedemann.

5    Q.  Did you take some steps to contact Ms. Friedemann?

6    A.  I did.

7    Q.  What did you do?

8    A.  I found her phone number online and gave her a phone

9    call.

10   Q.  And when you spoke to her, do you remember what date it

11   was that you spoke to her?

12   A.  February 28th of 2018.

13   Q.  And in that first call, did you have an extensive phone

14   call with her or would you describe it as less than

15   extensive?

16   A.  Brief.

17   Q.  What was the purpose of the call?

18   A.  I was wanting to know specifically what the threat was.

19   Q.  And so you spoke to her by telephone?

20   A.  Yes, sir.

21   Q.  And what did you understand her to tell you the threat

22   was?

23   A.  You don't know the 50 different ways I plan to kill her.

24   Q.  Did you write that down when you spoke to her?

25   A.  I did.

WOOTON - DIRECT

1   Q.  Did you also learn whether, in that phone call, whether

2   she had -- how she had recorded that statement?

3   A.  She told me that she wrote it down verbatim as it --

4   right after it was said.

5   Q.  So that's what you know after that first call with her;

6   is that correct?

7   A.  That's correct.

8   Q.  Did you at a later time learn some more information from

9   Ms. Friedemann about the phone call, including Mr. Ivers'

10  demeanor and some of the other statements that he made?

11  A.  Yes.

12  Q.  In fact, did you speak to her a few different times over

13  the ensuing months?

14  A.  That's correct.

15  Q.  Did Ms. Friedemann indicate, when you talked to her,

16  that she perceived what Mr. Ivers had done as a threat

17  against Judge Wright?

18  A.  Yes.

19  Q.  Now, when you interviewed Ms. Friedemann the first time,

20  did you believe that what she said was "You don't know the

21  50 different ways I plan to kill her"?

22  A.  Yes, sir.

23  Q.  And did you continue to believe that as you're going

24  forward with the investigation?

25  A.  I did.

WOOTON - DIRECT

1    Q.  And, in fact, do some of your reports reflect that?

2    A.  They do.

3    Q.  We have heard a lot of conversation about the notes that

4    Ms. Friedemann took during the phone call with Mr. Ivers,

5    that she was writing down as he was speaking, and you've

6    seen this in the courtroom because you have been sitting in

7    the courtroom.  At some point in time, deputy, did you

8    receive these notes from Ms. Friedemann?

9    A.  Yes.  We received them after Judge Pratt made a ruling

10   that we could.

11   Q.  When you first talked to Ms. Friedemann, was she

12   being -- was she kind of careful about providing you with

13   the information?

14   A.  She was.  She made it very clear about attorney-client

15   privilege and that she was not going to violate that.

16   Q.  Okay.  So at some point in time you got these notes; is

17   that right?

18   A.  Yes, sir.

19   Q.  So let's go back.  I'll take you back to February 28th

20   of 2017.  Well, first of all, let me -- you hear from

21   Ms. Friedemann.  What do you do after that first phone call

22   with her?

23   A.  After the first phone call, I made a report and entered

24   some information into our JADA system that's been talked

25   about and then started attempts to locate Robert Ivers to

550

WOOTON - DIRECT

1    interview him.

2    Q.  Okay.  And what was the purpose of that?

3    A.  I wanted to assess the threat that had been communicated

4    to me.

5    Q.  And what kind of steps did you take?

6    A.  Just started out like I normally do on a fugitive

7    investigation, research through law enforcement and open

8    source databases to try and find an address.  And I chose to

9    go with his driver's license address, which is one known to

10   me.  That's his brother's address in Hopkins.

11   Q.  When you looked through the databases for Mr. Ivers, did

12   it reflect a single address or multiple addresses?

13   A.  There's multiple addresses.  We have multiple listed for

14   him, including a P.O. Box.

15   Q.  We have looked at some letters that were -- the letters

16   that were sent to the court by Mr. Ivers where some of

17   those -- the return address on them listed as a P.O. Box for

18   him?

19   A.  Yes, sir.

20   Q.  We have also seen some that were listed with North

21   Dakota on them; is that correct?

22   A.  That's correct.

23   Q.  Did you know specifically where he was in February of

24   2018?

25   A.  At that time I did not.

WOOTON - DIRECT

1    Q.  So you took some steps.  You were starting to describe

2    what steps you took.  What did you do next?

3    A.  We went to the brother's house to see if Robert was

4    there and, if not, try and find some information about his

5    whereabouts.  And I did interview someone, and I was told

6    that he might be in North Dakota living with a relative.

7    Q.  And did you -- were you able to determine whether he had

8    a relative in North Dakota?

9    A.  I did, yes.

10   Q.  What did you do after that?

11   A.  After that I put together what's called a collateral

12   lead that was talked about, and it's just a formal request

13   for another district to perform an interview or something

14   for us, and sent it to North Dakota.

15   Q.  I'm going to back up actually to the 28th of February,

16   after you got the report from Judge Wright's clerk and then

17   spoke to Ms. Friedemann.  Did you speak to anybody else

18   about the threat around that time period?

19   A.  My management and I spoke with Judge Wright and I also

20   spoke with Jeff Hattervig, and I can't remember anyone else

21   right off the top of my head.

22   Q.  Did you notify -- and I don't want you to testify about

23   what city it is, but did you notify local police in the city

24   in which Judge Wright lived?

25   A.  I did.  I called local law enforcement and asked for

WOOTON - DIRECT

1    increased patrol around her residence.

2    Q.  About what?  About whom?

3    A.  About Robert Ivers.  And they had a picture and they

4    knew who he was and what had been done.

5    Q.  So you made some efforts to locate Mr. Ivers.  You spoke

6    to somebody at his brother's house, and you find out that he

7    might be in North Dakota.  And then you send the lead up to

8    North Dakota?

9    A.  Yes, sir.

10   Q.  Did that go to Deputy Seyfried?

11   A.  It went to the Judicial Security Inspector Bill Klug and

12   then was worked in conjunction with Matt Seyfried.

13   Q.  At some point in time before the interview took place

14   did Deputy Seyfried reach out to you to get some additional

15   information?

16   A.  He did.

17   Q.  Did you put him also in touch with Deputy Hattervig?

18   A.  Yes, sir.

19   Q.  Why was that?

20   A.  Jeff Hattervig had a lot more information at the time

21   about Robert Ivers and the case and had a good rapport with

22   Robert and had a lot of good information to provide.

23   Q.  Okay.  And so connected the two of them, so Deputy

24   Seyfried could have a little bit more information before

25   going out there?

WOOTON - DIRECT

1    A.  Yes, sir.

2    Q.  And, Deputy Wooton, why was it, as a threat

3    investigator, why was it that you wanted to go out and have

4    Deputy Seyfried interview Mr. Ivers?

5    A.  I was wanting to find out if Robert Ivers planned on

6    carrying out this threat that he had made.

7    Q.  So you send the lead to Deputy Seyfried.  Did you

8    eventually hear back from him?

9    A.  I did.

10   Q.  Did you hear back from him -- I think we saw the

11   interview with Mr. Ivers took place on March 14th of 2018;

12   is that right?

13   A.  Yes, sir.

14   Q.  Did you hear from Deputy Seyfried that day?

15   A.  I did.

16   Q.  And what, if anything, did he report to you?

17   A.  He gave me a phone call just to let me know how it went.

18   And he basically explained what the jury heard on the

19   interview, that he was very irate, punching walls, hitting

20   things, screaming, yelling, cussing, using hate-filled

21   speech, the N word, and basically wouldn't interview with

22   them, just was screaming and yelling at them.

23   Q.  Did you get a recording of that interview to listen to?

24   A.  I did.

25   Q.  How long after the interview did you get it?

WOOTON - DIRECT

1   A.  It was either that day or the next day.

2   Q.  Was one of the purposes of having Deputy Seyfried go out

3   and interview Mr. Ivers was to get some comfort that he

4   wasn't going to act on his threat?

5   A.  Yes.

6   Q.  After hearing back about that interview and listening to

7   the recording, did you get any comfort?

8   A.  I had zero comfort after that.

9   Q.  So after hearing back from Deputy Seyfried, did you take

10   some steps to try to monitor Mr. Ivers' location?

11   A.  I did.  I applied and received -- applied for and

12   received a phone warrant for Robert Ivers' cell phone.

13   Q.  Okay.  And so, first of all, why did you want to know

14   his location?

15   A.  I wanted to keep track of Robert Ivers and make sure he

16   didn't go anywhere near Judge Wright.

17   Q.  So you said you got a phone warrant.  Does that mean you

18   get to listen to what he was saying on the telephone?

19   A.  No, not a phone tap.  It was just a warrant -- I think

20   we had to get a search warrant through the district here,

21   but the information I was wanting was location.  And with

22   his cell phone, cell phone provider, the location that they

23   will give you is basically just cell tower information.  So

24   whenever the cell phone would connect to a cell tower, I

25   would get an email with a link to a Google map and I could

WOOTON - DIRECT

1    click on that and it would show me the tower that the phone

2    had just connected to.

3    Q.  So it's not like a real-time GPS device to show where he

4    is all the time?

5    A.  No.

6    Q.  Only when he is using the phone and when it connects

7    with a cell tower?

8    A.  Yes, sir.

9    Q.  But that gives you some kind of, at least, loose

10   location?

11   A.  It does.

12   Q.  You can tell what city he is in and things like that?

13   A.  Correct.

14   Q.  And did you also determine at that point in time -- make

15   some decisions about charging?

16   A.  Yes, sir.  I thought it was time that I needed to

17   contact the United States Attorney's Office and look to

18   indict Robert Ivers.

19   Q.  And how long was it between when Deputy Seyfried spoke

20   with Mr. Ivers and when he was charged?

21   A.  I believe he was charged on April 18th, was when the

22   indictment came out.

23   Q.  So between March 14th and April 18th?

24   A.  Yes, sir.

25   Q.  Did you have that -- the phone warrant in place that

WOOTON - DIRECT

1   whole time?

2   A.  I did.

3   Q.  And, in fact, did the phone warrant show that he was in

4   North Dakota for most of that time?

5   A.  Most of the time, yes.

6   Q.  Was there a time period where it showed that he wasn't?

7   A.  Yeah.  I believe it was around April 4th that he -- the

8   cell towers were starting to ping along Interstate 94 and

9   ended up down in the Minneapolis area, Hopkins I think.

10  Q.  Did you do anything in response to seeing Mr. Ivers'

11  phone moving towards the Twin Cities?

12  A.  I did.  I contacted you, and we were looking to seek an

13  arrest warrant, a complaint.

14  Q.  In that time period?

15  A.  In that time period, yes, sir.

16  Q.  Did you continue to monitor Mr. Ivers' location?

17  A.  I did.

18  Q.  And did he stay in the Twin Cities area?

19  A.  No.  Well, he stayed -- he didn't go farther than

20  Minneapolis, farther east, and he wasn't here for very long

21  and went back to North Dakota.

22  Q.  Okay.  And then after that there were steps taken to get

23  an indictment for charging; is that correct?

24  A.  Yes, sir.

25  Q.  Deputy Wooton, I think you testified that mister --

WOOTON - DIRECT

1    well, you got an indictment or grand jury returned an

2    indictment on April 18th of 2018?

3    A.  Yes, sir.

4    Q.  And did you testify in front of that grand jury?

5    A.  I did.

6    Q.  Indictment -- as a result of the indictment, was an

7    arrest warrant issued?

8    A.  Yes, sir.

9    Q.  And did you arrest Mr. Ivers?

10   A.  I did on April 20th.

11   Q.  Can you describe how that arrest took place?

12   A.  Yes.  We went up on April 19th to Fargo, North Dakota,

13   and made -- tried to make some arrangements with the Fargo

14   office.  They didn't have any bodies available to assist me

15   on the arrest.  I was fortunate enough to have two deputies

16   from my district were in Bismarck the day before and were

17   able to travel to Fargo on Friday morning.  Actually, they

18   came I think Thursday night.  But then in the morning I had

19   those two deputies with me, a task force officer from the

20   District of North Dakota, and he's a border patrol agent,

21   and a local Fargo officer or West Fargo officer.  And we met

22   early in the morning, formed our entry plan and went up to

23   the residence, Janet Patterson's residence.  I knocked on

24   the door.  Janet came to the door.  We told her we had an

25   arrest warrant for Robert.  She said okay and told us that

558

WOOTON - DIRECT

1    he was in his bedroom downstairs, told us where it was.  We

2    went down there, went in the room, and he was in bed, and

3    told him this was police with an arrest warrant and show us

4    your hands, handcuffed him and went from there.

5    Q.  Now, in Mr. Scott's opening he said you guys went in in

6    black.  And did you kick the door in?  Did you do anything

7    like that going in?

8    A.  We didn't have to breech anything.  Our body armor is

9    actually green and no automatic weapons.  We don't have

10   those.

11   Q.  That's because mister -- did Mr. Scott say you had

12   automatic weapons in his opening?

13   A.  He did.

14   Q.  So he's arrested; is that correct?

15   A.  Yes, sir.

16   Q.  And you testified earlier that you had testified in

17   front of the grand jury in connection with an indictment

18   that was issued on April 18th of 2018; is that correct?

19   A.  Yes, sir.

20   Q.  And when you testified in front of the grand jury, how

21   did you describe what Mr. Ivers had said about the 50

22   different ways' statement?

23   A.  I used the word plan.

24   Q.  Is that what you believe that you had been told by

25   Ms. Friedemann?

WOOTON - DIRECT

1    A.  Yes, it is.

2    Q.  Did you -- I think you testified earlier that at some

3    point in time we got the notes from Ms. Friedemann, correct?

4    A.  We did get the notes.

5    Q.  And did you then go back to the grand jury and advise

6    them of what was in those new notes?

7    A.  I did go back, advise them that the notes contained

8    planned and sought and received another indictment.

9    Q.  Did the grand jury indict on that statement as well?

10   A.  They did.

11   Q.  Now, Deputy Wooton, a couple of housekeeping matters.

12   Did you learn as part of your investigation where

13   Ms. Friedemann and Ms. Rondoni Tavernier were during the

14   February 27th, 2018, phone call?

15   A.  I learned that they were in their office in Minneapolis,

16   Minnesota.

17   Q.  And did you also learn where Mr. Ivers was during that

18   phone call?

19   A.  Yes, sir.  In West Fargo, North Dakota.

20               MR. RANK:  I'm going to offer right now a

21   stipulation that's been reached by the parties, Your Honor,

22   and this is reflected in Government's Exhibit 30.

23               THE COURT:  Okay.

24               MR. KELLEY:  No objection.

25               THE COURT:  Remember there was an instruction

WOOTON - DIRECT

1   about a stipulation.  That's an agreement between the

2   parties.  So you should listen carefully, for counsel might

3   read it or just offer it as an exhibit, whatever he's going

4   to do.

5          MR. RANK:  And, Your Honor, this is an exhibit, so

6   it will be available for the jury as well.

7          THE COURT:  All right.

8          MR. RANK:  So I'm going to publish Exhibit 30, and

9   this is a legal document, and I'm just going to blow up the

10  portion that shows the agreement between the parties.

11  BY MR. RANK:

12  Q.  Was there a Verizon Wireless witness that was scheduled

13  to testify at this trial?

14  A.  Yes, sir.

15  Q.  And by getting this agreement between the parties, did

16  we call off his testimony?

17  A.  We did.

18  Q.  And so the parties in this case, it says, have

19  stipulated, that is, they have agreed, that if the Verizon

20  Wireless employee Dion Morrow were called as a witness he

21  would testify as follows.  Do you want to read from

22  paragraph 1?

23  A.  Verizon Wireless has the ability to determine the

24  location of subscriber cell phones at the time the phone is

25  used to make a call.

WOOTON - DIRECT

1          Two, Mr. Morrow has reviewed records produced by

2     Verizon related to a cell phone with the phone number

3     952-529-8798.

4     Q.  Can I stop you there?

5     A.  Yes.

6     Q.  What phone number is that?

7     A.  Robert Ivers.

8     Q.  And do you know that from a number of different sources?

9     A.  I do.

10    Q.  Do you want to go on to No. 3?

11    A.  Three, a review of those records shows that there were

12    two phone calls on February 27, 2018, between the cell phone

13    with the phone number 952-529-8798 and a phone with the

14    number 612-492-7265.

15    Q.  Can you tell me, do you know whose number that is?

16    A.  Anne Rondoni Tavernier's number.

17    Q.  Okay.  And then next?

18    A.  Four, the first of these calls lasted approximately

19    28 minutes and the second call, which was placed within two

20    minutes after the first call concluded, lasted approximately

21    1 minute.

22          And, five, a review of cell tower records shows

23    that the cell phone with the phone number 952-529-8798 was

24    physically located in North Dakota during both of the calls

25    with the number 612-492-7265 on February 27th, 2018.

WOOTON - CROSS

1  Q.  And then it says you should accept that as being

2  Mr. Morrow's testimony just as if it had been given here in

3  court on the witness stand?

4  A.  Yes, sir.

5  Q.  That's the agreement of the parties.  And is this sort

6  of a long way of saying that when the phone call between

7  Mr. Ivers and Ms. Friedemann and Rondoni Tavernier took

8  place on February 27th they were here in Minnesota and he

9  was in North Dakota?

10  A.  Yes, sir.

11  Q.  Thank you, Deputy Wooton.

12          MR. RANK:  I have no further questions.

13          MR. KELLEY:  Your Honor, it will take me about a

14  minute and a half, two minutes.

15          THE COURT:  That's fine.

16                  CROSS-EXAMINATION

17  BY MR. KELLEY:

18  Q.  It's still morning for another few minutes.  Good

19  morning, Deputy Wooton.

20  A.  Good morning.

21  Q.  I'm going to jump straight to the September 1st, 2017,

22  interview.

23  A.  Okay.

24  Q.  Did you and Deputy Hattervig go to Mr. Ivers' residence,

25  the place he is staying, in Minnetonka?

WOOTON - CROSS

1    A.  Yes, sir.

2    Q.  You were concerned about a comment that Mr. Ivers had

3    said about being a walking bomb.

4    A.  That's correct.

5    Q.  You wanted to see what he meant.

6    A.  Yes.

7    Q.  Whether or not he was actually serious about that.

8    A.  That's correct.

9    Q.  So you talked to him, and the jury heard the testimony

10   -- or the recording, rather, but Ivers said to you and

11   Deputy Hattervig that I'm not going to hurt anybody.  Do you

12   remember him saying that?

13   A.  I do.

14   Q.  So then that was actually a pretty long interview,

15   wasn't it?

16   A.  Yes, it was.

17   Q.  You talked about his band Beatlestone at the end of it?

18   A.  Yes, sir.

19   Q.  Sometimes he likes to go off on tangents and talk about

20   strange things like that, right?

21   A.  That time, I guess, in that interview he did.

22   Q.  But at the end of the September 1st interview you didn't

23   charge him, did you?

24   A.  No.

25   Q.  And one of the other points of going to see him on

WOOTON - CROSS

1    September 1st was to get him to stop sending letters to the

2    judges.

3    A.  And to mitigate the threat, yes, sir.

4    Q.  All right.  So mitigate the threat, stop sending

5    letters.  Stop calling too?

6    A.  That would be preferable, yes.

7    Q.  So after September 1st isn't it true that Mr. Ivers did

8    not send any letters to the federal judges here?

9    A.  Yes, sir.

10   Q.  He did not call any of these federal judges after that?

11   A.  Yes, sir.

12   Q.  And no emails?

13   A.  Yes, sir.

14   Q.  No correspondence whatsoever?

15   A.  None that I am aware of.

16   Q.  And that includes Judge Wright?

17   A.  Yes, sir.

18   Q.  So you were there to get him to stop doing that and he

19   in fact did?

20   A.  For that time being he did, yes, sir.

21   Q.  Well, he didn't send any correspondence to any of these

22   federal judges after August or September 1st, 2017?

23   A.  He didn't mail anything, that's correct, that I'm aware

24   of.

25   Q.  So then some time November he files this second civil

WOOTON - CROSS

1  lawsuit with Magistrate Schultz?

2  A.  Yes, sir.

3  Q.  Then he gets referred by the Pro Se Project to

4  Ms. Rondoni Tavernier and Ms. Friedemann?

5  A.  Yes, sir.

6  Q.  Okay.  So that takes us through December and still there

7  is no correspondence with the federal judges here.

8  A.  Nothing I'm aware of.

9  Q.  Okay.  February 27th, 2018, that's the date of the phone

10  call.  It's very clear Mr. Ivers is in West Fargo, North

11  Dakota.

12  A.  Yes, sir.

13  Q.  Have you been there?

14  A.  I have.

15  Q.  About four hours?  Is that how long it takes to get

16  there?

17  A.  Four and a half, I would say.

18  Q.  Four and a half hours?

19  A.  It depends on when you catch traffic out of the city

20  here.

21  Q.  Four and a half hours from the Twin Cities?

22  A.  I would say, yes.

23  Q.  And did you know at this point that Mr. Ivers did not

24  have a car?

25  A.  No, I didn't know the status of a vehicle for him.

WOOTON - CROSS

1   Q.  You knew at one point he was living out of a truck and

2   the truck broke down?

3   A.  I only know that it broke down after hearing something

4   about that today or in this trial, I guess.

5   Q.  Okay.  So February 27th is the phone call that we're all

6   here to talk about.  Let's talk about how you received word

7   of Mr. Ivers' alleged threat.

8   A.  Yes, sir.

9   Q.  So it's February 28th.  That's 24 hours after this phone

10  call.

11  A.  Correct.

12  Q.  Ms. Friedemann waits 24 hours and calls Tiffany Sanders,

13  correct?

14  A.  She called Tiffany Sanders, yes.

15  Q.  Then Tiffany Sanders reports something to Judge Davis'

16  chambers?

17  A.  Yes.  She called -- yes.

18  Q.  And she may not have reported what Mr. Ivers actually

19  said?

20  A.  I don't think initially she did.

21  Q.  She might have just said there was a threat.

22  A.  I think that's what she testified to.

23  Q.  So she doesn't use his words, his exact words from the

24  phone call.

25  A.  Not on the first contact with Judge Davis.

WOOTON - CROSS

1    Q.  So then Tiffany Sanders calls Judge Davis' chambers,

2    passes along that information.  Judge Davis calls you, is

3    that correct, or was it his clerk?

4    A.  It was his calendar clerk Kristine Wegner.

5    Q.  So Kristine Wegner calls you and says a threat has been

6    made.

7    A.  Yes.

8    Q.  She doesn't use the language.

9    A.  No.

10   Q.  Okay.  Because she doesn't know it?

11   A.  That's my assumption, yes.

12   Q.  But you don't really know what was said before Judge

13   Davis' assistant calls you.

14   A.  I didn't know.

15   Q.  Okay.  So after you hear that there's a threat from

16   Judge Davis' assistant, you call Ms. Friedemann.

17   A.  I called Judge Wright next.

18   Q.  Okay.  So you called Judge Wright.  You report the

19   threat, alleged threat to her for the first time.

20   A.  No, I didn't report the threat to her.  I called to ask

21   if she knew there was a threat against her and find out what

22   all she knew.

23   Q.  You didn't use the words that Mr. Ivers said because you

24   didn't know them at this point.

25   A.   That is correct.

WOOTON - CROSS

```
1    Q.  All you were going on was that you had been told there
2    was a threat, generally?
3    A.  This was the start of my investigation, yes.
4    Q.  Okay.  And somebody had already told Judge Wright that
5    before you even called her?
6    A.  From the testimony that's what I believe.
7    Q.  Okay.  And she still -- Judge Wright did not know what
8    Mr. Ivers had actually said?
9    A.  I'm not sure if she did at that point or not.
10   Q.  There was a lot of information going around between a
11   lot of people at this point, right?
12   A.  All I know is what I did.  I heard from Kristine.  I
13   called Judge Wright, and I went from there.
14   Q.  Okay.  So you call Ms. Friedemann.  You ask her about
15   this alleged threat.  And she tells you, quote, well, he
16   said, quote, "You don't know the 50 different ways I plan to
17   kill her," present tense.
18   A.  That's what I perceived, yes.
19   Q.  You heard plan, present tense?
20   A.  I heard plan, present tense.
21   Q.  And this is the only statement that she discloses to you
22   on February 28th.
23   A.  Yes.
24   Q.  So this is all you have to go on for your investigation
25   going forward, is Ms. Friedemann's one statement?
```

WOOTON - CROSS

1    A.  That's all I needed, yes.

2    Q.  And as part of your investigation, you know that

3    Mr. Ivers did not communicate these words to Judge Wright,

4    did he?

5    A.  Not directly to Judge Wright, no.

6    Q.  He said them to Ms. Friedemann and Ms. Rondoni Tavernier

7    only?

8    A.  Yes, sir.

9    Q.  Okay.  So let's go to March 14th.  So now you're

10   concerned about what Mr. Ivers said on February 27th.

11   A.  I am.

12   Q.  You wait -- I don't know -- a little over two weeks to

13   send deputies out to talk to him.

14   A.  I wasn't waiting for that to happen.  I was conducting

15   an investigation during that time.

16   Q.  Okay.  But it's two and a half weeks before somebody

17   goes out to ask him whether or not he's actually serious

18   about what he said.

19   A.  From the -- yes, it was March 14th, I believe, when they

20   went out there.

21   Q.  I guess that's two and a half weeks after the phone

22   call, roughly?

23   A.  Sure.

24   Q.  And, again, their purpose was to figure out whether he

25   was serious.

WOOTON - CROSS

1   A.  Yes, to assess the threat and if he was going to carry

2   it out.

3   Q.  Because it's important to know whether or not he was

4   serious.

5   A.  It is important.

6   Q.  So you dispatch Deputy Seyfried and Deputy Wickenheiser

7   to Mr. Ivers' house, correct?

8   A.  To Janet Patterson's house?

9   Q.  Yes.

10  A.  Yes, sir.

11  Q.  His sister's house.  And Ivers was obviously not happy

12  to see them.

13  A.  It didn't sound like he was, no.

14  Q.  He didn't really talk to them much at all?

15  A.  He kind of talked at them and didn't really have a

16  conversation.

17  Q.  And Deputy Seyfried's conclusion from that was he

18  couldn't tell whether there was a credible threat or whether

19  there was no bite.

20  A.  I believe that's what he testified to.

21  Q.  So he didn't know if he was serious.

22  A.  He said there should be more investigation and this guy

23  needs to be talked to some more.

24  Q.  So then two days later, March 16th, you and Mr. Rank

25  call Ms. Friedemann.

WOOTON - CROSS

1    A.  Correct.

2    Q.  And this is the second time now that you have

3    interviewed her.

4    A.  Okay.

5    Q.  I mean, that's correct?

6    A.  Yes.

7    Q.  And during this phone call on March 16th Ms. Friedemann

8    again tells you that Mr. Ivers said, quote, "You don't know

9    the 50 different ways I plan to kill her."

10   A.  Plan, yes, sir.

11   Q.  Present tense.

12   A.  Yes, sir.

13   Q.  And that's what you wrote down in your report?

14   A.  That is my belief.  That's why I wrote it in my report.

15   Q.  And she told you that she wrote down the statement

16   verbatim.

17   A.  Yes, sir.

18   Q.  So then relying on this one statement from

19   Ms. Friedemann, you obtained a search warrant to, for lack

20   of a better word, tap Mr. Ivers' cell phone.

21   A.  We didn't tap his phone.

22   Q.  I mean, would you please describe what it actually --

23   A.  Yeah.  To me tapping is you are listening to a phone

24   call, and we did not have that.  It was just to track.

25   Different cell phone providers will provide you with

WOOTON - CROSS

1    different information.  Some give GPS location.  His cell

2    phone provider only gave us tower location.  The phone

3    connects to a tower; I get an email about where that tower

4    is.

5    Q.  So I was listening during that, but can you describe --

6    so Mr. Ivers makes a phone call.  It pings off a cell phone

7    tower.  And what kind of message do you get?

8    A.  I get an email with a link to a Google map, and you

9    click on that link, the map comes up, a little blue dot

10   showing the tower that the phone just connected to.

11   Q.  Sir, if you want to flip through those.  Do you

12   recognize what those are?  Deputy Wooton, do you

13   recognize --

14   A.  I do recognize this.

15   Q.  Okay.  What are they?

16   A.  These are copies of the emails that I would receive from

17   the cell phone provider.

18   Q.  Okay.  And it has a link to Google.  You would click on

19   that, and it'd pop up a map, and you would be able to tell

20   the cell phone tower near Mr. Ivers' phone call?

21   A.  The cell phone tower that it had connected to.

22   Q.  Okay.  Which would give you what?

23   A.  Approximate -- I guess I don't know -- I'm not super

24   versed on this on how far, it is different, I guess how far

25   out it could be, the radius, but you get the cell phone

WOOTON - CROSS

1    tower that it's connecting to.

2    Q.  Okay.  So every time Mr. Ivers makes a phone call from a

3    different tower, you get one of these alerts with a link to

4    Google Maps telling you --

5    A.  Which tower the phone is connected to.

6    Q.  Okay.  And Mr. Ivers has no idea that you're doing this

7    with his phone, correct?

8    A.  I would assume he does not.

9    Q.  And the point of doing this was to make sure that he

10   didn't visit Judge Wright.

11   A.  So I could keep track of him and see if he was going to

12   go anywhere near Judge Wright.

13   Q.  Okay.  Let's talk -- so you get this search warrant to

14   start tracking his whereabouts on March 16th.

15   A.  Yes.

16   Q.  And you start -- you do in fact start tracking his

17   whereabouts on March 16th.

18   A.  I am getting the emails, yes.

19   Q.  So then April 3rd, two to three weeks later, Mr. Ivers

20   for the first time moves.

21   A.  The 3rd or 4th, yes.

22   Q.  So he sits in West Fargo where he lives between

23   March 16th and April 3rd, does not go anywhere else.

24   A.  That's correct.

25   Q.  There's nothing unusual about that because he lives

WOOTON - CROSS

1    there, right?

2    A.  Well, he was staying there.

3    Q.  So then on April 3rd you receive one of these alerts

4    that says Mr. Ivers is moving east on 94 towards the Twin

5    Cities.

6    A.  Yes, sir.

7    Q.  And there's not a lot between West Fargo and the Twin

8    Cities, right?

9    A.  Not a whole lot.

10   Q.  So it doesn't take much guessing to figure out where

11   he's going.

12   A.  I was assuming he was coming to the Twin Cities.

13   Q.  Okay.  So the morning of April 3rd he leaves West Fargo.

14   You get an alert that says that.

15   A.  I am not a hundred percent on the times.  I would have

16   to look to confirm that.  But are these all the travel

17   dates?

18   Q.  They are.  So they start on the 2nd, if you look at that

19   first one.

20   A.  Yes, I see.

21   Q.  Okay.  Flip to the second one, and then it just starts

22   going sequentially by date.  It has grid coordinates on

23   there.

24   A.  Correct.

25   Q.  Okay.  So the morning of April 3rd he starts moving

WOOTON - CROSS

1   towards the Twin Cities.

2   A.  Yes, sir.

3   Q.  This is alarming to you.

4   A.  It is.

5   Q.  Okay.  Judge Wright lives in the Twin Cities.

6   A.  She lives down here, yes.

7   Q.  The Twin Cities is a pretty -- I mean, it just depends

8   on where you live, but it's a pretty big geographic area.

9   A.  It is.

10  Q.  You have no evidence that Mr. Ivers knew where Judge

11  Wright lived.

12  A.  I didn't know if he knew or not.

13  Q.  Judges don't normally publish their home addresses,

14  correct?

15  A.  I don't know what judges normally do.

16  Q.  I mean, you do security for the courts here.  They do

17  not publish their home addresses in the Yellow Pages, do

18  they?

19  A.  I don't know.  We tell them a lot of stuff not to do and

20  sometimes they listen, sometimes they don't.

21  Q.  But you didn't have any real reason to believe Mr. Ivers

22  knew exactly where she lived.

23  A.  No.  As far as I'm concerned as a threat investigator,

24  I'm assuming that he knows everything about Judge Wright.

25  That's why I'm concerned.

1    Q.  Okay.  Where does Judge Wright live?  General city.

2              MR. RANK:  Objection.  Relevance.

3              THE COURT:  Sustained.

4              What relevance does it -- what does it --

5              MR. KELLEY:  Your Honor, if --

6              THE COURT:  Go ahead.

7              MR. KELLEY:  If Deputy Wooton was concerned about

8    where Mr. Ivers was headed, we should know generally where

9    Judge Wright lives to determine whether or not they're even

10   close in proximity.  It's relevant to that.

11             MR. RANK:  That can be asked in a way that doesn't

12   disclose the city she lives in, Your Honor.

13             MR. KELLEY:  Well, I guess I don't know the answer

14   to the question I asked, so let me ask another one, Your

15   Honor.

16             THE COURT:  All right.

17   BY MR. KELLEY:

18   Q.  Does she live on the east side of the Twin Cities?

19   A.  She lives in the eastern part of the metro.

20   Q.  Okay.  So eastern Woodbury-ish, in that area?

21             MR. RANK:  Objection.  Relevance.  It's the same

22   thing.

23             THE COURT:  What does it tend to prove that's at

24   issue here, counsel?  That's what I don't understand.

25             MR. KELLEY:  If Mr. Ivers -- if he was concerned

WOOTON - CROSS

1   that Mr. Ivers was coming to the Twin Cities --

2           THE COURT:  Okay.

3           MR. KELLEY:  -- and he's able to track where

4   Mr. Ivers is going and he goes nowhere near where Judge

5   Wright actually lives, then it's not reasonable to be

6   alarmed.

7           THE COURT:  Do you want to ask him, Did he go

8   anywhere near where Judge Wright lives?

9           MR. KELLEY:  I don't know where she lives, Your

10  Honor.

11          THE COURT:  Well, but he does.

12          MR. KELLEY:  Okay.

13  BY MR. KELLEY:

14  Q.  So let's finish tracking where Mr. Ivers goes that day.

15  A.  Okay.

16  Q.  Okay.  So he goes through -- he's on 94 heading towards

17  the Twin Cities.  While he's heading towards the Twin

18  Cities, you go see Mr. Rank.

19  A.  I believe it was a phone call.

20  Q.  Okay.  So you call Mr. Rank.

21  A.  Yes, sir.

22  Q.  Because you thought Mr. Ivers was headed to Judge

23  Wright's house.

24  A.  That was going through my head, yes.

25  Q.  Okay.  So you have this conversation with Mr. Rank, and

WOOTON - CROSS

1    the two of you decide we need to seek an indictment.

2    A.  I think we were going to go for a complaint.

3    Q.  So a complaint would still get an arrest warrant for

4    Mr. Ivers.

5    A.  And that's what we were seeking.

6    Q.  So you were seeking this arrest warrant based on the

7    idea that he's traveling from West Fargo to go see Judge

8    Wright.

9    A.  Those were my thoughts.

10   Q.  Okay.  Let's keep tracking where Mr. Ivers went.  So

11   he's heading east on 94.  At some point he stops in

12   St. Louis Park.  Is that what your Google alerts --

13   A.  In the area.  Like I said, it is not precise.  It is a

14   tower.

15   Q.  So a cell phone tower pings him somewhere near, say,

16   Highway 7 and 100.  Do you remember one of the Google pings

17   from there?

18   A.  I think that I would take your word for that.  It sounds

19   correct.

20   Q.  Okay.  He lived in Hopkins for a long time, didn't he?

21   A.  I think at his brother's address and -- yes.

22   Q.  That's where -- he grew up in the west metro, correct?

23   I mean, that's your understanding of his --

24   A.  That's what I have heard, yes.

25   Q.  Okay.  And you also knew that he had lived in

WOOTON - CROSS

1    Minnetonka, which is pretty far out west in the Twin Cities.

2    A.  It was kind of right on the eastern border of

3    Minnetonka, so it was closer to the Twin Cities.

4    Q.  So western suburbs?

5    A.  Yes.

6    Q.  And Judge Wright in fact lives in the eastern suburbs.

7    A.  She is east.  That's correct.

8    Q.  So you are tracking Mr. Ivers.  He stops in the

9    St. Louis Park area and then traveled back to Minneapolis.

10   He makes a stop in Minneapolis.  Do you remember that?

11   A.  I believe so, yes.

12   Q.  Okay.  Would it make sense that one of those Google

13   pings is right near the bus depot at 394 at the downtown

14   exit in Minneapolis?

15   A.  That would make sense.

16   Q.  So he stops there at some point, and then he goes

17   straight back to West Fargo.

18   A.  Yes.

19   Q.  Okay.  It takes him a while to get back to West Fargo,

20   right?  He doesn't --

21   A.  It had to take a little bit.

22   Q.  Is it possible there was a major snowstorm that day?

23   A.  It is possible.

24   Q.  Okay.  If I told you the Google pings have him sitting

25   in Alexandria overnight, would that make sense?

WOOTON - CROSS

1   A.  I saw him sitting there, yes.

2   Q.  There's a big bus depot in Alexandria, isn't there?

3   A.  I'm not sure.

4   Q.  Not sure.  Okay.  But he arrives home then -- if you

5   flip to the last page, you finally get a ping saying he

6   arrives home at 4:00 a.m. on April 4th.  Those grid

7   coordinates, West Fargo.

8   A.  Yes, sir.

9   Q.  Okay.  So he sets out mid morning on April 3rd and is

10  back in West Fargo 4:00 a.m. on April 4th.

11  A.  Yes, sir.

12  Q.  So less than a 24-hour trip.

13  A.  Correct.

14  Q.  Got stuck in a snowstorm along the way, maybe.

15  A.  That's what it sounds like, yes, sir.

16  Q.  So, in fact, he never went close to Judge Wright.

17  A.  No.

18  Q.  So your belief that he was going to see Judge Wright

19  turned out not to be true.

20  A.  Correct.

21  Q.  But you went and saw Mr. Rank, and you two decided to

22  seek a complaint for Mr. Ivers' arrest before you knew that

23  Mr. Ivers just took a day trip down to the cities.

24  A.  Yes.

25  Q.  So at the point where you decided to seek an arrest

WOOTON - CROSS

1    warrant, you have one statement from Ms. Friedemann.  "You

2    don't know the 50 different ways I plan to kill her,"

3    present tense.

4    A.  Yes.

5    Q.  So you and Mr. Rank decide to seek an arrest warrant and

6    then -- so that's April 3rd.  You don't sit before the grand

7    jury until April 17th.  Does that sound correct?

8    A.  Yes.

9    Q.  Okay.  And you were the only witness that testified

10   before the grand jury.

11   A.  Yes.

12   Q.  And the only statement you conveyed to the grand jury

13   was "You don't know the 50 different ways I plan to kill

14   her," present tense.

15   A.  I believe I also brought up some of the other statements

16   about the judge stealing my life, stacking the deck against

17   me, throwing chairs.  I believe those were testified to

18   also.

19   Q.  Okay.  But you also told them, "You don't know the 50

20   different ways I plan," present tense, "to kill her."

21   A.  Yes, sir.

22   Q.  Because that's the only statement you knew about.  Well,

23   I guess you just testified you knew the other three at this

24   point.  But those four statements; that's it.

25   A.  I believe so.

WOOTON - CROSS

 1          THE COURT:  Mr. Kelley, are you going to be

 2     awhile?  They have been sitting for an hour and 15 minutes,

 3     and we do need to take a break.  So it's entirely up to you,

 4     if you want to continue, or we can --

 5          MR. KELLEY:  I can be done in less than ten, or we

 6     can take a break, Your Honor.  I will leave it to you.

 7          THE COURT:  We will take you at your word, "less

 8     than ten."

 9          MR. KELLEY:  All right.  Time myself.

10          THE COURT:  All right.  Do you want to stretch

11     before he gets his ten minutes?

12                    (Short break taken.)

13          MR. KELLEY:  Just took twenty seconds of my ten

14     minutes.

15     BY MR. KELLEY:

16     Q.  Okay.  So you get the indictment based off of those four

17     statements, including the one that has plan, present tense.

18     A.  Yes.

19     Q.  Okay.  Mr. Ivers then in fact is arrested based on that

20     indictment.

21     A.  Yes.  I arrested him on April 20th.

22     Q.  That's April 20th.  I'm going to take you now to early

23     August.  So about a month ago.  That's when Ms. Friedemann

24     discloses her notes to the government for the first time.

25     A.  Okay.

WOOTON - CROSS

1   Q.  Is that correct?  It's the first time you saw them?

2   A.  Yes, the first time I saw them.

3   Q.  And these are the notes from the February 27th phone

4   call.

5   A.  That's correct.

6   Q.  They're redacted, though.  You only have the second

7   page.

8   A.  Yes, sir.

9   Q.  And the second page is those four statements you were

10  just talking about, roughly?

11  A.  Yes, sir.

12  Q.  Okay.  And her notes in fact read, "You don't know the

13  50 different ways I planned to kill her," past tense.

14  A.  That's correct.

15  Q.  This was the first time you heard her say planned, past

16  tense, isn't it?

17  A.  Correct.

18  Q.  Okay.  So this is mid August now.  The trial is less

19  than a month away?

20  A.  Yes, sir.

21  Q.  You felt that this late revelation from Ms. Friedemann

22  about whether or not she said plan or planned was important

23  enough that you went back to the grand jury.

24  A.  We did, yes.

25  Q.  Okay.  You tell the grand jury, well, we went off, for

WOOTON - CROSS

1    the original indictment, we went off the statement, "You

2    don't know the 50 different ways I plan," present tense, "to

3    kill her."

4    A.   Yes, sir.

5    Q.   Okay.  And then you tell them now we have the notes; the

6    notes say planned, past tense.

7    A.   Yes, sir.

8    Q.   Well, Mr. Rank asked you then, okay, well, in light of

9    that revelation that it is not plan, it's planned, were you

10   still concerned based on the pen communication, P-E-N?

11   A.   Now I'm not sure what you are asking.

12   Q.   Do you remember Mr. Rank asking you if you were still

13   concerned despite the change in words based on a pen

14   communication?

15   A.   I'm not sure if I remember the pen communication

16   statement.

17   Q.   Do you have -- did I hand you your grand jury testimony?

18   A.   No.

19   Q.   So this is from the superseding indictment, and we will

20   take you to page 24.  Okay.  So do you see the question

21   going down from line 16 to line 25?

22   A.   Yes, sir.

23   Q.   Okay.  Mr. Rank, after you discussed this change in

24   words, plan to planned, Mr. Rank asks you, well, in light of

25   everything else, were you still concerned based on this pen

WOOTON - CROSS

1   communication.

2   A.  Yeah, that was asked and I was still concerned.  I'm not

3   sure what the pen communication means.

4   Q.  The pen -- could it refer to the cell phone tracking?

5   A.  I think that's P-I-N, but I'm not --

6   Q.  Are you familiar with a pen register?  It's kind of an

7   old term --

8   A.  Yes, sir.

9   Q.  -- for tracking phones?  Okay.  Is it possible Mr. Rank,

10  a little bit older than I am, but is it possible pen

11  communication referred to the cell phone tracking?

12  A.  I don't know what it refers to.  This isn't familiar to

13  me, and I don't actually remember this during the --

14  Q.  Okay.  So you don't remember him asking if you were

15  still concerned based on this pen communication.  And you

16  said what?

17  A.  I was still very concerned.

18  Q.  Okay.  You don't even know what the pen communication

19  is, sitting here today.

20  A.  No.  It could even be a typo, I guess.

21  Q.  So the change in those words was important enough for

22  you guys to run back to the grand jury, correct?

23  A.  We felt it was important.

24  Q.  Okay.  And then Mr. Rank is asking you about, okay, in

25  light of this difference, were you still concerned based on

WOOTON - CROSS

1  a pen communication.  You answer yes.  But you don't know

2  what the pen communication is?

3  A.  No.  I was concerned about the threat.

4          MR. KELLEY:  One moment, Your Honor.

5          THE COURT:  Yes.

6              (Counsel conferring.)

7  BY MR. KELLEY:

8  Q.  Mr. Scott brings up a good point for the record, and

9  that's why he's here, but -- so these four statements that

10  were in Ms. Friedemann's notes --

11  A.  Yes, sir.

12  Q.  -- the throwing the chairs, stack the deck, those

13  statements --

14  A.  Yes, sir.

15  Q.  -- the first time you learned about that was May 7th,

16  2018.  Does that sound right?

17  A.  I'm not sure.  I would have to refer to some reports, if

18  you have them.

19  Q.  Sure.  There you are.

20  A.  Thank you.  Those statements are in this report.

21  Q.  Okay.  And in your report those four statements, this is

22  May 7th, the first time you've heard anything else aside

23  from "You don't know the 50 different ways I plan," present

24  tense, "to kill her."

25  A.  I'm not sure if it's the first time I heard them or not.

WOOTON - CROSS

1    I know that they are in this report, though.

2    Q.  Okay.  But you put in your report, again, plan, present

3    tense, correct?  That second page?

4    A.  Yes, sir.

5    Q.  So, again, Ms. Friedemann told you plan, present tense.

6    A.  That's what I perceived, yes, sir.

7    Q.  Okay.  So for five months between February 27th and

8    August, when Ms. Friedemann finally turns over her notes,

9    you relied on her statement, "You don't know the 50

10   different ways I plan," present tense.

11   A.  I perceived it to be that and that's what I relied on.

12   Q.  Okay.  Then, in fact, you figured out you guys were

13   mistaken.  She had written down planned.

14   A.  I did find that out, yes.

15   Q.  In August?

16   A.  I believe so, yes.

17   Q.  So you are operating off of the mistaken belief that he

18   had said that when you sought the arrest warrant.

19   A.  I'm sorry.  Could you ask that question again?

20   Q.  You are operating off "50 different ways I plan" when

21   you sought the arrest warrant.

22   A.  That's what I had perceived and that's what I was --

23   Q.  You were operating off that same statement, plan,

24   present tense, when you sought the indictment.

25   A.  The first indictment, yes.  Yes, sir.

1    Q.  No further questions.

2              MR. KELLEY:  And I think I've run out of time.

3              THE COURT:  Mr. Rank.

4              MR. RANK:  Thank you, Your Honor.

5                      REDIRECT EXAMINATION

6    BY MR. RANK:

7    Q.  Deputy Wooton, I will jump into it, so we can get to

8    lunch.  Mr. Kelley asked you about the interview in

9    September of 2017 with Mr. Ivers.  Do you recall some

10   questions about that?

11   A.  Yes, sir.

12   Q.  And in that interview he asked you whether Mr. Ivers

13   said, "I'm not going to hurt anybody"?

14   A.  Yes, sir.

15   Q.  If somebody -- even if somebody tells you that they are

16   not going to hurt somebody, might they hurt somebody?

17   A.  Yes, sir.

18   Q.  And he asked you about the purpose of that interview in

19   September of 2017, that it was somehow to just get him to

20   stop sending letters to the court.  Was that the only

21   purpose of that interview?

22   A.  It's always a threat assessment when you are doing a

23   threat interview, so to assess the level of where Robert

24   Ivers was with what he had been sending, was he elevated,

25   was he going to act on any of the stuff he had been saying,

WOOTON - REDIRECT

1    was he still a danger to the courts and to our protectees.

2    Q.  That's what is being assessed in January of 2017 when

3    Deputy Hattervig first talked to him?

4    A.  Yes, sir.

5    Q.  And also in September of 2017 when both of you talked to

6    him?

7    A.  Yes, sir.

8    Q.  And is one of the other purposes in September of 2017 to

9    advise Mr. Ivers that he is scaring people with his words?

10   A.  Yes, sir.  Deputy Hattervig made it very clear.

11   Q.  In fact, we saw that in the recording that he's being

12   told to stop using threatening language.

13   A.  Yes, sir.

14   Q.  Mr. Kelley asked you a few times is that all you had to

15   go on, is that all you had to go on, was this statement that

16   you heard from Ms. Friedemann on February 28th that you

17   understood to be the "You don't know the 50 different ways I

18   plan to kill her."

19   A.  Yes, sir.

20   Q.  And he asked you if that was all you had to go on when

21   you sought the arrest warrant, the indictment.  That's not

22   all you had to go on, was it?

23   A.  It was cumulative of everything he had said, all the

24   letters he had sent, everything he had written, his actions

25   during interviews.  That all adds up to make it even more

WOOTON - REDIRECT

1    concerning, the statement, the 50 different ways I plan to

2    kill you.

3    Q.  And that's -- you know that as of February 28th; is that

4    right?

5    A.  Yes.

6    Q.  But before you decide that this is a chargeable criminal

7    threat, you get some more information, right?

8    A.  Yes.

9    Q.  In March of -- March 14th of 2018?

10   A.  Yes.

11   Q.  Which I don't think is two and a half weeks from

12   February 28th.  I think that's precisely two.

13   A.  About two weeks.

14   Q.  But you get some more information.  And that's the

15   result of the interview that Deputy Seyfried did with

16   Mr. Ivers.

17   A.  Yes, sir.

18   Q.  And did the level of anger being expressed by Mr. Ivers

19   during that call focused on Judge Wright, combined with

20   everything else --

21           MR. KELLEY:  Objection, Your Honor.  Leading.

22           THE COURT:  Sustained.

23   BY MR. RANK:

24   Q.  Did that contribute to your conclusion that this was a

25   chargeable criminal threat?

WOOTON - REDIRECT

1   A.  It did.  Robert Ivers showed no remorse.  He didn't say

2   he was sorry for the statement, he didn't mean the

3   statement.  He didn't say he wasn't going to act.  He was

4   just still aggravated and fixated on Judge Wright.  And

5   there was zero comfort in that interview that he was not

6   going to carry out a threat.

7   Q.  And Mr. Kelley asked you whether he ever actually

8   traveled to somewhere near, very near to where Judge Wright

9   lived.  Do you recall that line of questioning?

10  A.  Yes, sir.

11          MR. KELLEY:  Objection, Your Honor.  Misstates the

12  testimony.

13          THE COURT:  Overruled.

14  BY MR. RANK:

15  Q.  Do you recall that testimony and those questions?

16  A.  I do.

17  Q.  Where was Mr. Ivers located most of the time that you

18  had that warrant to track his cell phone?

19  A.  In West Fargo, North Dakota.

20  Q.  And at some point in time when he traveled towards the

21  Twin Cities did that increase your level of concern?

22  A.  It did.  And I should also add on that, with the phone

23  and the cell tower information, he could have went and

24  parked out front of Judge Wright's house, and I would have

25  never known unless he used his phone while he was there,

WOOTON - REDIRECT

1    because it's not going to hit off a tower and send me an

2    email unless he uses his phone.  So I guess I don't

3    ultimately know if he did.

4    Q.  And once he is here in close proximity, do you have less

5    control of the situation?

6    A.  Yes.  With the more cell phone towers, metro area, you

7    don't really get as -- West Fargo, North Dakota, there's not

8    that many cell phone towers, so you have a good idea where

9    he is.

10   Q.  At least with respect to when he's up in North Dakota

11   and the cell phone is showing he is up in North Dakota, you

12   have a better idea that he is there?

13   A.  Yes, sir.

14   Q.  A little more control over the situation.

15   A.  Yes, sir.

16   Q.  And, lastly -- and I'm looking at the transcript of the

17   grand jury.  And looking at it -- I'm not even sure -- is it

18   possible that what was asked of you in the grand jury was,

19   Were you still concerned based on the entire communication?

20   A.  Yes, sir.

21   Q.  Does that make more sense, in light of what your answer

22   was?

23   A.  It does.

24            MR. RANK:  I have no further questions.

25            THE COURT:  Okay.  Mr. Kelley, any recross?

WOOTON - RECROSS

1            MR. KELLEY:  A couple questions, I believe, Your

2      Honor.

3                     RECROSS-EXAMINATION

4      BY MR. KELLEY:

5      Q.  Deputy Wooton, Mr. Rank was just talking to you about

6      Mr. Ivers traveling down to the city on April 3rd.

7      A.  Yes, sir.

8      Q.  That was the day he did the quick -- less than 24-hour

9      turnaround?

10     A.  That's correct.

11     Q.  There were no restrictions on Mr. Ivers' travel, right?

12     A.  Correct.

13     Q.  So he wasn't somehow under some court order prohibiting

14     him from coming to the Twin Cities where he lived?

15     A.  No.  He could come to the Twin Cities.

16     Q.  Nothing unusual about him coming back to the place that

17     he lived before.

18     A.  No.  He can do that.

19     Q.  And just to be clear, I think Mr. Rank said that -- I

20     asked whether or not Mr. Ivers was very close to where Judge

21     Wright lived.  Not knowing where Judge Wright lives, where

22     Mr. Ivers was was not very close, was it?

23     A.  Your definition of "very close" could be different than

24     mine.

25     Q.  Is it 25 miles away?

WOOTON - RECROSS

1   A.  I don't know.  And, like I said, with the cell tower

2   information, I don't ultimately know where he was the entire

3   time he was here, only when it pinged off a tower.

4   Q.  He did not know you were tracking his phone, correct?

5   You testified to that.

6   A.  I assume that he did not.

7   Q.  And so he would not be, you know, weary of making calls

8   and pinging off of towers, correct?

9   A.  I'm not sure if he would or not.

10  Q.  But he wouldn't know that you were tracking every time

11  he made a phone call, it would be able to tell you where you

12  were at.

13  A.  He wouldn't know that I was tracking him, no.

14  Q.  If he wanted to go see Judge Wright and made a phone

15  call, he would have no idea you were tracking him.

16  A.  I assume he doesn't know that I was tracking his phone.

17  Q.  All right.

18          MR. KELLEY:  No further questions, Your Honor.

19  Thank you.

20          THE COURT:  Thank you.

21          You may be excused.

22          Ladies and gentlemen, we are going to take our

23  afternoon recess.  We will be in recess till 1:45.

24          The lawyers should stay.

25          THE CLERK:  All rise.

1    **IN OPEN COURT WITHOUT THE JURY PRESENT**

2         THE COURT:  Please be seated.

3         Mr. Rank, do you want to tell me where we are in

4    terms of your presentation?

5         MR. RANK:  I believe, Your Honor, when the jury

6    returns, the government will be resting.

7         THE COURT:  All right.  And, Mr. Kelley, you are

8    ready to proceed after lunch?

9         MR. KELLEY:  Yes, Your Honor.

10        THE COURT:  How do you want to handle your Rule 29

11   work?

12        MR. SCOTT:  Well, if the government is actually

13   resting, this would be a good time for it.

14        THE COURT:  All right.

15        MR. SCOTT:  And without belaboring any of the

16   points, Your Honor, pursuant to Rule 29 of the Federal Rules

17   of Criminal Procedure, we move for a judgment of acquittal

18   from the court on the grounds that the government has not

19   proven, has not offered sufficient evidence even looked at

20   in the best light of the jury verdict, I mean, of the jury

21   verdict they want -- finish a bad sentence there -- that

22   from which they could find him guilty.  They have not proven

23   a threat beyond a reasonable doubt here.

24        We have, I think -- I lost count on how many

25   different versions of the statement that our client

1     supposedly made and they vary from thought, from imagined,

2     from imagine, from plan, from planned.  And it appears that

3     the one that might be the best argument that there was a

4     threat, which is I plan on killing the judge, that everyone

5     who has testified so far agrees that that's not what he

6     said.

7            And the government -- and it seems to me at this

8     point we are talking about something that is not taking

9     place now or in the future or, to quote the *Doe* case,

10    presently or in the future and that -- so we haven't

11    established a threat under what the various readings are.

12    Depending on which one the jury grabs, if any, none of them

13    constitute a present, a threat of a present or future plan

14    to harm somebody.

15            THE COURT:  All right.  Thank you.

16            Counsel.

17            MR. RANK:  Your Honor, I think we are in the state

18    that we were in when we briefed this issue before the trial.

19    So I think the court is very aware of the law on this, that

20    the threat can be totality of the circumstances.  It can

21    take into context and it can take into context both verbal

22    and nonverbal.

23            THE COURT:  Well, the better practice here is, as

24    the Court of Appeals has instructed district judges, we

25    should submit the case and then if we are convinced that

1    there is insufficient evidence we can either grant another

2    trial or grant judgment of acquittal following the verdict.

3             So the motions, plural, as to Counts 1 and 2 are

4    overruled, taking the evidence in the light most favorable

5    to the United States.

6             We will be in recess till 1:45.

7             THE CLERK:  All rise.

8        (Recess taken from 12:36 p.m. till 1:45 p.m.)

9             **IN OPEN COURT WITH THE JURY PRESENT**

10            THE COURT:  Please be seated.

11            Ms. Allyn or Mr. Rank, did you want to rest in

12   front of the jury?

13            MR. RANK:  Government rests, Your Honor.

14            THE COURT:  All right.  Thank you.

15            Ladies and gentlemen, we have now reached the

16   point in the trial where the defendant may offer evidence on

17   his behalf.

18            So the record, counsel, that we made outside the

19   courtroom will apply after the government rested.

20            So, Mr. Kelley or Mr. Scott, you may proceed.

21            MR. KELLEY:  Thank you, Your Honor.  The defense

22   calls Ms. Janet Patterson.

23            THE COURT:  Ms. Patterson, could you remain

24   standing for just a minute?

25            THE WITNESS:  Yes, I will.

PATTERSON - DIRECT

1          THE COURT:  Look at the ladies and gentlemen of

2     the jury and raise your right hand, please, to be sworn as a

3     witness.

4                         JANET PATTERSON,

5     called on behalf of the defendant, was duly sworn, was

6     examined and testified as follows:

7          THE WITNESS:  I do.

8          THE COURT:  Please be seated.

9                      DIRECT EXAMINATION

10    BY MR. KELLEY:

11    Q.  Ms. Patterson, would you please spell your last name for

12    the court reporter, please?

13    A.  Yes.  P-A-T-T-E-R-S-O-N.  Patterson.

14    Q.  And, Ms. Patterson, do you go by Jan or Janet?

15    A.  Janet if you are mad at me or Jan if you are not.

16    Q.  What does Bob call you?

17    A.  He called me Jan.

18    Q.  So you are Bob's sister?

19    A.  Yes, I am.  I am his only sister.

20    Q.  Are you older or younger?

21    A.  I am nine and a half years older than Bob.

22    Q.  So tell me a little bit about yourself first.  Where do

23    you live?

24    A.  I live in West Fargo, North Dakota.  I have been there

25    40 -- 43 years this year.

PATTERSON - DIRECT

1    Q.  And your last name is Patterson.  It used to be Ivers.

2    Were you married at one point?

3    A.  Yes, I was married at one point.  And I never remarried,

4    kept the name.

5    Q.  How long have you been divorced?

6    A.  46 -- let's see.  My son is 48.  42 years.

7    Q.  And you have been in West Fargo ever since?

8    A.  Yes, I have.

9    Q.  What do you do for work?

10   A.  I have a window covering business.  I started out as

11   just a home sewer for a very exclusive place in Edina,

12   Minnesota, and I used to do piece work, and I did that for

13   about three years.  Then my husband was transferred to Fargo

14   and we were separated, but I ended up going up there and I

15   got there and he left.  So I started my business and

16   eventually branched out into Hunter Douglas window

17   coverings, and I have been in business 43 years now.

18   Q.  How old are you now?

19   A.  I am going to be 75.

20   Q.  Forgive me for asking.  Do you still work?

21   A.  I am -- my son and I work together.  I am kind of

22   semi-retired, but, yes, I still work.  I have had some

23   health issues, so I have had to slow down the last couple

24   years.

25   Q.  Why don't you tell me about some of these health issues

PATTERSON - DIRECT

1    that you have.

2    A.  Well, I had a couple strokes.

3    Q.  When did those happen?

4    A.  They would be about three years ago.  And then about two

5    years ago I ended up having -- I found out I had hardening

6    of the arteries of my brain and my heart, and I ended up

7    having a craniotomy and open-heart surgery and a throat

8    surgery, and I came out of that with a lot of chutzpah.  And

9    about six months later I started to have chest pain again,

10   and I in 2017, toward the end, I had some stents put in and

11   here I am.  So I'm -- I feel pretty good, but I have my -- I

12   can tell -- I don't know if it's because I'm going on 75 or

13   because of the hardening of the arteries of the brain, I

14   have got some like slower memory things.  I have to think

15   things out.

16   Q.  Well, your memory is not shot.  You can remember things,

17   right?

18   A.  I can remember things, yes.  The worst is names, but --

19   yeah.

20   Q.  Names you have a problem with?

21   A.  Names.  Names would be the worst.

22   Q.  You remember mine, right?

23   A.  Yes, I do.  You are Brett.

24   Q.  So tell me about your family growing up.  Where did you

25   guys live growing up as a family?

601

PATTERSON - DIRECT

1    A.  We lived in Minnetonka, Minnesota.  We moved there when

2    I was seven and lived in the same house.  My parents owned

3    the house for 50 some years, I think about 52 years, so,

4    yeah, that's --

5    Q.  This is Minnetonka.  Was it close to the lake or closer

6    to --

7    A.  It's closer to Ridgedale.  And it was just a big old

8    house, pretty joyful, big yard, two-acre yard, and, yeah, we

9    loved it there.

10   Q.  So we all know about Bob, your brother.  But how many

11   other siblings do you have?

12   A.  I had four other brothers.  One of them passed away

13   when -- he was a couple years older than I am.  He passed

14   away from a heart attack at 50.  And then there would be

15   three other brothers, one seven years -- let's see.  One

16   that would be seven years younger, one that would be about

17   eight and a half years younger and then Bob was the

18   youngest.  And so I was about nine and a half years old when

19   Bob was born, so I kind of was a baby-sitter for all my

20   younger brothers, because both my parents worked.  So I was

21   pretty close to them when they were young.  I was the

22   right-hand helper.

23   Q.  You went to college?

24   A.  I did go to college.  I went to college when I was 18.

25   Bob would have been about nine and a half years old then.

602

PATTERSON - DIRECT

1    And I went to Mankato State College.  I went away.  I lived

2    down there for three and a half years.

3    Q.  So what's the total span in years between the eldest and

4    Bob, down to youngest?

5    A.  Well, my brother Dave would have been 77 on 9-11.  He

6    had probably very little to do with Bob because just of age.

7    They -- you know, not because he disliked him, but just

8    that's where the age was.  And, I mean, by the time I was

9    18, I wasn't real interested in what was going on with any

10   of my younger brothers, but I was still part of the family.

11   Q.  So you went off to college.  Bob stayed at home.  What

12   did Bob do when he turned 18 or college age?

13   A.  Could you please repeat that?

14   Q.  Yeah.  So you went off to college when you were 18.  And

15   Bob was only nine and a half, right?

16   A.  Mm-hmm.

17   Q.  What did Bob do when he was about college age?

18   A.  Well, what did Bob do when he was college age?  Well, I

19   think Bob was -- I don't know a whole lot about what Bob did

20   in high school, because I was just busy with my own life.  I

21   mean, Bob was very helpful I know around the house.  He was

22   the youngest, and he was always a helper bee to my mother

23   and my dad and I think -- we had a two-acre yard.  There was

24   always yard work.  And Bob I do believe was a Cub Scout and

25   played Little League and -- I mean, I love Bob.  He was my

PATTERSON - DIRECT

1    baby brother.  I can remember dressing him up, the poor

2    thing, I don't know if he remembers that, and playing house

3    with him and pulling him around in a wagon and doing all

4    kinds of things just to be good sister.

5    Q.  How much older was your father than Bob?

6    A.  Well, my dad was 27 years older than my mother, so --

7    when Bob was born, my dad was about 53.  He was a pretty

8    older father.  And -- and then so he was like almost 52 and

9    maybe close to 50 when my oldest of the youngest brothers.

10   There was three of them that were, you know, kind of snap,

11   crackle and pop, so.

12   Q.  So did -- I'll stop you there.  You've told me that your

13   -- or Bob took care of your parents.  Can you describe that

14   for me?

15   A.  Well, I think Bob was -- he was just -- my dad was older

16   and he -- my dad was pretty demanding, and Bob was always --

17   Bob was a real helper to my mom and dad.  He was, you know,

18   not a talk-back person that I remember, just a real good

19   kid.  And I'm not exactly sure what Bob did when he got out

20   of high school, because at that point in time I was moving

21   to Fargo and I was busy with my own life, so I can't even

22   tell you exactly where Bob went when he graduated high

23   school, but I know he graduated.

24   Q.  Your father had health issues at the end of life?

25   A.  Yeah.  My father -- from the time he was 62 he no longer

PATTERSON - DIRECT

1     worked.  He had had an injury at work, had fallen off a

2     building or something and broke his elbow, and so he, you

3     know, he needed help with the yard.  And he was, like I

4     said, he was kind of demanding.

5     Q.  Did Bob take care of him at the end of his life?

6     A.  Bob did, yes.  And my mother.  He took care of my mother

7     for a year and about four months.  She had a blockage and a

8     bypass and got -- all of her lower extremities got

9     gangrenous, and she had to have her intestines removed and

10    she fed through her heart with TPN.  And Bob for a year and

11    a half put his life aside and took care of -- lived with her

12    and did every single thing for her that she wanted and

13    enjoyed.  And Bob told me that he should -- it should never

14    be thought of as work, but that it was something that he was

15    honored to do.

16    Q.  And he took care of your mother as well at the end of

17    her life?

18    A.  Yep.

19    Q.  Or father, rather?

20    A.  Father.  My father was -- all of us took care of my dad

21    on and off for ten years.  My dad had strokes and almost was

22    blind.  And Bob was very compassionate.  And we all, I mean,

23    we come from a family that -- it's like an old-fashion,

24    where you take care of your parents and you -- you just do

25    that.

PATTERSON - DIRECT

1    Q.  Okay.  So how often did you see Bob on a regular basis?

2    A.  After -- let's see.  I moved to Fargo when I was towards

3    30.  I didn't see Bob a lot except holidays, a wedding, a

4    new baby being born, because I was in North Dakota and he

5    was in Minnesota.  So I can't tell you all the first places

6    that maybe Bob lived or -- I know he got married and he was

7    married for almost ten years.  And I did, I did see him, you

8    know, on and off when I'd come home to visit, but it wasn't

9    like you came home every week.  And I didn't call him all

10   the time.  And as life went on after, I think, after Bob got

11   divorced, he moved to California and then I really didn't

12   see him -- you know, I didn't see him for a few years.

13   Q.  Okay.

14   A.  And he came back from California before my mother passed

15   away and took care of her.  That's when I saw him the most.

16   Q.  So I'm going to fast forward to this past December.  Bob

17   came to live with you, didn't he?

18   A.  Yes.  He called me up and said he -- where he was

19   living, the property had been purchased and the house was to

20   be destroyed and he had to move.  And he --

21   Q.  And this was a -- stop you there -- this is a house in

22   Minnetonka?

23   A.  In Minnetonka, right.  And he was having some difficulty

24   finding a place to live and asked me if he could come up and

25   spend a little time with me.  And I said, oh, that would be

PATTERSON - DIRECT

1    great, I can use the -- winter was coming, shovel snow, we

2    can get reacquainted and help with cooking and just visit.

3    And I didn't care how long he stayed for.  I knew it was

4    going to be longer than two weeks.  And after he got there

5    I, you know, I thought stay till spring, if you have to.

6    And we really never discussed any length of time after that,

7    that he would stay, but I knew he would eventually be

8    leaving.

9    Q.  So he moved in mid December then?

10   A.  I would say it was right -- I can't remember exactly,

11   but maybe a week or two before Christmas.

12   Q.  Can you describe Bob's daily routine?  What did he do?

13   A.  Well, he loved to eat, so he did cooking.  And he slept

14   in a little bit in the morning.  And I was gone a lot during

15   the day, but he was working on a project.  He didn't at

16   first share it with me.  He said he had this great idea and

17   he'd been working on it for quite sometime and he would tell

18   me when he was ready to really share it.

19   Q.  And this is -- stop you there.  He's talking about a

20   Pepsi --

21   A.  Yes, he's talking about his Pepsi project.

22   Q.  We will talk about that in a bit.  What else did he do

23   on a daily basis besides -- okay.

24   A.  Well, he read the paper every day from front to back.  I

25   took the paper.  And he was real big on news.  He watched

PATTERSON - DIRECT

1    the news morning and night.  And there were other -- Bob and

2    I are both interested in history.  He didn't watch stupid

3    stuff on TV.  He just -- he likes National Geographic,

4    history and politics.  He was pretty big on watching a lot

5    of political things, but no stupid, nonsense, crime.  That

6    kind of stuff didn't interest him.

7    Q.  And what was Bob's general mood while he was living with

8    you?

9    A.  Oh, real good mood.  We always got along great.  He was

10   so gentle to me and always caring and telling me how

11   wonderful I was and just a very sensitive person.

12   Q.  Did you two do things together?

13   A.  Well, we didn't go out and eat, because Bob liked to

14   cook at home and he had favorites, and he would have meals

15   ready for me a lot of times when I got home.  And he loved

16   the movies and the theater.  He's a pretty artsy person.

17   And we went to several movies.  And you are going to ask me

18   what they were and I'm not going to be able to remember

19   them, but we went on Tuesdays.  It is senior day for $5 and

20   free popcorn.  So we went to several of them.  I am sure we

21   missed a couple Tuesdays, but we had a lot -- we enjoyed

22   that.

23   Q.  Bob had a normal routine?

24   A.  I would say, for a person of our age or his age, I would

25   say it was pretty normal.  I have friends that are his age

PATTERSON - DIRECT

1    that they don't do too much during the day.  They hang out

2    or, you know, that's about it.

3    Q.  Does Bob drink alcohol?

4    A.  You know, I think two times in four months I went to the

5    liquor store for him, and he wanted a six-pack of Bud Light.

6    That was it.  I don't -- I am not a drinker.  I don't have

7    alcohol at my house.  I don't smoke and I don't drink.  And

8    Bob didn't smoke.  And I don't know if you could say two

9    times in four months was drinking.  It's not, certainly, not

10   a lot.

11   Q.  How often did he go to the bar?

12   A.  Never.  Never.

13   Q.  So he's a homebody then?

14   A.  He's just a homebody, yeah.  We liked just being home

15   and snacking and watching TV and that was it.

16   Q.  So you mentioned earlier this Pepsi.  Can you tell me

17   about Bob's Pepsi idea?

18   A.  Well, when he finally did show it all to me -- he was

19   working on it, and he worked on it a lot at my house.  I

20   would say every day.  He was making a new -- new label for

21   Pepsi-Cola, because Pepsi stock was pretty well down.

22   There's so many sodas out there now that the competition is

23   really tough; and it seems like if you have a good-looking

24   can, sometimes that's what the young people buy.  As a

25   matter of fact, I just noticed they put Michael Jackson back

PATTERSON - DIRECT

1    on it, so it must be -- you know, young kids like kind of

2    hip stuff.

3    Q.  He's designing a --

4    A.  He was designing something new for Pepsi-Cola.  And did

5    they know about it?  I don't think so, but he was working on

6    that and going to present it to them.

7    Q.  When you say "present it to" Pepsi, what was he going to

8    present to them?

9    A.  Well, he was going to present this poster he had made

10   up.  And he actually had been to the print shop several

11   times, and he had been designing the poster, been to the

12   library.

13   Q.  And you -- I'll stop you there, Janet.  Can you describe

14   this poster for us?

15   A.  Yes.  It's a space poster, and it's just what he thought

16   would be a really cool thing with the times and -- I don't

17   know.  I thought I gave you a picture of it.  I don't know

18   if you could show them to --

19   Q.  Would it refresh your memory if I hand you this --

20   A.  Yes.  Yeah.

21   Q.  -- so you can describe it to the jury?

22   A.  Yeah, it would.  I actually picked this up at the print

23   shop right after the incident that brought Robert here.

24   Q.  Don't show it to the jury, Janet.  But can you

25   describe --

PATTERSON - DIRECT

1    A.  Okay.  Well, it's a space odyssey on -- a space man on

2    a -- wherever he is at.  I can see a bridge here and --

3    there's a lot to it, and it's kind of hard to explain it,

4    but it says Pepsi on it and it says earth altering, which

5    would be your first drink of Pepsi, earth altering.  And it

6    says a new direction for everyone, everywhere, presenting a

7    new age of enlightenment, making the world equal for

8    everyone, defining the future.  I think it's kind of cool.

9    Q.  So how much time did Bob spend making this poster and

10   making this new can for Pepsi?

11   A.  Oh, he worked on it a lot every day.  He went to the

12   library.  He was looking for the perfect ideas to put

13   together to create this.  And I took him to the library a

14   variety of times.  And I can't tell you specifically how

15   many hours, because I wasn't around every day.  I was doing

16   my own business and -- but I know he did work on it every

17   day.

18   Q.  And he talked about his Pepsi plans a lot, didn't he?

19   A.  Yes.  He shared quite a bit with me.  And we actually --

20   I agreed that I would go with him to the Pepsi stockholders

21   meeting, and so we started investigating that.  And we

22   bought some -- he and I split some Pepsi stock.  We didn't

23   buy a lot of it.  We only needed to buy one share.  I think

24   we bought ten or so.

25   Q.  How many -- you think you bought ten shares?

PATTERSON - DIRECT

1    A.  Nine, eight, nine, ten.  Enough to make us not look too

2    cheap.  That was our -- and then --

3    Q.  So the two of you had a plan to go to the shareholders'

4    meeting.  Do you remember when the shareholders' meeting was

5    going to occur?

6    A.  Well, I think it was supposed to be about -- it was

7    going to be in May somewhere before the 15th.  I can't

8    remember exact date now after all this.

9    Q.  Would it refresh your memory to take a look at a letter?

10   A.  Yeah, it would.  It would.

11   Q.  Would you tell me what that is?

12   A.  This is a letter that Bob received from manager of

13   shareholder relations, is the letterhead.

14   Q.  And you have seen this before, correct?

15   A.  Yes.

16   Q.  Okay.  You recognize it?

17   A.  Yes.

18   Q.  Okay.

19   A.  And he had --

20   Q.  So would you describe it for us, please, Janet?

21   A.  Okay.  It says, "This is in response to your letter

22   requesting instructions to attend the next annual meeting.

23   I apologize for the delay in responding to your letter.

24   Historically, PepsiCo's annual meeting of shareholders is

25   held on the first Wednesday in May."

PATTERSON - DIRECT

1          THE COURT:  Ms. Patterson, would you slow down

2     just a little bit for the reporter when you read?

3          THE WITNESS:  Oh, certainly.

4          THE COURT:  Okay.  Thank you.

5          THE WITNESS:  I thought I was in slow motion,

6     but --

7          THE COURT:  Mr. Rank.

8          MR. RANK:  Sorry.  I hesitate to interrupt

9     Ms. Patterson, but I don't see the relevance of this line of

10    testimony, so I'm just objecting on relevance.

11         THE COURT:  Mr. Kelley.

12         MR. KELLEY:  It goes to Mr. Ivers' state of mind

13    during a relevant time period, so during this time period

14    prior to February 27th, what he was doing, what he was

15    thinking about.

16         THE COURT:  Okay.  Well, I don't know -- do we

17    have that in the record?  My notes don't reflect when he got

18    to Fargo and before the arrest.  I assume that's the time

19    frame you are aiming at?

20         MR. KELLEY:  So it would have been mid December

21    when he arrived at West Fargo.

22         THE COURT:  Okay.  So this is relevant to show

23    that during the time period of what he was doing?

24         MR. KELLEY:  Yes.

25         THE COURT:  Not threatening people?  Is that it?

PATTERSON - DIRECT

1   Something other than --

2           MR. KELLEY:  Right.

3           THE COURT:  Okay.  Well, to the extent it gives

4   background for us, it is admissible.  But could you shorten

5   it up a little bit?

6           MR. KELLEY:  Yes.  Absolutely.

7           THE COURT:  Okay.  Thank you.

8   BY MR. KELLEY:

9   Q.  Okay.  So he wrote -- Bob wrote other letters.  Let's go

10  back to the letter you were reading.  What is this letter

11  communicating to Bob, generally speaking?

12  A.  About when -- we were uncertain about the date of the

13  stockholder meeting.  And she wrote back and told us that,

14  you know, we were welcomed to come and what the dates were.

15  And then I went on to make reservations in a hotel and

16  flight arrangements to go to this stockholders' meeting.

17  And then, of course --

18  Q.  Where was the stockholders' meeting?

19  A.  It was in New Bern, North Carolina.  Is it North

20  Carolina or South Carolina?  I can't even remember now

21  with -- but New Bern.  I believe it's North Carolina.

22  Q.  Okay.

23  A.  But it could have been South Carolina.  I, yeah, I am

24  mixed up with hearing all the stuff on the weather now, if

25  it is North or South Carolina.  In a little town there.

PATTERSON - DIRECT

1    It's where they hold it every year.

2    Q.  So Bob sent some other letters to various people in the

3    Pepsi organization about his ideas, didn't he?

4    A.  That I cannot tell you exactly if he did.  If you showed

5    me a letter, I would --

6    Q.  I'm going to show you a letter here.  Do you recognize

7    this?

8    A.  Yes.  Yes, I do.  But at this time I was not with Bob.

9    He was not with me in August of 2017, but this is -- I made

10   this copy of this letter that he had sent.

11   Q.  Do you recognize the handwriting as Bob's?

12   A.  Yes.  Absolutely.

13   Q.  And --

14   A.  This is again to this same lady.

15   Q.  Okay.  Who is that letter to?

16   A.  It's to Marzita Bacoli [phonetic] and -- can I read the

17   letter?  It says, Dear Marzita Bacoli:  You were very kind

18   to send me the attached letter.  I am going out -- let's

19   see -- in hopes to make a pitch to PepsiCo.  The attached

20   letter to Jim Pohlad is -- I can't even say the word.

21   Q.  That's all right.

22   A.  Self-explanatory.  It feels strange to be -- strange to

23   make Pepsi to get me -- anyway --

24   Q.  So he's asking -- what is he asking here for?

25   A.  Can you help me get an appointment with the PepsiCo

PATTERSON - DIRECT

1    major decision makers.  He's asking for an appointment to

2    present his -- to present his post -- his can, new Pepsi can

3    cover.

4    Q.  Okay.  So Bob is spending a lot of time working on his

5    Pepsi idea.

6    A.  Yes.

7    Q.  Okay.  And he's planning to go out to New Bern with you;

8    is that correct?

9    A.  Correct.

10   Q.  Okay.  In May?

11   A.  In May.

12   Q.  I'm going to transition to something else here.  When

13   Bob was living with you in West Fargo, how did he get

14   around?

15   A.  I took him or he didn't go anywhere, because -- he

16   really just stayed home all the time, and if I took him to

17   the grocery store or I took him to the print shop or I took

18   him to the bank to meet with this gentleman.  He, yeah, he

19   was pretty much homeward bound.

20   Q.  Did he have a car?

21   A.  Well, not until a couple weeks before he left.  We

22   just -- we purchased a vehicle, so he was going to be able

23   to have wheels.

24   Q.  So when did he purchase this vehicle, do you think?

25   A.  Oh, I would say it would be about two weeks before he

PATTERSON - DIRECT

1   was arrested.

2   Q.  Okay.  So if he was arrested on April 20th, it would

3   have been the first, second week of April?

4   A.  Right.

5   Q.  How many times did he leave Fargo after he came to live

6   with you?

7   A.  Just one time and --

8   Q.  Can you describe this one time?

9   A.  Yes.  He took a bus to Minneapolis and then back to

10  Hopkins.  It was a one-day bus ride.  He was going to -- he

11  needed to get some information out of his storage or

12  somewhere about the Pepsi -- he had received a letter and he

13  -- he needed to get that mail.  Plus, he was going to the

14  bank.  So he left in the morning.

15  Q.  So he was going to get these Pepsi things from Hopkins?

16  A.  Yeah.  Right, right.  From Hopkins.  He left in the

17  morning.  I think the bus left at, oh, man, 7 or 9:00 in the

18  morning.  It was going to really be tight for him, because

19  he wanted to come back that night.  And he got to the bus

20  depot, took another bus to Hopkins.  And then it was snowing

21  really bad when mid -- through the day it started snowing.

22  Anyway, he got all of his things accomplished, and he said

23  he had to run to get on the bus.  To get back to the bus

24  depot in Minneapolis, he had to catch the bus in Hopkins, go

25  back to Minneapolis, because the bus left at 9:00 at night

PATTERSON - DIRECT

1    in Minneapolis.  And then as it turns out, it was, by the

2    time they got to Alexandria, it was storming so bad they had

3    to pull over.  I think he said the bus had gone off the

4    highway and it had to -- they were stranded in Alexandria

5    until the storm calmed down, and he didn't get into Fargo

6    until 4:00 in the morning.

7    Q.  How did he get home?

8    A.  Then I picked him up.  I don't live too terribly far

9    from the bus station, maybe a mile.

10   Q.  So do you remember when, approximately, this one bus

11   trip was?

12   A.  That was in March.  Boy, I don't have that date either,

13   but --

14   Q.  Would it be the end of March?

15   A.  Yeah, it was near the end of March.

16   Q.  Okay.  Is it possible, based on your memory, it could

17   have been a few days later?

18   A.  It could have, because I do not have the date.  I could

19   just tell you it was a bad snowstorm.  I probably -- I guess

20   if I had known a little bit more about it I could have

21   looked up the date, because I probably have it on my

22   calendar at home.

23   Q.  All right.  But he only left West Fargo once, as far as

24   you remember?

25   A.  That's the only time, yes.

PATTERSON - DIRECT

1    Q.  And he came right back?

2    A.  Came right back.

3    Q.  Okay.  Now I want to talk about February 27th.

4    A.  Okay.

5    Q.  There was a phone call from his attorneys that day.  Can

6    you describe what was happening that morning?

7    A.  We were having coffee upstairs, watching the news.  I'm

8    going to say we were watching Good Morning America, because

9    that's on till 9:00 or something, but I could be wrong.  It

10   could have been a little bit later.  Anyway, he got a phone

11   call and he excused himself and went downstairs to talk on

12   the phone, and I stayed upstairs with the television on, and

13   that's the way that went.

14   Q.  So Bob is downstairs.  Can you describe your house for

15   us?

16   A.  I live in a bi-level.  And he -- he had a bedroom

17   downstairs and the family room.  And I just know that he

18   went down there, and I am thinking that he was in the

19   bedroom.  I didn't go down when he was talking on the phone,

20   and I had the television on, but I did hear him talking

21   loud, and I don't know for how long.

22   Q.  So can you describe what he was saying on this phone

23   call?

24   A.  No, I wouldn't be able to tell you one word, because I

25   had the television on myself.  And I just knew that he was

PATTERSON - DIRECT

1    -- he was speaking louder than, you know, than if I was

2    sitting in front of him.

3    Q.   Okay.  Then I'm going to move to -- okay.  So he has

4    this phone call.  What does he do after the phone call?

5    A.   After the phone call I believe he came upstairs.  And I

6    said, boy, that -- I think I said that was kind of loud.

7    Q.   What did he say?

8    A.   And that was about, that was about -- he said something

9    about it was a lawyer he was talking to and he already had

10   everything taken care of.  He didn't really need him.  And

11   that was the end of the conversation.  Bob didn't share a

12   lot of his -- what was going on in his life.  We didn't

13   really talk about it.

14   Q.   Okay.  So he didn't really talk about the phone call

15   much after?

16   A.   No, no.

17   Q.   What was his mood after the phone call?

18   A.   He was in -- he was in a good mood.

19   Q.   So after this phone call, yelling a bit, and then he was

20   in a good mood?

21   A.   Yeah.  He came upstairs and he was just in a -- yeah.  I

22   don't remember if he came up the minute after, but when he

23   did come up, yeah.  It was shortly after the phone call.

24   Q.   Okay.  Did he talk about this phone call much afterward?

25   A.   No, no.

PATTERSON - DIRECT

1    Q.  Okay.  Let's move to March 14th.  You were paid a visit

2    by a couple of marshals.  Do you remember that?

3    A.  Yes, I do.  It was kind of unnerving for me, because I

4    lead a pretty quiet, nice life.  And I went downstairs, and

5    they were ringing the doorbell.  I didn't know who they

6    were.  I opened the door.  I didn't open the storm door, but

7    I opened the door.

8    Q.  Ms. Patterson, what time of the day was it?

9    A.  It was once again in the morning.  I can't tell you

10   exactly, but we could say 9:00, 9:30, in that area.

11   Q.  What was Bob doing at this time?

12   A.  He was sleeping, as far as I know.

13   Q.  Okay.  So describe to me what you remember after the

14   marshals arrived.

15   A.  Well, I went down -- they asked if Robert Ivers was

16   there.  And I said yes, he's downstairs sleeping.  I said

17   I'll get him.  And I went downstairs and knocked on the door

18   and opened it, and Bob was in bed.  And I said can you come

19   up, there's a couple of gentlemen outside the door wanting

20   to talk to you.  So I went back upstairs.

21   Q.  Okay.  You went back upstairs.  What did you do then?

22   A.  I went back upstairs and kind of stood in front of the

23   door, and Bob came upstairs.  And when he saw them, he, he

24   yelled get or -- I think -- I don't know if he said what do

25   you want, get out of here.  And I am like wow, you know.  I

PATTERSON - DIRECT

1    was kind of in shock.  I didn't know what was going on.  And

2    then he, he -- I think he several times said just get out of

3    here, get out of here.

4    Q.  Okay.  So I'll stop you there.  How many times did Bob

5    slam the door while the marshals were there, to your memory?

6    A.  Well, there was no door for him to slam.  I don't have a

7    door coming up the stairs.  I, as far as I remember, I was

8    standing in front of the storm door and he was kind of

9    standing in back of me on maybe the top, top step or

10   something and maybe -- maybe he came up on the landing, but

11   there is no door to slam.

12   Q.  Do you remember him punching the wall?

13   A.  No, I don't remember that.  And I don't have any

14   markings on -- I have been asked that, and I don't have any

15   markings on the wall at all.  That would be something I have

16   -- if that happened, I don't know.  I must have been looking

17   in a different direction.

18   Q.  So the marshals are there for how long?

19   A.  I can't tell you that either.  I was just -- I was

20   really shocked over everything that was going on.  I suppose

21   they could have been there for ten minutes.  I don't know if

22   it was -- it wasn't very long.

23   Q.  And after the marshals left, how was Bob?

24   A.  Well, he went back downstairs and just cooled off.  And

25   I said, well, what -- you know, I wondered what it was all

622

PATTERSON - DIRECT

1    about and he really never told me.  I guess -- I'm going to

2    take that back.  He just said I guess it was over some phone

3    conversation he had and we let it be.

4    Q.  So let's talk about George Tallman.  Have you heard that

5    name before?

6    A.  Yes, I have.

7    Q.  Did you know who it is?

8    A.  It was a man that Bob got acquainted with and Bob ended

9    up helping him and living with him for about -- I don't know

10   how long -- three years, maybe.

11   Q.  How much do you know about Mr. Tallman?

12   A.  I really don't know anything about him.  I never met

13   him.  I never was to the house.  I couldn't even tell you

14   where the house was.  I was -- I lived in Fargo and I -- I

15   don't even know if I really talked to Bob during that span

16   that he lived with George Tallman.  I would hear

17   occasionally through my other brother that spent some time

18   with him -- I would say how's Bob.  And he would say, oh,

19   yeah, everything is good.

20   Q.  So you came to learn that Bob had a lawsuit over an

21   insurance claim involving Mr. Tallman, right?

22   A.  Yes.

23            MR. RANK:  Objection.  Leading.

24            THE COURT:  Sustained.

25

PATTERSON - DIRECT

1    BY MR. KELLEY:

2    Q.  What did you know about the insurance case with

3    Mr. Tallman?

4    A.  I really -- I really don't know anything about the

5    insurance case other -- I mean, I only knew about the

6    insurance case after Mr. Tallman died.  And I guess I -- I

7    don't know if I talked to Bob, I can't tell you, or through

8    my brother.  He told me that there was some -- some reason

9    Bob wasn't getting paid for the insurance case, and I can't

10   tell you what that was.  I still don't know why he didn't.

11   Q.  How often -- so Bob came to live with you in December.

12   How often did he talk about this insurance case while he was

13   living with you?

14   A.  He just told me once that it was over with.  He said

15   it's all over and I moved on.

16   Q.  Okay.  So how often on a daily basis did he talk about

17   it?

18   A.  Oh, we didn't talk about it.  Maybe -- I don't know.  I

19   suppose he could have -- something could have been said

20   about it another time, but I really -- we didn't discuss it.

21   I didn't know anything about it.  And the man was gone, and

22   he didn't get paid, and it's over with.  That's the way I

23   looked at it.

24   Q.  You have heard the name Judge Wilhelmina Wright now.

25   How often did Bob mention Judge Wright while he was living

PATTERSON - DIRECT

1    with you?

2    A.  Well, a week ago I wouldn't have even known her name.

3    And I didn't -- he didn't mention her.  He didn't talk about

4    her.

5    Q.  So on a daily basis how often?

6    A.  No, not at all.

7              THE COURT:  Mr. Kelley, could you look at

8    611(a)(2)?  And then if you'd come over to the side bar with

9    counsel, I would like to discuss a matter.

10             You can stretch while the lawyers and I are

11   talking.

12                  (Side-bar discussion.)

13             THE COURT:  Mr. Kelley, here's where I am at.  I

14   am somewhere between the heavy handedness that lets me use

15   611 and Lance Ito.  Now, you are too young to remember who

16   that is, but that's a person that loses total control of the

17   courtroom.  Okay?  So I don't really understand where we are

18   going.  To interrupt you I think is rude on my part, and I

19   know counsel are hesitant to object, but, you know, it says

20   mode and order of.  So I think that we're wasting time.

21             MR. KELLEY:  I'm close to being done.

22             THE COURT:  Well, I just didn't know.  And I

23   hesitated to bring it up, because you should ask Mr. Scott

24   when I say 611 on one side and Lance Ito on the other, so

25   I'm somewhere I hope in the middle.

625

PATTERSON - DIRECT

1        MR. KELLEY:  Okay.

2        THE COURT:  Okay?

3        MR. RANK:  Your Honor, thank you, because I did

4    hesitate to object.

5        THE COURT:  Right, but, well, and she's such a

6    nice lady.

7        MR. KELLEY:  I know I --

8        MR. RANK:  Can I raise one other issue --

9        THE COURT:  Yes, yes.

10        MR. RANK:  -- is that I don't know if this is

11    going to happen, but Mr. Scott raised the issue of Mr. Ivers

12    spending time in jail in his opening, which I think is a

13    nullification issue.  It's not relevant to put that in.  And

14    so what I don't want to have Mr. Kelley do is ask about

15    whether he's been sitting in jail for the last --

16        MR. KELLEY:  I did not intend to.

17        MR. RANK:  I just want to make sure, and also that

18    Mr. Scott doesn't go there, but --

19        THE COURT:  Okay.

20            (Side-bar discussion concluded.)

21    BY MR. KELLEY:

22    Q.  Okay.  Ms. Patterson, we were talking about how often

23    Bob talked about his insurance lawsuit and Judge Wright.

24    A.  Yes.

25    Q.  What was consuming his time while he was staying with

PATTERSON - DIRECT

1    you?

2    A.  Well, his project with Pepsi and he did reading,

3    watching TV.  He didn't have a big agenda every day, because

4    he didn't.

5    Q.  Okay.

6    A.  I don't know what else to tell you.  That would be the

7    truth.  He'd sleep.  He'd take some naps.  I think he was

8    just enjoying living, being with me in an environment that

9    was quiet and happy, and it was just taking up every --

10   every bit of that that he could.  And it was winter.  He

11   doesn't like the cold.  So he was just happy where he was

12   at.

13   Q.  So he was arrested on April 20th.  Can you describe what

14   happened that day?

15   A.  Yes, I can.  That was very scary.  I was -- my living

16   room is situated that I can see out in my front yard, and I

17   was watching -- I was watching the news in the morning,

18   having coffee.  I would guess it would be maybe about 9:00.

19   And I saw all these men coming down the sidewalk.  They were

20   dressed in black with armor and whatever.  And I thought,

21   well, I wonder who that is or what that's all about.  And

22   then all of a sudden they were knocking on my door.  And I

23   thought, well.  So I went downstairs and I looked out, and

24   they are all standing in front of me and said -- I can't

25   remember exactly.  It was either open the door or we will

PATTERSON - CROSS

1   knock it down or open the door or we will blow it down.  And

2   I am, Ooh.  I open the door right away.  And I went

3   upstairs, and they just went right downstairs, and I never

4   talked to Bob again.  And when they removed him from the

5   house, two men came upstairs and said they were going to

6   have to spend a couple hours searching.  And I said okay, go

7   ahead.  And that was it.

8   Q.  And if you could just give me a second, please.

9          MR. KELLEY:  No further questions, Your Honor.

10          THE COURT:  All right.  Thank you.

11          Is there any cross-examination?

12          MR. RANK:  Yes, Your Honor.  Thank you.  Thank

13   you, Your Honor.

14                      CROSS-EXAMINATION

15   BY MR. RANK:

16   Q.  Good afternoon, Ms. Patterson.

17   A.  Good afternoon to you.

18   Q.  My name is Tim Rank.  I'm the prosecutor in this case.

19   A.  Okay.

20   Q.  We haven't met before, have we?

21   A.  No, we haven't.

22   Q.  Ma'am, you testified here today that while Robert Ivers

23   was living with you that you were gone a lot during the day.

24   You have a business; is that right?

25   A.  Right.

PATTERSON - CROSS

1   Q.  You sell Hunter Douglas window treatments?

2   A.  Yes, I do.

3   Q.  You have been doing that for 40 years, did you say?

4   A.  Well, not quite 40, but at least 30.

5   Q.  And so that keeps you busy during the daytime; is that

6   correct?

7   A.  Yes.  And I have friends, and I go to lunch, and I have

8   other -- I have grandchildren.  I pick them up and do things

9   like that, so.

10  Q.  And you I think testified that you don't know what

11  Robert Ivers was doing all the time; is that correct?

12  A.  That's correct.  I wouldn't know what he was doing all

13  the time.  I would just -- I have a huge table in my

14  basement.  I sew draperies for a living, and he would have

15  stuff spread out on that, be working -- if I went

16  downstairs, he had his project.  And I honestly couldn't

17  tell you about every minute, no.

18  Q.  Okay.  And I think what you said, you testified Bob

19  didn't share a lot of what was going on in his life.  I

20  think that's what you testified earlier.

21  A.  I did say that about his personal life.  He didn't share

22  a lot.

23  Q.  Okay.  And so I also think you testified that he was

24  gentle with you; is that right?

25  A.  That's right.

PATTERSON - CROSS

1    Q.  You sound like a pretty good sister.

2    A.  I try.

3    Q.  He came to live with you in December of last year; is

4    that right?

5    A.  That's right.

6    Q.  And prior to that you really hadn't seen him since

7    really around 2000; is that right?

8    A.  No.  No, that -- that wouldn't be true.  I have seen him

9    on occasion, but not a lot.  I could have gone two years and

10   didn't see him.  I could have -- but I didn't see him every

11   week, every month, but I did see him occasionally.

12   Q.  So infrequently?  Is that --

13   A.  Infrequently.  Where he was living, I can't remember if

14   he lived there for two or three years, I think I saw him a

15   couple of times.  I brought him some fruit and some beef,

16   and there we go.

17   Q.  You're his sister.  So you had said, again, that he was

18   gentle to you; is that right?

19   A.  That's right.

20   Q.  Did you ever hear him or see him be less than gentle

21   with other people?

22   A.  No, I did not.

23   Q.  So you never heard him, like, raise his voice or yell or

24   be aggressive with people?

25   A.  Not in my presence.  I don't like that kind of stuff, so

1    -- not in my presence, no.  He didn't do it around my

2    house --

3    Q.  Okay.

4    A.  -- or with my friends.

5    Q.  Because you don't approve of that?

6    A.  No, I don't.

7    Q.  And I'm sure your brother knows that.

8    A.  Yes.  I mean, I work with the public and I don't -- I

9    don't make any -- I don't have opinions of anybody.  I like

10   everybody.  And if I don't like them, I go out in my car,

11   roll up the windows, get on the highway and talk to myself.

12   Q.  Okay.  And you had also said that, something to the

13   effect of, you had your business, Bob had his own business

14   and he didn't necessarily share that with you.

15   A.  Well, we, to be perfectly honest, we didn't have a lot

16   in common.  So whatever he had going on in his life, I guess

17   I -- I'm not going to say I wasn't interested, but we didn't

18   talk about it.

19   Q.  And so Mr. Kelley asked you about what you knew about

20   whether he was thinking about or working on or doing

21   anything about a lawsuit at the time period that he was

22   living with you.  Do you remember that question?

23   A.  Yes, I do.

24   Q.  And if he was, would you necessarily know whether he

25   was?

PATTERSON - CROSS

1    A.  No, I wouldn't have any way of knowing that because --

2    he did get some mail at my house, but I never opened his

3    mail.  And, quite frankly, I was never home when the mailman

4    came, so if there was mail, he'd sort mine and his and I

5    wasn't -- I didn't know what was going on with his mail.

6    Q.  And that was his business?

7    A.  That was his business.  I have enough of my own that I,

8    at the age, I don't want anybody else's.

9    Q.  And so let me ask you about that phone call that

10   Mr. Kelley asked you about.  There was a phone call on

11   February 27th.

12   A.  Right.

13   Q.  Of this year.

14   A.  Right.

15   Q.  And I think what you testified was that Robert got the

16   call.

17   A.  Yes.

18   Q.  That you two were upstairs watching TV.

19   A.  Yep.

20   Q.  Had the TV on.

21   A.  Right.

22   Q.  He went downstairs with the phone.

23   A.  Yes.  He had his own cell phone.

24   Q.  Even though he was downstairs when he was talking, at

25   some point in time he started yelling loudly enough that you

PATTERSON - CROSS

1    could hear him upstairs.

2    A.  I could just hear -- I couldn't make out what he was

3    talking about, but I could hear that he was being loud, yes.

4    I had the television on.  As a matter of fact, I may have

5    turned it up a little bit so I didn't have to, you know, get

6    involved in it, but I couldn't tell you who he was talking

7    to or what he was talking about.

8    Q.  So you actually turned the volume up to --

9    A.  Well, I don't know.  That, that I might have just thrown

10   in there, but I could have easily turned it up.

11   Q.  Okay.  Because he was being loud?

12   A.  He was being loud and I was listening to something.

13   Q.  Okay.  And I think you testified that after a while he

14   came back upstairs after the phone call was over.

15   A.  Mm-hmm.

16   Q.  And you said, I think you testified, he was in a good

17   mood.

18   A.  He was, yeah.  He didn't say anything nasty to me or

19   nasty.  I said, well, I did say, well, what's that -- you

20   were kind of loud, what's that about.  He said, well, I was

21   just speaking to a lawyer that called me and I already had

22   it taken care of, is what he said.

23   Q.  Okay.  Ma'am, you already indicated that you hadn't

24   heard him ever be less than gentle with other people or

25   aggressive with other people.  Is that your testimony?

PATTERSON - CROSS

1    A.  That's correct.

2    Q.  And had you ever heard him threaten anybody?

3    A.  No.

4    Q.  Did you know, ma'am, that your brother had sent a number

5    of threatening letters to district court judges in Hennepin

6    County in Minnesota?

7    A.  I had no idea, absolutely no idea.

8    Q.  And if he was doing something like that, he wouldn't

9    share that with you, would he?

10   A.  I guess that's something I don't know, but probably he

11   wouldn't share it with me.  I couldn't be a hundred percent.

12   But if you say he was doing it, you must know it.  I did not

13   know that.

14   Q.  Well, let me ask you, ma'am -- again, I hesitate to do

15   this, but --

16   A.  Go ahead.

17   Q.  Did you -- did you know that he was sending a bunch of

18   threatening letters to judges?

19   A.  No.

20   Q.  Did you know that he made a number of threatening phone

21   calls to judges and left them on a voicemail --

22   A.  No.

23   Q.  -- for a judge?  And did he share any of that stuff with

24   you?

25   A.  No.

RENEE A. ROGGE, RMR-CRR
(612) 664-5107

PATTERSON - CROSS

1   Q.  And is that the kind of thing you think he would share

2   with you?

3   A.  I wouldn't share it with anybody.  I wouldn't be --

4   Q.  Would your brother know that you wouldn't approve of

5   that kind of --

6   A.  Absolutely.

7   Q.  And so if he had made a threat to a judge in this case,

8   he is not going to share that with you either, is he?

9   A.  Well, he didn't share anything else, so I guess we would

10  have to presume that he wouldn't share that with me.

11  Q.  You haven't heard him using aggressive language at all?

12  A.  Not in front of me, no.

13  Q.  Okay.  Ma'am, I'm going to show you something, if I can

14  approach, and just see if -- I'm assuming you haven't seen

15  anything like this before.  And I apologize for putting this

16  in front of you.  But, first of all, do you recognize this

17  handwriting?

18  A.  Yep.

19  Q.  Whose handwriting is that?

20  A.  I would say that's his.

21  Q.  And is this something that -- if he sent that to a judge

22  in Hennepin County, did he tell you about that?

23  A.  No, no.

24  Q.  Would that be something that you would have approved of?

25  A.  No.  But from the -- from the writing he must have been

PATTERSON - CROSS

1   just very angry, because he's very neat and he's very -- so

2   I would say something like that was just -- well, I don't

3   know.  I would say he must have just all of a sudden been

4   very, very angry, because that isn't even his -- everything

5   is always in line and straight and symmetrical and -- so I

6   don't know.  I don't know what that was about.

7   Q.  Okay.  Would you like it if you received something like

8   that?

9   A.  Oh, well, of course not.

10  Q.  You testified, ma'am, that in early April Mr. Ivers went

11  down -- took a bus down to Minneapolis; is that right?

12  A.  Correct.

13  Q.  You also testified that right around that same time

14  period, maybe a little bit after that, he bought a car; is

15  that right?

16  A.  Well, we had talked about doing that all winter.  We

17  were looking.  And I had a client that didn't even have a

18  car for sale, and I -- we were just chatting, and he was

19  talking about getting a new car for his wife.  And I said,

20  oh, are you thinking about selling it?  And he said, well,

21  yeah.  And I said, well, what would you want for it?  And,

22  you know, if you can find something that runs real good and

23  is not a lot of drama with it and why not try to buy it.

24  And that's what happened.  So he said, yeah, well, I tell

25  you, I will sell it for X amount of dollars.  And so Bob

PATTERSON - CROSS

1    looked at it, and we went for it.  It wasn't real expensive.

2    It was just a -- I don't remember now if it's an '04, '08

3    Subaru, somewhere in that vicinity.  And so after we did

4    that -- yeah.

5    Q.  Okay.  So Mr. Ivers bought a car sometime in -- of April

6    of --

7    A.  Right.  I guess I could look at the title and tell you,

8    but I don't have the title with me.

9    Q.  A couple weeks before he was arrested?

10   A.  Yeah, yeah.

11   Q.  Okay.  And you had been -- he had been looking or

12   thinking about buying --

13   A.  Well, all winter we talked about -- because his previous

14   car had blown up.  He had to get rid of it.  The engine went

15   and he had somebody come out and pick it up.  So he didn't

16   have a car when he came to Fargo.

17   Q.  But he over the course of the winter had been talking

18   about getting a --

19   A.  Right, right.  Some sort of a car.  He was going to have

20   a car when he went back.

21   Q.  Okay.

22   A.  And then this just came up, this car, so we did it.

23   Q.  Talking about buying a car for a few months before he

24   actually bought a car?

25   A.  Yeah, yeah.  Well, he needed one.  I mean, you know,

637

PATTERSON - CROSS

1     pretty tough to get around down here without a car.

2     Q.  Okay.  Thank you very much, ma'am.

3     A.  You bet.

4          MR. RANK:  No further questions, Your Honor.

5          THE COURT:  Thank you.

6          Ladies and gentlemen, I want to remind you about

7     Preliminary Instruction No. 4, when someone characterizes

8     something as a threat.  I want you to remember this.  The

9     defendant made a threat to murder a United States Judge.

10    You have to determine whether or not the communication is a

11    threat, not the judge or any of the witnesses.  Okay?  I

12    just want to make sure there was an understanding of that.

13         Mr. Kelley, is there further examination?

14         MR. KELLEY:  No, Your Honor.  Thank you.

15         THE COURT:  You may be excused.  Thank you,

16    Ms. Patterson.

17         THE WITNESS:  Yes.

18         MR. SCOTT:  Come on, Bob.  Bob, walk up.  You saw

19    how you get sworn in.

20         THE DEFENDANT:  I'm the boogeyman.

21         THE COURT:  Mr. Ivers, good afternoon.  Would you

22    raise your right hand and please stand for the jurors, look

23    at the jurors.

24         THE DEFENDANT:  Hi, judge.

25

1                            ROBERT IVERS,

2      called on behalf of himself, was duly sworn, was examined

3      and testified as follows:

4                  THE DEFENDANT:  I do.

5                  THE COURT:  Please be seated.

6                  THE DEFENDANT:  Now I'm going to speak.  I have

7      had to sit there since Monday morning.  Don't anyone

8      chastise me or tell me.  I have had to sit there --

9                  THE COURT:  Mr. Ivers.

10                 THE DEFENDANT:  -- for four days.

11                 THE COURT:  Mr. Ivers, here, let me tell you.  I'm

12     supposed to have control over the courtroom.

13                 THE DEFENDANT:  Judge, you stuck me in jail for

14     five months when you could have let me out on the street

15     walking around during this trial.

16                 THE COURT:  Ladies and gentlemen, if you want to

17     be excused.

18                 THE DEFENDANT:  No.  Let's move forward on this

19     case.

20                 THE COURT:  Be excused.

21                 No, we're not going to move forward with the case.

22                 Ladies and gentlemen, you are excused.  If you

23     would go with the courtroom deputy, please.

24               **IN OPEN COURT WITHOUT THE JURY PRESENT**

25                 THE COURT:  Please be seated.

1          The record should show we are proceeding outside

2     the courtroom without the jury.

3          Mr. Ivers, you have very good lawyers.  I'm not

4     going to give you any legal advice.  Okay?

5          THE DEFENDANT:  I don't want any.

6          THE COURT:  Good.  You have to be a passive person

7     here until you are posed a question.  That's the rules we

8     operate under.  You are not to make statements without being

9     asked a question.  We're not going to have worked this hard

10    and gone this far with this case and let you get a mistrial.

11    So if you can't behave, I'm going to have you removed from

12    the courtroom and counsel can examine you and we will put

13    you on the video.  Now, what do you want?

14         THE DEFENDANT:  I want to sit right here and tell

15    my story.

16         THE COURT:  Okay.  Well, you better follow

17    Mr. Scott's advice, not mine, Mr. Scott's advice.

18         And if you need time to have a conference with him

19    outside the presence of myself and everybody else, we will

20    do that.  Do you want to take a recess, so you can talk to

21    Mr. Scott about how you are supposed to behave?

22         THE DEFENDANT:  I'm ready to rock and roll right

23    now.  Let's do it.

24         THE COURT:  Well, I'll take that as a no.

25         Do you want to get the jury in?

1      THE CLERK:  All rise.

2      **IN OPEN COURT WITH THE JURY PRESENT**

3      THE COURT:  Please be seated.

4      Counsel, you may proceed.

5      MR. SCOTT:  Sure.

6                    DIRECT EXAMINATION

7  BY MR. SCOTT:

8  Q.  Bob, can you tell the jury, first of all, how old a man

9  are you?

10  A.  I'm 65.

11  Q.  Okay.  And why don't you give the jury just a little bit

12  of your background.  Where are you from?

13  A.  Can we talk about how my day started today?

14  Q.  You want to talk about your case now?

15  A.  Yes.  Can we talk about how my day starts every day?

16  Q.  We will get to that.  We will get to that.  But if you

17  want, okay.  How did your day start today?

18  A.  Well, they got -- every day that I been here -- I don't

19  come in this suit coat.

20      MS. ALLYN:  Objection.  Relevancy.

21      THE COURT:  Ladies and gentlemen, Mr. Ivers has

22  been detained, as he told you before you left the courtroom.

23  That fact of his detention has no bearing at all.  He's

24  entitled like every other person accused of a crime to the

25  presumption of innocence.  Okay?  And the fact that he's

IVERS - DIRECT

1    been detained is of no concern to you.  Okay?  Clearly, as

2    his statement told you, he wasn't happy with it, but it

3    happened.  It's in the past.  But he's still entitled to the

4    presumption of innocence.  Okay?

5              Mr. Scott, you may proceed.

6              THE DEFENDANT:  How do I start my day.

7    BY MR. SCOTT:

8    Q.  Okay.  But let's go back.  Let's talk about you for just

9    a minute.  Okay?

10   A.  Talk.

11   Q.  Okay.  Well, you are the one that's going to be doing

12   the talking.  Tell us where you grew up.  Okay.  Well, I

13   won't ask that.  Tell us --

14   A.  About the case.

15   Q.  Tell us about -- listen.  Let's just go straight to it.

16   We won't talk about anything other --

17   A.  Straight to the case.

18   Q.  Tell us about February 27, 2018.

19   A.  Let's start with how this all happened.

20   Q.  Well, okay.

21   A.  Let's start with Judge Wright and how it all happened.

22   Q.  Okay.  Well, then let's go back to that.

23   A.  Start at the beginning.

24   Q.  Starting a little before the beginning, but let's start

25   at the beginning.  Prior to 2015, Bob, prior to 2015 --

IVERS - DIRECT

1   A.  Yes.

2   Q.  -- had you ever been in federal court?

3   A.  2015.

4   Q.  When your case --

5   A.  I don't know.  I don't know.  It's a long time ago.

6   Q.  Okay.  In 2015, Bob --

7   A.  I have nice teeth, but they are in this box, and they

8   hurt when I put them in.

9   Q.  2015, Bob.

10  A.  Yes.

11  Q.  The insurance company CMFG removed your case from state

12  court to federal court; isn't that right?

13  A.  Yes, they did.  I had registered it.  I had -- let me

14  finish my statement.

15          I had an attorney.  It took me three years while I

16  lived in my car -- I know it's difficult to believe, but it

17  took three years to find an attorney.  All the attorneys

18  wanted one-third.  My friend died.  He left me a hundred

19  thousand, and no attorney would touch the case unless I gave

20  them $33,000.  I was deeply, deeply resentful.  My friend

21  died.  Their friend didn't die, mine died, and they wanted

22  33 grand, and I refused to do it.

23          I finally found a team of attorneys, some young

24  men, about your age in the green shirt there, that would

25  handle it for 10 Gs.  They would do the paperwork; but if it

IVERS - DIRECT

1    went to court, they wanted the 33.  And I said okay, that's
2    workable, try to get me the hundred grand and I will give
3    you ten.  Let me clear my throat.  One was Eric Peterson.
4    One was Demetri Lametti.  Demetri -- they did the case.  It
5    was beautifully done, beautifully executed.  It's the way
6    the court system wanted to see it.  And they took it down to
7    district court and filed it into district court.  And you
8    don't have to make outrageous demands.  They automatically
9    give you a jury trial.  And so it was registered.
10   Everything was copacetic.  The system said yes, this looks
11   good, it is quality, it is fine, it is the way it should be.
12           Then Demetri Lametti got an offer he couldn't
13   refuse.  A friend had moved to Hawaii and said you've got to
14   come with me and you've got to come over here, and he
15   dropped out of the case.  And Eric Peterson did not want to
16   pay the $500 filing fee to be able to work within the
17   federal system.  The case I think might have been held in
18   this room.  It was in -- the trial with Judge Wright was --
19   I know she's on the third floor in here, but it might have
20   been in this courtroom here.  Nonetheless, he did not want
21   to file.  And it was such a simplistic case.  It was just
22   simple, my friend.  It wasn't all full of case law and all
23   kinds of fancy lawyering things that you need to do, all
24   high-end lawyer stuff, Armani suits.  No.  It was very
25   simple; he died and I want my money.  And so I handled the

IVERS - DIRECT

1   case.  And I have a lot of experience with court and court

2   cases, because I have sued people in the past, because in

3   America if you feel an injustice has been done to you, it is

4   your right, your right to file a court case.  It's your

5   right.  And so I have a lot -- I had a lot of court

6   experience.

7              And what happened was that the insurance company

8   just to be smarmy moved it over into federal court, because

9   they probably thought it would throw me for a loop, and it

10  didn't because the federal court I found is even easier to

11  negotiate than the district court, so --

12             MS. ALLYN:  Objection.  Narrative.

13             THE DEFENDANT:  Now, I can ramble, so put me back

14  on track.

15  BY MR. SCOTT:

16  Q.  Yeah, I'll get you back on track.

17  A.  But I like to move fast.  None of this slow stuff.

18             THE COURT:  Okay, Mr. Ivers.  Mr. Ivers.  Mr.

19  Ivers, you have to listen to your lawyer's question and not

20  go beyond what he asks.  Okay?

21             THE DEFENDANT:  Okay.  Let's roll.

22  BY MR. SCOTT:

23  Q.  I'm going to help you along.  I'm going to help you

24  along.

25  A.  I had to sit here for four days listening to my name

645

IVERS - DIRECT

1    being bashed.

2    Q.  Okay.  So I'm going to show you some documents here that

3    you brought to your case.  They are your case documents.

4    A.  Get them in.

5    Q.  Okay.  So the first one I am going to show you, which is

6    marked for identification as Defense Exhibit 1, is actually

7    filed in the district court as Document 1.1.  Take a look

8    and tell me if it is familiar to you.

9    A.  Yes.  It's the CMFG Life Insurance case.

10   Q.  Right.  It is the case that you filed, correct?

11   A.  Yes.

12   Q.  And you filed it, I think you were explaining to the

13   jury, you filed it under your own name, that is, you

14   filed --

15   A.  There I am.  That's me.

16   Q.  And I am looking at page 7 of it?

17   A.  Yeah.

18   Q.  And that's your signature or a copy of it?

19   A.  Yeah, that's me.

20              MR. SCOTT:  We will offer Defense Exhibit 1.

21              THE DEFENDANT:  Look, I want to say something.

22              THE COURT:  Mr. Ivers.  Mr. Ivers.

23              MR. SCOTT:  Wait.  Wait.  First I have to do these

24   things.

25              THE DEFENDANT:  Yeah.  No.

IVERS - DIRECT

1          MR. SCOTT:  I have to do it.

2          THE DEFENDANT:  I'm fast-paced, I dial direct, and

3     I want to thank the jury right now.  I know you had to sit

4     through a lot of boring blabber.

5          MS. ALLYN:  Objection.  There is no question

6     before this witness.

7          THE DEFENDANT:  This end of it is going to move

8     much faster.

9          THE COURT:  Ladies and gentlemen, we are going to

10    take another recess.

11         THE DEFENDANT:  No.  Come on.

12         THE COURT:  We are going to take another recess.

13         The jury is excused.

14         THE CLERK:  All rise.

15         **IN OPEN COURT WITHOUT THE JURY PRESENT**

16         THE COURT:  Please be seated.

17         Mr. Ivers, do you want to just not testify in this

18    case and give the jury the case that they have the record on

19    now?

20         THE DEFENDANT:  Do you understand how wound up I

21    am?

22         THE COURT:  You have to answer my question,

23    because if you want to do that, I'm not going to let you

24    continue to interrupt.

25         THE DEFENDANT:  Of course, I want to testify.

IVERS - DIRECT

1           THE COURT:  Okay.  Well, then the only way that

2     you can testify is by way of question and answer.  You

3     cannot initiate words, any words before the jury.  You

4     cannot say anything before the jury unless Mr. Scott poses a

5     question or counsel for the government poses a question.

6     Those are the two conditions that we're going to proceed by.

7     If you cannot abide by that, we will just adjourn for the

8     day.

9           THE DEFENDANT:  Can I be made co-counsel?

10          THE COURT:  Well, there's a case called *Faretta v.*

11    *California*.  If you tell me -- are you discharging

12    Mr. Scott?

13          THE DEFENDANT:  No.  I just want to be part of the

14    counsel.

15          THE COURT:  You can't be part of the counsel --

16          THE DEFENDANT:  That's fine.

17          THE COURT:  -- without discharging Mr. Scott.  You

18    have a right of self-representation or you have a right of

19    representation.

20          THE DEFENDANT:  No.

21          THE COURT:  You got to pick one or the other.

22    Okay?

23          THE DEFENDANT:  Okay.  But --

24          THE COURT:  But so here's the rule.  If you start

25    talking without there being a question, you are out of the

IVERS - DIRECT

1    courtroom and we're going to give the case to the jury based

2    on the record we have at this point.  And I'm going to tell

3    the jury that you didn't want to testify, because the

4    conditions of testifying, which is your right, as you well

5    know, you have to behave while testifying.  Every witness

6    has to behave while testifying.  If you don't want to do

7    that, we're going to adjourn and we're going to submit the

8    case based on the record.  Any additional record that

9    Mr. Scott or Mr. Kelley want to offer, we are just going to

10   be done.  Can you abide by my rule or not?

11        THE DEFENDANT:  Yes, I can, but I would like to

12   speak with my counsel for one minute, just one minute.

13        THE COURT:  Okay.  You can speak --

14        THE DEFENDANT:  Just one.

15        THE COURT:  You can speak to your counsel for one

16   minute.

17      (Defendant and defendant's counsel are conferring.)

18        THE COURT:  Okay.  We're going to bring the jury

19   in, Mr. Ivers.

20              **IN OPEN COURT WITH THE JURY PRESENT**

21        THE COURT:  Please be seated.

22        Ladies and gentlemen, you already know this, but

23   do not let distractions take you from your tasks, all of

24   you, which is to determine the facts of this case.  So we

25   are going to get you the evidence once the government is

1    finished with their evidence and Mr. Ivers is finished with

2    his.  So the fact that some people, myself included,

3    sometimes don't handle things the best way shouldn't detract

4    you from trying to determine what the facts are, which is

5    your real job here.

6            So Mr. Scott is going to continue with his

7    examination.

8            Mr. Scott.

9    BY MR. SCOTT:

10   Q.  Okay.  Bob, we're going to talk just a little bit about

11   your case, the case that you had against CMFG Life Insurance

12   Company.  And, first, you filed that case in state court?

13   A.  Correct.

14   Q.  And you identified the documents that you did in filing.

15   And within a few weeks the insurance company took your case

16   and they removed it to federal court, didn't they?

17   A.  That's correct.

18   Q.  Okay.  And just for the record, for the record, the

19   paperwork that they removed it from was filed in court as

20   Document 1 and it is -- and what I have marked as

21   Defendant's Exhibit 2 for identification, that's the removal

22   proceeding that they filed that pulled your case out of

23   state court and put it into federal court?

24   A.  Yeah.

25   Q.  And their argument that they made then was, well, we're

IVERS - DIRECT

1    a company, we're not from Minnesota and, therefore, we can

2    come to federal court?

3    A.   Fine.

4    Q.   And you said that that case went forward then in federal

5    court and that your -- the lawyers who were originally

6    planning on representing you in your state court case

7    eventually pulled out of your federal court case?

8    A.   Eric Peterson did not want to pay the $500 filing fee

9    and abide by all the federal statutes in federal court, and

10   Demetri Lametti moved to Hawaii.

11   Q.   Okay.  Mr. Lametti for a little while represented you?

12   A.   Until he moved Hawaii.

13   Q.   And then the case, as far as you could see, because it

14   was filed in 2015, became bogged down in a whole lot of

15   pretrial motions, everything else was -- it was really

16   getting irritating?

17   A.   Endlessly, endlessly, endlessly.  And they knew my

18   condition.

19   Q.   And, of course, the condition of the insurance company

20   was they had all your money and you didn't.  That's to start

21   with?

22   A.   Yeah, they had all my money, and I was living in my car.

23   Q.   And the longer it went, the longer they had your money?

24                MS. ALLYN:  Objection.  Leading.

25                THE DEFENDANT:  Yes.

IVERS - DIRECT

1        THE COURT:  Overruled.

2        MR. SCOTT:  I will ask for permission, Your Honor,

3    to do a little bit of leading here.

4        THE COURT:  Yes, particularly as to preliminary

5    matters, counsel.

6        MR. SCOTT:  Thank you.

7        THE DEFENDANT:  Yes.

8    BY MR. SCOTT:

9    Q.  So finally the case came up for trial?

10   A.  Correct.

11   Q.  And had you thought coming into that case, to at least a

12   month or two before trial, had you thought that you were

13   going to get the jury trial you were entitled to in state

14   court?

15   A.  I would never ever, ever, ever go into a courtroom

16   without a jury trial ever.

17   Q.  But my question was, Did you think --

18   A.  Yes.

19   Q.  -- you were going to have it?

20   A.  Judge Becky Thorson recommended in her recommendation

21   twice that a case like this -- she recommended to Judge

22   Wright that a case like this should absolutely be heard by

23   nothing but a jury.  And I also demanded my right to a jury

24   trial in state court, and, yes, I figured for sure it was

25   going to be a jury trial.

IVERS - DIRECT

1    Q.  And then just a couple of months before the case was

2    scheduled to go in front of the -- go to the court for a

3    jury, you got a notice that said, and I'll summarize it by

4    saying, too bad, no jury, right?

5    A.  Correct.

6    Q.  And that notice was filed as docket text -- or Docket

7    No. 87.  The jury has seen it.  And your response to it,

8    which you filed in court, was filed as Document 89, which is

9    Government's Exhibit 2.  And I'll just show it to you to

10   remind you.

11   A.  Okay.

12   Q.  And that's the one where you said that that text

13   document saying you didn't get a jury trial doesn't pass the

14   smell test; isn't that right?

15   A.  Yes, it didn't pass the smell test.

16   Q.  And that's the one that eventually you wrote down about

17   three, four pages in "Somebody needs to explain to me what

18   the fuck is going on."

19   A.  Exactly.

20   Q.  Well, but you didn't get your jury, did you?

21   A.  No.

22   Q.  And on January --

23   A.  Can I explain why I didn't get my jury?

24   Q.  Sure.  Why do you think you didn't get your jury?

25   A.  Well, first of all, there was a hearing set up, and I

1   went down to the hearing.  And you have to remember -- can

2   we go back to Tallman just for a minute?

3   Q.  Sure.

4   A.  George Tallman was a very good friend of mine that I

5   knew in the '70s.  I'm 65.  It was a long time ago, and I

6   don't want to do the math, 35, 40 years ago.  I ran into him

7   just by the oddities of life, just bumped into him by the

8   oddball of life.

9           MS. ALLYN:  Objection.  Narrative.

10          THE DEFENDANT:  And he --

11          MR. SCOTT:  I think it's a fair -- it's going to

12   be fairly short.

13          THE COURT:  Ladies and gentlemen, here, generally,

14   leading questions are not permitted.  That's when the lawyer

15   asks a question that requires a yes or no response.  As to

16   preliminary matters, there's a small exception that lets the

17   court permit lawyers to ask leading questions.  Much of, if

18   not all of, Mr. Scott's leading questions that you are going

19   to hear about have been referred to by earlier witnesses,

20   particularly Ms. Bender who reviewed the docket of this case

21   that Mr. Scott's now going over.  So to shorten the

22   testimony, the court's going to permit leading questions by

23   Mr. Scott.

24          Go ahead.

25

IVERS - DIRECT

1    BY MR. SCOTT:

2    Q.  So you were in the midst of talking about your friend

3    George Tallman.

4    A.  So I bumped into George, and he had a spare room in his

5    apartment, and he said come and live with me.

6    Q.  Okay.  And so you moved in and lived with him for a

7    number of years?  Would that be right?

8    A.  Almost three.

9    Q.  And you were, in essence, his caregiver during that

10   time?

11   A.  He had bad knees.  And I cooked, cleaned and sewed,

12   which I am very good at.  I enjoy doing those things.  I

13   also had a landscaping company.  You know, I know how to

14   throw boulders around, but I don't mind vacuuming or

15   scrubbing floors either.  And so, yeah, in exchange I helped

16   him out.

17   Q.  And somewhere as a result of that -- and I don't want

18   you to spend a lot of time going through any details, but

19   somewhere during that time period he and you made a

20   determination that he would name you as the beneficiary in

21   his life insurance policy?

22   A.  He had insurance companies left and right mailing him

23   junk mail, and CMFG were high-end browbeaters.  They really

24   stayed to the punch.  And he was -- just down the road a

25   half a mile he belonged to a credit union called Wings, and

IVERS - DIRECT

1   Wings was a division of CMFG, and they really pummeled him

2   with advertisings and this and that.  And he had the spare

3   cash.  After he paid his rent, he had some surplus money,

4   1200 bucks or something, but it was surplus.  He didn't need

5   it.  It was surplus.  And he said, hey, you want to know

6   what, I'm going to buy these life insurance policies.  These

7   people browbeat him.  He didn't even want it.  He didn't go

8   looking.  He didn't go to them.  They came to him.  And he

9   bought the policy.  And he said, you know what, I'm going to

10  make you as a beneficiary; if I fall over dead, it is my way

11  of saying thank you for being my friend and being here and

12  helping out.  And I said, hey, knock yourself out, do what

13  you want to do.  I really could care less, because I figured

14  he was going to live to be 90, and so I thought it was a

15  really kind of moot -- it was a moot point.  He would end up

16  turning 80 and have lost the whole investment.  He didn't

17  figure he was going to die.

18  Q.  And but he did?

19  A.  Very, very surprisingly, yes, very.

20  Q.  And CMFG was the insurance company's underlying name,

21  and you were the beneficiary.  They refused to pay?

22  A.  Yes, they did.

23  Q.  On their policy?

24  A.  They had a 60-day investment period.  And when George

25  died, I had to give up the apartment.  It was his apartment.

IVERS - DIRECT

1    I wasn't on the lease.

2    Q.  Set aside for that.  You got ahead of that.

3    A.  Yeah.

4    Q.  The first part is -- the first part is, though, is they

5    refused to pay?

6    A.  Yes, they did.  They refused to pay.

7    Q.  And the second thing, which you were about to mention,

8    was you were, in essence, after he passed away, you didn't

9    have his apartment anymore.  You were at loose ends when you

10   say you didn't have very many places to live.

11   A.  Yes.  Right.  It was kind of the rug got pulled out from

12   underneath me, because it's where I was living and the guy

13   died.

14   Q.  And they wouldn't pay, and they wouldn't say yes, and

15   you had no place to go, and they didn't care.

16   A.  The apartment complex gave me ten days to get out.

17   Q.  And so eventually you got tired of them saying no and

18   you sued them?

19   A.  Yes.

20   Q.  Okay.  And that's the suit we are talking about here.

21   A.  Yes.

22   Q.  That they removed to federal court.

23   A.  Yes.

24   Q.  And then we went through a -- without going through any

25   of that paperwork that the jury's already seen, we had a lot

IVERS - DIRECT

1    of pretrial activity in the case until it finally came up

2    for trial in January of 2016.

3    A.   The first big thing -- actually, the most important

4    thing was a pretrial hearing before Magistrate Becky

5    Thorson, and she had to approve the lawsuit.

6              MS. ALLYN:  Objection.  Nonresponsive.

7              THE COURT:  Mr. Ivers, here's the pending question

8    that Mr. Scott asked you.  He said, And then we went

9    through, without going through all that paperwork that the

10   jury's already seen, we had a lot of pretrial activity in

11   the case until it finally came up for trial in January of

12   2016.

13             THE DEFENDANT:  Okay.

14             THE COURT:  Is that yes?

15             THE DEFENDANT:  Did it come up?

16   BY MR. SCOTT:

17   Q.   Yes.

18   A.   Yes.

19   Q.   Say yes.

20   A.   Yes.

21   Q.   Very good.  I've got one of those documents just to show

22   you, because it's not in evidence yet and I just want to

23   have it in evidence, so the jury can understand.  I'm going

24   to show you what is Docket No. 88 out of that case.  I

25   know --

IVERS - DIRECT

1   A.  I like to smile, and I don't want the jury to think I'm

2   -- I want them to make sure I do have a partial.  I should

3   probably put it in.  I actually do like to laugh a lot, but

4   it's difficult for me to talk.  I will try it for a little

5   bit, otherwise I'm not bashful about taking it out.  It

6   takes a few minutes for it to settle.  Shoot.  What do you

7   want to know?

8   Q.  I want you to look at that.

9   A.  Yeah, yeah.

10   Q.  Okay.  So Exhibit 88 really is just before trial, this

11   is in November, you basically gave an outline of your case

12   to the judge.

13   A.  Yes.

14   Q.  And you filed it with the court.  It's your handwriting

15   on the front?

16   A.  Yes, it is.

17          MR. SCOTT:  Offer Exhibit 88.

18          MS. ALLYN:  No objection.

19          THE COURT:  Received.

20          MR. SCOTT:  Or excuse me, Your Honor.  Exhibit 3,

21   which is Docket No. 88.

22          THE COURT:  Received.

23          MR. SCOTT:  You are going to have to show me how

24   to do this, Brett.  I want the jury to know that I actually

25   can operate a document camera, but not with all that stuff,

IVERS - DIRECT

1    but that's my limit.

2            THE DEFENDANT:  I am pro se.

3    BY MR. SCOTT:

4    Q.  That's just the cover page that's in your handwriting.

5    A.  I'm pro se.  The court knows my condition.  I do not own

6    a computer.  I am computer illiterate.  I must rely on

7    surface mail.  I am forma pauperis.  That means acting as --

8    Q.  You are acting --

9    A.  It's Latin for acting in the form of a pauper --

10   Q.  Yes.

11   A.  -- which is confessing that you are poor.

12   Q.  Okay.  And the tenth one is the one I really --

13   A.  I know the court has the power to grant me latitude,

14   which they do.  I am prepared for trial now.

15   Q.  And ten is?

16   A.  The enclosed is my entire case.

17   Q.  And that's what you submitted then and paid for your

18   case and your arguments.

19   A.  Yes.

20   Q.  And you'd thought it through and thought you had a

21   pretty good argument too, didn't you?

22   A.  Airtight.

23   Q.  And you were working your way through, and if the jury

24   wants to look at it, you were working your way through

25   documents that had been filed in the case and then arguments

660

IVERS - DIRECT

1    that you were making as --

2    A.   It's extremely good.  I am very, very proud of it.

3    Q.   And so then you came up for trial in that first week in

4    front of the judge on the 9th and 10th of January of 2016.

5    A.   Correct.

6    Q.   And the insurance company had their lawyers, and you

7    represented your side of the case.

8    A.   Yes.

9    Q.   And you cross-examined witnesses?

10   A.   Yes.

11   Q.   You testified on your behalf?

12   A.   Yes.

13   Q.   Did you call a witness?  I'm not sure.  I don't think

14   you actually called one.

15   A.   No.

16   Q.   You mostly were cross-examining their witnesses.

17   A.   The beauty of the case was that all of their witnesses

18   really were my witnesses, because I was able to, just like

19   in this courtroom here, is point/counterpoint with the

20   prosecution relative to the defense.  We were -- I was able

21   to use their witnesses to my benefit.

22   Q.   Okay.  And then unlike a jury, you had to sit and wait

23   until she would finally issue her --

24            MS. ALLYN:  Objection to characterizing with

25   respect -- while he's leading, he's characterizing the

IVERS - DIRECT

1    evidence, Your Honor.

2              MR. SCOTT:  I'll restate the question, Your Honor.

3              THE DEFENDANT:  Can we argue about --

4    BY MR. SCOTT:

5    Q.  Wait a minute.  If you have a jury, the jury returns a

6    verdict.  You know what it is.

7    A.  Like that (indicating).

8    Q.  Okay.

9    A.  Probably give them a couple hours.

10   Q.  When a case is submitted to the judge --

11   A.  Ai-yai-yai-yai-yai.

12   Q.  -- they issue findings of facts and conclusions of law

13   and order for judgment at their pace.

14   A.  Yeah.  And if they don't like you, that variable.

15   Q.  Okay.  And so the base that we had here was that the

16   case was submitted to the judge for decision on the 10th of

17   January and it was decided at the end of June?

18   A.  Six months, I guess.

19   Q.  And we heard some testimony here in the trial that

20   occasionally you would call in saying when I am going to get

21   a ruling.

22   A.  I was living in an abandoned house.

23   Q.  Now, when the decision came down in June, at the end of

24   June, and you got the decision -- I don't know what the

25   exact day you got the decision, but on the day you got the

IVERS - DIRECT

1  decision were you -- was the result what you wanted?

2  A.  (Indicating).

3  Q.  No.  Okay.  I will take that as a no.

4  A.  Losing -- losing a trial is what everyone hopes for.

5  Q.  And at this point then what she -- the essence of her

6  decision was you don't get the hundred thousand dollars at

7  all.

8  A.  Yeah, that was it.  It was over with.

9  Q.  And you're representing yourself at this time, so you

10  don't have a lawyer to depend on to do the work that -- the

11  procedural work that needs to be done?

12  A.  I am clueless.

13  Q.  Did you call the court to find out if you could move for

14  a new trial?  I mean, the court system.  I don't mean the

15  judge.  I mean, like, clerks of court and stuff like that.

16  A.  Well, I started to read the fine print on the cover or

17  something, and I read that it said if you -- you could apply

18  like in 30 days or something, and I figured it out too late.

19  Q.  Okay.  But you were working on it, right?

20  A.  Yeah.  Well, I -- you can't imagine the tailspin I went

21  into.

22  Q.  Right.  But you were --

23  A.  I'm still in -- I'm not ashamed to admit it.  I'm not

24  ashamed to admit it.  I'm still in an absolute, just a

25  tailspin, just a tailspin.  The most absolutely devastating

IVERS - DIRECT

1     thing that could ever happen, just worse than a death, worse

2     than a death.

3     Q.  You asked the court to set you a date so you could

4     have -- make your new motion for a new trial.

5     A.  Correct.

6     Q.  And then you started yourself working on the paperwork

7     that you thought -- your arguments as to why you should get

8     a new trial.

9     A.  I did better than that.  I went ahead and actually filed

10    the motion with the court.

11    Q.  Okay.  And your problem was is you had missed the

12    deadline when you filed the motion.

13    A.  Correct.

14    Q.  And I'm going to show you -- it's already in evidence.

15    The government put it in evidence.  It's Exhibit 3, and it's

16    Docket 110 in that case, but exhibit -- and I'll just show

17    it to you for a minute.  This is the work that you were

18    doing and the paperwork that you were putting together --

19    A.  Let me hold it, please.

20    Q.  Yeah.  Excuse me.

21    A.  And step aside because I want the jury to see me.  Yeah,

22    stand there, because I want communication with the jury.

23    Q.  Look through that for a minute.

24    A.  Yes, I did.

25    Q.  That's your argument.

IVERS - DIRECT

1    A.  Magnificent work.  I hired a secretarial service.  As

2    far as I am concerned, it's brilliant.

3    Q.  Okay.  So let me just look over some pages, so the jury

4    can see what you hired somebody to type for you.  So this is

5    about -- I guess it's five pages into it here --

6    A.  Yes.

7    Q.  -- or four pages in, looking at the top.

8    A.  Yes.

9    Q.  This is -- your argument that you are making is in

10   numbered -- you've numbered your way through (y).  So this

11   starts out as 1, 1 through (h).

12   A.  Whoa, whoa, whoa, whoa.  Turn that back there now.

13   Motion Based on the Following Facts.

14   Q.  Right.

15   A.  Just -- whoa.  It's very similar to this case, no

16   photos, no videos, no voice recordings, no medical reports.

17   Kind of like this case, no evidence.  If you notice in this

18   case, there's never been any evidence produced.  Think about

19   it.  Yes.

20   Q.  You run through and literally lay out, I mean --

21   A.  Magnificent.  It's brilliant.

22   Q.  Right.  And the front of that is the letter that the

23   jury has seen that you filed in about six or seven different

24   filings in court, but that was your letter now that you have

25   missed a deadline -- but that's your letter to magistrate --

IVERS - DIRECT

1   excuse me -- to Judge Tunheim and Magistrate Thorson that

2   says, "Clearly, I feel justified in presenting you with this

3   petition based on the attached motion."  Right?

4   A.  Yes.  And I need to have a very, very short

5   philosophical discussion with you.  Ten seconds long.

6   Q.  Okay.

7   A.  You and I need to discuss the power of judges.

8   Q.  Well, judges are powerful people.

9   A.  Can judges rescind -- reverse themselves?

10  Q.  A judge can reverse themselves.

11  A.  Or reverse their decision?

12          MS. ALLYN:  Objection.  Improper form of these

13  questions.

14          THE DEFENDANT:  We need to --

15          THE COURT:  Sustained.

16          THE DEFENDANT:  We need to develop the power of --

17          THE COURT:  Ladies and gentlemen, we're going to

18  take a short --

19          MR. SCOTT:  Hold it.  Hold it.

20          THE COURT:  Yeah, we're going to take a short

21  break here.  The lawyers haven't had a break while you have.

22  We will be back at 3:45.  Remember the previous admonition

23  of the court, though.

24          All lawyers should stay.

25          THE CLERK:  All rise.

**IN OPEN COURT WITHOUT THE JURY PRESENT**

THE COURT:  Mr. Ivers, I'm going to set a time
limit on how long you have to present your case.  You and
Mr. Scott can decide how you want to use that time.  Okay?
You can continue to be nonresponsive, not answer his
question and make statements on your own, or you can proceed
by way of question and answer.  So I'm going to give you the
rest of the day.  You've got till 5:00.  And the government
has a right to cross-examine you; and if they want to do it
past 5:00, they can.  If they want to wait till 8:30
tomorrow morning, they can do that too.  Okay?

THE DEFENDANT:  Didn't they have three and a
half --

THE COURT:  Here, let me tell you.  Here's what
the law tells me.  Rule 611, okay, of the Rules of Evidence
says this, and here's -- because I want to make sure you
understand.  The rule is entitled Mode and Order of
Examining Witnesses and Presenting Evidence.  (A) Control by
the Court.  That's the judge.  Purposes.  The court should
exercise reasonable control over the mode -- that's the way
the evidence comes in -- and order of examining witnesses
and presenting evidence so as to:  (1) make those procedures
effective for determining the truth; (2) avoid waisting
time, and (3) protect witnesses from harassment or undue
embarrassment.  The rest of the rule has matters that don't

IVERS - DIRECT

1    pertain to direct examination.

2              So you and Mr. Scott talk during this recess.  The

3    marshals are kind enough to stay here with you, so you don't

4    have to go to a holding place.  You and Mr. Scott, Mr.

5    Kelley talk about how you want to use the rest of your time.

6    Okay?

7              MS. ALLYN:  Your Honor, if I may, before we break.

8              THE COURT:  Yes.

9              MS. ALLYN:  May I be heard on one objection?  I do

10   understand that Mr. Scott should be given some latitude for

11   leading.  That would not be my objection.  My objection is

12   the characterizing, though, within the leading question,

13   that is, to say things like, well, then it took so long for

14   that order to come out.

15             THE COURT:  Okay.

16             MS. ALLYN:  He can just say --

17             THE COURT:  When that happens, counsel, here's

18   what I need you to do.  You always listen carefully at

19   testimony.  When there's a characterization made that you

20   think is inappropriate, you tell me and I will move to

21   strike it.  Does that work?

22             MS. ALLYN:  Thank you, Your Honor.

23             THE COURT:  All right.  We will be in recess till

24   3:45.

25             THE CLERK:  All rise.

IVERS - DIRECT

1     (Recess taken from 3:30 p.m. till 3:45 p.m.)

2          **IN OPEN COURT WITH THE JURY PRESENT**

3          THE COURT:  Please be seated.

4          Mr. Scott.

5     BY MR. SCOTT:

6     Q.  Bob, three foundational questions here, just to lead

7     ourselves into this, and I'm going to lead you a little bit.

8     In November you filed a new lawsuit against the insurance

9     company.

10    A.  Correct.

11    Q.  And that lawsuit was filed in federal court?

12    A.  Correct.

13    Q.  And in this one you really -- you checked off that you

14    wanted a jury trial?

15    A.  Correct.

16    Q.  And then the magistrate recommended that you -- that you

17    talk to lawyers in the Pro Se Project; is that right?

18    A.  Somebody who had authority did, yes.

19    Q.  And so as a result of that, you set up a phone

20    conference with lawyers from Fredrikson Law Firm.

21    A.  I don't remember if they called me.  Yeah, they called

22    me to do it.  I didn't call them.

23    Q.  Okay.  And you actually had then a call on

24    February 27th, 2018.

25    A.  That's correct.

IVERS - DIRECT

1    Q.  And you were on the phone.

2    A.  Correct.

3    Q.  And so were they.

4    A.  Correct.

5    Q.  And, to your knowledge, was there anybody besides the

6    two lawyers and you?

7    A.  Quite honestly, I thought it was just one lawyer and me.

8    Q.  And were those lawyers then talking to you about your

9    case that you had in federal court?

10   A.  Yes.

11   Q.  And were they giving you their take on what the case

12   was, what -- how good it was?

13   A.  Yes.

14   Q.  Okay.  And their take was that you weren't going to win

15   the case, right?

16   A.  Yes.

17   Q.  And did you discuss the case with them, your side of the

18   case?

19   A.  Yes.

20   Q.  During that discussion that you had with them, did you

21   threaten anybody?

22   A.  No.

23   Q.  Did you threaten Judge Wright?

24   A.  No.

25   Q.  Did you threaten either of these two lawyers?

IVERS - DIRECT

1   A.  No.

2   Q.  Did you say anything to these people to tell them to

3   pass on anything you were saying to anyone else?

4   A.  No.

5   Q.  And, in fact, you'd already filed your amended complaint

6   at this point that the judge had ordered you to do, right?

7   A.  The judge had given me 90 days by the time these two

8   women called.  There were only three days left.  And I

9   figured I was going to be stood up and so a month previously

10  I just did it on my own, because no one ever calls me.

11  Q.  And, in fact, the call you got was like literally just

12  three days before your final answer was due anyway?

13  A.  When they originally called me, I told them, I said, you

14  know, I already did this, but they wanted to have a

15  conversation.

16  Q.  And did you say -- did you say to them when on the phone

17  that you had planned 50 different ways to kill Judge Wright?

18  A.  No.

19  Q.  Did you say that you had thought about 50 different ways

20  to kill Judge Wright?

21  A.  No.

22  Q.  Did you say that you had imagined 50 different ways to

23  kill Judge Wright?

24  A.  No.

25  Q.  Did you say that you had planned 50 different ways to

IVERS - DIRECT

1   kill Judge Wright?

2   A.  No.

3   Q.  Did you record the conversation that you had with those

4   lawyers?

5   A.  No, I did not.

6   Q.  Did they tell you whether they were recording that

7   conversation or not?

8   A.  No, they did not.

9   Q.  Did they send you any emails to follow up on this

10  conversation?

11  A.  No, they did not.

12  Q.  Did you send them any emails in advance of this -- in

13  advance of this conversation that you had with them?

14  A.  No.

15  Q.  Did you send them any emails afterwards?

16  A.  No.

17  Q.  Did you send them any letters, to them, talking about

18  Judge Wright?

19  A.  No.

20  Q.  Did they send you anything back talking about Judge

21  Wright?

22  A.  No.

23  Q.  Did they send you anything following that conversation

24  you had with them asking for permission to reveal that

25  conversation to other people?

IVERS - DIRECT

1    A.  No.

2    Q.  To the judge?

3    A.  No.

4    Q.  To the marshals?

5    A.  No.

6    Q.  To the other side?

7    A.  No.

8    Q.  Insurance company?  You have a cell phone?  You text?

9    A.  I don't know how to text.

10   Q.  Anybody -- can you read a text?

11   A.  No.  I don't even know how to retrieve one.

12   Q.  Okay.  So you don't know whether any texts were ever

13   received by you, right?

14   A.  I shake when I even dial it because I'm very -- I want

15   my car to have a crank to start it.  I am very low tech.  I

16   know how to use my TV controller, but I can barely make a

17   phone call and retrieve it and then I put the phone away and

18   I -- I am low tech.  I don't own a computer.  I never have.

19   Q.  The marshals came to see you in the middle of March at

20   your house or it was at your sister's house up in West

21   Fargo, the one we heard the tape.

22   A.  The one in Fargo?  Do you want to talk about the one in

23   Fargo?

24   Q.  Yes.

25   A.  Okay.  Yes.

IVERS - DIRECT

1    Q.  In a minute, but let me just say something.  When the

2    marshal asked you then if you had told Ms. Friedemann, I

3    think he used her name, if you had told Ms. Friedemann that

4    you had -- that you planned -- that you had a plan 50

5    ways -- 50 different ways to kill a federal judge, what did

6    you say to that?

7    A.  I don't think the marshal said that to me.  I think what

8    I got from the -- he might have said that to my sister.  I

9    can't remember during her thing.

10   Q.  Do you remember that you answered to that that that's

11   bullshit?

12   A.  I -- yes.  I think he said something like you threatened

13   to kill the judge or something.

14   Q.  And that answer was an accurate answer when you gave it,

15   wasn't it?

16   A.  It was bullshit.  I said produce a recording or some

17   form of evidence.  And he said they don't have any.  And I

18   said, well, leave.

19   Q.  Now, did you, during the time period after the marshals

20   saw you and before you got arrested, did you travel to

21   Minneapolis or to the Twin City area?

22   A.  Yes.

23   Q.  And how did you travel?

24   A.  I took a Greyhound bus.

25   Q.  And down there and back?

IVERS - DIRECT

1    A.   Yes.

2    Q.   And what was your purpose?

3    A.   I don't even have a cash card.  I really must get one.

4    And I had to go to my bank.  I had a very meagerly, paltry

5    sum of money in the bank, and I withdrew it to buy a used

6    car up in Fargo that my sister had found for me.

7    Q.   And we have heard from the testimony here about all of

8    the taps following your cell phone.  Does the 3rd and 4th of

9    April sound like the right time for the trip?

10   A.   I suppose.  I don't have a time frame on it.  I know we

11   had a snowstorm in Minneapolis that day, though, like about

12   ten inches.

13   Q.   So you had to go back and forth through the snow to get

14   to the bank and stuff?

15   A.   Am I talking too loud?

16   Q.   No.  You are doing fine.

17   A.   Bee bop a doo.  I used to be in a rock band

18   (indicating).

19   Q.   Yeah.

20   A.   Yeah.  Okay.  Roll.

21   Q.   Yeah.  And you picked up some money to go buy a car?

22   A.   I went to my bank.  I took the Greyhound into

23   Minneapolis.  From Minneapolis I dashed over to a bus stop.

24   From the bus stop I went into Hopkins.  From Hopkins I

25   borrowed my brother's bike.  I rode my brother's bike to the

IVERS - DIRECT

1    bank.  It was a grueling day.

2    Q.  And that money was to buy a used car?

3    A.  That money was to buy a used car.

4    Q.  And you still own that car, right?

5    A.  Yes, I own that car.

6    Q.  What is it?  Your sister didn't know.

7    A.  It's like about a 2000 Camry, Toyota Camry.

8    Q.  Toyota Camry?

9    A.  Yes.

10   Q.  Okay.  So a car that will run forever and it will have

11   to, given it's --

12   A.  I have been told it's a poor man's Mercedes.

13   Q.  So your trip down here was for the purpose of getting

14   money and not for the purpose of stalking a federal judge?

15   A.  Of course not.

16   Q.  Do you have any idea, other than what you might have

17   heard here in court, do you have any idea where the judge

18   might live?

19   A.  Look, I have been out since I walked out of court the

20   final day of my trial.  I haven't seen or heard or know

21   anything about Judge Wright.  The trial was two days long.

22   I walked out of the courthouse and that's it.  It must be

23   18 months.  I know nothing, nothing about Judge Wright,

24   anything, nothing, not her routine, her work patterns, where

25   she works, anything.

IVERS - CROSS

```
 1              MR. SCOTT:  I have no further questions.

 2              THE COURT:  All right.  Is there

 3     cross-examination, counsel?

 4              MS. ALLYN:  Yes, Your Honor.

 5              THE COURT:  All right.

 6              MR. SCOTT:  Oh, Your Honor, before we --

 7              THE COURT:  Yes.

 8              MR. SCOTT:  I think I had offered 1 and 2.  And

 9     for procedural reasons in the courtroom, we didn't have a

10     response or a ruling by the court.

11              MS. ALLYN:  No objection to those exhibits.

12              THE COURT:  All of those are received.

13              MR. SCOTT:  Thank you, Your Honor.

14              MS. ALLYN:  May I proceed, Your Honor?

15              THE COURT:  You may.

16                      CROSS-EXAMINATION

17     BY MS. ALLYN:

18     Q.  Good afternoon, Mr. Ivers.  So now you had a civil case

19     before Judge Wright, as we have heard a lot about.

20     A.  Yes.

21     Q.  In civil cases you get to have something done called a

22     deposition, right?

23     A.  Correct.

24     Q.  And the jury might not know what a deposition is, but

25     the other side, the defense attorney sat you down, put you
```

1    under oath and asked you a lot of questions for that civil

2    litigation, right?

3    A.   Yes.

4    Q.   And they make a transcript of that deposition as well,

5    right?

6    A.   I missed that.

7    Q.   They make a transcript of that deposition; isn't that

8    right?

9    A.   That's correct.

10   Q.   And then that's kind of the early part of the civil

11   lawsuit.  Later you actually had a civil trial, right?

12   A.   Yes.

13   Q.   And you testified at that trial?

14   A.   Yes.

15   Q.   And it was before Judge Wright?

16   A.   Yes.

17   Q.   It was in this building, wasn't it?

18   A.   Yes.

19   Q.   So federal court.

20   A.   It might have been this courtroom.  I don't think so,

21   but --

22   Q.   It probably looked a lot like this courtroom, though.

23   A.   Whatever.

24   Q.   And Judge Wright would have been wearing her black robe,

25   right?

IVERS - CROSS

1    A.  Yes.

2    Q.  And sitting up on a bench.  Maybe not so different

3    than -- from this courtroom here today.

4    A.  Yes.

5    Q.  And there were federal lawyers who were the defense

6    attorneys, right?

7    A.  It was the life insurance lawyers.  I suppose they were

8    registered in federal court.

9    Q.  A pretty serious affair in federal court, isn't it?

10   A.  Well, I was very comfortable.

11   Q.  Well, I understand that, but it's still a pretty serious

12   business to be in federal court, isn't it?

13   A.  I was completely unintimidated.

14   Q.  During your trial when you testified you took an oath to

15   tell the truth before you testified.

16   A.  Yes.

17   Q.  Now, when you testified at that civil trial, you

18   testified differently than some things you said in your

19   deposition, didn't you?  Right?

20   A.  I don't -- say the question again.

21   Q.  When you testified at trial, you testified differently

22   than some things you said in your deposition under oath;

23   isn't that right?

24   A.  I don't know.

25   Q.  Well, Judge Wright concluded that your statements at

IVERS - CROSS

1    trial and your statements in the deposition were strikingly

2    inconsistent.

3            MR. SCOTT:  I'm going to object, Your Honor, to

4    what the witness out of court may have said as to that

5    issue.  I don't think that that out-of-court statement

6    should be used to attack credibility.

7            THE COURT:  Sustained.

8    BY MS. ALLYN:

9    Q.  Did Judge Wright find that you lacked credibility in

10   that civil hearing?

11           MR. SCOTT:  I'm going to object again.

12           THE COURT:  Sustained.

13   BY MS. ALLYN:

14   Q.  Mr. Ivers, you have seen that we have in evidence

15   Exhibit 21; isn't that right?  And you have heard

16   testimony -- this is the order from Judge Wright.  And there

17   was testimony in this trial that Judge Wright found that you

18   lacked credibility.  Didn't she find that?

19           MR. SCOTT:  Your Honor, I'm going to object again.

20           THE COURT:  Sustained.  It's sustained.

21   Sustained.

22           MS. ALLYN:  Your Honor, not for the truth of the

23   matter asserted, but for the impact on Mr. Ivers.

24           THE COURT:  Yeah.  Here's what, I don't think

25   we -- I don't think this is admissible.  The finding about

1    his credibility is not admissible.  That's just my feeling

2    based on the objection.

3                 MS. ALLYN:  Your Honor, may we have a side bar?

4                 THE COURT:  Sure.

5                         (Side-bar discussion.)

6                 THE COURT:  Okay.

7                 MS. ALLYN:  Your Honor, if I may.

8                 THE COURT:  Yes.

9                 MS. ALLYN:  We had testimony on this.  It is a

10    document in evidence.  It's part of what he's mad about.

11    It's part of --

12                 THE COURT:  Well, I understand, Ms. Allyn.  Here's

13    my problem.  Giving the jury somebody else's opinion about

14    whether a witness is telling the truth, I'm just -- that

15    usurps their role.

16                 MR. SCOTT:  Especially an unavailable witness.

17                 MS. ALLYN:  If the concern is that they are

18    holding it against him here, there could be this cautionary

19    instruction, but it's part of what is making him so angry at

20    Judge Wright, is through retaliation --

21                 THE COURT:  But I think it's 403.  I think the

22    telling them that somebody else said he's not telling the

23    truth is more harmful than the benefit that would come on

24    cross to the government.  That's my feeling.

25                 MS. ALLYN:  Well, if there is this cautionary

IVERS - CROSS

1   instruction, though, that they can't use it to his judge

2   credibility --

3               THE COURT:  Well, I mean, I just think that we

4   don't give juries enough credit.  If I am letting somebody

5   else who has heard testimony about a case I don't know

6   anything about that's made a credibility finding, I'm just

7   bothered by the fact that we tell the jury, well, this is

8   what somebody else thought.

9               MS. ALLYN:  But how is his credibility not an

10  issue for the jury to evaluate?

11              THE COURT:  Okay.  Well --

12              MR. RANK:  If he's lying and there's been a

13  judicial finding that he -- that's admissible.

14              MR. KELLEY:  No, it's not.

15              MR. RANK:  Sure it is.

16              MS. ALLYN:  How is it not?

17              MR. KELLEY:  It's not admissible if -- a judicial

18  finding of lying in the past?

19              MR. RANK:  Yes.

20              MR. KELLEY:  No.  That's not --

21              MR. RANK:  It goes to his credibility.

22              MR. SCOTT:  What?  What?

23              MR. RANK:  That she found him not to be credible.

24              MR. SCOTT:  No, no, no, no.  No, no.  Those are

25  two different words.  You said a lie.  Sometimes a

1      particular lie may be admissible to attack the credibility

2      of a witness, but a general finding of credibility is not a

3      specific example.  Then you are just talking about, if

4      nothing else, reputation.  But second of all is it's a

5      finding by a person who is not in court, has not testified

6      as to the basis for it and it's about a collateral matter

7      and --

8               MR. RANK:  It's not about a collateral matter.

9               MR. SCOTT:  Yes, it is.  It's a collateral matter.

10     And then other than generally you want to prove it up, you

11     don't have a specific statement that is made that where he

12     says she called me a liar and therefore.  And then it might

13     be admissible that she called him a liar in fact, but that's

14     not what you have in any of your things here.

15              MR. RANK:  But what we do have is an --

16              MS. ALLYN:  It's impeachment.

17              MR. RANK:  -- official document.  He is charged

18     with retaliating against her for her official duties and

19     this is --

20              THE COURT:  I agree with all that.  I just think

21     the prejudice -- it's unfair prejudice, unfair prejudice.

22                   (Side-bar discussion concluded.)

23              THE DEFENDANT:  Thank God.  White noise.

24     BY MS. ALLYN:

25     Q.  Mr. Ivers, you lost your lawsuit before Judge Wright

IVERS - CROSS

1   because she ruled in favor of the insurance company, didn't

2   she?

3   A.  Yes.

4   Q.  And she ruled in favor of the insurance company because

5   she determined that what you wrote on that insurance

6   application was willfully false or intentionally misleading,

7   didn't she?

8            MR. SCOTT:  I'm going to object, Your Honor.  Same

9   grounds.

10            THE COURT:  Sustained.

11   BY MS. ALLYN:

12   Q.  Mr. Ivers, you lost that lawsuit before Judge Wright;

13   isn't that right?

14   A.  Yes.

15   Q.  And that made you very angry to lose that lawsuit.

16   A.  It was a hundred thousand dollars.  I was living in my

17   car.

18   Q.  And not just that you lost a hundred thousand dollars,

19   but Judge Wright claimed that you wrote down something

20   intentionally misleading, right?

21            MR. SCOTT:  I'm going to object, Your Honor.  Same

22   objection.

23            THE COURT:  That's overruled.

24            THE DEFENDANT:  No, that doesn't bother me at all.

25   The part that bothers me at all is that a six-person jury

1    didn't hear it, instead of just the Almighty Judge Wright.

2    BY MS. ALLYN:

3    Q.  You don't care at all that Judge Wright said you are the

4    reason that you lost this lawsuit --

5                MR. SCOTT:  I'm going to object.  I'm sorry.  The

6    question is not done.

7                I'll let you finish.

8    BY MS. ALLYN:

9    Q.  It doesn't upset you at all that Judge Wright said that

10   you are the person that wrote something willfully false and

11   intentionally misleading on an application and that's why

12   she ruled in favor of the insurance company and that does

13   not bother you?

14   A.  That did not --

15               THE COURT:  Ms. Allyn.

16               Wait, wait, wait, wait.

17               Ms. Allyn.  Wait a minute.  I want to make sure I

18   understand the record.  I thought what Judge Wright found

19   was that someone else made a misleading statement and that's

20   why Mr. Ivers didn't prevail.  Is my understanding of what

21   Judge Wright determined incorrect?

22               MS. ALLYN:  Yes.

23               MR. SCOTT:  Your Honor, I think Judge Wright

24   didn't find who did it.

25               MS. ALLYN:  Your Honor, I --

 1          THE COURT:  Well, wait a minute.  Wait a minute.

 2          MS. ALLYN:  -- believe you had directed the

 3    question to me, if you don't mind, Your Honor.

 4          THE COURT:  Yeah.

 5          MS. ALLYN:  And that is not fully accurate.

 6          THE COURT:  Okay.

 7          MS. ALLYN:  Judge Wright determined --

 8          MR. SCOTT:  Your Honor, can we have this

 9    discussion not in front of the jury?

10          THE COURT:  Yes.  Yeah, sure.

11                (Side-bar discussion.)

12          THE COURT:  Okay.  Here's kind of my broad, broad

13    understanding of what the finding was.  I thought that the

14    claim was that plaintiff's claim was denied because there

15    was a false and misleading application for the policy.  And

16    so he didn't make the misleading statement or the false

17    statement.  I thought it was Mr. Tallman.

18          MS. ALLYN:  No.  He --

19          THE COURT:  Go ahead.

20          MS. ALLYN:  He wrote down the answers from

21    Mr. Tallman.  Now, he likes to claim that he was just

22    writing down what Mr. Tallman told him.  But Judge Wright

23    did make a point to say maybe Mr. Tallman is telling you

24    what to write down, maybe you are writing it down, but what

25    Mr. Ivers wrote down is what she determined was a willfully

IVERS - CROSS

1    false and misleading application.

2            MR. RANK:  And he testified --

3            MR. SCOTT:  That's a pretty -- they are trying to

4    blame it on him.  But, again, where are we going?  And the

5    only other thing I have to say is I'd like the court to tell

6    them that they're off in this wilderness and they've got 55

7    minutes.

8            THE COURT:  I'm going to tell them that.

9            MR. RANK:  We only asked two questions, and we

10   spent ten minutes up here on your objection.

11           MR. SCOTT:  Well, just keep the idea.  Now you are

12   wasting time.

13           MR. RANK:  I think if you ask Mr. Ivers whether he

14   filled out the box, he will admit that he did because that's

15   how he testified at the trial and says he checked the box.

16           MR. SCOTT:  And then he's going to say, well, then

17   the judge claimed I'm a --

18           THE COURT:  Here's just kind of my -- here's just

19   kind of my feeling, that somebody else's credibility finding

20   usurps the jury's role.  How is that -- you know, tell me

21   how I am missing that.

22           MS. ALLYN:  Retaliation.  This is part of it.  We

23   have to prove retaliation for Judge Wright's dismissal of

24   the lawsuit.  Dismissal of the lawsuit included finding he's

25   the reason.  She's not the reason.

IVERS - CROSS

1      THE COURT:  Well, can't you just say, Isn't the

2    reason you are mad at Judge Wright is because she beat you

3    on the claim?

4      MR. RANK:  She didn't beat him on the claim.

5      THE COURT:  Yes, she did.  She denied his claim.

6      MS. ALLYN:  And ruled in favor of the insurance

7    company.

8      THE COURT:  Right.  She beat his claim.

9      MR. RANK:  Well, I don't think the judge beats.

10   The judge makes the determination that the claim has no

11   merit.  It doesn't beat the claim.

12     THE COURT:  Wait a minute.  That's exactly what

13   judges do, isn't it?

14     MR. RANK:  Well, I don't know that you beat a

15   claim.  It sounds --

16     THE COURT:  Well, I never had enough clients that

17   I -- okay.  I'm just not going to let it in.

18     MS. ALLYN:  Okay.  Thank you, judge.

19         (Side-bar discussion concluded.)

20     THE COURT:  Okay.  Are you 14 okay?  Okay.  If you

21   need a break, raise your hand.  Okay.

22     Okay, Ms. Allyn.

23     MS. ALLYN:  Thank you, Your Honor.

24   BY MS. ALLYN:

25   Q.  Mr. Ivers, you testified here today that your federal --

1   no.  Let me back up.  The attorney that submitted your

2   complaint in state court.  Remember talking about him?

3   A.  Yes.

4   Q.  And you claimed that he wasn't going to represent you in

5   federal court anymore because he wanted to move to Hawaii.

6   A.  Correct.

7   Q.  But actually didn't he submit a motion to withdraw as

8   counsel because you were asking him to send communications

9   that he found repugnant?

10  A.  Judges are very -- I have my teeth in now, so I'm going

11  to take them out.  I talk like Tweety bird.  Judges are --

12  they don't like it when counsel withdraws for a client.  And

13  they asked me, both Eric and Demetri, they said, Bob, we

14  filled out this report here and it says, you know, you don't

15  like this and you don't like that, and they said we want to

16  move on with our lives, would you please sign it.  And I

17  said sure, I will.  And so they juiced it up to make it look

18  like that we were all unhappy with each other.  It's sort of

19  like everybody in a rock band suing each other over some

20  record deal.

21          THE COURT:  Mr. Ivers, here's the question that

22  the lawyers asked you.  But actually didn't he, referring to

23  your lawyer, submit a motion to withdraw as counsel because

24  you were asking him to send communications that he found

25  repugnant?  That's the question that the lawyers posed to

IVERS - CROSS

1    you.

2            THE DEFENDANT:  I don't remember that.  You would

3    have to show it to me.

4    BY MS. ALLYN:

5    Q.  Sure.  I will show you what was filed as Document 45 in

6    your civil lawsuit entitled Motion to Withdraw As Counsel of

7    Record Without Substitution For Plaintiff Robert Ivers,

8    submitted by Demetri Lametti with a signed affidavit, sworn

9    testimony by Eric Peterson.

10           May I approach, Your Honor?

11           THE COURT:  You may.

12           MS. ALLYN:  May I inquire at the stand?

13           THE COURT:  Yes.

14           MS. ALLYN:  Thank you.

15   BY MS. ALLYN:

16   Q.  Mr. Ivers, I'm going to direct your attention --

17   A.  Can I hold it?

18   Q.  Oh, sure.  Do you see that sentence?  I can direct you

19   to the word repugnant if you'd like.

20   A.  Yeah, I know, but I don't remember sending any repugnant

21   letters to anybody.  That's the part that I'm confused

22   about.

23   Q.  The question actually is --

24   A.  Right, but like I told you we did that so that they

25   could get out of the contract.

IVERS - CROSS

1   Q.  Okay.

2   A.  But I don't remember any actual repugnant letters.

3   Q.  Mr. Ivers, if I could show you to page, 1, 2, 3, 4 of

4   that document, do you see where your attorney signed under

5   oath for this motion to withdraw?  Do you see that?

6   A.  Yeah.

7   Q.  Yeah.  And I show you on page 1 -- why don't you read

8   what's highlighted in green?

9   A.  "And asks counsel to send communications which counsel

10  finds to be repugnant and not to be in the best interests of

11  the client."

12  Q.  So that's why your federal attorneys were not

13  representing you in the civil lawsuit anymore, right, not

14  because they moved to Hawaii.

15  A.  Except for we never sent anything to anybody.  I think

16  they just did that to get out -- the judges are real fickle

17  about letting somebody drop out of a case.

18  Q.  So they didn't send anything to anybody because they

19  asked to leave your case -- remove themselves from the case

20  before they had to do so, right?

21  A.  Well, I don't think we drafted anything up to look at to

22  do so.  It was just them to get out the back door because

23  they didn't want to be the attorneys anymore and wanted to

24  move on.  It was basically, I guess, they were lying.  I

25  can't help it if they sign something --

1    Q.  Well, sir, you claim that they weren't representing you

2    to move to Hawaii.  Isn't that what's inconsistent to what

3    they filed in Document No. 45, right?

4    A.  No.  They told me they were going to have great

5    difficulty quitting the case, that judges were very fickle

6    about it.  And they asked me if I would please sign that.

7    And I was a good sport and I said yes, you are unhappy.  And

8    they said we need something strong to do it, otherwise the

9    judge might deny it and he might make us stay with you.  And

10   so I signed it for them.  I -- you know, could you produce a

11   repugnant letter?

12   Q.  And so you saw that that defense attorney, though,

13   signed under oath saying that they were withdrawing because

14   of your demands, not to move to Hawaii, right?

15          MR. SCOTT:  I object, Your Honor, as asked and

16   answered and argumentive.

17          THE DEFENDANT:  It was their signature and their

18   oath.  It wasn't mine.

19          MR. SCOTT:  Bob.

20          MS. ALLYN:  I withdraw the --

21          THE COURT:  I'm sorry.  Overruled.

22          MR. SCOTT:  The answer is already in, Your Honor.

23          THE COURT:  All right.

24   BY MS. ALLYN:

25   Q.  Mr. Ivers, let's talk about your March 14th statement.

IVERS - CROSS

1    That's when the deputies came to ask you about that threat

2    you made against Judge Wright.  I assume remember that.  It

3    just happened this morning, right?

4    A.  Yes.

5    Q.  This is your sister's house, right?

6    A.  Yes, that's my sister's townhouse.

7    Q.  And you were just staying there since about December,

8    right?

9    A.  Yes, I think in the very first part of December.  Maybe

10   December 10th precisely.

11   Q.  You were sleeping downstairs?  That's your bedroom?

12   A.  She has a guest bedroom in the basement.

13   Q.  Your sister is the one who answered the door when the

14   marshals came, right?

15   A.  Yes.

16   Q.  And she came down.  She asked you to come upstairs and

17   talk to the marshals at the door, right?

18   A.  Yes.

19   Q.  The marshals never came all the way inside the house,

20   did they?

21   A.  I guess not.

22   Q.  And one moment.  I just need my mouse, so I can --

23   A.  I'm a little bit borderline diabetic.  That's why I sip

24   on water a lot, in case anyone wanted to know.

25   Q.  Now, you finally got to the door and the marshals were

IVERS - CROSS

1    there.  And you were agitated the very second you got to

2    that door, weren't you?

3    A.  Yes.

4    Q.  All right.  And it takes like five minutes.  I mean,

5    your voice isn't first on this recording till about minute

6    five.  So I'm going to take Exhibit 14 to about minute five,

7    if I can see right.

8    A.  Are we going to listen to it or read the transcript?

9    Q.  Yeah.  Here you go.

10                   (Audio recording is playing.)

11   Q.  So you are asking whether they got -- you are wondering

12   if they have an arrest warrant, right?

13   A.  Yes.

14   Q.  And, in fact, that's what you kind of ask right away.

15                   (Audio recording is playing.)

16   Q.  Now, of course, they're not going to arrest you for

17   anything unless you did something wrong, right?  But what

18   happened is you knew you had crossed the line when you made

19   that threat against Judge Wright.  So you knew that's why

20   they were coming; isn't that true?

21              MR. SCOTT:  I'm going to object to the form of the

22   questions.  There's three questions there, Your Honor.

23   There's a statement of fact and then two separate questions.

24              THE COURT:  Okay.  Well, she'll restate the

25   question.

IVERS - CROSS

1        MS. ALLYN:  Sure.

2    BY MS. ALLYN:

3    Q.  They would only need an arrest warrant to arrest you if

4    you had done something illegal, right?

5    A.  Yes.

6    Q.  And you knew at this time when those marshals were at

7    your door that you had crossed the line when you made that

8    threat against Judge Wright to those lawyers, right?

9    A.  I never made a threat against Judge Wright.

10   Q.  You knew exactly why those marshals were there to

11   interview you that day, right?

12   A.  No, I did not.

13   Q.  Well, let's listen a little bit.

14              (Audio recording is playing.)

15   Q.  Your sister asked you to go find out why those marshals

16   were there, but you told her that you already knew why they

17   were there; isn't that right?  That's what you said.

18   A.  Okay.

19   Q.  Because you did already know why they were there, didn't

20   you?

21   A.  There was a lead-up to it of some sort.  They were -- in

22   September or something they had been by, and I just figured

23   it was more follow-up to the same thing.

24   Q.  Now, sir, on September 1st, 2017, two different marshals

25   came to visit you in Minnesota; isn't that right?

1   A.  You know, I've put all of this in a cloud behind me, and

2   I have to think a little bit now.  Help me -- help me think.

3   Now say the date again.

4   Q.  In September.

5   A.  In September.

6   Q.  2017.

7   A.  Okay.  We're in '19?  Are we in '18 still?

8   Q.  Sir, when these marshals came to visit you March 14,

9   2017 --

10  A.  Where was I?

11  Q.  In Fargo.  You already knew that they were coming there

12  because you knew you had made that statement about Judge

13  Wright, because at this time in this interview they have not

14  told you yet why they are there; isn't that true?

15  A.  I didn't know anybody was coming to see me in Fargo.

16  Q.  Right.  So when the marshals showed up at your door,

17  before they said one reason why they were there, you already

18  knew why they were there and that's what you told your

19  sister, right?

20          MR. SCOTT:  Your Honor, object to the form of the

21  question again.  There's four statements in that question.

22          THE COURT:  Would you rephrase, Ms. Allyn?

23          MS. ALLYN:  Sure, Your Honor.

24          THE COURT:  Thank you.

25

IVERS - CROSS

1   BY MS. ALLYN:

2   Q.  Mr. Ivers, if we were to continue to listen to this

3   interview, you talk about Judge Wright, don't you?

4   A.  In what?

5   Q.  You talk about the F'g judge that stole your life during

6   this interview on March 14th, don't you?

7   A.  What are we talking about now?  The phone conversation

8   or the marshals?

9   Q.  I'm going to talk to you about the --

10  A.  I'm an old guy.  I'm 65.  I know that's not real old.

11  But the marshals came and saw me when I was living at the

12  Linberry House, they came into Hopkins, they came into

13  Fargo.  And so it's a mixy-match for me.

14          THE COURT:  Mr. Ivers, where this started was

15  Ms. Allyn posed this question, after I asked her to

16  rephrase.  Mr. Ivers, if we were to continue to listen to

17  the interview -- I think she's talking about what's on the

18  screen -- you talk about Judge Wright, don't you?  That's

19  the question that's before you right now, that she's asked

20  you.

21          THE DEFENDANT:  Say that again.  I will pay closer

22  attention.

23          THE COURT:  Okay.  The question that's pending is

24  this interview of March when Deputy Seyfried, Deputy Marshal

25  Seyfried came to see you.  She is asking you if we -- that

IVERS - CROSS

1    is you and she -- continue to listen to the tape recording

2    of the March interview with Deputy Seyfried and yourself,

3    you talk a lot about Judge Wright, don't you?  That's her

4    question.

5              THE DEFENDANT:  I talk a lot about Judge Wright

6    with who?

7              THE COURT:  In this interview do you talk a lot

8    about Judge Wright?

9              THE DEFENDANT:  With who?  The marshals?

10             THE COURT:  Yes.

11             THE DEFENDANT:  When they came to Fargo?

12             THE COURT:  Yes.

13             THE DEFENDANT:  Well, when they questioned me in

14   Fargo?

15             THE COURT:  Yes.

16             THE DEFENDANT:  Well, I don't know.  Let's play

17   the tape.  It's a long time ago for me.  Let's see if I talk

18   about it.

19   BY MS. ALLYN:

20   Q.  Mr. Ivers, we played the tape this morning.  You heard

21   Deputy Seyfried testify and play the tape.

22   A.  Yeah.  I still don't get what the question is.

23   Q.  You talked about Judge Wright throughout your discussion

24   with Deputy Seyfried --

25   A.  Yeah.

IVERS - CROSS

1    Q.  -- in Fargo on March 14th, didn't you?

2    A.  Yeah, yeah.

3    Q.  You talk about her, said she's the F'g judge that stole

4    my money?

5    A.  Mm-hmm.  Mm-hmm.

6    Q.  And you said that F'g judge, that you want to know what,

7    she doesn't sleep very good, F her, right?

8    A.  Yeah.

9    Q.  You said that's the F'g judge that stole my money,

10   right?

11   A.  Yeah.

12   Q.  That F'g, racial slur, N word, F'g judge stole my

13   future.  You said that, right?

14   A.  Yes.

15   Q.  And you said that F'g judge stole my F'g life, right?

16   A.  Yeah.

17   Q.  F her.  You said that, right?

18   A.  Well, it's on the tape.

19   Q.  Do you want me to play it?

20   A.  If you want to.

21   Q.  You tell them that I am crazy F'g angry, right?

22   A.  Yes.

23   Q.  All of that is about Judge Wright to Deputy Seyfried on

24   March 14th, correct?

25   A.  The seque to that was that the marshals had come over to

IVERS - CROSS

1    the previous house I was living at in September, and they

2    made inquiries about the Judge Tunheim thing, and then them

3    showing up in Fargo I thought was just an escalation of

4    that.  And when they showed up, if you reverse the tape, he

5    explains, he says I'm here to talk about Judge Wright.  I

6    was clueless.

7    Q.  No.  Actually, let's reverse it.

8    A.  Well, let's, yeah, let's go back.

9    Q.  Because before you started talking about the F'g judge

10   that F'g stole your life, at least at the very beginning,

11   they had not told you why they were there.  So you show up

12   at about 5 minutes, 40 seconds.  I guess we will have to

13   play the whole --

14   A.  Well, here I can --

15                   (Audio recording is playing.)

16   Q.  See if I can get it to --

17                   (Audio recording is playing.)

18   Q.  Do you see that the transcript is going to stay?

19   Nothing is going to change.  No words said about Judge

20   Wright.  And I am moving it up to about 5 minutes,

21   30 seconds.

22                   (Audio recording is playing.)

23   Q.  And there we go.  That's that fucking judge that stole

24   my money.  But they had never told you Judge Wright's name;

25   isn't that right?

IVERS - CROSS

1   A.  Yes, except for that was --

2   Q.  No.  That's my question.  Thank you.  And you made a

3   claim that it's a continuation from having been visited in

4   September by marshals.  Isn't that what you were saying

5   earlier, right?

6   A.  Yes.

7   Q.  But, sir, September, October, November, January,

8   February to March is about seven months; isn't that right?

9   A.  Wait a minute now.  Start again.  September, October,

10  November, December.

11  Q.  So about seven months later.

12  A.  Four.

13  Q.  September.

14  A.  September, October, November, December.

15  Q.  January, February.  And they are there in March.

16  A.  February.

17  Q.  And, sir, supposedly after September 1st when the

18  marshals visited you you never sent any more letters to

19  Judge Wright, did you?

20  A.  I never sent any letters to Judge Wright.

21  Q.  You never sent any letters to Judge Wright?

22  A.  Not after the day of the trial.  I hadn't had any

23  contact with Judge Wright for 18 months or 16 months or I --

24  up until today, two years.  When I walked out of the

25  courtroom -- we had a two-day trial.  When I walked out of

IVERS - CROSS

1   the courtroom, I don't know anything about her.  I haven't

2   seen her.  I don't know anything about her.  I don't know

3   where she lives, her routine, nothing.  I haven't had any

4   contact whatsoever with the judge.

5   Q.  Okay.  Let's look at Exhibit 7 and page on down to the

6   envelope, which is going to be -- this one could be kind of

7   hard.  There we go.  I'll blow this up for you a little bit.

8   It's to Judge Wright, the judge you just said you had no

9   contact with after January.  And then, in fact, the postmark

10  from Hopkins where you were living is August 22nd, 2017,

11  right?

12  A.  Mm-hmm.

13  Q.  And it's from you.  It's got your name on it, right?

14  A.  Mm-hmm.

15  Q.  Okay.  So right there is at least one letter of contact

16  with Judge Wright after the trial of January.

17  A.  I forgot after she made her decision that I sent this

18  retort.  And isn't it a motion?

19  Q.  You --

20  A.  Chief Judge Tunheim?

21  Q.  -- sent other letters to Judge Tunheim about --

22  A.  Let's go back to the Judge Wright one you were just

23  talking about.

24  Q.  No.  Let's talk about how you could forget the fact that

25  you sent dozens of letters in a three-day period in August,

IVERS - CROSS

1    right?

2    A.  I don't remember.

3    Q.  So I'll show you the postmark on Exhibit 4.  August

4    22nd, 2017, right?  Sent it to Judge Tunheim because you

5    thought you were cheated?

6    A.  Yes.

7    Q.  By who?  Judge Wright; is that right?

8    A.  Yes.

9    Q.  And then Exhibit 5.  Now it's to the clerk of courts.

10   A.  Yes.

11   Q.  Also saying you are cheated by Judge Wright; isn't that

12   correct?

13   A.  Okay.

14   Q.  Same date, August 22nd, 2017, right?

15   A.  Clerk of court.

16   Q.  Okay.  But about Judge Wright, correct?

17   A.  About Judge Wright, but not to Judge Wright.

18   Q.  Sure.  And Exhibit 6.

19   A.  Judge Becky Thorson.

20   Q.  Yep.  She did buy one of your judges, Judge Wright,

21   correct?

22   A.  Yes.

23   Q.  Also sent August 22nd, 2017, right?

24   A.  Yes.

25   Q.  Well, and then that brings us to the exhibit we were

IVERS - CROSS

1    just looking at.  That did go to Judge Wright?

2    A.  Except for I think that was a motion that I filed.

3    Q.  Nope.  It's just --

4    A.  It was a copy of a motion.  Well, it has --

5    Q.  Judge Wright.

6    A.  Yes, but it has evidence in it for -- look, it says

7    filed response on it.

8    Q.  Okay.  I've moved on to Exhibit 8.  And now we're three

9    days later.  August 25th, 2017; is that right?  And if we

10   look on the back of that envelope, page 2, you write Judge

11   Wright is a corrupt judge, right?

12   A.  Right, but it's to Judge Becky Thorson.  It's not to

13   Judge Wright.

14   Q.  Sure.  But you said you hadn't had anything to do with

15   Judge Wright after her --

16   A.  I didn't have anything to do with her.  That's Judge

17   Becky Thorson.

18   Q.  And because you sent that to Judge Thorson --

19   A.  It has nothing to do with Judge Wright.  It has to do

20   with Judge Thorson.

21   Q.  You sent that to Judge Thorson --

22   A.  And the one to Judge Tunheim was for Judge Tunheim.

23   Q.  Hold on.  Sent it to her the same day you also sent

24   another letter to Judge Wright; isn't that right?  And this

25   is Exhibit 10, right?  See that?  Here.  Maybe I need to

IVERS - CROSS

1   show you.  Do you see where it says Judge Wright?

2   A.  Okay.

3   Q.  And this is the one sent August 25th, 2017.

4   A.  Mm-hmm.

5   Q.  So now do you remember that after your trial with Judge

6   Wright you actually sent her and others several letters

7   involving Judge Wright?

8   A.  Well, those were court papers that I believe I filed

9   with the court.

10   Q.  You know what?  That's not my question.  You claimed

11   that you hadn't had anything to do with Judge Wright after

12   you walked out that door on your trial date, but that's not

13   true because you actually sent her letters, didn't you?

14   A.  I don't think I sent her letters.  I think I filed them

15   with the court.  I think those are court papers that I

16   filed.  I don't recall ever sending Judge Wright a personal

17   letter after that trial.  I made an attempt to file some

18   motions, and then I sent some arguments to Judge Tunheim and

19   then some arguments to Judge Becky Thorson.

20   Q.  There's no more question in front you.

21   A.  But I don't believe I mailed anything to Judge Wright

22   that had any contact with her.  I don't remember any.

23   Q.  Do you remember on April 24th, 2018, you had a court

24   appearance in North Dakota on this case before Judge

25   Senechal, right?

IVERS - CROSS

1    A.  Yes.

2    Q.  At that court appearance you told -- well, let me back

3    up.  At that court appearance you were also placed under

4    oath, weren't you?

5    A.  Yes.

6    Q.  And at that court appearance you told the judge under

7    oath that you hadn't said or talked anything about Judge

8    Wright in 15 to 16 months; isn't that right?

9    A.  That's correct.  At least I -- I think so.

10   Q.  Okay.  But you just said that during your March 14th,

11   2017, interview in Fargo with Deputy Seyfried you did talk

12   about Judge Wright.

13   A.  I don't get the question.

14   Q.  Okay.  You have admitted that on March 14th, talking to

15   Deputy Seyfried, you talked about Judge Wright, you know,

16   calling her an F'g judge who stole your life, right?

17   A.  When I talked to the marshal in our conversation?

18   Q.  Yep.

19   A.  I guess so.

20   Q.  Okay.  And then when you were --

21   A.  But that's not talking to Judge Wright.  That's talking

22   to the marshal.

23   Q.  Sure.  But about Judge Wright?

24   A.  So what.

25   Q.  And you told Judge Senechal under oath, though, that you

IVERS - CROSS

1   hadn't talked anything about Judge Wright in 15 to

2   16 months.

3   A.  Talked anything about her or talked to her or had

4   contact with her?  I haven't had any contact with Judge

5   Wright since I walked out of that courtroom.  Now, I think I

6   made an attempt to file a motion, the one that I was saying

7   that I thought was very good, and filed political -- filed

8   papers with the court or maybe an argument, but I never sent

9   any kind of a personal letter to Judge Wright or --

10  Q.  And, sir, under oath --

11  A.  -- or anything that I can remember.  I just don't

12  remember.

13  Q.  Sir, under oath to Judge Senechal you also told her that

14  you had never left the State of North Dakota since

15  December 13th, 2017, right?

16  A.  December 13th.

17  Q.  I can show you --

18  A.  Yes.

19  Q.  -- the transcript.

20  A.  I guess so.  I was in handcuffs and was in shock from

21  just being arrested.  I was like fresh into my arrest, like

22  20 hours fresh into being seized by a SWAT team.

23  Q.  So that was a lie because you had actually left North

24  Dakota on April 3rd to come to Twin Cities.

25  A.  I completely forgot that I grabbed a Greyhound to go

IVERS - CROSS

1    into town to get money and to the bank.

2    Q.  You were under oath before a judge.

3    A.  I forgot.

4    Q.  Now, sir, let's talk about your phone call to

5    Ms. Friedemann and Anne Rondoni Tavernier.  Okay?

6    A.  Yes.

7    Q.  The court had referred you to this Pro Se Project to

8    talk to them; isn't that right?

9    A.  Say that again.

10   Q.  You were assigned to them to consult with as pro se

11   lawyers, right?

12   A.  Yes.

13   Q.  And they made a phone call because you were in North

14   Dakota and they were in Minneapolis, right?

15   A.  They called me.

16   Q.  Yep.  And the call was February 27th, 2018?

17   A.  As far as I understand it.

18   Q.  Did you even remember the names of those lawyers before

19   today?

20   A.  I didn't know the names of the lawyers.

21   Q.  You had never met them before?

22   A.  I knew the names of Tavernier about a month ago and

23   Friedemann maybe two -- on June 18th when she was at the

24   hearing --

25   Q.  Right.

708

IVERS - CROSS

1    A.  -- at the hearing here and said that I had said that I

2    imagined 50 ways to kill her.  She goes, Mr. Ivers said he

3    imagined 50 ways, which I don't think is against the law to

4    imagine something.

5    Q.  At the time of the phone call you didn't even know their

6    names, did you?

7    A.  No.

8    Q.  You had never met them, had you?

9    A.  No.

10   Q.  You only ever talked to them on the phone about two or

11   three times right around that February 27th, 2018, right?

12   A.  I think I spoke with them one time.

13   Q.  And it was just for a consultation about your federal

14   case, right?

15   A.  Yes.

16   Q.  And so when I say "federal case," I mean your new

17   federal case.

18   A.  Yes.

19   Q.  Right?  And they told you that that new federal case was

20   no good, right?

21   A.  Well, they didn't just come out that abrupt about it.

22   Q.  But pretty clear that your new federal case would be no

23   good because of Judge Wright's order.

24   A.  We philosophized for a while, and we did talk -- we

25   actually had kind of a philosophical talk about the law and

IVERS - CROSS

1   various things and --

2   Q.  And that included talking about Judge Wright's order was

3   going to prevent you from filing a new suit, right?

4   A.  At the very end they used that fancy Latin word that you

5   used earlier, recata, and they told me I couldn't refile the

6   case.

7   Q.  Because of what Judge Wright had done.

8   A.  No.  I argued the fact.  I said that they -- the cover

9   sheet of the federal lawsuits, my original one, they have

10  squares on the federal front sheets and you can file for --

11  Q.  Mr. Ivers.  Mr. Ivers.

12  A.  I filed for Americans With Disabilities as opposed to

13  the breach of contract.

14  Q.  Mr. Ivers, they told you it was because of Judge

15  Wright's order was going to prevent you from filing your new

16  lawsuit, right?

17  A.  They told me that because the case had been decided on

18  that I couldn't file another one.

19  Q.  Yep.  And by "decided on," that means Judge Wright's

20  decision is why you couldn't file, right?

21  A.  Yes.

22  Q.  And you're pretty mad about Judge Wright again during

23  that conversation then?

24  A.  Of course.

25  Q.  She's stealing your life away from you again?

710

1    A.   Yes.

2    Q.   A hundred thousand dollars --

3    A.   Yes.

4    Q.   -- stolen from you?

5    A.   Yes.

6    Q.   All because of Judge Wright?

7    A.   I have something interesting to say about that.

8    Q.   Let's hear it.

9    A.   If I may.

10   Q.   Yeah.

11   A.   Judge Schiltz and Judge Schultz, two judges, very nice

12   men, gave me the benefit of the doubt.  And when I lost the

13   case to Judge Wright, because my grievance is she didn't

14   give me a jury trial, this Judge Schiltz and Schultz, one's

15   a judge and one's a magistrate, they were willing to take a

16   walk with me on the deal.  And what I had done is, yes, they

17   were similar, very -- they were the same case only the

18   breach of contract, which they have squares on the front of

19   the civil cover sheet, all kinds of different things you can

20   file for, and the original one was breach of contract, but

21   they had another little square which was Americans With

22   Disabilities Act.  The big complaint with the insurance

23   company and Judge Wright was that George Tallman was

24   disabled and that's -- and there had been some

25   misrepresentation of his physical condition, which they

IVERS - CROSS

1    never proved, that she dismissed the case.  Well, I said,

2    well, if George Tallman is disabled, then wouldn't he

3    qualify under the American Disabilities Act?  And they had a

4    box that I could check, and I checked that box and --

5    Q.  Well, that was the theory you wanted --

6    A.  -- and I took it down to the --

7    Q.  I will try to help a little bit here.

8    A.  I took it to this federal courthouse right -- I took it

9    to the one in Minneapolis, and Judge Schiltz and Schultz

10   said we are going to work with you on that.  They said

11   here's your problem.  They said you need to define more

12   precisely what -- how he falls under the American

13   Disabilities Act.  And he said to do that --

14   Q.  And I'm going to have to interpret you, so we can

15   hopefully still get out of here at five.

16   A.  -- to do that Lora can call me.

17   Q.  No.  Please let me ask this next question.  They called

18   you and said, though, it was because of Judge Wright.  And

19   that made you really angry that you couldn't do your second

20   federal lawsuit, right?  She stole your life.

21   A.  I am in no rush to get out of here at 5:00.  I just go

22   straight back to jail.  I'm actually in a rush to stay here.

23   We can go till six if you want.

24   Q.  I'm going to show you Exhibit 15.  You were so mad at

25   Judge Wright to hear again that she was stealing your life.

IVERS - CROSS

```
1    You said earlier today that you are still in an absolute
2    tailspin over what Judge Wright did to you, right?
3    A.  Now what point are you trying to bring up right now?
4    What are you asking me?
5    Q.  So that you were angry with Judge Wright during that
6    phone call with the lawyers, weren't you?
7    A.  Towards the end of it --
8    Q.  Yes.
9    A.  -- there might have been a little dust up.
10   Q.  Right.  And you told them that this fucking judge stole
11   my life from me, right?
12   A.  Yeah.  Well, you want to know what?  That's what they
13   wrote down.  I, quite frankly, hardly even remember the
14   phone call.  I am only agreeing just to go along to get
15   along.  They said all of this, and I'm nodding and saying
16   yeah.  I don't remember any of it.  Okay?
17   Q.  Well, you testified earlier you didn't say any of it,
18   and now you say you don't remember it.
19   A.  Well, that's the same thing.
20   Q.  You told them that "This fucking judge stole my life
21   from me," didn't you?
22   A.  How could I remember the entire contents of a phone
23   conversation?
24   Q.  You told them, "I had overwhelming evidence."  But Judge
25   Wright did not give you a jury trial, did she?
```

IVERS - CROSS

1    A.  This is why it should have been tape-recorded.

2    Q.  These notes are written down.

3    A.  Had it been tape-recorded, there would be no confusion.

4    They are two very professional lawyers.  They should have

5    out of professional protocol hit a button in their office

6    and tape-recorded the conversation.  Then none of this would

7    happen.  None of us would be here.  All they had to do was

8    record it.

9    Q.  Mr. Ivers, do you remember telling them that the "judge

10   stacked the deck to make sure I lost this case"?

11   A.  Yeah.  Well, she did.

12   Q.  Do you remember telling them that you didn't read the

13   fine print, 30 days you missed, she's lucky there was not

14   that hearing because you're going to throw some chairs,

15   right?

16   A.  You want to know what?  Like I said, I've basically been

17   nodding and saying yeah.  I really don't remember

18   everything, like she says, contemporaneously and verbatim.

19   I just -- I would be a liar if I tried to say that I could

20   note for note go over that phone conversation.

21   Q.  But so you are admitting that you were angry with Judge

22   Wright during your phone call with these lawyers, right?

23   A.  Yeah, what I am admitting is that the phone call should

24   have been recorded.

25   Q.  That's not my question.

IVERS - CROSS

1    A.  And so --

2    Q.  You are admitting that during that phone call with those

3    lawyers you were angry with Judge Wright; isn't that right?

4    A.  Is your final point on this this last statement, you

5    don't know the 50 ways?  Is that the point you are trying to

6    make?

7    Q.  Sir, during your phone call with those lawyers you were

8    angry with Judge Wright, weren't you?

9    A.  Towards the end they got my ire up because every time,

10   you know, I hear her name I do get a little mad.  Yeah, I

11   do.  I wanted a jury trial, and she wouldn't give one to me,

12   and then she decides to go against me.  Gee.  Go figure.

13   Q.  She went against --

14   A.  The judge says I don't want you to have a jury trial,

15   and then she decides against me.  Had we had a jury trial, I

16   would have a sweet taste in my mouth if I lost, because I

17   would have been treated squarely by, one, two, three, six

18   citizens and none of this would be happening.  We wouldn't

19   have any of this.  I wouldn't have been jailed.  Nothing.  I

20   would -- because six people would have said I was wrong, and

21   I would have walked away from it, but because I was denied a

22   jury trial and then the very person who denied that trial to

23   me sided against me.

24          Now, each one of you take that home tonight when

25   you are sitting around and think about it.  The very judge

1    that says I'm not going to give you a jury trial and then

2    she decides against you.

3              Your other option was to have six people sit and

4    listen and have the six decide.  Now, come on.  This is a

5    federal judge of high standing.  Their names are honorable.

6    The Honorable Judge Wright.  Well, the honorable thing to do

7    would have been to give me a jury trial.  She and I had huge

8    sparring fights.  It's -- you know, I told Judge Wright, I

9    said, Judge Wright, I like you, I did, and she smiled.  And

10   I said, listen, I got to tell you the truth, I don't trust

11   judges, I want to have a jury trial.  It's in the transcript

12   of the hearing.  And she said no, I'm not going to give you

13   a jury trial, and then she decides against me.  All I wanted

14   was six people to hear the case.

15   Q.  And she decided against you.  And then she didn't let

16   you have a new hearing, did she?

17   A.  I screwed up on the hearing because I got it too late,

18   but judges have the power to do anything they want.  And she

19   should have said, you want to know what, I'm going to let

20   you have the -- whether you are on time or not.  Judges are

21   so powerful.

22   Q.  All right.  And she didn't let you have -- she in

23   her power --

24   A.  Well, she decided against me.  She probably thought this

25   is wonderful, he screwed up on the potential of a new trial.

IVERS - CROSS

1   Q.  That's right.  Even with the power that she could have

2   given you another trial and she didn't, did she?

3   A.  Yeah.  Had I filed the papers, had I filed the papers in

4   time, I could have gone in there and argued my case and she

5   still could have thrown it out.

6   Q.  Well, you had the beautiful motion and she still would

7   not --

8   A.  I know, but I didn't get it in on time.  I filed it

9   about three days late, in hopes that maybe they would accept

10  it.  And if she was an honorable judge, an honorable one,

11  she would have said, you want to know what, it looks good,

12  I'm going to give you a second shot.

13  Q.  She's not an honorable judge to you, is she?

14  A.  No, she's not.

15  Q.  I mean, you really hate her.

16  A.  I think she should be thrown off the bench.  And that's

17  why I sent the letter to Judge Tunheim.  I wanted him to

18  intercede and walk down to her office and say, How could you

19  be so goddamn dumb?  You went against this guy.  Look, he

20  has uncontrovertible evidence in this case.  He's a Joe

21  six-pack.  You decided with the towers of power against this

22  poor little guy, who is living in his car.  What is wrong

23  with you?  You could have at least sided against the

24  insurance company.  They have all the muscle, all the power.

25  They could have filed an appeal, taken it to an appellate

1    court, and then everything would be happy and copacetic.

2    Instead, she picks on the weakest, tiniest little kid on the

3    playground and beats him up.

4    Q.  She picked up -- picked out on you?

5    A.  Yes.

6    Q.  She took all that money away --

7    A.  Everybody in this room knows that Judge Wright and I

8    have a grievance with each other.

9    Q.  And that's why you said you don't know the 50 different

10   ways I plan to kill her, didn't you?

11   A.  I never said that.

12   Q.  You saw those attorneys testify before --

13   A.  Listen, since you brought it up --

14   Q.  I'm asking you a question right now.

15   A.  -- since you brought it up --

16   Q.  Sir.

17   A.  -- in this courtroom I have been accused of saying you

18   imagined --

19          THE COURT:  Mr. Wright -- Mr. Ivers, you are going

20   to have to proceed by way of question and answer.  We got a

21   little off here.  Okay?

22          THE DEFENDANT:  Okay.

23          THE COURT:  But listen carefully to Ms. Allyn.

24   Try to listen carefully to her question and then try to

25   respond to it, because if you don't, she's going to move to

IVERS - CROSS

1    strike it, whatever, if it doesn't respond to her question,

2    and I'll have to rule.  Okay?

3              So, Ms. Allyn, do you want to pose a question?

4              MS. ALLYN:  Thank you, Your Honor.

5    BY MS. ALLYN:

6    Q.  Mr. Ivers, you see in front of you the verbatim notes

7    taken by Lora Friedemann, don't you?

8    A.  Yes.

9    Q.  And you heard her testimony here today and yesterday in

10   this courtroom, didn't you?

11   A.  Yes.

12   Q.  And she told you that what you see on Exhibit 15 is what

13   she wrote down that you said and she wrote that down

14   verbatim, right?

15   A.  Yes.

16   Q.  You saw how emotional Lora Friedemann got when she

17   talked about hearing those words that you said, right?  You

18   saw her --

19   A.  I'm a little emotional five months in jail and looking

20   at a 15-year prison sentence and a half-a-million-dollar

21   fine too.  I'm a little emotional about that.  I'm looking

22   at a 15-year prison sentence here and a

23   half-a-million-dollar fine.

24   Q.  Are you claiming that you did not say this, You don't

25   know the 50 different ways I plan to kill her?

IVERS - CROSS

1    A.  I'll tell you what I heard that woman say yesterday.

2    She said, and my attorney has the note, she said Mr. Ivers

3    said I imagined --

4             MS. ALLYN:  Your Honor.

5             THE DEFENDANT:  -- 50 different ways.

6             THE COURT:  Okay.

7             THE DEFENDANT:  She said -- she said I imagined 50

8    different ways.

9             THE COURT:  The question pending -- the question

10   that's pending before you, Mr. Ivers, that was asked by the

11   lawyer, You saw her.  That's Ms. Allyn's question.  She's

12   asking about your seeing Ms. Friedemann yesterday.  That's

13   the --

14            THE DEFENDANT:  Ms. Friedemann is a liar.  She's

15   come up with --

16            THE COURT:  No, no, no.

17            THE DEFENDANT:  -- four different stories.

18            THE COURT:  No, no.

19            THE DEFENDANT:  Imagined, plan, planned, thought.

20   These people have five different stories that they tell, and

21   my attorney will do it in closing argument.  I'm looking at

22   15 years in prison.

23            THE COURT:  Okay.  Mr. Ivers, the jury is going to

24   be very confused.  I'm talking over you.  Okay?

25            So, Ms. Allyn, would you pose a new question?

1   BY MS. ALLYN:

2   Q.  Mr. Ivers, are you saying that Lora Friedemann, an

3   attorney for 23 years, is a liar?

4   A.  At her June 18th hearing she said that -- she said it in

5   front of this jury, if you were listening yesterday.  She

6   said Mr. Ivers -- he had her read it in front of this judge.

7   She swore in front of this judge.  It said Mr. Ivers says I

8   imagined 50 different ways to kill her.  Well, number one is

9   I didn't say that; and number two is if somebody did imagine

10   50 different ways to kill her, that's not against the law.

11   Now, two sentences after she said that, two sentences after

12   she said that -- my attorney wrote it down.  It's on -- we

13   can have it brought up on the transcript.  She goes

14   Mr. Ivers said I had imagined 50 different ways.  Now you

15   have planned here.  I didn't say any of them.

16           And, furthermore, they should get their story

17   straight.  They have five different allegations.  Do you

18   understand I am looking at 15 years in prison here for five

19   different allegations?  These people can't even get their

20   story straight.  When they went to the original grand jury,

21   they went with he had a plan to kill her.  Well, three weeks

22   ago they had to run up and change it.  I have been sitting

23   in jail on a charge that wasn't even valid.  They had to go

24   up and revalidate it four weeks ago and change it again.

25   Q.  I'm going to ask you another question.

1  A.  Do you understand I have lost my life?  You've put me in

2  jail for five months.

3          MS. ALLYN:  I move to strike with respect to the

4  comments as to --

5          THE COURT:  You should ignore the last response of

6  the witness.

7          THE DEFENDANT:  Yeah, ignore.  I lost my life.

8  BY MS. ALLYN:

9  Q.  Now, your anger at Judge Wright is because she denied

10  you a jury trial and she cheated you out of the money,

11  right?

12  A.  I am angry at Judge Wright because she is the worst

13  possible example of justice.

14  Q.  You were so mad at her that you were willing to call her

15  a racial slur, right?

16  A.  I was so mad at her that I was willing to call her a

17  racial slur, yes.  And is that against the law?  What crimes

18  here were against the law?  Well, you sent Judge Tunheim a

19  letter.  Why wasn't I arrested?  Because it's not against

20  the law.  They have done nothing but sling mud for three and

21  a half days.  And you will notice not one time, not once,

22  was I arrested, not once did these guys say we took him in,

23  we gave him a beating in the alley, he's a piece of scum, we

24  arrested him, not one time, because, you know why, you can

25  send a letter to a judge.  And you can tell a judge to go

IVERS - CROSS

1    fuck himself; and if he wants to hold you in contempt of

2    court, that's his prerogative.  But the point is I broke no

3    laws.  I stood up for myself.  I consider --

4              THE COURT:  Okay.  We're going --

5              THE DEFENDANT:  -- myself a dignified individual.

6              THE COURT:  Court is going to adjourn, ladies and

7    gentlemen.  It may be for the day; it may not be for the

8    day.  I need to visit with the lawyers.

9              THE CLERK:  All rise.

10             THE COURT:  We will be in recess.

11             THE DEFENDANT:  You got to always look at the

12   evidence.  In this case there is no evidence.  You got an

13   arrest warrant?  No evidence.

14             **IN OPEN COURT WITHOUT THE JURY PRESENT**

15             THE COURT:  Please be seated.

16             I need to ask both sides here, Is there a way to

17   have Mr. Ivers off site and available by video in this

18   courtroom?

19             MS. ALLYN:  We could look into it, Your Honor.  We

20   don't know that answer right now.

21             THE COURT:  All right.

22             MS. ALLYN:  Perhaps, Your Honor, if I could have

23   the court help direct when Mr. Ivers is not responding to

24   the questions.

25             THE COURT:  Well, I haven't been successful,

———— IVERS - CROSS ————

1    counsel, thus far.  So I'd like to be optimistic that it

2    could.

3             But, Mr. Ivers, you can't behave this way and --

4             THE DEFENDANT:  Judge, I have been under a lot of

5    pressure.  You have to cut me a little bit of latitude.

6    Now, you want to know what?  I feel like I got in my two

7    cents' worth.  I feel like I vented, and I'm prepared to be

8    a good little boy.

9             THE COURT:  Well, we pride ourselves on proceeding

10   in an orderly fashion.  Okay?

11            THE DEFENDANT:  I promise to do that.

12            THE COURT:  And you have been way out of order.

13            THE DEFENDANT:  You want to know what?  I'm under

14   a lot of pressure here, judge.  I'm looking at 15 years in

15   prison, a half-a-million-dollar fine.  I was jerked out of

16   society.  I have been in jail for five months.  You got to

17   cut me a little slack here.

18            THE COURT:  Well, everybody that's working here is

19   under a lot of pressure.

20            THE DEFENDANT:  Not 15 years in prison.

21            THE COURT:  Well, I understand.

22            THE DEFENDANT:  So you want to know what?  I got

23   out what I wanted to say.

24            THE COURT:  Okay.

25            THE DEFENDANT:  I am relaxed now and --

724

IVERS - CROSS

1          THE COURT:  Okay.  Ms. Allyn, how many more

2     questions -- how much more testimony do you anticipate?

3     Because we've got redirect yet.

4          MS. ALLYN:  Yes, Your Honor.  I could try to wrap

5     this up in the next 15 minutes.

6          THE COURT:  Okay.  Well, I need some input.

7          Mr. Scott, should we continue this evening, or do

8     you think we're better put over till tomorrow?

9          MR. SCOTT:  No.  I think we should continue this

10     evening, Your Honor.

11          THE COURT:  All right.

12          MR. SCOTT:  I think a lot of it, as you know, as

13     all the lawyers are doing in this case, and we are certainly

14     included, it gets repetitive, and I think at a certain point

15     we are going to get repetitive.  If she doesn't wait -- and,

16     Your Honor, I would say this.  I thought she was baiting him

17     and that's why she was letting him go, in hopes that he

18     would go off like a tea kettle.  And she has to hold him up

19     immediately.  If she wants to stop him, she has to stop him

20     immediately, because you will back her up.  We know that.

21     And she let him run; and, you know, whether she succeeded in

22     getting the baiting, it's a matter for the jury.

23          THE COURT:  All right.

24          MR. SCOTT:  But I think if she holds him under

25     control, you will back her up.

IVERS - CROSS

1       THE COURT:  All right.  Well, here's what I need

2   from you and counsel for the government.  Here's what I need

3   from you and counsel for the government.  I don't know what

4   to tell the jury about what's happened this afternoon so I

5   can refocus them on their role.  So I'm looking for input

6   from both of you, because, you know, the environment that

7   the -- I think Chief Justice Hughes said the judge was

8   supposed to be the, quote, governor of the trial.  So I

9   don't feel very much like a governor, okay, that's supposed

10   to be in control.  So if you have got some way we can

11   refocus the jury on the seriousness, despite the behavior of

12   the defendant.  They still have to assess the credibility of

13   the many witnesses.  There is some conflicts here.  So I

14   need your input.  What do you think I should be telling

15   them?

16       MR. RANK:  Your Honor, I think the jury

17   instructions that they are going to get are sufficient in

18   this case, the jury instructions that they are going to get

19   at the close of trial.  I don't think you need to focus on

20   any aspect of what's taking place in the courtroom, and I

21   think to do so would actually be to focus on something too

22   much.

23       THE COURT:  All right.

24       MR. RANK:  The instructions themselves properly

25   instruct the jury.  The instructions themselves properly

IVERS - CROSS

1    instruct them on their role in the case.

2              THE COURT:  Mr. Scott, have you had a situation

3    like this before?

4              MR. SCOTT:  I've had a number of them, Your Honor.

5    My clients walk off the stand and out the back door.

6              THE COURT:  Do you think the instructions that

7    Mr. Rank talked about are sufficient to --

8              MR. SCOTT:  Yes, I do.

9              THE COURT:  Okay.  All right.

10             MR. SCOTT:  I think the instructions you are going

11   to give the jury will do so, Your Honor.  I may not agree

12   with the ones you give, but that's a different statement.  I

13   think the ones that we planned for about the jury's role,

14   about credibility of witnesses, about the fact that there

15   are elements and that that's what has to be proven, all of

16   that I think is -- will handle with the jury.  I think the

17   jury may well -- I think the jury brings their common sense

18   here, and I think the jury clearly understands what's going

19   on here, and I think they can make their judgments based on

20   that.

21             THE COURT:  Ms. Labriola, do you want to retrieve

22   the jurors?

23             THE CLERK:  All rise.

24         **IN OPEN COURT WITH THE JURY PRESENT**

25             THE COURT:  Okay.  Please be seated.

IVERS - CROSS

1        Ladies and gentlemen, I know the first thing you

2    are wondering is how long we are going to be here, and I

3    asked the lawyers that during the recess.  Ms. Allyn

4    believes she's going to be 15 minutes.  She's not held to

5    that, but she anticipates that's how long she will be.  And

6    then there may be some redirect.  You will be out of here by

7    5:30.  Okay?

8        So, Ms. Allyn, you may proceed.

9        MS. ALLYN:  Thank you, Your Honor.

10   BY MS. ALLYN:

11   Q.  Mr. Ivers, are you ready for me to ask a question or

12   should I give you a moment?

13   A.  Go ahead.

14   Q.  On direct testimony here today, you claimed in your

15   phone call with the two lawyers that you didn't make any

16   threats about Judge Wright at all; is that right?  Am I

17   understanding that right?

18   A.  They called me.  I didn't call them.

19   Q.  I am going to try to do this better.  Listen to my

20   question.  When you were testifying with Mr. Scott --

21   A.  Yes.

22   Q.  -- on direct, you claimed in the phone call with the

23   attorneys that you didn't make any threats at all.  That's

24   how you testified, right?

25   A.  That's correct.

IVERS - CROSS

1   Q.  That you never made any threats --

2   A.  Correct.

3   Q.  -- about Judge Wright?

4   A.  Correct.  I think -- if I said that, you want to know I

5   will stand by it.

6   Q.  You testified that you never talked about how you had a,

7   planned 50 different ways to kill Judge Wright.

8   A.  I never said that.

9   Q.  You never said anything like that at all?

10  A.  Never.

11  Q.  And so having heard the testimony from the lawyers where

12  they testified and said you did say you don't know the 50

13  different ways I plan to kill her, are you saying then that

14  they are lying?

15  A.  Yes.

16          MR. SCOTT:  I'm going to object, Your Honor, to

17  him -- I think that's an improper form of the question.  Him

18  calling other witnesses liars.  But I also want to object

19  that her statement that those lawyers that said it was a

20  plan is improper.

21          THE COURT:  Sustained.  Sustained.

22          MS. ALLYN:  Your Honor, if I could have direction

23  on what objection was -- what was sustained.

24          THE COURT:  Well, I think he was saying the form

25  of the question was improper.  That was the basis of his

IVERS - CROSS

1    objection, at least that's what I read.

2             Am I correct?

3             MR. SCOTT:  That's correct, Your Honor.

4    BY MS. ALLYN:

5    Q.  Mr. Ivers, when they testified that you made the

6    statement you don't know the 50 different ways I plan to

7    kill her, that they were lying?

8    A.  Yes.

9    Q.  Now, sir, you know that when you use words about a judge

10   such as using the word "dead," you are going to get in

11   trouble for it.  It's going to be considered threatening to

12   people, right?

13   A.  In what context?

14   Q.  Well, you were charged in Hennepin County in 2016 for

15   leaving messages with Judge McShane; isn't that right?

16   A.  Yes.

17   Q.  And you left messages on a voicemail for Judge McShane

18   that said things like you are going to treat me with F'g

19   respect, you are going to find out who you're F'g with, you

20   are going to see the F'g male is, you, dead F, right, to

21   Judge McShane?  Those are some of the statements, right?

22   A.  It's a -- it's a tough bar room term.  It's called a

23   dead fuck.

24   Q.  Mr. Ivers.

25   A.  It means you are a loser.

1   Q.  Mr. Ivers, you were charged in Hennepin County with

2   making --

3   A.  Well, that's how I said dead, dead fuck.

4   Q.  Okay.  So you admit that you left messages for Judge

5   McShane in Hennepin County, including calling him a dead

6   fuck, right?  You admit that?

7   A.  It's -- it's a tough bar room expression meaning loser.

8   Q.  I know.  But you were then charged in Hennepin County

9   with terroristic threats and stalking by making repeated

10   phone calls; isn't that right?

11   A.  I was found not guilty.

12   Q.  So my question is, You were charged in Hennepin County

13   with terroristic threats and --

14   A.  And found not guilty.

15   Q.  -- and found guilty of a stalking charge by making the

16   phone ring repeatedly with these messages, such as dead

17   fuck, right?

18   A.  I was found guilty because I made a phone call, you have

19   to call at least twice, and it was his clerk who I didn't

20   even know.

21   Q.  Right.

22   A.  But I got charged with it.

23   Q.  You made sixteen different phone calls.  And the judge's

24   clerk got all those messages, didn't she?

25   A.  Yes, except for they were all for the judge.

IVERS - CROSS

1   Q.  And you -- the messages also said you F'g pig and talked

2   about ripping out a fucking C-U-N-T, a woman's body part.

3   All of that were part of the messages, right?

4   A.  I was exonerated for the charge.

5   Q.  But you were found guilty of the stalking charge

6   involving the clerk who heard it, right?

7   A.  It's only because I made a phone ring more than two

8   times.

9   Q.  Well, it's not only that you made a phone ring more than

10  two times.  The jury also had to know that the law clerk who

11  heard the messages had felt threatened or oppressed, right?

12  A.  You'd have to be at the trial.  She wasn't threatened at

13  all.  I had a bad lawyer.

14  Q.  Well, the jury found you guilty of that.  And you admit

15  to leaving those messages, right?

16  A.  Say the last part.

17  Q.  You admit to making those messages, right?

18  A.  I admit to calling that judge, yes.

19  Q.  And you weren't joking around when you were leaving

20  those messages at all, were you?

21  A.  I wasn't joking around at all, and I was acquitted of

22  all charges by a jury.  Jury.

23  Q.  You were not acquitted of the charges for stalking by

24  phone for all of the messages that the law clerk had to

25  hear, right?

IVERS - CROSS

1   A.  I didn't even know the girl.  She just fetched up the

2   judge's calls.

3   Q.  That's right.  And what you learned then from that trial

4   is that a third party can hear your threatening words and

5   you are going to be found guilty of those threatening words,

6   right?

7   A.  Not necessarily.

8   Q.  But that's what happened in Hennepin County in 2016.

9          MR. SCOTT:  I'm going to object, Your Honor.  I

10  think what she said is he was convicted of making phone

11  calls, not of making threats.

12          THE COURT:  Okay.  Ladies and gentlemen, I've got

13  to read you an instruction.  Remember when I told you in

14  preliminary instructions that you get instructions during

15  the trial?

16          You've just heard evidence about Mr. Ivers'

17  charges in Hennepin County.  I believe they came about in

18  2016.  He was charged with two things.  He was charged with

19  stalking by phone, and he was charged with --

20          What's the other charge, counsel?

21          MR. SCOTT:  Terroristic threats, Your Honor.

22          THE COURT:  Terroristic threats.  The jury found

23  him not guilty of terroristic threats.  The jury found him

24  guilty of stalking by phone.

25          Now, here's the way you have to treat this under

733

IVERS - CROSS

1    the law.  You may decide that by considering all of the

2    evidence -- let me back up.  So the evidence that you have

3    heard or will hear about the underlying Hennepin County

4    charges that Ms. Allyn has just asked Mr. Ivers about, you

5    may consider this evidence only if you unanimously find it

6    more likely true than not true.  You may decide that by

7    considering -- you may decide that by considering all of the

8    evidence and deciding what evidence is more believable.

9    This is a lower standard than beyond a reasonable doubt.

10            If you find this evidence, "this evidence"

11   referring to the Hennepin County evidence, charges, then you

12   may consider it to help you decide Mr. Ivers' intent,

13   knowledge or absence of mistake with regard to the

14   indictment with which he's been charged here in the District

15   of Minnesota.  You should give this evidence the weight and

16   value you believe it is entitled to.  If you find that this

17   evidence has not been proved, you must disregard it.

18            You should remember even if you find the defendant

19   may have committed these acts or similar acts in the past,

20   this is not evidence that he committed such an act in this

21   case, "this case" referring to the two-count indictment that

22   we're here about in the District of Minnesota.  Mr. Ivers is

23   on trial only for the crimes charged here in this District

24   of Minnesota, and you may consider the evidence of the prior

25   acts only on the issue as stated above.

IVERS - CROSS

1          You may proceed.

2          MS. ALLYN:  Thank you, Your Honor.

3   BY MS. ALLYN:

4   Q.  Mr. Ivers, this was, what, like a two-day trial in

5   Hennepin County; is that right?

6   A.  Yes.

7   Q.  And it was January of 2016?

8   A.  Well, it was a real trial, and we did it, and I was

9   acquitted, so whatever it was, it was.

10  Q.  I'm sorry.  I had the wrong date.  January of 2017.

11  Sound right?

12  A.  If you say so.

13  Q.  And you sat in that courtroom listening to the testimony

14  and listening to the judge; isn't that right?

15  A.  That's correct.

16  Q.  And you understood that in order to be found guilty of

17  that stalking charge that the victim would have to feel

18  frightened, threatened, oppressed, persecuted or

19  intimidated, right?

20  A.  Is the way it is drafted, I think that's how they draft

21  it up.

22  Q.  Okay.  You heard the judge say that to the jury, right?

23  A.  I think maybe after the case, not prior to the case.

24  Look, this is a long time ago, and I sat there and just

25  listened.  You know, when you people give out these

IVERS - CROSS

1    instructions, I basically just say yes and nod my head

2    because it is what it is; but if those were the

3    instructions, they were the instructions.

4    Q.  And it was just a year ago, January 2017, right?

5    A.  My memory is gone.

6    Q.  And it was before you made the threat against Judge

7    Wright, right?

8    A.  I didn't make any kind of a threat against Judge Wright.

9    Stop trying to entrap me.

10   Q.  You learned from your conviction in Hennepin County that

11   your words can cross the line and make people feel scared

12   and threatened?

13   A.  I was not -- you want to know what?  It is not against

14   the law to be angry, now that you brought it up.  You can be

15   as angry as you goddamn want.  See?  Right there.  It's not

16   against the law.

17          You want to arrest me, marshal?

18          It's not against the law to be angry.  Now, I sent

19   those judges letters.  If it's against the law, then they

20   should have arrested me.

21   Q.  Sir.

22   A.  Just piling it on.

23   Q.  Sir, the judge in that -- at sentencing told you that

24   it's not against the law to be angry, but it is against the

25   law to cross the line, didn't she?

1          MR. SCOTT:  Your Honor, I'm going to object.  It's

2    hearsay, Your Honor.

3          THE COURT:  Sustained.

4    BY MS. ALLYN:

5    Q.  Now, Mr. Ivers, during that trial in Hennepin County you

6    were admonished about your behavior towards Judge Wright,

7    weren't you?

8    A.  I don't remember.  I don't remember any of that.

9    Q.  Would it help if you looked at your sentencing

10   transcript where the judge there admonished you about the

11   letters you were sending Judge Wright?

12         MR. SCOTT:  I'm going to object.  That's hearsay,

13   Your Honor.

14         THE DEFENDANT:  Those letters were --

15         MR. SCOTT:  Hold it.

16         THE COURT:  Overruled.  Overruled.

17         You may proceed, counsel.

18   BY MS. ALLYN:

19   Q.  Would you like to see the sentencing transcript to be

20   reminded of how that judge admonished you about what you

21   were doing to Judge Wright?

22   A.  I'll just take your word for it.

23   Q.  You don't have to take my word for it.  I will show you

24   the transcript.

25   A.  Well, in the efficiency of time, everyone is trying to

─IVERS - CROSS─

1   get home and everything, I'll just take your word for it.

2   That's fine.

3   Q.  And so at your sentencing hearing, which occurred

4   January of 25, 2017, you were warned that your

5   correspondence with Judge Wright was concerning and going to

6   cross the line, weren't you?

7            MR. SCOTT:  I'm going to object, Your Honor.  I

8   mean, it's also a legal conclusion by somebody who doesn't

9   know what the law is, which is a state court judge, and has

10  no idea what federal law is.

11           THE COURT:  Okay.  The evidence of the sentencing

12  that's just been offered, the judge, is only for notice.

13  You can't use it for any other reason.  It's notice to the

14  defendant.

15           THE DEFENDANT:  I'm always concerned in a case --

16  BY MS. ALLYN:

17  Q.  There's not a question before you, sir.

18  A.  And there's no evidence.

19  Q.  Well, there's --

20  A.  If we would have just had a recording.

21  Q.  You were also warned repeatedly by Deputy Hattervig --

22  A.  I could care less.

23  Q.  I haven't asked the question yet.

24  A.  Yeah.  Fine.

25  Q.  You were asked repeatedly by deputy -- warned, warned

IVERS - CROSS

1    repeatedly by Deputy Hattervig that your words were

2    threatening people.

3    A.  Tough shit.

4    Q.  That your words were scaring people.

5    A.  Hey, arrest me.

6    Q.  And Deputy Hattervig is a pretty nice guy, isn't he?

7    A.  No.  He was -- tape-recorded our conversations.  He was

8    a slime ball, actually.  He baited me.  He pretended to be

9    my friend.

10   Q.  Hold on.

11   A.  He cozied up to me and he tried -- he asked me, he said,

12   What are you going to do to Judge Wright if you lose this

13   trial?  He actually tried to bait me before the trial even

14   happened to say something that could get me arrested.

15   Q.  I need you to not talk.

16   A.  No.  He's a slime ball.  He's not my friend.

17   Q.  So I'm going to show you here what's Exhibit 1, and this

18   is about page 5.  And this is pretty much the first letter

19   that we have been talking about in your trial sent the end

20   of October 2017.  And I'm sure you remember it; 8, 9 say I'm

21   becoming a very dangerous person.  Remember that letter?

22   A.  Yeah.  Mm-hmm.

23   Q.  And this is before you talked to Deputy Hattervig

24   January 4th, isn't that correct, for your pretrial?

25   A.  Yes.

IVERS - CROSS

1    Q.  Right?  And Deputy Hattervig wanted to talk to you about

2    this letter that you sent before -- had sent -- he wanted to

3    ask you about this letter, right?

4    A.  Yeah.

5    Q.  And he told you that based just on this letter, just

6    saying I'm becoming a very dangerous person, that is raising

7    a red flag, that they're worried will it mean he's going to

8    try and kill the judge or something, right?

9    A.  Why would they think that?

10   Q.  But he told you they thought that.  Whether you agree or

11   not, he told you that, right?

12   A.  You want to know what?  Here again, there's no

13   transcript or recording.  I don't -- no.  And I don't

14   remember him saying that to me.

15   Q.  Okay.  Would you like to hear the transcript?  Or you

16   heard it in court earlier when Deputy Hattervig testified

17   and he warned you that they have got to take that stuff

18   seriously, right?

19   A.  That's what he said.

20   Q.  Yep.

21   A.  That doesn't mean it took place.

22   Q.  Well, Deputy Hattervig also told you that the court gave

23   him a copy of that letter because they were afraid it was

24   threatening.  He told you that, right?

25   A.  I don't -- you know, I just don't remember.

IVERS - CROSS

1    Q.  Is it easier to show you the transcript from January 4th

2    and then you can remember?

3    A.  You want to know what?  If it will get the jury home to

4    their dinner, I will say that I remember it, because it's

5    bullshit.  It doesn't mean anything anyways.  You want to

6    know why I was becoming dangerous?  Because I was going to

7    stick my hand in the fan of my car.  I was going crazy.  I

8    wanted my trial to happen.  It's an innocuous term.  It

9    doesn't direct itself at anything.  It just says I am

10   becoming dangerous.

11   Q.  Now, Mr. Ivers --

12   A.  I might jump off a bridge.

13   Q.  Mr. Ivers.

14   A.  All it was was to get the court moving.

15   Q.  Mr. Ivers, Deputy Hattervig also told you during that

16   January 4th, 2017, interview that your words are scaring

17   people, right?

18   A.  Well, that's his opinion.

19   Q.  Yes.  And he let you know that that wasn't just his

20   opinion.

21   A.  I could give a damn about his opinion.  Fuck him.

22   Q.  Then you sent even more letters in August?

23   A.  Arrest me.

24   Q.  And I showed you all of those letters in August, right?

25   A.  Where's the arrest report?

1   Q.  And so Deputy Hattervig and Deputy Farris Wooton came to

2   talk to you again September 1st.

3   A.  Here again, none of this is against the law.  I was

4   never arrested.

5   Q.  Sir.

6   A.  Anybody can send it.

7          THE COURT:  Mr. Ivers.  Mr. Ivers, you have to let

8   her ask a question.  Then you have to try to answer.

9          THE DEFENDANT:  Did I send more letters?  If you

10  say so.

11  BY MS. ALLYN:

12  Q.  Well, we just looked at all those letters.

13  A.  Well, yeah, they are boring.

14  Q.  And so Deputy Hattervig came to talk with you again.

15  And you were impressed that he found you, right?

16  A.  No.  I know what he did.  He hammered down on some

17  illegal Mexicans in Hopkins and asked where I was.  It was

18  real poor cop work, to tell you the truth.

19  Q.  And the time Deputy Hattervig is showing up at your

20  house September 1st, you've also called the clerk and said

21  I'm a walking bomb, right?

22  A.  Yes.

23  Q.  And so Deputy Hattervig wanted to tell you that's

24  scaring people, they think it's threatening, right?

25  A.  Yeah.  Well, boohoo.

IVERS - CROSS

1    Q.  And so Deputy Hattervig told you, hey, it's the same

2    thing I talked to you about before, they get frightened.

3    You had called in and said, hey, I'm a ticking time bomb.

4    And you disagreed with that and said, yeah, I am a ticking

5    time bomb, didn't you?

6    A.  Yeah.

7    Q.  And so Hattervig tries to continue with you and say, but

8    people are taking that as threatening.

9    A.  I could give a damn.

10   Q.  But he warned you that that's how people --

11   A.  So what.  Fuck him.

12   Q.  And, in fact, you agreed with Deputy Hattervig.  You

13   said yeah, when he told you --

14   A.  Good.  I'm glad they're scared.  That's not against the

15   law.

16   Q.  And he said, though, the problem is you are scaring

17   people.  If you are saying you are a ticking time bomb, that

18   makes them think this guy is going to hurt me, right?

19   A.  Arrest me.

20   Q.  But Deputy Hattervig told you that on September 1st,

21   didn't he?

22   A.  This guy went to the indictment with a fake allegation.

23   Q.  Mr. Ivers, that is not the question before you at all.

24          Move to strike.

25   A.  Yeah, I don't care if it scared people.  It's not

1    against the law.

2                MS. ALLYN:  Your Honor, move to strike.

3                THE COURT:  You should ignore the last answer by

4    the witness.

5                THE DEFENDANT:  You will notice none of this is

6    against the law.  There's no arrest warrants.

7    BY MS. ALLYN:

8    Q.  Mr. Ivers, you didn't care about all those warnings from

9    Deputy Hattervig because you were glad that your words were

10   scaring people, weren't you?  You wanted that.

11   A.  I was so beyond anything that anybody in this room can

12   feel.  Damaged.

13   Q.  Which is why you were glad that people were scared by

14   your --

15   A.  I was so damaged --

16   Q.  Sir.

17   A.  -- that I sent --

18   Q.  Sir, please.

19   A.  -- Judge Tunheim a letter that said I was a walking bomb

20   so that he could understand the pain I was feeling.

21   Q.  Mr. Ivers, I want you to listen to this statement.  Tell

22   me if I've got this right from September 1st, when Deputy

23   Hattervig talked to you.  But that F'g judge, you know,

24   she's scared, and if she's fearful, it's not my problem, she

25   made her bed, she's scared, she's fearful, she made her own

IVERS - CROSS

1   decision.  You said that, right?

2   A.  What about it?

3   Q.  Because you are glad she's scared about your words.

4   A.  So what.

5   Q.  You said I'm not interested in Judge Wright sleeping

6   comfortably tonight.

7   A.  And what am I being prosecuted in this room for?

8   Q.  I am asking you that you are glad that Judge Wright is

9   scared about your threatening words, right?

10   A.  Yeah.  She screwed me out of a hundred thousand dollars

11   by not giving me a jury trial.  She stacked the deck.  She

12   stole my life.  You bet.

13   Q.  In fact, when the deputies came to talk to you after you

14   said you don't know the 50 different ways I plan to kill

15   her, you said that F'g judge, you know what, she doesn't

16   sleep very well, good, F her, right?

17   A.  So what.  Big deal.

18   Q.  Because that's what you wanted.  You wanted her to feel

19   scared like that.

20   A.   It's my First Amendment right, freedom of speech, babe.

21   Look it up.

22   Q.  You are a dangerous person, aren't you?

23   A.  No, I'm not.

24   Q.  When Deputy Hattervig came to talk to --

25   A.  Who did I hurt?  Name somebody I have hurt.  How can I

745

IVERS - CROSS

1    be dangerous if I've never hurt anyone?

2    Q.  When Deputy Hattervig came to talk to you first on

3    January 1st and January 4th of 2017, you promised him that

4    this would be all over with once the court ruled, didn't

5    you?

6    A.  I don't remember.

7    Q.  You said this is it, it's all going to be over with,

8    right?  You told him that.

9    A.  Prior to her decision?

10   Q.  That's right.  January --

11   A.  Prior to her decision, I bet you I said that, because I

12   thought there is no way on Mother Earth that that woman can

13   decide against me.

14   Q.  But she did decide --

15   A.  That case was -- I had people in from public -- from

16   adult protection who said that --

17   Q.  Well, wait.

18   A.  -- George Tallman was a wonderfully, perfectly working

19   human being.

20   Q.  Now, Mr. Ivers, you also said that, though, after the

21   ruling, right?

22   A.  Do what?

23   Q.  Mr. Ivers, even on September 1st, 2017, after Judge

24   Wright's ruling, you still promised Deputy Hattervig this

25   could be over, right?

IVERS - CROSS

1    A.  I don't remember.

2    Q.  You said whoever I yelled at, whatever, it's over with.

3    Didn't you say that to Deputy Hattervig on September 1st?

4    A.  I don't know.  I can't remember if I said that to him.

5    Q.  I'll show --

6    A.  I mean, I do -- you know, I think -- I've got to say

7    something.  You have done an absolutely wonderful job with

8    your graphics.  Superior to my team.  Sorry.

9    Q.  Okay.  There's no question before you about that.

10   A.  But -- but -- and the sound is impeccable, and the

11   read-along I have enjoyed that.

12            MS. ALLYN:  May I approach?

13            THE COURT:  You may.

14            THE DEFENDANT:  But some of it I can't remember.

15   BY MS. ALLYN:

16   Q.  Mr. Ivers, directing you to the transcript of

17   September 1st, page 5, you say whoever I yelled at, it's

18   over with, right?

19   A.  Okay.  So.

20            THE COURT:  Ms. Allyn, can you wrap it up here in

21   the next --

22            MS. ALLYN:  Yep.

23            THE COURT:  All right.

24   BY MS. ALLYN:

25   Q.  Sir, it wasn't over with, is it?  It wasn't over with.

IVERS - CROSS

1    You still threatened Judge Wright after that September 1st.

2    A.  I have never threatened Judge Wright ever.  I haven't

3    seen or heard from Judge Wright in two years, other than I

4    filed that motion.

5              MS. ALLYN:  No further questions, Your Honor.

6              THE COURT:  All right.  Mr. Scott, do you have any

7    redirect?

8              MR. SCOTT:  No redirect, Your Honor.

9              THE COURT:  All right.  Ladies and gentlemen, I

10   think I'm safe to tell you, and the lawyers are going to --

11   I haven't had a chance to visit with them, but I'm going to

12   tell you to come at 9:30 in the morning.

13             Mr. Scott, am I safe to conclude that the

14   defendant will rest in the morning or perhaps now or not?

15             MR. SCOTT:  Your Honor, we will rest now.

16             THE COURT:  Okay.  And is there rebuttal on behalf

17   of the United States?

18             MS. ALLYN:  No, Your Honor.

19             THE COURT:  Okay.  Ladies and gentlemen, why don't

20   you come at 9:30.

21             The lawyers and I will be here at 8:30 to work on

22   our instructions.

23             And I can't tell you how much I appreciate your

24   hard work.  I'm privileged to have this job, but one of the

25   great things I get to do is naturalize new citizens.  And I

1     use this line from Justice Brandeis, who used to tell his

2     student Justice Frankfurter, that the highest office that

3     anybody can hold in our country is that of citizen.  And,

4     you know, your devotion to being great citizens, coming

5     here, giving of your time, listening patiently, putting up

6     with the recesses and the delays, you know, I am very

7     impressed by.  I consider myself very lucky.

8            And so if you remember, don't get information from

9     anybody else, don't discuss it with anybody else.  And we'll

10    be here tomorrow at 9:30 when you return.

11           We will be in recess.

12           THE CLERK:  All rise.

13           (Court adjourned at 5:23 p.m., 9-13-2018.)

14       (The following record is made by Mr. Rank and Mr. Scott

15    regarding exhibits.)

16           MR. SCOTT:  Dan Scott for the defense.

17           MR. RANK:  Tim Rank for the government.

18           MR. SCOTT:  We have just gone through the exhibits

19    with the clerk, the government's exhibits and the defense

20    exhibits, and they are now all with the clerk, and we both

21    agree that the contents of the exhibits are correct.

22           MR. RANK:  We agree that they accurately reflect

23    the exhibits that were admitted into evidence and have

24    reviewed all of them such that they can go back to the jury.

25           MR. SCOTT:  Right.

1      (Court adjourned at 5:40 p.m., 9-13-2018.)

2                           *   *   *

3          I, Renee A. Rogge, certify that the foregoing is a

4   correct transcript from the record of proceedings in the

5   above-entitled matter.

6                      Certified by:  /s/Renee A. Rogge
                                      Renee A. Rogge, RMR-CRR
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25