UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No. 18-cr-90-RWP

United States of America,

        Plaintiff,

v.

Robert Phillip Ivers,

        Defendant.

**DEFENDANT'S SENTENCING MEMORANDUM**

"For we must interpret the language Congress chose 'against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.' " *Watts v. United States*, 394 U.S. 705, 708 (1969) (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 270 (1964)). "The language of the political arena, like the language used in labor disputes, is often vituperative, abusive, and inexact." *Id*. (citing *Linn v. United Plant Guard Workers of America*, 383 U. S. 53, 58 (1966)).

Robert Phillip Ivers is an American citizen, born and raised in Minnesota, schooled to believe in the right of the citizen to speak out against the actions of his government. That right, protected by the First Amendment of the United States Constitution, does not depend on being correct in the criticism. Because to so limit that right would mean the freedom to criticize only belongs to those in power to decide what is correct. Criticism of public officials need not be fair or even true. The Supreme Court recently held that it is

unconstitutional to restrict knowing lies told about political opponents. Federal judges, unelected by the people, deserve no more exalted status by virtue of their appointed positions.

"So what," says the Government. That right does not extend to threats to do bodily harm against public officials. Yes it does, said the Supreme Court in *Watts*, at least to some extent. According to the Supreme Court, Watts said, "If they ever make me carry a rifle the first man I want to get in my sights is L.B.J." The Supreme Court ordered that a judgment of acquittal be granted: "We do not believe that the kind of political hyperbole indulged in by petitioner fits within that statutory term." *Watts*, 394 U.S. at 708. Although Mr. Ivers vehemently disagrees that his statements to his attorneys on February 27, 2018 constitute a violation of the law, he knows the Court is bound by the verdict. But the Government does not want the Court to sentence based upon one intemperate sentence said to his attorneys in private. The official version of the Presentence Report mentions the crime in only two of twenty-two paragraphs. This is not to mention another eight paragraphs of other conduct that did not result in arrest, conviction, or any combination of the two. The Government wants Mr. Ivers to be punished for otherwise legal conduct.[1]

If there was ever a doubt, the Government's concluding paragraph makes clear that they equate "threatening" with "harassing" communications. (PSR at ¶ 29.) They note, "for example, Ivers sent threatening letters to two judges in June 2014 and three letters to the same two judges in July 2014." However, those letters are summarized by the probation

---

[1] The official version of the Presentence Report is written by the Government. *See* PSR at ¶ 6.

2

officer in paragraph 47 of the Presentence Report. Although the language allegedly used by Mr. Ivers is crude, at no point is he identified as making an actual threat. Both at trial and in the official version of the facts, the Government highlighted the statement of the state court judge warning Mr. Ivers not to "do it again," referring to behavior that was found not to be legally threatening by a jury, who truly do represent the people of the United States. Apparently Mr. Ivers must live by the verdict of the jury, but the Government need not. In fact, the Government argues that Mr. Ivers is a harsh and unrelenting critic of the courts. Now that he has crossed the line, we can punish him for his protected behavior. That is a natural human emotion—to swat the irritating gadfly—but it should not be part of the Court's calculus.

It is instructive to look at the actual threat, to whom it was made, and the context of the conversation that led to the threat. Lora Friedemann, who received the threat, testified consistently on three occasions that Mr. Ivers said "he had imagined fifty different ways he planned to kill her." [2] That testimony, though found to be a threat by the jury, did not have a declaration that he intended to act presently or in the future. The statement was not made to a person that would normally be expected to pass the threat on to anyone else. Rather, it was made in the context of an attorney-client conversation relating to a pending case not involving the judge. Nor did Mr. Ivers make any remarks that could constitute an intent that the threat be passed onward. He made no threats against the attorneys that had

---

[2] On June 18, 2018, Ms. Friedemann left out the word "different." The second time she referred to the conversation at trial she identified "her" as Judge Wright. Anne Rondoni Tavernier testified that her memory—not certain—was "you don't know the 50 ways I thought of killing her." Even the written notes are in the past tense.

3

just delivered the bad news, so they had no reason to fear for their safety—plus the statement was made from 200 miles way in a telephone conversation. The statement was part of a rant by Mr. Ivers. Not really a surprise; the lawyers just told him he had no case because Judge Wright's earlier ruling precluded any further avenue for relief. Even a person of placid temperament might have expressed some dissatisfaction with the effect of the original ruling.

The Sentencing Guidelines give no real credit for a law-abiding life. A 20-year-old with no record has zero points. A 65-year-old with no record has zero points. Yet, the 65-year-old has an additional 45 years—two generations—of compliance with the norms of society. That is worth nothing in the Guidelines. In fact, the Guidelines caution against taking age into account at all absent age related health infirmity. *See* USSG § 5H1.1. Mr. Ivers had no convictions in his life until he was 63 years old and that was for a misdemeanor. The theme of the Sentencing Guidelines is to punish for the bad, but not to reward for the good. Luckily our system no longer requires an unthinking conformance to such a flawed system.

Mr. Ivers previously filed objections to the guideline calculation and to information alleged in the Presentence Report that has not otherwise been proven. (*See* ECF No. 158.) He continues in those objections.[3] The defense believes that, consistent with the other guideline related findings in the Presentence Report, USSG § 2A6.1(b)(6) should apply,

---

[3] Sentencing decisions should be limited to proven facts. The defense has previously objected to portions of the Presentence Report that incorporate unproven allegations that resulted in acquittals, dismissals, or which did not even offer enough facts to meet a probable cause charging standard.

resulting in a four-level decrease in the offense level axis of the sentencing grid. This would lower the offense level from 20 to 16 and the suggested sentence range to 24-30 months imprisonment. Further, the defense objects to the finding in the Presentence Report that Mr. Ivers obstructed justice, recommending a two level increase in the offense level. His position at trial and in his testimony that his statements were not threats—even if found to be incorrect by the jury—were principled opinions. He testified that he did not remember the exact words he used. His direct denials were to questions where the Government misstated the evidence. (*See* Trial Tr. 712–13, 717.) Without that increase Mr. Ivers' suggested sentencing range would be 18 to 24 months (20-4-2=14).

Even more interesting is the awarding of levels for this violation. As counsel notes elsewhere, this offense punishes talk, not action. Yet, in setting the base offense at level 12, the Sentencing Commission stated that any offense should result in at least jail time. Further, why does a public official get so much more weight than a public citizen? Section 3A1.2(b) effectively doubles the recommended sentence for threatening a public official (six levels). Apparently the government is more interested in protecting its own than those it serves (assuming for the sake of discussion that would-be threateners spend any time consulting the Sentencing Guidelines before committing an offense).

Over the past 13 years, the Supreme Court has given judges the power to impose sentences that satisfy the direction of Congress to be not greater than necessary to satisfy the statutory purposes of sentencing, to consider all of the characteristics of the offender and circumstances of the offense, to reject advisory guidelines that are not based on national sentencing data and empirical research, and to serve their function in the

constructive evolution of responsible guidelines. *See United States v. Booker*, 543 U.S. 220 (2005); *Rita v. United States*, 551 U.S. 338 (2007); *Gall v. United States*, 552 U.S. 38 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007). The Supreme Court really means it. *See Spears v. United States*, 555 U.S. 261 (2009); *Pepper v. United States*, 562 U.S. 476 (2011). In *Nelson v. United States*, 555 U.S. 350, 351 (2009), the Supreme Court reaffirmed the existing rule that a district judge "may not presume that the Guideline range is reasonable."

In *Gall* and *Kimbrough*, the Supreme Court addressed the question specifically left open in *Rita,* the limits of review for sentences imposed outside the guideline range calculated for an individual case.

> We reject, however, an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range. We also reject the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence.
>
> As an initial matter, the approaches we reject come too close to creating an impermissible presumption of unreasonableness for sentences outside the Guidelines range.

*Gall*, 552 U.S. at 47. As the Supreme Court noted in *Rita* and again in *Kimbrough*, although the Sentencing Commission was entitled to come to its own conclusion on how to weigh the factors of Section 3553(a) in determining the guidelines, the district court has a separate statutory duty to do the same thing with each individual defendant.

Sentencing has now returned to its earlier purpose: to do justice to the victims of crime with an understanding that the person before the court is a member of the society the court is sworn to protect. It is the toughest duty the court faces. What is the right sentence

6

for Bob Ivers that is "sufficient, but not greater than necessary" to satisfy the public interest that justice has been done?

Deterrence is just not a factor here. Experience shows that most threat offenders are either mentally ill, angry, or both. They either have no capacity to think through the consequences of their actions or simply are not thinking outside the moment. In any event, deterrence has no validity as an effective sentencing tool. There is little support that the length of a sentence plays any role in specific deterrence to others. Here, the findings are uniformly negative: there is no evidence that increases in sentence length reduce crime through deterrence. Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime and Justice: a review of Research, 28–29 (2006). In a study of specific deterrence involving federal white collar offenders in the pre-guideline era, no difference in deterrence was found between probation and imprisonment. David Weisbrud, et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes,* 33 Criminology 587 (1995). Not surprisingly, studies confirm that it is the certainty of punishment, not its length, which has any deterrent value. *See* Andrew Von Hirsch, et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999). Therefore, with little evidence to support its efficacy, deterrence should play no real role in sentencing calculus. To the extent that deterrence plays a factor, the pre-trial/presentence incarceration of Mr. Ivers has accomplished that goal. In the nearly 12 months between Mr. Ivers' conversation with his attorneys and the sentencing, he will have spent 10 months behind bars. The brick has been applied to the head of the mule. Mr. Ivers is not happy with present events, but the Government surely has his attention.

This author is sorry, but he just cannot get excited about this offense. Threats against public officials are the norm in society. It is normal to hear a politician say, "I am going to get or I have gotten death threats over this." Anyone who puts themselves in the public eye will receive threats—and salacious suggestions, even marriage proposals. As threats go, Mr. Ivers' statement to his attorneys isn't much. We have lots of sayings: "talk is cheap," "sticks and stones may break my bones, but words will never hurt me," "he is all bark and no bite," and "I don't agree with what you say, but I will defend your right to say it." Each is a recognition that words are important, but words are not the same reality as action.[4] Mr. Ivers didn't like the message, so he blamed the messenger. In the pantheon of crime, words pale before actions.

That leads to the final factor: does Bob Ivers need to be warehoused in jail because he will act, that is, is incarceration necessary for protection of society? His 65-year history shows that he is a talker, not an actor. To paraphrase the Deputy Marshal, he needs to blow off steam by talking to get it out of his system. Counsel recently contracted with Dr. Ernest Boswell for a psychological evaluation of Mr. Ivers. That evaluation is illuminating. Mr. Ivers suffers from no mental illness. If he had money, he would be an eccentric. He doesn't, so the more apt word is "crackpot." Dr. Boswell, supported by a life history, says that Bob Ivers has a tendency to engage in activities that would result in a vindication of

---

[4] Counsel anticipates that the Government will argue that the need for severe punishment is because threateners may follow through with action. That just isn't so. Counsel would guess there are thousands of threats delivered on the internet every day with no action to follow. One in a million threats is followed by any act. There is no correlation between threat and action. Look at history. Lee Harvey Oswald, Sirhan Sirhan, John Hinckley, Timothy McVeigh, and James Earl Ray issued no threats before they acted.

his talent, but with almost no chance of success. He will not listen to any reasoned discussion on the issue. When the projects inevitably fail, he gets upset and blames the messenger. Counsel notes that Bob Ivers' life is a series of crushed dreams. Bob Ivers is a dreamer whose dreams always get crushed. For example, he was in a rock band. He may be right that he invented "punk rock." He even went to Los Angeles to strike it rich. But the odds of national success in music entertainment is lower than the odds of making an NBA team. Bob Ivers is one of those who are never deterred by reality.

The events underlying this offense are just another longshot idea—that he can make money suing people. Nice idea, but the causes of action must be viable. His are not. The evidence referenced at trial and by Dr. Boswell is that Bob Ivers has moved on from lawsuits to new endeavors. While in Fargo he decided that he had the next big advertising theme for Pepsi Cola (given the ads at the Super Bowl, Pepsi needs a different media campaign). He has worked diligently on his proposal. His plan for presentation to the corporation is more than a little different. He expects to appear as a shareholder and pitch his advertising campaign at Pepsi's annual shareholder meeting. (*See* PSR at ¶ 92.) Dr. Boswell noted that while in custody Bob Ivers has been writing/illustrating children's books based upon a theme involving the adventures of mythical "wolfcats." Bob Ivers believes they will be successful. These books are credible efforts. Counsel has attached as Exhibit 1 the book referenced by Dr. Boswell, "Kingdom of the Secret Ocean." But Bob Ivers has no agent, no editor, and no publisher. Nonetheless he is undaunted. Bob Ivers will never be satisfied with an ordinary job. Given his personality, he may not be capable of following the commands of an employer. Bob Ivers has managed to live his life at the

economic margins of society, but it has been clean. He has no history of petty crime common to the unemployed, nor has he had a lifetime of interactions with authorities that a petty offender might engender. As the PSR relates, his interactions with authorities rise from his refusal to keep his mouth shut.

These evaluations are not yet exact science, but the testing shows little likelihood of future violence. Dr. Boswell noted that Bob Ivers is capable of violent **ideation.** That is a given. The jury found credible testimony that Bob Ivers said words to the effect of "You can't imagine the fifty different ways I planned to kill her." But the psychological testing does not support a heightened risk of violent **behavior.** Sixty-five years of life history supports the testing prediction.

In summary, the offense behavior is all talk and no action. Mr. Ivers has a full life to prove he is not a danger to anyone. He has been incarcerated for nearly a year, which should be sufficient imprisonment to satisfy any deterrent effect. Supervision will provide sufficient incentive to keep control of Mr. Ivers' poison pen.[5] He asks for a sentence of time served followed by a three-year supervised release term on each count.

---

[5] In fact, incarceration will have no effect on a poison pen. Many of the persons convicted of threatening public officials do so from within institutional walls.

                                                    **KELLEY, WOLTER & SCOTT, P.A.**

Dated: February 8, 2019          By:  *s/Daniel M. Scott*
                                                   Daniel M. Scott (#98395)
                                                   Brett D. Kelley (#397526)
                                           Centre Village Offices, Suite 2530
                                           431 South Seventh Street
                                           Minneapolis, MN  55415
                                           Tel: (612) 371-9090
                                           Fax: (612) 371-0574
                                           Email: dscott@kelleywolter.com
                                           Email: bkelley@kelleywolter.com

                                           *Attorneys for Robert Phillip Ivers*