IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No.: 18-CR-90 (RWP/CFB) |
| v. | ) | |
| | ) | **GOVERNMENT'S SENTENCING** |
| ROBERT PHILLIP IVERS | ) | **MEMORANDUM** |
| | ) | |
| Defendant. | ) | |
| | ) | |

COMES NOW the United States of America, by its undersigned counsel, and provides the following memorandum for the sentencing in this matter.

## TABLE OF CONTENTS

I.  BACKGROUND ............................................................................................................... 2

II. SENTENCING CALCULATION ..................................................................................... 5

A.    **Statutory Maximum Sentence** ........................................................................... 5
B.    **Sentencing Guidelines Calculation** ................................................................... 5
C.    **The PSR Correctly Concluded that a 2-level Enhancement for**
       **Obstruction of Justice, Pursuant to U.S.S.G. §3C1.1, is Applicable** ............... 6
D.    **The PSR Properly Concluded that a Reduction Under**
       **U.S.S.G. § 2A6.1(b)(6) Does Not Apply** ........................................................... 8

III. GOVERNMENT'S RECOMMENDATION ....................................................................... 9

1

I.     **BACKGROUND**

The threats made by Robert Ivers against Judge Wilhelmina Wright on February 27, 2018 were the culmination of a pattern of harassing and threatening behavior that spanned over a year.  And even though Ivers was warned repeatedly about his threats by Deputy U.S. Marshals, who told him that his words scared people, he did not care and he did not stop.  Indeed, Ivers knew very well that his words scared people.  He liked that his words scared people.  He used words intended to frighten.  And he understood full well that screaming about the "50 different ways he planned to kill" Judge Wright would cause Ms. Friedemann and Ms. Rondoni Tavernier to fear for Judge Wright's life.  Robert Ivers uses words as weapons, and his persistent and utter disregard for the fear that his threats caused warrants a substantial prison sentence.

As described in the Presentence Report ("PSR") and detailed at trial, Ivers' interactions with Judge Wright began when Ivers' federal civil lawsuit was assigned to her in February 2016.  And, almost immediately, Ivers engaged in abusive communications with the Court.  When Judge Wright made decisions that displeased Ivers, he retaliated by sending angry, threatening letters designed and intended to intimidate.  For example, after the Court cancelled a hearing on October 31, 2016, Ivers sent a letter to Judge Wright in which he wrote, "I am in dire fucking straights!" and "I am becoming a very dangerous person!!!"  Gov't Tr. Ex. 1.

2

Ivers' antagonism toward Judge Wright continued throughout the litigation.  After Judge Wright cancelled a 2017 hearing on his motion for a new trial, Ivers sent multiple letters to Judge Wright, Chief Judge Tunheim, and the Clerk of Court calling Judge Wright "corrupt" and stating that he was "cheated" by her.  Gov't Tr. Ex. 11.  About this time, Ivers also placed a telephone call to Chief Judge Tunheim's Courtroom Deputy Clerk in which he told the clerk that he was very upset with Judge Wright and described himself as "crazy mad" and "a walking bomb."

Court staff testified that they found these communications to be threatening and caused concern for Judge Wright's safety, sufficiently concerned to report Ivers' communications to the U.S. Marshals.  Over and over, Deputy U.S. Marshals met with Ivers to admonish him about his threatening language, to warn him that his words scared people, and to tell him to stop.  Ivers, however, was undeterred.  Indeed, when Marshals spoke with him about being "a ticking time bomb," Ivers responded about Judge Wright: "that fucking judge … if she's scared, and if she's fearful, it's not my problem."  Gov't. Tr. Ex. 13.

Ivers' anger grew and festered in the months after Judge Wright ruled against him, exploding in vitriol during his phone call with Ms. Friedemann and Ms. Rondoni-Tavernier.  As the lawyers described it, when Ivers started talking about Judge Wright, it was as if "a switch flipped," screaming in manner that was "clearly angry and out of

control" that "you don't know the fifty different ways I planned to kill her." *See* Gov't Tr. Ex. 15; ECF No. 154 at 264.

Ms. Friedemann testified that based on Ivers' angry demeanor, the escalation of his anger while he was talking about Judge Wright, and the totality of his communications during the call, she was "frightened and scared for Judge Wright" and concerned Ivers would take future action, describing it as a "death threat." ECF No. 154 at 280.  Despite concerns regarding confidentiality, Ms. Friedemann, after consultation with ethics lawyers in her firm, concluded Ivers' conduct was so threatening it necessitated reporting to authorities.  Ultimately, the threat was reported to the U.S. Marshals Service.

When the Marshals Service received the report of the threat about Judge Wright they took it seriously and took immediate action.  ECF No. 157 at 551.  The Marshals contacted the police department in the city where Judge Wright resided to notify them of the threats by Ivers, and to request extra patrols around Judge Wright's residence and that they be on the look-out for Ivers. *Id.* at 551-52.  A Deputy U.S. Marshal also notified Judge Wright regarding the threats from Ivers and about the increased patrols by city police around her house.

Then, on March 14, 2018, when two Deputy U.S. Marshals spoke to Ivers about the threats at his sister's residence in North Dakota, Ivers was combative and unremorseful.  If there had been any doubt about whether he intended his statements in the phone call with Ms. Friedemann and Ms. Rondoni-Tavernier to be threatening, Ivers eliminated it entirely

4

as the Marshals tried to talk to him, angrily yelling "that fucking [racial epithet] fucking judge stole my future" and "you wanna know what, if she doesn't sleep very good, fuck her!" Gov't Tr. Ex. 14.

## II.   SENTENCING CALCULATION

### A.   Statutory Maximum Sentence

Count One carries a maximum term of imprisonment of ten years and Count Two carries a maximum term of imprisonment of five years.

### B.   Sentencing Guidelines Calculation

The advisory guideline range is calculated in PSR ¶¶ 35-43, 98, as follows:

| | |
|---|---|
| USSG §2A6.1(a)(1) (base offense level): | 12 |
| USSG §3A1.2 (victim related adjustment): | +6 |
| USSG §3C1.1 (obstruction of justice) | +2 |
| Total Offense Level: | 20 |
| Level 20/Criminal History II: | 37-46 months' imprisonment |

The government has no objections to the PSR and will not be offering any testimony or exhibits.  Ivers has objected to the PSR's (1) application of a 2-level enhancement for obstruction of justice pursuant to USSG §3C1.1 and (2) determination that a 4-level reduction under 2A6.1(b)(6) was not applicable. (ECF 158.)

**C.**   **The PSR Correctly Concluded that a 2-level Enhancement for Obstruction of Justice, Pursuant to U.S.S.G. §3C1.1, is Applicable.**

Under U.S.S.G. § 3C1.1, the base offense level is increased by 2 levels for "Obstructing or Impeding the Administration of Justice" if:

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense…

Committing or attempting to commit perjury is cited specifically in the Guidelines as an example of conduct to which the adjustment applies.  *See* U.S.S.G. § 3C1.1, comment n.4 (B); *United States v. King*, 854 F.3d 433, 446 (8th Cir. 2017).   The enhancement is applicable to "defendants who completely denied knowledge of the crimes for which they were accused."   *United States v. Boone*, 110 F. Supp. 909, 915 (S.D. Iowa 2015) (citing *United States v. Dunnigan*, 507 U.S. 87, 90 (1993) (defendant denied ever possessing or distributing cocaine); *United States v. Esparza*, 291 F.3d 1052, 1056 (8th Cir. 2002) (defendant testified that he did not know there were drugs in his trailer); and *United States v. Pena*, 67 F.3d 153, 157 (8th Cir. 1995) (defendant denied knowledge or involvement in drug trafficking)).

In this case, the defendant clearly committed perjury when he repeatedly testified under oath that he *never* made any statement about 50 different ways he planned to kill Judge Wright.  As Ivers testified on direct:

> Q.   And did you say – did you say to them when on the phone that you had planned 50 different ways to kill Judge Wright?
>
> A.   No
>
> Q.   Did you say that you had thought about 50 different ways to kill Judge Wright?
>
> A.   No
>
> Q.   Did you say that you had imagined 50 different ways to kill Judge Wright?
>
> A.   No
>
> Q.   Did you say that you had planned 50 different ways to kill Judge Wright?
>
> A.   No.

ECF No. 157 at 250-251.

As the Court heard and observed, Ms. Friedemann and Ms. Rondoni-Tavernier credibly testified that Ivers made a series of angry statements leading up to the explicit threat, "you don't know the 50 different ways I planned to kill her," and that Ms. Friedemann took contemporaneous notes of Ivers' threats.  Ms. Friedemann testified that her notes recorded Ivers' words verbatim, including "you don't know the 50 different ways I planned to kill her."   Both Ms. Friedemann's and Ms. Rondoni-Tavernier's testimony

was careful and credible.  Indeed, to find Ivers guilty, the jury had to have believed their testimony.

In contrast, the jury had to have rejected Ivers' testimony.  Not only did Ivers repeatedly deny saying anything about "50 different way to kill" Judge Wright during his direct examination, he doubled down during cross-examination, stating, among other things, "Ms. Friedemann is a liar."  ECF No. 157 at 299; *see also id.* at 309.

Defense counsel attempts to argue that Ivers did not commit perjury by claiming his testimony amounted to a "principled opinion" that his statements were not threats.  ECF No. 167 at 5.  That argument, however, is fatally undermined by Ivers' testimony.  He could have admitted the words he said while disputing the intent behind them, but he did not – instead, he simply lied, and he lied about the central issue in the case.  That is perjury.  The obstruction of justice enhancement, pursuant to USSG §3C1.1, should be applied.

### D.   The PSR Properly Concluded that a Reduction Under U.S.S.G. § 2A6.1(b)(6) Does Not Apply.

Ivers contends that his base offense level should be reduced by 4 levels pursuant to U.S.S.G. § 2A6.1(b)(6), arguing that his "offense involved a single instance evidencing little or no deliberation."  Ivers makes no argument as to why this reduction should apply to him other than to simply parrot the language of the guidelines.  (ECF No. 158 at 1).

In the context of § 2A6.1(b)(6), the term "single instance" does not mean a "single threat."  *United States v. Humphreys*, 352 F.3d 1175, 1176 (8th Cir. 2003).  The reduction is most applicable when the threat is the product of "a single impulse, or are a single

8

thoughtless response to a particular event." *Id.* at 1177.  Such is not the case here.  Ivers'
threats on February 27, 2018 were the culmination of months of angry, intimidating
communications – communications that had resulted in visits from Deputy U.S. Marshals
during which they told Ivers to stop because his words were scaring people.  This was not
an isolated incident.  It was certainly an escalation, but it was also part of a pattern of
conduct that had begun more than a year before.

## III.   GOVERNMENT'S RECOMMENDATION

After consideration of the advisory guideline range and the factors under 18 U.S.C.
§ 3553(a), specifically the nature and circumstances of the offense, the history and
characteristics of the defendant, and the need for the sentence to reflect the seriousness of
the offense, promote respect for the law, provide just punishment, afford adequate
deterrence to criminal conduct, and protect the public from further crimes of the defendant,
the government requests a sentence of 46 months of imprisonment.

The instant conviction spans a year of threatening conduct ending in a death threat
to a Federal District Court Judge.  Ivers' history is rife with instances of harassment and
threats against public officials involving this same type of behavior spanning years.  PSR
¶ ¶ 44-47, 54, 56, 58. 59.  This conduct ranged from writing to judges that he "prayed" for
"the death of [their] fucking family," to telling a government attorney he was going to take
a shotgun to the Minnetonka Police Department.  PSR ¶ ¶ 44, 59.  For most of these

instances, police were called, investigated and warned Ivers, and even prosecuted him for some of these threats, but Ivers was never remorseful and never deterred.

In fact, prior to this instant conviction, Ivers had already been convicted for similar threatening conduct when he was convicted of stalking for making repeated, threatening and vulgar phone calls to a state court judge, which included telling the judge "I'm going to make sure you feel some fucking pain" and "You're going to see who the alpha male is, you dead fuck."  Ivers was given a lenient sentence (only 5 days) for that conviction, but he was specifically warned about crossing the line in his behavior towards Judge Wright. PSR ¶ 28.  The sentencing judge told Ivers "I want you to be successful on this probation by not picking up any new offenses like this."  *Id.*  Ivers disregarded the court's warning, and indeed made his threat against Judge Wright while on probation for the state conviction.  (PSR ¶ 51).  Neither the lenient sentence, nor the warnings from the state court judge, nor the repeated warnings from Deputy U.S. Marshals did anything to deter Ivers from making threats intended to frighten people.  The message simply did not sink in.  A significant sentence in this case is necessary to deliver the message more forcefully.  And, even if, as it appears, Ivers is incapable of being deterred, a significant sentence will at least prevent him from using his words as weapons during the period of his incarceration.

Time and time again, Ivers has been warned that his angry, threatening, intimidating words scare people, that his words are themselves harmful.  But Bob Ivers has shown repeatedly that he does not care.  If anything, he appears proud of the distress he causes.

10

Even after he heard all the testimony about the impact of his threats against Judge Wright, Ivers testified defiantly that he was glad Judge Wright was scared about his threatening words.  ECF No. 157 at 324.  When told that his words scared people, he said "boohoo" and "I could give a damn."  ECF No. 157 at 321-22.

The defense contends that Ivers is "all talk and no action" and therefore "is not a danger to anyone."  ECF 167 at 10.  But this position fails to consider that Ivers' words themselves cause harm, and that Ivers' dangerousness is based on his belief that he can say whatever he wants whenever he wants.  While it is possible that Ivers won't pair his violent words with violent physical conduct (which is not a certainty, given his clinical diagnostic scores for "violent ideation and affective instability"), he will most certainly continue to inflict harm on people through those words.  As the psychologist who examined Ivers wrote about the crime of which he was convicted: "Mr. Ivers descended into a pattern of brooding and obsessive thoughts about what he perceived as a biased and unfair legal system.  As his anger escalated, he was unable to contain his verbal remarks and rationalized his response as reflecting his constitutional right of free speech."  There is little doubt that, in the future, something else will make Ivers mad and, confident in his rectitude, he will unleash intentionally violent words on the people who upset him.

Defendant's memorandum argues that Ivers has learned his lesson: "The brick has been applied to the head of the mule. Mr. Ivers is not happy with present events, but the Government surely has his attention."  ECF No. 167 at 7.  Certainly this would be true for

most people – that they would be deterred by the reality that arrived when the jury pronounced its verdict in this case.  But the defense has itself identified the fatal flaw in this logic, that "Bob Ivers is one of those who is never deterred by reality." *Id.* at 9.

Bob Ivers may not care what his words do to people, but society does.  Ivers is not a person to be deterred unless given very significant consequences.  The time for warnings and admonishments is over.  A sentence at the top of the guidelines may be the only thing to finally impress upon him that he cannot make these threats, or will at least prevent him for doing so for a significant period of time.

Given Ivers' prior conviction, the prior admonishments from judges and law enforcement, the circumstances of the instant offense including over a year of persistent threatening behavior toward a Federal Judge, his blatant perjury, and his utter lack of remorse, the government believes a sentence of 46 months of imprisonment is sufficient, but not greater than necessary, and takes into account all of the factors set forth in 18 U.S.C. § 3553(a).

WHEREFORE, the government prays that the district court considers this sentencing memorandum in determining the final sentence of the defendant.

Respectfully Submitted,

ERICA H. MacDONALD
United States Attorney

By: *Julie E. Allyn*

Julie E. Allyn
Assistant United States Attorney

Timothy C. Rank
Assistant United States Attorney