UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------
                            )  CRIMINAL FILE
UNITED STATES of AMERICA     )  NO. 18-CR-90 (RWP/CFB)
                            )
         vs.                )  Courtroom 6B
                            )  Thursday, February 13, 2020
ROBERT PHILIP IVERS          )  St. Paul, Minnesota
                            )  11:22 A.M.
------------------------------------------------------------

## AUDIO DIGITAL TRANSCRIPTION OF:


**PRELIMINARY REVOCATION and DETENTION HEARING**

BEFORE THE HONORABLE HILDY BOWBEER
UNITED STATES MAGISTRATE JUDGE


**A P P E A R A N C E S:**

**For the Government:**   **OFFICE OF THE U.S. ATTORNEY**
                          By:  JULIE E. ALLYN
                               ALLISON K. ETHEN
                               Assistant U.S. Attorneys
                          600 United States Courthouse
                          300 South Fourth Street
                          Minneapolis, Minnesota  55415


**For the Defendant:**    **OFFICE OF THE FEDERAL PUBLIC DEFENDER**
                          By:  MANVIR K. ATWAL
                          First Assistant Defender
                          107 United States Courthouse
                          300 South Fourth Street
                          Minneapolis, Minnesota  55415


## AUDIO DIGITAL RECORDING TRANSCRIBED BY:

**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - United States District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota  55101
651.848.1224

**I  N  D  E  X**

**W I T N E S S E S:**                                              **PAGE**


**ODELL WILSON, III**

    Direct Examination by Ms. Allyn                    5
    Cross-Examination by Ms. Atwal                    33
    Redirect Examination by Ms. Allyn                 49
    Recross-Examination by Ms. Atwal                  54


**ROBERT PHILIP IVERS**

    Direct Examination by Ms. Atwal                   58
    Cross-Examination by Ms. Allyn                    69




\* \* \* \* \*



**E  X  H  I  B  I  T  S**

| **NUMBER** | **FOR ID** | **IN EVIDENCE** |
|---|---|---|
| Government 1 | | 11 |
| Government 2 | | 24 |
| Government 3 | | 24 |
| Defendant 1 | | 42 |

1          (11:22 a.m.)

2                    **P R O C E E D I N G S**

3                    **IN OPEN COURT**

4          (Defendant present)

5                    THE COURT:  ... preliminary revocation hearing and

6     detention hearing in the matter of United States vs. Robert

7     Ivers.  This is matter number 18-CR-90.

8                    Let's get appearances, first on behalf of the

9     Government.

10                   MS. ALLYN:  Good morning, Your Honor.  Julie Allyn

11    and Allison Ethen for the United States.

12                   THE COURT:  Okay.  Good morning.

13                   And on behalf of Mr. Ivers.

14                   MS. ATWAL:  Good morning, Your Honor.  Manny Atwal

15    on behalf of Mr. Ivers, who's sitting next to me.

16                   THE COURT:  Okay.  Good morning to both of you.

17                   As I indicated, we are here both for a preliminary

18    revocation hearing and a detention hearing.  Is the

19    Government still seeking detention of Mr. Ivers pending a

20    final revocation hearing?

21                   MS. ALLYN:  Yes, Your Honor.

22                   THE COURT:  Okay.  And is Mr. Ivers contesting

23    both probable cause and detention, Ms. Atwal?

24                   MS. ATWAL:  Yes, Your Honor, we are.

25                   THE COURT:  All right.  Ms. Allyn, do you intend

1      to call any witnesses or to introduce any evidence?

2              MS. ALLYN:  Yes, Your Honor.  We would be calling

3      one witness from the Probation Office and introducing three

4      exhibits.

5              THE COURT:  All right.  Please go ahead.

6              MS. ALLYN:  Your Honor, when Defendant came in, I

7      understand that your clerk called a tech person for the

8      courthouse to help -- to see if we could get the audio to

9      work.

10             THE COURT:  All right.  Why don't --

11             MS. ALLYN:  Could we get a break for a moment?

12             THE COURT:  That would be just fine.  Let's go off

13     the record for a moment and we'll see if our --

14         (Recording paused from 11:24 a.m. to 11:26 a.m.)

15                          IN OPEN COURT

16             THE COURT:  Okay.  We're back on the record in the

17     matter of United States vs. Robert Ivers, matter number

18     18-CR-90.

19             Ms. Allyn, you can go ahead, and I believe you

20     were about to call a witness.

21             MS. ALLYN:  Yes, thank you, Your Honor.  At this

22     time the Government would call Odell Wilson to the stand.

23             THE COURT:  Okay.  Officer Wilson, if you'd please

24     come forward.

25             Raise your right hand.

1          **ODELL WILSON, III, GOVERNMENT'S WITNESS, SWORN**

2                    THE WITNESS:  Yes.

3                    THE COURT:  All right.  Please be seated in the

4          witness box.

5                    And please state your full name and spell your

6          last name for the record.

7                    THE WITNESS:  Odell Wilson, III.  The last name is

8          W-I-L-S-O-N.

9                    THE COURT:  And if you could make sure that you're

10         speaking into the microphone.  You don't have to swallow the

11         microphone, but make sure you're speaking right into it so

12         we get a good clear record.

13                    Go ahead, Ms. Allyn.

14                    MS. ALLYN:  Thank you, Your Honor.

15

16                           **DIRECT EXAMINATION**

17         BY MS. ALLYN:

18         Q.  Good morning.

19         A.  Good morning.

20         Q.  What is your job?

21         A.  I'm a supervising U.S. federal probation officer.

22         Q.  What are some of your duties and responsibilities in

23         that role?

24         A.  I supervise officers who carry a caseload of individuals

25         that they're supervising in the community.  I review cases

1    with them when there are issues or concerns with them.  I

2    fill in for them if they're not able to come to court, such

3    as today, and I do handle some cases right now just based on

4    the fact that we have an officer that's basically retiring

5    at the end of the month.  I'm holding onto those cases until

6    we distribute them to other officers.

7    Q.  How long have you been a supervisor?

8    A.  It'll be 23 years next month.

9    Q.  Always at the -- in the District of Minnesota?

10   A.  Yes, always in the District of Minnesota, yes.

11   Q.  And how are you associated with this case that brings

12   you here today to testify?

13   A.  I supervise James Weinberger, who is the probation

14   officer of Mr. Ivers.

15   Q.  And is Mr. Weinberger unavailable to testify today?

16   A.  Yes.  He's in training for the week, so he's not here

17   today.

18   Q.  Out of the state?

19   A.  Yes, out of state.

20   Q.  How have you come to learn about this case in order to

21   be able to testify here today?

22   A.  Well, from the beginning I was involved with the case

23   when Mr. Ivers was released, would have a lot of

24   conversation about his transport to North Dakota where he

25   was -- where he was going.  We had the GPS at the time of

1    his release so that we could monitor his whereabouts.

2    Q.  And since the transportation of the defendant to North

3    Dakota, have you continued to be in contact with his

4    probation officer about this case?

5    A.  Yes.

6    Q.  Is the -- sort of jump to it, but I suppose Mr. Ivers is

7    currently on supervised release?

8    A.  Yes.

9    Q.  What was the underlying crime of conviction giving rise

10   to his supervised release term?

11   A.  He had two counts.  One was threatening a federal judge

12   and one was -- it's a long one -- interstate threats --

13   Q.  Basically, threats against a judge?

14   A.  Yes.

15   Q.  What was his term of supervised release?

16   A.  Three years of supervised release.

17   Q.  And what was his sentence?

18   A.  Eighteen months.

19   Q.  Was Mr. Ivers placed on supervised release in August of

20   2019?

21   A.  Yes.

22   Q.  At that time, were the conditions of supervised release

23   explained to him?

24   A.  Yes.

25   Q.  Are you alleging that Defendant has violated some

1   conditions of -- some of his release conditions?

2   A.  Yes.

3   Q.  How many conditions?

4   A.  I'd say three.

5   Q.  And what conditions are you alleging Mr. Ivers violated?

6   A.  Well, he left the jurisdiction of where he was residing

7   without permission of the judge or his probation officer.

8   He violated the conditions of his electronic monitoring

9   conditions, which was basically he needed permission to

10  leave the district while on that device.  And a directive

11  from the probation officer and myself, I guess, I would say,

12  that he was not to enter into the District of Minnesota

13  without the permission of Judge Pratt.

14  Q.  So let's start with this issue of leaving a certain

15  district, right?  Where was Mr. Ivers supposed to be living?

16  What was his district of jurisdiction for where he had

17  permission to reside?

18  A.  He was living in Fargo, North Dakota.

19  Q.  And so is Fargo, North Dakota where Mr. Ivers was

20  authorized by Probation to reside?

21  A.  Yes.

22  Q.  And had Probation done like a house study, home study,

23  to ensure that that was the right location for Mr. Ivers to

24  live?

25  A.  Yes.  Originally it was North Dakota, and then we went

1    up January 30th of this year.

2    Q.  So North Dakota had done that home study before

3    Mr. Ivers moved there?

4    A.  When Mr. Ivers went there he was not there, but by the

5    probation officer from North Dakota.

6    Q.  And where was it that Mr. Ivers would be living in North

7    Dakota?

8    A.  He was living with his sister.

9    Q.  So who was supervising Mr. Ivers while while he was

10   living in North Dakota in August of 2019?

11   A.  Chris Amundson (ph), I believe his name is, the

12   probation --

13   Q.  Maybe Ambuehl?

14   A.  Yeah.  I guess -- I have a hard time pronouncing it, but

15   yes, Aamodt or Amdahl or something like that.  Yes, but

16   there was a probation officer there who was -- who was

17   supervising him as courtesy supervision for our office,

18   because obviously it's in North Dakota, and we were

19   monitoring the electronic monitoring part of it.

20   Q.  So a probation officer named Chris in North Dakota was

21   doing courtesy supervision?

22   A.  Yes.

23   Q.  And when you say you were monitoring the GPS portion,

24   what do you mean by that?

25   A.  Well, I'm sorry.  Let me backtrack.

1              They were monitoring the GPS portion because he

2       was living in North Dakota and they had courtesy supervision

3       at that time.  It changed to us on January 30th.

4       Q.  Okay.  Great.  Before we get to January 30th, in the

5       beginning, in August of 2019, did this North Dakota

6       probation officer, Chris Ambuehl, meet with Mr. Ivers in

7       person?

8       A.  Yes.

9       Q.  And did he meet with Mr. Ivers and go over Mr. Ivers'

10      conditions of release?

11      A.  Yes.

12      Q.  Did Mr. Ivers sign anything reflecting that he had had

13      this meeting where the conditions of his release were

14      explained to him?

15      A.  Yes.

16      Q.  And what was that form, or what was signed by Mr. Ivers?

17      A.  It was his conditions of supervised release.  It gives

18      the standard conditions of supervision as well as any

19      special conditions.  He signed them as well as the probation

20      officer.

21      Q.  It's kind of a standard form, is that fair?

22      A.  Yes.

23      Q.  All right.

24              MS. ALLYN:  Your Honor, may I approach the

25      witness?

1          THE COURT:  Yes.

2     Q.  Okay.  Probation Officer Wilson, do you recognize what

3     I've handed to you as Government's Exhibit 1?

4     A.  Yes.

5          MS. ALLYN:  Your Honor, the Government has given

6     before this hearing defense counsel the exhibits.

7     Q.  How do you recognize this Exhibit 1?

8     A.  This is a document that was signed by Mr. Ivers.

9     Q.  What date?

10    A.  August 2nd, 2019.

11         MS. ALLYN:  Your Honor, at this time the

12    Government would move into evidence Government Exhibit 1.

13         THE COURT:  Any objection, Ms. Atwal?

14         MS. ATWAL:  No, Your Honor.

15         THE COURT:  Government's Exhibit 1 will be

16    received.

17    BY MS. ALLYN:

18    Q.  All right.  So this is the supervised release conditions

19    as explained to Mr. Ivers in North Dakota in August, is that

20    right?

21    A.  Yes.

22    Q.  If you could turn to page 4 of 7 of this document, and

23    the heading should say "Standard Conditions of Supervision."

24         Do you see that page?

25    A.  Yes.

1    Q.  Can you look at number 3 of those standard conditions.

2    A.  Okay.

3    Q.  Can you read number 3 to the Court.

4    A.  "You will not knowingly" -- "You must not knowingly

5    leave the federal judicial district where you are authorized

6    to reside without first getting permission from the court or

7    the probation officer."

8    Q.  And can you read number 13 of those standard conditions?

9    A.  "You must follow the instructions of the probation

10   officer related to the conditions of supervision."

11   Q.  And for number 3, in this specific instance when it says

12   the federal judicial district where you are authorized to

13   reside, for Mr. Ivers, was that North Dakota?

14   A.  Yes.

15   Q.  Fargo, North Dakota area?

16   A.  Yes.

17   Q.  And is it for now conditions sort of 3 and 13 that you

18   just read that are part of the allegations for how Mr. Ivers

19   violated his supervised release?

20   A.  Yes.

21   Q.  All right.  So this was August 2019.  Let's move to

22   September 2019, okay?

23   A.  Mm-hm.

24   Q.  Did Mr. Ivers want to travel to Minnesota in

25   anticipation of hoping to move to Minnesota?

1    A.  Yes.

2    Q.  Did Mr. Ivers ask Probation permission to travel to

3    Minnesota?

4    A.  Yes.

5    Q.  Can you explain any of that conversation or how

6    Probation responded.

7    A.  Well, he asked to come to Minnesota to look for

8    residence and take care of some personal business.  It was

9    within the first 60 days of supervision.  As a rule

10   generally, we -- within 60 days we would not allow travel

11   pretty much anywhere outside the district because we want to

12   make sure that people are getting settled in and following

13   the conditions of supervision.  So he was told that that

14   would not be allowed at that particular time.

15   Q.  What did Mr. Ivers do then after Probation denied his

16   request to travel to Minnesota?

17   A.  There was a petition that was filed with Judge Pratt

18   making a request to travel to Minnesota.

19   Q.  And is it true that Judge Pratt is the judge, I guess,

20   overseeing this matter?

21   A.  Yes.

22   Q.  Does it sound right that this order denying Mr. Ivers'

23   request was issued about September 25th, 2019?

24   A.  Yes.

25   Q.  Oh, I'm sorry.  That's wrong.  Was the order from Judge

1     Pratt October 10th?

2     A.  October 10th, yes.

3     Q.  Okay.  That's my fault.  Mr. Ivers filed his petition

4     September 25th, is that right?

5     A.  Yes.

6     Q.  How did Mr. Ivers respond with respect to his

7     conversations with his North Dakota probation officer after

8     Judge Pratt denied him in October?

9     A.  Well, he was upset.  I listened to an audiotape that was

10    sent to him.  He was upset that he was denied and he was --

11    stated that he was angry and left a rather what I would

12    consider vulgar and disrespectful message for the probation

13    officer.

14    Q.  And so his vulgar message is left in October 2019, is

15    that right?

16    A.  Yes.

17    Q.  And you've heard those messages?

18    A.  Yes.

19    Q.  In November of 2019, did Mr. Ivers again petition the

20    Court to leave North Dakota?

21    A.  Yes.  He made a petition to have the condition amended

22    that would not allow him to travel to Minnesota, yes.

23    Q.  Do you remember which condition was he asking to amend?

24    A.  I don't remember off the top of my head here, but it

25    was -- essentially he's asking him to allow him to travel

1     from North Dakota to there and amend the condition that, you

2     know, was in place that would not allow him to do it at that

3     particular time.

4     Q.  How did Judge Pratt rule on Mr. Ivers' second request to

5     leave the District of North Dakota?

6     A.  He denied it.

7     Q.  And this time let's see if I have the right date.  Was

8     that denial about December 6th, 2019?

9     A.  Yes.

10    Q.  Okay.  How did Mr. Ivers do on probation in North Dakota

11    after that December ruling?

12    A.  Well, after the December ruling there were continued

13    messages that were left, same or similar messages, you know,

14    like I said, level of disrespect for as far as I'm

15    concerned.  I mean, that's my opinion.  I heard them and

16    that's just not the way people generally confront themselves

17    with their probation officer.  It was a little disturbing,

18    but that's what it was.  And, you know, it continued

19    whenever, I guess, he got angry enough to call him, because

20    there were several of them.

21    Q.  And how did North Dakota respond after getting these

22    angry messages from Mr. Ivers?

23    A.  At one point -- I believe it was around January 13th

24    they notified us that they were going to close their

25    interest in the case based on his desire not to live in

1    North Dakota and essentially his behavior that he's

2    demonstrating while under supervision there.

3    Q.  Did they characterize that behavior a certain way, like

4    angry or abusive, or any characterization?

5    A.  I think they assumed we knew based on the history and

6    just said that they were closing it based on the fact

7    that -- you know, that he's -- didn't want to be there and

8    was unamenable to supervision there according to them.

9    Q.  Now, these messages that we're talking about that

10   Mr. Ivers left for his probation officer in January, you've

11   heard those messages, is that right?

12   A.  Yes.

13   Q.  And we discussed this morning that I had an exhibit, a

14   disc with those three January messages, is that right?

15   A.  Yes.

16        MS. ALLYN:  Your Honor, if I could at this time

17   offer into evidence Exhibit 2 for the Government.  Ms. Atwal

18   does have the disc.  I could try to play it first or --

19        MS. ATWAL:  Well, first, Your Honor, I am going to

20   object as to relevance as to Government's Exhibit 2, the

21   phone messages.

22        THE COURT:  I'm going to overrule the objection.

23        MS. ALLYN:  Thank you, Your Honor.  At this time,

24   if I could offer into evidence Government's Exhibit 2.

25        Judge, if I can try to play just one of the calls

1    using the microphone, see if you can hear it; otherwise, if

2    the Court feels it necessary to hear, the Government

3    believes it's relevant towards detention, perhaps a brief

4    recess.  They're very short.

5              THE COURT:  All right.  Let's see how we do.

6    Obviously it's important not only that I hear, but that

7    Mr. Ivers and Ms. Atwal be able to hear as well and

8    hopefully be able to get a recorded record of it also, but

9    let's see how you do with the microphones.

10             MS. ALLYN:  And I said I'll try.  And again, too,

11   if there needed to be a recess, Ms. Atwal has the disc and

12   anyone can hear it from my computer.  It's just how long

13   you'll be able to hear it now.

14             So I'm going to play -- it's from January 10th.

15             MS. ATWAL:  Your Honor, I will let the Court know

16   that Probation did provide these recordings to me last

17   night.

18             THE COURT:  And have you listened to them?

19             MS. ATWAL:  I have, Your Honor.

20             THE COURT:  All right.

21             MS. ATWAL:  The Government's indicated out of the

22   calls which ones are on Exhibit 2.

23             THE COURT:  All right.  Thank you.

24             MS. ALLYN:  Yes.  Thank you, Your Honor.  I will

25   to make the record clear -- thank you, Ms. Atwal -- the

1    probation officer sent us three calls from October.  Those

2    calls actually the Government already put into evidence at a

3    prior hearing involving Mr. Ivers.  So on this disc are just

4    the January calls from Mr. Ivers to his North Dakota

5    probation officer.

6            THE COURT:  Do you happen to know the disc -- to

7    be that much more clear about the record, do you happen to

8    know the dates of the January messages that you're going to

9    be playing?

10           MS. ALLYN:  Yes, Your Honor.  On this disc there's

11   two listed from January 10th and two listed from January 14,

12   although I have to say I thought there's only -- if I can

13   check my notes -- one of those could be another call.  There

14   are at least two from the 10th and I think only one from the

15   14th.

16           THE COURT:  All right.  Go ahead.

17           MS. ALLYN:  Thank you, Your Honor.

18       (Audio recording played)

19           MS. ALLYN:  Your Honor, were you able to hear that

20   at all?

21           THE COURT:  Yes.

22           MS. ALLYN:  Then I'll just play one from the 14th.

23   I think it was a line (ph) one on the 14th.  I'm not going

24   to play the second one on the 10th, because I think as the

25   Court sees, they are vulgar.

```
1              (Audio recording played)
2                   MS. ALLYN:  Were you able to hear that, Your
3      Honor?
4                   THE COURT:  Yes.
5      BY MS. ALLYN:
6      Q.   Probation Officer Wilson, does that sound accurate,
7      those two of several phone calls that you heard from
8      Mr. Ivers?
9      A.   Yes.
10     Q.   All right.  So you said that about January 13th North
11     Dakota was declining their courtesy supervision, is that
12     right?
13     A.   Yes.
14     Q.   So who took over supervising Mr. Ivers at that time?
15     A.   Jim Weinberger took over the supervision of the case.
16     Q.   Was anybody going to assist Jim Weinberger in
17     supervising Mr. Ivers?
18     A.   Stephanie Thompson works out of our Fergus Falls office,
19     which is closer to North Dakota, and she would likely assist
20     him with just looking at the electronic monitoring
21     equipment.  We have to do monthly checks on it.  So she was
22     someone that we wanted to introduce to Mr. Ivers so that he
23     could put a name with a face, because she may have to go and
24     check on the equipment periodically.
25     Q.   And that would still be -- Ms. Thompson and
```

1    Mr. Weinberger going to North Dakota, is that right?

2    A.  Correct.

3    Q.  So is there anything about North Dakota declining

4    courtesy supervision that would change the authorized

5    district where Ivers could live?

6    A.  No.

7    Q.  Was Ivers still only authorized to live in North Dakota

8    regardless of the change in probation officer?

9    A.  Yes.  He was only authorized to live in North Dakota.

10   Q.  Now, once North Dakota declined that supervision, did

11   anyone from Minnesota meet with Mr. Ivers again to discuss

12   his supervision with respect to it now coming to Minnesota

13   or now being supervised by Minnesota probation officers?

14   A.  On January 30th, supervision was transferred to

15   Minnesota.  Myself and Jim Weinberger went to Mr. Ivers'

16   residence, met with him and did a home inspection because,

17   you know, we were going to be the supervisors of his case.

18           After finishing the home inspection we met down at

19   the police station and Stephanie Thompson met us there so we

20   could introduce her to him.

21   Q.  So first let's start with that home inspection.  Where

22   did you do the home inspection?

23   A.  At his sister's residence in Fargo, North Dakota.

24   Q.  And how would you describe that residence?

25   A.  A very nice residence, very well-kept, clean, roomy.

1    One of the nicer places that I've seen in doing home

2    inspections before.

3    Q.  Had Mr. Ivers ever indicated to either you or

4    Mr. Weinberger that his sister did not want him to live

5    there?

6    A.  Prior to transferring supervision back to Minnesota, he

7    had indicated that his sister didn't want him there and they

8    weren't getting along and he needed to move out.

9            At that time we said that he -- if he was going to

10   move out of the residence that he would have to go to

11   Center, which is a residential rehabilitation center,

12   halfway house, in North Dakota.  At that time he said that

13   it would interfere with his Social Security and it would

14   cost -- it would take a significant amount from him.  And

15   didn't hear any more about that being an issue after that

16   particular time.

17   Q.  So you did give him an alternative from living at his

18   sister's house, is that so?

19   A.  Yes.

20   Q.  But it still didn't include moving to Minnesota, did it?

21   A.  No.

22   Q.  Did Mr. Weinberger or you reach out to his sister to see

23   whether in fact it was a problem for Mr. Ivers to live with

24   her?

25   A.  Mr. Weinberger reached out to Mr. Ivers' sister prior to

1    us going up for the home inspection, and according to

2    Mr. Weinberger, she told him that he did not -- he was

3    welcome to stay there, that she had no problem with him

4    being there and they were not having any issues.  In fact,

5    that she welcomed him there, he treated her very nicely and

6    that he was a help to her at the residence and he could

7    stay -- she didn't expect him to stay forever, but she

8    did -- was fine with him being there until he found an

9    alternative place to live.

10   Q.  All right.  So we're just breaking down this

11   January 30th visit.  You had a home inspection.  Then you

12   said something about going to the police department.  Can

13   you explain that?

14   A.  Yes.  So we met at the police department so that we

15   could review his conditions, pretty much the same conditions

16   that he reviewed with the North Dakota probation officer.

17   And there was one other thing that we reviewed, which was

18   basically Jim giving him written instructions about his

19   behavior and language and how he would address the probation

20   officers doing -- from that day going forth in terms of his

21   supervision.

22   Q.  And what did this extra special condition say?  What was

23   it requiring of Mr. Ivers?

24   A.  It was requiring him to not use vulgar language and to

25   be respectful when he's having conversation with Probation.

1     He put it in writing, Jim Weinberger signed it as well as

2     Mr. Ivers.

3     Q.  And as part of that, you're saying that you also went

4     through these same conditions of supervised release again

5     with Mr. Ivers?

6     A.  Yes, all of them.

7     Q.  And did Mr. Ivers again sign this list of conditions of

8     his supervised release?

9     A.  Yes, he did.

10              MS. ALLYN:  Your Honor, may I approach?

11              THE COURT:  Yes.

12    Q.  Probation Officer Wilson, I show you Government Exhibit

13    3.  Do you recognize it?

14    A.  Yes.

15    Q.  And what is it?

16    A.  It's a copy of his judgment and his conditions.

17              THE COURT:  Make sure you're speaking into the

18    microphone.

19              THE WITNESS:  Okay.

20    A.  A copy of the judgment and conditions that were signed

21    by Mr. Ivers.

22    Q.  And are there certain signatures and dates on this

23    Government Exhibit 3?

24    A.  Yes.  Mr. Ivers' signature, as well as Jim Weinberger's

25    signature on January 30th.

1    Q.  2020?

2    A.  2020, yes.

3             MS. ALLYN:  Your Honor, the Government would move

4    to enter into evidence Government's Exhibit 3.

5             MS. ATWAL:  Three?

6             MS. ALLYN:  Yes, 3.

7             MS. ATWAL:  Yes.  No objection.

8             THE COURT:  Government Exhibit 3 is admitted.

9    Just for housekeeping purposes, you played messages off of

10   Government Exhibit 2, but you didn't actually offer

11   Government Exhibit 2 into evidence.  Did you intend to or

12   not?

13            MS. ALLYN:  Yes, Your Honor, and I'm sorry.  I

14   thought when defense objected to playing the Court had

15   overruled that objection.

16            THE COURT:  I wasn't sure it was formally offered,

17   but in any event, just to keep the record clear, yes,

18   Government Exhibit 2 is admitted and it was previously

19   played.

20            MS. ALLYN:  Yes, Your Honor.  I apologize.  I

21   think with not (inaudible) play it, I lost track.  Thank

22   you.

23   BY MS. ALLYN:

24   Q.  So, Officer Wilson, aside from these extra signatures,

25   if we were to look again at judgment page 4 of 7, does this

1     again contain the same provisions, number 3 and 13, that you

2     previously read into the record?

3     A.  Yes.

4     Q.  So you were there when Mr. Ivers went through these

5     standard conditions of supervision, is that true?

6     A.  Yes.

7     Q.  Did Mr. Ivers talk to you then about wanting to come

8     back, leaving North Dakota and coming to Minnesota?

9     A.  Yes.

10    Q.  Can you explain that conversation to the Court.

11    A.  Mr. Ivers explained that his attorney had filed

12    something with Judge Pratt stating that he was coming to

13    Minnesota on April 10th.

14    Q.  And how did you respond to that?

15    A.  Well, Jim Weinberger first responded, telling him that

16    he could not come to Minnesota without the permission of

17    Judge Pratt and that he was not giving him permission to

18    come to Minnesota on April 10th.

19              THE COURT:  April 10th?

20              THE WITNESS:  I'm sorry, on February 10th.  On

21    February 10th.

22    Q.  Thank you.  How did Mr. Ivers respond when

23    Mr. Weinberger told him that?

24    A.  Well, Mr. Ivers believed that Mr. Weinberger could make

25    a decision to allow him to come to Minnesota.  He

1    specifically said that Mr. Weinberger was denying him to

2    come to Minnesota and that it was -- that he expressively

3    tells him that he could come.  Mr. Weinberger explained to

4    him that he could not give him permission to come -- that he

5    was not giving him permission to come on February 10th and

6    that if he wanted to come on February 10th, he should

7    request that his attorney file a motion to allow him to come

8    to Minnesota, and then if Judge Pratt approved of that, then

9    we would make arrangements for him to come to Minnesota.

10            As he continued to say that Mr. Weinberger could

11   make that decision himself, I interjected and made it clear

12   that as Jim's supervisor, if he was to say right that moment

13   that he would allow him to come to Minnesota, I would have

14   to object to it and tell him that he needed to follow the

15   instructions, which would be file the motion and get

16   permission from Judge Pratt, as he had already denied travel

17   to Minnesota for Mr. Ivers on two different occasions.

18   Q.  How did Mr. Ivers respond when you said the only way he

19   could travel to Minnesota is to get permission from

20   Mr. Pratt -- or Judge Pratt?  Excuse me.

21   A.  Well, he said he had -- he wanted to get out of North

22   Dakota, he didn't like it there, he didn't want to be there,

23   he had business in Minnesota.  He then said that he'd rather

24   be in prison than living in North Dakota.

25   Q.  Did you warn Mr. Ivers that he would be arrested if he

1    came to Minnesota without permission?

2    A.   Mr. Ivers made it clear that day that he intended to

3    come to Minnesota on April 10th.  I specifically spoke to

4    Mr. Ivers about what he was saying and I told him that, you

5    know, if he was coming to Minnesota he might not even make

6    it to Minneapolis or to the Twin Cities area, because he

7    would likely be arrested because he's on a GPS monitoring.

8    If he had it on, we would be able to monitor his location

9    and he would likely be picked up and taken into custody.

10   And he just made it clear he'd rather be in prison than to

11   live in North Dakota.  That was kind of how we ended that

12   conversation.

13   Q.   Did you also during this January 30th, 2020 meeting

14   discuss him using GPS, any issues he was having with GPS?

15   A.   There was no issues with his GPS.  We went over the

16   conditions and he signed the conditions saying that he

17   understood what he was supposed to do in terms of GPS

18   monitoring.  We asked if he had any questions, if there

19   was -- he was welcome to ask if there were any problems with

20   any of the conditions and he signed them and that was it.

21   He stated that he understood them clearly.

22   Q.   After the January 30th meeting, did Probation Officer

23   Stephanie Thompson have any contact with Mr. Ivers that

24   first week of February 2020?

25   A.   Yes.  Shortly after we had our meeting on January 30th,

1    there was some issues with his electronic monitoring

2    equipment.  We weren't sure if it was just an issue with the

3    equipment or if Ivers had not charged up the battery that

4    was in the equipment at the time.  Mr. Weinberger called him

5    to try to troubleshoot the situation.  Mr. Ivers, you know,

6    used some explicit language and told him that he needed to

7    call his attorney and hung up the phone on him.  He was

8    simply asking him to change the battery to see -- to make

9    sure that it was working properly, because he was getting

10   alerts.

11   Q.  And did Stephanie Thompson try to meet with Mr. Ivers on

12   February 3rd?

13   A.  Well, what happened was because we were getting these

14   alerts and there were issues with the electronic monitoring

15   equipment, we asked Stephanie to go and change the equipment

16   out just to make sure it was not just the equipment that

17   there was an issue with.

18          You know, the concern for us at that time was that

19   Mr. Ivers, number one, wasn't answering his phone when Jim

20   was calling, which is part of the condition of being on

21   electronic monitoring, that we need to be able to

22   communicate with him when there's a problem or if we wanted

23   to speak with him about something.

24          The issue with the electronic monitoring equipment

25   was resolved apparently when she went and changed the

1    equipment.  We did not have any further issues with the

2    equipment showing alerts or anything like that.

3    Q.  But it was this time when Officer Thompson was there,

4    are you saying Mr. Ivers said -- was refusing to talk to Jim

5    Weinberger?

6    A.  He was refusing to talk to Jim before she went up to

7    change the equipment.  So, you know, instead of kind of

8    going back and forth, we just said, you know, we want to

9    make sure that the equipment is proper based because we want

10   to make sure that he's under the supervision that he's

11   supposed to be under.  The issue at the time was simply he

12   didn't want to talk to Jim, he didn't want to -- he hung the

13   phone up on him, he cursed at him.  You know, and that's not

14   a violation, but the violation is that he was not allowing

15   us to do our job in terms of troubleshooting with the

16   electronic monitoring.  We asked Stephanie to go up, change

17   the equipment out altogether and we didn't have any issues

18   thereafter.

19   Q.  So I think you said he started swearing at him and

20   started to say, "F you," basically?

21   A.  Yeah, "F you.  Call my attorney.  I don't" -- you know,

22   "I'm not going to talk to you."

23   Q.  Is that a violation of the condition to at least follow

24   the instructions of your probation officer, stay in contact

25   with your probation officer?

1    A.  Yes.  The instruction is that and he had just signed

2    a -- you know, what we had signed with him about his

3    language and his demeanor when he's in communication with

4    Probation.  We went over that, discussed it with him, and he

5    stated that he understood that, but went back to that a

6    little bit again at that particular time.

7    Q.  So after this exchange on about February 3rd, 2020, did

8    Mr. Ivers leave North Dakota?

9    A.  Yes.

10   Q.  And when did he leave North Dakota?

11   A.  February 9th I got a call from Mr. Weinberger that his

12   GPS was showing him headed toward Minneapolis.

13   Q.  And when -- did in fact Mr. Ivers come to Minnesota?

14   A.  Yes.

15   Q.  Did Mr. Ivers have permission from the Probation Office

16   to leave North Dakota and come to Minnesota?

17   A.  No.

18   Q.  Did Mr. Ivers have permission from Judge Pratt to leave

19   North Dakota and come to Minnesota?

20   A.  No.

21   Q.  So what did you all at the Probation Office do then?

22   A.  Filed a petition for a warrant, which was signed off by

23   Judge Pratt, and he was picked up in Hopkins, Minnesota by

24   the Hopkins police.

25   Q.  Do you know any of the circumstances of his arrest?

1     A.  What I was made aware of was that when they picked him

2     up, he was in his car.

3     Q.  In Hopkins, Minnesota?

4     A.  Yes.

5     Q.  Was Defendant in Hopkins, Minnesota in his car a

6     violation of his conditions of release?

7     A.  Yes.

8     Q.  How so?

9     A.  He did not have permission to leave the jurisdiction of

10    the district that he was living in.  He did not get

11    permission from Jim Weinberger, his probation officer, nor

12    did he get permission from Judge Pratt, who had already

13    given two previous orders, and he also did not follow the

14    instructions of Mr. Weinberger, which we gave him on

15    January 30th.  Mr. Weinberger and myself gave him the same

16    instructions, that he should not come to the District of

17    Minnesota without those -- without getting prior permission,

18    or he will be arrested.

19    Q.  How has Defendant's behavior been on supervision for

20    these last six months, or for only the six months?

21    A.  As far as I'm concerned, very uncommon.  It's very

22    uncommon that people who are on supervision talk to their

23    probation officers off record.  Generally people are

24    respectful, understand that they have a job to do and follow

25    the instructions of the probation officer.  I made it clear

1    he hasn't committed a new crime as far as I'm concerned, but

2    he's violated the conditions of supervised release and has

3    made it clear to us in this situation that that's what he

4    intended to do and that's what he did.

5    Q.  Do you have a recommendation as to whether Mr. Ivers

6    should be detained or not?

7    A.  Mr. Ivers did not follow the instructions of the

8    probation officer, including myself, or Judge Pratt in

9    regards to him remaining where he was supposed to be in

10   terms of his location monitoring.  I have no reason to

11   believe that Mr. Pratt would not make -- I'm sorry --

12   Mr. Ivers would not make the same decision.  If he decides

13   he wants to leave, I can't see that we have any way of

14   enforcing or him to remain in a location other than in

15   custody or where he's supposed to be until this situation is

16   resolved.

17   Q.  So is that a recommendation that Mr. Ivers should be

18   detained at least until the final revocation hearing?

19   A.  That would be my recommendation.

20        MS. ALLYN:  If I could have one moment, Your

21   Honor.

22        THE COURT:  Yes.

23      (Pause)

24        MS. ALLYN:  Your Honor, thank you.  I have no

25   further questions.

1              THE COURT:  All right.  Ms. Atwal,

2     cross-examination.

3              MS. ATWAL:  Thank you, Your Honor.  And with the

4     Court's permission, I would like to address detention

5     factors during this witness's cross-examination as well.

6              THE COURT:  Yes.

7              MS. ATWAL:  Thank you.

8              THE COURT:  And I assume, Ms. Allyn, that your

9     examination was intended both to cover probable cause and

10    detention, right?

11             MS. ALLYN:  Yes, Your Honor.

12             THE COURT:  Okay.  Go ahead, Ms. Atwal.

13             MS. ATWAL:  Thank you, Your Honor.

14                         **CROSS-EXAMINATION**

15    BY MS. ATWAL:

16    Q.  Good morning, Officer Wilson.  How are you today?

17    A.  I'm fine.  Good morning.

18    Q.  Good morning.  Okay.  So let's just start off kind of

19    where we left off during your direct examination.

20             One of the things you said is there's no way to

21    know where he's going to be since he hasn't followed your

22    directions, correct?

23    A.  I said there's no reason to believe that he would follow

24    my directions, yes.

25    Q.  Okay.  So let's talk about his arrest.  He was located

1    because of his GPS location, correct?

2    A.  Yes.

3    Q.  In other words, he didn't cut off his bracelet, did he?

4    A.  No.

5    Q.  And in fact, he was arrested outside of his brother's

6    home in Hopkins, correct?

7    A.  Yes.

8    Q.  The same address that's listed on his driver's license

9    that he's had for quite a while, correct?

10   A.  Yes.

11   Q.  Now, let's go back to your qualifications.  You've been

12   a supervisor recently, but you've also been a line PO,

13   correct?

14   A.  Yes.

15   Q.  That means you've supervised offenders, correct?

16   A.  Yes.

17   Q.  Part of the goal of probation is to help offenders

18   succeed, correct?

19   A.  Yes.

20   Q.  You want them to integrate back into their community?

21   A.  Yes.

22   Q.  And for Mr. Ivers, his community has always been

23   Minnesota, correct?

24   A.  No.

25   Q.  For the most part of his life it's been Minnesota,

1    correct?

2    A.   According to Mr. Ivers, yes.

3    Q.   According to your probation officer -- or Probation, who

4    wrote the PSR, correct?

5    A.   Correct.

6    Q.   In fact, they stated in the PSR report that Mr. Ivers

7    was born and raised in Minnesota.

8    A.   Correct.

9    Q.   He left for a short period to go to California.

10   A.   Correct.

11   Q.   And right prior to this offense conduct he was living in

12   North Dakota for a brief period.

13   A.   Yes.

14   Q.   But other than that, born and raised in Minnesota,

15   correct?

16   A.   Yes.

17   Q.   And in fact, he has siblings that live here in

18   Minnesota?

19   A.   I know the brother.

20   Q.   He has two brothers living in Minnesota, correct?

21   A.   The only one I've ever spoken about was the one brother

22   that he -- I'm assuming yes, that he has two brothers here.

23   Q.   Okay.  If the probation officer wrote that in the PSR,

24   you have no reason to doubt that --

25   A.   No, no reason to, no.

1    Q.  And in fact, he went to school right here in Minnesota?

2    A.  Yes.

3    Q.  And when he has said to Probation over and over again he

4    wants to go home, home to him has always been the Hopkins

5    area in Minnesota, correct?

6    A.  Yes, according to him, yes.

7    Q.  So let's talk about why it is that he's in North Dakota.

8         When he was getting released from prison, it was

9    Mr. Ivers who suggested that he go to North Dakota, correct?

10   A.  Yes.

11   Q.  And that was because he wanted to pick up a vehicle that

12   his sister had in North Dakota for him, correct?

13   A.  Yes.

14   Q.  And when his sister was interviewed during the PSR

15   process, she said:  My home's open in North Dakota, but on a

16   temporary basis, correct?

17   A.  I'm not aware of that.

18         MS. ATWAL:  Your Honor, may I approach?

19         THE COURT:  Yes.

20   Q.  I'm going to show you the PSR.

21         Mr. Wilson, I'll refer you to paragraph 74.  And

22   do you see right there it says the last line that his sister

23   said that Mr. Ivers could live with her temporarily,

24   correct?

25   A.  Yes.

1    Q.  So at Mr. Ivers' suggestion when he was getting released

2    from prison, he's sent to North Dakota, correct?

3    A.  Yes.

4    Q.  And in fact in Government's Exhibit 1 and 3, which is

5    the judgment, which includes standard conditions of

6    supervision, special conditions of supervision, nowhere in

7    this document does it say he cannot reside in Minnesota,

8    correct?

9    A.  Correct.

10   Q.  In fact, the hearing that Judge Pratt held back in

11   October after Mr. Ivers' prior attorney filed a motion for

12   travel, it was suggested by his North Dakota probation

13   officer that the plan was always for Mr. Ivers to be

14   supervised and to live in Minnesota, correct?

15   A.  Correct.

16   Q.  And in fact, that probation officer was under the

17   impression that that was going to happen in October of 2019,

18   correct?

19   A.  I can't say that I can speak to that.  I can't speak for

20   what his thoughts were.  I don't know.

21   Q.  Were you at that hearing?

22   A.  I was not.

23   Q.  Did you talk to Mr. Weinberger about that hearing?

24   A.  I did.

25   Q.  Do you recall Mr. Weinberger telling you that there was

1    some plan for Mr. Ivers to be moved back to Minnesota

2    sometime in October?

3    A.  I don't recall him talking about Mr. Ivers moving back

4    in October, no.

5    Q.  Why was it that Probation did not want him here in

6    Minnesota?

7    A.  The victim lives in Minnesota.

8    Q.  Okay.  So let's talk about that for a moment.

9            It's true in the PSR that they talk about the

10   offense conduct, correct?

11   A.  Correct.

12   Q.  And in one of the paragraphs it states that after verbal

13   threats were made against the victim, that the marshals

14   started kind of keeping tabs on Mr. Ivers, correct?

15   A.  Correct.

16   Q.  And at one point they noted that he traveled from North

17   Dakota to the Cities, correct?

18   A.  Correct.

19   Q.  And at no time did he attempt to make contact with the

20   victim, correct?

21   A.  Correct.

22   Q.  At no time did he try to come to the federal courthouse?

23   A.  Correct.

24   Q.  At no time did he try to go to the victim's residence?

25   A.  Correct.

1    Q.  And in fact when he traveled on February 9th which he

2    gave notice for, there was no indication he tried to come to

3    the federal courthouse in St. Paul or to the victim's

4    residence, correct?

5    A.  That's correct.

6    Q.  There's been no allegations that he's attempted to

7    contact the victim in this case, correct?

8    A.  Correct.

9    Q.  And in fact, the threats that were made, it was a verbal

10   conversation that he had with his attorneys at the time,

11   correct?

12   A.  Yes, correct.

13   Q.  In other words, there was no direct threats to the

14   alleged victim?

15   A.  Correct.

16   Q.  Now, going back to some of your testimony from earlier,

17   you said you were familiar with this case because of -- you

18   had a lot of conversations about the GPS and things like

19   that, correct?

20   A.  Yes, special circumstances, yes.

21   Q.  Okay.  So on January 30th, you and PO Weinberger went up

22   to see Mr. Ivers and go over Government's Exhibit 3,

23   correct?

24   A.  Correct.

25   Q.  And you again read to him I think it was paragraph 3 on

1    the special conditions, correct?

2    A.  Correct.

3    Q.  Can you read that for me again?

4    A.  Number 3?

5    Q.  Yes.

6    A.  "You must not knowingly leave the federal judicial

7    district where you are authorized to reside without first

8    getting permission from the court or the probation officer."

9    Q.  So the last part says "from the court or the probation

10   officer," correct?

11   A.  Yes.

12   Q.  So you review this with him on the 30th.

13   A.  Yes.

14   Q.  And he turns around and says, "Mr. Weinberger, I want to

15   go to Minnesota," correct?

16   A.  Correct.

17   Q.  "I want permission from you, my probation officer."

18   A.  Yes.

19   Q.  And then you guys tell him, "No, it has to be from the

20   Court," right?

21   A.  Yes.

22   Q.  So in other words saying, "Yes, we want you to follow

23   condition number 3, but what we really mean, you have to

24   have permission from the Court, not from the PO."

25   A.   No, when we said get permission from the Court, because

1    we're not giving him permission.

2    Q.  Okay.  So when he was -- when you said earlier that if

3    Mr. Weinberger had said, "I give you permission," you would

4    have objected to that and said, "No, you've got to get

5    permission from the Court."

6    A.  Yes, because we were not giving him permission to come

7    to Minnesota.

8    Q.  Okay.  So what did you mean by your statement that if

9    the probation officer had given him permission, you would

10   have objected?

11   A.  I would have objected because we were not giving him

12   permission.  If he said that he wanted to allow him to go

13   right that minute, that I would object as his supervisor --

14   Q.  Okay.  As his supervisor --

15   A.  As a supervisor, yes, because he was not going to be

16   getting permission from us.  If he wanted to come, he'd have

17   to go through Judge Pratt, because we were not going to give

18   it to him.

19   Q.  All right.  So after he reads paragraph 3 that says

20   "court or probation officer," it was three days later that

21   he's upset on the phone with Mr. Weinberger, correct?

22   A.  Yes.

23   Q.  He's upset and says, "Talk to my attorney."

24   A.  Yes.

25   Q.  And in fact, you guys have told him, "Go to your

1    attorney.  File a motion to see if you can travel," correct?

2    A.  Yes.

3    Q.  So when Mr. Weinberger's calling him, he says, "I don't

4    want to talk to you.  Call my attorney."  In not so many

5    words, but the general gist of it was to call his attorney.

6    A.  Yes.

7    Q.  Okay.  Now, on that same day, on January 30th, you and

8    Mr. Weinberger also received notice that his prior attorney,

9    Dan Scott, had filed a notification with the Court, correct

10   A.  Yes.

11   Q.  And that notification said -- it was ECF filing 226.

12              MS. ATWAL:  Your Honor, may I approach?

13              THE COURT:  Yes.

14   Q.  Mr. Wilson, I'm showing you Defendant's Exhibit 1, which

15   is ECF filing 226, which I had previously given a copy to

16   the Government.

17              MS. ATWAL:  Your Honor, I now move to enter

18   Defendant's Exhibit 1, which is document filing 226 from

19   ECF.

20              THE COURT:  Any objection?

21              MS. ALLYN:  No objection.

22              THE COURT:  Defendant's Exhibit 1 is received.  Do

23   you have a copy for me?

24              MS. ATWAL:  Oh, yes, Your Honor.  I'm sorry.  May

25   I approach?

 1              THE COURT:  That's all right.

 2          (Pause)

 3              THE COURT:  Thank you.

 4      BY MS. ATWAL:

 5      Q.  Mr. Wilson, what this notice says:  "Robert Philip

 6      Ivers, through counsel, hereby provides notice that, now

 7      that he is no longer under the supervision of the North

 8      Dakota Probation Office, he intends to travel to the

 9      Minnesota United States Probation Office in Minneapolis,

10      Minnesota on February 10th, 2020, to personally report to

11      his Probation Officer during business hours," right?

12      A.  Yes.

13      Q.  Okay.  So this is filed on ECF.  You have notice of

14      this, correct?

15      A.  Yes.

16      Q.  Mr. Weinberger has notice of this.

17      A.  Yes.

18      Q.  Did you discuss this document with Judge Pratt?

19      A.  Mr. Weinberger may have spoken with Judge Pratt.

20      Q.  You don't know?

21      A.  I'm not positive.

22      Q.  Did you have a discussion with the Government about this

23      document prior to February 10th?

24      A.  Did I?  No.

25      Q.  Did Mr. Weinberger?

1    A.  Not that I know of.

2    Q.  Okay.  So everybody had notice that this is what

3    Mr. Ivers wanted to do.

4    A.  Yes.

5    Q.  So in order to make sure he succeeds and does well on

6    probation, nobody files an objection to this notice, do

7    they?

8    A.  No.

9    Q.  Judge Pratt doesn't issue an order saying you can't

10   travel?

11   A.  No.

12   Q.  The Government, as far as you know, didn't file a notice

13   saying you got to stay put; otherwise, we're going to file a

14   violation.

15   A.  No.

16   Q.  And in fact, when he crossed the border to come into --

17   from Fargo, North Dakota, it takes about four hours from the

18   border, you said, three or four hours?

19   A.  Yes.

20   Q.  Okay.  He wasn't arrested until later on in that evening

21   when he was outside of his brother's home, correct?

22   A.  Correct.

23            MS. ATWAL:  Your Honor, may I just have a moment?

24            THE COURT:  Yes.

25   BY MS. ATWAL:

1    Q.  Also, when -- you did say that Mr. Weinberger had talked

2    to his sister Janet, correct?

3    A.  Correct.

4    Q.  And that she said he was more than welcome to stay at

5    our house.

6    A.  Correct.

7    Q.  She also informed Probation at that time that he wanted

8    to go home to Minnesota, correct?

9    A.  Correct.

10   Q.  And in fact, the October phone calls that are not a part

11   of this hearing, he sounds pretty desperate.  He keeps

12   saying he wants to succeed, do well, and that would mean

13   being home in Hopkins, correct?

14   A.  Correct.

15   Q.  He says he wants medical care, he wants to be close to

16   his brother and get housing, correct?

17   A.  Correct.

18   Q.  Would you agree with me in some of those phone calls he

19   sounds desperate to be back in Minnesota?

20   A.  I can't speak to his state of mind, but he sounded

21   angry.

22   Q.  Okay.  Did he sound desperate?

23   A.  He sounded angry to me, not desperate.

24   Q.  Okay.  In the October phone calls when he's saying he's

25   losing it, he really wants to just be in Minnesota?

1    A.  He sounds angry to me.

2    Q.  Okay.  So you don't think he sounds desperate.

3    A.  I wouldn't say desperate.  I said he sounds angry.

4    Q.  Okay.  Now, you would agree with me that Mr. Ivers has

5    completed mental health treatment as was required by the

6    Court, correct?

7    A.  Correct.

8    Q.  He successfully completed that.

9    A.  Correct.

10   Q.  You would agree with me that when the hearing happened

11   last year when he was on his second motion to travel, the

12   probation officer at that time noted that Mr. Ivers had been

13   compliant with Probation, correct?

14   A.  Correct.

15   Q.  He had not had a single violation on GPS.

16   A.  Correct.

17   Q.  His house had been searched.  There was nothing

18   threatening found inside his home.

19   A.  Correct.

20   Q.  No firearms found in his home?

21   A.  Correct.

22   Q.  And in fact, he kept in contact with his PO, went to the

23   Probation Office when he was supposed to, correct?

24   A.  Correct.

25   Q.  Was at his home at his sister's place when the PO said,

1    "I'm going to come visit," he was there.

2    A.  Correct.

3    Q.  And in fact, the North Dakota PO said he was being

4    compliant.

5    A.  Correct.

6    Q.  In regards to -- just give me a moment.  Sorry.

7           MS. ATWAL:  Sorry, Your Honor.  I apologize.

8           THE COURT:  No, go ahead.

9        (Pause)

10   BY MS. ATWAL:

11   Q.  Just going to the safety factors, when you searched his

12   home on January 30th, it was you and Officer Weinberger,

13   correct?

14   A.  It was not a search.  It was just an inspection.

15   Q.  Okay.  What does that mean?

16   A.  Well, a search would mean we'd be looking for something.

17   Q.  What's an inspection?

18   A.  An inspection is just an overall look at the residence,

19   layout of the home, see all the rooms, just confirm that he

20   lives there.

21   Q.  So you weren't concerned enough about Mr. Ivers to do a

22   search of the home.

23   A.  No, we didn't -- we weren't authorized to do a search.

24   We weren't doing a search.  It was an inspection, as I just

25   mentioned.

1    Q.  Okay.  You didn't see anything like a firearm sitting

2    out, correct?

3    A.  Correct.

4    Q.  You didn't see a bomb-making kit or anything like that

5    sitting out?

6    A.  Correct.

7    Q.  And in fact, looking at Mr. Ivers' record, there is no

8    type of violence on his record but for the 2016 excessive

9    phone call conviction, correct?

10   A.  Correct.

11   Q.  Finally, when he was in prison -- he was sent off to

12   prison for 18 months and I know it was a little bit shorter

13   than that because of his time in Sherburne County -- there's

14   no indication that he did not behave well in prison; in

15   fact, it shows that he did well in prison.

16   A.  Correct.

17   Q.  If he is released to a halfway house, you can still have

18   GPS monitoring at a halfway house, correct?

19   A.  Correct.

20   Q.  There is staff at the halfway house that can monitor

21   offenders, correct?

22   A.  Correct.

23   Q.  There can be a condition placed that he continue with

24   mental health treatment, correct?

25   A.  Correct.

1    Q.  And he still can be supervised by his probation officer,

2    correct?

3    A.  Correct.

4    Q.  Thank you?

5              MS. ATWAL:  I have nothing further, Your Honor.

6              THE COURT:  Thank you.  Ms. Allyn, anything by way

7    of redirect?

8              MS. ALLYN:  Yes.  Thank you, Your Honor.

9

10                        **REDIRECT EXAMINATION**

11   BY MS. ALLYN:

12   Q.  Probation Officer Wilson, I think when Ms. Atwal was

13   first asking you about this address where Mr. Ivers went to

14   when he was arrested, do you recall those questions?

15   A.  Yes.

16   Q.  I think you answered that this was the same address as

17   he lived at before.  Do you know that to be true at all?

18   A.  No, I wasn't saying that he lived there before.  That's

19   the same address that was on his identification.

20   Q.  Okay.  So he has not lived at that address before, is

21   that right?

22   A.  Not that I knew of.

23   Q.  Explain to me what you know or understand for him having

24   gotten identification that happens to have this address on

25   it.

1    A.  At the beginning of supervision, Mr. Ivers was allowed

2    to go into Moorhead, Minnesota, and reestablish his driver's

3    license, his identification, and that's the address that he

4    used on his application.  That's the address that he had put

5    on his Minnesota ID.

6    Q.  So how do you characterize using an address where he's

7    never lived to get an identification?

8    A.  Fraudulent.

9    Q.  Is that how Judge Pratt viewed it?

10   A.  I believe so.

11   Q.  This brother that Mr. Ivers went to, house in Hopkins,

12   do you know that he's been civilly committed as

13   schizophrenic and bipolar?

14   A.  Yes.

15   Q.  And you had heard that the circumstances of the arrest

16   were that Mr. Ivers was in a car at this address, is that

17   right?

18   A.  Yes, he was in his vehicle.  My understanding, they said

19   sleeping.

20   Q.  Do we even know for sure this was his brother's address?

21   A.  That's the address that he says his brother lived at.

22   I'm not sure if that's his brother.  He had mentioned to me

23   when we were in the meeting on January 3rd that that was his

24   friend's address and that's why he used the address.  He

25   said his friend.

1    Q.  There's some testimony about the North Dakota probation

2    officer and he thought Mr. Ivers was coming back in October

3    to Minnesota.  Do you remember all that?  Is that true?  Do

4    you remember --

5    A.  I wasn't -- I wasn't in the hearing, so I can't say that

6    he said it or he didn't say it.  There was no discussion

7    with us or with Jim and there was nothing he said that said

8    that there was any plan for him to move back at that

9    particular time, that I know of.

10   Q.  Is it fair to say that that North Dakota probation

11   officer wanted rid of Mr. Ivers?

12   A.  They requested to relinquish their interest in the case

13   and I believe it was based on the behavior of Mr. Ivers and

14   his insistence --

15            MS. ATWAL:  Objection.  Speculation.

16            THE COURT:  Overruled.

17   Q.  Probation Officer Wilson, moving on regardless, there's

18   some testimony about Mr. Ivers is not prohibited from coming

19   to Minnesota in his conditions, right?

20   A.  No, he's not prohibited.

21   Q.  Was it your view or Mr. Weinberger's view that if

22   Mr. Ivers could be compliant for, I don't know, say six

23   months, a year, he'd be allowed to travel to Minnesota?

24   A.  It would probably increase his chances of being able to

25   come to Minnesota.  He wants to come on his -- as far as I

1    can see, when he's ready and it's been made clear to him he

2    needs permission from us or Judge Pratt.  At this time we're

3    giving permission, so we direct him to -- if he wants -- if

4    Judge Pratt says he can come, then he can come and we would

5    make accommodations for him to come and take care of his

6    business and return to North Dakota unless Judge Pratt says

7    differently.

8    Q.  But as of now, Probation's been denying it because he's

9    just not being compliant for a long enough period of time,

10   is that true?

11   A.  Correct.

12   Q.  Back on February 2nd, February 3rd, I think when

13   Mr. Weinberger was trying to talk to Mr. Ivers, do you

14   remember that time period?

15   A.  Yes.

16   Q.  And that's when Mr. Ivers said, you know, "F you.  Talk

17   to my lawyer," right?

18   A.  Correct.

19   Q.  But Mr. Weinberger was not trying to talk to Mr. Ivers

20   about the travel at that time, is that right?

21   A.  That conversation was about his GPS and his electronic

22   monitoring.  There was issues with it, he was getting

23   alerts.  He wanted to talk to Mr. Ivers about making sure

24   that issue was corrected.  Mr. Ivers said, "F you, talk to

25   my attorney.  I don't want to talk to you."  It had nothing

1    to do with travel.  It was simply about the electronic

2    monitoring on that particular day.

3    Q.  So Mr. Ivers was refusing to talk to Probation even

4    about GPS monitoring, is that true?

5    A.  Yes, which is a violation of his -- of his conditions

6    and a violation of what he signed with the agreement for his

7    electronic monitoring, that he would be able to be reached

8    at all times and he'd be available to take -- to have

9    conversation if there were issues with the monitoring.

10   Q.  Defendant's Exhibit Number 1, it's labeled as a notice,

11   is that correct?

12   A.  Yes.

13   Q.  So it's not a motion, is it?

14   A.  No.

15   Q.  And Judge Pratt would have had that notice in ECF equal

16   to you or equal to me, is that true?

17   A.  Yes.

18   Q.  And did Judge Pratt rule -- make any ruling about that

19   notice?

20   A.  No.

21   Q.  Did Judge Pratt thereafter give Mr. Ivers permission to

22   leave North Dakota?

23   A.  No.

24   Q.  Did Judge Pratt sign the search warrant for Mr. Ivers

25   even after having -- that notice had been filed --

```
1                THE COURT:  Search warrant?

2                MS. ALLYN:  I'm sorry.  Arrest warrant.  I'm used

3       to saying search warrant.

4       A.  Yes.

5                MS. ALLYN:  Nothing further, Your Honor.  Thank

6       you.

7                THE COURT:  All right.  Anything further,

8       Ms. Atwal?

9                MS. ATWAL:  Just briefly, Your Honor.

10               THE COURT:  All right.

11

12                        RECROSS-EXAMINATION

13      BY MS. ATWAL:

14      Q.  Officer Wilson, after that February 3rd phone call with

15      Mr. Weinberger, Ms. Thompson was able to change up the

16      equipment, correct?

17      A.  Yes.

18      Q.  And that happened after the phone call.

19      A.  Yes.

20      Q.  In other words, after you got off the phone with

21      Mr. Weinberger, he allowed Probation to put the GPS and redo

22      the equipment, correct?

23      A.  Yes.

24      Q.  Talking about that address, the one in Hopkins, you're

25      also aware that Mr. Ivers has ran for mayor at least two
```

1   times in the City of Hopkins.

2   A.  Yes.

3   Q.  And in order to run for mayor, you have to be a resident

4   of that city, correct?

5   A.  Yes.

6   Q.  And nobody's ever called into question that he has not

7   been a resident of Hopkins, correct, when he ran for mayor?

8   A.  Correct.

9   Q.  Thank you.

10              MS. ATWAL:  I have nothing further.

11              THE COURT:  Thank you.

12              MS. ATWAL:  Oh, wait.  I'm sorry.  One more

13   question.

14              THE COURT:  All right.  That's fine.

15   BY MS. ATWAL:

16   Q.  And, Mr. Wilson, if the Court finds that he has violated

17   the conditions of supervised release, his advisory guideline

18   range is four to ten months, correct?

19   A.  Correct.

20   Q.  Thank you.

21              MS. ATWAL:  I have nothing further, Your Honor.

22              THE COURT:  All right.  You may step down, Officer

23   Wilson.  Thank you.

24              Do you have any other witnesses to call,

25   Ms. Allyn?

1          MS. ALLYN:  No, Your Honor.  Thank you.

2          THE COURT:  Do you have any witnesses to call,

3     Ms. Atwal?

4          MS. ATWAL:  Your Honor, against my advice,

5     Mr. Ivers wishes to take the stand.

6          THE COURT:  All right.

7          Now, Mr. Ivers, you understand that you've got the

8     right to remain silent, right?

9          THE DEFENDANT:  That's correct.

10          THE COURT:  And you understand that anything you

11     say can and will be used against you.

12          THE DEFENDANT:  Yes.

13          THE COURT:  And you also understand that if you

14     testify in response to direct examination, that Ms. Allyn

15     will have the opportunity to cross-examine you.

16          Do you understand that as well?

17          THE DEFENDANT:  That's correct.

18          THE COURT:  Okay.  Then please raise your right

19     hand.

20

21          **ROBERT PHILIP IVERS, DEFENDANT, SWORN**

22          THE DEFENDANT:  I do.

23          THE COURT:  All right.

24          THE DEFENDANT:  And I'm borderline diabetic.  I

25     suffer from a very dry throat.  Could I get some of your

```
 1    water, please?

 2              THE COURT:  Absolutely.  Actually, my water has

 3    gone dry as well, but is there any at counsel table?

 4              MS. ATWAL:  No.

 5              THE COURT:  There isn't.  You know what?  Let's --

 6    we're going to recess for two minutes.  I'm going to run

 7    back and get you some water.

 8              THE DEFENDANT:  Sounds good.  Thank you.

 9    Appreciate it.

10              THE CLERK:  All rise.

11         (Recess taken at 12:26:23 p.m.)

12                        *     *     *     *

13         (12:27:35 p.m.)

14                        IN OPEN COURT

15              THE COURT:  ... but you need to respond to her

16    questions and not just kind of go off and provide a

17    narrative.  So you need to make sure you're responding to

18    Ms. Atwal's questions.  And if there's something else that

19    she wants to ask you, she'll ask you the next question.

20              So if you could observe that question-and-answer

21    format, I would appreciate it.

22              THE DEFENDANT:  Let's start by my prison release,

23    what happened.

24              THE COURT:  Well, let -- actually --

25              MS. ATWAL:  I have to ask the question.
```

1          THE COURT:  Let her start.  She's a wonderful

2     lawyer.  Let her --

3          THE DEFENDANT:  I --

4          THE COURT:  -- take the lead.

5          THE DEFENDANT:  Yes, she is a wonderful lawyer.

6          THE COURT:  All right.

7          THE DEFENDANT:  I was going to say that.

8          THE COURT:  All right.  So listen to her question.

9          MS. ATWAL:  Thank you, Your Honor.

10          THE DEFENDANT:  Okay.

11

12                      **DIRECT EXAMINATION**

13     BY MS. ATWAL:

14     Q.  All right.  Mr. Ivers, can you state your name for the

15     record and your age?

16     A.  Robert Philip Ivers, one "l," P-H-I-L-I-P, I-V, as in

17     victory, E-R-S.

18     Q.  How old are you?

19     A.  66.

20     Q.  Do you have some medical problems?

21     A.  Yes.  I have a --

22     Q.  What are those?

23     A.  -- bulging hernia and I have stage 2 bladder cancer.

24     Q.  Where were you born and raised?

25     A.  I was born and raised in Minnetonka, Minnesota, but we

1    went to the Hopkins school district, and both of them are

2    suburbs of Minneapolis.

3    Q.   Okay.  Let's talk about now when you were released from

4    prison.

5    A.   Yes.

6    Q.   Why is it that you requested to go to North Dakota?

7    A.   When I was released from prison, I was called into an

8    office by three or four prison officials, and they nearly

9    rubber-hosed me.  They said, "Why are you demanding to go to

10   North Dakota?  We insist that you go to Minneapolis.  It's

11   the Bureau of Prisons' policy that you go there.  Get rid of

12   this North Dakota dream.  It's not going to happen.  You're

13   not going to go there."  And I had to fight and argue and

14   kick and scream.

15        And I said, "My car is" -- I had boughten a car

16   just three days before I was arrested, very nice Toyota

17   Camry.

18   Q.   Okay.

19   A.   "My car is there.  I need to renew my driver's license,"

20   which had expired while I was in prison, and I needed to go

21   to the Social Security office and I needed my sister's help

22   and support with regard -- I didn't have a driver's license.

23   She needed to drive me around and I needed to go there to

24   get those three -- those were the three primaries:  car,

25   renew license, and Social Security.

1          Previously from prison, well-documented, had made

2     it extremely clear to Judge Pratt and in his various motion

3     is he states it as well that it was understood in no

4     uncertain terms that I was just going to North Dakota on a

5     very temporary basis until I accomplished those three

6     objectives and then I would be allowed to return home.

7     Q.   Okay.  So let's talk about once you get to North Dakota.

8     Do you get a North Dakota PO?

9     A.   The Bureau of Prisons went way out of their way to do me

10    basically a favor.

11          First of all, my entire life I've never been on a

12    train and wanted to take a train trip and they bought me a

13    train ticket on Amtrak first class, the white table cloth

14    deal, the whole bit.  It was very nice.  I'll never do it

15    again.

16          But I took an Amtrak from Chicago to North Dakota,

17    and within I think that next -- I got in at 4:00 in the

18    morning and that next day I met up with my probation

19    officer.

20    Q.   So, Mr. Ivers, what I want you to try and do is really

21    listen to my question and try and answer my question as

22    direct as you can, okay?

23    A.   Okay.

24    Q.   So you get your North Dakota probation officer.  Were

25    you compliant with your probationary terms with that

1    probation officer?

2    A.  Everything.

3    Q.  Did you remain law abiding?

4    A.  Yes.

5    Q.  Were you able to get your driver's license?

6    A.  Yes.

7    Q.  Were you able to get your Social Security?

8    A.  Yes.

9    Q.  Were you able to get your vehicle?

10   A.  Yes.

11   Q.  At some point did you make a request to come back to

12   Minnesota?

13   A.  Pardon me?

14   Q.  At some point did you make a request to come back to

15   Minnesota?

16   A.  Yes, through Dan Scott we asked for -- I had talked to

17   Jim Weinberger in this period, and he told me, he said

18   after -- just a few days after being at my sister's,

19   actually after accomplishing the Social Security, the car, I

20   called him up and I said, "I'm ready to come home and to

21   conduct business," and he said, "Not so fast.  We're going

22   to keep you there."  And it hurt and it bothered me.  And I

23   said, "Well, what's the plan here?"  And he said, "Well,

24   we're just going to keep you there as long as" -- "until we

25   feel like it."

1          Then that -- that was a wall, so I called up my

2     attorney, Dan Scott, and he filed the motion for a two-day

3     pass to come into town to find a reasonable -- better than

4     reasonable, good solid lodgings for me to stay at that

5     Probation could come and examine and look and okay so that I

6     could be in my hometown and resume my life and conduct my

7     business.

8          So we started by filing the two-day pass to come

9     into town.

10    Q.  Why was it that you wanted to be in Minnesota?

11    A.  It's where I was born and raised.  I have not only -- my

12    poor, dear mentally handicapped brother, last week he was

13    just in Methodist Hospital's psych ward.  He needs me so

14    desperately and he wonders where I am.  I have nieces and

15    nephews and another brother.  I have ten, 15 relatives.

16         My father was born in New Richland, Minnesota.

17    It's my home.  It's where I live.  I had to beg and scream

18    and fight and yell with the Bureau of Prisons to go to North

19    Dakota to get my car.  That's the only reason why I was

20    there, the only, only reason.

21         And three days before I was indicted -- which

22    actually ended up being a false indictment; they had to

23    reindict me two months later because they didn't even get

24    the indictment correct -- I had my car packed and was on my

25    way headed home.  I was actually in three days was going to

1   get on an airplane and go to a Pepsi Cola shareholders

2   convention.  I'm a minor shareholder, but I have a big

3   promotion that I'm going to present to them.  So I was three

4   days away from them showing up.  I was going to get in my

5   car and go back home.

6   Q.  Now, have you -- if you were released today, when is

7   your next court appearance?

8   A.  I see that somebody confused me around here.  It's on

9   either the 13th or 17th of February.

10  Q.  If this Court released you, would you show up?

11  A.  I have never, ever, ever, ever missed a court date in my

12  life.  I like court.  I would crawl across broken glass to

13  get to court.  I've gotten up at 3:00 and 4:00 in the

14  morning to make court appearances.  I've gotten up at 3:00

15  and 4:00 in the morning and rode my bicycle five miles to

16  get on a bus to appear in court.  I don't ever, ever miss my

17  court appointments.

18  Q.  So let's say we're in front of Judge Pratt on March 13th

19  and he finds you in violation.  He could send you back to

20  prison and you could go to prison for four to ten months,

21  maybe longer.

22  A.  That's correct.

23  Q.  How would the Court know that you would still show up

24  knowing that you could go back to prison?

25  A.  Four to ten months is --

1            THE WITNESS:  Judge, I'm 66 years old.  I've had a

2     hard life.  My life has never, ever been in such perfect

3     order.  I have a Toyota Camry.  It's Blue Booked at three

4     thousand.  I got it for 1500.  It's been gone over.  It's

5     just tricked out.  It's beautiful, new tires, new windshield

6     wipers, new battery, full tank of gas, fully insured.  Tabs

7     are on it until the 14th.  I got a couple grand hard cash.

8     I got a sister who's a successful businesswoman.  She can

9     rent me a motel room anywhere in the world with just a phone

10    call for a year.  I could stay at Trump Towers just off her

11    dining card, anywhere.  I have a fantastic support system.

12            There is no reason for me to flee for a rinky-dink

13    little four-month sentence in prison, or even a ten-month

14    sentence.  Why would it take me 16 -- 66 years to finally

15    get my ducks in a row that I would flee over a rinky-dink

16    little four-month.

17            Judge Pratt, my attorney, never, ever let me --

18    every time he saw me he said, "You wanna know what?  This

19    judge is fully within his rights to give you 15 years in

20    prison," and he said, "You get ready for it."  He said, "You

21    square up and get ready."

22            And the prosecution wanted five years.  Judge

23    Pratt gave me 18 months.  Now, that tells you something

24    about what was in his head.  I think he realizes this was

25    just a lame complaint phone call with an attorney.  No

1    judges were ever threatened.  I was never running around.

2    Nobody ever got threatened or contacted.  This was -- my

3    attorney interpreted something that she thought I said.

4          The point I was trying to make is Judge Pratt on

5    the 17th, he might say, "You want to know what?  Just get

6    out of the courthouse and stay out of trouble."  At worst he

7    could say ten months.  So what.  Big deal.

8          Now, my plan -- excuse me.

9          THE COURT:  Well, I think you've probably gotten

10   to the end of that --

11         THE DEFENDANT:  I got one more rant.  My --

12         THE COURT:  Well, I'm not interested --

13         THE DEFENDANT:  My -- my plan --

14         THE COURT:  Hold on, Mr. Ivers.  I'm not

15   interested in a rant.  I'm interested in answers to

16   Ms. Atwal's --

17         THE DEFENDANT:  It's just a sentence.

18         THE COURT:  -- questions.

19         THE DEFENDANT:  It's just a sentence.

20         My plan is to go into Hopkins, get my car, hug my

21   brother, and drive down Flying Cloud Drive to the Best

22   Western motel.  And I need to rub elbows and shmooze and

23   talk with them and I want to do a month-to-month room

24   rental.  And I want to shave down the cost on it by telling

25   them that I don't need all the room service and sheets

1    changed and all this, but I've got to go over there and

2    shmooze with them and talk with them.  I got a pocket full

3    of cash, pull out eight, $900, and I would -- and they'd

4    say, "Yeah."  From that area, which Probation can come --

5    it's a motel room.  There's not going to be anything in it.

6    I don't want my friends in trouble.  I was in prison with

7    guys -- somebody found a civil war gun out in some guy's

8    barn and the guy ended up going into prison because of --

9                MS. ATWAL:  Okay.  Mr. Ivers?

10               THE DEFENDANT:  -- this silly little thing.  I

11   want a hotel room because it's clean.  Probation can come

12   over and anything that's in that room is mine and that's why

13   I want to do it this way.  From that hotel room I will go

14   into town.  Maybe I can rent a nice room above somebody's

15   garage or something.

16               THE COURT:  We've gotten to the end, way past --

17               THE DEFENDANT:  I wanted you to get to know me a

18   little bit.

19               THE COURT:  I understand, but let's leave it to

20   Ms. Atwal to ask the right question pertinent to what we're

21   talking about here.

22   BY MS. ATWAL:

23   Q.  Okay.  Mr. Ivers, so your plan -- you want to stay at a

24   motel in Chaska, is that correct, temporarily?

25   A.  Temporary convenience.

1    Q.  Okay.  Now, if the Court ordered you to stay in a

2    halfway house, would you comply with that condition?

3    A.  I would comply with that condition just as long as they

4    didn't turn it into an enslavement, that I was allowed to --

5    it's standard policy.

6    Q.  Okay.  What I'm asking --

7    A.  I would stay at a halfway house.  My preference would be

8    that they treated me decently and respectfully and said,

9    "Bob, if you want to go out today and look for some

10   lodgings, that's a good idea.  There's nothing wrong with

11   that."

12   Q.  Okay.  Would you promise the Court that you won't use

13   vulgar language or be loud?

14   A.  The only time I -- Mr. Odell, who I like very much, the

15   third, he interpreted it as anger.  I was just -- you can't

16   understand the frustration of being sequestered in North

17   Dakota.  I --

18   Q.  Okay.  Mr. Ivers --

19   A.  I had lawsuits that I've lost because I couldn't get

20   into court.  All of my business, all of my business

21   connections.  The recording studio I work out of.  I need to

22   be with my personal assistant.  I wrote two children's

23   books.  We have to go over them.  I have to go to print

24   shops.  I have five publishers waiting to look at these

25   books.  I can't do it from North Dakota, and I was driven to

1    a breaking point, driven to a breaking point, especially --

2    Q.  Okay.  But let's --

3    A.  -- when I knew Jim Weinberger could say, "Bob, come into

4    town.  Let's have a beer.  Let me get to know you.  Let's

5    talk a little bit."  Instead, he decided I'm going to punish

6    this guy.  I'm going to make him squirm and I'm going to

7    hurt this guy, and that's exactly what took place.

8            THE COURT:  That --

9    Q.  Well, let's --

10           MS. ATWAL:  Sorry, Your Honor.

11           THE COURT:  No, go ahead.  I was just -- get to

12   the next question.

13   BY MS. ATWAL:

14   Q.  Putting that to the side, one of the things the judge

15   has to look at is whether you should be detained or

16   released.  I want to ask you -- I want you to really direct

17   your answers to that factor.

18           If the Court released you to a halfway house,

19   would you follow the directions of those people that are

20   supervising you at that halfway house?

21   A.  Yes.

22   Q.  Would you agree not to raise your voice or scream or be

23   disrespectful as long as people are being respectful to you?

24   A.  Motion number two was to be -- we -- I asked to go --

25   Q.  I'm asking you --

1    A.  Of course.  You want to know why?  I wouldn't be filled

2    with frustration.  I would be home.

3    Q.  Okay.  Now, there was a thing about your driver's

4    license.  This driver's license address you've used, how

5    many years have you been using that address?

6    A.  Maybe six.

7    Q.  For a long time.

8    A.  Yeah.  It's my legal address.

9    Q.  Okay.  Do you also sometimes have a P.O. box?

10   A.  Yes, I have a P.O. box because I wanted something

11   absolutely permanent and something that can't be tampered

12   with.

13   Q.  Okay.  And has your goal always been since you went to

14   prison to reside back somewhere in Hopkins?

15   A.  Absolutely without fail, yes.

16   Q.  Okay.

17           MS. ATWAL:  Thank you.  I have nothing further,

18   Your Honor.

19           THE COURT:  Thank you, Ms. Atwal.

20           Ms. Allyn, any cross-examination?

21           MS. ALLYN:  Just a little.  Thank you, Your Honor.

22

23                      **CROSS-EXAMINATION**

24   BY MS. ALLYN:

25   Q.  Good afternoon, Mr. Ivers.

1    A.   Yeah.

2    Q.   So Probation had previously offered you a chance to

3    reside at a halfway house, but you refused.  Why is that?

4    A.   When?  You're gonna have --

5    Q.   In North Dakota.

6    A.   What would be the point of being in a halfway house at

7    North Dakota?  That's not home.  That's not Minneapolis.

8    Q.   So you refused because you didn't want them to take some

9    of your Social Security money, is that correct?

10   A.   I refused because the object was to leave my sister's.

11   Why would I leave the plush digs, which Odell can confirm,

12   very plush digs at a very nice townhouse, a movie theater

13   basement, why would I leave that to go into a halfway house?

14   Q.   So you're saying you didn't tell the probation officers

15   that you disagreed about going to a halfway house in North

16   Dakota.

17   A.   I -- I cannot remember an exact conversation, but I can

18   tell you this:  When that was suggested, that I told them,

19   "What's the point in that?  Why would I leave my sister's

20   and go into a halfway house when the entire objective was to

21   go home?"

22   Q.   You just talked to Ms. Atwal about how you would be

23   agreeable to a halfway house if it wasn't an enslavement.

24   What do you mean by if it's an enslavement?

25   A.   Where the people running it purposely oppress you, get

1    kicks out of purposely making you squirm where you're -- I

2    want to be treated like a gentleman and with respect, and

3    when I ask, "May I please go out today and look for a home,"

4    I don't want them to say, "We need names, we need addresses,

5    where are you going to be, we need exact locations," because

6    that's how they came off.  And I've talked to other guys in

7    the system and they said, "You shouldn't be treated like

8    that.  That's" -- "that's terrible treatment."  The

9    probation officer should be kind.  They should be gentle.

10   They should say, "God, that's neat that you're doing this.

11   You're going to the recording studio tonight."  Well, I

12   don't think so.  Well, why?  You just want to hurt me?  You

13   want to make me feel bad?

14   Q.  What do you think -- what would you do then if the

15   halfway house told you you couldn't go look for a place to

16   live?

17   A.  Well, then I wouldn't.  I'd call up my attorney and

18   probably bitch.

19   Q.  So what are some other ways that the halfway house would

20   oppress you?

21   A.  Well, they can think those things up.  I'm not going to

22   do it.

23   Q.  Now, you did leave North Dakota on February 9th and

24   travel to Minnesota, is that right?

25   A.  That is correct.

1   Q.  And had Probation given you permission to leave North

2   Dakota that day?

3   A.  I had -- through my attorney --

4   Q.  It's actually super --

5   A.  Through my attorney we contacted Judge Pratt --

6   Q.  Mr. Ivers --

7   A.  We contacted --

8           THE COURT:  Mr. Ivers?  Mr. Ivers?

9   Q.  Mr. Ivers, did Probation --

10  A.  Nobody denied me.  I did not receive a formal denial in

11  the mail saying:  If you come, we will arrest you.  I did

12  not receive a formal denial from the court, and that's what

13  I respect, a formal denial.

14  Q.  Mr. Ivers, did Judge Pratt give you formal permission to

15  leave North Dakota?

16  A.  Judge Pratt was given -- first of all, North Dakota.

17  Q.  No, no.  Did Judge Pratt give you permission to leave

18  North Dakota?  I don't -- I'm not asking about denial.  I'm

19  asking about permission.

20  A.  Judge Pratt had no comment.

21  Q.  And did Probation give you permission to leave North

22  Dakota?  I'm not talking about denial.  I'm talking about

23  permission.

24  A.  No comment.

25          MS. ALLYN:  Thank you, Your Honor.  No further

1    questions.

2              THE COURT:  Thank you.  Ms. Atwal, anything

3    further?

4              MS. ATWAL:  No, Your Honor.

5              THE COURT:  All right.  You may step down,

6    Mr. Ivers.

7              THE WITNESS:  Thank you for the water.

8              THE COURT:  Of course.  In fact, if you want to

9    take it back to the table with Ms. Atwal, you're welcome to

10   do that.

11             Anything further, Ms. Atwal, by way of testimony

12   or evidence?

13             MS. ATWAL:  No, Your Honor.

14             THE COURT:  All right.  Ms. Allyn, I will hear

15   argument on both issues, both probable cause and detention.

16             MS. ALLYN:  Thank you, Your Honor.

17             I believe the testimony of Probation Officer

18   Wilson has firmly established that there is at least the

19   probable cause that conditions of probation have been

20   violated.

21             There was a clear and explicit instruction to

22   Mr. Ivers that he is not to leave the District of North

23   Dakota without permission.  Honestly, that clear instruction

24   has been given since August.  Mr. Ivers has appeared in

25   court.  He's been not denied by Judge Pratt, he's been not

1    denied by the probation officers, and yet he was arrested in

2    Minnesota.

3              With respect to detention, however, we'd like to

4    be heard a little bit more.  Defendant has only been on

5    probation, supervised release, for about six to seven

6    months, and in that entire time he has just tried to bully

7    his way into what he wants, which is not how supervised

8    release works.  Even here today, listening to Mr. Ivers

9    testify, he's trying to do that to this Court and he's

10   trying to do that to the system.  He sat up there talking

11   like, "I want this, I want that, I'm going to go here and

12   get a hotel, I'm going to rub some elbows."  This is not how

13   supervised release works.

14             THE COURT:  I hear you, Ms. Allyn, and I agree

15   with respect to how supervised release is supposed to work,

16   that there are rules and instructions to be followed.

17   Ultimately, it would be for Judge Pratt at the final

18   revocation hearing to decide what the implications of that

19   conduct are.

20             The question I've got to answer today is whether

21   there are conditions of release that would reasonably assure

22   that Mr. Ivers will show up for that final revocation

23   hearing and that will reasonably assure the safety of the

24   community between now and then.  So it's a somewhat more

25   nuanced question than can we count on Mr. Ivers to, you

1    know, follow the rules.  It's about the safety of the

2    community.  So speak to me about that.

3              MS. ALLYN:  Thank you, Your Honor.  I guess the

4    point I was trying to make about that with respect to

5    following the rules, the rules to include how to keep the

6    community safe, is that a person who is willing with such

7    intentionality, such willfulness, to disregard the most

8    simple rules, who is trying to dictate to this Court how he

9    is going to do what he's going to do, is a person who will

10   not follow now your rules to him to show up or to follow the

11   rules of a halfway house.

12             Even listening to Mr. Ivers now, watching his

13   behavior throughout these months -- I assume the Court has

14   read Judge Pratt's orders twice denying him his request to

15   move to Minnesota, of which he has now willfully and

16   intentionally thwarted by coming to Minnesota, that is not a

17   person who's going to follow the rules of a curfew.  There

18   is at least no reason to believe that.  He won't even talk

19   to his probation officer just about changing a battery in

20   the GPS.  That is not a person then who's going to listen to

21   the rules of a halfway house of, "No, today you can't go

22   look for a job, or you can't go look for a place to live."

23   He has given no indication that he can follow those rules.

24   He hasn't had a criminal case like this where he wasn't in

25   custody for federal court.  I don't know his history,

1      actually, in Hennepin County local court.

2              But his such adamant, monofocused desire to be in

3      Minnesota, is willing to take matters into his own hands the

4      way he did despite explicit instructions in two orders from

5      Judge Pratt, should alarm this Court.  That to leave him out

6      in the community right now till March 13th, we have no idea,

7      really, how he'll behave.  As that March 13th date gets

8      closer and closer and he thinks his freedom might be

9      restricted again, or evidently in his mind worse, sent back

10     to North Dakota, his behavior could escalate.  His inability

11     to follow those rules will escalate, because he will want to

12     do what he wants to do at the time and a place that he

13     desires it.

14             And I want to speak to this idea of the safety of

15     the community with respect to the arguments that we heard

16     from Mr. Ivers, that somehow he hasn't really done anything,

17     that he's not physical.  Well, Your Honor, as somebody who

18     tried Mr. Ivers for the threats against a district court

19     judge of this district, I can promise you that just words

20     are their own weapon and words cause their own harm, and

21     that is something Mr. Ivers is very capable of doing, and

22     I'd ask you to listen to Exhibit 2 just to fully understand

23     that.  His level of anger and animosity and complete

24     inability to control his anger -- and I'm not even sure it's

25     inability, but certainly his complete disregard,

1    unwillingness to even control his anger if his anger will

2    get him what he wants, and that is what he will do if he's

3    released.  He'll do it either to the halfway house, he will

4    lash out to the Court, or he'll lash out to attorneys.

5            We're just asking that Mr. Ivers remain in custody

6    for Judge Pratt to make many of these decisions and

7    analysis, like you said, even with respect to really what is

8    his ability to even behave on supervised release.  But it is

9    that pattern of him deciding to do what he wants when he

10   wants to do it is what should alarm the Court about how he

11   would behave as that March 13th date gets closer and closer

12   and he thought he wasn't going to get what he wanted.  He

13   would take matters into his own hands, which is exactly what

14   he did when he drove here on February 9th, and there is no

15   sense of security that he wouldn't do that again as

16   March 13th approaches.

17           Thank you, Your Honor.

18           THE COURT:  Thank you, Ms. Allyn.

19           Ms. Atwal.

20           MS. ATWAL:  Thank you, Your Honor.

21           Respectfully, Your Honor, as the Court knows, I am

22   asking that the Court release Mr. Ivers pending his final

23   revocation, and Rule 32.1(a)(6) says it's my burden to show

24   the Court by clear and convincing evidence that Mr. Ivers is

25   not a risk to flee or a danger to any person or the

1      community.  And I will tell the Court pursuant to 3142(b)

2      and (c) and 3142(a)(1) that burden has been met.

3               Let me first address the flight factors.

4               He is not a risk to flee.  As the Court heard

5      testimony from USPO Odell Wilson and from Mr. Ivers himself,

6      he's been a lifelong resident of Minnesota.  He has

7      siblings, he has nieces and nephews, he has everything here

8      in Minnesota.  In fact, we wouldn't be here today had it not

9      been for his ties to Minnesota, because the whole crux of

10     this whole issue is his need and want to be in Minnesota.

11     Well, guess what?  He's sitting in a courthouse in St. Paul,

12     Minnesota.  He is home.

13              When his probation officer when the Bureau of

14     Prisons was looking into him living in North Dakota, his

15     sister at that time said yes, he can live here, but on a

16     temporary basis, not forever.  So again, the goal has always

17     been for Mr. Ivers to be home.  So when the Government says

18     he wants his way and he bullies and he doesn't listen, the

19     whole thing has been to get him here to Minnesota because of

20     his ties here to this state.

21              What we do know is even though he had a GPS

22     tracking system on him which could locate him wherever he is

23     in the state, the Government knew exactly where he was

24     going.  Probation was monitoring that system and they knew

25     when he came into Minnesota, and they knew where to go to

1   tell people to go arrest him.  And when he was arrested

2   outside of his brother's home in his vehicle, he didn't

3   attempt to flee.  There was no allegations he tampered with

4   his GPS.  In other words, it's showing that he is somebody

5   that is not trying to hide.  He's not trying to flee.  And

6   in fact, as stated in Defense Exhibit 1, he filed a notice

7   on ECF and said:  Guess what, everybody?  I'm coming to

8   Minnesota, and he did exactly that.

9           Now, again, regardless of whether there was a

10  denial or there was permission, the fact is he said he's

11  coming to Minnesota.  That's where he came.  There is not --

12  there's clear and convincing evidence to show that he will

13  not flee and he will show up for court on March 13th.

14          I think of concern, what I'm gathering from the

15  Government's argument and what Probation certainly said,

16  there was an issue about safety.  So even looking at the

17  offense itself, it is true that even verbal threats can be

18  dangerous.  In fact, that's what he was convicted of.  But

19  let's look at his behavior during that investigation of that

20  case.

21          Even though the U.S. Marshals had knowledge that

22  he was right here in Minnesota, there was no indication he

23  attempted to travel or make contact with the victim.  Even

24  since his conviction, since he's been out of prison, there's

25  no indication he's attempted to come to the courthouse to

1    meet with the victim, go to the victim's residence, make any

2    type of phone calls.  There's no allegations of any new

3    threats.  In other words, whatever this offense conduct was

4    that convicted him, it certainly has not been repeated while

5    he's been out of custody.

6          Looking back at his records, there's no indication

7    he has any type of violence.  In the home inspection,

8    there's no indication that there was anything threatening or

9    alarming or anything of concern such that it would raise red

10   flags that he's a danger to the public.

11         And we know from the October 4th, 2019 hearing in

12   front of Judge Pratt, his PO said he's completed -- or is

13   going to mental health counseling.  "He comes to my office.

14   I go to his home."  He has been compliant in every such way.

15   That is a very big factor.

16         So when you look at the safety issues, we see

17   someone who has been convicted of a very serious crime.

18   There's no indication he's engaged in that kind of behavior.

19   Yes, Mr. Ivers is loud and yes, as evidenced by Government's

20   Exhibit 2, he uses vulgar language, but that does not mean

21   he's a danger to his community, and it does not mean that he

22   will not attend court when he is supposed to.

23         Your Honor, there is plenty of clear and

24   convincing evidence before the Court not only because he

25   didn't cut off the GPS, not only because he gave notice that

1     he was coming to Minnesota, not only because he was arrested

2     right here in Minnesota in Hopkins, exactly where he said he

3     would be.  It's also because this is where he's always

4     wanted to be.  He is not a flight risk.  He told the Court

5     himself even if he gets prison time, he will face those

6     consequences.  He's not going to run.  He's so desperate to

7     be here for so many reasons, the last thing he wants to do

8     is be on the run.  If he wanted to run, if he was that

9     frustrated with Probation, with Mr. Weinberger, it would

10    make sense that when he was denied on January 30th, he would

11    have cut off that bracelet and took off and been a free

12    bird, gone to California, gone to wherever he wanted to, but

13    he didn't do that.  He came back to Minnesota.  I don't know

14    what is more clear and convincing to show that he's not a

15    risk of flight.

16          And again with the safety, the Government has not

17    shown anything to say that he is violent since he's been

18    released from prison, or even prior to him being

19    incarcerated, but between the period he was incarcerated at

20    Sherburne County and while the investigation was going on

21    that he was a danger to the community, during that period of

22    time.  Because again, there was no indication he was making

23    contact with at that time the alleged victim.

24          For those factors, Your Honor, I would submit to

25    the Court I have shown by clear and convincing evidence

1    there are conditions the Court can place, and the conditions

2    I'm asking the Court to do is to place him in a halfway

3    house and that he remain on GPS monitoring, and during that

4    time period he be allowed to do searches for homes or places

5    to live and that he can conduct some of business he spoke to

6    the Court about with permission from the halfway house and

7    with permission from his probation officer.

8              Thank you, Your Honor.

9              THE COURT:  Thank you.

10             Ms. Allyn, anything further?

11             MS. ALLYN:  Your Honor, two points I'd like to

12   make.

13             This defendant did flee.  If we're wondering about

14   if he's a risk of flight, he did flee.  He fled from exactly

15   the place he is absolutely required to be, was told to him

16   by multiple probation officers and the judge overseeing this

17   case more than once, and yet he fled.

18             And this idea that somehow, "I'm where you thought

19   I would be or I said I would be," let's play that out if

20   that was a halfway house.  If he told the halfway house,

21   "Hey, I'm going out to the bar" and they say, "No, you don't

22   get to go" and he's like, "Well, I'm going" and then he went

23   to the bar, does he get to say like, "Well, I told everybody

24   where I was, so how was I disobeying the rules?  I told you

25   where I was."  This is the exact thinking and behavior that

1  if this Court allows him to go to a halfway house, it will

2  only embolden him.  He will have gotten there then almost by

3  brute force, right?  Everybody else telling him no, he did

4  what he wanted, and then there he is.  He ended up at the

5  halfway house when he is actually a risk of flight because

6  he in fact did flee.

7        And as far as safety goes, Your Honor, I would ask

8  the Court to consider this:  What is really the one thing

9  that's in Minnesota that's not in North Dakota?  The victim.

10  Because in North Dakota he has family, just like he has a

11  brother in North Dakota -- or in Minnesota, he has a sister

12  in North Dakota.  He does not have a place to live in

13  Minnesota.  He does in North Dakota.  He does not have

14  business interests.  They're different in Minnesota than

15  North Dakota.  That list can go on and on.  But besides

16  maybe his brother that his sister could drive his brother

17  there for him to visit, the only other thing here then is

18  the victim, and the Government argues what that does is

19  indicate to the Court a safety concern.

20        Thank you, Your Honor.

21        THE COURT:  Thank you.

22        MS. ATWAL:  Your Honor, may I be heard briefly to

23  respond to that last comment?

24        THE COURT:  Of course.  Come on forward.

25        MS. ATWAL:  Your Honor, that is very inaccurate to

1    say the only thing here is the victim in this case.  He has

2    told you he was born and raised here.  He talked about some

3    of his business.  He's talked about having different court

4    appearances.  And if you look through the ECF filings, you

5    see he has a lot of civil lawsuits that were pending also.

6    There is much more than the alleged victim.  And again, if

7    that was his sole target, there would have been contact and

8    there just has not been any of that.  He was born and raised

9    here, this is his home, he has family, he has friends.

10   There's much more here here than there is in North Dakota.

11   And in fact, when you look at the PSI, it doesn't talk about

12   his life in North Dakota.  It talks about his life right

13   here in Minnesota with his nieces, nephews, with his

14   relatives, with his siblings.  And again, the intent always

15   was it was temporary placement in North Dakota.  And he

16   himself told you when he was in prison, he is the one that

17   asked for North Dakota.  If he was that intent on contacting

18   the victim in this case, he would have said, "Yeah, put me

19   in Minnesota."  He didn't say that.  He said, "Put me in

20   North Dakota."  And that is telling, because that is showing

21   again his intent is not to put the community in danger, in

22   particular in this case the victim.

23            Thank you, Your Honor.

24            THE COURT:  Thank you.  I want to take just five

25   minutes, review my notes.  We've had a long session.  I

1    don't think I'll be more than that and I think I've got

2    something starting at 1:15 in any event, but I do want to

3    take five minute to review my notes.  So we will be in

4    recess until 1:05.

5         (Recess taken at 1:00 p.m.)

6                        *      *      *      *

7         (1:12 p.m.)

8                         IN OPEN COURT

9              THE COURT:  Starting with the issue of probable

10   cause, I do find that there is probable cause to support the

11   allegation that Mr. Ivers violated conditions of his

12   supervised release.  Obviously, it will be ultimately up to

13   Judge Pratt to make a finding on the question of whether in

14   fact he did, but there is certainly reason to -- there is

15   probable cause to believe that he did it, and so Mr. Ivers

16   will be moving forward to a final revocation hearing in

17   front of Judge Pratt.

18             On the issue of detention, the burden, as

19   Ms. Atwal acknowledged, is on Mr. Ivers through counsel to

20   persuade me by clear and convincing evidence that there are

21   conditions of release that would reasonably assure his

22   appearance and would reasonably assure the safety of the

23   community.

24             On the question of appearance, I am persuaded that

25   he would show up when he's supposed to show up, but I'm not

1    persuaded that there are conditions of release that would

2    assure the safety of the community and I am going to order

3    Mr. Ivers detained until the final revocation hearing.

4              My reason is that the conditions that have been

5    proposed -- and actually they're really the only conditions

6    that I could possibly have considered, and that's release to

7    a halfway house, but Mr. Ivers has shown that he is either

8    not willing or not able to manage his frustration when he is

9    required to live by rules that he doesn't agree with.  And

10   the rules of a halfway house do have to do with the safety

11   of the community.  The rules require that the residents

12   there comply with those rules even when the residents don't

13   agree with them.  Mr. Ivers' phone calls to his probation

14   officers, among other things, show me that he either isn't

15   able or isn't willing to manage his anger and manage his

16   frustration if he feels like the rules aren't fair, and I

17   believe that's a setup for trouble at a halfway house.  I

18   believe that's a setup for risk.  And when the burden is on

19   Mr. Ivers to convince me by clear and convincing evidence

20   that there would not be danger to the community if he were

21   released on conditions such as those, that burden simply

22   hasn't been met.

23             So I am ordering Mr. Ivers detained until the

24   final revocation hearing and obviously at that time Judge

25   Pratt can take a look at kind of the larger picture of the

1     conditions of supervised release and ultimately make

2     whatever decisions he thinks are appropriate under the

3     circumstances.

4             So I'm going to ask Ms. Allyn to prepare a draft

5     of the order, noting that I've made a finding only on the

6     issue of safety and finding that flight is not the concern

7     here, and I think that concludes our business for now, this

8     afternoon.

9             Anything further for the Government?

10            MS. ALLYN:  No, Your Honor.

11            THE COURT:  Okay.  Ms. Atwal, anything further for

12    Mr. Ivers?

13            MS. ATWAL:  Not at this time, Your Honor.

14            THE COURT:  All right.  We'll be in recess.

15            (Proceedings concluded at 1:17 p.m.)

16                    *      *      *      *

17

18

19

20

21

22

23

24

25

**C E R T I F I C A T E**

I, **TIMOTHY J. WILLETTE,** Official Court Reporter

for the United States District Court, do hereby

certify that the foregoing pages are a true and

accurate transcription from an audio digital

recording of proceedings taken in the

aforementioned matter, to the best of my skill

and ability.


*/s/ Timothy J. Willette*


**TIMOTHY J. WILLETTE, RDR, CRR, CRC**
Official Court Reporter - U.S. District Court
Warren E. Burger Federal Building & U.S. Courthouse
316 North Robert Street - Suite 146
St. Paul, Minnesota  55101
651.848.1224